IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

In re: Chapter 11

Case No. 13-29597-RAM
(Joint Administration Requested)

FLORIDA GAMING CENTERS, INC., *et al.*,[1]

Debtors. /

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING OTHER RELIEF

## BASIS FOR EMERGENCY HEARING

Miami Jai-Alai's immediate use of the Cash Collateral is necessary to maintain and maximize the value of the Debtors' assets during the pendency of these Chapter 11 cases. Absent the use of the Cash Collateral, the Debtors will be unable to operate their businesses in a manner necessary to maintain and maximize the value of their assets for the benefit of their creditors and other parties in interest. Approval of interim use of the Cash Collateral is crucial to maximizing the value of the Debtors' estates. Miami Jai-Alai also respectfully requests that the Court waive the provisions of Rule 9075-1(B), as the relief requested herein is urgent in nature and does not lend itself to advance resolution, and further submits that the relief sought herein satisfies the requirements of Federal Rule of Bankruptcy Procedure 6003(a) and is necessary to avoid immediate and irreparable harm notwithstanding that this Motion is being filed within 21 days of the filing of the petition.

Debtors, Florida Gaming Centers, Inc. ("**Florida Gaming Centers**"), Florida Gaming Corporation ("**Florida Gaming Corp.**"), Tara Club Estates, Inc. ("**Tara**") and Freedom Holding, Inc. ("**Freedom**")(collectively, "**Debtors**" or "**Miami Jai-Alai**"), move this Court (the **"Motion"**) for

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Florida Gaming Corporation (0533), Florida Gaming Centers, Inc. (5893), Tara Club Estates, Inc. (9545), and Freedom Holdings, Inc. (4929).

entry of an order, substantially in the form annexed hereto as **Exhibit "A"** (the **"Interim Order"**): (a) authorizing, on an interim basis pending a final hearing on the Motion (the "**Final Hearing**"), Miami Jai-Alai's use of cash collateral, as defined under 11 U.S.C. § 363 (the **"Cash Collateral"**),[2] pursuant to Bankruptcy Code Sections 105, 361 and 363 and Federal Rules of Bankruptcy Procedure 4001(b) (the **"Bankruptcy Rules"**), and in accordance with the budget annexed as Exhibit A to the proposed Interim Order; (b) approving the form of adequate protection provided to the Pre-Petition Lenders (as defined below) pursuant to section 361 of the Bankruptcy Code; (c) scheduling the Final Hearing to consider entry of a final order authorizing the relief provided in the Interim Order on a permanent basis (the **"Final Order"** and, together with the Interim Order, the **"Cash Collateral Orders"**); and (d) granting related relief. In support of this Motion, the Debtors respectfully state:

## PRELIMINARY STATEMENT

1. Miami Jai-Alai comes before the Court seeking authority to continue to use Cash Collateral based on the following facts:

2. Miami Jai-Alai is one of Miami's oldest institutions. In fact, the first professional Jai-Alai game was played at Miami Jai-Alai in 1926. Over the years, Miami Jai-Alai has been an important part of this growing community. In the early part of 2000, as the popularity of jai-alai waned, it became clear that casino gambling was the key to Miami Jai-Alai's continued viability. In 2008, when Miami-Dade County residents voted to legalize gambling at pari-mutuel sites,

[2] Nothing contained herein shall be construed as a concession or admission by the Debtors that any cash and/or cash equivalents of the Debtors, including, but not limited to, "Cage Cash" is subject to a valid and enforceable lien or security interests, or constitutes Cash Collateral, and the Debtors expressly reserve any and all rights with respect to the same.

Miami Jai-Alai began the process of building a casino that would house the permitted slot machines adjacent to the historic Miami Jai-Alai site.

3. Miami Jai-Alai is now thriving and is a success by every measure but one: its relationship with its lender, a syndicate led by ABC Funding, LLC (**"ABC Funding"**) that provided the $87 million necessary to build the casino. Despite the fact that Miami Jai-Alai built the casino ahead of schedule and made all required payments under the loan, ABC Funding called a number of technical defaults and initiated foreclosure proceedings. It is Miami Jai-Alai's firm belief that ABC Funding's sole interest is owning the casino, and not repayment of its loan.

4. Miami Jai-Alai's use of cash is cricical to its business. If the public perception of the operations is that it does not have sufficient cash to operate it will quickly lose its employees and customer base. The Pre-Petition Secured Parties are fully protected with an equity cushion of more than 30% based on an appraisal performed by an independent appraiser jointly selected by the Pre-Petition Secured Party and the Debtors. Additionally, the Debtors provide for further adequate protection by offering the Pre-Petition Secured Parties a replacement lien to the extent of their lien, if any, as of the Petition Date. Notwithstanding the foregoing, Miami Jai-Alai firmly believes that the cash is free and clear of any liens, as discussed more fully below. Nevertheless, Miami Jai-Alai files this Motion in an abundance of caution.

5. Accordingly, Miami Jai-Alai respectfully submits that the foregoing facts more than justify entry of the Interim Order and Final Order.

## SUMMARY OF PROPOSED INTERIM ORDER

6. Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001, the Debtors set forth herein a concise statement of the relief requested and a summary of the material provisions of the proposed Interim Order:[3]

| | |
|---|---|
| **PROPOSED ADEQUATE PROTECTION** | Replacement Liens only to the extent of a valid, perfected lien pre-petition<br><br>Equity Cushion<br><br>Continued Maintenance and value of the Debtor Operations |
| **USE OF CASH COLLATERAL** | Pursuant to Budget attached to the proposed Interim Order as Exhibit A |

## JURISDICTION

7. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8. The statutory bases for the relief requested herein are, without limitation, sections 105, 361 and 363 of the Bankruptcy Code, Rule 4001(b) of the Bankruptcy Rules and Local Rule 4001-2.

[3] This summary of key provisions of the proposed Interim Order is qualified in all respects by the terms of the proposed Interim Order. In the event of an inconsistency, the terms of the proposed Interim Order shall control. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the proposed Interim Order.

