**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                    **Case No.:  13-29597-RAM**[1]
                                                          (Jointly Administered)

**FLORIDA GAMING CENTERS, INC.**, et al.,

                                                          Chapter 11

            Debtors.

_____/                    **Related to:  ECF No. 8**

**PREPETITION LEDNERS' NOTICE OF LATE FILING**
**OF PAPER PURSUANT TO LOCAL RULE 5005-1(F)(2)**

ABC FUNDING, LLC, as Administrative Agent ("**Agent**") for SUMMIT PARTNERS

SUBORDINATED DEBT FUND IV-A, L.P., SUMMIT PARTNERS SUBORDINATED DEBT

FUND IV-B, L.P., JPMORGAN CHASE BANK, N.A., LOCUST STREET FUNDING LLC,

CANYON VALUE REALIZATION FUND, L.P., CANYON VALUE REALIZATION

MASTER FUND, L.P., CANYON DISTRESSED OPPORTUNITY MASTERFUND, L.P., and

CANYON-GRF MASTER FUND II, L.P. (collectively with the Agent, the "**Lenders**"), by and

through its undersigned counsel, files this Notice of Late Filing of Paper Pursuant to Local Rule

5005-1(F)(2) and states as follows:

1.      The attached *Objection of the Prepetition Lenders to Entry of Interim Order*

*Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(B)(I)*

*Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection, (III)*

*Scheduling a Final Hearing, and (IV) Granting Other Relief* ("**Objection**") is filed for

consideration at the hearing scheduled today,  **August 21, 2013, at 3:00 p.m.** ("**Hearing**") at

---

[1] Pursuant to Order [ECF No. 11], the Court is jointly administering the following cases under the Lead Case No.
13-29597-RAM:  (i) Florida Gaming Centers, Inc. (Case No. 13-29597-RAM)(Tax ID: 5893); (ii) Florida Gaming
Corporation (Case No. 13-29598-RAM)(Tax ID: 0533); (iii) Tara Club Estates, Inc. (Case No. 13-29603-RAM)(Tax
ID:  9545); and (iv) Freedom Holding, Inc. (Case No. 13-29607)(Tax ID:  4929).

#3066400 v1

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Claude Pepper Federal Building, 51 SW First Avenue, Room 1406, Miami, Florida, to consider the Debtors' *Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Utilize Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Other Relief* ("**Cash Collateral Motion**") [ECF No. 8].

2.     The Lenders have been unable to comply with the requirements of Local Rule 5005-1(F)(1) for timely submission of papers in matters already set for hearing due to the following circumstances:

> The Debtors commenced these bankruptcy cases on Monday, August 19, 2013, and filed certain first-day motions, including the Cash Collateral Motion on the same date. Despite the Lenders being the Debtors' largest secured creditor, the Debtors provided no prior notice to the Lenders of the bankruptcy filing or the Cash Collateral Motion. The Court issued the Notice of Hearing yesterday, August 20, 2013.

> Accordingly, the Lenders were unable to file its Objection within the timeframe required by Local Rule 5005-1(F)(1), but nevertheless, has filed the Objection as early as possible.

The Lenders respectfully requests that the Court consider the Objection at the above scheduled Hearing.

#3066400 v1

2

Dated:  August 21, 2013

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER**
**ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:     (305) 789-3200
Facsimile:     (305) 789-3395

By:     */s/ Drew M. Dillworth*
DREW M. DILLWORTH
ddillworth@stearnsweaver.com
Florida Bar No. 167835

*Counsel for the Lenders*

#3066400 v1

3

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

**FLORIDA GAMING CENTERS, INC.**, et al.,

Debtors.

_____/

Case No.:  **13-29597-RAM**[1]
(Jointly Administered)

Chapter 11

**Related to:  ECF No. 8**

**OBJECTION OF THE PREPETITION LENDERS TO ENTRY OF INTERIM**
**ORDER PURSUANT TO SECTIONS 105, 361 AND 363 OF THE BANKRUPTCY**
**CODE AND BANKRUPTCY RULE 4001(B) (I) AUTHORIZING DEBTORS TO USE**
**CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION, (III)**
**SCHEDULING A FINAL HEARING, AND (IV) GRANTING OTHER RELIEF**

ABC Funding, LLC, as Administrative Agent (the "Agent") for Summit Partners

Subordinated Debt Fund IV-A, L.P., Summit Partners Subordinated Debt Fund IV-B, L.P.,

JPMorgan Chase Bank, N.A., Locust Street Funding LLC, Canyon Value Realization Fund, L.P.,

Canyon Value Realization Master Fund, L.P., Canyon Distressed Opportunity Master Fund, L.P.,

and Canyon-GRF Master Fund II, L.P. (collectively with the Agent, the "Lenders"), by and

through their undersigned counsel, hereby file this objection (the "Objection") to entry of an

Interim Order Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code and Bankruptcy

Rule 4001(b) (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate

Protection, (III) Scheduling a Final Hearing, and (IV) Granting Other Relief (the "Proposed

---

[1]  The debtors in these chapter 11 cases (the "Cases"), along with the last four digits of each debtor's tax identification number are: Florida Gaming Centers, Inc. (5893) ("Centers"), Florida Gaming Corporation (0533), Tara Club Estates, Inc. (9545), and Freedom Holding, Inc. (4929) (collectively, the "Debtors").

<u>Interim Order</u>").  In support of this Limited Objection, the Lenders respectfully represent as follows:

## BRIEF BACKGROUND

1.     The Debtors owe the Lenders more than $127 million.[2]  As such, the Lenders are by far the largest stakeholder in these Cases.  The Lenders' claims are secured by mortgages and security interests in substantially all of the Debtors' assets.

2.     These Cases are the latest in a series of paths that the Debtors have taken the Lenders down over the past two years, when the Debtors first began breaching the terms of the Credit Agreement (as defined in the Motion).  As recently as one week before the bankruptcy filings, the Debtors brought the Lenders to court seeking to compel their cooperation in the closing of the pending sale of Centers' stock (*i.e.*, the Debtor with all of the operating assets) to Silvermark, LLC.  Even on the morning of the bankruptcy filings, the Lenders' counsel were exchanging documents with counsel to Silvermark, thereby facilitating a transaction that the Debtors had maintained for months was in the best interests of their stakeholders.  The Lenders expected that the transaction would close this week.  Instead, the Debtors filed these Cases with no notice to the Lenders or Silvermark.

3.     The Motion and the Debtors' other first-day filings are rife with factual inaccuracies,[3] mischaracterizations and internal inconsistencies.[4] The Lenders do not attempt to

---

[2] The Debtors estimated that "[t]he total amount owed to the Prepetition [Lenders] is approximately $128,000,000." *See Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Utilize Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Other Relief* [Docket No. 8] (the "<u>Motion</u>"), ¶ 49.

