**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

**FLORIDA GAMING CENTERS, INC.,**

          Debtor.

_____/

Case No.:  **13-29597-RAM**[1]
(Jointly Administered)

Chapter 11

**MOTION OF ABC FUNDING, LLC FOR AN ORDER DIRECTING
THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT
TO SECTION 1104 OF THE BANKRUPTCY CODE AND FOR AN ORDER
DIRECTING THAT DAVID JONAS REMAIN AS RECEIVER
<u>PURSUANT TO SECTION 543(D) OF THE BANKRUPTCY CODE</u>**

ABC Funding, LLC ("ABC"), as Administrative Agent for Summit Partners

Subordinated Debt Fund IV-A, L.P., Summit Partners Subordinated Debt Fund IV-B, L.P., J.P.

Morgan Securities LLC, Locust Street Funding LLC, Canyon Value Realization Fund, L.P.,

Canyon Value Realization Master Fund, L.P., Canyon Distressed Opportunity Master Fund, L.P.,

and Canyon-GRF Master Fund II, L.P. (collectively, "Lenders"), respectfully moves this Court

for an order directing the appointment of a chapter 11 trustee for Debtor Florida Gaming Centers,

Inc. pursuant to sections 1104(a)(1) and 1104(a)(2) of the United States Bankruptcy Code (the

"Bankruptcy Code"), 11 U.S.C. § 101 <u>et seq</u>., and for an order directing that David Jonas be

retained as Receiver managing the post-petition affairs of Debtors Florida Gaming Centers, Inc.,

pursuant to section 543(d) of the Bankruptcy Code.  In support of this motion (the "Motion"),

ABC respectfully states as follows:

---

[1] Pursuant to Order [ECF No. 11], the Court is jointly administering the following cases under the Lead Case No. 13-29597-RAM:  (i) Florida Gaming Centers, Inc. (Case No. 13-29597-RAM)(Tax ID: 5893); (ii) Florida Gaming Corporation (Case No. 13-29598-RAM)(Tax ID: 0533); (iii) Tara Club Estates, Inc. (Case No. 13-29603-RAM)(Tax ID:  9545); and (iv) Freedom Holding, Inc. (Case No. 13-29607)(Tax ID:  4929).

## PRELIMINARY STATEMENT

1.        Immediate appointment of a chapter 11 trustee for Florida Gaming Centers, Inc. ("FGC") and authorization for FGC's pre-petition receiver to continue operating its business are necessary to protect the interests of FGC's stakeholders in these bankruptcy cases.[2]  The significant nature of the relief ABC seeks in this Motion is justified by the substantial and manifest conflicts of interest of FGC's insiders, their history of mismanagement and self-dealing, and their flagrant and repeated violation of contractual obligations in order to benefit themselves.

2.        FGC owns substantially all of the assets that are the subject of these bankruptcy cases, including Casino Miami/Casino Jai-Alai.  FGC's parent, Florida Gaming Corporation ("Holdings"), owns 100% of the stock of FGC but has no other meaningful assets. Consequently, Holdings' creditors and equity holders depend almost entirely upon the value of FGC's equity for any recovery they might obtain in these cases.  Moreover, Holdings' largest unsecured creditors and largest equity holders – directly or indirectly through legal entities they own and/or control – are the President and Chief Executive Officer of FGC, William Bennett Collett, Jr. ("Collett"), and the Chairman of FGC, William Bennett Collett, Sr. ("Collett Sr.") (collectively, the "Insiders").

3.        Not surprisingly given these inherent conflicts of interests, the Insiders are pursuing a "strategy" for FGC that advances their own self-interests, not the interests of FGC's stakeholders.  The latest twist in that strategy is a completely unexpected and undisclosed bankruptcy filing on the eve of the closing of a sale that the Insiders had been pursuing for more than nine months, which likely would have paid FGC's secured and unsecured creditors in full.

---

[2] Although ABC, through this Motion, seeks the appointment of a chapter 11 trustee and the retention of David Jonas as Receiver only with respect to Florida Gaming Centers, Inc., ABC would not object to the same relief with respect to the remaining Debtors as well.

The only logical explanation for the Insiders' abrupt decision to withdraw from the transaction is a realization that they would not receive certain benefits that they had previously expected.  By contrast, the unanticipated bankruptcy filing they initiated could result in tens of millions of dollars of additional claims against FGC, including a potential break-up fee/expense reimbursement of up to $5,100,000 payable to the prospective pre-filing purchaser, continuing accrual of interest on secured and potentially unsecured claims, and significant bankruptcy expenses, not to mention the significant risk associated with aborting a strategy they had been pursuing for almost a year.  The Insiders are pursuing this new high-risk strategy in the hope of achieving value for themselves through their claims against and equity interests in Holdings, irrespective of the inappropriate risks that such a strategy entails for FGC's secured and unsecured creditors.  In addition to gambling with the FGC's stakeholders money seeking a favorable return for themselves, the Insiders' decision to file was apparently made with no consideration of the impact that the bankruptcy could have on the business – such as the likely negative effect on the perception of the customers of the casino.

4.      A long history of pervasive self-dealing and mismanagement by the Insiders further supports appointment of a chapter 11 trustee and authorization for FGC's pre-petition receiver, Mr. David Jonas ("Jonas"), to remain in place.  That history, which is detailed below, includes improper payments of FGC's cash to entities owned and/or controlled by the Insiders, including to family members of the Insiders and to the Insiders themselves for expenses unrelated to the business.  These improper payments are among the reasons that ABC sought the appointment of Jonas as receiver last November during foreclosure proceedings initiated by the Lenders — an appointment which the Florida state court judge ordered.  Since his appointment,

Jonas has by all accounts improved FGC's business operations and virtually eliminated the Insiders' self-dealing, and the business has achieved greater success.

5.       The Lenders, who lent FGC the money to build Casino Miami/Casino Jai-Alai, have endured over twenty separate breaches of their credit agreement over the past two years, including principal and interest payment defaults.  Throughout that time, the Insiders have completely changed course numerous times to continue to try and stretch out the process without making the Lenders whole in accordance with the terms of the contracts into which the Debtors (through the Insiders) freely entered.  These bankruptcy cases are the latest such change in course. In the meantime, the Lenders are still waiting to be paid.

6.       Authorization for Jonas to continue running FGC's business during these bankruptcy cases is absolutely essential and clearly is in the best interests of all of FGC's stakeholders given Jonas's success over the past 10 months and the Insiders' inability to properly run the business.  Further, because of the Insiders' inability to run their business and discharge their fiduciary duties at FGC, their direct conflicts of interest and history of self-dealing, appointment of a chapter 11 trustee to make non-operational decisions on behalf of FGC in these bankruptcy cases also is necessary to protect the interests of FGC's stakeholders.

