UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Case No: 13-29597-RAM

**FLORIDA GAMING CENTERS, INC.**               Chapter 11

           Debtors[1]                           Jointly Administered
_____/

### SILVERMARK LLC'S JOINDER AND STATEMENT IN SUPPORT OF MOTION OF ABC FUNDING, LLC FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Silvermark LLC ("Silvermark") files this joinder and statement of support (the "Statement") regarding the motion filed by ABC Funding, LLC ("ABC") on August 30, 2013 (the "Trustee Motion") for the appointment of a chapter 11 trustee for Florida Gaming Centers, Inc. ("FGC") [D.E. 61].[2] For the reasons set forth below, Silvermark supports the Trustee Motion and also respectfully requests that any trustee that may be appointed for FGC also be appointed as trustee for Florida Gaming Corporation ("Holdings" and, collectively with FGC, the "Seller Parties").

In support of the Trustee Motion and this Statement, Silvermark respectfully represents as follows:

1.    Silvermark and the Seller Parties are parties to a Stock Purchase Agreement dated November 25, 2012 (as amended, the "SPA"). Under the SPA, Silvermark contracted with the Seller Parties to acquire all of the shares of FGC from Holdings for a cash purchase price of $115.0 million, plus assumption by Silvermark of approximately $14.0 million in liabilities of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Florida Gaming Corporation (0533), Florida Gaming Centers, Inc. (5893), Tara Club Estates, Inc. (9545), and Freedom Holding, Inc. (4929). These cases are being jointly administered under Case No. 13-29597.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Trustee Motion.

1

the Seller Parties (collectively, the "FGC Acquisition").

2.  Following execution of the SPA last November, Silvermark worked diligently and in good faith to close the FGC Acquisition. Indeed, even as the Debtors filed their bankruptcy cases (entirely unbeknownst, and without any notice, to Silvermark) on August 19, 2013 (the "Petition Date"), Silvermark anticipated and prepared for a closing that Silvermark firmly believed would occur that week. In addition to the $129.0 million in aggregate value originally documented in the SPA, the closing documents that were being finalized by the parties contemplated a number of other material contributions to be made by Silvermark exclusively to address certain creditor situations confronting the Seller Parties, cover various transaction costs and otherwise facilitate the closing.

3.  As the Court is aware, the closing of the FGC Acquisition did not occur. Nevertheless, despite the bankruptcy filings by the Seller Parties and their failure to close pre-petition, the SPA remains in effect. The SPA constitutes a valid and binding executory contract of the Seller Parties as of the Petition Date. The SPA had neither been terminated by any party nor breached by Silvermark pre-petition. Indeed, the record herein is devoid of any evidence to the contrary.

4.  The Trustee Motion, however, does not revolve around the SPA. The Trustee Motion articulates a substantial number of unrelated examples of the insiders' misconduct, mismanagement and self-dealing which, on their own, warrant the appointment of a chapter 11 trustee in these cases. But the Debtors' proposed rejection of the SPA, as well as their inaccurate and contradictory representations to the Court concerning the status and import of the SPA, serve as additional glaring examples of the incurable conflicts of interest that plague both the Debtors' controlling insiders and the bankruptcy estates. These irreconcilable conflicts of

interest similarly warrant the appointment of an independent, disinterested third party such as a trustee or chief restructuring officer ("CRO") who will hopefully steer these cases to a successful conclusion rather than gamble away the value bestowed upon these bankruptcy estates through the SPA.

5. Ironically, prior to these unannounced and unplanned bankruptcy filings, the Seller Parties themselves were the most outspoken supporters of the innumerable benefits conferred upon all interested parties by the SPA. As recently as July 19, 2013, the Seller Parties filed their Emergency Motion to Compel ABC Funding, LLC to (I) Accept Full Payoff of All Amounts Due Under the Loan Documents, and (II) to Execute and Provide All Closing Documents in Connection With the Sale of Substantially All of Miami Jai-Alai Assets (the "Emergency Closing Motion") before the Circuit Court for Miami-Dade County, Florida (the "State Court"), which is currently presiding over the pending Florida Foreclosure action. In the Emergency Closing Motion, the Seller Parties unequivocally embraced the SPA:

