IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

In re:

FLORIDA GAMING CENTERS, INC.,
*et al.*,

Debtors.    /

Chapter 11

Case No. 13-29597-RAM
(Jointly Administered)

### DEBTORS' RESPONSE TO MOTION OF ABC FUNDING, LLC FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE AND FOR AN ORDER DIRECTING THAT DAVID JONAS REMAIN AS RECEIVER PURSUANT TO SECTION 543(D) OF THE BANKRUPTCY CODE

Debtors, Florida Gaming Centers, Inc. ("**Florida Gaming Centers**"), Florida Gaming Corporation ("**Florida Gaming Corp.**"), Tara Club Estates, Inc. ("**Tara**") and Freedom Holding, Inc. ("**Freedom**")(collectively, "**Miami Jai-Alai**"), hereby object to the *Motion of ABC Funding, LLC for an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code and for an Order Directing that David Jonas Remain as Receiver Pursuant to Section 543(d) of the Bankruptcy Code* (ECF No. 61) (the "**Trustee Motion**"), and in support state:

### PRELIMINARY STATEMENT

1.    The appointment of a Trustee requires "clear and convincing" evidence of cause, such as fraud, dishonesty, incompetence, or gross mismanagement on the part of a debtor's current management. ABC Funding's Trustee Motion fails to meet that burden. When not twisting, or outright misstating the facts here, it cites primarily to alleged breaches of its Credit Agreement as grounds for such drastic relief. But such breaches do not support the appointment of a trustee—indeed, if that were the standard, every debtor case would require the appointment of a trustee.

2.      Instead of credible evidence of fraud, dishonesty, incompetence, or gross mismanagement, ABC Funding has resorted to unfounded accusations, and speculation – much of it quite petty even when examined in a light most favorable to ABC Funding – without the substantive proof required under Bankruptcy Code Section 1104. Each of those allegations are addressed in turn on page 11 below. But in short, other than making the conclusory and threadbare assertion that "[t]he Insiders ... have engaged in numerous acts amounting to dishonesty, incompetence, gross mismanagement, and breaches of fiduciary duties" (Trustee Motion at ¶ 42), ABC Funding fails to offer any actual facts that remotely rise to that level, much less support, the extraordinary relief it seeks.

3.      Further, ABC Funding fails to set forth adequate cause for maintaining the receiver, who was appointed pursuant to the contractual remedies under the Credit Agreement and not because of any wrong-doing on Miami Jai-Alai's part. In reality, Miami Jai-Alai is subject to numerous, overlapping controls. For example, Miami Jai-Alai is regulated by the Department of Business and Professional Regulation, which imposes strict operational, reporting, and security requirements. Miami Jai-Alai is also required to develop, maintain, and implement extensive security controls that govern the intake and management of all cash. Likewise, State regulators maintain an active presence and office on site, monitoring the facility through over 350 cameras.  In essence, Miami Jai-Alai has been and continues to operate with significant oversight by third parties, even without considering the reporting and oversight requirements of this Bankruptcy proceeding.

4.      The unsupported accusations of ABC Funding are insufficient to establish cause under the Bankruptcy Code.  ABC Funding's reliance upon unsubstantiated hyperbole and unfounded petty accusations does not establish cause or that the interests of the administration of Miami Jai-Alai's estates require the appointment of a trustee.  The Trustee Motion must therefore be denied.

Salazar Jackson, LLP                    S | J                    www.SalazarJackson.com

## BACKGROUND

5.    **OVERWHELMING CONTROLS ARE IN PLACE.**   The Trustee Motion suggests that a trustee is required to make sure controls are in place to protect Miami Jai-Alai.   But far from the laughable stereotypes of gaming establishments in movies like *Oceans' 11* or *Casino*, the modern casino business is heavily regulated and controlled.   When combined with the additional oversight and controls imposed by the process of a chapter 11 bankruptcy, the imposition of a receiver, much less a trustee, is patently unnecessary

6.    Miami Jai-Alai is regulated by the Department of Business and Professional Regulation, which imposes strict operational, reporting, and security requirements.   Miami Jai-Alai is required to develop, maintain, and implement extensive security policies, procedures, and controls that govern the intake and management of all cash as a matter of fact, Miami Jai-Alai "System of Internal Control" Manual is 100's of pages long.   *See* Declaration of Daniel Licciardi in Opposition to Motion to Appoint Trustee filed simultaneously with this *Response*.

7.    As part of these required controls, Miami Jai-Alai also maintains security personal and an internal auditing department whose sole function is to monitor cash, in part using the over 350 cameras that monitor every part of the facility.

8.    In addition, State regulators maintain an active presence and office on site.   The State regulator's office is manned by state regulators, who have independent and direct access to all of the cameras at the facility.

9.    Further, Miami Jai-Alai is also a publicly traded company that is required and in fact is audited annually.   It files required quarterly and annual SEC public disclosures.   Morrison, Brown, Argiz & Farra, LLC, a reputable and well-known accounting firm, currently audits Florida Gaming Centers.

10.    **THE COLLETT'S COMPENSATION.**  The Trustee Motion makes many unfounded and false accusations with respect to the Colletts and their operation of Miami Jai-Alai.   Miami Jai-Alai, however, would be nowhere close to

its current level of value and operational success without the efforts and sacrifices of the Colletts.

11.     When the Colletts acquired Miami Jai-Alai in 1997, they implemented a long-term, strategic plan to pursue the expansion of legal gambling at the facility, including traditional casino-style gambling. This required careful management to ensure that Miami Jai-Alai's parimutuel operations survived the lean years and their financially sustaining the company over the last 20 years.  The Colletts have truly invested their very last penny to ensure that Miami Jai Alai would survive to flourish as a casino, as it is today.

12.     Since the ABC Funding Loan, W. Bennett Collett, Sr. has received no income from the company, other than the initial two authorized payments of $25,000, and is not employed by Miami Jai-Alai. W. Bennett Collett, Jr., who serves as CEO of both Corp and Centers receives a salary of $315,000 a year, plus health care benefits. This is an amount that is comparable if not less than that paid for CEOs of similar-size companies.

13.     **RETAINING THE RECEIVER.**  On October 18, 2012, ABC Funding filed its *Verified Motion to Appoint Receiver* in the ABC Florida Action, relying in large part upon the obligation in the Loan Documents that a receiver be appointed upon declaration of a default.  On November 2, 2012, Miami Jai-Alai consented to an Order appointing David Jonas as Receiver, *nunc pro tunc* to October 25, 2012, of the real and personal property described in and encumbered by the two mortgages at issue in the ABC Florida Action including, without limitation, all real, personal, tangible, and intangible property, contracts, records, documents.  Miami Jai-Alai consented to that relief because Jonas had, in fact, already been retained by Florida Gaming Centers a year earlier and was serving as its casino manager.

22.     During the course of the Receivership, Mr. Jonas continued to focus his efforts on casino operations, where his experience lies.  Although Miami Jai-Alai does not agree that Mr. Jonas should continue as receiver in these Chapter 11 cases, it has no intention of terminating its relationship with Mr. Jonas.  To the

contrary, Miami Jai-Alai and Mr. Jonas have already undertaken discussion for him to remain in the casino management role he currently fills.