## BACKGROUND

9. On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under Chapter 11 of the Bankruptcy Code in this Court. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or statutory creditors' committee has been appointed in these Chapter 11 cases. A motion for joint administration of the debtors Chapter 11 cases is pending.

10. For a description of the Debtors' business operations and the events leading up to the commencement of these Chapter 11 cases, Miami Jai-Alai respectfully refers the Court to the *Declaration of Daniel Licciardi in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "**Licciardi Declaration**") filed on the Petition Date and incorporated herein by reference.

## DEBTORS' BUSINESS OVERVIEW

11. Florida Gaming Corporation ("**Corp.**") is a corporation that was organized under the laws of the state of Florida. Corp. is a public company registered with the United States Securities and Exchange Commission and is owned by (i) Freedom Holding, Inc. and (ii) shares that are publicly traded. Corp. acts generally as a holding company that owns 100% of Florida Gaming Centers, Inc. ("**Centers**"), a Florida corporation that operates the Miami jai-alai facility, and Tara Club Estates, Inc. ("**Tara Club**"), a Georgia corporation that owns six (6) residential lots in Loganville, Georgia.

12. The Debtors' principal business is owning jai-alai frontons, courts where jai-alai is played, with simulcasting operations in Miami and Ft. Pierce, Florida. It is one of the largest,

if not the largest, jai-alai operator in the world.

13. The Debtors got their start in the jai-alai industry in 1994 when Corp. acquired a jai-alai fronton in Ft. Pierce, Florida. Following the purchase of the Ft. Pierce fronton, Corp. changed its name to Florida Gaming Corporation on March 17, 1994. On January 1, 1997, Corp. purchased jai alai frontons in Ocala, Tampa and Miami, Florida and transferred those frontons along with the Ft. Pierce fronton to Centers. Corp. also entered into the real estate development business in 1997, but has since sold all developed real estate except six (6) residential lots that continue to be owned by Tara Club. On September 4, 1998, Centers sold the Tampa jai alai property and on July 31, 2000, Centers sold the Ocala jai-alai facility.

14. Due to a decline in the jai-alai industry and the need to bring in additional cash flow to the Miami jai-alai fronton, using loans from the Syndicated Credit Facility, as defined below, Corp. opened Casino Miami Jai-Alia in January 2012. The addition includes a 40,000 square foot state of the art casino with 1035 Class III slot machines, an expanded poker room, electronic blackjack, roulette, dominoes, live shows such as concerts and boxing, a new restaurant and three full-service bars.

15. Corp. continues to operate a fronton in Ft. Pierce, Florida and an inactive jai-alai permit for Tampa, Florida. The Ft. Pierce location provides inter-track wagering on interstate simulcasting of horse racing, dog racing, and jai-alai from various tracks and frontons in the United States and within the state of Florida.

16. Corp. maintains its principal office in Miami, Florida and also has an office in Charlestown, Indiana.

17. Collectively, the Debtors employ approximately 500 full-time and part-time hourly and salaried employees.

## PRE-PETITION CREDIT FACILITY

*The Syndicated Credit Facility*

18. On April 25, 2011, Corp. entered into a Credit Agreement (the "**Credit Agreement**") with its wholly owned subsidiary, Centers, with a syndicate of unaffiliated third party lenders, Summit Partners Subordinated Debt Fund IV-A, L.P., Summit Partners Subordinated Debt Fund IV-B, L.P., Canyon Value Realization Fund, L.P., and FS Investment Corporation (collectively, the "**Pre-Petition Lenders**")[4], and ABC Funding, LLC, as administrative agent for the Lenders (the "**ABC Funding**", collectively with the Pre-Petition Lenders, the "**Pre-Petition Secured Parties**"). Pursuant to the Credit Agreement, the Pre-Petition Lenders agreed to make revolving loans available to Centers up to $87,000,000 (the "**Syndicated Credit Facility**") to be used by Centers to pay off existing debt of Centers and Corp., fund the casino project at the Miami jai-alai fronton and for working capital. The use of these funds is strictly governed by a Disbursement Agreement dated April 25, 2011 between Centers and Agent (the "**Disbursement Agreement**").

19. Corp., Tara Club and certain affiliates of Corp. are guarantors (the

[4] However, the "Pre-Petition Lenders" shall be limited to only those entities comprising the syndicate of third party lenders that are parties to the Credit Agreement as of the Petition Date, which upon information and belief, includes: Summit Partners Subordinated Debt Fund IV-A, L.P., Summit Partners Subordinated Debt Fund IV-B, L.P., Canyon Value Realization Fund, L.P., Canyon Value Realization Master Fund, L.P., Canyon Distressed Opportunity Master Fund, L.P., Canyon-GRF Master Fund II, L.P., Locust Street Funding LLC, and JPMorgan Chase Bank, N.A.

"**Guarantors**") of the Syndicated Credit Facility under the Credit Agreement. The Syndicated Credit Facility is allegedly secured by first priority liens and security interests (subject only to certain mortgage liens granted in favor of the County on the Phase I Property and Phase II Property, as described below) (collectively, the "**Alleged Pre-Petition Lender Liens**") granted by the Debtors and certain affiliates of the Debtors to the Pre-Petition Secured Parties, including, but not limited to, all accounts, chattel paper, commercial tort claims, documents, equipment, goods, general intangibles, instruments, inventory, investment property, pledged deposits, letter-of-credit rights and supporting obligations and the real property in Ft. Pierce and Miami (all of the foregoing collateral generally described above, and all proceeds thereof, shall be referred to herein as the "**Pre-Petition Encumbered Assets**").

*The Debtors' Miami-Dade County Debt*

20. In February 2009, in a settlement agreement related to an eminent domain proceeding, Corp. agreed to acquire a total of 10.982 acres of land from Miami-Dade County (the "**County**") in two (2) separate phases and to sell the County a temporary construction easement and 0.492 acres of Centers' Miami property. The purchase price for the acquisition of the 10.982 acres from the County is $16,742,145 (the "**County Debt**").

21. On April 6, 2009, Corp. acquired approximately 2.283 acres (the "**Phase I Property**") from the County for $3,348,429, of which a portion was financed by the County in the amount of $3,013,586. The financing was evidenced by a promissory note executed and delivered by Corp. to the County in the original principal amount of $3,013,586 (the "**Phase I Note**"), which was allegedly secured by a first mortgage lien on the Phase I Property.