[3] For example, although the Licciardi Declaration (defined below) states that the Debtors "made all payments required under the loan," in fact, the Debtors defaulted under the loan documents by failing to make a principal payment of approximately $2 million as early as July of 2012 (with several more to follow), prior to the commencement of the Lenders' foreclosure action.  There are numerous other defaults, including recently-missed interest payments, many of which have been admitted by the Debtors.

address those inaccuracies and mischaracterizations in this Objection because of the less than

two days between the filing of the Cases and the first-day hearing.  However, the Lenders fully

reserve their rights to do so in connection with the final hearing or otherwise during these Cases.

## OBJECTION

4.      The Lenders do not consent to the use of their cash collateral, as proposed in the

Motion.  The purported adequate protection offered by the Debtors is illusory and is almost

completely devoid of typical protections afforded secured lenders.  The Debtors rely almost

completely on a valuation by Jefferies – which was conducted at the Lenders' demand pursuant

to the Warrant Agreement (as defined in the Motion) – to argue that there is a significant equity

cushion to protect the Lenders.  Yet the Debtors have been pursuing for months, including for

two months since the issuance of the Jefferies valuation, a transaction with Silvermark that

would yield materially less than the $180 million valuation amount.  The Debtors also do not

account for the secured debt of Miami-Dade County or the continuing accrual of interest on the

Lenders' claim in calculating the alleged equity cushion.  Nor do the replacement liens proposed

by the Debtors provide any protection to the Lenders.  Those proposed liens are limited to "post-

petition assets to the extent that the post-petition assets are the same as the applicable pre-

petition collateral" that is encumbered by the Lenders' existing liens.  It is not clear what, if any,

value such liens provide.

5.      The Debtors' conclusory statements in support of their proposed non-consensual

use of the Lenders' cash collateral fail to meet the necessarily high burden established for

---

[4] By way of example, the Debtors blame the Lenders for delaying and preventing the closing of the Silvermark transaction.  *See Declaration of Daniel Licciardi in Support of First-Day Motions and Applications* [Docket No. 6] (the "Licciardi Declaration"), ¶¶ 30-36.  But elsewhere the Debtors claim that they have determined in their business judgment that the Silvermark transaction was not the best avenue for maximizing value for their shareholders.  *See Licciardi Declaration*, ¶¶ 6, 37 ("it thus became apparent that the proposed sale to Silvermark would mean that shareholders in Florida Gaming Centers would be unable to realize on Miami Jai-Alai's residual equity, which may exceed $50 million.").

debtors seeking to use cash collateral over the objection of the secured party.  In addition, the Lenders and their advisors have had little time to vet the budget submitted with the Motion. Such budget appears to contain expenditures that are unexplained and/or not appropriate given the Debtors' circumstances and the filing of these cases.  Any use of cash collateral between the interim and final hearings should be limited to what is absolutely required to prevent harm to the Debtors' operations and value.[5]  And the Debtors should at a minimum be required during the interim period to provide the Lenders with weekly reports comparing their actual expenditures to those in the budget, as well as relevant bank statements on a weekly basis.

6.      Previous misconduct by certain of the Debtors' insiders further heightens the Lenders' concerns regarding lack of adequate protection.  As explained in the Licciardi Declaration, the Florida State Court adjudicating the ABC Florida Action (as defined in the Motion) appointed David Jonas as receiver at the request of the Lenders in November, 2012. Attached respectively as Exhibits 1 and 2 (collectively, the "Receiver Order") are the temporary Order appointing the Receiver, dated November 2, 2012, and the final Order, dated November 27, 2012 that was in effect as of the Petition Date.  The reasons for Mr. Jonas' appointment are several but include misuse of Centers' funds by certain insiders for the purpose of, among other things, making payments to an entity controlled by the Debtors' CEO to pay a note secured by the CEO's personally-owned shares of Florida Gaming Corporation.  Mr. Jonas signed an affidavit in the ABC Florida Action which outlined some of the misuse that he had personally observed prior to his appointment as receiver, including payment of personal and family

---

[5] For example, during the interim period, none of the Debtors' professional fees should be paid and no salaries or other benefits should be paid to insiders other than those previously approved by the Receiver Order (as defined below).

members' expenses by the Debtors' CEO.  A copy of that Affidavit is attached hereto as <u>Exhibit 3</u>.  Mr. Jonas was still serving in the capacity of receiver when the Debtors filed these Cases.

7.     The Lenders respectfully request that any use of cash collateral during the interim period be conditioned upon Mr. Jonas continuing to have the authority and responsibility set forth in the Receiver Order.[6]  The concerns that led to Mr. Jonas' appointment as receiver are as present today as they were when Mr. Jonas was first appointed.  Self-dealing insiders should not be permitted to use bankruptcy to regain control over a business that a court previously removed from their control.[7]

## <u>RESERVATION OF RIGHTS</u>

8.     This Objection is by necessity abbreviated in light of the extremely short timeframe between the filing of the Cases and the first-day hearing.  The Lenders reserve all of their respective rights, claims, defenses, and remedies with respect to the Motion, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections to the Motion (including to object to the entry of a final order approving the Motion) and related documents at any time.  In addition, the Lenders reserve all of their rights to contest the propriety of the Debtors' bankruptcy filing, including whether or not these cases were filed in good faith as required under the Bankruptcy Code, and to seek discovery in connection therewith.

---

[6] The Lenders reserve their rights to seek continued operation of the Debtors' business by Mr. Jonas pursuant to 11 U.S.C. § 543(d).

[7] Several insiders also are defendants in a shareholder derivative suit accusing them of, among other things, engaging in self-dealing transactions and breaches of fiduciary duties in connection with the Silvermark transaction.

WHEREFORE, for the reasons set forth herein, the Lenders respectfully request that the Court sustain this Objection, or in the event the Court is inclined to permit some use of cash collateral during the interim period, (i) limit such use to what is absolutely required to prevent harm to the Debtors' operations and value, (ii) provide for Mr. Jonas to have the continued authority and responsibility set forth in the Receiver Order and (iii) require weekly reporting by the Debtors of the type described above.

Dated:  August 21, 2013

*/s/ Dennis Twomey*_____
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Dennis M. Twomey
Andrew F. O'Neill

- and –

*/s/ Drew M. Dillworth*_____
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile:  (305)  789-3395
Drew M. Dillworth
Florida Bar No. 167835
ddillworth@stearnsweaver.com
Marissa D. Kelley
Florida Bar No. 379300
mkelley@stearnsweaver.com

*Counsel for the Prepetition Lenders*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 21, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day, as indicated on the attached Service List (i) by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case, and (ii) by U.S. Mail to the Debtors.

By: _*/s/ Drew M. Dillworth*_

DREW M. DILLWORTH

**SERVICE LIST**
**Lead Case No.: 13-29597-RAM**
**United States Bankruptcy Court, Southern District of Florida**
*(Jointly Administered with Case Nos. 13-29598-RAM, 13-2960-RAM and 13-29607-RAM)*

  The following parties are registered to receive Notice of Electronic Filing and should

have been served through CM/ECF.