## FACTUAL BACKGROUND

### A.    The Debtors' and Insiders' Relationships and Obligations

7.       Debtor FGC is a Florida corporation that owns and operates a gaming facility in Miami-Dade County, Florida, known as Casino Miami/Casino Jai Alai.  Declaration of Marissa Kelley in Support of the Motion ("Kelley Decl.") Exh. A ¶ 11.  Debtor Holdings is a Delaware corporation whose only meaningful asset is 100% of the stock of FGC.  *Id.* ¶ 13.  Debtor Freedom Holding, Inc. ("Freedom") is a Delaware corporation, *id.* ¶ 16, that owns approximately 33% of the stock of Holdings.  Kelley Decl. Exh. B at 9:3-8.

4

8.      Collett is the President and Chief Executive Officer of both FGC and of Holdings. *See* Voluntary Petition at Corporate Resolution, *In re Florida Gaming Centers, Inc., et al.*, No. 13-29598-AJC (S.D. Fla. filed Aug. 19, 2013) (Docket No. 1); Voluntary Petition at Corporate Resolution, *In re Florida Gaming Centers, Inc., et al.*, No. 13-29598-AJC (S.D. Fla. filed Aug. 19, 2013) (Docket No. 1).  Collett Sr. is the Chairman of FGC and Holdings.  Kelley Decl. Exh. C at 15.  Collett and Collett Sr. are equity holders of Holdings and of Freedom.  *Id.* at 16.

9.      FGC, Holdings, Freedom and the Insiders are interconnected through financial obligations as well as through management and ownership.  For example, with cash taken from FGC, Holdings transferred funds for no consideration to non-debtor Freedom Financial Corporation, a related entity controlled by the Insiders, for the benefit of Collett Sr.  This benefit was nominally the management fee that Collett Sr. receives as Chairman of Holdings. *Id.* at 15. When these management fees and other accounts receivable from Freedom Financial Corporation accrued as unpaid, Holdings entered into a promissory note with Freedom Financial Corporation in the amount of $1,905,000.  *Id.*  Holdings also paid Collett Sr. with funds taken from FGC, under a consulting agreement that provides for the payment of $300,000 to $400,000 annually. *Id.*; *see also* ¶ 17, *infra*.  In another example, Freedom Financial Corporation purchased a $2,400,000 loan owed by FGC to Centers First Bank.  *Id.* at 16.  When the note matured, it was refinanced with a $1,322,574 note that was issued to Freedom.  *Id.*  On April 25, 2011, on or about the date that the Credit Agreement described below was executed with ABC, FGC and Freedom modified this note such that FGC was released from its obligations and Holdings became the new obligor—although the cash to make payments would necessarily still come from FGC.  *Id.*

**B.**     **FGC's Entry into Credit Agreement and History of Defaults**

10.     In April 2011, FGC and Holdings executed a Credit Agreement with ABC, as administrative agent for the Lenders, under which the Lenders agreed to extend loans to FGC in the amount of $87,000,000, with Holdings, Freedom, and Tara Club Estates, Inc. as guarantors. *See* Credit Agreement.  The loans were to be used to fund the construction of a new casino at the existing Miami Jai-Alai Facility, and were secured by mortgages in Miami-Dade County and St. Lucie County, Florida.  The Credit Agreement defined numerous occurrences and circumstances that would constitute an Event of Default (as defined in the Credit Agreement).  Under the Credit Agreement, if any Event of Default occurred, ABC had the right to foreclose on the mortgages and take possession of the property.   Kelley Decl. Exh. D § 7.01; Kelley Decl. Exh. E §§ 6.2, 6.3.  In addition, the Lenders, FGC, and Holdings executed a Warrant Agreement in April 2011, pursuant to which FGC issued to the Lenders warrants to purchase FGC's common stock.

11.     Beginning at least as early as June 2011, FGC was in default under the Credit Agreement.  As described below, in addition to failing to pay principal due under the loans, FGC defaulted by making payments to creditors whose priority was lower than that of the Lenders, and by making payments to certain affiliates of the FGC Debtors' management.

12.     After numerous Events of Default, including monetary Events of Default, ABC accelerated the obligations under the Credit Agreement on August 9, 2012.  In September 2012, ABC brought foreclosure actions in Miami-Dade County and St. Lucie County, Florida which were to be consolidated into a single action pending in the Circuit Court of the 11th Judicial Circuit in Miami, Florida, entitled *ABC Funding, LLC, et al. v. Florida Gaming Centers, Inc., et al.*, Case No. 12-35064-CA-58 (the "Florida Foreclosure").  The Florida Foreclosure seeks to foreclose upon the mortgages that secured FGC's obligations to the Lenders, and otherwise to enforce the Credit Agreement.  After accelerating the obligations and initiating the Florida

Foreclosure, ABC continued in discussions with FGC and Holdings regarding a potential consensual resolution of the issues under the Credit Agreement.  However, during the course of foreclosure proceedings and the related litigation, it became clear that FGC's management had grossly and improperly mismanaged the affairs of FGC.

C.    **FGC's Impropriety**

13.    Over the course of these proceedings, ABC has learned of numerous instances of FGC and its affiliates, at the behest of the Insiders, making improper payments to and among each other and to the Insiders.  Many of these instances were known prior to ABC instituting the Florida Foreclosure, and in fact constituted Events of Default under the Credit Agreement.  After the Foreclosure, with the appointment of Jonas as Chief Restructuring Officer of FGC, *see* ¶¶ 22-24, *infra*, additional, more serious instances of impropriety came to light.  For example, FGC was over $1,000,000 in arrears on various accounts payable even while it was making improper payments to its affiliates for the benefit of the Insiders.

*Improper Payments Known Prior to Jonas's Appointment*

14.    Even before the Florida Foreclosure was instituted, numerous Events of Default had occurred under the Credit Agreement, including a number of payments made by FGC to its affiliates and, indirectly, to creditors of its affiliates, as well as other payments that violated the terms of the Credit Agreement.  These payments highlight the Insiders' use of FGC funds to pay other entities' debts.