> Enough is enough. The arc of this case has been long but has always bent toward the closing of the contemplated transaction with Silvermark – **a transaction that is in [the] best interest[s] of all parties as it will make ABC Funding whole and breathe life back into Miami Jai-Alai as a going concern** and ensure the survival of an esteemed and storied establishment that has been enmeshed as a part of the fabric of Miami for over 80 years.[3]

6. The entire purpose of the Emergency Closing Motion was to have the State Court compel ABC to provide the Seller Parties with an accurate estoppel letter and to further compel delivery of various other closing documents to an escrow account **so that the Seller Parties could proceed with the scheduled SPA closing.** Touting the closing of the SPA as a transaction that was not only in the best interests of all parties, but one that would also

---

[3] See Exhibit Q to the Trustee Motion, ¶15 (emphasis added). A copy of the Emergency Closing Motion is attached hereto as Exhibit "A" for ease of reference.

EAST\58083219.5

successfully resolve the pending state court litigation, the Seller Parties successfully convinced the State Court to grant the Emergency Closing Motion. Persuaded by the Debtors' representations, which ironically were made less than one month ago, the State Court entered the requested order on August 13, 2013.

7. Shockingly, **less than one week** after obtaining that order, the Debtors completely and unilaterally reversed their course on the SPA when they advised this Court in their first day papers:

> [I]t thus became apparent that the proposed sale to Silvermark would mean that **shareholders in Florida Gaming Centers would be unable to realize on Miami Jai-Alai's residual equity**, which may exceed $50 million. Thus, Miami Jai-Alai seeks chapter 11 protection to enable it to realize this value for the benefit of its creditors, shareholders and other parties in interest.[4]

8. It is unclear exactly when it "became apparent" to the Debtors during this one week period that in their "business judgment" they had to suddenly disavow the $129.0 million transaction imbedded in the SPA. Indeed, the Emergency Closing Motion, which was driven by and based entirely upon the Debtors' representations to the State Court concerning the importance of the SPA, was heard on August 12, 2013, with the ensuing order thereon entered the next day. Clearly, if it was already "apparent" to the Debtors at that time that the SPA was no longer desirable, they presumably would not have proceeded with that hearing – or at least would have advised the State Court that they were having second thoughts.

9. Instead, the Debtors aggressively prosecuted the Emergency Closing Motion at that hearing, imploring – and ultimately convincing - the State Court to take immediate action based upon the clear and imminent value of the SPA to the Debtors and their constituents. The

---

[4] Declaration of Daniel Licciardi in Support of First-Day Motions and Applications executed on August 19, 2013 (the "Licciardi Declaration"), ¶6 (emphasis added).

EAST\58083219.5

only logical conclusion that can be drawn from the schizophrenic chronology of the Debtors' actions is that the Debtors' reservations concerning the value and benefits of the SPA did not surface until sometime **after** the State Court hearing held on August 12, 2013 but before the August 19, 2013 Petition Date.

10. Nowhere have the Debtors disclosed to this Court (or anyone else, for that matter) exactly what transpired during those few days between August 14, 2013 and the Petition Date to cause the Debtors to so abruptly cease their pursuit of the SPA which had been executed ten months earlier. In fact, the timeline below includes, without limitation, some of the many efforts undertaken by the parties to the SPA to effectuate a closing.

| | |
|---|---|
| November 25, 2012 | Execution of SPA |
| March 1, 2013 | Holdings announces it has obtained Shareholder Approval of the SPA |
| June 27, 2013 | Jefferies Appraisal received by Holdings |
| July 19, 2013 | Debtors file Emergency Closing Motion |
| July 29, 2013 | Silvermark obtains order approving license transfers from State of Florida DBPR, Division of Pari-Mutuel Wagering |
| July 30, 2013 | Silvermark secures surety bonds issued to State of Florida in connection with the SPA |
| August 12, 2013 | Hearing on Debtors' Emergency Closing Motion |
| August 13, 2013 | State Court enters order granting Emergency Closing Motion |
| August 19, 2013 | Petition Date |

5

11. To further exacerbate the shock and awe of the Seller Parties' unilateral juxtaposition concerning the SPA, the Seller Parties, once again, unilaterally exercised their "business judgment" to file their motion to reject the SPA (the "Rejection Motion") ten days after the Petition Date. Clearly, neither the half-baked decision to commence these bankruptcy cases nor the decision to reject the SPA were well thought out, let alone rooted in either sound or rational business judgment.