23.     Given that, and the extensive controls already in place by gaming regulations and these Chapter 11 proceedings, maintaining the receivership is completely unnecessary going forward.

24.     **ABC'S STAUNCH OPPOSITION TO THE SILVERMARK SALE.** Incredibly, ABC Funding complains in its Trustee Motion that Miami Jai-Alai walked away from a sale transaction that ABC Funding somehow supported.  The reality is that ABC Funding fought tooth and nail to prevent that closing and gave no assurance whatsoever that it intended to even provide an acceptable payoff letter.

25.     Despite the fact that Miami Jai-Alai was negotiating with Silvermark to effectuate a sale and was offering to pay the debt in full, ABC Funding continuously delayed the process and ran up their ultimate pay-off along the way.

26.     It was in ABC Funding's interest to delay this sale for at least three reasons.  First, ABC truly wants to own the Casino, and torpedoing the Silvermark transaction was and has been its primary goal.

27.     Second, ABC Funding charges nearly $45,000 a day in interest, or nearly $1 million a month for a total of over $10 million during the pendency of the foreclosure action alone.  During the pendency of the foreclosure action, Miami Jai-Alai actually paid that interest every month – with some agreed upon exceptions – despite being declared in default.

28.     Third, ABC Funding actively sought to delay any possible Silvermark closing to allow it to argue that it is entitled to an additional and significant increase in Warrants when a nearby competitor, Hialeah Race Track Casino, begins slot operations, which in fact appears to have occurred on or about August 14, 2013.  This may entitle the Warrant holders to up to $7 million more.

29.     As of the Petition Date, Miami Jai-Alai was unable to obtain an acceptable payoff amount or estoppel letter setting forth the amounts due under

the Loan Documents, including a *per diem* and was unable to close the transaction with Silvermark.

30.    Miami Jai-Alai tried again and again to compel ABC to cooperate with the possible Silvermark transaction, and the chart below shows just some of the many pleadings and hearings in the foreclosure action pertaining to the Silvermark transaction demonstrating ABC Funding's efforts to unilaterally hold up the contemplated sale:

| Date | Motion |
|------|--------|
| May 9, 2013 | Motion to Designate Investment Bank in Accordance With Terms of Credit Agreement and Warrant Agreement |
| May 14, 2013 | Order Directing Parties to Mediation |
| May 30, 2013 | Motion to Approve Employment and Retention of Jefferies LLC as Selected Investment Bank |
| June 10, 2013 | Joint Stipulation (for retention of Jefferies) |
| July 1, 2013 | Motion to Compel Plaintiff to Deliver Estoppel Letter |
| July 9, 2013 | Emergency Motion to Compel ABC Funding, LLC to (i) Accept Full Payoff of All Amounts Due Under the Loan Documents, and (ii) to Execute and Provide All Closing Documents in Connection with the Sale of Substantially All of Miami Jai-Alai Assets (the **"Payoff Motion"**) |
| July 15, 2013 | Motion to Set Hearing on Reasonableness of Attorney's Fees Incurred by ABC Funding |
| July 23, 2013 | First Case Management Conference on Payoff Motion |

| July 24, 2013 | Second Case Management Conference on Payoff Motion |
|---|---|
| July 24, 2013 | Order on Court's Case Management Conference |
| August 12, 2013 | Order Compelling Delivery of Estoppel Letter and Satisfaction of Liens Upon Receipt of Full Payment – AFTER 4 HEARINGS BEFORE JUDGE BUTCHKO ON THE PAYOFF/ESTOPPEL ISSUES |

31.    Again, ABC Funding cannot honestly contend that it supported the Silvermark transaction, or that it had anything but a dishonest intent to stop any possible sale.

### The Relationship Among Florida Gaming Companies

32.    ABC Funding's Trustee Motion constantly mixes the terms Holding and Corp in describing the Florida Gaming companies, perhaps in an effort to make their relationships seem far more complex that they actually are. Below is an organizational chart, showing the companies mentioned in the Trustee Motion, and the debts unclearly described by ABC Funding.



Notably, it is the debtors that owe these top-tier companies, which reflects the years and millions of dollars invested by the Colletts to sustain Miami Jai-Alai before the advent of slots.

## ARGUMENT

### CAUSE DOES NOT EXIST FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE UNDER SECTION 1104(A)(1)

14.     Section 1104(a)(1) of the Bankruptcy Code provides, in relevant part, that –

> (a)  At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee

> (1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by **current management**, either before or after the commencement of the case.

11 U.S.C. §1104(a) (emphasis added). The appointment of a chapter 11 trustee is an "extraordinary remedy," and that the standard for appointment of a chapter 11 trustee is "very high." *In re Smart World Tech.*, LLC, 423 F.3d 166, 176 (2d Cir. 2005).

15.     Indeed, there is a strong presumption underlying Section 1104(a) and the applicable principles of law that unless there is a clear and convincing showing of credible evidence establishing cause, the appointment of a trustee should be denied. *See, e.g., In re Marvel Entm't Group, Inc.*, 140 F.3d 463 (3d Cir. 1996); *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007)("There is a strong presumption that a debtor should remain in possession . . . ."); *In re Sun Cruz Casinos, LLC*, 298 B.R. 821, 827 (Bankr. S.D. Fla. 2003)(citing *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)).

Salazar Jackson, LLP                    S  J                    www.SalazarJackson.com

16.    "The default position is that current management will retain control of the company," *see In re Garland Corp.*, 6 B.R. 456,460 (1st Cir. BAP 1980); *In re The Bible Speaks*, 74 B.R. 511, 512 (Bankr. D. Mass. 1987)(consistent with the 'belief that current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate.'" *Tradex Corp. v. Morse*, 339 B.R. 823, 826 (D. Mass 2006).

17.    The burden is on ABC Funding to demonstrate by "clear and convincing evidence" that cause exists to appoint a trustee in these cases. *In re Sundale, Ltd.*, 400 B.R. 890 (Bankr. S.D. Fla. 2009)("Because the appointment of a trustee is such an extraordinary remedy, the moving party must show that cause for appointment of a trustee exists by clear and convincing evidence."); *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007). It is a very substantial burden that cannot be satisfied by speculation and unsubstantiated hyperbole. The difficulty of sustaining such burden is demonstrated by the extensive cases reflecting the denial of motions for the appointment of a trustee in other large cases beset by similarly unfounded assertions of cause. *See In re Adelphia Commc'ns Corp., et. al.*, 336 B.R. 610, 645-648 (Bankr. S.D.N.Y. 2006) (denying creditor group's request for appointment of chapter 11 trustee and collecting cases, including, *inter alia*, Enron, World-Com, and Global Crossing, where the appointment of a trustee was denied for lack of cause).