22. On June 16, 2011, Corp. acquired the remaining 8.67 acres (the "**Phase II**

**Property**") from the County for $13,393,716, a portion of which was financed by the County in the amount of $12,054,344. The financing was evidenced by a promissory note executed and delivered to County by Corp. in the original principal amount of $12,054,344 (the "**Phase II Note**"), which was allegedly secured by a first mortgage lien on the Phase II Property.

23. The parking lot for the Miami jai-alai facility is located on the Phase I Property and the Phase II Property, which is vital to the operations of such facility.

*The Debtors' Additional Financing*

24. In addition to the Alleged Pre-Petition Lender Liens asserted by the Pre-Petition Secured Parties against certain pre-petition assets of the Debtors, certain other parties have asserted liens and security interests against certain pre-petition assets of the Debtors, including but not limited to the County (collectively, the **"Other Alleged Pre-Petition Liens"**, and the holders of the Other Alleged Pre-Petition Liens, including but not limited to the County, shall be referred to collectively herein as the **"Other Alleged Pre-Petition Lien Holders"**), and may potentially have an interest in the Cash Collateral.

## THE DEBTORS' CASH COLLATERAL

25. As of the Petition Date, the Debtors had approximately $4 Million of cash and cash equivalents. Of this amount, approximately $3 Million consists of "Cage Cash," which the Debtors submit does not constitute Cash Collateral and is excluded from the Syndicated Credit Facility, Alleged Pre-Petition Lender Liens, and Other Alleged Pre-Petition Liens, as more fully discussed below.

26. Accordingly, most of the Debtors' cash would not constitute Cash Collateral. However, in an abundance of caution, due to the immediate need of the Debtors to utilize their

cash and cash equivalents and the irreparable harm that the Debtors would suffer if they were not able to immediately access their cash and cash equivalents, the Debtors file this Motion with respect to all cash and cash equivalents.

## EVENTS LEADING TO THESE BANKRUPTCY FILINGS

27. The filing of these Chapter 11 cases has been brought about by several factors, which over time have resulted in extreme liquidity pressures for the Debtors. The Debtors have had to contend with: (i) delays by the Pre-Petition Secured Parties to fund disbursements consistent with the Disbursement Agreement, resulting in late payments and mechanic liens to be filed against the Debtors' real estate; (ii) ABC Funding preventing Centers from moving funds to Corp. to pay for operating expenses, including without limitation, salaries, accounting expenses, legal expenses and consulting fees; (iii) failure of the Debtors' previous financial advisor to appropriately support the businesses; (iv) recent business expansion into a new market impeding the Debtors' day-to-day cash flow, and (v) extended litigation with the Pre-Petition Secured Parties. Collectively, these issues as well as other factors have caused extreme liquidity pressure for the Debtors.

28. On September 5, 2012, ABC Funding filed a Complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida seeking to foreclose the Mortgage, styled as *ABC Funding, LLC, et al. v. Florida Gaming Centers, Inc., et al.*, Case No. 12-35064 CA 58.

29. On that same day, ABC Funding also initiated a foreclosure action against Florida Gaming in the Circuit Court of the 19th Judicial Circuit in and for St. Lucie County, Florida, styled as *ABC Funding, LLC, et al. v. Florida Gaming Centers, Inc., et al.*, Case No. 56-

2012-CA-003525 AXXXHC. The St. Lucie matter was later transferred to and consolidated with the Miami-Dade matter on May 8, 2013, and is now being heard as one case in the Circuit Court of Miami-Dade County by the Honorable Beatrice Butchko (collectively, the "**ABC Florida Action**").

30. The ABC Florida Action has been heavily contested and litigated for over 11 months, with many complex and unique legal and factual issues addressed along the way.

31. As part of providing financing, ABC Funding required that Corp. and Centers execute a Warrant Agreement on April 25, 2011 (the "**Warrant Agreement**"). The Pre-Petition Lenders are the counterparties and warrant holders under that agreement.[5]

32. In connection with the ABC Action, the Debtors and the Pre-petition Secured Parties, were required to value the Debtor. After protracted litigation over the selection of the investment banker to perform the valuation, Miami Jai-Alai and the Prepetition Secured Party's investment bankers jointly selected Jefferies, LLC ("**Jeffries**") to serve as the selected investment bank to provide financial services to Miami Jai-Alai, including, without limitation, valuation services and reports as required under the terms of the Warrant Agreement.

33. Jefferies ultimately issued its valuation report, valuing Miami Jai-Alai at ***over $180 million***. The valuation was binding on both parties.

34. Based on the foregoing, the Debtors determined that the commencement of these Chapter 11 cases would be the best avenue for maximizing the value of their assets for the benefit of all creditors and parties in interest, while giving the Debtors a chance to successfully

[5] When amounts due under the Warrant Agreements are combined with interest charged under the lending facility, the resulting interest rate is usurious and violates Florida law. The Debtors intend to challenge the Pre-Petition Secured Party's loan on these and other grounds.

reorganize and operate their businesses.

## RELIEF REQUESTED

35. By this Motion, the Debtors seek the entry of the proposed Interim Order, substantially in the form annexed hereto as **Exhibit A**, authorizing, on an interim basis pending the Final Hearing, the Debtors' use of the Cash Collateral, pursuant to sections 105, 361 and 363 of title 11 of the Bankruptcy Code and Bankruptcy Rule 4001(b), and in accordance with the budget annexed as **Exhibit A** to the proposed Interim Order (the "**Budget**"); (b) approving the form of adequate protection provided to the Pre-Petition Secured Parties pursuant to section 361 of the Bankruptcy Code; (c) scheduling the Final Hearing to consider entry of the Final Order; and (d) granting related relief.