Office of the US Trustee
*USTPRegion21.MM.ECF@usdoj.gov*

Luis Salazar, Esq.
*salazar@salazarjackson.com*
*jackson@salazarjackson.com*
*aguilar@salazarjackson.com*
*Lee-Sin@SalazarJackson.com*
*Counsel for Florida Gaming Centers, Inc.,*
*Florida Gaming Corporation, Freedom*
*Holding, Inc. and Tara Club Estates, Inc.*


The following parties were served by U.S. Mail, postage prepaid:

Florida Gaming Centers, Inc.
3500 N.W. 37 Avenue
Miami, FL 33142
*Debtor*

Florida Gaming Corporation
3500 N.W. 37 Avenue
Miami, FL 33142
*Debtor*

Tara Club Estates, Inc.
2669 Charlestown Road, #D
New Albany, IN 47150
*Debtor*

Freedom Holding, Inc.
2669 Charlestown Road, #D
New Albany, IN 47150
*Debtor*

#3066291 v1
CH1 7912650v.3

# Exhibit 1

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-35064CA58

ABC FUNDING, LLC, as Administrative Agent for SUMMIT PARTNERS SUBORDINATED DEBT FUND IV-A, L.P., SUMMIT PARTNERS SUBORDINATED DEBT FUND IV-B, L.P., JPMORGAN CHASE BANK, N.A., LOCUST STREET FUNDING LLC, CANYON VALUE REALIZATION FUND, L.P., CANYON VALUE REALIZATION MASTER FUND, L.P., CANYON DISTRESSED OPPORTUNITY MASTERFUND, L.P., and CANYON-GRF MASTER FUND II, L.P.,

      Plaintiff,

vs.

FLORIDA GAMING CENTERS, INC., a Florida corporation; FLORIDA GAMING CORPORATION, a Delaware corporation; CITY NATIONAL BANK OF FLORIDA, not individually but solely as Trustee under the Land Trust Agreement dated January 3, 1979, known as Trust Number 5003471; FREEDOM HOLDING, INC., a Delaware Corporation; TARA CLUB ESTATES, INC., a Georgia Corporation; FLORIDA LEMARK CORPORATION, a Florida corporation; ART SIGN CO., INC., a Florida corporation; M & G FILL CORPORATION, a Florida corporation; D2 CONSTRUCTION, INC., a Florida corporation; AUSTIN TUPLER TRUCKING, INC., a Florida corporation; *et al.*,

      Defendants.

_____/

## ORDER APPOINTING TEMPORARY RECEIVER PENDING HEARING ON NOVEMBER 27, 2012

**THIS CAUSE** came before the Court at 8:45 a.m. on October 25, 2012 upon Plaintiff's

Verified Motion for Appointment of Receiver, Supplement to Verified Motion to Appoint

Receiver and Request for Emergency Hearing (collectively, the "Motion"), and the Court having

reviewed the file, heard from counsel and it appearing to the Court that the loan documents at issue expressly authorize the relief requested herein, and being otherwise duly advised in the premises,

It is hereby **ORDERED AND ADJUDGED:**

1.  <u>Appointment</u>.   David Jonas is hereby appointed Temporary Receiver (the "Receiver") of the real and personal property which is described in and encumbered by the Miami Dade Mortgage and the St. Lucie Mortgage, each executed by Borrower in favor of Lenders (collectively, the "Mortgages") and other loan documents which are the subject of this action, including all real, personal, tangible, and intangible property, whether now existing or hereafter arising, wherever located (the "Receivership Property"), such appointment to be effective as of October 25, 2012, *nunc pro tunc*, to continue until further order of this Court.

2.  <u>Hearing</u>.  A hearing has been scheduled for November 27, 2012 at which time the Court will consider whether the Receiver should be appointed through the pendency of this litigation.

3.  <u>Expedited Discovery</u>.  Responses to all discovery with respect to the Motion shall be served within two (2) weeks of service.

4.  <u>Oath</u>.  Within ten (10) days of the date of this Order, the Receiver shall file with this Court an Oath of Receiver.

5.  <u>Bond</u>.  The Receiver shall post a surety bond in the amount of $100,000.00 with the Clerk of Court within ten (10) days of the date of this Order.

6.  <u>Possession of Receivership Property</u>.  The Receiver shall immediately take possession of all the accounts, books of account, checkbooks, lease agreements, sales contracts, assets, files, papers, contracts, records, documents, monies, securities, choses in action, keys, pass codes and passwords, computers, all software and data, archived and historical data, and all

other property, real, mortgaged, personal or mixed, of FLORIDA GAMING CENTERS, INC. ("Borrower") including but not limited to any and all funds being held by any third-party on behalf of Borrower, which are specifically included within the definition of the Receivership Property, which are within the jurisdiction of this Court, except as is otherwise set forth herein, and shall retain custody, except as is set forth hereinafter, of all such Receivership Property, until further order of this Court. All persons and corporations now or hereafter in possession of any Receivership Property, or any part thereof, shall forthwith surrender such possession to the Receiver. Plaintiff and Borrower shall have access to the above records and documents upon reasonable notice and during business hours. For the purpose of taking possession of and managing the Receivership Property, the Receiver is hereby authorized to employ agents, servants and employees and to contract as reasonably necessary for property management and accounting services, leasing and sales as may be necessary. The Receiver shall collect the rents, issues, profits and revenues, if any, from the Receivership Property. Further, Borrower and any persons in active participation with them, shall grant the Receiver unfettered access to any accounts, records, documents, files, plans, engineering reports, permits (whether expired or not), and computer equipment owned by Borrower. Such access shall include, without limitation, the right to inspect and copy any such accounts, records, documents, files, plans, engineering reports, permits, and computer equipment.

The Receiver may at any time, apply to this Court for further powers and authority as may be necessary and appropriate to carry out the purposes of this Order.

7.    <u>Receiver's Powers</u>. The Receiver is empowered, directed and authorized by this Court to act on its behalf as the Receiver of the Receivership Property, and to do any and all things necessary for the proper management, operation, preservation, maintenance, protection and administration of the Receivership Property. The Receiver may, but is not required to, take

action in the name of Borrower, where necessary to fulfill his duties pursuant to this Order. Further, the Receiver may, but is not required to, utilize Borrower's promotional and marketing materials, website, signs, logos and brand names, where necessary to fulfill his duties pursuant to this Order. The Receiver shall have and possess all powers and rights to the extent necessary in the discretion of the Receiver to facilitate its management and preservation including, but not limited to, the following:

(a)    taking immediate possession of the Receivership Property to the extent necessary to manage, preserve and protect the same, including, taking possession and control, to the exclusion of defendants and all others of all accounts relating to the Receivership Property and holding, retaining, preserving, protecting, operating and managing the Receivership Property and performing all tasks necessary therefore;

(b)    directing, overseeing and managing the Borrower's daily operations, including without limitation sole responsibility for all treasury functions and day-to-day cash flow decisions;

(c)    managing the Borrower's cash flow and liquidity, make recommendations and implement improvements;

(d)    evaluating current management and employees, reporting and governance procedures and implement appropriate alterations;

(e)    attending meetings of the Board, if any;

(f)    providing any ongoing operational and financial updates and other information required under the Credit Agreement to the Plaintiff;

(g)    paying all costs reasonably necessary to conserve, maintain, repair, secure, operate, preserve and protect the Receivership Property, including all such costs incurred prior to date of this Order of which Plaintiff has approved;