15.    First, in June 2011, FGC provided Holdings with funds to make a payment of $54,835.00 in satisfaction of certain amounts owed by Freedom (an equity owner of Holdings) to Farmers Bank on a note (the "Farmers Note") that was essentially a personal margin loan for the Insiders secured by their shares in Holdings.  Kelley Decl. Exh. F.  This payment was in direct violation of Section 6.06 of the Credit Agreement.  As a result of this violation, ABC required

Freedom to return the payment to FGC, in exchange for which ABC retroactively consented to the transaction. During the time in which FGC and ABC worked together to address this unauthorized disbursement, FGC's management assured ABC that no further improper disbursements would occur. *Id.* FGC did not keep this promise.

16. Second, in April 2012, FGC began paying monthly interest on an obligation of Holdings. In total, FGC made four monthly payments in April, May, July, and August 2012, totaling $43,532.72. These payments were in direct violation of the Credit Agreement and also failed to respect proper corporate form, inasmuch as FGC directly paid the obligations of its corporate parent.

17. Third, under the Freedom Consulting Agreement,[3] Holdings made two payments of $25,000.00 each to Freedom, using funds obtained from FGC. Kelley Decl. Exh. H; Kelley Decl. Exh. I at 15. Because other Events of Default under the Credit Agreement were already outstanding when FGC (through Holdings) made these payments, the payments were likewise prohibited under the Credit Agreement.

18. Fourth, in June 2012, FGC made a payment of $100,322.95 to Holdings, which Holdings then disbursed to Freedom for use in making a further payment on the Farmers Note. Kelley Decl. Exh. H. These disbursements were not only in violation of the Credit Agreement and made in complete disregard for corporate governance, but were precisely the type of improper disbursements that FGC had made in June 2011 and that FGC's management had assured ABC would not be made again.

---

[3] In April 2011, Holdings and Freedom entered into the "Freedom Consulting Agreement" with Freedom Financial Corporation, whose principals are Collett and Collett Sr. The Freedom Consulting Agreement provided that FGC would compensate Collett Sr., using corporate funds, in connection with vague and undocumented consulting services. Kelley Decl. Exh. G at 131:17-133:8. Upon information and belief, the Freedom Consulting Agreement was nothing more than a mechanism set up by FGC's management to distribute funds to the Insiders.

19.     Finally, FGC, Holdings, and certain affiliated parties are subject to subordination agreements that requires certain affiliated parties receiving payments from either entity to turn those payments over to the Lenders.  Kelley Decl. Exh. J § 3.  FGC, Holdings, and their affiliates have violated these subordination agreements by not turning over the foregoing payments to the Lenders—for example, the payments made under the Freedom Consulting Agreement.

20.     These instances of improper payments to affiliates for the benefit of the Insiders, in addition to constituting Events of Default under the Credit Agreement, are symptomatic of FGC's management's inability to manage the company's finances, comply with corporate governance and contractual obligations, preserve corporate assets, and avoid benefitting themselves at the expense of their stakeholders.  ABC ultimately had no practical choice but to institute the Florida Foreclosure.

*FGC's Further Mismanagement Discovered after the Appointment of Jonas*

21.     After instituting the Florida Foreclosure in September 2012, ABC began to uncover even further mismanagement and self-dealing by FGC's management.

22.     In connection with the Florida Foreclosure, Jonas was appointed Chief Restructuring Officer ("CRO") of FGC in September 2012 Kelley Decl. Exh. K ¶ 5.  Prior to his appointment as CRO, Jonas, in his capacity as President and Chief Operating Officer of Miami Casino Management, LLC ("MCM"), had entered into a Management Agreement with FGC under which MCM would supervise and manage FGC's facility at Miami Jai-Alai.  *Id.* ¶¶ 2-3. MCM was retained in large part because FGC's management had no experience managing a casino operation, and needed professional assistance in making it profitable.  As President and COO of MCM, Jonas had familiarized himself with FGC's operations, but had not been allowed access to much information on the finances and expenses of the business.  *Id.* ¶ 4.

23.    Following the institution of the Florida Foreclosure, in his new capacity as CRO of FGC, Jonas oversaw the day-to-day operations and activities of the facilities in Miami-Dade and St. Lucie Counties.  *Id.*

24.    As CRO, Jonas was empowered to, among other things: (a) direct, oversee, and manage the daily operations of FGC, including exercising sole responsibility for all treasury functions and cash flow decisions; (b) manage FGC's cash flow and liquidity; (c) evaluate current management and employees, reporting, and governance procedures; and (d) provide ongoing operational and financial updates and any other information required under the Credit Agreement.  *Id.* ¶ 6.

25.    Once appointed CRO, Jonas began to uncover further fiscal abuses and mismanagement involving FGC, and started working to improve the financial situation of FGC.

26.    For example, Jonas learned that FGC was over $1,000,000 in arrears in addressing its accounts payable, despite having sufficient cash flow to pay its bills.  Within a matter of weeks after being appointed CRO, Jonas reduced this backlog by approximately 70% by re-organizing and re-prioritizing the bills.  *Id.* ¶ 7; Kelley Decl. Exh. L at 73:18-75:18.  Due to Jonas's efforts, FGC's vendors, including advertising vendors crucial to the casino's potential revenue growth, began working with FGC again.  Kelley Decl. Exh. L at 74:23-75:4.

27.    Jonas also helped reduce FGC's expenses by streamlining payroll, eliminating redundant positions, replacing overpaid employees with employees who commanded a lower salary, and implementing a hiring freeze with respect to new employees.  *Id.* at 77:4-25.

28.    Jonas further discovered that FGC had directly paid (a) all of Holdings's employees, (b) certain other liabilities of Holdings, and (c) a settlement payment for a lawsuit

between Holdings and CCLN, LLC, all of which was in contravention of proper corporate form and in violation of the Credit Agreement.  Kelley Decl. Exh. K ¶ 8.

29.     Jonas's efforts as CRO also revealed that from January to July 2012, in addition to its general corporate malfeasance, FGC had been paying a considerable amount of Collett's personal expenses, including, on a number of occasions, payments for alleged business expenditures that had no backup documentation.  These payments also violated the Credit Agreement.  The payments included:

- FGC paying approximately $20,000 to cover personal rent and utility payments for Collett and his son;

- FGC paying approximately $10,500 on a gas credit card used by Collett and his son;

- FGC paying approximately $20,200 in petty cash replenishments with no documentation;

- FGC paying at least one month's personal rent on behalf of Collett, in the amount of $2,600;

- FGC paying thousands of dollars in other undocumented personal expenses of Collett and others, including gas credit card and hotel bills, and expensive meals.

Kelley Decl. Exh. K ¶¶ 9-11.

30.     When Jonas discovered these misuses of FGC funds, he took steps to halt this activity, including removing FGC's corporate checkbooks and credit cards from Collett's possession and placing them with the company's accounting department.  *Id.* ¶ 14.