12. The first day motions and affidavit filed in these cases shed some, albeit dim, light on the reasons for this charade. The meager evidentiary support for the motions suggests that the Debtors' sudden decision to spurn the SPA was prompted solely by the fact that, in connection with the Florida Foreclosure, "Miami Jai-Alai was appraised by an investment bank as having a value of at least $180 million."[5] This is clearly a reference to an appraisal report prepared by Jefferies, LLC on June 27, 2013 (the "Jefferies Appraisal") at the request of the Lenders for an entirely different purpose not affiliated with Silvermark's acquisition of FGC.[6] The Debtors, however, had the Jefferies Appraisal for over **3 full weeks** before they publicly extolled the virtues of the SPA in their Emergency Closing Motion and for more than **6 weeks** by the time they appeared in State Court and successfully argued that motion. Hence, any suggestion that the Seller Parties' receipt of the Jefferies Appraisal somehow evoked an epiphany among the Debtors that not only undermined, but diminished the business attributes of the SPA, belies the actual chronology of events.

---

[5] Licciardi Declaration, ¶5.

[6] Trustee Motion, ¶35.

13. In addition, the Jefferies Appraisal has no bearing on the Silvermark transaction. The Jefferies Appraisal is a by-product of a "tie-breaking" mechanism included in a separate and distinct Warrant Agreement between the Debtors and the Lenders that is designed to resolve any disputes concerning the repurchase price of the warrants in the event of a change in control of the Seller Parties. When the Seller Parties and Lenders could not agree on the repurchase price for the subject warrants, Jefferies, LLC was engaged for the sole purpose of calculating the ultimate repurchase price. The Debtors are now improperly attempting to characterize the Jefferies Appraisal as a business enterprise valuation of the Seller Parties' entire gaming operation despite the fact that this was not the scope or nature of the Jefferies engagement.

14. Whatever their motivations, the Debtors furthered their duplicitous change of heart concerning the SPA on August 29, 2013, when they filed the Rejection Motion.[7] The Rejection Motion seeks to terminate a valid, binding executory contract that would bestow in excess of $129.0 million of value upon all stakeholders of the Debtors in the glaring absence of a better alternative. Neither the Debtors nor members of their former management team have prepared a plan term sheet, let alone an actual confirmable plan and disclosure statement, that promotes a more favorable transaction that provides anywhere near the $180.0 million in value suggested in the Jefferies Appraisal. Moreover, the Debtors have neither suggested nor confirmed that they have a higher or better offer than that conferred by the SPA. Rather, the only suggestion uttered to date by Debtors' management is the unconfirmed and unsubstantiated sound bite in Mr. Licciardi's Affidavit that the proposed sale to Silvermark "would mean that **shareholders in Florida Gaming Centers would be unable to realize on Miami Jai-Alai's residual equity,**

---

[7] Silvermark will be filing a separate objection to the Rejection Motion and hereby reserves all rights in connection therewith.

EAST\58083219.5

which may exceed $50 million."[8] In other words, Debtors' management has unilaterally and intentionally decided to try to reject the undisputed value of the SPA to instead pursue a "nebulous adventure" designed to recapture the perceived, yet speculative "residual equity" for the benefit of insiders.