18.    In addition, appointment of a trustee can only be imposed after a court carefully weighs all of the facts and interests in a case. *See In re Northstar Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991). Moreover, courts have made clear that "on a motion for the appointment of a trustee, the focus is on the debtor's current activity, not past misconduct." *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001). Thus, courts have appointed trustees when exceptional circumstances (proven by clear and convincing evidence) are present. For example, when (1) the debtor's principals siphoned money out of the debtor by means of a kickback scheme, *see Fukutomi v. United States Trustee (In re Bibo, Inc.)*, 76 F.3d 256 (9th Cir. 1995), (2) assets were sold just prior to the bankruptcy

filing with the knowledge that the transfer would be avoided, *see In re Russell*, 60 B.R. 42 (Bankr. W.D. Ark. 1985), and (3) a complete conversion of corporate assets occurred. *See In re Colby Construction, Inc.*, 51 B.R. 113 (Bankr. S.D.N.Y. 1985).

19.    Something beyond simple mismanagement is required before the appointment of a trustee is warranted.  *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644-45 (Bankr. E.D.N.Y. 1980).  In fact, gross mismanagement must be found.  *Id.* The mere fact of filing for debtor relief under the Bankruptcy Code, the fact of insolvency, which may ensue as a result of any number of factors independent of the abilities and integrity of current management, does not demonstrate that the debtor is incapable or unsuited to superintend its own reorganization.  *In re La Sherene, Inc.*, 3 B.R. 169, 174 (Bankr. N.D. Ga. 1980).  Slight evidence of mismanagement in the form of imprudent, or poor business decisions, or the poor use of resources are to be expected, and will not alone overcome the presumption of a debtor in possession.  *Id.*

20.    Under this strict standard, and applying this law to the facts of these cases leads to the inescapable conclusion that the request for the appointment of a chapter 11 trustee is not warranted.  ABC Funding has not shown by clear and convincing evidence that there is cause to appoint a trustee in these cases.  ABC Funding has not alleged any fraud, dishonesty, misconduct, improper dealings or the like.  Rather, the appointment of a chapter 11 trustee would cause immediate and substantial harm to Miami Jai-Alai's estates and their respective creditors.

### ABC Funding Has Not Met, And Cannot Meet, Its Statutory Burden

21.    ABC Funding has failed to provide any proof upon which an adjudication may be made as to any "fraud, dishonesty, incompetence, or gross mismanagement" on the part of Miami Jai-Alai before or after the commencement of these chapter 11 cases.  The Trustee Motion makes numerous unfounded allegations that are, stated simply, untrue.  It is of paramount importance to

Miami Jai-Alai that any potential appearance of impropriety in respect of the allegations asserted in the Trustee Motion be refuted.

22.    Thus, below, Miami Jai-Alai addresses and refutes each of the allegations set forth in the Motion:

| Allegation | Response |
|---|---|
| **June 2011 transfer of $54,835.00 to pay Farmer's Bank loan** | There was no such payment. Farmer's Bank set-off overdue interest in the amount of $54,835.00 when Miami Jai-Alai obtained the release of a nearly $250,000 deposit for its gambling-license bond. The funds were not ABC's collateral. Nonetheless, ABC declared this a default and levied a $377,000 interest penalty. |
| **April, May, July, and August 2012 payments of monthly interest payment to "obligation of Holdings."** | These are $10,883.18 interest payments pursuant to a note with Florida Lemark, the casino general contractor, made with full knowledge and agreement of ABC. Debt to Lemark was previous owed by Centers, but was subordinated at ABC's demand. Additionally, payments were permissible from, and pursuant to, the $65,000 monthly expense budget for Corp. pursuant to Credit Agreement. *See Credit Agreement*, Section 606.06(d).[1] |
| **Two payments of $25,000 each to Freedom pursuant to Freedom Consulting Agreement.** | Consulting agreement entered into with ABC's full knowledge and consent – in fact, it is a defined term in the Credit Agreement and an attached Exhibit. *See Credit Agreement,* page 11 and Exhibit H. The Credit Agreement allows payments under the Freedom Consulting Agreement, up to a cap of $300,000. *See Credit Agreement,* page 19.[2] |

---

[1] "[T]he Borrower may pay dividends to Holdings [Corp.] in an amount not to exceed $65,000 per month with respect to Permitted Corporate Expenses[.]" *See* **Exhibit A** to the Declaration of Daniel Licciardi in Opposition to Motion to Appoint Trustee, *Credit Agreement*, Section 606.06(d). Permitted Corporate Expenses includes $498,600. See **Exhibit A** to the Declaration, *Credit Agreement*, Schedule 1.01.

[2] "Permitted Freedom Consulting Payment Cap" means $300,000 per fiscal year[.]" *See* **Exhibit A** to the Declaration of Daniel Licciardi in Opposition to Motion to Appoint Trustee, *Credit Agreement*, page 19.

| Allegation | Response |
|---|---|
| **June 2012 payment of $100,322.95** | This payment of interest was made with full knowledge of ABC. Payment was required to avoid default under ABC's $87 million Credit Agreement. *See Credit Agreement,* Section 7.01(f). |
| **Payment of a total of $20,000 from January 2012 to June 2012 to cover personal rent and utilities for Mr. Collett.** | Mr. Collett (CEO) is an FGC employee. He is a resident of Indiana and it has consistently been Florida Gaming's practice to pay his housing expenses, which total $3,340 a month. ABC was aware of this long-standing practice and these expense payments. These housing expenses are *less than* the $5,000 ABC agreed were reasonable for the living expenses of Jonas, the Receiver. |
| **Payment of a total of $10,500 from January 2012 to June 2012 in gas credit card use by Mr. Collett.** | Mr. Collett (CEO) is an FGC employee and a resident of Indiana. FGC's consistent, disclosed practice has been to pay his travel expenses. Mr. Collett commutes from Indiana by car, and does not travel by air, which saves Florida Gaming that considerable travel expense. |
| **FGC paying approximately $20,200 in petty cash replenishments with no documentation.** | There is no support for this allegation, nor does ABC allege that the Colletts were the recipients of any "petty cash replenishments." Notably, Miami Jai-Alai had $7,565,290 of nonpayroll, nontax expenses during this time. This $20,200 presumably found by ABC's forensic team after a 3 month investigation is less than .002% of the total expenses during that time. |
| **FGC paying thousands of dollars in other undocuments personal expenses of Collett and others, including gas credit cards and hotel bills, and expensive meals.** | Repetitive, no evidence to support such an allegation. |
| **Jonas asked to take actions he felt was improper. Only example cited: asked to approve transfer of $30,000 to Corp without documentation.** | No such request was made. |