36. It is essential to the Debtors' efforts to preserve and maximize the value of their assets that they obtain the authority to use the Cash Collateral in these Chapter 11 cases. The Cash Collateral will be used to pay for expenses incurred by the Debtors in the ordinary course of business and in connection with these Chapter 11 cases. These expenses include, but are not limited to, expenses incurred in connection with the day-to-day operations of the gaming facilities and other required gaming expenses, employee payroll and benefits, rent, payments to utility providers and other expenses incurred in connection with the Debtors' business operations, as well as expenses otherwise necessary in connection with these Chapter 11 cases, including but not limited to, the payment of fees to the United States Trustee and the payment of fees and expenses of certain professionals the Debtors seek to retain in these Chapter 11 cases.

## BASIS FOR REQUESTED RELIEF

### I. MIAMI JAI-ALAI'S REQUEST TO USE CASH COLLATERAL AND THE PROPOSED ADEQUATE PROTECTION ARE APPROPRIATE AND SHOULD BE APPROVED

#### A. *THE CASH IS NOT CASH COLLATERAL UNDER THE DEFINITION IN SECTION 363.*

37. A substantial amount of money in coin and currency is generated through the operation of the casino. This money is maintained by the Debtors and deposited into the casino cage (the "**Cage**"). Once deposited, the money is commingled with all other monies maintained in the Cage and related cash vaults (the "**Cage Monies**") and used in operations day to day, such as the casino tables, slots, floor banks, and change booths. Only the "house money" is deposited into a bank account maintained at Wells Fargo each day. The balance of the funds remain in the Cage to be used on the casino floor.

38. The Cage Monies are not Cash Collateral of the Pre-Petition Secured Parties, as no security interest in the Cage Monies was perfected prior to the Petition Date. The only way to perfect an interest in money is to have actual possession of the money, exept under certain circumstances which are not applicable here. F.S. 679.304(1); *Rus, Miliband &Smith, APC v. Yoo (In re Dick Cepek, Inc.),* 339 B.R. 730, 740 (B.A.P. 9th Cir. 2006). Thus, because the Pre-Petition Secured Parties failed to maintain control and possession over the Cage Monies, they did not have a perfected interest in such Monies.

39. Similarly, the funds generated from jai alai, bar sales, poker and other activities of the Debtors do not do not constitue cash collateral because, among other things, the funds are all deposited into bank deposit accounts at Wells Fargo Bank. The Pre-Petition Secured

Parties have no lien on the accounts and therefore have no perfected security interest in the funds in the accounts.

40. The Security Agreement executed by the Debtors in favor of the Pre-Petition Lenders provides for a security interest in "proceeds" of the collateral. However, the term "proceeds" does include revenues generated from a casino or jai alai. The term "proceeds" means proceeds from the "sale, exchange or other dispensatation of other encumbered property." *In re Bering Trader, Inc.*, 944 F.2d 500, 502 (9th Cir. 1991). Here, the proceeds are money generated by the customers' daily *use* of the gaming equipment, and not the sale, exchange or other dispensation of the equipment.

41. In *S&J Holding Corp.*, 42 B.R. 249 (Bankr. S.D.Fla.1984), the Bankruptcy Court for the Southern District of Florida held that cash obtained through the debtor's video game machines were not proceeds of other collateral under the definition of proceeds in the Uniform Commercial Code. Specifically, the Court held as follows:

> The video game equipment is collateral under the security agreement in question. But the cash which is generated through that equipment is not received from the sale of the collateral, but rather, throught the use of it. It is more analogous to income generated through the use of, for example, construction equipment, which is given as collateral. The fact that the money was earned through the use of the collateral does not make it "proceeds" subject to the protection of [the UCC]. *Id.* At 250 (emphasis added).

The *S&J* Court held that the debtor held the cash free from all security intersts.

42. Similarly, in *Value-Added Communication, Inc.*, a security agreement granted a creditor a security interest in an inmate telephone system as well as all "proceeds" arising from the equipment. *CLE Equip. Co. v. Brewer (Matter of Value-Added Communications,*

*Inc.*), 139 F.3d 543, 544 (5th Cir. 1998). The Court held that the coins generated from the prisoners each time they used the telephone system were not deemed "proceeds" under the UCC definition. The Court determined that "the funds collected from the prisoners were the product of the use of the equipment. Use is not a disposition of the collateral wihin the meaning of the definition of 'proceeds'." *Id. citing Kingsley v. First Am. Bank of* Casselton (In re Kingsley, 865 F.2d 975, 980-1 (8th Cir. 1989).

43. Similarly, the cash generated from the casino and jai alai, including the Cage Monies, do not constitute "cash collateral" within the meaning of 11 USC § 363.

**B. *THE PRE-PETITION SECURED LENDERS ARE ADEQUATELY PROTECTED.***

44. Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Further, section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code. One means of adequate protection is providing for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property. 11 U.S.C. § 361.

45. Adequate protection must be determined on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to

protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *4 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Production Credit Assoc. & Federal Land Bank*, 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

46. The Debtors submit that the terms and conditions of the proposed Cash Collateral Order has been carefully designed to meet the dual goals of sections 361 and 363 of the Bankruptcy Code. If the proposed Cash Collateral Order is entered by this Court, the Debtors will have necessary funds to operate their businesses and thus, maximize the value of their assets for the benefit of the Debtors' estates and their creditors. At the same time, the Pre-Petition Secured Parties and any Other Alleged Pre-Petition Lien Holders will be adequately protected with respect to any actual diminution in value of their interest, if any, in the Cash Collateral.

47. Among other things, the proposed Interim Order provides that, as adequate protection for the use of the Cash Collateral, to the extent of any actual diminution in value of the interests of the Pre-Petition Secured Lenders or any Other Alleged Pre-Petition Lien Holder in their respective pre-petition collateral as a result of the Debtors' use of the Cash Collateral, the Pre-Petition Secured Lenders or any such Other Alleged Pre-Petition Lien Holder will be granted replacement liens in the Debtors' post-petition assets to the extent that the post-petition assets are the same as the applicable pre-petition collateral that is allegedly encumbered by the

applicable Alleged Pre-Petition Lender Liens or any Other Alleged Pre-Petition Liens and further provided that the Pre-Petition Secured Parties or any such Other Alleged Pre-Petition Lien Holder had a valid, properly perfected, enforceable and non-avoidable lien in and to the Debtors' assets prior to the Petition Date (the **"Replacement Liens"**).