4

(h)    paying any and all necessary costs, executing any and all necessary documents, obtaining releases of lien;

(i)    paying any taxes, assessments and charges in the nature thereof, due in connection with the Receivership Property;

(j)    opening accounts in the name of the Receiver in order to fulfill his duties pursuant to this Order;

(k)    applying for or obtaining from Borrower an assignment of all licenses, approvals, and permits issued for the operation of the Receivership Property, including but not limited to the Certificate of Occupancy for the real property;

(l)    directing, overseeing, and managing Borrower's daily operations, including without limitation, exercising sole responsibility for all treasury functions and day-to-day cash flow decisions;

(m)    managing Borrower's cash flow and liquidity;

(n)    taking any action which could lawfully be taken by the managers or officers of Borrower prior to the date of this Order to fulfill its duties pursuant to this Order;

(o)    enforcing rights under agreements, contracts, leases, warranties, easements, covenants, and restrictions benefiting the Receivership Property;

(p)    providing to Lenders ongoing operational and financial updates and any other information required under the Credit Agreement;

(q)    performing under any declarations of covenants, restrictions and easements or other similar agreements appurtenant to the Receivership Property; and

(r)    hiring legal counsel to assist the Receiver in performing the responsibilities with respect to the Receivership Property as set forth in this order and in performing the filing

obligations with the Clerk of the Circuit Court set forth in this order and paying all legal costs and fees incurred in performing the responsibilities with respect to the Receivership Property.

Nothing contained herein shall require the Receiver to expend any of its own funds.

8.    <u>Turnover of Receivership Property</u>.  The parties in this matter and their respective officers, directors, shareholders, employees, and agents are directed, forthwith, to turn over to the Receiver all of the Receivership Property, as described in paragraphs 1 and 5 of this Order, including without limitation, any and all cash and other monies, whether in a bank or otherwise, all income, issues, revenues, rental payments, security deposits, down payments or other monies paid to or on account of any contracts, leases or rental agreements, and records and documents relating to the business operations of the Receivership Property (including all licenses, permits, and other land use entitlements, approvals and files), the Receivership Property itself, and any other matter not specifically described in this Order, but which is reasonably necessary for the Receiver to perform his duties as described herein.

9.    <u>Specific Duties of Receiver</u>.  The Receiver shall manage, secure, sell, rent (to the extent provided hereafter), preserve, protect, and maintain the Receivership Property in a reasonable, prudent, diligent and efficient manner.  Without limitation of that general duty, the Receiver shall have the following specific duties:

(a)    <u>Receivership Property Maintenance and Repair</u>.  The Receiver shall maintain the building, appurtenances and grounds of the Receivership Property, substantially in accordance with their current condition, making such repairs and renovations as are necessary and appropriate to ensure the security, life, health, and safety of any persons or thing on the Receivership Property, but only to the extent the Receiver determines, after consultation with Plaintiff, that such repairs and renovations are economically feasible and in the best interest of the Receivership Property.

6

(b)    Approvals and Permits.  The Receiver shall (i) take such actions as may be necessary or appropriate to ensure that any and all existing or future licenses, permits, applications and other governmental approvals and entitlements pertaining to the ownership, operation, management, use, or development of the real property (collectively, "Permits"), are obtained and maintained in full force and effect; and (ii) enter into a contract or contracts with third parties to obtain and maintain such Permits, and to complete any required improvements to the Receivership Property in connection with such Permits.

(c)    Insurance.  The Receiver shall maintain casualty insurance with respect to the Receivership Property, and if required by Plaintiff, liability, windstorm, flood, professional liability, betterment and improvement and workers' compensation insurance with respect to the Receivership Property, all in such amounts and with such coverages as are required under the Mortgage which is the subject of this action.  All such insurance policies shall name the Receiver and Plaintiff, as additional insureds and shall name Plaintiff as loss payee with respect to all casualty policies.  The Receiver is authorized to continue in existence all current insurance policies in place.  The Receiver shall promptly investigate and will file a full, prompt written report with the Clerk of this Court as to all serious and material accidents, claims for damage relating to the ownership, operation and maintenance of the Receivership Property, and any damage or destruction to the Receivership Property, and the estimated cost of repair thereof, and shall prepare any and all reports required by any insurance company in connection therewith.

(d)    Operating Account.  The Receiver may establish and maintain, at a bank whose deposits are insured by the Federal Deposit Insurance Corporation, a separate operating account or accounts into which the Receiver shall deposit all receipts, if any, related to the Receivership Property and from which the Receiver shall disburse all amounts due and payable as reasonable, necessary and proper operating expenses of the Receivership Property, subject to

7

the terms of this Order and the availability of funds. The parties shall provide the Receiver with information regarding those expenses which the Receiver is required to pay, which expenses were incurred prior to the Receivership.

        (e)    <u>Records</u>.  The Receiver shall maintain a comprehensive system of office records, books and accounts concerning the maintenance of the Receivership Property.  Upon reasonable notice, and at all reasonable times, Plaintiff and Borrower, and their respective agents, shall have reasonable access to such records, accounts and books and to all other material pertaining to the operation of the Receivership Property, all of which the Receiver agrees to keep safe, available and separate from any records not having to do with the operation of the Receivership Property.

        (f)    <u>Legal Requirements</u>.  The Receiver shall ensure that all aspects of the Receivership Property, and its operation, management, and development, comply with any and all laws, regulations, orders or requirements affecting the Receivership Property having jurisdiction thereover.

        (g)    <u>Major Repairs and Improvements</u>.  Except as otherwise provided herein, the Receiver shall not incur any obligation for major repairs, improvements, additions or alterations of the Receivership Property requiring expenditures in excess of $50,000.00 without prior order of this Court or a written stipulation of Plaintiff.

        (h)    <u>Use and Maintenance of Premises</u>.  The Receiver shall not permit the use of the Receivership Property for any purpose which will or might void any required policy of insurance or which might render any loss thereunder uncollectible, or which would be in violation of any law or government restriction.

        (i)    <u>Service Contracts</u>.  The Receiver shall not enter into any service contracts affecting the Receivership Property including any and all real estate brokerage and listing

agreements, having a term which cannot be cancelled (without premium or penalty), upon the termination of the receivership or upon 30 days notice, whichever is earlier, except with prior order of this Court or a written stipulation of Plaintiff. In submitting all such service contracts to the Court for its approval or to the Plaintiff, the Receiver shall disclose any affiliate relationship, or pecuniary interest, that he may have with or in such contracting party. The Casino Development and Management Agreement between Borrower and Miami Casino Management, LLC (which is affiliated with Receiver) dated March 31, 2011 shall remain in place.

(j)     No Waste.  Without the approval of the Plaintiff or Court, the Receiver shall not suffer, cause or permit: (i) any removal of any Receivership Property; nor (ii) any waste of the Receivership Property or any of the components thereof.

10.     Environmental Report.  The Receiver may, if he reasonably deems same to be necessary or appropriate, have environmental inspections and/or reports prepared with respect to the Receivership Property, showing the environmental status of the Receivership Property and any remediation required with respect to same.