31.     While serving as CRO of FGC, Jonas was also asked multiple times by FGC's management to take actions that he believed were improper.  *Id.* ¶ 12.  For example, FGC management requested Jonas's approval of a transfer of $30,000 from FGC to Holdings, without any documentation.  When Jonas requested the backup documentation needed to approve the

$30,000 transfer, he was provided with invoices and receipts totaling only $7,000. Jonas refused to approve this transfer. *Id.* ¶ 13.

32.     Finally, when Jonas informed FGC management that the Credit Agreement required it to terminate its then current auditor, King & Company PSC, and to engage a new, independent auditor, FGC failed to take such action. Further, numerous auditors declined to accept an engagement by FGC. Kelley Decl. Exh. G at 39:9-40:3. In efforts to get FGC to comply with its contractual obligations, Jonas refused to authorize payments for the unauthorized work performed by King & Company PSC. Kelley Decl. Exh. K ¶ 15.

*Jonas's Termination and Appointment as Receiver*

33.     On October 19, 2012, having learned of the foregoing examples of FGC management's waste and mismanagement of FGC funds, ABC moved in the Florida Foreclosure to have Jonas appointed as a Receiver over the property. *See* Motion to Appoint Receiver. The following day, on October 20, 2012, FGC terminated Jonas's position as CRO. Jonas Aff. ¶ 16. Jonas received his termination notice on October 22, 2012. *Id.* ¶ 17 & Exh. B. On October 24, 2012, ABC supplemented its motion to appoint Jonas as Receiver of FGC. The Florida state court heard argument on the motion on October 25, 2012, and indicated that Jonas would be appointed on a temporary basis, but that if FGC could demonstrate that it was "doing everything above board," that it would remove Jonas as Receiver. *See* Hr'g Tr., 26:20-25. On November 27, 2012, the Court issued an order confirming Jonas's continued appointment as Receiver. *See* Receiver Order. Putting Jonas in charge of FGC resulted in a complete stop to the financial impropriety perpetrated by previous management.

D.    **The Silvermark Transaction and Jefferies Valuation**

34.     After initiating the Florida Foreclosure, the Lenders continued discussions with FGC regarding a potential restructuring that would have resulted in a consensual resolution of

the issues embodied in the Florida Foreclosure.  However, on or about November 25, 2012, FGC

and Holdings entered into a Stock Purchase Agreement ("SPA") with Silvermark, LLC

("Silvermark").  FGC gave the Lenders no indication that they were pursuing a sale until just

days prior to the announcement of the executed SPA with Silvermark.  Under the SPA,

Silvermark agreed to purchase the stock of FGC for $115,000,000 plus the assumption of certain

liabilities.  Among other things, the SPA contemplated a significant break-up fee payable to

Silvermark in the event of certain defaults thereunder by FGC and Holdings.

35.    Subsequent to the appointment of Jonas as receiver and execution of the SPA,

ABC exercised its right under the Warrant Agreement to seek a determination of FGC's "Net

Company Value" by a selected investment bank.  *See* Section 8 of the Warrant Agreement.  In

accordance with the provisions of the Warrant Agreement, Jefferies LLC was selected to

determine that "Net Company Value."  The result was a report dated June 27, 2013, issued by

Jefferies, which valued FGC at approximately $180 million.  Under the Warrant Agreement,

FGC was required to make a repurchase offer for the Lenders' warrants at a price based upon

Jefferies' valuation.  The Lenders accepted FGC's repurchase offer in a letter dated July 25,

2013.

36.    After the issuance of the Jefferies report in June, FGC continued to push hard

toward completion of the Silvermark transaction.  For example, on or about July 19, 2013, FGC

and Holdings moved in the Florida Foreclosure for an order directing ABC to accept full

payment of all of FGC's and Holdings's obligations, in the amount of $120,274,150.29, upon the

upcoming closing of the Silvermark transaction.[4]  *See* Motion to Compel ABC to Accept Full

---

[4] Much of the delay in closing the Silvermark transaction related to the refusal of the Debtors to acknowledge and
properly account for the terms of the Warrant Agreement.  For example, the Debtors sought payment of certain
undocumented payables allegedly owed by FGC to Holdings, which would have reduced the repurchase price of the

Payoff.  Over the next month, FGC, ABC and Silvermark negotiated resolutions of substantially all of their open issues, and the Lenders and Silvermark anticipated that the transaction likely would close before the end of August.  But just before that anticipated closing, on August 19, 2013, the FGC Debtors' management elected to file these voluntary bankruptcy petitions (the "Petition") without notifying the Lenders or Silvermark.

37.     The Petition was completely unexpected and, upon information and belief, FGC did not communicate (or plan communications) with its employees or customers regarding the filing, or try to negotiate use of cash collateral with the Lenders.  By filing the Petition on the eve of closing of a sale that likely would have paid FGC's creditors in full, FGC's management has caused FGC to incur significant incremental costs attributable to, among other things, the administrative expenses of bankruptcy and a potential $5.1 million break-up fee and expense reimbursement claim by Silvermark, as well as risk forgoing a responsible solution to the company's financial problems.  Moreover, even after the Petition, FGC's management has continued to demonstrate their lack of regard for their creditors or fiduciary obligations: ABC has recently learned that FGC maintains two bank accounts that it had not previously disclosed. *See* Debtors' Emergency Motion, filed on August 22, 2013, at Exh. A (Docket No. 27).  These are only the latest examples of FGC's management's demonstrated inability to manage the affairs of its company responsibly.

---

warrants under certain provisions of the Warrant Agreement (as well as potentially providing improper benefits to the Insiders).

<u>**ARGUMENT**</u>

**A.    <u>The Appointment of a Trustee is Warranted</u>**

38.    The appointment of a chapter 11 trustee is warranted in this case pursuant to both

section 1104(a)(1) and section 1104(a)(2) of the Bankruptcy Code.  Section 1104(a) provides, in

relevant part:

> At any time after the commencement of the case but before confirmation
> of a plan, on request of a party in interest or the United States trustee, and
> after notice and a hearing, the court shall order the appointment of a
> trustee –
>
> (1)  for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management, either
> before or after the commencement of the case, or similar cause . . . ; or
>
> (2)  if such appointment is in the interests of creditors, any equity security
> holders, and other interests of the estate, without regard to the number of
> holders of securities of the debtor or the amount of assets or liabilities of
> the debtor [ ].

11 U.S.C. § 1104(a)(1), (a)(2).

39.    A court's decision to appoint a trustee under §1104(a) is a fact intensive inquiry

made on a case-by-case basis.  *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla.