15. The glaring impropriety of a decision to favor insider equity holders at the expense of secured, priority unsecured, and general unsecured creditors in this manner is further exacerbated by the fact that the $180 million Jefferies Appraisal, upon which the Debtors apparently rest their hopes and dreams, is not indicative of anything. It is nothing more than a single purpose appraisal for valuing the repurchase price of warrants issued by the Seller Parties to the Lenders as additional collateral for the underlying secured loan. The valuation has never been tested or vetted in any manner either in a courtroom or through a market analysis. The Jefferies Appraisal does not constitute a formal, binding proposal, commitment letter, letter of intent, indication of interest or any similar document that has the weight of a real cash offer behind it. Ironically, the Debtors have not provided any insight, let alone a shred of credible evidence, as to how they would transform an unseen, untested appraisal into a financially feasible and confirmable plan of reorganization that would actually deliver identical or improved recoveries to creditors over and above the SPA. In short, to the extent they are relying solely upon an untested appraisal to create the illusion of "residual equity," the Debtors are shooting the proverbial "bird in the hand" to pursue what is hardly a shadow in the bush.

16. The Debtors' collective decision to forego a clear and tangible source of *creditor* recovery in order to chase a highly speculative and risky *equity* recovery for insiders in the

---

[8] Licciardi Declaration, ¶6 (emphasis added). As discussed above, the Jefferies Appraisal was not "part" of the SPA transaction. The only connection is that the proposed sale of FGC triggered the Seller Parties' repurchase obligation under the Warrant Agreement. Otherwise, the SPA was completely separate from any warrant issues the Seller Parties may have had with ABC.

absence of a fully financed and confirmed alternative transaction, is a tangible manifestation of a conflict of interest that warrants the appointment of a chapter 11 trustee. The Debtors' former management may be willing to gamble away the indisputable value generated by the SPA in their new quest for "residual equity", but it is virtually guaranteed that an independent, objective and disinterested trustee, who has a fiduciary duty to all stakeholders in these bankruptcy cases, will not make that cavalier bet.

**WHEREFORE**, based upon the foregoing, Silvermark respectfully requests that the Court grant the Trustee Motion by appointing a chapter 11 trustee for both, FGC and Holdings, and requests that the Court grant such other and further relief as the Court deems just and proper.

Dated: September 9, 2013

Respectfully submitted,

By: /s/ Craig V. Rasile
Craig V. Rasile
Florida Bar Number: 613691
**DLA PIPER LLP (US)**
200 S. Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8500
Facsimile: (305) 437-8131
E-mail: craig.rasile@dlapiper.com

- and -

Thomas R. Kreller
**Milbank, Tweed, Hadley & McCloy LLP**
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063
E-mail: tkreller@milbank.com
*Admitted Pro Hac Vice*

*Counsel for Silvermark*

EAST\58083219.5

## CERTIFICATES OF ADMISSION AND SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1 (A).

I FURTHER CERTIFY that on September 9, 2013, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Craig V. Rasile
Craig V. Rasile

EAST\58083219.5

FLORIDA GAMING CENTERS, INC. *et al.*
CASE NO: 13-29597-RAM

SERVICE LIST

The following is the list of parties who are currently on the list to receive email notice/service for this case.

David W Baddley    baddleyd@sec.gov
Ileana Cruz    cao.bkc@miamidade.gov
Drew M Dillworth    ddillworth@stearnsweaver.com,
mfernandez@stearnsweaver.com;bank@stearnsweaver.com;rross@stearnsweaver.com;dillworth
cdp@ecf.epiqsystems.com;cgraver@stearnsweaver.com
Andrew R Herron    aherron@herronortiz.com, ndrubin@herronortiz.com
Aaron P. Honaker    honaker@salazarjackson.com, lee-sin@salazarjackson.com
Christopher A Jarvinen    cjarvinen@bergersingerman.com, efile@bergersingerman.com
Miami-Dade County Tax Collector (Darely)    mdtcbkc@miamidade.gov
Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov
Craig V. Rasile    craig.rasile@dlapiper.com,
monica.tucker@dlapiper.com,jacqueline.figueroa@dlapiper.com,rachel.nanes@dlapiper.com
Luis Salazar    salazar@salazarjackson.com,
jackson@salazarjackson.com;aguilar@salazarjackson.com;Lee-Sin@SalazarJackson.com
Howard S Toland    htoland@mitrani.com

Manual Notice List

The following is the list of parties who are not on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Robert W Hudson
Hudson & Calleja LLC
3211 Ponce De Leon Blvd #102
Coral Gables, FL 33134

Thomas R Kreller
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa St, 30th floor
Los Angeles, CA 90017