| Allegation | Response |
|---|---|
| **FGC failed to terminate current auditor and hire new, independent auditor.** | ABC's Credit Agreement required FGC to hire one of the "big six." *See Credit Agreement,* Section 5.01(a) and Schedule 5.01(a). FGC interviewed each, but each declined to accept the engagement because of its relatively small size, previous "going concern" warnings, and ABC's constant calling of technical defaults. ABC was fully aware of the results of this effort, and ABC even negotiated directly with two of the auditing firms and tried convincing them to accept the engagement. ABC failed to do so. As a publicly traded company, FGC required an auditor at all times. But ABC refused to permit the interview of any other auditors, leaving FGC with no choice but to continue using King & Co. That allowed ABC to keep FGC in a constant artificial state of default. The Receiver finally convinced ABC to permit Morrison, Brown, Argiz, & Farra, LLC to assume that auditing role. |
| **When the Receiver took over, he found over $1 million in receivables "in arrears," not overdue which he reduced by 70% in the first month.** | Again, this is an intentionally deceptive statement on ABC's part. Miami Jai-Alai normally pays over $5 million in monthly expenses. At any one time during the month, the amount outstanding can easily exceed $1 million, but it cycles up and down. Further, the Receiver assumed control almost a year ago, when Miami Jai-Alai's cash-flow was much less than it is today, and payables were managed to meet that cash constraint. |
| **Two undisclosed bank accounts** | This is false. These accounts were disclosed to ABC – and to the Court and all parties, of course. One is a zero based account opened in November 2011 and used for Florida lottery sales. It currently holds $1,901.33, the same amount it has held for years. The second is Corp's principal business checking account, which was opened in April 2011. |

| Allegation | Response |
|---|---|
| **Funding of Settlement Payments to CCLN, LLC** | CCLN, LLC, now known as Miami Gaming Ventures, is the consulting firm that assisted Centers in legalizing slots at Miami Jai-Alai. At least 80% of the monies owed to CCLN is owed by Centers. These payments were permissible under the $65,000 cap authorized by the Credit Agreement. |
| **The insiders failed to disclose a liability of $3,600,000, which ABC uncovered prior to the Silvermark closing.** | This allegation is a false and nonsensical. There is so such "secret debt." The only debt Miami Jai-Alai can see that is close in dollar amount is the $3,550,000 agreed contribution to a political action committee (PAC) that worked to expand gaming rights to include slots. This debt was disclosed to ABC and in multiple public filings with the SEC, and was paid in full over a year ago. |

23.     These inaccurate or false allegations, coupled with the numerous glaring deficiencies of the Trustee Motion leave no room for doubt that it must be denied in its entirety.

### AN ALLEGED INTERDEBTOR CONFLICT, EVEN IF PRESENT, IS INSUFFICIENT TO WARRANT THE APPOINTMENT OF A TRUSTEE

24.     ABC Funding has not alleged any fraud, dishonesty, gross mismanagement or the like.  Rather, ABC Funding relies principally on the purported interdebtor conflict and disregard for corporate formality as the basis for "cause" under Section 1104(a)(1).  Even assuming, *arguendo*, that such concerns are valid (and they are not), interdebtor issues and conflicts are a routine part of multi-debtor cases and, without more, fall far short of satisfying the standards of either Section 1104(a)(1) or 1104(a)(2).  In fact, ABC Funding has not presented a single case that suggests that the existence of differing interests among jointly administered debtors satisfies either of these statutory requirements.   Nor can it as interdebtor and intercreditor conflicts are

commonplace in large, multi-debtor chapter 11 cases, and courts have repeatedly held that the mere existence of such conflicts does not itself overcome the very strong presumption in favor of the debtor-in-possession continuing to administer the estates.

25.    Indeed, courts have affirmatively stated that debtors-in-possession can and do faithfully fulfill their role of fiduciary in multi-debtor cases. *See, e.g., Adelphia*, 336 B.R. at 619 ("the existence of interdebtor disputes, even material ones, is not by itself cause for the appointment of a trustee."), *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) ("We expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee.") (adopting the reasoning of *Cajun Elec. Power Coop., Inc. v. Centr. La Elec. Coop., Inc. (In Matter of Cajun Elec. Power Coop.)*, 74 F.3d 599, 600 (5th Cir. 1996) (disavowing *per se* rule in the context of interdebtor acrimony among utility members of a power cooperative). The principal ground urged on this Court—the alleged interdebtor conflict—has been considered by numerous courts and rejected as insufficient to warrant the appointment of a trustee.

26.    For example, the *Adelphia* Court denied the request for the appointment of a trustee in a large, multi-debtor case on account of alleged interdebtor disputes. Acknowledging the existence of conflicts of interest between the debtor constituencies the Court ruled that the appointment of a trustee would not be in the best interests of any of the debtors. Rejecting the moving noteholders' appeal to Section 1104(a)(1), the Court held that "[i]nterdebtor disputes do not by themselves evidence (much less establish) fraud or mismanagement, or misconduct of the type that constitutes cause under section 1104(a)(1)." *Adelphia*, 336 B.R. at 657. In considering whether the court should exercise its discretionary power to appoint a trustee under section 1104(a)(2), the Court explained that the Court should "engage[] in a fact driven analysis, principally balancing the advantages and disadvantages of taking such a step, and mindful of the many cases, noted above, that have held that appointment of a

trustee is an extraordinary remedy, and should be the exception, rather than the rule." *Adelphia*, 336 B.R. at 658.

27. As part of this analysis, the Court considered a number of factors that militated against the appointment of a trustee, including, among others, (i) the fact that the debtors were trustworthy, (ii) the debtors had shown satisfactory performance and their rehabilitation (if not disrupted by the motions to appoint a trustee) was strongly likely, (iii) those "lacking axes to grind" (such as the Creditors' Committee or other parties in interest) had voiced no dissatisfaction or lack of confidence with the debtors' management, and (iv) the "grave uncertainty" as to the length of time it would take to educate the trustee on the debtors' operation issues, particularly if the debtors were "to be run, in whole or in part, independently." *Adelphia*, 336 B.R. at 658-60.

28. Similarly, in another large and complex chapter 11 case, *WorldCom*, Judge Arthur Gonzalez of the United States Bankruptcy Court for the Southern District of New York considered a motion of a creditor of one of the subsidiary debtors to appoint a chapter 11 trustee where the moving creditor disagreed with the debtors' conclusions regarding substantive consolidation and intercompany claims. The Court there held that "this disagreement is not the basis for the appointment of a trustee where it appears the Debtors have appropriately discharged their fiduciary duty in evaluating and analyzing these issues and have reached an informed conclusion." *WorldCom*, 2003 Bankr. LEXIS 2192, at *25–26.

29. The Court further considered that (i) the appointment of a chapter 11 trustee was unnecessary to ensure that the movants would continue to receive accurate information from the debtors and the debtors' disclosure had been sufficient, (ii) the debtors had worked diligently with the creditor constituencies and were trustworthy, (iii) the debtors had made progress with respect to their business plan and expanding customer bases, and (iv) the appointment of a trustee would reduce, not enhance, creditor and customer confidence in the debtors and their businesses. *Id.* The Court further commented that:

Salazar Jackson, LLP                     S  J                     www.SalazarJackson.com

> The appointment of a trustee would be very costly to the Debtors and their estates, with no apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and expense that would be caused by the trustee's (and new professionals') need to learn about the Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely seriously and adversely affect the prospects of rehabilitation

*Id.* at *38.  The relevant considerations from *Adelphia* and *WorldCom* – **both of which involved fraud and criminal conduct and still did not justify a trustee** – are equally applicable here (where no such facts have been or ever will be alleged) and strongly weigh against the appointment of a chapter 11 trustee.