48. As provided in the proposed Interim Order, any Replacement Lien will only extend to those assets of the Debtors that were specifically encumbered pre-petition by the applicable Alleged Pre-Petition Lender Liens or Other Alleged Pre-Petition Liens and will not extend to any other asset of the Debtors not previously encumbered pre-petition by such applicable Alleged Pre-Petition Lender Liens or Other Alleged Pre-Petition Liens. Further, the proposed Interim Order provides that Replacement Liens will be subject to all other validly and properly perfected, pre-petition liens in favor of third parties. The Replacement Liens will also have the same priority with respect to post-petition assets as the liens have with respect to pre-petition assets.

49. Based on the Jeffries Valuation binding on both the Prepetition Secured Parties and the Debtors, the Debtors are valued at $180,000,000. The total amount owed to the Prepetition Secured Parties is approximately $128,000,000. Therefore, the Prepetition Secured Parties have a significant equity cushion of more than $50,000,000 or 30%.

50. The Debtors respectfully submit that the use of the Cash Collateral on the terms set forth in the attached proposed Interim Order provides the Pre-Petition and any Other Alleged Pre-Petition Lien Holders with adequate protection and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. In the absence of entry of the proposed Interim Order by this Court and interim authority to use the

Cash Collateral, the continued operation of the Debtors' businesses would not be possible, causing serious and irreparable harm to the Debtors and their estates.

51. Accordingly, the Debtors' use of the Cash Collateral pending entry of any further order by this Court with respect to the use of the Cash Collateral following the Final Hearing should be authorized by this Court.

### C. *FAILURE TO USE CASH COLLATERAL IMMEDIATELY WOULD CAUSE IRREPARABLE HARM TO THE DEBTORS*

52. In the event that the Debtors were denied the use of Cash Collateral for even a short period of time it would close down Miami Jai Alai. Among other things, the employees would quit, the public would lose faith in the operations, and there would be no cash to use on the casino floor. The operations are open 24 hours a day, seven days a week. Any interruption of that schedule would undermine the credibility of the operations.

53. The Debtors' use of the Cash Collateral is necessary to maintain and maximize the value of the Debtors' assets during the pendency of these Chapter 11 cases. Absent the use of the Cash Collateral, the Debtors will be unable to operate their businesses in a manner necessary to maintain and maximize the value of their assets for the benefit of their creditors and other parties in interest. Approval of interim use of the Cash Collateral is crucial to maximizing the value of the Debtors' estates.

54. Rule 4001(b) of the Bankruptcy Rules permits this Court to approve the Debtors' request for use of the Cash Collateral during the 14-day period following the service of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P.

4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 449 (D. Co. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bank S.D.N.Y. 1990). After the 14-day period, the request for use of the Cash Collateral is not limited to those amounts necessary to prevent destruction of the Debtors' businesses, and the Debtors are entitled to use the Cash Collateral that they believe prudent in the operation of their businesses. *See, e.g., Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

55. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that this Court conduct an interim hearing and authorize the Debtors to use, on an interim basis, the Cash Collateral in accordance with the Budget and the terms and provisions of the proposed Interim Order in order to maintain and finance the ongoing operations of the Debtors and avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest.

56. The Debtors request authority to use the Cash Collateral to pay all fees payable to the United States Trustee under 28 U.S.C. § 1930 as and when due. The foregoing fees shall be a carve-out from any lien on Cash Collateral, including any Replacement Liens.

57. Subject to further orders of this Court upon interim and final fee applications under sections 330 and 331 of the Bankruptcy Code, the Debtors request authority to use the Cash Collateral to compensate retained professional persons pursuant to any duly executed order of this Court through termination of the Debtors' authority to use the Cash Collateral under the Interim Order. Upon entry of the Order and on the first day of each month thereafter the Debtors shall deposit the sum allocated for the U.S. Trustee fees and any professional fees for the Debtor and any Committee appointed in this Chapter 11 Case in the

trust account of Salazar Jackson, LLP, as counsel for the Debtors, to be distributed to the U.S. Trustee when due and payable and to the professionals upon entry of a Bankruptcy Court order so authorizing.

## Request For Final Hearing

58. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that this Court set a date for the Final Hearing as soon as practicable.

## Notice

59. No trustee or examiner has been appointed in these cases. Notice of this Motion has been given to (i) the Office of the United States Trustee for the Southern District of Florida; (ii) the Debtors' 20 largest unsecured creditors on a consolidated basis; (iii) the Florida Division of Pari-Mutuel Wagering and, (iv) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors including: ABC Funding, LLC, as administrative agent; Summit Partners Subordinated Debt Fund IV-A, L.P.; Summit Partners Subordinated Debt Fund IV-B, L.P.; Canyon Value Realization Fund, L.P.; Canyon Value Realization Master Fund, L.P.; Canyon Distressed Opportunity Master Fund, L.P.; Canyon-GRF Master Fund II, L.P.; Locust Street Funding LLC; JPMorgan Chase Bank, N.A.; and Miami-Dade County, Florida and their respective counsel if known. In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

WHEREFORE, the Debtors respectfully request that this Court enter the proposed Interim Order, substantially in the form attached hereto **as Exhibit A,** (a) authorizing the Debtors to use the Cash Collateral; (b) granting and affirming the adequate protection to be given

to the Pre-Petition Secured Parties and the Other Alleged Pre-Petition Lien Holders; (c) scheduling the Final Hearing to consider entry of the Final Order on substantially the same terms as the proposed Interim Order; and (d) granting such other and further relief as this Court deems appropriate.

Dated: August 19, 2013

Respectfully submitted,

SALAZAR JACKSON, LLP
*Proposed Counsel for Miami Jai-Alai*
Two South Biscayne Boulevard, Suite 3760
Miami, FL 33131
Telephone: (305) 374-4848
Facsimile: (305) 397-1021
Email: Salazar@SalazarJackson.com
Jackson@SalazarJackson.com
Honaker@SalazarJackson.com

By: /s/Luis Salazar
Luis Salazar
Florida Bar No. 147788
Linda Worton Jackson
Florida Bar No. 843164
Aaron P. Honaker
Florida Bar No. 48749

the Final Order on substantially the same terms as the proposed Interim Order; and (d) granting such other and further relief as this Court deems appropriate.