11.     Receiver's Certificates.  Without further order of this Court, the Receiver may from time to time borrow up to $150,000.00 from Plaintiff for the performance of his duties hereunder, if necessary, and may issue Receiver's Certificates of Indebtedness ("Certificates") to evidence such borrowings.  The principal and interest evidenced by the Certificates shall be a first lien and security interest upon the Receivership Property, and all rents, earnings and income of the Receivership Property.  Any such funds advanced by Plaintiff and evidenced by the issuance of Certificates shall be considered advances made under the Loan Documents, whether or not such advances are otherwise permitted thereunder.  The lien of each Certificate shall be prior and superior to the rights, titles and interests in the Receivership Property of all parties to this action, except Plaintiff.  The lien of each Certificate shall be prior and superior to the interest

9

or lien of all judgment holders, mechanics' lien claimants, partners, members, shareholders, and creditors of Defendants. Without limiting the foregoing, the sums evidenced by each Certificate shall also be secured by the lien and security interests in the Loan Documents. Nothing herein shall obligate Plaintiff to advance all or any part of the borrowings authorized herein. If the Receiver desires to borrow additional funds, or funds from sources other than Plaintiff, the Receiver shall petition this Court (with notice to all parties) for authority to issue Supplemental Certificates of Indebtedness ("Supplemental Certificates"), and this Court may authorize the specific amounts and terms of any Supplemental Certificates, the specific uses of any funds borrowed thereunder, and the lien priority of any Supplemental Certificates.

12.    Net Proceeds. All profits from the Borrower's operations or arising from all or part of the Receivership Property shall be held by Receiver in a Receivership account, pending further Order of this Court. It is anticipated that the Plaintiff will seek to have some or all of said net proceeds paid over to it during the pendency of this receivership.

13.    Net Cash Flow. On or before the 20th day of each month while this Order is in effect, the Receiver shall pay to the Plaintiff any net cash flow in excess of $10,000.00, available from the operation of the Receivership Property from the prior month's collections, for application to costs, expenses, interest and principal evidenced by any of Receiver's Certificates issued to Plaintiff, and then for application to such sums which are secured by the security documents.

14.    No Interference. Except as otherwise requested or authorized by the Receiver, or until further order of this Court, the parties, and their respective officers, directors, shareholders, agents, servants, employees, representatives, and attorneys are hereby enjoined from: (i) collecting, or attempting to collect, the rents, receivables, income, revenues, profits, and bank accounts of the Receivership Property from and after the date of the Order; (ii) interfering in any

10

manner with the management of the Receivership Property by the Receiver as hereinabove described until further order of this Court; or (iii) acting or purporting to act on behalf of the Receivership Property and/or the Receiver.

15.   <u>Consultants and Professionals</u>.  Without further order of the Court, the Receiver is hereby empowered to employ independent legal counsel to furnish legal advice to the Receiver for such purposes as may be necessary during the period of receivership.  Upon further order of the Court, or with the prior written approval of Plaintiff, the Receiver is also empowered to employ accountants, consultants, developers and other professionals, to furnish accounting and other advice and services to the Receiver, all for such purposes as may be reasonable and necessary during the term of the receivership.  Such professionals may include those retained by the Receiver to assist in obtaining and maintaining permits.  All such persons shall be compensated in accordance with Paragraph 18 below.

16.   <u>Fees</u>.  The Receiver shall be compensated at a rate of $25,000.00 per month, plus the reasonable and necessary out-of-pocket expenses incurred by the Receiver on behalf of the Receivership Property, excluding travel, lodging and meal expenses.  All approved counsel, accountants, consultants and other professionals retained by the Receiver shall be compensated on hourly rate basis as approved by Plaintiff in writing, or upon further order of this Court.  The Receiver and all such approved accountants, attorneys, consultants and other professionals shall be paid on a monthly basis.  To be paid on a monthly basis, the Receiver must serve a copy on Plaintiff and Defendants for the monthly fee and expenses of the Receiver and the time, fees and expenses of such approved accountants, attorneys, consultants and other professionals, incurred in the preceding calendar month.  The statement of account shall be included in the monthly report of the Receiver as provided for in Paragraph 13 above.  If no objection thereto is filed and served by the Plaintiff and/or Defendants on or within ten (10) business days following service

11

on the Plaintiff, such statement of account may be paid. In the event objections are made to fees and/or expenses, objected-to fees and/or expenses shall be paid within ten (10) business days of an agreement between the objecting party and Receiver, or entry of an order of this Court adjudicating the matter. If an objection is timely filed and served, the contested portion of such statement of account shall not be paid absent further order of this Court, but the uncontested portion shall be paid as provided herein. The fees, costs and expenses of the Receiver and its attorneys, accountants, consultants and other professionals shall be paid by Plaintiff as a protective advance under the Loan Documents, or by Receiver issuing a Receiver's Certificate to pay for such fees, costs and expenses, as permitted under Paragraph 10 above, all as determined by Plaintiff in its sole discretion.

     17.   <u>Judicial Immunity</u>. The Receiver and the Receiver's attorneys and agents: (i) may rely on any and all outstanding court orders, judgments, decrees and rules of law, and shall not be liable to anyone for their own good faith compliance with any such order, judgment, decree or rule of law; (ii) may rely on, and shall be protected in any action upon, any resolution, certificate, statement, opinion, report, notice, consent, or other document believed by them to be genuine and to have been signed or presented by the proper parties; (iii) shall not be liable to anyone for their good faith compliance with their duties and responsibilities as a receiver, or as attorney or agent for Receiver; (iv) shall not be considered nor have liability as a "successor developer;" and (v) shall not be liable to anyone for their acts or omissions, except upon a finding by this Court that such acts or omissions were outside the scope of their duties or were grossly negligent or constitute misfeasance. Except for matters set forth in subsection (v) of the preceding sentence, persons dealing with the Receiver shall only look to the receivership assets and bond posted by the Receiver to satisfy any liability, and neither the Receiver nor his attorneys or his agents shall have any personal liability to satisfy any such obligation.

18.   <u>Further Instructions</u>.  The Receiver may at any time upon notice to all parties, apply to this Court for further or other instructions or powers, whenever such instructions or additional powers shall be deemed necessary in order to enable him to perform properly and legally the duties of his Receivership and to maintain, operate, protect and preserve the real property.

19.   <u>Duration</u>.  This Receivership will continue for such time until the Court enters an order terminating it and discharging the Receiver; provided that to the extent the Receiver no longer desires to serve in that capacity, upon notice to Plaintiff and Borrower, the Receiver may apply to the Court for termination of his appointment.

20.   <u>Discharge</u>.  If the Plaintiff is paid in full, inclusive of all principal, interest, costs, fees, and advances, while the Receiver is in place, Borrower shall have the right to request that the Court discharge the Receiver after notice and hearing on a motion setting forth those facts.

21.   <u>Jurisdiction</u>.  Jurisdiction of this action is retained to enter further orders as are appropriate.