2003).  A court may consider the cumulative or collective impact of the conduct and issues

raised, whether occurring pre- or post-petition.  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228

(3d Cir. 1989); *In re Cardinal Indus., Inc.*, 109 B.R. 755,  759-61, 66 (Bankr. S.D. Ohio 1990).

40.    Once a court determines that the movant has met its burden of proving that cause

exists under §1104(a)(1), it *must* order the appointment of a trustee.  *In re Oklahoma Refining*

*Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re SunCruz Casinos*, 298 B.R. at 828 ("Once the

court finds that cause exists under 1104(a)(1), there is no discretion; an independent trustee must

be appointed.").[5]   The examples of cause enumerated in §1104(a)(1)—fraud, dishonesty, incompetence or gross mismanagement—are not exhaustive; a court may find that cause exists for a reason not specifically set forth in the statute.  *In re SunCruz Casinos*, 298 B.R. at 830. Thus, courts have considered additional factors when appointing a trustee under §1104(a)(1), including:  (1) the materiality of the misconduct; (2) the evenhandedness or lack of the same in dealings with insiders or affiliated entities vis-à-vis other creditors  or customers; (3) the existence of pre-petition voidable preferences or fraudulent transfers; (4) the unwillingness or inability of management to pursue the estate causes of action;  (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and (6) self-dealing by management or waste or squandering of corporate assets.  *Id.* (citing *In re Matter of Intercat, Inc.*, 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000)).[6]

41.    Even if a bankruptcy court does not find that cause exists to appoint a chapter 11 trustee under §1104(a)(1), the court may still appoint a trustee pursuant to §1104(a)(2) if it is in the "interest of the creditors . . . and other interests of the estate . . . ."  11 U.S.C. § 1104(a)(2); *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1), §1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists").  Section 1104(a)(2) provides a more flexible standard for appointment and gives a court discretion to appoint a trustee "when to do so

---

[5] Some courts have indicated that grounds for the appointment of a trustee must be established by "clear and convincing" evidence.  *See In re G-I Holdings, Inc.*, 385 F.3d 313, 319-21 (3rd Cir. 2004).  ABC respectfully submits that in light of Supreme Court precedent and the recent addition of § 1104(e) to the Bankruptcy Code, the better view is that the "preponderance of the evidence" standard applies. *See Tradex Corp. v. Morse*, 339 F.3d 823, 829-32 (D. Mass. 2006) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

[6] *See also In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), *aff'd in part, vacated in part*, 254 B.R. 509 (D. Conn. 2000) ("[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence.")

would serve the parties' and estate's interests." *In re Marvel Entertainment Group, Inc.*, 140

F.3d 463, 474 (3rd Cir. 1998); *In re Sharon Steel Corp.*, 871 F.2d at 1226.

        i.      <u>Cause Exists for the Appointment of a Chapter 11 Trustee Under Section 1104(a)(1)</u>

      42.     Through § 1104(a)(1) of the Bankruptcy Code, Congress has mandated that a

chapter 11 debtor-in-possession, who acts as a fiduciary of the bankrupt estate, be an honest

broker.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985)

("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that

the officers and managing employees can be depended upon to carry out the fiduciary

responsibilities of a trustee.'").  When a debtor-in-possession, its management, or its

professionals have exhibited an inability or unwillingness to comply with their basic fiduciary

duties, there is but one remedy established by Congress to supplant management while allowing

the case to remain in chapter 11: the appointment of a trustee pursuant to 11 U.S.C. § 1104(a).

*See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("And if

the debtor-in-possession defaults in this respect, [s]ection 1104(a)(1) [of the Bankruptcy Code]

commands that stewardship of the reorganization effort must be turned over to an independent

trustee.").   Here, the Insiders that would control the FGC Debtors' course in these bankruptcy

cases have engaged in numerous acts amounting to dishonesty, incompetence, gross

mismanagement, and breaches of fiduciary duties that mandate the appointment of a chapter 11

trustee.  In addition, as is evident from the circumstances of, and apparent strategy behind, the

filing of the Petition, the FGC Debtors have significant conflicts of interest that mandate a trustee

to oversee the FGC estate, where the value of the business resides.

      43.     <u>Material Misconduct and Breach of Fiduciary Duties</u>.   The numerous improper

payments to or on behalf of Insiders and relatives of Insiders clearly demonstrates the need in

these cases for the appointment of a trustee to manage the affairs of FGC's estate. Specifically, FGC has made a number or improper or highly questionable payments covering, among other things, (a) at least $50,000 of Collett's personal expenses, (b) other exorbitant credit card and hotel bills that likewise appear to be improper and of a personal nature, and (c) an improper prepayment of Collett's personal rent that he caused to be made immediately upon the appointed CRO's request to Collett to relinquish control of FGC's checkbook. Kelley Decl. Exh. K ¶¶ 9-11.

44.      In addition to directly funneling funds to or on behalf of the Insiders and their family members, FGC's assets have improperly been distributed to affiliates controlled by the Insiders for the purposes of enriching the Insiders, in violation of the Credit Agreement and subordination agreements. FGC (through Holdings) also made two payments totaling $50,000 pursuant to a consultancy agreement entered into between Holdings and its affiliate, Freedom. Kelley Decl. Exh. H; Kelley Decl. Exh. I at 15. The actual benefit to Holdings and FGC under this agreement, as well as the "consulting" services provided under it, are certainly suspect, Kelley Decl. Exh. G at 131:17-133:8, as the consulting agreement appears to be nothing more than a mechanism set up by FGC to funnel its borrowed money to Collett and his father, Collett, Sr., both of whom are equity holders in Freedom. All of these actions, whether viewed individually or collectively, demonstrate that the Insiders of FGC have repeatedly paid themselves or affiliates that they control at the expense of protecting FGC's creditors' interests, which provides yet another basis to find cause under §1104(a)(1). *See e.g., In re Intercat, Inc.*, 247 B.R. at 922 (principal charging thousands of dollars of personal travel expenses to the debtor as business expenses were either acts of incompetence or mismanagement that supported finding of cause under §1104(a)); *In re Colby Const. Corp.*, 51 B.R. 113 (S.D.N.Y. 1985) (majority

shareholders' depletion of debtor's assets through payment of exorbitant personal expenses, while avoiding obligations due to creditors, required appointment of trustee).