30.    None of the other cases cited by ABC Funding in its Trustee Motion are analogous to the case at hand.  In the cases relied on by ABC Funding, the applicable debtors failed to disclose material or required information, were found to be abusing the bankruptcy process, or engaged in fraudulent behavior and gross mismanagement.  These cases do not support ABC Funding's argument that a trustee should be appointed here.  Instead, they illustrate how egregious ABC Funding's request is.

## The Appointment Of A Chapter 11 Trustee Is Not In The Best Interests Of Creditors And The Debtors' Estates

31.    Section 1104(a)(2) of the Bankruptcy Code provides, in relevant part, that –

> (b) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders

of securities of the debtor or the amount of assets or liabilities of the debtor.

32.     Under Section 1104(a)(2), a court must find that the appointment of a chapter 11 trustee is in the best interests of **all** three statutorily identified constituencies – creditors, equity security holders, and other parties in interest. 11 U.S.C. § 1104(a)(2). Stated differently, a court must find that the appointment of a chapter 11 trustee is in the best interests of the bankruptcy estate generally. *See* 7 Collier on Bankruptcy ¶ 1104.02[3][d][i] (15th ed. 2013).

33.     The Trustee Motion is devoid of any credible evidence that the appointment of a trustee in the circumstances pertinent to these chapter 11 cases would be in the interests of any parties or stakeholders, let alone their best interests. The Trustee Motion focuses on the supposed "unplanned" nature of these chapter 11 cases as a basis for the appointment of a trustee, implying recklessness on the part of management and that such an action constitutes "erratic" and "irresponsible" behavior. *See* Trustee Motion at ¶ 53. But such conclusions are unwarranted.

34.     Beginning in October, 2012, Miami Jai-Alai's Board and management analyzed a number of alternatives to respond to ABC Funding's relentless efforts to control and own the Casino. The Board and management, in consultation with its professionals, considered, for example, a work out with ABC Funding, a potential chapter 11 filing and restructuring, and a sale of the company or its assets. In fact, in 2012, before ABC Funding initiated its Florida foreclosure action, Miami Jai-Alai prepared a full chapter 11 filing, but ultimately decided to pursue a sale to Silvermark, LLC. And even the Silvermark stock purchase agreement contains an alternative deal structure that contemplates a potential Section 363 sale.

35.     Further, as discussed in the *Declaration of Daniel Licciardi in Opposition to Motion to Appoint Trustee*, filed contemporaneously herewith, during the course of the Florida foreclosure litigation and the negotiations on the sale to

Silvermark, Miami Jai-Alai periodically revisited its potential strategic options, including a chapter 11 filing.   More recently, when it became clear that the Silvermark transaction was likely no longer feasible due to Miami Jai-Alai's $180 million valuation and the related warrant repurchase, the Board and management again reconsidered its strategic options, including a Chapter 11 filing.   And as it became increasingly clear during July and August that the Silvermark transaction was not a workable option, the Board and management directed its counsel to pursue preparation of a Chapter 11 in a parallel strategy, should a filing become necessary.

36.     It is true, however, that the Board decided to file without notifying either Silvermark or ABC Funding.   There are several reasons why it felt this approach was necessary.   For example, the relationship with Silvermark had become quite adversarial by that time because Miami Jai-Alai had refused to acquiesce to various unreasonable and substantial modifications to the stock purchase agreement.   Moreover, Silvermark personnel had repeatedly threatened Miami Jai-Alai's CEO and were actively soliciting creditors to file an involuntary proceeding against the company.   Also, the Board felt there was no benefit in reaching out to ABC Funding, as ABC Funding had taken an obstructionist approach to every Miami Jai-Alai initiative.   As the above shows, far from being an unplanned or reckless decision, this Chapter 11 proceeding is the result of over a year of constant review, consideration, and planning.

37.     Ultimately, ABC Funding's chicken-little prognostications aside, the Casino business is as strong as ever, even in the face of the Chapter 11 and the grand opening of Hialeah Casino & Racetrack. Coin-in wagers, which are the strongest indication of demand because it shows actual customers gambling, are still up over 27% from last year.   In fact, the two weekends post-petition have been among the strongest, as the chart below demonstrates:



38.     In addition, the cases cited by ABC Funding in support of the appointment of a chapter 11 trustee are factually distinguishable and of no moment here. Each of those cases implicated factual issues completely different from those that pertain to these chapter 11 cases. For instance, ABC Funding cites to *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998) in support of its argument that "Section 1104(a)(2) provides a more flexible standard for appointment and gives a court discretion to appoint a trustee…" Trustee Motion at ¶ 41.

39.     In *Marvel*, the United States Court of Appeals for the Third Circuit held that it was not an abuse of discretion for the district court to have directed the appointment of a chapter 11 trustee for the debtor where the intense acrimony that permeated the chapter 11 cases made the further administration and prosecution of such cases tenuous. There, the adversity over control of the cases as between the interests controlled by Carl C. Icahn and those of the secured lenders had risen to a level that dialog had ceased. The situation resulted in what the Third Circuit referred to as an anomaly because the Icahn Interests "began to wear two hats: one as creditors of the holding companies that controlled Marvel; the other as the debtor-in-possession." *Id*. at 467.

40.     In the aftermath of aborted settlements, those aligned with Mr. Icahn initiated litigation, asserting claims of breaches of fiduciary duties against the holding companies. *Id*. No longer willing to sit on the sidelines and watch the

Mr. Icahn derail the debtors' chapter 11 cases, the statutory creditors' committee in those cases moved for the appointment of a trustee. As a consequence of determining that there was no "reasonable likelihood of any cooperation between the parties in the near future," and that the level of acerbities had brought the administration of the chapter 11 cases to a standstill, the district court found that these circumstances warranted the appointment of a chapter 11 trustee.

41.      On appeal, the decision of the district court was affirmed. After acknowledging that the appointment of a trustee should be the exception rather than the rule in any chapter 11 case, the Third Circuit explained that such "strong presumption" is premised on a debtor's familiarity with the operation of its business that often makes "it the best party to conduct operations" during a chapter 11 case. *Id.*

42.      The *Marvel* case is limited to its unique facts. It represents the resolution of an intense dispute between creditors of different classes that was counterproductive to the achievement of the objectives of chapter 11, as recognized by the creditors' committee in those cases. The facts of these cases are very different from those presented in *Marvel*. As of the date of the filing of this Response, no committee has yet been appointed. If and when a committee is appointed in these cases, Miami Jai-Alai will work together with the committee and all parties in interest cooperatively to achieve the best results for the benefit of all economic stakeholders.