Dated: August 19, 2013

Respectfully submitted,

SALAZAR JACKSON, LLP
*Proposed Counsel for Miami Jai-Alai*
Two South Biscayne Boulevard, Suite 3760
Miami, FL 33131
Telephone: (305) 374-4848
Facsimile: (305) 397-1021
Email: Salazar@SalazarJackson.com
Jackson@SalazarJackson.com
Honaker@SalazarJackson.com

By: /s/Luis Salazar
Luis Salazar
Florida Bar No. 147788
Linda Worton Jackson
Florida Bar No. 843164
Aaron P. Honaker
Florida Bar No. 48749

# EXHIBIT A

## PROPOSED INTERIM ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

In re: Chapter 11

Case No. 13-____________ (___)
(Joint Administration Requested)

FLORIDA GAMING CENTERS, INC., *et al.*,[6]

Debtors. /

**INTERIM ORDER GRANTING MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING OTHER RELIEF**

This matter came before the court on August __ 2013 (the "**Interim Hearing**") upon the *Emergency Motion of Debtors for Orders (I) Authorizing Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Other Relief* (the "**Motion**") Upon consideration of the Motion the argument of counsel and the record, and after due deliberation and consideration, this Court hereby finds:

A. On August 19, 2013 (the "**Petition Date**"), the Debtors filed a voluntary petition for relief with this Court under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. A motion for joint administration of the Debtors' Chapter 11 cases are pending.

[6] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Florida Gaming Corporation (0533), Florida Gaming Centers, Inc. (5893), Tara Club Estates, Inc. (9545), and Freedom Holdings, Inc. (4929).

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and this matter constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

C. The Debtors properly served notice of the Motion and the Interim Hearing thereon pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001,[3] which notice was sent to among others: (i) the United States Trustee for the Southern District of Florida; (ii) all counsel of record; (iii) the Debtors' 20 largest unsecured creditors; (iv) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, including the Pre-Petition Secured Parties[7] and the Other Alleged Pre-Petition Lien Holders (each as defined hereafter); (v) all agencies requiring notice; (vi) all agencies that regulate the Debtors' business; and (vii) the United States Trustee. This notice is appropriate in the particular circumstances and is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules and Local Bankruptcy Rules in respect to the relief requested.

D. The Debtors have requested authorization to use cash collateral (the "**Cash Collateral**") to pay for expenses incurred by the Debtors in the ordinary course of business and in connection with this Chapter 11 case, as further described in the Motion. The Debtors' ability to finance their business operations pending entry of a final order on the Motion (a **"Final Order"**) is essential to the Debtors' ability to preserve the value of the Debtors' assets.

---

[3] As used herein, the Federal Rules of Bankruptcy Procedure are referred to as the "Bankruptcy Rules."

[7] All Capitalized Terms not described herein shall have the meaning ascribed to them in the Motion.

E. The Debtors' need for use of the Cash Collateral is immediate, and the Debtors have requested immediate entry of this Interim Order. In the absence of entry of this Interim Order and authority to use the Cash Collateral for the period concluding on the date that this Court enters a further order regarding the use of the Cash Collateral following the final hearing on the Motion (the **"Final Hearing"**), the continued operation of the Debtors' businesses would not be possible, causing serious and irreparable harm to the Debtors and their estates.

F. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, provide the Debtors with the necessary liquidity to sustain the operation of the Debtors' businesses. If the Debtors are not able to use the Cash Collateral as provided herein, they may be unable to fund operating expenses and expenses in connection with this Chapter 11 case that are necessary to maintain the value of the Debtors' estates and to enable the Debtors to attempt to maximize recoveries for all parties in interest.

Based upon the foregoing findings and conclusions, and good and sufficient cause appearing therefore, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1. The Motion is granted on an interim basis on the terms set forth in this Interim Order. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn, and all reservations of rights contained therein, are overruled on the merits. The requirements of Bankruptcy Rule 4001(b)(2) are satisfied with respect to the use of the Cash Collateral on an interim and preliminary basis pending the Final Hearing on the Motion.

2. The Debtors are authorized to use the Cash Collateral until the entry of a further order by this Court regarding the use of the Cash Collateral following the Final Hearing (the

**"Interim Cash Collateral Period"**), subject to the terms and conditions set forth in this Interim Order.

3. The Debtors may use the Cash Collateral to pay the expenses incurred by the Debtors in the ordinary course of business and in connection with this Chapter 11 case, as outlined in the budget (the **"Budget"**) attached hereto as **Exhibit A.**

4. As adequate protection for the Debtors' use of the Cash Collateral, to the extent of any actual diminution in value of the interests of the Lender or any Other Alleged Pre-Petition Lien Holder in its respective pre-petition collateral as a result of the Debtors' use of the Cash Collateral, the Lender or such Other Alleged Pre-Petition Lien Holder is hereby granted replacement liens in the Debtors' post-petition assets to the extent that the post-petition assets are the same as the applicable pre-petition collateral that is allegedly encumbered by the applicable Lender Alleged Liens or Other Alleged Pre-Petition Liens and further provided that the Lender or any such Other Alleged Pre-Petition Lien Holder had a valid, properly perfected, enforceable and non-avoidable lien in and to the Debtors' assets prior to the Petition Date (the **"Replacement Liens"**). Any Replacement Lien shall only extend to those assets of the Debtors that were specifically encumbered pre-petition by the applicable Lender Alleged Lien or Other Alleged Pre-Petition Lien and shall not extend to any other asset of the Debtors not previously encumbered pre-petition by such applicable Alleged Pre-Petition Lender Lien or Other Alleged Pre-Petition Lien. The Replacement Liens shall be subject to all other validly and properly perfected, pre-petition liens in favor of third parties. The Replacement Liens shall have the same priority with respect to post-petition assets as the liens have with respect to pre-petition assets.