**DONE AND ORDERED** in Chambers at Martin County, Florida, on this ___ day of November, 2012.   *Nunc Pro tunc 10/25/12*

CONFORMED **COPY**

NOV 0 2 2012

BEATRICE BUTCHKO
CIRCUIT COURT JUDGE

_____
HONORABLE BEATRICE BUTCHKO
Circuit Court Judge

Copies furnished to:

Marissa D. Kelley, Esq., *Counsel for Plaintiff*, Stearns, Weaver, Miller, *et al.*, 200 East Las Olas Boulevard, Suite 2100, Fort Lauderdale, FL 33301

Gerard D. Kelly, Esq. and Claire E.W. Stewart, Esq., *Co-Counsel for Plaintiff*, Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Robert W. Hudson, Esq., *Counsel for Florida Gaming Centers, Inc. and Florida Gaming Corporation*, Hudson & Calleja, LLC, 3211 Ponce De Leon Boulevard, Suite 102, Coral Gables, FL 33134

Luis Salazar, Esq., *Co-Counsel for Florida Gaming Centers, Inc. and Florida Gaming Corporation*, Salazar Jackson, Two South Biscayne Boulevard, Suite 3760, Miami, FL 33131

James S. Lupino, Esq. and Jessica Rothenberg, Esq., *Counsel for Florida Lemark Corporation*, Hershoff Lupino & Yagel, LLP, 90130 Old Highway, Tavernier, FL 33070

David S. Tupler, Esq., *Counsel for Austin Tupler Trucking, Inc. and M & G Fill Corporation*, David S. Tupler, P.A., 9900 Stirling Road, Suite 211, Cooper City, FL 33024

Jorge L. Piedra, Esq., *Counsel for Larrabee Air Conditioning, Inc. d/b/a KAR & Larabee Mechanical Constractors*, Jorge L. Piedra & Associates, P.A., Grove Professional Building, 2950 SW 27th Avenue, Suite 300, Miami, FL 33133

City National Bank of Florida, Attention:  S. Marshall Martin, Esquire, 25 West Flagler Street, Miami, FL 33130

Freedom Holding, Inc., W.B. Collett, Jr., *Registered Agent*, 1750 S. King Highway, Fort Pierce, FL 34945

Tara Club Estates, Inc., W.B. Collett, *Registered Agent*, 637 Richmond Place, Loganville, GA 30052

Art Sign Co., Inc., Joseph C. Dillard, *Registered Agent*, 835 N.W. 6th Avenue, Ft. Lauderdale, FL 33311

Decktight Roofing Services, Inc., Richard P. Spreen, *Registered Agent*, 6680 N.W. 17th Avenue, Fort Lauderdale, FL 33309

Statewide Electric & Environmental Solutions, LLC, Rafael J. Fernandez, *Registered Agent*, 10737 S.W. 104th Street, Miami, FL 33176

High Tech Striping, Inc., Paul A. Reyes, *Registered Agent*, 7776 N.W. 73rd Court, Medley, FL 33166

Southeast Duct Specialists, Inc., Leo Moya, *Registered Agent*, 2200 S.W. 58th Ave, West Park, FL 33023

Barreiro Concrete Corporation, Americo Barreiro, *Registered Agent*, 25440 S.W. 140 Avenue, Princeton, FL 33032

Exhibit 2

#3059672 v1

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-35064CA58

ABC FUNDING, LLC, as Administrative Agent for
SUMMIT PARTNERS SUBORDINATED DEBT
FUND IV-A, L.P., SUMMIT PARTNERS
SUBORDINATED DEBT FUND IV-B, L.P.,
JPMORGAN CHASE BANK, N.A., LOCUST
STREET FUNDING LLC, CANYON VALUE
REALIZATION FUND, L.P., CANYON VALUE
REALIZATION MASTER FUND, L.P., CANYON
DISTRESSED OPPORTUNITY MASTERFUND, L.P.,
and CANYON-GRF MASTER FUND II, L.P.,

      Plaintiff,

vs.

FLORIDA GAMING CENTERS, INC., a Florida
corporation; FLORIDA GAMING CORPORATION, a
Delaware corporation; CITY NATIONAL BANK OF
FLORIDA, not individually but solely as Trustee under
the Land Trust Agreement dated January 3, 1979,
known as Trust Number 5003471; FREEDOM
HOLDING, INC., a Delaware Corporation; TARA
CLUB ESTATES, INC., a Georgia Corporation;
FLORIDA LEMARK CORPORATION, a Florida
corporation; ART SIGN CO., INC., a Florida
corporation; M & G FILL CORPORATION, a Florida
corporation; D2 CONSTRUCTION, INC., a Florida
corporation; AUSTIN TUPLER TRUCKING, INC., a
Florida corporation; *et al.*,

      Defendants.

_____/

## AGREED ORDER APPOINTING RECEIVER

**THIS CAUSE** came before the Court at 10:00 a.m. on November 27, 2012 upon

Plaintiff's Verified Motion for Appointment of Receiver and Supplement to Verified Motion to

1

Appoint Receiver and Request for Emergency Hearing (collectively, the "Motion"), and the Court having reviewed the file, being advised of the agreement of the Plaintiff and the Borrower Defendants, and otherwise duly advised in the premises,

It is hereby **ORDERED AND ADJUDGED:**

David Jonas was appointed as temporary Receiver in the Order Appointing Temporary Receiver Pending Hearing on November 27, 2012 ("First Receiver Order") entered by the Court on November 2, 2012, nunc pro tunc to October 25, 2012. David Jonas shall remain as Receiver and the First Receiver Order shall remain in full force and effect until further order of this Court.

**DONE AND ORDERED** in Chambers at Martin County, Florida, on this ___ day of November, 2012.

CONFORMED COPY

NOV 2 7 2012

_____
HONORABLE BEATRICE BUTCHKO
Circuit Court Judge

Copies furnished to:

Marissa D. Kelley, Esq., *Counsel for Plaintiff*, Stearns, Weaver, Miller, *et al.*, 200 East Las Olas Boulevard, Suite 2100, Fort Lauderdale, FL 33301

Gerard D. Kelly, Esq. and Claire E.W. Stewart, Esq., *Co-Counsel for Plaintiff*, Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Robert W. Hudson, Esq., *Counsel for Florida Gaming Centers, Inc. and Florida Gaming Corporation,* Hudson & Calleja, LLC, 3211 Ponce De Leon Boulevard, Suite 102, Coral Gables, FL 33134

Luis Salazar, Esq., *Co-Counsel for Florida Gaming Centers, Inc. and Florida Gaming Corporation,* Salazar Jackson, Two South Biscayne Boulevard, Suite 3760, Miami, FL 33131

James S. Lupino, Esq. and Jessica Rothenberg, Esq., *Counsel for Florida Lemark Corporation,* Hershoff Lupino & Yagel, LLP, 90130 Old Highway, Tavernier, FL 33070

David S. Tupler, Esq., *Counsel for Austin Tupler Trucking, Inc. and M & G Fill Corporation,* David S. Tupler, P.A., 9900 Stirling Road, Suite 211, Cooper City, FL 33024