45.     <u>Conflicts Among Debtors and Disregard for Corporate Formality</u>.  FGC's past conduct is marked by a consistent pattern of its Insiders – acting as management or simply directing affairs through their control as indirect owners – improperly diverting funds to affiliated entities and subordinate creditors, in lieu of fulfilling FGC's contractual obligations to more senior creditors, including the Lenders.  In so doing, there has been no adherence to corporate formality.  The willful, improper diversion of funds away from FGC's creditors have included a variety of distributions made by and among the FGC, Holdings, their principals, and/or their affiliates.[7]

46.     Even if Jonas remains as receiver, which the Lenders view as absolutely essential to avoid further misconduct, there is significant risk to the FGC estate in allowing the Insiders to retain *any* modicum of control in these cases.  Their track record of dishonest dealings, breaches of fiduciary duties to the Lenders and other creditors, and/or the complete lack of managerial control required to protect the collateral of its secured creditors, any of which individually provides sufficient grounds to find cause under §1104(a)(1).  *See e.g,. In re Celeritas Techs., LLC*, 446 B.R. 514 (Bankr. D. Kan. 2011) (debtors' repeated breaches of fiduciary duties in failing to disclose material information regarding finances warranted appointment of trustee); *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1336 (10th Cir. 1988) (cause found under § 1104(a)(1) when there was a history of transactions between the debtor and related companies).

---

[7] These distributions include, among others: (a) a $55,000 distribution by Holdings, using FGC's funds, to pay amounts owed by its affiliate, Freedom, (*see* Kelley Decl. Exh. F); (b) up to $44,000 in monthly interest payments made by FGC on an obligation of Holdings, and (c) an additional $100,000 distribution by Holdings, using FGC's funds, to pay amounts owed by Freedom (*see* Kelley Decl. Exh. H).  This last $100,000 payment was made in flagrant contravention of the assurance that senior management of FGC had given ABC only weeks earlier that they would refrain from making any more unpermitted distributions of this type.

Further, the Insiders' repeated disregard for corporate form, and favoritism of certain of the Debtors' over others (i.e., the ones that they directly control), presents hopeless conflicts that cannot be overcome.

47.     <u>Failure to Properly Manage FGC</u>.  In addition to the material waste of assets through improper self-dealing, past conduct has shown that without Jonas, FGC is simply incapable of exercising proper fiscal responsibility in the day to day operations of its business. For example, after Jonas was appointed CRO, it was revealed that FGC was over $1,000,000 in arrears on its accounts payables, despite having sufficient cash flow to pay such liabilities. Within a matter of weeks after being appointed CRO, Jonas reduced the outstanding payables by approximately 70%.  Kelley Decl. Exh. L at 73:18-75:18.  The only conclusion that can be drawn from this dramatic shift to proper account management is that FGC's management lacks the discipline, or more likely, simply refuses, to institute fiscal and managerial controls necessary to ensure that all of their creditors' interests are maintained.  This failure to properly manage the business and handle FGC's finances also provides grounds for finding cause under §1104(a)(1). *See In re Oklahoma Refining Co.*, 838 F.2d at 1335 (cause found when debtor made no efforts to collect accounts receivables owed by affiliated companies).

48.     Indeed, the mismanagement of FGC's financial affairs has been so bad that reputable accounting firms have refused to work with the company.  Under these circumstances, there is ample evidence that cause exists to appoint an independent chapter 11 trustee.  *See, e.g.*, *In re U.S. Commc'ns. of Westchester, Inc.*, 123 B.R. 491 (Bankr. S.D.N.Y. 1991) (appointment of trustee when debtor mishandled its affairs and failed to maintain financial books and records to extent that accounting firm concluded that debtor's financial records were incapable of being audited).

49.     <u>Significant Risks to Stakeholders' Interests</u>.   There are serious and well-founded questions about FGC's ability to protect its stakeholders' interests or properly restructure during these chapter 11 cases.   For example, FGC previously operated in a manner in which expense payments did not require proper—or any—backup documentation.   Kelley Decl. Exh. L at 73:18-75:18.   *See, e.g., In re PRS Ins. Group, Inc.,* 274 B.R. 381 (Bankr. D. Del. 2001)  (trustee appointed when the debtor and its management had diverted funds without satisfactory explanation of such diversion).   Other significant concerns exist about the proper financial accounting and reporting by FGC during the pendency of this reorganization due to, among other things: (a) FGC's previous refusal—in violation of its contractual obligations—to engage new, independent accountants (*see* Kelley Decl. Exh. G at 39:9-40:3); (b) FGC's previous attempt to exclude Jonas, an independent fiduciary, from the management of the financial operations; (c) the Insiders' failure to disclose a liability of $3,600,000, which ABC uncovered prior to the closing of the Silvermark transaction; and (d) the submission of documents in which an Insider apparently inserted his own signature for that of a city official.

50.     Further, given the Insiders' reluctance to terminate FGC's previous auditor, it is highly doubtful that they, as debtors in possession, are the proper parties to conduct an independent investigation into whether the estate has any colorable claims against that auditor, other professionals, or any other persons or entities.  *In re Sharon Steel Corp.*, 871 F.2d at 1220-21.  Further, it goes without saying that these Debtors will not, if the Insiders remain in charge of the bankruptcy aspects of the FGC estate, have the benefit of impartial examiners of other

potential estate causes of action against the Insiders for, among other things, breach of fiduciary duty, and against its affiliates.[8]

51.    <u>Inability to Work With Creditors and Achieve Consensus</u>.  FGC's cynical gamesmanship throughout the duration of its relationship with the Lenders, including repeated Events of Default under the Credit Agreement and related indifference to the truth in addressing such defaults, its attempts to fire Jonas during the Florida Foreclosure, its refusal to close on the Silvermark Transaction,[9] and its filing of this Chapter 11 case to avoid that closing, have led to bitter, contentious relations between FGC and the Lenders.  The Lenders are by far the largest creditor in these cases, and are secured by all of FGC's assets.  Given the level of acrimony, this will almost certainly impede reorganization efforts and alone is sufficient to find cause under §1104(a)(1).  *See In re Celeritas Techs., LLC*, 446 B.R. at 519 ("Acrimony between debtor and creditor which impedes the reorganization effort is cause to appoint a Chapter 11 trustee.")  Certainly, based upon its previous actions and relationship with the Lenders, it is highly doubtful that FGC can transition from the position of zealous and self-interested litigant that it previously occupied to the objective fiduciary that it is required to be throughout this bankruptcy.  *See generally In re Norton Corp.*, 330 B.R. 573, 590 (Bankr. W.D. Mich. 2005).

ii.    <u>The Best Interests of the Creditors are Served by the Appointment of a Trustee</u>

52.    In determining whether a trustee should be appointed under §1104(a)(2), courts "look to the practical realities and necessities."  *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).  Among the factors considered by the court are: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the

---

[8] Prior to the Petition, at least two shareholder lawsuits were filed asserting breach of fiduciary duties.  On information and belief, one of these suits has settled, while the other remains pending.
[9] The Debtors made many contradictory statements in their first-day papers assigning blame to both the Lenders and Silvermark for their bankruptcy filing.

debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *Id.* (citations omitted); *see also Euro-American*, 365 B.R. at 427.