43.      Similarly, the *Ionosphere* case relied upon by the ABC Funding is inapposite. In that case, a trustee was appointed by the Bankruptcy Court after more than 13 months of administration by a debtor in possession that had resulted in increasing losses and erosion of values. The creditors' committee in that case established that the debtors' creditors had lost all confidence in the debtors' management because, *inter alia*, the debtors and their non-debtor affiliates had consistently failed to properly project the results of their operations and, therefore had "repeatedly reneged" on various reorganization plan agreements that they had entered into with the committee. *In re Ionosphere Clubs*, 113 B.R. 164, 166-67

(Bankr. S.D.N.Y. 1990).  After four full days of evidentiary hearings on the issue, it was determined that the committee had established that the best interests of the debtor's stakeholders were served by the appointment of a trustee because the debtors had "continually made operating projections which [they] ha[d] failed to achieve, with the resultant losses being borne by the unsecured creditors." *Id.* at 168.

## ABC Funding Has Failed To Meet Its Burden Under Bankruptcy Code Section 543(d)(1)

44.    In addition to the trustee appointment request, ABC Funding asks that this Court allow Mr. Jonas to continue in his role as Receiver pursuant to Bankruptcy Code Section 543(d)(1).  That Section requires that a custodian in possession, custody, or control of a debtor's property turnover such property to the debtor upon the commencement of a case.  A party in interest may then move to continue the custodian's relationship upon the showing of cause by a preponderance of evidence.  But there is a "longstanding presumption that chapter 11 debtors should remain in custody and control of their assets."  *In re R & G Props., Inc.*, No. 08-10876, 2008 WL 4966774, at *7 (Bankr. D. Vt. Nov. 21, 2008).  Thus, ABC Funding has the burden of proof with respect to Section 543.

45.    To prove that the receiver should continue in possession, courts will consider factors such as "(1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the turnover property for the benefit of the creditors; (3) whether there has been mismanagement by the debtors; (4) whether or not there are avoidance issues raised with respect to property retained by a receiver, because the a receiver does not possess avoiding powers for the benefit of the estate; and (5) the fact that the bankruptcy automatic stay has deactivated the estate court receivership action."  *In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994).

46.    Based on such factors, the appointment of the Receiver in these cases should lapse pursuant to Bankruptcy Code Section 543(b).  The first two

and last two factors are not in dispute here, as ABC Funding has failed to argue them.  ABC Funding, instead, relies on the defaults under the Credit Agreement and the conclusory "history of mismanagement" to continue the appointment of the receiver.  Neither point is persuasive.

47.     First, breaches of a credit agreement, taken alone, do not prove mismanagement.  Debtors are routinely in default on credit agreement obligations prior to filing a bankruptcy petition.  *See In re R & G Props., Inc.*, at *10 ("If every debtor in default was deemed to have mismanaged its business for purposes of § 543(d)(1), it would be <u>virtually impossible</u> for any debtor to regain control of its property and to enjoy the presumption that chapter 11 debtors should operate as debtors in possession." (emphasis added)).

48.     Second, all of the factual allegations with respect to mismanagement of Miami Jai-Alai's properties have been addressed in the preceding pages of this response.  *See Supra* at page 10.  Finally, the supposed "insider self-dealing" has been squarely addressed in the *Declaration of Daniel Licciardi in Opposition to Motion to Appoint Trustee*, and all such transactions relied on by ABC Funding were undertaken either at its insistence, or its acquiescence. The Court should, therefore, decline to allow Mr. Jonas to remain in place as Receiver.

### THERE IS NO BASIS TO EXCUSE COMPLIANCE WITH SECTION 543(B)

49.     Bankruptcy Code Section 543(b) provides:

(b) A custodian **shall** —

(1)     deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

> (2)     file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C. §542(b) (emphasis added).  The Receiver qualifies as a custodian for purposes of Section 543.  *See In re Left Guard of Madison, Inc.*, 11 B.R. 238, 240 (Bankr. W.D. Wis. 1981) (a court-appointed receiver is a custodian as defined in 11 USC § 101(10)(A)).[3]

50.     Because the Bankruptcy Code mandates turnover, any creditor or custodian seeking to be excused from compliance with the turnover provisions of Section 543 bears the burden with respect to all issues relating to that affirmative relief.  *In re Northgate Terrace Apartments, Ltd.*, 117 BR 328, 332 (Bankr. S.D. Ohio 1990). The *Northgate Terrace* court explained:

> The turnover provisions of 11 U.S.C. § 543 are part of the statutory expression of **the Congressional preference that a Chapter 11 debtor be permitted to operate and control its business during the reorganization process**. Moreover, that operation is for the benefit of all constituencies and is **not solely for the benefit of the lender holding the primary mortgage against the debtor's property**.  Generally the basic equities would favor a debtor or debtor in possession.  If nothing more, a substantial weight is added to the debtor's burden of attempting to reorganize and promulgate an acceptable plan of reorganization if the debtor cannot have access to all of its assets during its initial breathing spell.
>
> The statute contemplates that property being managed by a receiver will be returned to the representative of the estate upon the commencement of the bankruptcy case by the owner.  Excuse from this statutory mandate requires [the creditor] to show that the interests of all creditors are better served if the Receiver is kept in place.  Absent a bad faith filing lacking any possibility of reorganization, the presence

---

[3]   11 USC § 101(10)(A) provides: "custodian" means – receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title[.]

> of grossly inept management of the Property, or fraudulent behavior, that burden will be hard to sustain.

*Id.* at 332-33 (citing *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 239-40 (Bankr. W.D. Mo. 1989)) (emphasis added).

51.    Moreover, "[t]here is no question that a custodian is **not** entitled to adequate protection as a condition to turnover and the ***duty of the custodian to deliver and turn over properties in his possession is absolute***, unless excused by the Bankruptcy Court pursuant to § 543(d)." *In the Matter of Property Management & Investments, Inc.*, 17 B.R. 728, 731 (Bankr. M.D. Fla. 1982).

52.    Here, there is no basis for the Receiver to be excused from the mandates of Section 543(b) and, much like its trustee arguments that rely upon unsubstantiated hyperbole and unfounded petty accusations, ABC Funding has fallen far short of satisfying its burden by clear and convincing evidence that cause exists to excuse the immediate turnover of all estate property held by the Receiver.

53.    **The Immediate Need for An Accounting.** The Receiver is required to file an accounting of "any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian." 11 U.S.C. § 543(b)(2).

54.    It is imperative that Miami Jai-Alai receive this accounting as soon as possible so that it may have a complete financial picture of its business operations from the Petition Date going forward.

### Conclusion

For the reasons stated above, ABC Funding has failed to overcome its burden under Bankruptcy Code Sections 1104(a) and 543(d)(1) and its motion should be denied.

WHEREFORE, Miami Jai-Alai respectfully requests that the Court enter an Order (i) denying the Trustee Motion in its entirety; (ii) requiring the immediate turnover of any estate property in the Receiver's possession to Miami

Jai-Alai; (iii) requiring the Receiver to provide an accounting of estate property; and (iv) granting such other and further relief as this Court deems just and proper, including all attorneys fees and costs.