5. The Replacement Liens, significant equity cushion and the continuation of the Debtors' business operations shall constitute sufficient adequate protection for the Prepetition Lender and any Other Alleged Pre-Petition Lien Holders under sections 361 and 363 of the Bankruptcy Code.

6. Notwithstanding any other provision in this Interim Order, this Court makes no determination as to the amount, extent, validity, perfection, priority and/or enforceability of the Pre-Petition Debt, the Alleged Pre-Petition Lender Liens or any Other Alleged Pre-Petition Liens. Further, nothing contained in this Interim Order shall be construed as a concession or admission by the Debtors that the Alleged Pre-Petition Lender Liens or any Other Alleged Pre-Petition Liens are valid and enforceable against the Debtors or a concession or admission as to the amount of the Pre-Petition Debt.

7. This Interim Order is not intended nor shall it be construed as a waiver or limitation in any way by the Debtors of any rights or remedies under the Bankruptcy Code or other applicable law which it may have, nor shall this Interim Order limit the Debtors' right to request use of the Cash Collateral in the future.

8. The Debtors shall be authorized to use the Cash Collateral to pay all fees payable to the United States Trustee under 28 U.S.C. § 1930 as and when due. The foregoing fees shall be a carve-out from any lien on Cash Collateral, including any Replacement Liens.

9. Subject to further orders of this Court upon interim and final fee applications under sections 330 and 331 of the Bankruptcy Code, the Debtors are authorized to use the Cash Collateral to compensate retained professional persons pursuant to any duly executed order of this Court through termination of the Debtors' authority to use the Cash Collateral under this

Interim Order. Upon entry of this Order and on the first day of each month thereafter the Debtors shall deposit the sum allocated for the U.S. Trustee fees and any professional fees for the Debtor and any Committee appointed in this Chapter 11 Case in the trust account of Salazar Jackson, LLP, as counsel for the Debtors, to be distributed to the U.S. Trustee when due and payable and to the professionals upon entry of a Bankruptcy Court order so authorizing.

10. The Final Hearing on the Motion is scheduled for **_______________, 2013 at __:___ __.m. (prevailing Eastern time)** before the Honorable __________________________, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Florida, Claude Pepper Federal Building, 51 S.W First Avenue, Miami Florida 33130, at which time any party in interest may appear and state its objections, if any, to the relief requested in the Motion. Objections shall be in writing and shall be filed with the Clerk of the Bankruptcy Court with a copy served upon (a) counsel for the Debtors, Luis Salazar and Linda Worton Jackson, Salazar Jackson, LLP 2 South Biscayne Boulevard, Suite 3760, Miami, Florida 33131 (b) the Office of the United States Trustee for the Southern District of Florida, 51 S.W First Avenue, Miami Florida 33130, Suite 1204, Miami, Florida 33130; and (c) any other parties requesting notice in this Chapter 11 case, so as to be received on or before **4:00 p.m. (prevailing Eastern time) on ______________________, 2012** (the **"Objection Deadline"**). Any objections by creditors or other parties in interest to any of the provisions of this Interim Order shall be deemed waived unless filed and served as set forth herein prior to the Objection Deadline. Counsel for the Debtors shall promptly serve a copy of this Interim Order on the parties that received notice of the Motion and Interim Hearing and those parties requesting notice in this Chapter 11 case.

11. Except as otherwise provided herein, or as otherwise ordered by this Court, the terms of this Interim Order shall be valid and binding upon the Debtors, all of their creditors, and all other parties in interest from and after the date of this Interim Order.

12. The relief granted in this Interim Order is effective *nunc pro tunc* to the Petition Date.

13. This Interim Order shall be deemed effective immediately and, for the avoidance of doubt, Federal Rule of Bankruptcy Procedure 6004(h) shall not apply hereto.

###

Submitted by:
Luis Salazar, Esq.
SALAZAR JACKSON, LLP
2 South Biscayne Boulevard
Suite 3760
Miami, Florida 33131
Phone: (305) 374-4848
Fax: (305) 397-1021
Email: Salazar@SalazarJackson.com

(Attorney Salazar shall serve a copy of this Order upon all interested parties upon receipt and file a certificate of service.)