Jorge L. Piedra, Esq., *Counsel for Larrabee Air Conditioning, Inc. d/b/a KAR & Larabee Mechanical Constractors,* Jorge L. Piedra & Associates, P.A., Grove Professional Building, 2950 SW 27th Avenue, Suite 300, Miami, FL 33133

Freedom Holding, Inc., W.B. Collett, Jr., *Registered Agent,* 1750 S. King Highway, Fort Pierce, FL 34945

Art Sign Co., Inc., Joseph C. Dillard, *Registered Agent,* 835 N.W. 6th Avenue, Ft. Lauderdale, FL 33311

Decktight Roofing Services, Inc., Richard P. Spreen, *Registered Agent,* 6680 N.W. 17th Avenue, Fort Lauderdale, FL 33309

Statewide Electric & Environmental Solutions, LLC, Rafael J. Fernandez, *Registered Agent,* 10737 S.W. 104th Street, Miami, FL 33176

High Tech Striping, Inc., Paul A. Reyes, *Registered Agent,* 7776 N.W. 73rd Court, Medley, FL 33166

Southeast Duct Specialists, Inc., Leo Moya, *Registered Agent,* 2200 S.W. 58th Ave, West Park, FL 33023

Barreiro Concrete Corporation, Americo Barreiro, *Registered Agent,* 25440 S.W. 140 Avenue, Princeton, FL 33032

Exhibit 3

#3059672 v1

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 12-35064CA58

ABC FUNDING, LLC, as Administrative Agent for
SUMMIT PARTNERS SUBORDINATED DEBT
FUND IV-A, L.P., SUMMIT PARTNERS
SUBORDINATED DEBT FUND IV-B, L.P.,
JPMORGAN CHASE BANK, N.A., LOCUST
STREET FUNDING LLC, CANYON VALUE
REALIZATION FUND, L.P., CANYON VALUE
REALIZATION MASTER FUND, L.P., CANYON
DISTRESSED OPPORTUNITY MASTERFUND, L.P.,
and CANYON-GRF MASTER FUND II, L.P.,

      Plaintiff,

vs.

FLORIDA GAMING CENTERS, INC., a Florida
corporation; FLORIDA GAMING CORPORATION, a
Delaware corporation; CITY NATIONAL BANK OF
FLORIDA, not individually but solely as Trustee under
the Land Trust Agreement dated January 3, 1979,
known as Trust Number 5003471; FREEDOM
HOLDING, INC., a Delaware Corporation; TARA
CLUB ESTATES, INC., a Georgia Corporation;
FLORIDA LEMARK CORPORATION, a Florida
corporation; ART SIGN CO., INC., a Florida
corporation; M & G FILL CORPORATION, a Florida
corporation; D2 CONSTRUCTION, INC., a Florida
corporation; AUSTIN TUPLER TRUCKING, INC., a
Florida corporation; DECKTIGHT ROOFING
SERVICES, INC., a Florida corporation; STATEWIDE
ELECTRIC & ENVIRONMENTAL SOLUTIONS,
LLC, a Florida limited liability company; LARRABEE
AIR CONDITIONING, INC., d/b/a KAR &
LARRABEE MECHANICAL CONTRACTORS, a
Florida corporation; HIGH TECH STRIPING, INC., a
Florida corporation; SOUTHEAST DUCT
SPECIALISTS, INC., a Florida corporation; and
BARREIRO CONCRETE CORPORATION, a Florida
corporation,

      Defendants.

_____/

### AFFIDAVIT OF DAVID JONAS

I, **DAVID JONAS** declare as follows:

1.      I received a Bachelor of Science Degree in Accounting from Widener University in June 1983 and completed Executive Education Courses at the University of Virginia Darden School and Cornell University.

2.      I have almost thirty years of experience in the gaming industry.  I am currently the President and Chief Operating Officer of Miami Casino Management, LLC ("MCM").  My curriculum vitae is attached hereto as Exhibit "A."

3.      On April 25, 2011, MCM entered into a Management Agreement ("Agreement") with Florida Gaming Centers, Inc. (the "Company").  Pursuant to the Agreement, MCM agreed to perform certain duties and was granted the authority, among other things, to supervise, manage, direct, and operate the Company's slots facility at its Miami Jai-Alai facility located in Miami, Florida (the "Miami-Dade Facility"), and to assist the Company in performing tasks reasonably necessary for its successful opening of that facility.

4.      I have been actively involved in MCM's performance of its obligations under the Agreement and, as a result, have become familiar with the Company's operations.  I was personally responsible for the hiring of key personnel in several areas, including marketing and operations.

5.      On September 25, 2012, I was appointed as Chief Restructuring Officer ("CRO") of the Company.  In that role, I was engaged to provide interim general management services over the Company and to oversee the day-to-day operations and activities of the Miami-Dade Facility, as well as Ft. Pierce Jai-Alai and Poker, which is the Company's facility in St. Lucie County, Florida (the "St. Lucie Facility")..

6.      As CRO, I was authorized and empowered, among other things:

        a.      To direct, oversee and manage the Company's daily operations, including, without limitation, to exercise sole responsibility for all treasury functions and day-to-day cash flow decisions.

        b.      To manage the Company's cash flow and liquidity and to make recommendations for and implement improvements.

        c.      To evaluate current management and employees, reporting and governance procedures and to implement appropriate alterations.

        d.      To provide any ongoing operational and financial updates and any other information required under the Credit Agreement between the Company and ABC Funding, LLC.

7.      As CRO, I learned of aspects of the Company's operations and numerous problems in connection therewith to which I was not privy in my role with MCM. Most notably, I learned that the Company was over $1 million behind in addressing its accounts payable, even though it appeared to have sufficient cash flow to pay its legitimate bills. Within three weeks, under my direction as CRO, all of the Company's legitimate bills were well on the way to being paid, and the backlog of over $1 million that existed at the time of my appointment as CRO had been reduced by approximately 70%.

8.      In addition, based on an audit performed at the request of ABC Funding LLC, it appears that the Company has been paying directly all of the employees of its corporate parent, Florida Gaming Corporation ("Holdings") (including provision of benefits). Furthermore, it appears that the Company has been paying for certain direct liabilities of Holdings. In this regard, Holdings settled a lawsuit with CCLN, LLC ("CCLN"), yet it appears that the Company has paid most of the debt owed by Holdings to CCLN pursuant to the settlement.

9.      Furthermore, it appears that the Company has, inappropriately, paid certain personal expenses made of William B. Collett, Jr., and others. Also, the Company appears to have made a great number of undocumented expenditures.

10.     For example, it appears that, from January through July 2012, numerous expenses of a personal nature have been paid improperly using checks written from the Company's main operating bank account including, inter alia, (a) approximately $20,000.00 paid to cover personal rent and utility payments for William B. Collett, Jr., and his son, Kyle Collett, (b) $10,500.00 paid for a gas credit card used by William B. Collett, Jr., and Kyle Collett, and (c) $20,200.00 spent in petty cash replenishments with no apparent invoices of related payments.  Kyle Collett had been given an American Express card and gas credit card by the Company, even though he is a fairly junior employee.  In addition, on or about September 29, 2012, William B. Collett, Jr., wrote a check for prepayment of at least one month's future personal rent, at the rate of approximately $2,600.00 per month, from the checkbook for the Company's main operating bank account.