53.    Under the circumstances here, it is undoubtedly in the best interests of all creditors that an independent trustee is appointed, even if Jonas remains in place as receiver (which the Lenders believe is absolutely necessary).  Considering the circumstances surrounding FGC's Petition – made without warning and without planning of any kind – there is every reason to believe that FGC's current management, if allowed to manage the reorganization, would behave as erratically and irresponsibly as they did while running their businesses, resulting at least in a continued waste of corporate assets.  *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980) (describing equitable remedy under § 1104(a)(2) as "a special blend of what is necessary, what is fair and what is workable" and appointing trustee as in creditors' best interest where debtor "fail[ed] . . . to keep adequate books and records, to properly maintain the hotel while it was within its control and in order to open the possibility of other [reorganization] plans being presented")

54.    Under the Insiders' direction, FGC has, at every recent turn, decided to delay or withdraw from transactions and arrangements that could have benefited its creditors, in favor of pursuing increasingly risky strategies for the sole benefit of the Insiders.  With its last-minute, unplanned chapter 11 filing, there is a meaningful risk that the Insiders will continue these delay tactics and prolong the restructuring process (while getting paid handsomely in their managerial roles, even though harming the business), resulting in even further depletion of the estate's assets.  This bankruptcy, if left to the Insiders' devices, will significantly increase claims against

FGC's estate through accruals of restructuring costs, the compounding interest on FGC's secured obligations, and a potential $5,100,000 break-up fee/expense reimbursement claim by Silvermark, whose prospective purchase was foiled at the last minute by the Petition.  The appointment of an independent chapter 11 trustee free from any other motivations except to maximize the value of the estate is thus appropriate and necessary.  Such an appointment will benefit *all* of FGC's stakeholders by clearing away the self-dealing, conflicts and acrimony that have defined the Insiders' control of FGC, and would clearly outweigh the cost.  *See, e.g., In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. W. Va. 1980) (appointing chapter 11 trustee pursuant to § 1104(a)(2) and concluding that, based on "a cost-benefit analysis," "it would be more economical, beneficial and advantageous to the creditors" to replace current management with trustee where debtor's retail department stores were "suffering substantial operating losses," and where assets were being depleted by expenses).

E.  **This Court Should Allow David Jonas to Remain in Place as Receiver Pursuant to Section 543(d)(1)**

55.     In addition to appointing a chapter 11 trustee, it is also in FGC's stakeholders' best interest for the estate to retain Jonas as receiver and avoid turning over management responsibility to parties that have never responsibly managed this business.  For all of the reasons detailed above, Jonas remaining as receiver is critical to this business remaining viable, especially given the overlay of the bankruptcy cases.  Indeed, in the wake of the bankruptcy filing, Jonas, in his current role, has already begun working with consultants to protect the casino's brand in the market and continues to show he is trying to protect the value of the estate.

24

56.     Section 543(d) of the Bankruptcy Code allows the bankruptcy court to excuse a pre-petition custodian, such as a court-appointed receiver,[10] from the normal turnover requirements of § 543(b) "if the interests of creditors and, if the debtor is not solvent, of equity security holders would be better served by permitting [the] custodian to continue in possession, custody, or control of such property . . . ."  11 U.S.C. § 543(d)(1).[11]  The party seeking to excuse the receiver from the turnover provisions of section 543(b) must establish cause under section 543(d).  "Cause must be proved by the preponderance of the evidence."  *In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995) (citations omitted).

57.     Although the Bankruptcy Code does not define "interests of creditors," and relief under section 543(d) is largely fact-driven, "requiring turnover cannot be calculated, or reasonably be foreseen, to be injurious to the creditors or oblivious to them."  *In re Powers Aero Marine Servs., Inc.*, 42 B.R. 540, 543 (Bankr. S.D. Tex. 1984).  When evaluating whether to excuse the turnover requirements of section 543(b), courts consider various factors, including whether there will be sufficient income to fund a reorganization, whether the debtor will use the property for the benefit of its creditors, and evidence of mismanagement by the debtor.  *See, e.g.*, *In re Lizeric*, 188 B.R. at 506-07; *In re Uno Broadcasting Corp.*, 167 B.R. 189, 200 (Bankr. D. Ariz. 1994); *Matter of WPAS*, *Inc.*, 6 B.R. 40, 44 (M.D. Fla. 1980).[12]  The interests of the debtor

---

[10] Jonas, as a state court-appointed receiver, is a "custodian" within the meaning of 11 U.S.C. § 101(11).  *See In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995) (citing cases).

[11] The creditors do not contend that section 543(d)(2) applies in this case, as Jonas was not appointed at the Debtors' request and is therefore not an "assignee" within the meaning of that subsection.  *See* 11 U.S.C. § 543(d)(2) (requiring mandatory suspension of the turnover requirement "if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the filing of the petition"); *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 331-32 (Bankr. S.D. Ohio 1990) ("[A]n assignee for the benefit of creditors is one to whom a debtor voluntarily assigns its property to be administered for the benefit of its creditors.").

[12] Other courts have included additional factors, such as "whether there are preferences which a receiver is not empowered to avoid," *In re Lizeric*, 188 B.R. at 506-07, and "the fact that the bankruptcy automatic stay has deactivated the state court receivership action." *In re Dill*, 163 B.R. at 225 (citing cases).

"are not part of the criteria considered when applying section 543(d)(1)." *In re Dill*, 163 B.R.

221, 225 (E.D.N.Y. 1994) (citing *Collier on Bankruptcy*, ¶ 543.05 at 543-12 (15th ed. 1993)).

58.    Courts applying section 543(d) give significant weight to evidence of the debtor's

mismanagement and use of the property for personal gain.  *See In re Lizeric*, 188 B.R. at 507

(finding that despite no evidence of insufficient income to fund a reorganization, significant

evidence of the debtor's previous mismanagement of rental property supported excusing the

receiver from turnover pursuant to section 543(d)); *Matter of Plantation Inn Partners*, 142 B.R.