Dated: September 9, 2013                 Respectfully submitted,

SALAZAR JACKSON, LLP
*Counsel for Florida Gaming Centers, Inc.,*
*Florida Gaming Corporation, Tara Club*
*Estates, Inc., and Freedom Holding, Inc.*
2 South Biscayne Boulevard, Suite 3760
Miami, Florida 33131
Phone: (305) 374-4848
Fax: (305) 397-1021
Email: Salazar@SalazarJackson.com
Email: Honaker@SalazarJackson.com

By:_____ */s/ Luis Salazar*_____
                 Luis Salazar
                 Florida Bar No. 147788
                 Aaron P. Honaker
                 Florida Bar No. 48749

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true copy of this Notice is being served this day on all parties identified on the Master Service List attached to the original hereof, who received notice of the hearing for which the document was filed.

<i>/s/  Luis Salazar</i>
Luis Salazar

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

### Debtors

Florida Gaming Centers, Inc.
Florida Gaming Corporation
Freedom Holding, Inc.
Tara Club Estates, Inc.
Attn: W. Bennett Collett, Jr.
3500 NW 37th Avenue
Miami, FL 33142

### Debtors Counsel / Professionals

Luis Salazar, Esq.
Linda Worton Jackson, Esq.
Aaron P. Honaker, Esq.
SALAZAR JACKSON, LLP
Two S. Biscayne Blvd., Suite 3760
Miami, FL 33131
Email: Salazar@SalazarJackson.com
Email: Jackson@SalazarJackson.com
Email: Honaker@SalazarJackson.com
*Counsel for Debtors*

VIA EMAIL ONLY
Robert W. Hudson, Esq.
HUDSON & CALLEJA, LLC
3211 Ponce de Leon Boulevard, Suite 102
Coral Gables, FL 33134
Email: rhudson@hudsoncalleja.com
*Proposed Special Counsel for Debtors*

VIA EMAIL ONLY
R. James Straus, Esq.
FROST BROWN TODD LLC
400 West Market Street, Suite 3200
Louisville, KY 40202-3363
Email: jstraus@fbtlaw.com
*Proposed Special Counsel for Debtors*

### U.S Trustee

Office of the United States Trustee
51 Southwest First Avenue, Room 1204
Miami, FL 33130
Email: USTPRegion21.MM.ECF@usdoj.gov

### Secured Creditors

Drew Dillworth
150 West Flagler Street
Miami, FL 33130
Email: ddillworth@stearnsweaver.com
*Local Counsel for ABC Funding, LLC*

Marissa D. Kelley, Eq.
Stearns Weaver Miller Weissler Alhadeff &
Sitterson, P.A.
200 East Las Olas Blvd., Suite 2100
Fort Lauderdale, FL 33301
Email: mkelley@stearnsweaver.com
*Counsel for ABC Funding, LLC*

Andrew F. O'Neill
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Email: aoneill@sidley.com
*Counsel for ABC Funding, LLC*

Dennis M. Twomey
 Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Email: dtwomey@sidley.com
*Counsel for ABC Funding, LLC*

ABC Funding, LLC
Attn: James Freeland and Adam Britt
222 Berkeley Street, 18th Floor
Boston, MA 02116

1

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc. *et al.***

Canyon Distressed Opportunity Master
Fund, L.P.
c/o Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

Canyon-GRF Master Fund II, L.P.
c/o Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

Canyon Value Realization Fund, L.P.
c/o Canyon Capital Advisors LLC
Attn: Chaney Sheffield
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

Canyon Value Realization Master Fund, L.P.
c/o Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

J.P. Morgan Securities LLC
Attn: Jason Kroll
383 Madison Avenue, 3rd Floor
New York, NY 10017

JPMorgan Chase Bank, N.A.
Attn: Jason Kroll
383 Madison Avenue, 3rd Floor
New York, NY 10017

Locust Street Funding LLC
c/o GSO/Blackstone Debt Funds Management
Attn: James Roche
345 Park Avenue, 31st Floor
New York, NY 10154

Summit Partners Subordinated Debt Fund IV-A,
L.P.
c/o Summit Partners Credit Advisors, L.P.
Attn: James Freeland and Adam Britt
222 Berkeley Street, 18th Floor
Boston, MA 02116

Summit Partners Subordinated Debt Fund IV-
A, L.P.
Summit Partners Subordinated Debt Fund IV-
B, L.P.
ABC Funding, LLC
Attn: Summit Partners SD IV, L.P.,
Attn: Robin W. Devereux, General Partner
222 Berkeley Street, 18th Floor
Boston, MA 02116

Summit Partners Subordinated Debt Fund IV-B,
L.P.
c/o Summit Partners Credit Advisors, L.P.
Attn: James Freeland and Adam Britt
222 Berkeley Street, 18th Floor
Boston, MA 02116

Ileana Cruz
Assistant County Attorney
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1993
Email: ileanac@miamidade.gov
Email: cao.bkc@miamidade.gov
*Counsel for Miami Dade County-County Tax
Collector*

Miami Dade County Tax Collector
Darely Garcia-Lopez
c/o Miami Dade County Paralegal Unit
Miami Dade Bankruptcy Unit
140 West Flagler Street, Suite 1403
Miami, FL 33130-1575
Email: dgjp@miamidade.gov
Email: MDTCBKC@miamidade.gov

2

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

Thomas P. Abbott, Assistant County Attorney
PO Box 025504
Miami, FL 33102-5504
Facsimile: 305-876-7294
Email: TABBOTT@miami-airport.com

**20 Largest Creditors**

Andrew R. Herron, Esq. Herron Ortiz
255 Alhambra Circle, Suite 1060
Coral Gables, FL 33134
Email: aherron@herronortiz.com
Email: ndrubin@herronortiz.com
*Counsel for Miami Gaming Ventures, LLC*

Allied Health Plans
Attn: Vdayan Sen
9400 South Dadeland Blvd. Suite 510
Miami, FL 33156

American Gaming Systems, LLS
Attn: Lisa Begay-Jennings
6680 Amelia Earhart Court
Las Vegas, NV 89119

Aristocrat Technologies
Attn: Tatiana Janevski
7230 Amigo Street
Las Vegas, NV 89119

Andrea Neiman
1333 St. Tropez Circle #406
Weston, FL 33326

Broadridge ICS
 PO Box 416423
Boston, MA 02241

Chase Credit Cardmember
P.O. Box 94014
Palatine, IL 60094

Construct Design/Florida Lemark
20470 NW 94th Avenue
Miami, FL 33172
Continental Stock Transfer
17 Battery Place
New York, NY 10004

Cousins, Chipman, and Brown
The Nemours Building
Attn: Joseph Cicero
1007 North Orange Street, Ste 1110
Wilmington, DE 19801

Dania Jai-Alai
Attn: Clint Morris
301 East Dania Beach Blvd
P.O. Box 96
Dania, FL 33004

Derby Lane
Attn: Sandra Halbert
10490 Gandy Blvd. N.
Saint Petersburg, FL 33702

Edmunds Direct Mail, Inc.
Attn: K. Biglin
301 Tilton Road
Northfield, NJ 08225

Farmers Bank
P.O. Box 231
Hardinsburg, KY 40143

Freedom Financial Corporation
2669 Charlestown Road #D
New Albany, IN 47150

Florida Legislative Consultants, Inc.
Attn: Jim Tillman
522 East Jefferson Street
Tallahassee, FL 32302