# EXHIBIT "A"

**Florida Gaming Centers, Inc.**
Cash Flow Projections
16 Week period August 24 - December 7, 2013

| | ACTUAL W/E 8/17/2013 | FORECAST W/E 8/24/2013 | FORECAST W/E 8/31/2013 | FORECAST W/E 9/7/2013 | FORECAST W/E 9/14/2013 | FORECAST W/E 9/21/2013 | FORECAST W/E 9/28/2013 | FORECAST W/E 10/5/2013 | FORECAST W/E 10/12/2013 | FORECAST W/E 10/19/2013 | FORECAST W/E 10/26/2013 | FORECAST W/E 11/2/2013 | FORECAST W/E 11/9/2013 | FORECAST W/E 11/16/2013 | FORECAST W/E 11/23/2013 | FORECAST W/E 11/30/2013 | FORECAST W/E 12/7/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash receipts** | | | | | | | | | | | | | | | | | |
| Net slot receipts | 1,324,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,125,000 |
| Card room receipts | | | | | | | | | | | | | | | | | |
| Miami | 143,573 | 119,539 | 119,539 | 119,539 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 | 123,200 |
| Ft Pierce | 74,158 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Pari-mutuel receipts | | | | | | | | | | | | | | | | | |
| Miami | 48,308 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 | 39,600 |
| Ft Pierce | 54,423 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 |
| DFS payments | 74,817 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 | 61,600 |
| Transfer from jackpot | | | | | | | | | | | | | | | | | |
| DFS commission | | 64,240 | | | | | 64,240 | | | | 64,240 | | | | 64,240 | | |
| Food, beverage & other | 9,353 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Total cash receipts | 1,728,632 | 1,563,979 | 1,499,739 | 1,499,739 | 1,503,400 | 1,503,400 | 1,567,640 | 1,503,400 | 1,503,400 | 1,503,400 | 1,567,640 | 1,503,400 | 1,503,400 | 1,503,400 | 1,567,640 | 1,503,400 | 1,503,400 |
| **Cash disbursements** | | | | | | | | | | | | | | | | | |
| State casino taxes | | | | 1,900,000 | | | | 1,900,000 | | | | 1,900,000 | | | | 1,900,000 | |
| State and local slots & pari-mutuel taxes | | - | 83,984 | 72,690 | - | 79,200 | - | 74,800 | - | 79,200 | - | 74,800 | - | 79,200 | - | 74,800 | - |
| State gaming license | | | | | | | | | | | | | | | | | |
| Payroll | 255,093 | 182,396 | 356,486 | 225,280 | 206,800 | 263,120 | 278,960 | 225,280 | 206,800 | 263,120 | 278,960 | 225,280 | 206,800 | 263,120 | 278,960 | 225,280 | 206,800 |
| Payroll taxes | 55,031 | 180,469 | 204,792 | 94,160 | 75,680 | 76,560 | 116,160 | 94,160 | 75,680 | 76,560 | 116,160 | 94,160 | 75,680 | 76,560 | 116,160 | 94,160 | 75,680 |
| Employee benefits | 8,816 | | 110,855 | 1,000 | 10,000 | | 114,400 | 1,000 | 10,000 | | 114,400 | 1,000 | 10,000 | | 114,400 | 1,000 | 10,000 |
| Other taxes | 9,867 | 33,000 | 8,000 | 4,000 | 10,000 | 33,000 | 8,000 | 4,000 | 10,000 | 33,000 | 8,000 | 4,000 | 10,000 | 33,000 | 8,000 | 4,000 | 10,000 |
| Cage checks cleared | 5,686 | | 22,000 | 23,000 | 1,000 | | 22,000 | 23,000 | 1,000 | | 22,000 | 23,000 | 1,000 | | 22,000 | 23,000 | 1,000 |
| Cash orders | 12,400 | 7,000 | 9,000 | 17,000 | | 7,000 | 9,000 | 17,000 | | 7,000 | 9,000 | 17,000 | | 7,000 | 9,000 | 17,000 | |
| Debt service payments | | | | | | | | | | | | | | | | | |
| US Trustee Fee | | | | | | | 13,000 | | | | | | | | | | |
| Gaming equipment rentals | 197,500 | | 50,000 | | 205,000 | | 50,000 | | 205,000 | | 50,000 | | 205,000 | | 50,000 | | 205,000 |
| ITW payments | 17,908 | | 108,000 | 15,000 | 2,000 | | 108,000 | 15,000 | 2,000 | | 108,000 | 15,000 | 2,000 | | 108,000 | 15,000 | 2,000 |
| Utilities | 87,180 | | 80,000 | | | | 80,000 | | | | 80,000 | | | | 80,000 | | |
| Insurance | | | 12,000 | 129,000 | 54,000 | | 12,000 | 129,000 | 54,000 | | 12,000 | 129,000 | 54,000 | | 12,000 | 129,000 | 54,000 |
| Marketing and advertising | 99,722 | 44,000 | 103,000 | 38,000 | 69,000 | 44,000 | 103,000 | 38,000 | 69,000 | 44,000 | 103,000 | 38,000 | 69,000 | 44,000 | 103,000 | 38,000 | 69,000 |
| Corporate transfers | | | | | | | | | | | | | | | | | |
| Professional fees | 363,907 | | | 381,927 | | | 350,000 | 5,000 | | | 250,000 | 5,000 | | | 250,000 | 5,000 | |
| Property taxes | | | | | | | | | | | | | | | | | |
| Bank service charges | 13,273 | | | 13,000 | | | | 13,000 | | | | 13,000 | | | | 13,000 | |
| Other operating expenses | 232,460 | 56,000 | 212,000 | 157,000 | 72,000 | 56,000 | 212,000 | 157,000 | 72,000 | 56,000 | 212,000 | 157,000 | 72,000 | 56,000 | 212,000 | 157,000 | 72,000 |
| Total cash disbursements | 1,358,843 | 502,865 | 1,360,117 | 3,071,057 | 705,480 | 558,880 | 1,476,520 | 2,696,240 | 705,480 | 558,880 | 1,363,520 | 2,696,240 | 705,480 | 558,880 | 1,363,520 | 2,696,240 | 705,480 |
| Net change in cash | 369,789 | 1,061,114 | 139,622 | (1,571,318) | 797,920 | 944,520 | 91,120 | (1,192,840) | 797,920 | 944,520 | 204,120 | (1,192,840) | 797,920 | 944,520 | 204,120 | (1,192,840) | 797,920 |
| Opening balance cash | 745,854 | 1,115,643 | 2,176,757 | 2,316,379 | 745,061 | 1,542,981 | 2,487,501 | 2,578,621 | 1,385,781 | 2,183,701 | 3,128,221 | 3,332,341 | 2,139,501 | 2,937,421 | 3,881,941 | 4,086,061 | 2,893,221 |
| Closing balance cash | 1,115,643 | 2,176,757 | 2,316,379 | 745,061 | 1,542,981 | 2,487,501 | 2,578,621 | 1,385,781 | 2,183,701 | 3,128,221 | 3,332,341 | 2,139,501 | 2,937,421 | 3,881,941 | 4,086,061 | 2,893,221 | 3,691,141 |

Assumptions

1. Slot net deposits have increased approximately 20% over deposits at same time in previous year.
This is as the result of marketing and promotional efforts that have drawn a larger customer base throughout Miami-Dade County. The promotional efforts are also drawing away Miami-Dade residents that had formerly gambled at Broward casinos such as the Isle and Hard Rock Casinos. Management expects that revenue will follow the same seasonal patterns as in prior year (1st year of operations - 2012) except with the same 20% net increase over deposits at same time in previous year.

2. Management paid property taxes in the amount of $400,000 in May 2013 and expects to pay remaining balance in months of June - August 2013

3. Gaming tax - slots is payable monthly at 1.5% of slot receipts to City of Miami and 1.5% of slot receipts to Miami - Dade County.

4. DFS receipts represent repayment of cash advances on checks and credit cards that were advanced by the Casino to customers.
Net slot receipts are reported net of the DFS advances.
In addition to the DFS receipts, the Casino also receives a commission from DFS related to the total advances each month.