11.     I have seen evidence of additional misuses of the Company's funds.  These misuses, included the payment of exorbitant gas credit card, Sun-Pass, and hotel bills, as well as expensive meals, including meals at Capital Grill, Morton's, and other high-end restaurants costing thousands of dollars, for William B. Collett, Jr., and others.  I saw that these payments had been made despite the lack of proper documentation to establish that any of them represented proper business expenses.

12.     In the few weeks that I served as CRO, I was asked by the Company to take certain actions that I felt were improper and saw other clear evidence of improprieties.

13.     For example, I was asked to approve the transfer of $30,000.00 from the Company to Holdings.  I was told this transfer was necessary to pay certain bills of the Company, but I was not provided with any invoices.  I refused to approve the transfer without being provided actual, legitimate invoices.  When invoices were finally provided to me, they

4

only totaled approximately $7,000.00. No satisfactory explanation was every provided for the $23,000.00 discrepancy.

14.    In addition, I immediately saw that the Company's petty cash accounts were being misused. In particular, it was clear that they were being used to pay the personal expenses of William B. Collett, Jr., and his son, Kyle Collett, some of which are described above. I therefore took steps to block further improper disbursements of "petty cash." I also sought to have the Company's check books and credit cards retrieved from William B. Collett, Jr., who had them in his personal possession, and instead secured in the Company's accounting department, where they belonged. I promptly began to investigate the use and misuse of the Company's petty cash accounts and credit cards.

15.    Furthermore, I learned that, under section 5.01(a) of the Credit Agreement entered into between the Company, Holdings, and the Company's lenders, represented by ABC Funding, LLC, the Company was required to terminate its auditor, King & Company PSC, and to engage a new auditor. The Company, however, had refused to do so and had continued to employ King & Company PSC. Therefore, I refused to authorize payments to King & Company PSC.

16.    On Friday, October 20, 2012, I was informed by Daniel Licciardi that the Company's Board had voted to terminate my employment as CRO. Mr. Licciardi informed me that the termination was due to my refusal to approve the transfer of money from the Company to Holdings, as described above. However, Mr. Licciardi asked me if I would agree to stay on as an employee of the Company in a capacity other than as CRO.

17.    On October 22, 2012, I received a termination notice from the Company, a copy of which is attached hereto as Exhibit "B." I pointed out to Mr. Licciardi that the notice was incorrectly dated October 5, 2012. He said that the date on the notice was a mistake. Also on

Monday, October 22, 2012, William B. Collett, Jr., offered me a job with the Company in a position other than as CRO.  I declined that offer.

18.    I am concerned that, with my termination as CRO, the Company will revert to or will continue the improper practices I identified and have tried to stop.  I am also concerned that some of the key personnel in the marketing, operations, and other areas in whose hiring I was directly involved will decide to leave the Company because of my termination as CRO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 23, 2012

STATE OF _Florida_ )
) SS:
COUNTY OF _Miami Dade_ )

**BEFORE ME**, the undersigned authority, on October 23, 2012, personally appeared David Jonas, who took an oath, and who is personally known to me and/or produced _New Jersey Driver License_ as identification.

_____
Notary Public, State of _Florida_

NOTARY PUBLIC-STATE OF FLORIDA
Connie Graver
Commission #DD843876
Expires:  DEC. 15, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

#2470404 v1

6

# Exhibit A

## Dave Jonas

4 Overlook Court Medford, NJ 08055 · (c) 609-234-4133
davesjonas@gmail.com

## Career Statement

Dave Jonas' astute business acumen and strategic philosophy is derived from his
first-hand experience in developing and operating the most profitable casino
properties in the country.

## Experience

**Parx Casino, Bensalem PA**                                                2006 - 2010
**President & Chief Operating Officer**

- Appointed in 2006 as President & Chief Operating officer of Philadelphia Park Casino, a temporary facility, responsible for gaining licensing, opening first facility, recruitment of entire gaming management team in record time of four months
- Oversaw design of master plan and construction of permanent facility (Parx Casino) over a three-year period
- Branding, positioning, execution of marketing and operations of both PPC & Parx
- Led the team responsible for the highest casino revenue in Pennsylvania 2007 – 2010
- Parx Casino 2010 estimated GTR  –  $421 Million
- Philadelphia Park Casino GTR 2007  –  $283 Million, 2008 – $343 Million, 2009 – $357 Million, Parx leads the industry with highest win per unit ($396, East Coast Slot Report)
- Three year average operating margin – 30%
- Key contributor to live table games legislation in Pennsylvania
- Facilitated the amendment to the Clean Indoor Act, which resulted in the designation of 50% of the gaming floor in PA for smoking games

**Harrah's Entertainment Inc., Atlantic City NJ**
**Regional President of Atlantic City Operations**                          2004 - 2005

- Pioneered the establishment of multi-property consolidation.
- Oversaw four properties, Harrah's, Caesars, Bally's & Showboat
- Total annual gaming revenue $1.9 Billion
- Opened House of Blues at Showboat in July 2005
- Oversaw development of $175 Million dollar retail pier at Caesars
- Developed design for the $550 Million dollar expansion of Harrah's Resort

**Harrah's Resort, Atlantic City NJ**
**Senior Vice President & General Manager**                                 1998 – 2004

- Contributed to record breaking revenue growth year over year from 1999 – 2004
- Managed all aspects of marketing and operation with an excess of 2,000 rooms, 3,500 slots, 120 tables and 3,500 employees

# Dave Jonas

4 Overlook Court Medford, NJ 08055 · (c) 609-234-4133
davesjonas@gmail.com

Showboat, Atlantic City NJ
**Vice President of Operations**                                          1986 – 1998
- Participated on the opening team in 1986 and held various positions in management until being promoted to Vice President of Operations with full property responsibilities reporting to the President
- Initiated several casino expansion projects
- Executed development of Asian Market

Harrah's Resort, Atlantic City NJ
**Finance**                                                              1983 – 1986
- Started gaming career in Internal Audit and climbed through the ranks of Finance into Operations

**Education**

Widener University
Bachelor of Science in Accounting

Executive Education Courses
University of Virginia Darden School and Cornell University

# Exhibit B

*FLORIDA GAMING CENTERS, INC.*

October 5, 2012

Mr. David Jonas
3500 NW 37th Ave.
Miami, Florida 33142

      Re:   Termination of Engagement

Dear Mr. Jonas:

Reference is made to the Engagement Letter between you and Florida Gaming Centers, Inc. (the "Company") dated September 24, 2012. By order of the Board of Directors of the Company, this is written notice, as contemplated by paragraph 8(ii) of the Engagement Letter, that your Engagement (as that term is defined in the Engagement Letter) with the Company is hereby terminated effective immediately.

Should you have any questions do not hesitate to contact me.

Sincerely,

W. Bennett Collett, Jr.
Chief Executive Officer

cc:    R. James Straus
      Frost Brown Todd LLC
      400 W. Market Street
      32nd Floor
      Louisville, KY 40202