561, 563-65 (Bankr. S.D. Ga. 1992) (excusing turnover of hotel "in light of the clear evidence of

[debtor's] mismanagement" which was "bordering on, if not probative of, fraud" where debtor

failed to report revenue or pay various taxes and fees, hired an unqualified manager, and "paid

over $50,000.00 to Debtor's principal or his affiliated companies for 'management services'

without any documentation or justification of the basis for such payments"); *In re Powers Aero

Marine Servs., Inc.*, 42 B.R. at 545 (excusing turnover of yacht under section 543(d) where

debtor's "[m]ismanagement . . . is definitely apparent in that in the several years of the yacht's

usage, the debtor's expenses and liabilities have outweighed its income by a four to one ratio").

59.    Here, FGC's repeated defaults under the Credit Agreement and subordination

agreements and history of mismanagement underscore that FGC's pre-Jonas management cannot

be trusted to take possession of the property.  As discussed above, FGC and Holdings were in

default within two months after executing the Credit Agreement.  Moreover, not only did FGC

fail to pay principal due under the loans, but it instead made payments to junior lenders and

affiliates in direct violation of the Credit Agreement and subordination agreements.  Indeed,

FGC's management has treated its corporate coffers as though they were their own personal

piggy bank.  *See supra* at ¶45.  FGC's wholesale disregard of its obligations under the Credit

Agreement, combined with its track record of fiscal abuse and mismanagement, provides more than a sufficient basis upon which to excuse the receiver from turnover pursuant to section 543(d).  *See, e.g, Matter of Plantation Inn Partners*, 142 B.R. at 564; *In re CNN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (excusing turnover of rents collected by receiver and finding that mortgage holder was "justifiably concerned that the turnover of the collected rent proceeds may be a prelude to their being frittered away"); *Matter of WPAS, Inc.*, 6 B.R. at 43-44 (allowing receiver to remain in control of debtor's radio station "based on the undisputed facts . . . which show that the affairs of the debtor were clearly mismanaged," specifically the debtor's "total disregard of the requirements of the [federal tax code]" and practice of drawing checks on accounts with insufficient funds).

60.    Moreover, Jonas has made significant progress toward addressing FGC's previous mismanagement.  As CRO, Jonas intervened to prevent FGC from raiding the Casino's revenues and ensure that the Company paid its bills.  Kelley Decl. Exh. K ¶ 7  ("Within three weeks, under my direction as CRO, all of the Company's legitimate bills were well on the way to being paid, and the backlog of over $1,000,000 that existed at the time of my appointment as CRO had been reduced by approximately 70%.").  Indeed, Jonas testified that since his appointment as receiver, "[w]e have made significant progress in getting these payables to a point where I'm not getting calls from vendors anymore that we owe them money." Kelley Decl. Exh. L at 74:23-75:1. This progress has also enabled the casino to advertise again in *The New York Times* and other publications, which will help generate revenue. *Id.* at 75:1-4.  Further, under Jonas's receivership, FGC is improving its operations and overall cash flow.  By streamlining its payroll, cutting expenses, and taking out new advertising, Jonas has generated enough new revenues for FGC that payments to its creditors have  recently restarted.

61.     These measures have improved the efficiency and effectiveness of the business. Allowing FGC to retake full managerial duties and possession of the property would only jeopardize this progress and potentially harm the creditors.  It is therefore in FGC's stakeholder's best interest for the Court to excuse turnover and allow Jonas to continue as receiver.  *See In re Uno Broadcasting Corp.*, 167 B.R. at 200 (excusing compliance with turnover pursuant to section 543(d) where evidence suggested that "the Receiver has been proceeding expeditiously and professionally to manage the affairs of the Debtor.  The Receiver has begun to deal with seriously delinquent obligations to the Internal Revenue Service, has reorganized management, has implemented accounting controls, has contacted and dealt with numerous vendors and has taken certain personnel actions").  The continuation of the receivership is therefore necessary to preserve, protect, and manage FGC's properties, and to ensure that the rents, profits, and operations necessary to maintain the value of the estate continue without interruption.

62.     In addition, Jonas has been in place as the receiver for months, and the additional appointment of a trustee would not be inefficient because receivers and trustees have different responsibilities in the management of the estate.  Because of their separate roles, courts have retained receivers alongside chapter 11 trustees where doing so is in the creditors' best interests. *See In re Basil Street Partners, LLC*, 477 B.R. 856, 868 (Bankr. M.D. Fla. 2012) (granting section 543(d) turnover request and allowing receiver to continue day-to-day management of debtor's resort property and appointing chapter 11 trustee pursuant to section 1104(a)(2), observing that "a trustee could solicit and evaluate [reorganization] plans, formulate her own plan, decide whether it is desirable to continue the business operations altogether (or, alternatively, liquidate assets), . . .  and otherwise manage the affairs of the Debtor, including deciding whether to object to claims or to pursue causes of actions available to the estate").

**WHEREFORE,** ABC Funding LLC respectfully requests that this Court enter an order directing the appointment of a chapter 11 trustee in FGC's bankruptcy case and further directing that David Jonas be retained as receiver for FGC through the course of the bankruptcy, or grant such other relief as the Court deems just, fair, and equitable.

Dated: Miami, Florida
          August  30, 2013                    Respectfully submitted,

                                              I hereby certify that the undersigned attorney are appearing *pro hac vice* in this matter pursuant to court order dated August 22, 2013 (ECF Nos. 25 and 26, respectively)

                                              /s/ Dennis Twomey_____
                                              DENNIS M. TWOMEY
                                              Illinois Bar No. 6273190
                                              ANDREW F. O'NIELL
                                              Illinois Bar No. 6287008
                                              SIDLEY AUSTIN LLP
                                              One South Dearborn
                                              Chicago, Illinois 60603
                                              Telephone: (312) 853-7000
                                              Facsimile: (312) 853-7036
                                              Dennis M. Twomey
                                              Andrew F. O'Neill
                                                      - and -
                                              **STEARNS WEAVER MILLER WEISSLER
                                                ALHADEFF & SITTERSON, P.A.**
                                              Museum Tower, Suite 2200
                                              150 West Flagler Street
                                              Miami, Florida 33130
                                              Telephone:    (305) 789-3200
                                              Facsimile:    (305) 789-3395

                                              By:___*/s/ Drew M. Dillworth*_____
                                                      DREW M. DILLWORTH
                                                      ddillworth@stearnsweaver.com
                                                      Florida Bar No. 167835
                                                      Marissa D. Kelley
                                                      Florida Bar No. 379300

                                                      *Counsel for the Prepetition Lenders*