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

George Galloway
2399 Mountain Tops Road
Blue Ridge, GA 30513

Gulfstream Park
Attn: Carl Ng Mon
901 South Federal Highway
Hallandale, FL 33009

H. Hewitt Brown
600 East Main Street
Louisville, KY 40202

IGT-Eastern Operating
Attn: Dea Drummond
6355 South Buffalo Drive
Las Vegas, NV 89113

International Sound Corporation
Attn: Dale Walter
7130 Milford Industrial Rd.
Pikesville, MD 21208

James Stuckert/Solomon Howell
7308 Shadwell Lane
Prospect, KY 40059

Kim Tharp
2669 Charlestown Rd #D
New Albany, IN 47150

King & Company
Attn: Jim King
32400 Dutchmans Lane
Louisville, KY 40205

Miami Casino Management, LLC
Attn: Dave Jonas
21001 North Tatun Blvd. Suite 1630-256
Phoenix, AZ 85050

Palm Beach Kennel
Attn: Le Ruth DeMunn
1111 North Congress Avenue
West Palm Beach, FL 33409

Roberts Communication Network, Inc.
Attn: Joanne Colon
4175 Cameron Street Suite B-10
Las Vegas, NV 89103

Roland Howell Estate
Attn: Alex Rosa
555 NE 15th Street
Miami, FL 33132

Staples Credit Card
P.O. Box 689020
Des Moines, IA 50368

SHFL Entertainment, Inc.
Attn: Amy Lawrence
1106 Palms Airport Drive
Las Vegas, NV 89119

Sportech, Inc.
Attn: Albashir Haji
1095 Winward Ridge Parkway, Suite 170
Alpharetta, GA 30005

Tampa Bay Downs
Attn: Greg Gelyon
11225 Race Track Road
Tampa, FL 33626

Tom Tew
Four Seasons Tower
1435 Brickell Avenue 15th Floor
Miami, FL 33131

Vintage Filings
350 Hudson Street, Suite 300
New York, NY 10014

4

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

William Haddon Estate
Attn: Betty Haddon
196 Atlanta Country Club Drive
SE Marietta, GA 30067

### Governmental Agencies / Taxing Authorities

Division of Alcoholic Beverages and Tobacco
Attn: Allen Douglas, Director
1940 North Monroe Street
Tallahassee, FL 32399
Facsimile: 850.922.5175

Division of Pari-Mutuel Wagering
Southern Division
1400 West Commercial Boulevard, Suite 165
Ft. Lauderdale, FL 33309-3787

Division of Pari-Mutuel Wagering
Attn: Leon M Biegalski, Director
1940 North Monroe Street
Tallahassee, FL 32399-1035
Facsimile: 850.488.0550

Florida Department of Revenue
Attn: Bankruptcy Unit
P.O Box 6668
Tallahassee, FL 32314-6668

Florida Department of Revenue
c/o Agency Clerk
501 S. Calhoun Street
Room 201, Carlton Building
Tallahassee, FL 32399

Florida Department of Revenue
8175 NW 12th St, Suite 119
Miami Service Center
Miami, FL 33126-1828

Florida Department of Revenue
5050 West Tennessee Street
Tallahassee, FL 32399-0100

Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Special Procedures- Insolvency
7850 SW 6th Court
Plantation, FL 33324

David Baddley
U.S. Securities and Exchange Commission
Office of Reorganization
950 East Paces N.E, Suite 900
Atlanta, GA 30326-1382
Email: atlreorg@sec.gov
*Counsel for U.S. Securities and Exchange Commission*

Securities and Exchange Commission
Eric I Bustillo, Regional Director
801 Brickell Ave., Suite 1800
Miami, FL 33131

Special Asst. U.S. Attorney
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, FL 33130

Special Asst. U.S. Attorney
IRS District Counsel
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

Eric Holder, US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Parties in Interest**

VIA EMAIL ONLY
Lance A. Schildkraut, Esq.
DiConza Traurig LLP
630 Third Avenue, 7th Floor
New York, NY 10017
Email: las@dtlawgroup.com

VIA EMAIL ONLY
Gerald D. Kelly, Esq.
Claire E. W. Stewart, Esq.
SIDLEY AUSTIN, LLP
One South Dearborn Street
Chicago, IL 60603
Email: gkelly@sidley.com

VIA EMAIL ONLY
Benjamin R. Nagin, Esq.
Adam McClay, Esq.
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, NY 10019
Email: bnagin@sidley.com
Email: amcclay@sidley.com

VIA EMAIL ONLY
Alexander D. Silverman, Member
William S. Kogan, General Counsel
SILVERMARK LLC
430 Park Avenue, 5th Floor
New York, NY 10022
Email: alexs@andalex.com
Email: wkogan@andalex.com

VIA EMAIL ONLY
Craig V. Rasile, Esq.
DLA Piper LLP (US)
200 S. Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8539
Facsimile: (305) 437-8131
Email: craig.rasile@dlapiper.com
*Local Counsel for Silvermark, LLC*

VIA EMAIL ONLY
Andrew D. Zaron, Esq.
DLA Piper LLP (US)
200 S. Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8523
Facsimile: (305) 437-8131
Email: andrew.zaron@dlapiper.com
*Local Counsel for Silvermark, LLC*

VIA EMAIL ONLY
Rachel Nanes, Esq.
DLA Piper LLP (US)
200 S. Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8563
Facsimile: (305) 437-8131
Email: rachel.nanes@dlapiper.com
*Lcoal Counsel for Silvermark, LLC*

Thomas R. Kreller
Milbank, Tweed, Hadley & McCloy LLP
601 South Figuerora Street, 30th Floor
Los Angeles, CA 90017
*Counsel for Silvermark, LLC*

VIA EMAIL ONLY
Linda A. Conahan
GUNSTER, YOAKLEY & STEWART, P.A.
450 E. Las Olas Boulevard, Suite 1400
Ft. Lauderdale, FL 33301
Email: lconahan@gunster.com

6

**MASTER SERVICE LIST AS OF SEPTEMBER 6, 2013**
**Florida Gaming Centers, Inc.** *et al.*

<u>VIA EMAIL ONLY</u>
Etan Mark, Esq.
BERGER SINGERMAN, LLP
1450 Birckell Avenue, Suite 1900
Miami, FL 33131
Email:  emark@bergersingerman.com
*Counsel for David Jonas*

<u>VIA EMAIL ONLY</u>
Christopher A. Jarvinen, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
E-mail: cjarvinen@bergersingerman.com
*Counsel for David Jonas*

<u>VIA EMAIL ONLY</u>
David Jonas
4 Overlook Ct.
Medford, NJ 8055
Email:  davesjonas@gmail.com

Wells Fargo Bank Deposits Bankruptcy
Wells Fargo Bank NA
2701 NW Vaughn St, 5th Floor
Portland, OR 97210