# EXHIBIT "A"

**EXECUTION COPY**

CREDIT AGREEMENT

dated as of

April 25, 2011

among

FLORIDA GAMING CENTERS, INC.,

as the Borrower

FLORIDA GAMING CORPORATION,

as Holdings

The Lenders Party Hereto,

and

ABC FUNDING, LLC,

as Administrative Agent

# TABLE OF CONTENTS

Page

ARTICLE I Definitions ................................................................................................. 1

SECTION 1.01.   Defined Terms. ................................................................................. 1
SECTION 1.02.   Terms Generally. ............................................................................ 24
SECTION 1.03.   Accounting Terms; GAAP. ............................................................ 25
SECTION 1.04.   Miami Jai-Alai Facility Generally. ............................................... 25

ARTICLE II The Credits ............................................................................................. 25

SECTION 2.01.   Commitments. ................................................................................ 25
SECTION 2.02.   Loans and Borrowings. .................................................................. 26
SECTION 2.03.   Requests for Term Loan Borrowings. ............................................ 26
SECTION 2.04.   Funding of Borrowings. ................................................................ 27
SECTION 2.05.   Termination of Commitments. ....................................................... 27
SECTION 2.06.   Repayment of Loans; Evidence of Debt. ....................................... 27
SECTION 2.07.   Amortization of Term Loans. ......................................................... 28
SECTION 2.08.   Prepayment of Loans. .................................................................... 29
SECTION 2.09.   Fees. .............................................................................................. 31
SECTION 2.10.   Interest. .......................................................................................... 32
SECTION 2.11.   Increased Costs. ............................................................................. 32
SECTION 2.12.   Break Funding Payments. ............................................................. 33
SECTION 2.13.   Taxes. ............................................................................................. 33
SECTION 2.14.   Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .... 35
SECTION 2.15.   Mitigation Obligations; Replacement of Lenders. ........................ 37
SECTION 2.16.   Defaulting Lenders. ....................................................................... 38

ARTICLE III Representations and Warranties ........................................................... 38

SECTION 3.01.   Organization; Powers; Key Employees. ........................................ 38
SECTION 3.02.   Authorization; Enforceability. ....................................................... 39
SECTION 3.03.   Governmental Approvals; No Conflicts. ........................................ 39
SECTION 3.04.   Financial Condition; No Material Adverse Change. ...................... 39
SECTION 3.05.   Properties. ...................................................................................... 40
SECTION 3.06.   Litigation, Labor Matters and Environmental Matters. ................. 41
SECTION 3.07.   Compliance with Laws and Agreements; No Burdensome Restrictions. ... 42
SECTION 3.08.   Investment Company Status. .......................................................... 43
SECTION 3.09.   Taxes. ............................................................................................. 43
SECTION 3.10.   ERISA. ........................................................................................... 43
SECTION 3.11.   Disclosure. ..................................................................................... 44
SECTION 3.12.   No Default. ..................................................................................... 44
SECTION 3.13.   Liens. ............................................................................................. 44
SECTION 3.14.   Contingent Obligations. ................................................................ 44
SECTION 3.15.   Regulation U. ................................................................................. 45

SECTION 3.16.    Solvency. ........................................................................................45
SECTION 3.17.    Insurance. .......................................................................................45
SECTION 3.18.    Collateral Documents. ....................................................................45
SECTION 3.19.    Permits. ...........................................................................................46
SECTION 3.20.    Sufficiency of Construction Documents. .........................................47
SECTION 3.21.    Survey. .............................................................................................47

ARTICLE IV Conditions                                                                                    47

SECTION 4.01.    Effective Date. .................................................................................48
SECTION 4.02.    Each Credit Event. ...........................................................................51

ARTICLE V Affirmative Covenants                                                                          52

SECTION 5.01.    Financial Statements and Other Information. ...................................52
SECTION 5.02.    Notices of Material Events. .............................................................54
SECTION 5.03.    Existence; Conduct of Business. ......................................................55
SECTION 5.04.    Payment of Obligations. ..................................................................55
SECTION 5.05.    Maintenance of Properties; Insurance. ............................................55
SECTION 5.06.    Books and Records; Inspection Rights. ...........................................56
SECTION 5.07.    Compliance with Laws. ...................................................................57
SECTION 5.08.    Use of Proceeds. ..............................................................................57
SECTION 5.09.    Credit Parties Guaranty. ..................................................................58
SECTION 5.10.    Collateral; Cash Management. .........................................................58
SECTION 5.11.    Materials. .........................................................................................60
SECTION 5.12.    Maintenance of Construction Site. ..................................................60
SECTION 5.13.    Mechanic's Liens and Other Encumbrances. ...................................60
SECTION 5.14.    Construction of the Miami Jai-Alai Facility. ..................................60
SECTION 5.15.    Maintenance of Gaming. .................................................................62
SECTION 5.16.    Completion Reserve Account and Warrants. ...................................62
SECTION 5.17.    Repayment of Certain Indebtedness. ...............................................62

ARTICLE VI Negative Covenants                                                                            62

SECTION 6.01.    Indebtedness. ...................................................................................62
SECTION 6.02.    Liens. ...............................................................................................65
SECTION 6.03.    Fundamental Changes. .....................................................................65
SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions. ........66
SECTION 6.05.    Swap Agreements. ...........................................................................66
SECTION 6.06.    Restricted Payments. ........................................................................66
SECTION 6.07.    Transactions with Affiliates. ............................................................67
SECTION 6.08.    Restrictive Agreements. ...................................................................68
SECTION 6.09.    Changes in Fiscal Year. ...................................................................69
SECTION 6.10.    Asset Sales. ......................................................................................69
SECTION 6.11.    Sale and Leaseback Transactions. ...................................................69
SECTION 6.12.    Total Leverage Ratio. .......................................................................70
SECTION 6.13.    Minimum Consolidated EBITDAM. ...............................................71

ii

SECTION 6.14.    Fixed Charge Coverage Ratio...................................................................74
SECTION 6.15.    Capital Expenditures; Pre-Opening Expenses.................................................75
SECTION 6.16.    Conduct of Business....................................................................................76
SECTION 6.17.    Limitation on Construction Document Modifications or Terminations........76
SECTION 6.18.    Limitation on Zoning and Contract Changes and Compliance. ...................76
SECTION 6.19.    Limitation of Miami Jai-Alai Facility, Ft. Pierce Property and Other Real
        Estate Development.......................................................................................77
SECTION 6.20.    Governmental Authority Action....................................................................77

ARTICLE VII Events of Default and Remedies                                                77

SECTION 7.01.    Events of Default..........................................................................................77
SECTION 7.02.    Right to Complete Construction....................................................................82
SECTION 7.03.    Curing Certain Events of Default..................................................................82

ARTICLE VIII The Administrative Agent                                                      82


ARTICLE IX Miscellaneous                                                                   86

SECTION 9.01.    Notices.........................................................................................................86
SECTION 9.02.    Waivers; Amendments. .................................................................................87
SECTION 9.03.    Expenses; Indemnity; Damage Waiver. .........................................................88
SECTION 9.04.    Successors and Assigns. ................................................................................90
SECTION 9.05.    Survival.........................................................................................................93
SECTION 9.06.    Counterparts; Integration; Effectiveness. ......................................................93
SECTION 9.07.    Severability....................................................................................................94
SECTION 9.08.    Right of Setoff................................................................................................94
SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process. ......................94
SECTION 9.10.    **WAIVER OF JURY TRIAL**. ..................................................................95
SECTION 9.11.    Headings........................................................................................................95
SECTION 9.12.    Confidentiality...............................................................................................95
SECTION 9.13.    USA PATRIOT Act.......................................................................................97
SECTION 9.14.    Subordination of Intercompany Indebtedness................................................97
SECTION 9.15.    Interest Rate Limitation.................................................................................98
SECTION 9.16.    Interest Reserve Account...............................................................................98
SECTION 9.17.    Post Closing Requirements............................................................................98


ARTICLE X GAMING                                                                           101

SECTION 10.01.    Restrictions Under Gaming Laws and Liquor Laws. ...................................101



SCHEDULES:

Schedule 1.01          --          Permitted Corporate Expenses

CH1 5547448v.28

Schedule 2.01(a)     --     Commitments
Schedule 2.01(b)     --     Main Cash Account Requirements
Schedule 3.01        --     Subsidiaries
Schedule 3.05        --     Owned and Leased Properties
Schedule 3.06        --     Disclosed Matters
Schedule 3.07        --     Compliance with Laws and Agreements; No Burdensome
                            Restrictions
Schedule 3.17        --     Insurance
Schedule 4.01(n)     --     Indebtedness to be Repaid on the Effective Date
Schedule 4.01(x)     --     Modified Indebtedness
Schedule 5.01(a)     --     Acceptable Accountants
Schedule 5.05        --     Post-Opening Date Insurance
Schedule 5.08(a)     --     Sources and Uses
Schedule 5.08(b)     --     Indebtedness to be Repaid Upon Receipt of Slot Licenses
Schedule 6.01        --     Existing Indebtedness
Schedule 6.02        --     Permitted Liens
Schedule 6.08        --     Existing Restrictions
Schedule 6.15        --     Pre-Opening Expenses

EXHIBITS:

Exhibit A      --     Form of Assignment and Assumption
Exhibit B-1    --     Form of Opinion of Frost Brown Todd LLC, Holdings' and Borrower's
                      External Counsel
Exhibit B-2    --     Form of Opinion of Infante, Zumpano, Hudson & Miloch, LLC, Holdings'
                      and Borrower's Florida Counsel
Exhibit B-3    --     Form of Opinion of Gunster, Yoakley & Stewart, P.A., Holdings' and
                      Borrower's Gaming Counsel
Exhibit C      --     Form of Compliance Certificate
Exhibit D      --     List of Closing Documents
Exhibit E      --     Disbursement Agreement
Exhibit F      --     Pledge and Security Agreement
Exhibit G      --     Credit Party Guaranty
Exhibit H      --     Freedom Pledge Agreement
Exhibit I      --     Management Agreement
Exhibit J      --     Form of Freedom Financial Note
Exhibit K      --     Form of Freedom Consulting Agreement

CH1 5547448v.28

CREDIT AGREEMENT (this "Agreement"), dated as of April 25, 2011, among FLORIDA GAMING CENTERS, INC., FLORIDA GAMING CORPORATION, the LENDERS party hereto, and ABC FUNDING, LLC, as Administrative Agent.

ARTICLE I

Definitions

SECTION 1.01.    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Administrative Agent" means ABC Funding, LLC, in its capacity as administrative agent for the Lenders hereunder, and shall include any successor administrative agent appointed pursuant to Article VIII.

"Administrative Agent Fee Letter" means the Fee Letter, dated as of April 25, 2011, by and among Holdings, the Borrower and the Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Term Loan Commitment" means the aggregate of the Term Loan Commitments of all the Lenders, as may be reduced from time to time pursuant to the terms of this Agreement.  The Aggregate Term Loan Commitment is Eighty Seven Million and 00/100 Dollars ($87,000,000).

"Applicable Percentage" means, with respect to any Lender, a percentage equal to a fraction the numerator of which is such Lender's outstanding principal amount of its Term Loans and the denominator of which is the aggregate outstanding principal amount of the Term Loans of all of the Term Loan Lenders; provided, that Defaulting Lenders shall be excluded from determinations of the Applicable Percentage.

"Applicable Rate" means (x) 15.75% per annum prior to the occurrence of the Hialeah Park Slots Event and (y) 16.50% per annum on and after the date on which the Hialeah Park Slots Event occurs.

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A hereto or any other form approved by the Administrative Agent.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Florida Gaming Centers, Inc., a Florida corporation.

"Borrower Warrant Agreement" means the Warrant Agreement dated as of April 25, 2011 among the Borrower, Holdings, as guarantor, and the holders named therein, pursuant to which the Borrower has agreed to issue warrants entitling such holders to purchase shares of Borrower's common stock on the terms and conditions set forth therein.

"Borrowing" means Loans made on the same date.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, New York or Boston, Massachusetts are authorized or required by law to remain closed.

"Capital Expenditures" means, without duplication, any expenditures for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Control" means:

(a)    without the prior written consent of the Administrative Agent, W. Bennett Collett, Sr., W. Bennett Collett, Jr. and Robert L. Hurd shall cease to own and control all of the issued and outstanding Equity Interests of Freedom Holding; provided, that Robert L. Hurd may own and control all or any part of his Equity Interests in Freedom Holding through the Hurd

2

Family Limited Partnership, a New Jersey limited partnership, so long as Robert L. Hurd owns and controls all of the Equity Interests in such partnership and is required to approve all decisions made by such partnership prior to the effectiveness thereof, including decisions in respect of Freedom Holding;

      (b)    any Permitted Holder sells, transfers, or assigns any of its Equity Interests in Holdings on or after the Effective Date (other than sales, transfers and assignments between Permitted Holders);

      (c)    the Permitted Holders collectively cease to own or control at least the Required Equity Amount of the issued and outstanding Equity Interests of Holdings;

      (d)    any Person other than a Permitted Holder owns more than 5% of the issued and outstanding Equity Interests of Holdings;

      (e)    Holdings shall cease to own and control all of the Equity Interests of the Borrower; or

      (f)    occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings or the Borrower by Persons who were neither (i) nominated by the board of directors nor (ii) appointed by directors so nominated.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.11(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, however, that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property and interests in property now owned or hereafter acquired by any Credit Party in or upon which a security interest or Lien or mortgage is from time to time granted to the Administrative Agent, for the benefit of the Holders of Obligations, whether under the Pledge and Security Agreement, under any of the other Collateral Documents or under any of the other Loan Documents.

"Collateral Documents" means all agreements, instruments and documents executed in connection with this Agreement pursuant to which the Administrative Agent is granted a security interest in Collateral, including, without limitation, the Pledge and Security Agreement, the Freedom Pledge Agreement, the Credit Party Guaranty, the Mortgages, and all other security agreements, loan agreements, notes, guarantees, subordination agreements, pledges, account control agreements, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether heretofore, now,

or hereafter executed by or on behalf of Holdings, the Borrower, any of their Subsidiaries or any Credit Party and delivered to the Administrative Agent or any of the Lenders, together with all agreements and documents referred to therein or contemplated thereby.

"Commitment" means a Term Loan Commitment.

"Company Accounts" has the meaning set forth in the Disbursement Agreement.

"Completion Reserve Account" has the meaning set forth in the Disbursement Agreement.

"Consolidated Capital Expenditures" means, with reference to any period, the Capital Expenditures of the Borrower and its Subsidiaries calculated on a consolidated basis for such period.

"Consolidated EBITDAM" means Consolidated Net Income plus, to the extent deducted from revenues in determining Consolidated Net Income, (i) Consolidated Interest Expense, (ii) expense for income and franchise taxes paid or accrued (with no addback for any gaming or gambling taxes, whether state, municipal or otherwise), (iii) depreciation, (iv) amortization, (v) extraordinary losses incurred other than in the ordinary course of business, (vi) Management Fees, and (vii) no more than $1,000,000 in the aggregate of Pre-Opening Expenses, minus, to the extent included in Consolidated Net Income, extraordinary gains realized other than in the ordinary course of business, all calculated for the Borrower and its Subsidiaries on a consolidated basis.

"Consolidated Interest Expense" means, with reference to any period, the interest expense (including without limitation interest expense under Capital Lease Obligations that is treated as interest in accordance with GAAP) of the Borrower and its Subsidiaries calculated on a consolidated basis for such period.

"Consolidated Net Income" means, with reference to any period, the net income (or loss) of the Borrower and its Subsidiaries calculated on a consolidated basis for such period in accordance with GAAP.

"Consolidated Total Indebtedness" means at any time the aggregate Indebtedness of the Borrower and its Subsidiaries calculated on a consolidated basis as of such time.

"Construction Agreement" means that certain standard form guaranteed maximum price construction contract on Form AIA Document A141-2004 together with Exhibit A, Exhibit B, and Exhibit C, dated as of April 6, 2011, entered into by and between Contractor and Borrower setting forth the agreements between the parties thereto with respect to the construction and development of the Miami Jai-Alai Facility, as the same has been amended and as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Construction Budget" means the budget attached to the Disbursement Agreement as Exhibit H thereto detailing the costs and expenditures for the construction and development of the Miami Jai-Alai Facility, as the same may be updated and modified from time to time in accordance with the terms of the Disbursement Agreement.

CH1 5547448v.28

"Construction Documents" means the Construction Agreements and all subcontracts to which the Contractor is a party (existing and to be let), and all other contracts, certificates and other documents related thereto or to the construction and/or development of the Miami Jai-Alai Facility, including, without limitation, the Design Documents.

"Construction Funds Account" has the meaning set forth in the Disbursement Agreement.

"Construction Inspector" means Merritt & Harris, Inc. or such other construction inspector or construction consultant of recognized national standing appointed by the Administrative Agent.

"Construction Plans" means collectively, the Plans and Specifications, the Construction Budget and the Construction Timeline.

"Construction Timeline" means the timeline (reported in monthly increments) attached to the Disbursement Agreement as Exhibit I thereto setting forth in detail a schedule for the construction and development of the Miami Jai-Alai Facility and including monthly construction milestones with respect thereto.

"Contingency Reserve Account" has the meaning set forth in the Disbursement Agreement.

"Contractor" means Florida Lemark Corp., or any other contractor hired by the Borrower with the prior approval of the Administrative Agent.

"Contractor Debt" means Indebtedness in respect of the Contractor-Related Property, including, if applicable, the construction of a parking garage thereon, and in respect of all other amounts owing from time to time by the Borrower or its Affiliates to the Contractor.

"Contractor Debt Documents" means the agreements, documents and instruments evidencing the Contractor Debt, as each may be amended, restated, supplemented or otherwise modified from time to time.

"Contractor-Related Property" means that parcel of real property disclosed to the Administrative Agent prior to the Effective Date, which parcel may be use to construct a parking garage for use by the Miami Jai-Alai Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Party" means Freedom Holding, Holdings, the Borrower, Florida Trust, and each Subsidiary required to become a Credit Party pursuant to Sections 5.09 and 5.10.  As of the Effective Date, the Credit Parties are Freedom Holding, Holdings, the Borrower (which is a wholly-owned Subsidiary of Holdings), Tara Club Estates, Inc. (which is a wholly-owned Subsidiary of Holdings) and the Florida Trust.

"Credit Party Guaranty" means the Credit Party Guaranty (the form of which is attached hereto as Exhibit G), dated as of April 25, 2011, by and among Freedom Holding, Holdings, certain of their Subsidiaries, the Florida Trust and the Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Dade County Debt" means Indebtedness owing by the Borrower to Miami-Dade County in an aggregate principal amount not in excess of (x) $14,900,000 plus (y) increases thereto resulting from paid-in-kind interest plus (z) no more than $570,000 in the aggregate, which amount under this clause (z) shall only be permitted if arising out of remediation costs in respect of the Parking Lot Property; provided, that the aggregate amount of Indebtedness owing by the Borrower in respect of the Dade County Debt shall not exceed $16,000,000.

"Dade County Debt Documents" means the principal agreements, documents and instruments evidencing (x) the agreement between Miami-Dade County and the Borrower to purchase the Parking Lot Property, and (y) the Dade County Debt, in each case as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, or (ii) pay over to any Lender Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Lender Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by a Lender Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Lender Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent or (d) has become the subject of a Bankruptcy Event.

"Design Documents" means those contracts between the Borrower and the design professionals and architects party thereto, which relate to the Miami Jai-Alai Facility's construction and expansion projects.

"Development Agreements" means the Development Agreement between the City of Miami, Florida, and the Borrower, dated as of May 26, 2008, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Disbursement Agent" means the Escrowee (as defined in the Disbursement Agreement).

"Disbursement Agreement" means the Disbursement Agreement dated as of April 25, 2011 (the form of which is attached hereto as Exhibit E), by and between the Borrower and the Administrative Agent (and as guaranteed by Holdings and acknowledged by certain other parties thereto), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Dollars," "dollars," or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means a Subsidiary organized under the laws of a jurisdiction located in the United States of America.

"EBITDAM Adjustment Condition" means, as demonstrated by the Borrower to the Administrative Agent's satisfaction on the first day of each of the following twelve-month periods, that Consolidated EBITDAM for the applicable twelve-month period (with the first such period beginning six months after the Opening Date and ending twelve months thereafter, and with each period thereafter running for a subsequent twelve months)) equals or exceeds the following amounts for such periods (with the understanding that this condition shall not have been satisfied if Consolidated EBITDAM for the applicable twelve-month period is less than the following amounts):

| Calculation Period (as tested on the first day of such period) | Consolidated EBITDAM |
|---|---|
| First Twelve-Month Period | $29,339,000 |
| Second Twelve-Month Period | $33,000,000 |
| Third Twelve-Month Period | $34,939,000 |
| Fourth Twelve-Month Period | $36,065,000 |
| Fifth Twelve-Month Period | $36,801,000 |

"ECF Percentage" means, as tested for the fiscal year giving rise to the applicable Required Excess Cash Flow Prepayment, (x) 75% if the Total Leverage Ratio was greater than or

7

equal to 2.00 to 1.00 for such fiscal year, and (y) 50% if the Total Leverage Ratio was less than 2.00 to 1.00 for such fiscal year.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Holdings, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Holdings or the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure with respect to any Plan to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Holdings or the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Holdings or the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Holdings or the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Holdings or the Borrower or any ERISA Affiliate of any notice, or the

CH1 5547448v.28

receipt by any Multiemployer Plan from Holdings or the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Event of Eminent Domain" with respect to any real property, (i) any compulsory transfer or taking by condemnation, seizure, eminent domain or exercise of a similar power, or transfer under threat of such compulsory transfer or taking or confiscation of such real property or the requisition of the use of such real property, by any agency, department, authority, commission, board, instrumentality or political subdivision of any state, the United States or another Governmental Authority having jurisdiction or (ii) any settlement in lieu of clause (i) above.

"Excess Cash Flow" means, for any fiscal year, (a) Consolidated EBITDAM for such fiscal year minus (b) the aggregate amount of Taxes paid in cash by the Borrower and its Subsidiaries during such fiscal year minus (c) the aggregate amount of all interest paid in cash in respect of Indebtedness by the Borrower and its Subsidiaries during such fiscal year minus (d) the aggregate amount of all cash payments of the principal portion of Indebtedness during such fiscal year minus (e) increases in working capital (or plus decreases in working capital, as the case may be) minus (f) Restricted Payments made in respect of Permitted Corporate Expenses so long as the aggregate thereof for the applicable fiscal year does not exceed the Permitted Corporate Expenses Cap and the corresponding dividends were permitted when paid minus (g) Management Fees paid in cash during the applicable fiscal year to the extent permitted to be paid during such fiscal year.

"Excluded Asset" means any Gaming License or Liquor License or permit from any Gaming Authority or Liquor Authority, or any other license, permit or approval, or any other right or interest in or to any of the foregoing or any other property of Holdings, the Borrower or any Affiliate thereof, to the extent that the granting of a Lien upon such property is prohibited by, or would result in a breach or violation of, any Gaming Law or any Liquor Law.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.16), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.13(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the

Borrower with respect to such withholding tax pursuant to Section 2.13(a), and (d) any withholding taxes imposed pursuant to Sections 1471 through 1474 of the Code.

"Farmers Bank Cure Period" means, with respect to any Event of Default under Section 7.01(f) or (g) in connection with the Indebtedness in an aggregate principal amount up to $1,300,000 owing from Freedom Holding to The Farmers Bank, a period not in excess of 60 days (beginning on the date the applicable Event of Default occurs), during which period Freedom Holding shall either fully repay and terminate such Indebtedness or shall amend and modify the terms of such Indebtedness in a manner acceptable to the Administrative Agent. Failure to fully repay such Indebtedness or consummate such approved amendments or modifications by the end of such 60 day period shall result in an Event of Default as of the last day of such period.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"FH Note" means the promissory note, dated as of November 1, 2008, as re-evidenced by the promissory notes dated May 1, 2009, September 1, 2009 and September 1, 2010, made by the Borrower in favor of Freedom Holding, as the foregoing have been modified and assigned to Holdings pursuant to the Modification, Assignment and Assumption Agreement dated as of April 25, 2011 by and among the Borrower, Freedom Holding and Holdings, as each of the foregoing have been and/or may be amended, restated, supplemented or otherwise modified from time to time.

"Financial Officer" means the chief operating officer of Holdings or the Borrower, as applicable.

"First PCE Dividend Amount" means, for the first fiscal quarter that the Borrower is required to comply with the financial covenants set forth in Sections 6.12 through 6.15, an amount equal to the excess of (x) the aggregate amount of dividends that may be paid in respect of Permitted Corporate Expenses during such quarter (including, without limitation, after giving effect to all financial covenant compliance requirements and dollar caps for such quarter and year) over (y) the aggregate amount of $65,000 monthly payments that were made in accordance with Section 6.06(d) during such quarter.

"Fixed Charge Coverage Ratio" has the meaning set forth in Section 6.14.

"Florida Gaming Board" means the Division of Pari-mutuel Wagering of the Department of Business and Professional Regulation of the State of Florida, together with any other state or local body with oversight of gaming or gambling in the State of Florida.

10

"Florida Trust" means that certain Land Trust Agreement, known as Trust Number 5003471, dated January 3, 1979 between the Borrower, as the owner of the beneficial interest under the Florida Trust and the Florida Trustee.

"Florida Trustee" means City National Bank of Florida, as trustee under the Florida Trust.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary which is not a Domestic Subsidiary.

"Freedom Consulting Agreement" means the Consulting Agreement, dated as of April 25, 2011 (the form of which is attached hereto as Exhibit K), by and between Freedom Financial and Holdings, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Freedom Financial" means Freedom Financial Corp., an Indiana corporation.

"Freedom Financial Note" means the promissory note, dated as of April 25, 2011 (the form of which is attached hereto as Exhibit J), made by Holdings in favor of Freedom Financial, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Freedom Holding" means Freedom Holding, Inc., a Delaware corporation.

"Freedom Pledge Agreement" means that certain Pledge Agreement (the form of which is attached hereto as Exhibit H), dated as of April 25, 2011, by and among W. Bennett Collett, Sr., W. Bennett Collett, Jr., Hurd Family Limited Partnership and the Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time, pursuant to which Equity Interests in Freedom Holding are pledged to the Administrative Agent.

"Ft. Pierce Debt" means the Indebtedness owing by the Borrower to Isle of Capri Casinos, Inc. in an aggregate outstanding amount not in excess of the following that was first incurred by the Borrower on October 29, 2004 and that was refinanced by the parties on December 31, 2008: (i) aggregate outstanding principal of $3,000,000, (ii) aggregate accrued and unpaid interest of $999,904.11 plus $1,479.45 per day from April 1, 2011 through the date on which such Indebtedness is fully repaid, and (iii) aggregate other amounts of $474,661.38.

"Ft. Pierce Property" means that certain parcel of real property with a street address of 1750 S. Kings Highway, Ft. Pierce, Florida 34945.

"GAAP" means generally accepted accounting principles in the United States of America.

11

"Gaming Authority" means, in any jurisdiction in which Freedom Holding, Holdings, the Borrower or any Affiliate thereof conducts any gambling, gaming or similar business or activities, any agency, authority, board, bureau, commission, department, office or instrumentality of any nature whatsoever of the United States federal government, any foreign government, any applicable tribal government, any state, province or city or other political subdivision or otherwise, whether now or hereafter in existence, or any officer or official thereof, including, without limitation, the Florida Gaming Board, in each case, with licensing, permit or regulatory authority over gambling or gaming.

"Gaming Laws" means, in any jurisdiction in which Freedom Holding, Holdings, the Borrower or any Affiliate thereof conducts any gambling, gaming or similar business or activities, all laws, rules, regulations and orders of all Gaming Authorities, as in effect from time to time, including without limitation the policies, interpretations and administration thereof by such Gaming Authorities.

"Gaming License" means, in any jurisdiction in which Freedom Holding, Holdings, the Borrower or any Affiliate thereof conducts any gambling, gaming or similar business or activities, any license, permit, finding of suitability, consent, approval or other authorization to conduct gaming activities that is granted or issued by the applicable Gaming Authorities, including, without limitation, jai-alai pari-mutuel wagering permits for use at the Miami Jai-Alai Facility and the Ft. Pierce Property, and a slot machine gaming license for use at the Miami Jai-Alai Facility.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including, without limitation, each applicable Gaming Authority and Liquor Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or

12

petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hialeah Park" means the Hialeah Park Race Track located at 2200 E. 4th Avenue, Hialeah, Florida 33013, including, without limitation, all gaming and gambling facilities and racing operations related thereto.

"Hialeah Park Slots Event" means that slot machine gaming is offered through at least 100 slot machines at Hialeah Park.

"Holders of Obligations" means the holders of the Obligations from time to time and shall include (i) each Lender in respect of its Loans, (ii) the Administrative Agent and the Lenders in respect of all other present and future obligations and liabilities of Freedom Holding, Holdings, the Borrower and each Subsidiary of every type and description arising under or in connection with the Credit Agreement or any other Loan Document, (iii) each Lender and affiliate of such Lender in respect of Swap Agreements entered into with such Person by Freedom Holding, Holdings, the Borrower or any Subsidiary, (iv) each indemnified party under Section 9.03 in respect of the obligations and liabilities of Holdings or the Borrower or any Affiliate thereof to such Person hereunder and under the other Loan Documents, and (v) their respective successors and (in the case of a Lender, permitted) transferees and assigns.

"Holdings" means Florida Gaming Corporation, a Delaware corporation.

"Holdings Warrant Agreement" means the Warrant Agreement dated as of April 25, 2011 among Holdings and the holders named therein, pursuant to which Holdings has agreed to issue warrants entitling such holders to purchase shares of Holdings common stock on the terms and conditions set forth therein.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by preferred stock, bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, and (k) all Off-Balance Sheet Liabilities of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest

in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes imposed on or with respect to any payment made by the Borrower under any Loan Document, other than Excluded Taxes or Other Taxes.

"Initial Permitted Corporate Expenses Cap Amount" means (x) $1,750,000 times (y) a fraction, the numerator of which is 365 minus the number of days that occur during the period beginning (and including) on January 1, 2011 and ending (and including) on the Opening Date, and the denominator of which is 365.

"Insolvency Event" has the meaning assigned to such term in Section 9.14.

"Intercompany Indebtedness" has the meaning assigned to such term in Section 9.14.

"Interest Payment Date" means the last day of each calendar month.

"Interest Reserve Account" has the meaning set forth in the Disbursement Agreement.

"Key Employees" means all members of executive management of Holdings, the Borrower and each other person materially involved in the day-to-day operations and activities of any of Holdings' or the Borrower's gambling or gaming operations, including, without limitation, W. Bennett Collett, Sr., W. Bennett Collett, Jr., Dan Licciardi, and Kim Tharp.

"Lender Party" means the Administrative Agent or any Lender.

"Lenders" means the Persons listed on Schedule 2.01(a) and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquor Authorities" means, in any jurisdiction in which Freedom Holding, Holdings, the Borrower or any Affiliate thereof sells and distributes liquor, the applicable alcoholic beverage commission or other Governmental Authority, including, without limitation, the Division of Alcoholic Beverages and Tobacco of the State of Florida, in each case, responsible for interpreting, administering and enforcing the Liquor Laws.

"Liquor Laws" means the laws, rules, regulations and orders applicable to or involving the sale or distribution of liquor by Freedom Holding, Holdings, the Borrower or any

Affiliate thereof in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the applicable Liquor Authorities.

"Liquor License" means, in any jurisdiction in which Freedom Holding, Holdings, the Borrower or any Affiliate thereof sells or distributes liquor, any license, permit or other authorization to sell or distribute liquor that is granted or issued by the applicable Liquor Authorities.

"Loan Documents" means this Agreement, any promissory notes executed and delivered pursuant to Section 2.06(e), the Collateral Documents, the Disbursement Agreement, the Warrant Agreements and warrants to be issued pursuant thereto, the other "Financing Agreements" (as defined in the Disbursement Agreement) and any and all other instruments and documents executed and delivered in connection with any of the foregoing.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Main Cash Account" means the Borrower's deposit account maintained with Wells Fargo Bank, National Association as disclosed by the Borrower to the Administrative Agent prior to the Effective Date.

"Management Agreement" means the Management Agreement, dated as of April 25, 2011 (the form of which is attached hereto as Exhibit I), by and among Miami Casino Management, LLC and Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Management Fees" means all management fees and all other amounts payable to Miami Casino Management, LLC or any other Person pursuant to and in accordance with the terms of the Management Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, performance, prospects or condition (financial or otherwise) of Holdings and the Subsidiaries (including the Borrower) taken as a whole, (b) the ability of Holdings or the Borrower to perform any of its obligations under this Agreement or (c) the validity or enforceability of this Agreement or the rights of or benefits available to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents.  Notwithstanding the foregoing, no change in GAAP shall be deemed to constitute a Material Adverse Effect.

"Material Indebtedness" means the Dade County Debt (if any), the Contractor Debt, and Indebtedness (other than the Loans) of any one or more of Freedom Holding, Holdings and its Subsidiaries (including the Borrower) in an aggregate principal amount exceeding $250,000.

"Maturity Date" means April 25, 2016.

"Miami Jai-Alai Facility" means (i) the real property described as such in Schedule 3.05 hereto, (ii) the gaming establishment, improvements, and other property and assets directly related or ancillary thereto or used in connection therewith, including, without limitation,

CH1 5547448v.28

the slot machine gaming facilities being constructed, any building, restaurant, hotel, theater, parking facilities, retail shops, land, golf courses, and other recreation and entertainment facilities, and equipment, and (iii) all other property related thereto to the extent required under applicable Gaming Laws or Liquor Laws to be registered with, or approved by, or not disapproved by, all applicable Gaming Authorities or Liquor Authorities, as the case may be.

"Miami Jai-Alai Facility Costs" has the meaning set forth in the Disbursement Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means the agreements, documents and instruments, all in form and substance reasonably acceptable to the Administrative Agent, pursuant to which a Credit Party grants the Administrative Agent, on behalf of the Lenders, a Lien on its real property, including without limitation, the following real properties: the Ft. Pierce Property, the Contractor-Related Property, the Parking Lot Property and the Miami Jai-Alai Facility.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all fees and out-of-pocket expenses paid by Freedom Holding, Holdings and the Subsidiaries and other Credit Parties (including the Borrower) to third parties (other than fees and expenses paid to Affiliates at prices or on terms and conditions less favorable to Freedom Holding, Holdings or any such Subsidiary or Credit Party (including the Borrower) than could be obtained on an arm's-length basis from unrelated third parties) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by Freedom Holding, Holdings, the Borrower and the Subsidiaries and other Credit Parties as a result of such event to repay Indebtedness (other than Loans) secured by such asset, and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by Freedom Holding, Holdings, the Borrower and the Subsidiaries and other Credit Parties, and the amount of any reserves established by Freedom Holding, Holdings, the Borrower and the Subsidiaries and other Credit Parties to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by the chief financial officer of Holdings or the Borrower); provided that "Net Proceeds" shall include on a dollar-for-dollar basis all amounts remaining in such reserve after such liability shall have been satisfied in full or terminated.

"Obligations" means all Loans, advances, debts, liabilities, obligations, covenants and duties owing by Holdings, the Borrower, any Subsidiary or any Credit Party to the Administrative Agent, any Lender, any Affiliate of the Administrative Agent, or any Lender, or any indemnified Person hereunder, of any kind or nature, present or future, arising under this

Agreement, any Collateral Document, any Swap Agreement (to the extent such Swap Agreement is with a Lender or its Affiliate) or any other Loan Document, whether or not evidenced by any note, guaranty or other instrument, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.  The term includes, without limitation, all interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, reasonable paralegals' fees (in each case whether or not allowed), and any other sum chargeable to Holdings, the Borrower, any Subsidiary or any Credit Party under this Agreement or any other Loan Document.

"Off-Balance Sheet Liabilities" of a Person means (a) any repurchase obligation or liability of such Person or any Subsidiary thereof with respect to receivables sold by such Person or such Subsidiary, (b) any liability under any sale and leaseback transaction which does not create a liability on the consolidated balance sheet of such Person or any Subsidiary thereof, (c) any liability of such Person or any Subsidiary thereof under any financing lease, so-called "synthetic" lease or "tax ownership operating lease" transaction, (d) any obligation under a receivables purchase facility or other similar asset securitization transaction that would be characterized as principal if such facility were structured as a secured lending transaction rather than a purchase, or (e) any obligation of such Person or any Subsidiary thereof arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which, in the case of the foregoing clauses, does not constitute a liability on the consolidated balance sheet of such Person or any Subsidiary thereof.

"Opening Date" means the earlier to occur of (x) the date on which the Borrower has received all necessary approvals, permits and licenses to open and operate slot machine gaming at the Miami Jai-Alai Facility, and the Miami Jai-Alai Facility is first opened to the public for slot machine gaming purposes, and (y) each of the Disbursement Agent and the Construction Inspector countersigns the Borrower's Opening Date Certificate (under and as defined in the Disbursement Agreement) acknowledging the foregoing and that the Opening Conditions (under and as defined in the Disbursement Agreement) have been satisfied; provided, that if the Opening Date has not occurred within nine months after the Effective Date, the Administrative Agent, in its sole discretion, may declare that the Opening Date has occurred at any time after the nine-month anniversary of the Effective Date.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Owner Representative" means LPCiminelli, Inc. or such other Person that is approved by the Administrative Agent in its sole discretion.

"Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

CH1 5547448v.28

"Parking Lot Property" means that parcel of real property disclosed to the Administrative Agent prior to the Effective Date, which parcel is to be converted into a parking lot for use by the Miami Jai-Alai Facility.

"Participant" has the meaning set forth in Section 9.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted CapEx Amount" means (i) for the period beginning on the Opening Date and ending December 31, 2011, an amount equal to $750,000 times a fraction, the numerator of which is 365 minus the number of days that occur during the period beginning (and including) on January 1, 2011 and ending (and including) on the Opening Date, and the denominator of which is 365, and (ii) the following amounts for the following fiscal years:

| Fiscal Year | Maximum Aggregate Permitted Capital Expenditures |
| --- | --- |
| 2012 | $750,000 |
| 2013 | $1,000,000 |
| 2014 | $1,500,000 |
| 2015 | $2,000,000 |
| 2016 | $2,000,000 |

"Permitted Corporate Expenses" means those categories of overhead, professional fees, directors fees and expenses, and similar expenses set forth in Schedule 1.01 (including, without limitation, payments under the Freedom Consulting Agreement) that are payable by Holdings in the ordinary course of business, that are consistent with past practices, and that are payable in good faith without any intent to evade or avoid any covenant, restriction or prohibition set forth in any Loan Document.  Notwithstanding the foregoing or anything to the contrary set forth herein, no payment in respect of the FH Note or the Freedom Financial Note shall constitute a Permitted Corporate Expense.

"Permitted Corporate Expenses Cap" means the Initial Permitted Corporate Expenses Cap Amount for 2011, $1,837,500 for 2012, $1,929,375 for 2013, $2,025,843 for 2014, $2,127,135 for 2015, and $2,233,491 for 2016; provided, that (i) if the EBITDAM Adjustment Condition has been satisfied during any such fiscal year, then the Permitted Corporate Expenses Cap for such fiscal year shall be increased by $250,000; (ii) only one such increase shall occur (if such increase occurs at all) during any fiscal year; (iii) no portion of the Permitted Corporate Expenses Cap that goes unused in any fiscal year shall be available in any other fiscal year; and (iv) no more than 25% of any year's Permitted Corporate Expenses Cap amount shall be available or otherwise distributed in any quarter occurring during such year.

18

"Permitted Encumbrances" means:

(a)    Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)    with respect to the Ft. Pierce Property, carriers', warehousemen's, materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days or are being contested in compliance with Section 5.04; provided, that no mechanic's Liens or Liens in favor of the Contractor or any Subcontractor shall be permitted hereunder;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    with respect to the Ft. Pierce Property, judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 7.01;

(f)    the encumbrances listed on Schedule 6.02; and

(g)    Liens in favor of the Administrative Agent for the benefit of the Holders of Obligations;

provided that, except as set forth in clause (g) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Freedom Consulting Payment Cap" means $300,000 per fiscal year; provided, that (i) if the EBITDAM Adjustment Condition has been satisfied during such fiscal year, then the Permitted Freedom Consulting Payment Cap for such fiscal year shall equal $450,000; (ii) only one such increase shall occur (if such increase occurs at all) during any fiscal year; (iii) no portion of the Permitted Freedom Consulting Payment Cap that goes unused in any fiscal year shall be available in any other fiscal year; and (iv) no more than 25% of any year's Permitted Freedom Consulting Payment Cap amount shall be available or otherwise distributed in any quarter occurring during such year.

"Permitted Holders" means each of the following and/or any combination thereof; provided, however, with respect to those Persons identified in the following, each such Person shall only constitute a Permitted Holder if approved by the Florida Gaming Board and all other applicable Governmental Authorities (including all applicable Gaming Authorities) with oversight over Freedom Holding, Holdings, the Borrower, its Affiliates and/or the Key Employees: (i) Freedom Holding, (ii) each of W. Bennett Collett, Sr., W. Bennett Collett, Jr., and Dorothy Howell; (iii) spouses and descendents of the Persons referenced in clause (ii); and (iv) any trustee of a trust revocable by any of such Persons covered in clause (ii) and (iii), and any executor, administrator, guardian, conservator or personal representative of any such Person.

CH1 5547448v.28

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 90 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-2 from S&P and at least P-2 from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within one-hundred eighty (180) days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000;

(e)    in the case of investments of any Foreign Subsidiary or non-domestic branch of Holdings or the Borrower, securities issued by any foreign government or any political subdivision of any foreign government or any public instrumentality thereof having maturities of not more than one year from the date of acquisition thereof and, at the time of acquisition thereof, having an investment grade credit rating obtainable from S&P, Moody's, or other generally recognized rating agency; and

(f)    in the case of investments by any Foreign Subsidiary or non-domestic branch of Holdings or the Borrower, investments in time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with any highly capitalized commercial bank which is located in the jurisdiction where such non-domestic branch of Freedom Holding, Holdings or the Borrower or such Foreign Subsidiary is located and which bank has an investment grade credit rating obtainable from S&P, Moody's or other generally recognized rating agency.

"Permitted Main Cash Account Amount" means (x) as required by the Florida Gaming Board and applicable Florida laws and regulations, the minimum amount of cash the Borrower is required to have available to operate gaming activities at the Miami Jai-Alai Facility and the Ft. Pierce Property, including, without limitation, "cage cash" and other similar amounts needed to pay successful wagers, plus (y) $500,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Holdings, the Borrower or any ERISA Affiliate is (or, if such

plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plans and Specifications" means the final plans and specifications for the construction and development of the Miami Jai-Alai Facility, including, without limitation, the plans and specifications for the construction of all improvements therein and thereto, which plans and specifications are attached to the Disbursement Agreement as Exhibit T-1 thereto.

"Pledge and Security Agreement" means that certain Pledge and Security Agreement (the form of which is attached hereto as Exhibit F), dated as of April 25, 2011, by and among the Credit Parties party thereto and the Administrative Agent for the benefit of the Holders of Obligations, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Pre-Opening Expenses" means marketing, promotional, training, start-up and other non-recurring expenses associated with the opening of the Miami Jai-Alai Facility.

"Register" has the meaning set forth in Section 9.04.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks applicable to member banks of the Federal Reserve System.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, trustees, employees, agents and advisors of such Person and such Person's Affiliates.

"Required Equity Amount" means at least 1,325,869 of the issued and outstanding Equity Interests of Holdings.

"Required Excess Cash Flow Prepayment Amount" means, for any date on which a mandatory prepayment is required to be made under Section 2.08(f), an amount equal to the ECF Percentage of Excess Cash Flow based upon the information set forth in the applicable financials and compliance certificate delivered on such date.

"Required Lenders" means, at any time, Lenders having Term Loans and unused Commitments not otherwise described herein representing more than 50% of the sum of the outstanding Term Loans and unused Commitments at such time; provided, that subject to Section 2.16, Defaulting Lenders shall be excluded from determinations of Required Lenders.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings, the Borrower or any option, warrant or other right to acquire any such Equity Interests in Holdings or the Borrower, or any

21

payment in respect of Indebtedness owing by Holdings, the Borrower or any Affiliate thereof to any other Affiliate thereof (including, without limitation, Freedom Holding and Freedom Financial).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale and Leaseback Transaction" means any sale or other transfer of assets or property by any Person with the intent to lease any such asset or property as lessee.

"Scheduled Multiplier" means (x) prior to the occurrence of the Hialeah Park Slots Event, 11.50%, and (y) on and after the date on which the Hialeah Park Slots Event occurs, the following percentages for Term Loan Repayment Dates that occur during the following twelve-month periods:

| Year | Scheduled Multiplier Percentage |
|------|-------------------------------|
| First twelve month period following the first Term Loan Repayment Date | 5% |
| Second twelve month period following the first Term Loan Payment Date | 7.5% |
| Third twelve month period following the first Term Loan Repayment Date | 7.5% |
| Fourth twelve month period following the first Term Loan Repayment Date | 7.5% |

"Scheduled Term Loan Payment Amount" means (x) the aggregate principal amount of the Term Loans outstanding on the first day to occur after all of the mandatory prepayments under Section 2.08 using amounts on deposit in the Interest Reserve Account, the Construction Funds Account, the Completion Reserve Account and the Contingency Reserve Account have been made times (y) the Scheduled Multiplier, with the product of (x) and (y) representing the aggregate amount required to be paid during each annual period (with the first four quarters in which Term Loan Repayment Dates occur constituting an annual period, with the next four quarters constituting an annual period, and continuing thereafter in such four-quarter increments, through the Maturity Date), and with the amount due on a Term Loan Repayment Date that falls during an annual period equaling 25% of such annual amount (by way of example only, if the Scheduled Term Loan Payment Amount for an annual period was $10,000,000, then the amount payable on each Term Loan Repayment Date during such annual period would be $2,500,000).

"Subcontractor" has the meaning set forth in the Disbursement Agreement.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Holdings or the Borrower.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or the Subsidiaries shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make a Term Loan hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Lender hereunder, as such commitment may be (a) terminated pursuant to Section 2.05 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.  The initial amount of each Lender's Term Loan Commitment is set forth on Schedule 2.01(a), or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Loan Commitment, as applicable.

"Term Loan Repayment Date" means (x) the last Business Day of the calendar month to occur six full months after the Opening Date (so that, for example, if the Opening Date occurred January 15th, the first Term Loan Repayment Date would occur on the last Business Day of July), and (y) the last Business Day of each third calendar month to occur thereafter (so that, for example, if the first Term Loan Repayment Date would occur on the last Business Day of July, then the next Term Loan Repayment Date would occur on the last Business Day of October).

"Total Leverage Ratio" has the meaning assigned to such term in Section 6.12.

"Transaction Fee Letter" means the Fee Letter, dated as of April 25, 2011, by and among Holdings, the Borrower, and the Administrative Agent, on its behalf and on behalf of the

Lenders, as the same may be amended, restated, supplemented or otherwise modified from time to time with the consent of the parties thereto and all of the Lenders.

"Transactions" means the execution, delivery and performance by Holdings and the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans, the use of the proceeds thereof, and the Borrower's construction, development, completion, operation and maintenance of the Miami Jai-Alai Facility.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unfinanced Capital Expenditures" means, for any period, Capital Expenditures minus the amount of such Capital Expenditures financed by purchase money Indebtedness permitted hereunder and minus the principal portion of Capital Lease Obligations permitted hereunder made in accordance with the terms of this Agreement during such period.

"Warrant Agreements" means collectively, the Borrower Warrant Agreement and the Holdings Warrant Agreement.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Working Capital" means, at any date, the excess of current assets of the Holdings and its Subsidiaries (including the Borrower) on such date over current liabilities of Holdings and its Subsidiaries (including the Borrower) on such date, all as determined on a consolidated basis in accordance with GAAP.

SECTION 1.02.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

CH1 5547448v.28

SECTION 1.03.    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if Holdings or the Borrower notifies the Administrative Agent that Holdings or the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies Holdings or the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until  such notice shall have been withdrawn or such provision  amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Holdings or any Subsidiary (including the Borrower) at "fair value", as defined therein.

SECTION 1.04.    Miami Jai-Alai Facility Generally.  With respect to the Miami Jai-Ali Facility, all references to the construction or improvement thereof, and gaming or gambling operation occurring on such premises, shall include the establishment of slot machine gaming at the site of the Miami Jai-Alai Facility, including the construction and operation of the facilities for such slot machine gaming.  The parties hereto acknowledge that a portion of the Miami Jai-Alai Facility is in existence as of the Effective Date and that such portion of the Miami Jai-Alai Facility shall continue to operate during the construction of the slot machine facilities.  For purposes of the Loan Documents, any reference to slot machines shall include any machine as defined by subsection (8) of Section 551.102, Florida Statutes.


ARTICLE II

The Credits

SECTION 2.01.    Commitments.

Subject to the terms and conditions set forth herein and in the Disbursement Agreement, each Lender agrees to make Term Loans to the Borrower on the Effective Date in an aggregate principal amount for all such Term Loans made by such Lender equal to its Term Loan Commitment.  Amounts repaid or prepaid in respect of Term Loans may not be reborrowed. Proceeds of the Term Loans shall be used as contemplated by Section 5.08 and shall be deposited into Company Accounts as follows: (i) a portion thereof shall be deposited into the Interest Reserve Account in such amount as shall be necessary to satisfy all interest payments due and payable in respect of such Term Loans through the twelve month anniversary of the Effective Date (with the assumption that such Term Loans shall remain outstanding through such date); (ii) to the extent required by the Disbursement Agreement, a portion shall be deposited into the Contingency Reserve Account; (iii) a portion of such proceeds shall be deposited into

the Construction Funds Account; (iv) a portion of such proceeds shall be deposited into the Completion Reserve Account, (v) a portion of such proceeds shall be deposited into the Main Cash Account, and (vi) a portion of such proceeds shall be deposited into each of the "Holdback Account" and the "Slot License Account" (as each is defined in the Disbursement Agreement), with all such deposits being made in the amounts set forth in the sources and uses attached hereto as Schedule 5.08(a).  Amounts on deposit in the Main Cash Account shall be used in accordance with Schedule 2.01(b), and shall not exceed any limits set forth therein.  All amounts deposited into Company Accounts shall be distributed and applied as required by the Disbursement Agreement and this Agreement.  Proceeds of Term Loans deposited into the Contingency Reserve Account shall remain on deposit in the Contingency Reserve Account until the later of (x) the three month anniversary of the Opening Date and (y) the date on which the Construction Inspector pursuant to the terms of the Disbursement Agreement authorizes the release of such amount to the Borrower; provided, that if the Opening Date has not occurred within nine months after the Effective Date, the Administrative Agent, in its sole discretion, may release such funds from the Contingency Reserve Account.  On the date such funds are released from the Contingency Reserve Account, such funds shall be applied as a prepayment of the Term Loans in accordance with Section 2.08 hereof.

SECTION 2.02.    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several, and no Lender shall be responsible for any other Lender's failure to make Loans as required hereunder.

(b)    Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

SECTION 2.03.    Requests for Term Loan Borrowings.  To request a Term Loan Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone not later than 11:00 a.m., New York City time, three (3) Business Days before the date of the proposed Borrowing.  Each telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower, and such written Borrowing Request shall also be delivered together with the items, if any, required under the Disbursement Agreement.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)    the aggregate amount of the requested Borrowing, which shall be the entirety of the Aggregate Term Loan Commitment;

(ii)    the date of such Borrowing, which shall be a Business Day; and

CH1 5547448v.28

(iii)    the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.04.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Funding of Borrowings.

(a)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to the account required by the Disbursement Agreement or as otherwise agreed upon by the Borrower and the Administrative Agent.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the Applicable Rate.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.05.    Termination of Commitments.    Unless previously terminated or fully funded, the Term Loan Commitments shall terminate at 5:00 p.m., New York time, on the Effective Date.  The Borrower shall not be entitled to terminate any Commitment prior to the Effective Date.  The Borrower may terminate the Commitments in their entirety on the Effective Date with at least 3 Business Days prior written notice to the Administrative Agent.  Such termination shall be made concurrently with the full repayment of any Obligations then outstanding.

SECTION 2.06.    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan as provided in Section 2.07.

27

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.07.     Amortization of Term Loans.

(a)     Subject to adjustment pursuant to paragraph (c) of this Section and the full repayment thereof on the Maturity Date as described in paragraph (b) of this Section, the Borrower shall repay Term Loans on each Term Loan Repayment Date in an amount equal to the Scheduled Term Loan Payment Amount on each such Term Loan Repayment Date.  No penalty or premium shall be due or payable on such scheduled payments and such scheduled payments shall be made at par.  Each such payment shall be applied ratably among the Term Loans based on the outstanding principal amounts thereof.

(b)     To the extent not previously paid, all Term Loans and all accrued and unpaid interest due thereon shall be due and payable on the Maturity Date.

(c)     Unless set forth in Section 2.08, any prepayment of a Term Loan Borrowing shall be applied to reduce the scheduled repayments of the Term Loan Borrowings to be made pursuant to this Section in inverse order of maturity.

(d)     Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Term Loan Borrowings shall be accompanied by accrued interest on the amount repaid.

CH1 5547448v.28

(e)     During the continuance of an Event of Default, all amounts received in respect of outstanding Term Loans and other Obligations shall be applied in accordance with the priority of payments set forth in Section 7.4 of the Pledge and Security Agreement.

SECTION 2.08.     Prepayment of Loans.

(a)     Subject to the remainder of this Section 2.08(a), the Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to (i) prior notice in accordance with paragraph (i) of this Section, (ii) payment of the funding compensation required by Section 2.12 and (iii) such prepayment being in a minimum amount equal to $1,000,000 or any integral multiple of $100,000 in excess thereof. A prepayment of the Obligations in their entirety shall require that notice thereof be delivered to the Administrative Agent at least 3 Business Days prior to the date of the requested prepayment.  Such notice shall be irrevocable once delivered.  Except as otherwise provided in this Agreement, the Borrower shall not have the right to voluntarily prepay any Term Loan until the occurrence of the first anniversary of the Effective Date.  Thereafter, the Borrower may voluntarily prepay the Term Loans so long as the Borrower satisfies the prepayment requirements set forth in this Section 2.08(a) and as otherwise set forth in this Agreement, and so long as the Borrower remits the following prepayment premium to the Administrative Agent for the ratable benefit of Lenders holding Term Loans:  (i) if such a prepayment is made after the first anniversary of the Effective Date but prior to the second anniversary thereof, an amount equal to 3% times the principal amount of such prepayment, (ii) if such a prepayment is made on or after the second anniversary of the Effective Date but prior to the third anniversary of the Effective Date, an amount equal to 2% times the principal amount of such prepayment, (iii) if such prepayment is made on or after the third anniversary date but prior to the fourth anniversary of the Effective Date, an amount equal to 1% times the principal amount of such prepayment, and (iv) thereafter, no prepayment premium shall be required.  No such prepayment premium shall be required in connection with a scheduled or mandatory prepayment of any Term Loan contemplated by Section 2.07 or Section 2.08.  Notwithstanding the foregoing, if amounts remain on deposit in the Contingency Reserve Account subsequent to the later of (x) three months after the Opening Date and (y) the date on which the Construction Inspector authorizes the release of funds from such account, then, on the date such funds are released from the Contingency Reserve Account, such funds shall be applied as a prepayment of the Term Loans at par (and no prepayment penalty or premium shall apply in respect of such application); provided, that if the Opening Date has not occurred within nine months after the Effective Date, the Administrative Agent, in its sole discretion, may release such funds from the Contingency Reserve Account for application as a prepayment hereunder.

(b)     If amounts remain on deposit in the Interest Reserve Account on the six-month anniversary of the Opening Date (with the understanding that if the Opening Date has not occurred within nine months after the Effective Date, the Administrative Agent, in its sole discretion, may declare such date to have occurred subsequent to such nine-month anniversary for purposes hereof), the Borrower, within five (5) Business Days after such anniversary, shall offer to prepay (via a notice to the Administrative Agent) the Term Loans with the balance of the Interest Reserve Account.  The Administrative Agent shall promptly notify the Lenders of such offer.  Each Lender, within ten (10) Business Days after delivery of such notice to the Administrative Agent, shall notify the Administrative Agent whether or not a prepayment of its Loans should occur (the "Decision Period").  Lenders that decline such offer shall not receive a

prepayment under this Section 2.08(b).  Failure to notify the Administrative Agent by the end of the Decision Period shall be deemed a rejection of such prepayment.  Lenders that agree to receive such prepayment shall receive such prepayments within two (2) Business Days after the end of the Decision Period.  Such prepayments shall be applied to the Term Loans of the accepting Lenders ratably at par based on the outstanding principal amounts of their Term Loans (and Term Loans of declining Lenders shall not be included in such determination).  All of the amounts available for prepayment shall be used to reduce the principal amount of the Loans held by the Lenders accepting a prepayment hereunder.  If any amounts remain after making the applicable prepayments, and no Default or Event of Default is then outstanding, such remaining amounts shall be remitted to the Borrower for use in the ordinary course of its business.  No prepayment penalty or premium shall apply in respect of such prepayments.  The foregoing prepayment shall not be deemed to contravene any ratable sharing or pro rata sharing provisions set forth herein (including, without limitation, Section 2.14 hereof).

(c)     In the event and on such occasion Freedom Holding, Holdings, the Borrower, any Subsidiary or any other Credit Party receives any Net Proceeds from the sale, transfer, lease or other disposition (including pursuant to a sale and leaseback transaction, or any sale of all or any part of the Ft. Pierce Property) of any property or asset of any such Person, other than dispositions described in clauses (a), (b) and (d) of Section 6.10, the Borrower shall make a mandatory prepayment of the Term Loans in an aggregate amount equal to 100% of such Net Proceeds.  Such prepayment shall be applied ratably to the Term Loans at par without premium or penalty.

(d)     In the event and on such occasion that Freedom Holding, Holdings, the Borrower, any Subsidiary or any Credit Party receives any Net Proceeds from any casualty or other insured damage to, or any taking under power of eminent domain or by casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of Freedom Holding, Holdings, the Borrower, any Subsidiary, or any Credit Party, including, without limitation, the Miami Jai-Alai Facility and the Ft. Pierce Property, within three (3) Business Days after such Person's receipt of such Net Proceeds, the Borrower shall make a mandatory prepayment of the Term Loans in an aggregate amount equal to 100% of such Net Proceeds. Such prepayment shall be applied ratably to the Term Loans at par without premium or penalty.

(e)     With respect to the Construction Funds Account and the Completion Reserve Account:

(i)      If amounts remain on deposit in the Construction Funds Account subsequent to the later of (x) three months after the Opening Date and (y) the date on which the Construction Inspector authorizes the release of funds from such account, then, on the date such funds are released from the Construction Funds Account, such funds shall be applied as a prepayment of the Term Loans at par (and no prepayment penalty or premium shall apply in respect of such application); provided, that if the Opening Date has not occurred within nine months after the Effective Date, the Administrative Agent, in its sole discretion, may release such funds from the Construction Funds Account for application as a prepayment hereunder; and

CH1 5547448v.28

(ii)    Subsequent to the Effective Date and the initial deposit of Loan proceeds into the Completion Reserve Account, if the Borrower or any Affiliate thereof deposits at least $3,000,000 into the Completion Reserve Account as contemplated by the Disbursement Agreement (including, without limitation, as a result of having not been "In Balance" under and as defined in the Disbursement Agreement), then the Borrower shall prepay, from funds on deposit in the Completion Reserve Account, the Term Loans at par, without penalty or premium, in an amount equal to $3,000,000 on the date on which such deposit is made.  In addition, if any amounts remain on deposit in the Completion Reserve Account two months after the occurrence of the Opening Date, such amounts shall be applied at par, without penalty or premium, as a prepayment of the Term Loans on such two-month anniversary.

(f)    Concurrently with Holdings' and the Borrower's delivery of its financials from time to time under Section 5.01(a), the Borrower shall make a mandatory prepayment of the Term Loans at par in an aggregate amount equal to the Required Excess Cash Flow Prepayment Amount for the applicable period, with the first such payment being required in connection with fiscal year 2011.

(g)    Unless otherwise specified in this Agreement, prior to any optional or mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (h) of this Section 2.08.

(h)    The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder not later than 11:00 a.m., New York City time three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided, that if a notice of prepayment is given in connection with an anticipated receipt of Net Proceeds in respect of any event described in clauses (c), (d) or (e) of this Section 2.08 and such event subsequently fails to occur at the anticipated time, then such notice of prepayment may be revoked.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.   Each prepayment of a Borrowing shall be applied to each installment of the Loans in inverse order of maturity.  Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.10 and (ii) break funding payments pursuant to Section 2.12.

(i)    During the continuance of an Event of Default, all amounts received in respect of outstanding Term Loans and other Obligations under this Section 2.08 shall be applied in accordance with the priority of payments set forth in Section 7.4 of the Pledge and Security Agreement.

SECTION 2.09.    Fees.

(a)    Holdings and the Borrower agree, jointly and severally, to pay the Lenders those fees set forth in the Transaction Fee Letter as and when required thereunder.

(b)     Holdings and the Borrower agree, jointly and severally, to pay the Administrative Agent those fees set forth in the Administrative Agent Fee Letter as and when required thereunder.

(c)     All fees payable hereunder or under any other Loan Document shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution if and as contemplated by the Transaction Fee Letter or the Administrative Agent Fee Letter.  Fees paid shall not be refundable under any circumstances.

SECTION 2.10.      Interest.

(a)     The Loans shall bear interest at the Applicable Rate.

(b)     Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, all outstanding Obligations shall accrue interest at a rate per annum equal to 2% plus the Applicable Rate.

(c)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.  Interest shall be paid in cash when due.  The Borrower shall not be entitled to elect when amounts on deposit in the Interest Reserve Account may be used to pay accrued and unpaid interest.  The Borrower agrees that it shall always use its or Credit Parties' cash to make such payments when due, and is not relying on cash or other items on deposit in the Interest Reserve Account to make such payments when due.  Cash or other items on deposit in the Interest Reserve Account shall only be used to pay interest if, in the Administrative Agent's sole and absolute discretion, no Credit Party possesses any unencumbered cash to make the required payment, or if the Administrative Agent elects, in its sole and absolute discretion, to do so during the continuance of an Event of Default.  No Credit Party shall take any action in avoidance or hindrance of this provision (including investing cash in cash equivalents, illiquid assets or otherwise, or causing cash or other items of payment to be unavailable at the time of payment). Cash or other items of payment shall only be deemed unavailable hereunder if such cash or other items of payment are required under applicable law to be retained by such Credit Party (such as "cage cash") or if such cash or other items of payment are used in the ordinary course of business (and not in avoidance or hindrance hereof) for costs and expenses (such as accounts payable).

(d)     All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2.11.      Increased Costs.

(a)     If any Change in Law shall impose, modify or deem applicable any reserve, special deposit, Tax (other than Indemnified Taxes, Other Taxes, or Excluded Taxes which shall be governed by Section 2.13) or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, and the result of any of the foregoing

shall be to increase the cost to such Lender of making or maintaining any Loan or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.12.    Break Funding Payments.  In the event of the failure to borrow or prepay a Term Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.08 and is revoked in accordance therewith), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.

SECTION 2.13.    Taxes.

(a)     Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then

(i)     the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional

33

sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made,

(ii)     the Borrower shall make such deductions; and

(iii)    the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Administrative Agent, and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, or such Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate.

(f)     If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.13, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.13 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties,

interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)    In cases in which the Borrower makes a payment under this Agreement to a U.S. Person, as defined in Section 7701(a)(30) of the Code, with knowledge that such U.S. Person is acting as an agent for a foreign person, the Borrower will not treat such payment as being made to a U.S. Person for purposes of Treas. Reg. § 1.1441-1(b)(2)(ii) (or successor provision) without the express written consent of such U.S. Person.

(h)    Each Lender shall severally indemnify the Administrative Agent for any Taxes (but, in the case of any Indemnified Taxes or Other Taxes, only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Borrower to do so) attributable to such Lender that are paid or payable by the Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.13(h) shall be paid within 10 days after the Administrative Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by the Administrative Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

SECTION 2.14.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, or fees, or of amounts payable under Section 2.11, 2.12 or 2.13, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no time is expressly required, prior to 12:00 noon, New York City time) on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its main offices at Boston, Massachusetts or as otherwise designated from time to time by the Administrative Agent, except that payments pursuant to Sections 2.11, 2.12, 2.13 and 9.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder of under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder or under any other Loan Document shall be made in dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied in accordance with the priority of payments set forth in Section 7.4 of the Pledge and Security Agreement.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans, resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans, and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans, of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that:

(i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered,  such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and

(ii)     the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Holdings, the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each of Holdings and the Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against Holdings or the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of Holdings or the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(b), 2.14(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter

received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.15.    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.11, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 or 2.13, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests compensation under Section 2.11, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, (iii) any Lender is a Defaulting Lender, or (iv) any Lender refuses to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement or the other Loan Documents requiring the consent of the Required Lenders or all Lenders (or all affected Lenders) pursuant to Section 9.02, and the same have been approved by such Lenders, as applicable (or would have been approved by such Lenders with the disapproving Lender's consent), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld,

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.11 or payments required to be made pursuant to Section 2.13, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

CH1 5547448v.28

SECTION 2.16.    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, at the election of the Administrative Agent, the following provisions shall apply for so long as such Lender is a Defaulting Lender: (i) fees under the Transaction Fee Letter shall cease to accrue in respect of the Defaulting Lender's Term Loans; and (ii) the Term Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or, waiver or other modification pursuant to Section 9.02); provided, however, that no amendment, waiver or modification under Section 9.02(b)(i), (ii), (iii), (iv), (v) or (vii) directly affecting a Defaulting Lender shall be given effect with respect to such Defaulting Lender without such Defaulting Lender's consent.


ARTICLE III

Representations and Warranties

Each of Holdings and the Borrower represents and warrants to the Administrative Agent and the Lenders that:

SECTION 3.01.    Organization; Powers; Key Employees.  Each of Holdings, the Borrower and the Subsidiaries and other Credit Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted or proposed to be conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.  Schedule 3.01 hereto identifies each of Freedom Holding, Holdings, the Borrower and each Subsidiary and other Credit Party, the jurisdiction of its incorporation or organization, as the case may be, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by the owners of Equity Interests in Freedom Holding, Holdings, the Borrower or such Subsidiary or other Credit Party, and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class issued and outstanding (including, without limitation, the percentage of Holdings' Equity Interests owned by the Permitted Holders); provided, that no holder of fewer than 5% of the Equity Interests of Holdings that also is not a Permitted Holder shall be required to be set forth in Schedule 3.01.  All of the outstanding shares of capital stock and other Equity Interests of Freedom Holding, Holdings, the Borrower and each of the Subsidiaries and other Credit Parties are validly issued and outstanding and fully paid and nonassessable, and all such shares and other Equity Interests indicated on Schedule 3.01 as owned by the holders of Equity Interests in Freedom Holding, Holdings, the Borrower or another Subsidiary or Credit Party are owned, beneficially and of record, by such holders of Equity Interests in Freedom Holding, Holdings, the Borrower or such Subsidiary or Credit Party free and clear of all Liens (other than Liens created by the Collateral Documents); provided, that the foregoing Lien representation shall not apply and is not made with respect to those Persons that are not Permitted Holders and that hold fewer than 5% of the Equity Interests of Holdings.  As of the Effective Date, the Key Employees are listed on Schedule 3.01.  The only directly owned Subsidiary of Freedom Holding is Holdings.

38

SECTION 3.02.    Authorization; Enforceability.  The Transactions are within each Credit Party's corporate or other organizational powers, as applicable, and have been duly authorized by all necessary corporate or other organizational action and, if required, stockholder or other equity holder action, as applicable.   This Agreement, and each of the other Loan Documents, has been duly executed and delivered by each Credit Party and constitutes a legal, valid and binding obligation of each such Credit Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.    Governmental Approvals; No Conflicts.  The Transactions

(a)    do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority (including any Gaming Authority or Liquor Authority), except such as have been obtained or made and are in full force and effect,

(b)    will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Credit Party or any order of any Governmental Authority,

(c)    will not violate or result in a default under any indenture, agreement or other instrument binding upon any Credit Party or its assets, or give rise to a right thereunder to require any payment to be made by such Credit Party, and

(d)    will not result in the creation or imposition of any Lien on any asset of any Credit Party except Liens created under the Loan Documents.

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    Holdings and the Borrower have previously furnished to the Lenders their balance sheets and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2009 and December 31, 2010 on a consolidated basis reported on by King & Company PSC, independent public accountants, and (ii) for each fiscal month of 2010 and the months of January and February 2011 on a consolidated and consolidating basis (it being understood that monthly statements of cash flows are only provided in a consolidated format for Holdings), each certified by its chief financial officer.   Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Holdings and its consolidated Subsidiaries (including the Borrower) as of such dates and for such periods in accordance with GAAP.

(b)    Except as disclosed in the financial statements referred to above or the notes thereto and except for the Disclosed Matters, after giving effect to the Transactions, none of Holdings, the Borrower or any Subsidiary has, as of the Effective Date, any contingent liabilities that would reasonably be expected to have a Material Adverse Effect.

(c)    Since December 31, 2009, there has been no material adverse change in the business, assets, operations, performance, prospects or condition (financial or otherwise) of Holdings and its Subsidiaries (including the Borrower), taken as a whole.

SECTION 3.05.        Properties.

(a)        Each of Holdings, the Borrower and the Subsidiaries and Credit Parties has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)        Each of Holdings, the Borrower and the Subsidiaries and Credit Parties owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and the Subsidiaries or any other Credit Party does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)        Schedule 3.05 sets forth the address of each parcel of real property that is owned, and each material parcel of property that is leased, by Holdings, the Borrower or any of the Subsidiaries or Credit Parties.

(d)        Each of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property, and the Parking Lot Property (including, without limitation, the operation and use thereof) complies in all material respects with all applicable laws and regulations (including, without limitation, Gaming Laws and Liquor Laws) and with all insurance requirements set forth in this Agreement and the Disbursement Agreement.

(e)        There are no current, pending, or to the knowledge of Holdings or the Borrower, proposed special or other assessments for public improvements or otherwise affecting the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property, nor are there any contemplated improvements to either of the foregoing that may result in such special or other assessments.  No Events of Eminent Domain have occurred or, to the knowledge of Holdings or the Borrower, are expected to occur with respect to the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property.

(f)        Each of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property is in conformity and compliance in all material respects with all certificates of occupancy and other permits, licenses, variances, easements, agreements, restriction, covenants and/or conditions effecting either such property, including those governing the construction, occupancy and operation of the Miami Jai-Alai Facility.

(g)        There are no outstanding options to purchase or rights of first refusal or restrictions on transferability (other than restrictions which as a matter of law are imposed by Gaming Authorities) affecting the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property.

(h)        Each of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property and the Parking Lot Property has adequate rights of access to public ways. Subject only to payment of fees reflected in the Construction Budget with respect to the Miami Jai-Alai Facility, all utility and municipal services required for the construction,

40

occupancy and operation of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property, as applicable, including, but not limited to, water, electric, gas, telephone, sewer, sanitary sewer and storm drain facilities, in each case as necessary to permit such property to be used for its intended purposes, are (or will be) available for use and tap-on at the boundaries of the real property, and written permission has been (or will be) obtained from the applicable utility companies or municipalities to connect (or maintain existing connections) the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property into each of said service. All roads necessary for the utilization of each of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property has been completed and dedicated to public use. No building or structure now or hereafter constituting a portion of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property violates (or will violate) any restrictive covenant or encroaches (or will encroach) on any easement or property of others.  No portion of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property has suffered any material damage by fire or other casualty loss. The storm and sanitary sewage disposal system, water system, drainage system and all mechanical systems of each of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property, when or as already constructed (as applicable), will comply with all applicable laws, including, without limitation, all Environmental Laws. The applicable environmental protection agency, pollution control board and/or other governmental agencies  having jurisdiction of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property have issued their Permits (as defined in Section 3.19 below), if any, for the construction, tap-on and operation of those systems. All utility, parking, access (including curb-cuts and highway access), construction, recreational and other Permits and easements required for the construction and/or use of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property have been granted and issued, or will be granted and issued prior to the time that Borrower causes or allows any corresponding work to be performed. Neither the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property nor the Contractor-Related Property (including all work done to the Miami Jai-Alai Facility in accordance with the Plans and Specifications), encroaches upon any building line, set back line, sideyard line, or any recorded or visible easement (or other easement of which Holdings or the Borrower is aware or has reason to believe may exist) which exists with respect to the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property. The Plans and Specifications have been designed using generally accepted trade practices, are complete in all material respects, including a provision for all offsite improvements, and containing all other details requisite for the Miami Jai-Alai Facility which, when built and equipped in accordance therewith, shall be ready for the intended use thereof.

SECTION 3.06.        Litigation, Labor Matters and Environmental Matters.

(a)        There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened against or affecting, Holdings, the Borrower or any of its Subsidiaries or the Credit Parties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in

41

a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve this Agreement or the Transactions.

(b)    Except for the Disclosed Matters, there are no labor controversies pending against or, to the knowledge of Holdings or the Borrower, threatened against or affecting Holdings, the Borrower or any of its Subsidiaries or the Credit Parties (i) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve this Agreement or the Transactions.

(c)    Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Subsidiary thereof or any other Credit Party:

(i)    has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law;

(ii)    has become subject to any Environmental Liability;

(iii)    has received notice of any claim with respect to any Environmental Liability; or

(iv)    knows of any basis for any Environmental Liability.

(d)    Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.    Compliance with Laws and Agreements; No Burdensome Restrictions.  Except as set forth on Schedule 3.07,

(a)    Each of Holdings, the Borrower and its Subsidiaries and the other Credit Parties is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  None of Holdings, the Borrower or any Subsidiary or other Credit Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any agreement or instrument to which it is a party, which default would reasonably be expected to have a Material Adverse Effect, (ii) any agreement or instrument evidencing or governing Indebtedness or (iii) the Construction Agreement or any other material Construction Document.

(b)    No Default has occurred and is continuing.

(c)    None of Holdings, the Borrower or any Subsidiary or other Credit Party is party or subject to any law, regulation, rule or order, or any obligation under any agreement or instrument, that has a Material Adverse Effect.

(d)     None of Holdings, the Borrower or any Subsidiary thereof or other Credit Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any (i) agreement or instrument to which it is a party, which default would reasonably be expected to have a Material Adverse Effect or (ii) any agreement or instrument evidencing or governing Indebtedness.

(e)     No event described in Section 7.01 (h) or (i) will terminate, rescind, nullify or otherwise have any adverse impact upon the Development Agreements, and such agreements will remain enforceable against the non-Credit Parties subject thereto, and such Persons shall be required to perform as and when required thereunder.

(f)     None of Holdings, the Borrower or any Subsidiary thereof or other Credit Party (including any partner, manager, director, officer, agent, employee or advisor thereof) has directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property, or services, to obtain favorable treatment in securing business, to pay for favorable treatment for business secured, to obtain special concessions or for special concessions already obtained, for or in respect of Holdings, the Borrower or any Subsidiary thereof or other Credit Party (or any Affiliate thereof), or in violation of any law, rule or regulations.

(g)     None of Holdings, the Borrower or any Subsidiary or other Credit Party is party or subject to any advisory, brokerage, financial management or any similar agreement with any Person other than Innovation Capital, LLC (or its successor), that grants exclusivity, right of first refusal, or any similar rights to such Person, whether in respect of the Miami Jai-Alai Facility or otherwise.

SECTION 3.08.    Investment Company Status.    None of Holdings, the Borrower or any Subsidiary thereof or other Credit Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.    Taxes.    Each of Holdings, the Borrower and their Subsidiaries (as well as the other Credit Parties) has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary or other Credit Party, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  To the knowledge of Holdings or the Borrower, neither the Borrower nor any other Credit Party nor any of their Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the five-year period ending on the Effective Date.

SECTION 3.10.    ERISA.

(a)     No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred or is reasonably expected to occur, could reasonably be expected to result in a liability of Holdings,

the Borrower and the Subsidiaries (or any other Credit Party) in an aggregate amount in excess of $250,000.  With respect to each Plan, Holdings, the Borrower and all ERISA Affiliates have paid all required minimum contributions and all required installments on or before the due dates provided in Section 430(j) of the Code and Section 303(j) of ERISA.  With respect to each Multiemployer Plan, Holdings, the Borrower and all ERISA Affiliates have satisfied all required contributions and installments on or before the applicable due dates and have not incurred a complete or partial withdrawal under Section 4203 or 4205 of ERISA.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $250,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $250,000 the fair market value of the assets of all such underfunded Plans.

(b)     Assuming the accuracy of the representations and warranties made in Section 9.15 and in any assignment made pursuant to Section 9.04, neither the execution of this Agreement nor the making of Loans hereunder gives rise to a non-exempt prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

SECTION 3.11.     Disclosure.  Each of Holdings and the Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any of the Credit Parties is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of Holdings or the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each of Holdings and the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 3.12.     No Default.  Each of Holdings, the Borrower and each Subsidiary (as well as each other Credit Party) is in full compliance with the terms and conditions of this Agreement, and no Default has occurred and in continuing.

SECTION 3.13.     Liens.  There are no Liens on any of the real or personal properties of Holdings, the Borrower or any Subsidiary or other Credit Party except for Liens permitted by Section 6.02.

SECTION 3.14.     Contingent Obligations.  Other than any liability incident to any litigation, arbitration or proceeding which could not reasonably be expected to have a Material Adverse Effect, none of Holdings, the Borrower or any Subsidiary or other Credit Party

44

has any material contingent obligations not provided for or disclosed in the financial statements referred to in Section 3.04.

SECTION 3.15.    Regulation U.

(a)    Margin stock (as defined in Regulation U) constitutes less than 25% of the value of those assets of Holdings, the Borrower and their Subsidiaries (as well as the other Credit Parties) which are subject to any limitation on sale, pledge, or other restriction hereunder.

(b)    The Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 5.08.  No part of the proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

SECTION 3.16.    Solvency.  Immediately after the consummation of the Transactions to occur on the Effective Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of such Loans, (a) the fair value (measured on a going concern basis) of the assets of the Credit Parties, taken as a whole, will exceed their debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value (measured on a going concern basis) of the property of the Credit Parties, taken as a whole, will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business; (c) the Credit Parties, taken as a whole, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Credit Parties, taken as a whole, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the Effective Date.

SECTION 3.17.    Insurance.    Each of Holdings, the Borrower, their Subsidiaries and the other Credit Parties maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  Schedule 3.17 sets forth a description of all material insurance maintained by or on behalf of Holdings, the Borrower, the Subsidiaries and the other Credit Parties as of the Effective Date, including, without limitation, insurance on the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property and the Parking Lot Property, and construction-related insurance in respect of the Miami Jai-Alai Property.  As of the Effective Date, all premiums in respect of such insurance that are due and payable have been paid.  Each of Holdings and the Borrower believes that the insurance maintained by or on behalf of Holdings, the Borrower, the Subsidiaries and the other Credit Parties is adequate.

SECTION 3.18.    Collateral Documents.  The Collateral Documents create, as security for the obligations purported to be secured thereby, a valid and enforceable interest in and Lien on all of the properties covered thereby in favor of the Administrative Agent, and upon the filing of any financing statements, notices or mortgages contemplated thereby in the offices

45

specified therein, such Liens shall be superior to and prior to the right of all third Persons and subject to no other Liens (other than Liens permitted under Section 6.02 and the Collateral Documents).

SECTION 3.19.        Permits.  All "Permits" (as defined below) in respect of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property required by applicable laws for any demolition have been validly issued and are in full force and effect, and all fees therefor have been fully paid. The Borrower has duly applied for all governmental underground and foundation Permits required by applicable laws in respect of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property and the Parking Lot Property, if any. Prior to the commencement of construction in respect of the Miami Jai-Alai Facility, and at all times as the construction progresses, the Borrower covenants to promptly obtain, as and when they become necessary, all Permits required by applicable laws to construct, occupy and operate the Miami Jai-Alai Facility. The Borrower covenants not to submit any draw requests, and agrees that it shall not have the right to receive any draws, with respect to any work for which certain Permits are required, until such time as the Borrower has procured the same in accordance with applicable laws. The Borrower knows of no groups, organizations or people that are contesting the development, construction and/or use of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property. Respecting all Permits required in connection with the construction, occupancy and operation of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property and the Parking Lot Property, the Borrower further represents, warrants and covenants that (i) all such Permits either are or will be in full force and effect upon their issuance and all fees therefor either have been or will be fully paid, and the Borrower has performed and observed and will perform and observe all requirements of such Permits or, if the stage of construction of the Project does not allow the issuance of all such Permits, then Borrower shall provide evidence, reasonably satisfactory to Administrative Agent that as the construction progresses Borrower will promptly obtain and deliver to the Administrative Agent such Permits as and when they become available (which evidence shall include, without limitation, an architect's certificate (as required by the Disbursement Agreement) or opinion of Borrower's counsel reciting the above matters and listing all such Permits and/or necessary easements, together with copies of all Permits, utility letters, and/or grants of easements as the Administrative Agent may require), (ii) no event will have occurred which allows or results in, or after notice or lapse of time would allow or result in, revocation, modification, suspension or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit, (iii) no such Permits will contain any restrictions, either individually or in the aggregate, that will be unreasonably burdensome to the Borrower or the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property, (iv) the Borrower will have no knowledge that any Governmental Authority (including any Gaming Authority or Liquor Authority) is considering limiting, modifying, suspending, revoking or renewing on unreasonably burdensome terms any such Permit, and (v) the Borrower reasonably believes that each such Permit will be timely renewed and complied with, without undue expense or delay, and that any Permit not required to have been obtained by the date this representation is deemed made that may be required of such Person is of a type that is routinely granted on application and compliance with the conditions of issuance (such conditions being ministerial or of a type satisfied in the ordinary course of business, without undue expense or delay) and will be timely obtained and complied with, without undue expense or delay.  Holdings and the Borrower will obtain and maintain all

Permits required to operate slot machine gaming at the Miami Jai-Alai Facility.  For purposes hereof, "Permits" means all franchises, Gaming Licenses and other licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, variances, qualifications, easements, rights of way, liens and other rights, privileges and approvals required under all applicable laws, including all Gaming Laws and Liquor Laws, to which the Borrower, its Affiliates, the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property are subject.

SECTION 3.20.    Sufficiency of Construction Documents.  Other than those services or materials that can be reasonably expected to be commercially available when and as required, the services to be performed, the materials to be supplied and other rights granted or to be granted pursuant to the Construction Documents in effect as of such date (a) comprise all of the property interests necessary to secure any right material to the construction, operation and maintenance of the Miami Jai-Alai Facility in accordance with all applicable laws and regulations (including all Gaming Laws and Liquor Laws), (b) are sufficient to enable the Miami Jai-Alai Facility to be located and operate on the real property described as the Miami Jai-Alai Facility on Schedule 3.05, and (c) provide adequate ingress and egress from such real property for any reasonable purpose in connection with the operation of the Miami Jai-Alai Facility.

SECTION 3.21.    Survey.  Taking into account changes made to the land for the Miami Jai-Alai Facility (the "Land") by or under the authority of the Borrower and improvements added to or removed from the Miami Jai-Alai Facility by or under the authority of Borrower, in each case, after the initial date on which Loans and disbursements under the Disbursement Agreement are made, the survey of the Land provided to the Administrative Agent prior to such date (the "Survey") is true, accurate and complete in all other respects, including with respect to:  (i) the outline of the Land, and the outline of all buildings, structures and other improvements thereon, if any, and all paving, driveways and fences, if any, in place, (ii) the approximate acreage of the Land, (iii) the existence of all buildings, improvements, foundations and other structures on the Land, if any, (iv) encroachments by improvements located on adjoining property onto the Land or of buildings, improvements, foundations or other structures on the Land, if any, onto adjoining property, (v) means of ingress and egress to and from the Land, (vi) the flood area designation of the Land and improvements shown on the official maps of the Secretary of Housing and Urban Development, (vii) the identification of any portion of the Land and improvements which lies within a federally designated wetlands protection area as determined by the maps of the United States Army Corps of Engineers, (viii) the identification, location, size and use of all easements affecting the Land and improvements, and (ix) all other matters shown, indicated or noted thereon.  The Survey shall be in form and substance acceptable to the Administrative Agent and shall be delivered with a comparison against the Plans and Specifications outlining the proposed boundaries for the Miami Jai-Alai Facility.

ARTICLE IV

Conditions

CH1 5547448v.28

SECTION 4.01.    Effective Date.  The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent (or its counsel) shall have received from each Credit Party subject thereto either (i) a counterpart thereof signed on behalf of such Credit Party subject thereto or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include facsimile transmission of a signed signature page thereof) that such Credit Party has signed a counterpart of each of the Pledge and Security Agreement and such other Loan Documents as the Administrative Agent or its counsel may have reasonably requested.

(c)    The Administrative Agent shall have received favorable written opinions (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of (I) Frost Brown Todd LLC, counsel for the Credit Parties, substantially in the form of Exhibit B-1 hereto, (II) Infante, Zumpano, Hudson & Miloch, LLC, Florida counsel for the Credit Parties, substantially in the form of Exhibit B-2 hereto, and (III) Gunster, Yoakley & Stewart, P.A., gaming counsel for the Credit Parties, substantially in the form of Exhibit B-3 hereto, each covering such other matters relating to the Credit Parties, this Agreement or the Transactions as the Required Lenders shall reasonably request.

(d)    The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to (i) the organization, existence and good standing of each Credit Party, (ii) the authorization of the Transactions and (iii) any other legal matters relating to the Credit Parties, this Agreement or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(e)    All governmental, third party and shareholder approvals necessary or, in the discretion of the Administrative Agent, advisable in connection with the financing contemplated hereby and the continuing operations of Holdings, the Borrower and their Subsidiaries (including all Gaming Licenses and Liquor Licenses) shall have been obtained and be continuing in full force and effect; provided, that so long as the Borrower (or any Affiliate thereof) has not been denied a Gaming License from the Florida Gaming Board to operate slot machines and conduct slot-machine gaming at the Miami Jai-Alai Facility as of the Effective Date, and none of the Key Employees or officers and directors of the Borrower or its Affiliates have been denied slot or other gaming-related occupational licenses as of the Effective Date, then the Borrower may receive such slot-related Gaming License subsequent to the occurrence of the Effective Date, and such delayed delivery shall not prevent the Effective Date from occurring.

(f)    The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of Holdings

48

and the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02.

(g)     The Lenders and the Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by Holdings and the Borrower hereunder.

(h)     The Administrative Agent shall have determined that (i) there is an absence of any material adverse change or disruption in primary or secondary loan syndication markets, financial markets or in capital markets generally that would materially impair syndication of the Loans and other extensions of credit hereunder, and (ii) each of Holdings and the Borrower has cooperated with the Administrative Agent's syndication efforts, including, without limitation, by providing the Administrative Agent with information regarding Holdings', the Borrower's and the Subsidiaries' operations and prospects and such other information as the Administrative Agent reasonably deems necessary to successfully syndicate the Loans and other credit extensions hereunder.

(i)     The Administrative Agent shall have received results satisfactory to the Administrative Agent of all aspects of its due diligence investigation of Holdings, the Borrower, the Subsidiaries and the other Credit Parties (including, without limitation, contingent liabilities and contractual obligations).

(j)     All other legal and regulatory matters shall be satisfactory to the Administrative Agent and the Lenders.

(k)     There shall be no pending or threatened litigation, arbitration, administrative proceeding or consent decree against any Credit Party or Subsidiary thereof, other than the Disclosed Matters.

(l)     The Administrative Agent shall have received, with respect to the Borrower, in form and substance acceptable to the Administrative Agent: (i) projected monthly income statements (which shall include financial information down to the Consolidated EBITDAM line thereof) for the period beginning on the Effective Date and ending with (and including) the twelfth month to occur after the Opening Date (as projected to occur as of the date hereof); (ii) projected quarterly balance sheets and income statements for the consecutive fiscal quarter period beginning with the fiscal quarter in which the Effective Date occurs through the quarter following the first annual anniversary of the projected Opening Date; and (iii) projected annual balance sheets and income statements for the two fiscal years following the first annual anniversary of the projected Opening Date.

(m)     The Administrative Agent shall have received such documents and certificates as the Administrative Agent and its counsel may reasonably request, all in form and substance satisfactory to the Administrative Agent and its counsel and as further described in the list of closing documents attached as <u>Exhibit D</u> hereto.

(n)     Concurrently with the funding of the Term Loans hereunder, the Indebtedness described in Schedule 4.01(n) shall have been fully repaid, the agreements,

documents and instruments evidencing such Indebtedness (including all funding commitments thereunder) shall be terminated and of no further force and effect, and all Liens securing such Indebtedness shall be released and terminated.

(o)    The Construction Budget provides, to the Administrative Agent's reasonable satisfaction, that the aggregate of (i) the guaranteed maximum price (GMP) set forth in the Construction Agreement plus (ii) the portion of the Construction Budget allocated to furniture, fixtures and equipment shall not at any time exceed $37,702,416.

(p)    The Administrative Agent shall have received fully executed and effective copies of all Construction Documents in effect on the Effective Date including, without limitation, the Construction Agreement.

(q)    Holdings, the Borrower, the Lenders, and the Administrative Agent shall each have received all approvals and licenses required by the Gaming Authority and Liquor Authority, including all Gaming Licenses and Liquor Licenses, necessary to consummate the transactions set forth in this Agreement; provided, that this shall not include the slot-machine gaming licenses, further described in Section 5.17, that are permitted to be obtained subsequent to the Effective Date.

(r)    Merritt & Harris, Inc. shall have been retained and shall agree to serve as the Construction Inspector on terms and conditions reasonably satisfactory to the Administrative Agent.

(s)    The Administrative Agent shall have received, in form and substance reasonably acceptable to it, a fully executed and effective copy of the Disbursement Agreement, together with all deliveries required thereunder prior to the extension of any Loan or funding of any Disbursement.

(t)    The Administrative Agent shall have received, in form and substance reasonably acceptable to it, the Construction Plans.

(u)    The Administrative Agent shall be satisfied, in its sole and absolute discretion, with the outcome of the foreclosure proceeding involving the Ft. Pierce Property, including, without limitation, receipt of a payoff letter, evidence of a full release of Holdings, the Borrower and their Subsidiaries from any obligations, claims or liabilities under or in connection with such proceeding, and evidence of the dismissal with prejudice of the actions brought in respect of the Ft. Pierce Property, each in form and substance acceptable to the Administrative Agent.

(v)    The Administrative Agent shall have received a fully executed and effective set of the Dade County Debt Documents, all of which shall be in form and substance acceptable to the Administrative Agent.

(w)    Holdings and the Borrower shall have hired Miami Casino Management, LLC, pursuant to the Management Agreement, to oversee the construction and improvement of the Miami Jai-Alai Facility, and to oversee and make all strategic and other material decisions in respect of the design, marketing and implementation of a development plan for the Miami Jai-

50

Alai Facility, and Miami Casino Management, LLC shall be subject to a subordination agreement, in form and substance acceptable to the Administrative Agent, which, among other things, prohibits amendments and modifications of the Management Agreement without the Administrative Agent's prior consent and which limits payments made to Miami Casino Management, LLC subsequent to the occurrence of an Event of Default.

(x)     The Administrative Agent shall have received evidence satisfactory to it that, as of the Effective Date, the Indebtedness described in Schedule 4.01(x) has been amended and modified to (1) release the Borrower from all rights, duties and obligations thereunder (including, without limitation, as an obligor thereof), (2) cause Holdings to become the borrower, issuer, maker or obligor in respect thereof and to have assumed all duties and responsibilities in respect thereof, (3) have a stated maturity at least 6 months after the Maturity Date, (4) permit, at Holdings' option, interest thereunder to be paid-in-kind instead of in cash, and (5) be subordinated to the Obligations on terms and conditions acceptable to the Administrative Agent in its sole discretion.

(y)     The Administrative Agent shall have received forms of all of the Contractor Debt Documents to be used to evidence all Contractor Debt from time to time, which forms (including the terms and conditions thereof) shall be acceptable to the Administrative Agent in its sole discretion.

(z)     The Administrative Agent shall have received, in form and substance acceptable to it, a fully executed and effective copy of the Freedom Financial Note.

(aa)     The Administrative Agent shall have received, in form and substance acceptable to it, a fully executed and effective copy of the Freedom Consulting Agreement.

(bb)     The Administrative Agent shall have received, in form and substance acceptable to it, fully executed and effective copies of the Design Documents.

(cc)     The Administrative Agent shall have received balance sheets and statements of income, stockholders equity and cash flows of Freedom Financial covering the fiscal years ended December 31, 2009 and 2010.

(dd)     The Owner Representative shall have been retained on terms and conditions (including the scope and duration of such Person's engagement) acceptable to the Administrative Agent in its sole discretion.

The Administrative Agent shall notify Holdings and the Borrower and the Lenders in writing of the Effective Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 5:00 p.m., New York City time, on the date hereof (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

SECTION 4.02.     Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing herein is subject to the satisfaction of the following conditions:

(a)      The representations and warranties of Holdings, the Borrower and the Subsidiaries and other Credit Parties set forth in this Agreement and each other Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing.

(b)      At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)      The Administrative Agent shall have received all deliveries required under the Disbursement Agreement in connection with such Loan.

Each Borrowing shall be deemed to constitute a representation and warranty by each of Holdings and the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.


ARTICLE V

Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

SECTION 5.01.      Financial Statements and Other Information.  Holdings and the Borrower will furnish to the Administrative Agent and each Lender:

(a)      within 90 days after the end of each fiscal year of the Holdings and its Subsidiaries, its audited consolidated balance sheets and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by  independent public accountants of recognized national standing acceptable to the Administrative Agent, with the public accountants listed on Schedule 5.01(a) being acceptable to the Administrative Agent (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Holdings and its consolidated Subsidiaries (including the Borrower) on a consolidated basis in accordance with GAAP consistently applied; provided, that the Borrower's failure to deliver audited financials hereunder as a result of its failure to retain public accountants acceptable to the Administrative Agent shall constitute an Event of Default; provided, further, that King & Company PSC may provided audited financials for 2010 in lieu of the above-mentioned nationally recognized firms;

(b)      within 30 days after the end of each fiscal quarter, its consolidated balance sheets and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheets, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of

operations of Holdings and its consolidated Subsidiaries (including the Borrower) on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    within 30 days after the end of each calendar month, its consolidated and consolidating balance sheets and related statements of operations, stockholders' equity and cash flows as of the end of and for such calendar month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheets, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of Holdings and its consolidated Subsidiaries (including the Borrower) on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes (it being understood that monthly statements of cash flows shall only be provided in a consolidated format for Holdings);

(d)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate (substantially in the form of Exhibit C hereto) of a Financial Officer of Holdings and the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Sections 6.01, 6.06, 6.07, 6.10 and 6.12 through 6.15, (iii) with respect to deliveries in connection with annual financials, setting forth the amounts of Permitted Corporate Expenses paid during the applicable fiscal year, together with supporting detail identifying the various Permitted Corporate Expenses with specificity, and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)    concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(f)    no later than September 30th of each year, financial projections (in form and substance reasonably acceptable to the Administrative Agent) for Holdings and its Subsidiaries for the immediately following year, with an update thereof to be delivered six months after the first day of such following year;

(g)    within fifteen (15) days after the end of each calendar month preceding the Opening Date, Holdings and the Borrower shall deliver to the Administrative Agent a true, complete and correct report as of the end of the prior calendar month, which report shall be in form and substance reasonably satisfactory to the Administrative Agent, and shall (i) detail the progress of the construction and development of the Miami Jai-Alai Facility, (ii) compare such progress with the construction and budget milestones contained in the Construction Timeline and Construction Budget, (iii) explain in detail any material deviation in budget, timing or progress from the Construction Plans, and (iv) attach copies of any reports, notices or memoranda

53

received by the Borrower from the Contractor or any Subcontractor relating to the construction or development of the Miami Jai-Alai Facility;

(h)     on the Opening Date, the Borrower shall deliver a written notice to the Administrative Agent indicating that such date has occurred;

(i)     on the annual anniversary of the Effective Date, if so requested by the Administrative Agent, private rating letters with respect to the Loans from each of S&P and Moody's addressed to the Administrative Agent and the Lenders, each in form and substance acceptable to the Administrative Agent, and with the costs and expenses associated with such letters to be borne by the Borrower; and

(j)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of this Agreement and any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

SECTION 5.02.     Notices of Material Events.  Holdings and the Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)     the occurrence of any Default;

(b)     the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Holdings, the Borrower or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect;

(c)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower and the Subsidiaries in an aggregate amount exceeding $250,000; the failure with respect to any Plan or Multiemployer Plan to pay all required contributions and installments on or before the applicable due dates provided under such Plans and under Sections 430 and 431 of the Code;

(d)     promptly after Freedom Holding, Holdings, the Borrower or any Subsidiary thereof having knowledge thereof, any change or proposed change in any Gaming Law, administrative rule, regulation or advisory issued by a Gaming Authority, any Liquor Law or other applicable law, rule or regulation to which Freedom Holding, Holdings, the Borrower, any equity holder thereof or any Key Employee is subject, any of which may be reasonably expected to have an adverse effect upon the Administrative Agent or the Holders of Obligations, including, without limitation, any adverse effect upon their ability to enforce their rights and remedies under the Loan Documents;

(e)     receipt of all notices (including copies thereof, if any) from any Gaming Authority whose actions may have an adverse effect upon the Administrative Agent's or any Lender's ability to enforce its rights and remedies under the Loan Documents relating to a review, investigation, hearing, meeting or other action relating to the Gaming License(s) or other Collateral in which the Administrative Agent and the Lenders have an interest, or to the licensing status of any of the Key Employees, Financial Officers, or Freedom Holding's, Holdings' or the

54

Borrower's directors which may have an adverse effect upon the Administrative Agent's or any Lender's ability to enforce its rights and remedies under the Loan Documents;

        (f)     receipt of all notices (including copies thereof, if any) delivered in respect of the Dade County Debt;

        (g)     receipt of all notices (including copies thereof, if any) delivered in respect of the Contractor Debt;

        (h)     the filing (with a copy thereof) of Holdings' and the Borrower's annual report in accordance with the State of Florida's Uniform Reporting System Prescribed for Pari-Mutuel Permit Holders;

        (i)     the occurrence of the Hialeah Park Slots Event; and

        (j)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of Holdings or the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

        SECTION 5.03.     Existence; Conduct of Business.  Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the business operations and the rights, licenses, permits, privileges and franchises, patents, copyrights, trademarks and tradenames material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03.

        SECTION 5.04.     Payment of Obligations.  Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, pay its obligations, including Tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) Holdings the Borrower or such Subsidiary or Credit Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

        SECTION 5.05.     Maintenance of Properties; Insurance.  Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, (a) keep and maintain all property that is material to the conduct of the business of the Holdings and its Subsidiaries, together with the other Credit Parties (including the Borrower), taken as a whole in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations (including, without limitation, all insurance identified

CH1 5547448v.28

in Schedule 3.17 hereto), and each of Holdings and the Borrower will furnish to any Lender upon request full information as to the insurance carried.  Each of Holdings and the Borrower shall deliver to the Administrative Agent endorsements in form and substance reasonably acceptable to the Administrative Agent (x) to all "All Risk" physical damage insurance policies on all of the Credit Parties' tangible real and personal property and assets, hurricane and similar nature disaster insurance policies, and business interruption insurance policies naming the Administrative Agent as lender loss payee and (y) to all general liability, property and casualty policies naming the Administrative Agent as an additional insured; provided, that neither Holdings nor the Borrower shall be required to deliver to the Administrative Agent such endorsements to any automobile insurance policies.  Each of Holdings and the Borrower shall also obtain all additional real property and construction related insurance for the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property and the Parking Lot Property as the Administrative Agent may request from time to time or as required by the Disbursement Agreement.  In the event Holdings, the Borrower or any other Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or in part relating thereto, then the Administrative Agent, without waiving or releasing any obligations or resulting Event of Default hereunder, may at any time or times thereafter (but shall be under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which the Administrative Agent deems advisable.  All sums so disbursed by the Administrative Agent shall constitute part of the Obligations, payable as provided in this Agreement.  Each of Holdings and the Borrower shall direct (and, if applicable, shall cause the other Credit Parties to direct) all insurers under policies of property damage, boiler and machinery and business interruption insurance and payors and any condemnation claim or award relating to the property to pay all proceeds payable under such policies or with respect to such claim or award for any loss with respect to the Collateral directly to the Administrative Agent, for the benefit of the Holders of Obligations, to the extent such proceeds are required to be used to prepay the Obligations pursuant to the terms hereof or any other Loan Document.  Each such policy shall contain a long-form loss-payable endorsement naming the Administrative Agent as lender loss payee, which endorsement shall be in form and substance reasonably acceptable to the Administrative Agent.  Subsequent to the Opening Date, the Borrower shall maintain insurance as further described on Schedule 5.05, all of which shall be provided by insurer(s) acceptable to the Administrative Agent and shall be in such amounts and shall provide such coverages as acceptable to the Administrative Agent.

SECTION 5.06.    Books and Records; Inspection Rights.  Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, permit any representatives designated by the Administrative Agent or any Lender (including, without limitation, the Construction Inspector) upon reasonable prior notice, at the sole cost of Holdings, the Borrower or any applicable Subsidiary or Credit Party, to visit and inspect any of its property, including, without limitation, the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property, the Parking Lot Property, the other Collateral, books and financial records of Holdings, the Borrower and each Subsidiary and other Credit Party, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with

56

its officers and independent accountants, during normal business hours and as often as reasonably requested.  In the absence of an Event of Default, the Administrative Agent or any Lender exercising any rights pursuant to this Section 5.06 shall give Holdings, the Borrower or any applicable Subsidiary or Credit Party reasonable prior written notice of such exercise.  No notice shall be required during the existence and continuance of any Default or Event of Default.  The Administrative Agent and each Lender shall have board observation rights in respect of Holdings and the Borrower and shall be entitled to attend all meetings of their respective boards of directors.  Holdings and the Borrower shall provide at least three days prior notice in respect of any such meeting so that the Administrative Agent and each Lender has a reasonable opportunity to attend the applicable meeting.  The Administrative Agent and each Lender shall receive copies of all materials and other information distributed to any members of Holdings' and the Borrower's respective boards of directors.  The Administrative Agent and each Lender shall make a reasonable effort to notify Holdings or the Borrower if the Administrative Agent expects to attend a meeting of any board of directors (with such notice being delivered, if at all, prior to such meeting).

SECTION 5.07.    Compliance with Laws.    Each of Holdings and the Borrower will, and will cause each of its Subsidiaries and the other Credit Parties to, comply with all laws, rules, regulations and orders (including, without limitation, Environmental Laws) of any Gaming Authority or other Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.    Use of Proceeds.    The proceeds of the Loans will be used only to (i) finance the construction, development and operation of the Miami Jai-Alai Facility as required hereunder and under the Disbursement Agreement, (ii) fund the Company Accounts (as defined in the Disbursement Agreement), (iii) repay the Ft. Pierce Debt, (iv) pay fees and expenses in connection with the Transactions, and (v) make such payments (including repayments of certain Indebtedness) as contemplated by the Sources and Uses attached hereto as Schedule 5.08(a); provided, that the Indebtedness referenced in Schedule 4.01(n) shall be repaid and terminated on the Effective Date, and the Indebtedness referenced in Schedule 5.08(b) shall be repaid and terminated and all Liens securing such Indebtedness shall be released and terminated, in accordance with the Disbursement Agreement, on the date on which the Borrower receives a Gaming License from the Florida Gaming Board to operate slot machines and conduct slot-machine gaming at the Miami Jai-Alai Facility, and all other Gaming Licenses (including slot occupational licenses) required by the Borrower's and its Affiliates' officers, directors and Key Employees in respect of gaming operations at the Miami Jai-Alai Facility have been obtained (with the Administrative Agent receiving evidence satisfactory to it in its sole discretion that all such licenses have been obtained and are in full force and effect).  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.  No proceeds of any Loan, including those on deposit in the Company Accounts, shall be used to refinance any Indebtedness (including, without limitation, any Indebtedness owing to holders of Equity Interests in Freedom Holding, Holdings or any Subsidiary thereof) other than Indebtedness as described above.

SECTION 5.09.    <u>Credit Parties Guaranty</u>.    Holdings and the Borrower confirm that, as of the Effective Date, the only directly owned Subsidiary of Freedom Holding is Holdings, the only directly owned Subsidiaries of Holdings are the Borrower and Tara Club Estates, Inc., the only directly owned Subsidiary of the Borrower is Tara Club Estates, Inc. which has no Subsidiaries.  Borrower is the owner of 100% of the beneficial interest in the Florida Trust.  Other than the foregoing Subsidiaries, neither Freedom Holding, Holdings, the Borrower nor any Subsidiary thereof or any Credit Party shall create, form, acquire or otherwise own any Subsidiary on or after the Effective Date without the Administrative Agent's prior written approval.  If Freedom Holding, Holdings, the Borrower or the applicable Subsidiary or Credit Party receives such approval, then such new Person shall be required to guaranty the Obligations on terms and conditions and pursuant to agreements, documents and instruments acceptable to the Administrative Agent in its sole discretion, and to become a Credit Party.  The Borrower shall provide the Administrative Agent with at least thirty (30) days' prior written notice of any action that would result in it or any of such other Persons having a Subsidiary.  Each such new guarantor shall be required to pledge substantially all of its assets to the Administrative Agent for the benefit of the Holders of Obligations on terms and conditions and pursuant to agreements, documents and instruments acceptable to the Administrative Agent in its sole discretion (including, without limitation, complying with the terms of Section 5.10 and delivering all legal opinions required by the Administrative Agent).  Each such new guarantor shall be required to deliver such guaranty and pledge documents within 90 days (or such later date as may be approved by the Administrative Agent in its sole discretion) after the date on which such Person becomes a Subsidiary of Freedom Holding, Holdings, the Borrower, a Subsidiary thereof, or a Credit Party.  Failure by any Person to satisfy the requirements of this Section 5.09 or Section 5.10 shall constitute an Event of Default.

SECTION 5.10.    <u>Collateral; Cash Management</u>.

(a)    Each of Holdings and the Borrower will cause, and will cause each other Credit Party to cause, all of its owned property (other than Excluded Assets) to be subject at all times to first priority, perfected Liens in favor of the Administrative Agent for the benefit of the Holders of Obligations, to secure the Obligations in accordance with the terms and conditions of the Collateral Documents, subject in any case to Liens permitted by Section 6.02 hereof or by the Collateral Documents.  Without limiting the generality of the foregoing, each of Holdings and the Borrower will cause all of the issued and outstanding Equity Interests of each Credit Party directly owned by the Borrower or any other Credit Party to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent in accordance with the terms and conditions of the Collateral Documents or such other security documents as the Administrative Agent shall reasonably request, together with such other documentation as the Administrative Agent may reasonably request in connection with the foregoing, including, without limitation, certified resolutions and other authority documents of such Person and, to the extent requested by the Administrative Agent, customary opinions of counsel with respect to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and attachment and perfection of all Liens thereunder), all in form, content and scope reasonably satisfactory to the Administrative Agent.  All such deliveries shall be made within 90 days (or such later date as may be approved by the Administrative Agent in its sole discretion) after the date on which such Person becomes a Subsidiary of the Borrower, Holdings, Freedom Holding or a Subsidiary of any of the foregoing or otherwise becomes a

Credit Party.  Notwithstanding the foregoing, the Florida Trust shall not be required to become a party to the Pledge and Security Agreement unless otherwise requested by the Administrative Agent.

(b)       The Lenders and each of Holdings and the Borrower (on behalf of itself and the other Credit Parties), irrevocably authorize the Administrative Agent, at its option and in its reasonable judgment, in the event that, at any time, the Administrative Agent determines that it does not have a perfected Lien on substantially all of the assets (other than Excluded Assets) of any Credit Party to secure the Obligations, to obtain perfected Liens on such unencumbered assets as the Administrative Agent deems necessary in consultation with the Required Lenders to secure the Obligations.  The Borrower shall provide, and cause the other Credit Parties to provide, the Administrative Agent with all information reasonably requested by the Administrative Agent from time to time related to assets owned by Freedom Holding, Holdings, the Borrower, the Subsidiaries of the foregoing, and any other Credit Parties, shall cooperate fully with the Administrative Agent with respect to the performance of due diligence and the execution of instruments and other Collateral Documents and making of any filings necessary to facilitate such Lien perfection (including, without limitation, certified resolutions and other authority documents of any applicable Subsidiary or other Person and, to the extent requested by the Administrative Agent, customary opinions of counsel with respect to such Subsidiary or other Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and attachment and perfection of all Liens thereunder), all in form, content and scope reasonably satisfactory to the Administrative Agent) and shall pay all reasonable costs and expenses incurred by the Administrative Agent and its counsel in connection therewith, whereupon such Subsidiary or other Person shall thereafter be deemed a "Credit Party" hereunder.  Notwithstanding the foregoing, no pledge agreement in respect of the Equity Interests of a Foreign Subsidiary shall be required hereunder to the extent such pledge thereunder is prohibited by applicable law or its counsel reasonably determines that such pledge would not provide material credit support for the benefit of the Holders of Obligations pursuant to legally valid, binding and enforceable pledge agreements.

(c)       The Borrower shall at all times maintain the Main Cash Account.  The Main Cash Account shall not constitute a Company Account under and as defined in the Disbursement Agreement.  Subsequent to the Opening Date, no more than the Permitted Main Cash Account Amount shall at any time remain on deposit in the Main Cash Account.  The Borrower shall notify the Administrative Agent of any excess amount on deposit therein within one day after such excess first results.  If so directed by the Administrative Agent, the Borrower shall transfer (on the date of such direction) such excess amount to a deposit account designated by the Administrative Agent.  Failure to notify the Administrative Agent of such excess or to transfer such excess as and when required by the Administrative Agent shall constitute an Event of Default.  Holdings and the Borrower agree and acknowledge that amounts in excess of the Permitted Main Cash Account Amount are not to be held on deposit in the Main Cash Account, and that cash is generally required to be maintained in the Company Accounts and used as described in the Disbursement Agreement and the other Loan Documents.  The Main Cash Account at all times shall remain subject to a springing blocked account control agreement in form and substance acceptable to the Administrative Agent.

SECTION 5.11.    <u>Materials</u>.  Each of Holdings and the Borrower shall cause all materials, equipment or furnishings ("<u>Materials</u>") related to or used in the Miami Jai-Alai Facility to be purchased in a manner that will result in the ownership thereof vesting unconditionally in the Borrower, free from all Liens (other than Permitted Encumbrances), other than Materials leased by the Borrower pursuant to operating leases and approved by the Administrative Agent in writing.  All such materials shall be (x) used and stored at the site of the Miami Jai-Alai Facility under reasonable safeguards to minimize the possibility of loss, theft, damage or commingling with other materials or projects, (y) covered by the Lien of the Administrative Agent pursuant to the Collateral Documents, and (z) covered by a builder's risk insurance policy acceptable to the Administrative Agent.  The Borrower shall deliver to the Administrative Agent, on demand, copies of any contracts, bills of sale, statements, receipted vouchers or agreements under which the Borrower claims title to any Materials.

SECTION 5.12.    <u>Maintenance of Construction Site</u>.  Each of Holdings and the Borrower shall require that the Contractor and all Subcontractors cause the Miami Jai-Alai Facility and the improvements thereon to be kept in good condition and repair (subject to the ordinary wear and tear), maintain the same in a clean and orderly manner, make all necessary replacements and operate the same in compliance in all material respects with all pertinent laws respecting health, safety, and the conduct of such or similar operations.

SECTION 5.13.    <u>Mechanic's Liens and Other Encumbrances</u>.  None of Holdings, the Borrower or any Subsidiary thereof or any other Credit Party shall permit any mechanic's Lien or other Lien to be filed or recorded against the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property, the Parking Lot Property, or any other real property owned by Holdings, the Borrower or any Subsidiary thereof.  Notwithstanding the foregoing, if such a Lien shall be filed or recorded, Holdings, the Borrower or the applicable Subsidiary or Credit Party shall pay, discharge or bond in a manner acceptable to the Administrative Agent any such mechanic's Liens or other Lien no later than ten (10) days after the date on which such Lien attaches or otherwise arises.   In the event that Holdings or the Borrower shall fail to pay or discharge (or bond in a manner acceptable to the Administrative Agent) any such mechanic's Lien or other Lien within such time period, the Administrative Agent, and/or any Lender may, in addition to such other rights as may be available to it, pay and discharge such mechanic's Lien on other Lien or deposit in escrow an amount sufficient to do so, and each of Holdings and the Borrower shall reimburse the Administrative Agent and/or such Lender within two days after the Administrative Agent's and/or such Lender's demand for payment therefor.

SECTION 5.14.    <u>Construction of the Miami Jai-Alai Facility; Owner Representative</u>.

(a)    The construction and development of the Miami Jai-Alai Facility shall be performed in substantial compliance with (a) the Construction Plans, (b) all representations as to such construction made by Holdings or the Borrower hereunder or in connection herewith, (c) all permits, licenses and approvals relating to such construction, and (d) all applicable laws (including Gaming Laws and Liquor Laws), rules, regulations, requirements and orders of all Governmental Authorities having jurisdiction over the Miami Jai-Alai Facility (including all improvements thereon).

(b)     The Borrower shall proceed diligently with construction according to the Construction Plans, employing sufficient workmen and supplying sufficient materials so that the Miami Jai-Alai Facility shall be fully developed and completed (including installation of all required items of personalty in compliance with the Construction Plans).

(c)     The Borrower, at its sole cost and expense, shall undertake expeditiously and immediately following the date hereof all actions which are required to investigate and remediate the Miami Jai-Alai Facility in accordance with all applicable Florida statutes and regulations and consistent with the City of Miami's Department of Environmental Resources Management's ("DERM") codes and regulations pertaining to the protection of the environment. The Borrower shall conduct such required investigation and remediation pursuant to Florida's Brownfields Redevelopment Program ("Brownfields Program") and shall advise the Lender in writing immediately as to the specific reason for denial into the Brownfields Program should the Florida Department of Environmental Protection ("FDEP") or DERM determine that the Miami Jai-Alai Facility is not eligible for placement into the Brownfields Program. The Borrower, at the Borrower's sole cost and expense, shall engage an environmental consultant satisfactory to Administrative Agent in its sole discretion to investigate and remediate the Miami Jai-Alai Facility and shall provide all documents to and from the FDEP and/or DERM to Administrative Agent within five (5) Business Days of the date after such correspondence.  The Borrower shall also advise the Administrative Agent after any meetings with FDEP and/or DERM in connection with its obligation hereunder.  Upon the completion of the investigations and remediation required hereunder, the Borrower shall obtain a "no further action" letter or written communication of similar import that all such investigations and remediation have been satisfactorily completed with respect to the Miami Jai-Alai Facility and provide such written communication to the Administrative Agent.

(d)     If the Administrative Agent determines that the construction of any portion of the Miami Jai-Alai Facility is not being conducted in substantial compliance with the Construction Plans, in a good and workmanlike manner and in accordance with all applicable laws, the Administrative Agent may require work to be stopped and may withhold approval of all disbursements contemplated by the Disbursement Agreement and may suspend any Borrowing Request delivered hereunder until the deficiencies are corrected.  Each of Holdings and the Borrower agrees that it will correct any deficient work performed and replace any materials that do not comply with the Construction Plans, applicable laws, or acceptable standards of quality and workmanship.  The correction of deficient work or materials shall be at Holdings' or the Borrower's expense unless the Administrative Agent determines in its sole and absolute discretion that there are adequate funds remaining in the applicable line items of the Construction Budget to correct such deficient work or materials.

(e)     The Owner Representative shall be retained by the Borrower through the occurrence of the Opening Date and the completion of the Miami Jai-Alai Facility.  The Owner Representative shall perform such duties as disclosed to the Administrative Agent as of the Effective Date on those terms and conditions approved by the Administrative Agent as of the Effective Date or such other terms and conditions as approved by the Administrative Agent from time to time in its sole discretion.  In the event the Owner Representative (whether LPCiminelli, Inc. or any replacement thereof) is terminated by the Borrower or fails to perform its duties and obligations as and when required (including as a result of its resignation), the Borrower shall

61

have 14 days from the date of such termination or performance failure to retain a replacement Owner Representative that is acceptable to the Administrative Agent in its sole discretion on terms and conditions acceptable to the Administrative Agent in its sole discretion.

SECTION 5.15.    Maintenance of Gaming.  Each of Holdings and the Borrower agrees to maximize the use of each of the Miami Jai-Alai Facility and the Ft. Pierce Property for (x) jai-alai matches, games and competitions, (y) gaming and gambling as conducted as of the Effective Date, and, (z) once the construction of the Miami Jai-Alai Facility is completed, slot machine gaming, including, without limitation, conducting the minimum number of performances required under Florida law to be authorized and eligible to conduct pari-mutuel, intertrack wagering, and cardroom operations at each such location.  Each of Holdings and the Borrower shall maintain the necessary assets required to maximize such use, and shall conduct a "full schedule of live racing or games" at each such location (as defined in Section 550.002(11), Florida Statutes), including, without limitation, parking lots and all other real property needed for ingress or egress to and from each such location.

SECTION 5.16.    Completion Reserve Account and Warrants.  Warrants related to the Completion Reserve Account that are issued by the Borrower or any Affiliate thereof to any Lender or the Administrative Agent shall be fully exercisable within the time period described in Section 1.3.4(c) of the Disbursement Agreement.

SECTION 5.17.    Repayment of Certain Indebtedness.   In accordance with the terms of the Disbursement Agreement, Holdings and the Borrower shall fully repay and terminate the Indebtedness (including all Liens securing such Indebtedness and all agreements, documents and instruments evidencing such Indebtedness) referenced in Schedule 5.08(b) on the date on which the Borrower receives a Gaming License from the Florida Gaming Board to operate slot machines and conduct slot-machine gaming at the Miami Jai-Alai Facility, and all other Gaming Licenses (including slot occupational licenses) required of the Borrower's and its Affiliates' officers, directors and Key Employees in respect of gaming operations at the Miami Jai-Alai Facility have been obtained; provided, that the Administrative Agent shall receive evidence satisfactory to it in its sole discretion that all such licenses have been obtained and are in full force and effect prior to any such payment being made.

ARTICLE VI

Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

SECTION 6.01.    Indebtedness.  Neither Holdings nor the Borrower will, and will not permit any Subsidiary or other Credit Party to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created hereunder;

62

(b)     Indebtedness existing on the date hereof and set forth in Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness that do not increase the maximum principal amount thereof; provided, that if such Indebtedness also appears on Schedule 5.08(b), then such Indebtedness shall not be extended, renewed or replaced and shall be repaid as and when required under Section 5.17;

(c)     Indebtedness of (1) Holdings or the Borrower to any other Credit Party and (2) any Credit Party to any other Credit Party other than Holdings or the Borrower, in each case so long as such Indebtedness is subordinated to the Obligations on terms and conditions acceptable to the Administrative Agent;

(d)     Guarantees by any Credit Party of Indebtedness of any other Credit Party to the extent such Indebtedness is otherwise permitted hereunder; provided, that neither Holdings nor the Borrower shall guaranty any such Indebtedness;

(e)     Indebtedness evidenced by the FH Note for so long as (i) such Indebtedness is at all times unsecured and no Lien on any asset shall secure such Indebtedness; (ii) such Indebtedness remains subject to an intercreditor agreement in form and substance acceptable to the Administrative Agent, which intercreditor agreement, among other things, shall subordinate payments in respect of Indebtedness to the Obligations; (iii) all interest thereunder shall be paid-in-kind and shall not be paid in cash; (iv) the form and substance of the FH Note is approved in writing by the Administrative Agent prior to the effectiveness thereof and is not amended or modified without the Administrative Agent's prior written consent; (v) by their terms (as evidenced by the written acknowledgment of Freedom Holding), the FH Note and the Indebtedness evidenced thereby terminate, are cancelled and no longer remain outstanding or enforceable upon the occurrence of any event described in Section 7.01(h), (i), or (j); and (vi) the aggregate principal amount thereof does not at any time exceed $1,322,573.73 plus increases thereto resulting from paid-in-kind interest;

(f)     the Dade County Debt for so long as (i) the maximum interest rate per annum therefor does not exceed 7.25% per annum plus any default rate added thereto as set forth in the Dade County Debt Documents as of the Effective Date; (ii) the stated maturity therefor is at least 6 months after the Maturity Date; (iii) the Dade County Debt Documents are not amended or modified on or after the Effective Date without the Administrative Agent's prior written consent; (iv) such Indebtedness remains non-recourse to the Borrower and its Affiliates; (v) the terms thereof permit the Administrative Agent to maintain a second-priority Lien on the property securing the Dade County Debt; and (vi) no Credit Party (including, without limitation, the Borrower) provides a guaranty or any collateral in support of such Indebtedness; and

(g)     the Contractor Debt for so long as (i) the Contractor Debt is solely an obligation of Holdings, and no other Credit Party (including the Borrower) has any obligation or liability in respect thereof (including any guaranty liability), (ii) the aggregate principal amount thereof does not exceed $1,000,000 plus increases thereto resulting from paid-in-kind interest, (iii) the maximum interest rate per annum therefor does not exceed 12% per annum plus any default rate added thereto as set forth in the Contractor Debt Documents; (iv) the stated maturity therefor is at least 6 months after the Maturity Date; (v) the Contractor Debt Documents are approved in writing by the Administrative Agent prior to the effectiveness thereof and are not

amended or modified without the Administrative Agent's prior written consent; (vi) such Indebtedness is at all times unsecured and no Lien on any asset shall secure such Indebtedness; and (vii) such Indebtedness remains subject to an intercreditor agreement in form and substance acceptable to the Administrative Agent, which intercreditor agreement, among other things, shall subordinate payments in respect of the Contractor Debt to the Obligations and shall subordinate all Liens securing the Contractor Debt to the Liens securing the Obligations; provided, that an Event of Default shall result if any amounts are owing or otherwise due and payable by Holdings or any Affiliate thereof to the Contactor other than in accordance with the foregoing requirements;

        (h)    Indebtedness evidenced by the Freedom Financial Note for so long as (i) such Indebtedness is at all times unsecured and no Lien on any asset shall secure such Indebtedness; (ii) such Indebtedness remains subject to an intercreditor agreement in form and substance acceptable to the Administrative Agent, which intercreditor agreement, among other things, shall subordinate payments in respect of Indebtedness to the Obligations; (iii) all interest thereunder shall be paid-in-kind and shall not be paid in cash; (iv) the form and substance of the Freedom Financial Note is approved in writing by the Administrative Agent prior to the effectiveness thereof and is not amended or modified without the Administrative Agent's prior written consent; (v) by their terms (as evidenced by the written acknowledgment of Freedom Financial), the Freedom Financial Note and the Indebtedness evidenced thereby terminate, are cancelled and no longer remain outstanding or enforceable upon the occurrence of any event described in Section 7.01(h), (i), or (j); and (vi) the aggregate principal amount thereof does not at any time exceed $1,905,000 plus increases thereto resulting from paid-in-kind interest;

        (i)    Indebtedness referenced in Schedule 5.08(b) until such time as it is required to be fully repaid and terminated pursuant to Section 5.17;

        (j)    Indebtedness constituting a contingent payment obligation owing by the Borrower to a political action committee disclosed to the Administrative Agent prior to the date hereof; provided, that:

        (i)    within 10 days after the first date on which slot machine gaming is available at the Miami Jai-Alai Facility, such contingent payment obligation shall be fully paid (with evidence of such full repayment being delivered to the Administrative Agent on the date such payment is made), or such contingent payment obligation shall be converted into Indebtedness evidenced by an instrument the form and substance of which is approved by the Administrative Agent;

        (ii)    if such contingent payment obligation is converted into Indebtedness as described in the foregoing clause (i), then such Indebtedness shall be required to satisfy the following:

        (A)    the aggregate principal amount thereof shall not exceed $3,550,000 at any time;

64

(B)     such Indebtedness is at all times unsecured and free and clear of any Liens;

(C)     such Indebtedness is subordinated to the Obligations on terms acceptable to the Administrative Agent; and

(D)     such Indebtedness evidences, on a dollar-for-dollar basis, the conversion of the contingent payment obligation owing to such political action committee (by way of example, if the contingent payment obligation is $1,000,000, then the Indebtedness replacing such contingent payment obligation shall not exceed $1,000,000); and

SECTION 6.02.     Liens.  Neither Holdings nor the Borrower will, and will not permit any Subsidiary or Credit Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)     Permitted Encumbrances;

(b)     any Lien on any property or asset of Holdings, the Borrower or any Subsidiary or Credit Party existing on the date hereof and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of Holdings, the Borrower or any Subsidiary or Credit Party, (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof, and (iii) any Lien securing Indebtedness appearing in Schedule 5.08(b) shall be terminated as of the date such Indebtedness is required to be repaid, and no such Lien shall be permitted hereunder subsequent to such required release date; and

(c)     Liens upon the Parking Lot Property that secure the Dade County Debt.

SECTION 6.03.     Fundamental Changes.

(a)     Neither Holdings nor the Borrower will, and will not permit any Subsidiary or Credit Party to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose (including pursuant to a Sale and Leaseback Transaction) of (in one transaction or in a series of transactions) any of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or here-after acquired), or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing:

(i)     any Person may merge into the Borrower in a transaction in which the Borrower is the surviving company,

(ii)     any Subsidiary (other than the Borrower) may merge into any Subsidiary in a transaction in which the surviving entity is a Credit Party,

(iii)    any Subsidiary (other than the Borrower) may sell, transfer, lease or otherwise dispose of its assets to Holdings or the Borrower or any other Credit Party, and

(iv)    any Subsidiary of the Borrower or any Credit Party other than the Borrower may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)    Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries or any other Credit Party to, engage to any material extent in any business other than businesses (and businesses reasonably related thereto) of the type conducted by Holdings, the Borrower and its Subsidiaries and the other Credit Parties on the date of execution of this Agreement.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries or any other Credit Party to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

(a)    Permitted Investments;

(b)    investments by Holdings or the Borrower or any Subsidiary or Credit Party existing on the date hereof in the capital stock of its Subsidiaries;

(c)    loans or advances made by any Credit Party (other than Holdings or the Borrower) to any other Credit Party (including Holdings and the Borrower); and

(d)    Guarantees constituting Indebtedness permitted by Section 6.01.

SECTION 6.05.    Swap Agreements.  Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries or any other Credit Party to, enter into any Swap Agreement.

SECTION 6.06.    Restricted Payments.  Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(a)    Holdings or the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its common stock;

66

(b)     Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests to the Borrower or any other Credit Party (other than Holdings or Freedom Holding, which are covered in clauses (d) and (e) below);

(c)     the Borrower may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries;

(d)     the Borrower may pay dividends to Holdings in respect of Permitted Corporate Expenses so long as (1) no Default or Event of Default would result therefrom, (2) the Borrower demonstrates, to the Administrative Agent's reasonable satisfaction, pro forma compliance with the financial covenants set forth in Sections 6.12 through 6.15 after giving effect to the applicable dividend (and with the understanding that no such dividend shall be paid until such covenants are in effect and being measured as and when required under such Sections), (3) the aggregate amount of such dividends and related Permitted Corporate Expenses do not exceed the Permitted Corporate Expenses Cap for the applicable fiscal quarter and applicable fiscal year, and (4) if any portion of such dividend is used to pay amounts owing under the Freedom Consulting Agreement, such amount does not exceed the Permitted Freedom Consulting Payment Cap; provided, however, that (i) for any month ending prior to the end of the first full fiscal quarter to occur after the quarter in which the Opening Date occurs, the Borrower may pay dividends to Holdings in an amount not to exceed $65,000 per month with respect to Permitted Corporate Expenses (other than payments under the Freedom Consulting Agreement and the Freedom Holding Note, payments of interest or principal on any outstanding debt of Holdings and dividends in respect of preferred or common stock, none of which shall be paid with such $65,000 amounts), and (ii) for the first fiscal quarter that the Borrower is required to comply with the financial covenants set forth in Sections 6.12 through 6.15, no more than the First PCE Dividend Amount shall be permitted to be paid for such quarter;

(e)     Holdings may pay accrued dividends on its outstanding preferred stock using proceeds of dividends permitted under Section 6.06(d); and

(f)     so long as no Default or Event of Default is then outstanding or would result therefrom, and Miami Casino Management, LLC (or any successor thereto) remains subject to a subordination agreement in form and substance acceptable to the Administrative Agent, payments of Management Fees as and when required by the Management Agreement.

SECTION 6.07.     Transactions with Affiliates.  Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries or other Credit Parties to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)     in the ordinary course of business at prices and on terms and conditions not less favorable to Holdings or the Borrower or such Subsidiary or Credit Party than could be obtained on an arm's-length basis from unrelated third parties; provided, that each such transaction shall be approved by the Administrative Agent prior to the consummation thereof;

67

(b)    transactions between or among Holdings or the Borrower and the Borrower's wholly owned Subsidiaries not involving any other Affiliate; provided, that each such transaction shall be approved by the Administrative Agent prior to the consummation thereof;

(c)    any Restricted Payment permitted by Section 6.06;

(d)    payments by Holdings under the Freedom Consulting Agreement; provided that (i) no payments thereunder shall exceed the Permitted Freedom Consulting Payment Cap (as further described in Section 6.06(d)), (ii) the form and substance of the Freedom Consulting Agreement is approved in writing by the Administrative Agent prior to the effectiveness thereof and is not amended or modified without the Administrative Agent's prior written consent; (iii) the parties thereto and the payments owing thereunder are subject to an intercreditor agreement in form and substance acceptable to the Administrative Agent, which intercreditor agreement, among other things, shall subordinate payments thereunder to the Obligations and limit amounts which may accrue during any fiscal year (including, without limitation, as a result of missed or blocked payments) to $450,000 per year; (iv) by its terms (as evidenced by the written acknowledgment of Freedom Financial), the Freedom Consulting Agreement (including all payments and other obligations owing thereunder) terminates, is cancelled and no longer remains outstanding or enforceable upon the occurrence of any event described in Section 7.01(h), (i), or (j); and (v) no payment shall be made to W. Bennett Collett, Sr. except as provided under the Freedom Consulting Agreement; and

(e)    payments of compensation (other than those under the Freedom Consulting Agreement) to W. Bennett Collett, Jr. consisting of (A) a $300,000 annual base salary, which shall increase by 5.0% per year beginning on January 1, 2013 and on each January 1st thereafter and (B) incentive bonus compensation so long as (w) no Default or Event of Default is then outstanding or would result therefrom, (x) such incentive bonus compensation has been duly authorized by the board of directors of the Borrower, (y) the annual aggregate amount thereof does not exceed 50.0% of the base salary for that year, and (z) W. Bennett Collett, Jr. remains subject to a letter agreement with the Administrative Agent which, among other things, prohibits payments under clause (B) of the foregoing if a Default or Event of Default is then outstanding or would result therefrom and which requires a turnover of payments to the Administrative Agent if made in contravention hereof or such letter agreement.

SECTION 6.08.    Restrictive Agreements.    Neither Holdings nor the Borrower will, and will not permit any of its Subsidiaries or other Credit Parties to, directly or indirectly, enter into, incur or permit to exist any agreement (other than the Loan Documents) or other arrangement that prohibits, restricts or imposes any condition upon:

(a)    the ability of Holdings, the Borrower or any Subsidiary or Credit Party to create, incur or permit to exist any Lien upon any of its property or assets, or

(b)    the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to Holdings, the Borrower or any other Subsidiary or Credit Party or to Guarantee Indebtedness of Holdings, the Borrower or any other Subsidiary or Credit Party; provided that:

68

(i)      the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement,

(ii)      the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on <u>Schedule 6.08</u> (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition),

(iii)      the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder,

(iv)      clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and

(v)      clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.09.      <u>Changes in Fiscal Year</u>.      Neither Holdings nor the Borrower will, nor will it permit any of its Subsidiaries or any other Credit Party to, change its fiscal year from the basis in effect on the Effective Date.

SECTION 6.10.      <u>Asset Sales</u>.  Neither Holdings nor the Borrower will, nor will it permit any Subsidiary or other Credit Party to, sell, lease or otherwise dispose of its assets to any other Person except for:

(a)      sales of inventory for fair value in the ordinary course of business;

(b)      sales or other dispositions of obsolete, uneconomic or worn-out or no longer used or useful assets in the ordinary course of business;

(c)      the sale of the Ft. Pierce Property on terms and conditions, and with a purchase price, acceptable to the Administrative Agent; and

(d)      dispositions of cash and Permitted Investments in the ordinary course of business;

<u>provided</u> that, with respect to any sale, lease or disposition of assets pursuant to this Section 6.10, (i) the Net Cash Proceeds of such sale or other disposition of assets are applied as and to the extent required by Section 2.08 and, if applicable, Section 6.06, and (ii) at the time of such sale or other disposition, and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

SECTION 6.11.      <u>Sale and Leaseback Transactions</u>.  No Credit Party shall enter into any Sale and Leaseback Transaction.

SECTION 6.12.    Total Leverage Ratio.

(a)    Prior to the occurrence of the Hialeah Park Slots Event, the ratio (the "Total Leverage Ratio"), determined as of the end of each of its fiscal quarters set forth below, of (i) Consolidated Total Indebtedness of the Borrower to (ii) Consolidated EBITDAM for the then most-recently ended four fiscal quarters (subject to clause (c) below), shall not be greater than the applicable "Maximum Total Leverage Ratio" set forth below; provided, that Holdings' and the Borrower's compliance with the Maximum Total Leverage Ratio shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter:

| Fiscal Quarter | Maximum Total Leverage Ratio |
|---|---|
| 1 | 3.10 to 1.00 |
| 2 | 3.15 to 1.00 |
| 3 | 3.00 to 1.00 |
| 4 | 2.85 to 1.00 |
| 5 | 2.70 to 1.00 |
| 6 | 2.55 to 1.00 |
| 7 | 2.40 to 1.00 |
| 8 | 2.15 to 1.00 |
| 9 | 2.10 to 1.00 |
| 10 | 2.00 to 1.00 |
| 11 | 1.90 to 1.00 |
| 12 | 1.70 to 1.00 |
| 13 | 1.65 to 1.00 |
| 14 | 1.55 to 1.00 |
| 15 | 1.45 to 1.00 |
| 16 | 1.25 to 1.00 |
| 17 | 1.15 to 1.00 |

(b)    Subsequent to the occurrence of the Hialeah Park Slots Event, the ratio (the "Total Leverage Ratio"), determined as of the end of each of its fiscal quarters set forth below, of (i) Consolidated Total Indebtedness of the Borrower to (ii) Consolidated EBITDAM for the then most-recently ended four fiscal quarters (subject to clause (c) below), shall not be greater than the applicable "Maximum Total Leverage Ratio" set forth below; provided, that Holdings' and the Borrower's compliance with the Maximum Total Leverage Ratio shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

| Fiscal Quarter | Maximum Total Leverage Ratio |
|---|---|

70

| 1 | 4.25 to 1.00 |
|---|---|
| 2 | 4.40 to 1.00 |
| 3 | 4.30 to 1.00 |
| 4 | 4.15 to 1.00 |
| 5 | 4.00 to 1.00 |
| 6 | 3.80 to 1.00 |
| 7 | 3.65 to 1.00 |
| 8 | 3.45 to 1.00 |
| 9 | 3.35 to 1.00 |
| 10 | 3.20 to 1.00 |
| 11 | 3.05 to 1.00 |
| 12 | 2.85 to 1.00 |
| 13 | 2.80 to 1.00 |
| 14 | 2.70 to 1.00 |
| 15 | 2.60 to 1.00 |
| 16 | 2.45 to 1.00 |
| 17 | 2.35 to 1.00 |

(c)      For the first three fiscal quarters for which the Total Leverage Ratio shall be determined, Consolidated EBITDAM not be based on the then most-recently ended four fiscal quarters, and shall instead be determined as follows: (i) for the first such quarter, such quarter's Consolidated EBITDAM times 4; (ii) for the second such quarter, the first and second quarters' Consolidated EBITDAM times 2; and (iii) for the third such quarter, the first, second and third quarters' Consolidated EBITDAM times 4/3.

SECTION 6.13.      Minimum Consolidated EBITDAM.

(a)      Prior to the occurrence of the Hialeah Park Slots Event, Consolidated EBITDAM for the Borrower for each of the following fiscal quarters (determined solely for the applicable fiscal quarter and not for the four-quarter period then ended) shall not be less than the applicable "Minimum Consolidated EBITDAM" set forth below; provided, that Holdings' and the Borrower's compliance with Minimum Consolidated EBITDAM shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

| Fiscal Quarter | Minimum Consolidated EBITDAM |
|---|---|
| 1 | $7,200,000 |
| 2 | $6,800,000 |
| 3 | $7,050,000 |
| 4 | $6,850,000 |
| 5 | $7,850,000 |
| 6 | $7,850,000 |

71

| 7 | $7,850,000 |
| 8 | $7,850,000 |
| 9 | $8,200,000 |
| 10 | $8,200,000 |
| 11 | $8,200,000 |
| 12 | $8,200,000 |
| 13 | $8,400,000 |
| 14 | $8,400,000 |
| 15 | $8,400,000 |
| 16 | $8,400,000 |
| 17 | $8,600,000 |

(b)    Subsequent to the occurrence of the Hialeah Park Slots Event, Consolidated EBITDAM for the Borrower for each of the following fiscal quarters (determined solely for the applicable fiscal quarter and not for the four-quarter period then ended) shall not be less than the applicable "Minimum Consolidated EBITDAM" set forth below; provided, that Holdings' and the Borrower's compliance with Minimum Consolidated EBITDAM shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

| Fiscal Quarter | Minimum Consolidated EBITDAM |
|---|---|
| 1 | $5,250,000 |
| 2 | $4,800,000 |
| 3 | $5,050,000 |
| 4 | $5,150,000 |
| 5 | $5,550,000 |
| 6 | $5,550,000 |
| 7 | $5,550,000 |
| 8 | $5,550,000 |
| 9 | $6,000,000 |
| 10 | $6,000,000 |
| 11 | $6,000,000 |
| 12 | $6,000,000 |
| 13 | $6,200,000 |
| 14 | $6,200,000 |
| 15 | $6,200,000 |
| 16 | $6,200,000 |
| 17 | $6,400,000 |

(c)    Prior to the occurrence of the Hialeah Park Slots Event, Consolidated EBITDAM for the Borrower determined as of the end of each of its fiscal quarters for the four-fiscal quarter period then ended (subject to the annualization requirements of 6.13(e))  shall not

72

be less than the applicable "Minimum Consolidated EBITDAM" set forth below; provided, that Holdings' and the Borrower's compliance with Minimum Consolidated EBITDAM shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

| Fiscal Quarter | Minimum Consolidated EBITDAM |
|---|---|
| 1 | $30,400,000 |
| 2 | $29,500,000 |
| 3 | $29,600,000 |
| 4 | $29,500,000 |
| 5 | $30,200,000 |
| 6 | $31,300,000 |
| 7 | $32,100,000 |
| 8 | $33,300,000 |
| 9 | $33,700,000 |
| 10 | $34,000,000 |
| 11 | $34,000,000 |
| 12 | $34,000,000 |
| 13 | $34,500,000 |
| 14 | $34,500,000 |
| 15 | $35,000,000 |
| 16 | $35,000,000 |
| 17 | $35,100,000 |

(d)    Subsequent to the occurrence of the Hialeah Park Slots Event, Consolidated EBITDAM for the Borrower determined as of the end of each of its fiscal quarters for the four-fiscal quarter period then ended (subject to the annualization requirements of 6.13(e)) shall not be less than the applicable "Minimum Consolidated EBITDAM" set forth below; provided, that Holdings' and the Borrower's compliance with Minimum Consolidated EBITDAM shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

| Fiscal Quarter | Minimum Consolidated EBITDAM |
|---|---|
| 1 | $22,200,000 |
| 2 | $21,200,000 |
| 3 | $21,300,000 |
| 4 | $21,400,000 |
| 5 | $21,700,000 |
| 6 | $22,600,000 |

73

| 7 | $23,100,000 |
| 8 | $23,600,000 |
| 9 | $23,800,000 |
| 10 | $24,400,000 |
| 11 | $24,900,000 |
| 12 | $25,300,000 |
| 13 | $25,500,000 |
| 14 | $25,500,000 |
| 15 | $25,900,000 |
| 16 | $26,000,000 |
| 17 | $26,000,000 |

(e)　　For the first three fiscal quarters for which the Minimum Consolidated EBITDAM shall be determined pursuant to Section 6.13(c) or 6.13(d), as applicable, Consolidated EBITDAM shall not be based on the then most-recently ended four fiscal quarters, and shall instead be determined as follows: (i) for the first such quarter, such quarter's Consolidated EBITDAM times 4; (ii) for the second such quarter, the first and second quarters' Consolidated EBITDAM times 2; and (iii) for the third such quarter, the first, second and third quarters' Consolidated EBITDAM times 4/3.

SECTION 6.14.　　Fixed Charge Coverage Ratio. The ratio (the "Fixed Charge Coverage Ratio"), determined as of the end of each of its fiscal quarters for the four-fiscal quarter period then ended (subject to the remainder of this Section 6.14) of (i) Consolidated EBITDAM minus Consolidated Capital Expenditures (excluding those in respect of developing and constructing the slots facility at the Miami Jai-Alai Facility) minus expenses for taxes paid during such period minus dividends or distributions paid in cash to (ii) that portion of Consolidated Interest Expense paid in cash plus current maturities of principal Indebtedness for such period (including, without limitation, the current portion of all Capital Lease Obligations), all calculated for the Borrower and the Subsidiaries on a consolidated basis (collectively, the "Fixed Charges"), shall not be less than the following applicable "Minimum Fixed Charge Coverage Ratio" set forth below; provided, that Holdings' and the Borrower's compliance with the Minimum Fixed Charge Coverage Ratio shall not be determined until the first full fiscal quarter to occur after the quarter in which the Opening Date occurs (for purposes of the following, the numbers set forth below represent the number of full quarters since the quarter in which the Opening Date occurred, such that "3" means the third full quarter to occur since the Opening Date quarter):

Minimum Fixed Charge Coverage Ratio Prior to the Occurrence of the Hialeah Park Slots Event

| Fiscal Quarter | Minimum Fixed Charge Coverage Ratio |
|---|---|
| 1 | 2.00 to 1.00 |
| 2 | 1.65 to 1.00 |
| 3 | 1.30 to 1.00 |
| 4 | 1.05 to 1.00 |
| 5 | 1.00 to 1.00 |

74

| | |
|---|---|
| 6 | 1.00 to 1.00 |
| 7 | 1.05 to 1.00 |
| 8 | 1.15 to 1.00 |
| 9 | 1.20 to 1.00 |
| 10 | 1.20 to 1.00 |
| 11 | 1.20 to 1.00 |
| 12 | 1.25 to 1.00 |
| 13 | 1.25 to 1.00 |
| 14 | 1.30 to 1.00 |
| 15 | 1.35 to 1.00 |
| 16 | 1.40 to 1.00 |
| 17 | 1.40 to 1.00 |

Minimum Fixed Charge Coverage Ratio Subsequent to the Occurrence of the Hialeah Park Slots Event

| Fiscal Quarter | Minimum Fixed Charge Coverage Ratio |
|---|---|
| 1 | 1.45 to 1.00 |
| 2 | 1.30 to 1.00 |
| 3 | 1.15 to 1.00 |
| 4 | 1.05 to 1.00 |
| 5 | 1.00 to 1.00 |
| 6 | 1.00 to 1.00 |
| 7 | 1.00 to 1.00 |
| 8 | 1.00 to 1.00 |
| 9 | 1.05 to 1.00 |
| 10 | 1.05 to 1.00 |
| 11 | 1.10 to 1.00 |
| 12 | 1.10 to 1.00 |
| 13 | 1.10 to 1.00 |
| 14 | 1.15 to 1.00 |
| 15 | 1.15 to 1.00 |
| 16 | 1.20 to 1.00 |
| 17 | 1.20 to 1.00 |

For the first three fiscal quarters for which the Fixed Charge Coverage Ratio shall be determined, Consolidated EBITDAM shall not be based on the then most-recently ended four fiscal quarters, and shall instead be determined as follows: (i) for the first such quarter, such quarter's Consolidated EBITDAM times 4; (ii) for the second such quarter, the first and second quarters' Consolidated EBITDAM times 2; and (iii) for the third such quarter, the first, second and third quarters' Consolidated EBITDAM times 4/3.

SECTION 6.15.    Capital Expenditures; Pre-Opening Expenses.    Capital Expenditures by the Borrower and its Subsidiaries in a fiscal year shall not exceed the Permitted

75

CapEx Amount for such fiscal year; provided, however, that (i) Capital Expenditures in respect of the Miami Jai-Alai Facility shall not be included in this determination; and (ii) Holdings and Freedom Holding shall not enter into or be subject to any financing or transaction that would otherwise constitute a Capital Expenditure if entered into by the Borrower or any Subsidiary thereof. The aggregate amount paid by Holdings, the Borrower, any Subsidiary or any Credit Party in respect of Pre-Opening Expenses shall not exceed $1,500,000, and no Pre-Opening Expense shall be permitted to be paid hereunder other than those set forth in Schedule 6.15.

SECTION 6.16.    Conduct of Business.    Unless approved by the Administrative Agent in writing, neither Holdings nor the Borrower will, and will not permit any Subsidiary or any other Credit Party to, directly or indirectly, engage in any line of business other than those businesses directly related to the Miami Jai-Alai Facility and the Ft. Pierce Property engaged in on the Effective Date and businesses directly related thereto, including, without limitation, the introduction of slot machine gaming to the Miami Jai-Alai Facility and the activities engaged by Holdings, its Subsidiaries and the other Credit Parties as of the Effective Date.    No Permitted Corporate Expenses shall be paid by any Person other than Holdings.    Holdings shall not engage in any business activities or own any assets or other property other than (i) ownership of Equity Interests in the Borrower and its other Subsidiaries and activities ancillary thereto, (ii) activities and contractual rights incidental to the maintenance of its corporate existence (including the incurrence of any Permitted Corporate Expenses), (iii) the hiring and employment of members of the management of the Borrower and activities reasonably related thereto, and (iv) any other activity expressly permitted hereunder. Freedom Holding shall not engage in any business activities or own any assets or other property other than (i) ownership of Equity Interests in Holdings and its other Subsidiaries and activities ancillary thereto, (ii) activities and contractual rights incidental to the maintenance of its corporate existence, (iii) the hiring and employment of members of the management of Holdings and activities reasonably related thereto, and (iv) any other activity expressly permitted hereunder.

SECTION 6.17.    Limitation on Construction Document Modifications or Terminations.  Except as permitted by the Disbursement Agreement (if at all), neither Holdings nor the Borrower will enter into or agree to any amendment to, assignment or termination of, or waiver of any of its rights under any Construction Document.    Neither Holdings nor the Borrower shall terminate any Construction Document.

SECTION 6.18.    Limitation on Zoning and Contract Changes and Compliance.  Neither Holdings nor the Borrower will initiate, consent to or acquiesce to (a) any zoning downgrade of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property, or seek any material variance under any existing zoning ordinance, (b) use or permit the use of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property in any manner that could result in such use becoming a non-conformity case under any zoning ordinance or any other applicable land use law, rule or regulation or (c) any change in any laws, requirements of any Governmental Authority or obligations created by private contracts which now or hereafter could reasonably be likely to have an adverse effect on the occupancy, use or operation of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property.

SECTION 6.19.    <u>Limitation of Miami Jai-Alai Facility, Ft. Pierce Property and Other Real Estate Development</u>.  Neither Holdings nor the Borrower will construct upon, develop, improve, maintain or operate or permit to be constructed upon, developed, improved, reinvented or operated on the site of the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property or the Contractor-Related Property or enter into or permit to be entered into any contract or any agreement for such construction or development, improvement, maintenance or operation or for any materials, supplies, or labor necessary in connection with such construction, development, improvement, maintenance or operation except (i) any of the foregoing taken in accordance with the Construction Plans with respect to the Miami Jai-Alai Facility and, on terms and conditions previously disclosed to and approved by the Administrative Agent, the construction of a parking garage on the Contractor-Related Property, and (ii) maintenance and repairs in the ordinary course of business necessary to keep the Miami Jai-Alai Facility, the Ft. Pierce Property, the Parking Lot Property and the Contractor-Related Property operating in good and working order and condition.

SECTION 6.20.    <u>Governmental Authority Action</u>.  If any Governmental Authority shall revoke, rescind or impair the licenses, permits and other authorizations held or required to be held by any Permitted Holder, Freedom Holding, Holdings, the Borrower or any Key Employee to own, construct, develop, maintain, operate and/or manage the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property, each of Holdings and the Borrower shall take all necessary and required actions, including the severance of all employment and other relationships with a Permitted Holder, Freedom Holding, Holdings or the Borrower or any Key Employee as directed by the applicable Governmental Authority, so as to reinstate, remedy and obtain any such licenses, permits and/or other authorizations by the date that is designated by the applicable Governmental Authority as the deadline for any Permitted Holder or other applicable Person, or any such Key Employee to either (x) possess and maintain such license, permit or other authorization in proper form without any condition or defect therein or with respect thereto or (y) cease to be employed by Freedom Holding, Holdings, the Borrower or any Affiliate thereof; <u>provided</u>, <u>however</u>, that if no such date is designated by such Governmental Authority, then such action shall be taken within 30 days after the applicable revocation, rescission or impairment.

ARTICLE VII

Events of Default and Remedies

SECTION 7.01.    <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this

CH1 5547448v.28

Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three days;

(c)      any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower, any Subsidiary or any Credit Party in or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with the Loan Documents or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect when made or deemed made;

(d)      (i) Holdings, the Borrower, any Subsidiary or any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, 5.03 (with respect to organizational existence), 5.08, 5.09, 5.10, 5.13, 5.14(e), 5.16, 5.17, in Article VI or in Section 9.17, or (ii) any Loan Document shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or Holdings, the Borrower, any Subsidiary or any Credit Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document or any of its obligations thereunder;

(e)      Holdings, the Borrower, any Subsidiary or any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or in any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (i) notice thereof from the Administrative Agent to Holdings or the Borrower (which notice will be given at the request of any Lender) or (ii) an officer of Holdings or the Borrower becomes aware of any such breach;

(f)      subject to the Farmers Bank Cure Period, Freedom Holding, Holdings, the Borrower or any Subsidiary or other Credit Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)      subject to the Farmers Bank Cure Period, any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) bankruptcy, winding up, dissolution, liquidation, reorganization or other relief in respect of Holdings, the Borrower, any Subsidiary or any Credit Party or its debts, or of a substantial part of its assets, under any  Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower, any Subsidiary or any Credit Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

CH1 5547448v.28

(i)      Holdings, the Borrower, any Subsidiary or any Credit Party shall:

(i)      voluntarily commence any proceeding or file any petition seeking bankruptcy, winding up, dissolution, liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect,

(ii)      consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article,

(iii)      apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower, any Subsidiary or any Credit Party or for a substantial part of its assets,

(iv)      file an answer admitting the material allegations of a petition filed against it in any such proceeding,

(v)      make a general assignment for the benefit of creditors or

(vi)      take any action for the purpose of effecting any of the foregoing;

(j)      Holdings, the Borrower, any Subsidiary or any Credit Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)      one or more judgments for the payment of money in an aggregate amount in excess of $250,000 shall be rendered against Holdings, the Borrower, any Subsidiary or any Credit Party thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Holdings, the Borrower, any Subsidiary or any Credit Party to enforce any such judgment;

(l)      an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower, its Subsidiaries and the other Credit Parties in an aggregate amount exceeding $250,000; Holdings, the Borrower or any ERISA Affiliate fails to make a contribution payment to a Plan on or before the applicable due date which could reasonably be expected to result in the imposition of a Lien under Section 430(k) of the Code or Section 303(k) of ERISA;

(m)      a Change in Control shall occur;

(n)      any Loan Document shall fail to remain in full force or effect against any Credit Party subject thereto (except to the extent such Credit Party has been released from its obligations thereunder in accordance with this Agreement or such other Loan Document or such Loan Document has expired or terminated in accordance with its terms) or any Credit Party shall take any action to discontinue or to assert the invalidity or unenforceability of, or any action that results in the discontinuation or invalidity or unenforceability of, any Loan Document in any

CH1 5547448v.28

material respect or any Lien in favor of the Administrative Agent under the Loan Documents (except as contemplated by the Loan Documents), or such Lien shall not have the perfection or priority contemplated by the Loan Documents;

(o)     the Opening Date shall not have occurred by January 15, 2012, or the Borrower shall not have obtained the Slot License (as defined in the Disbursement Agreement) by June 1, 2011;

(p)     any material breach or default shall occur under any Construction Document which is not cured within any applicable grace period therefor or any grace period provided for in the Disbursement Agreement or any of the same shall cease to be in full force and effect or shall be amended, modified, supplemented or replaced without the Administrative Agent's prior written consent or any material provision therefor shall be waived by Holdings or the Borrower without the Administrative Agent's prior written consent;

(q)     any Governmental Authority shall revoke, rescind or impair the licenses, permits and other authorizations held or required to be held by Holdings, the Borrower, any Credit Party or any Key Employee to own, construct, develop, maintain, operate and/or manage the Miami Jai-Alai Facility, the Ft. Pierce Property, the Contractor-Related Property or the Parking Lot Property (including all applicable Gaming Licenses), or Holdings, the Borrower, any Credit Party or any Subsidiary otherwise ceases operations;

(r)     any "Event of Default" shall occur under the Disbursement Agreement, or any default, event of default, or similar event (including any breach of any term or condition thereof) shall occur under any Development Agreement;

(s)     any event occurs or circumstance exists that may be expected to cause a cancellation, termination, discontinuation or suspension of gaming activities at the Miami Jai-Alai Facility or the Ft. Pierce Property, and such cancellation, termination or suspension may be expected to result in the termination, cancellation or suspension of the Borrower's or any of its Affiliates' Gaming Licenses;

(t)     the Management Agreement is amended, restated, supplemented or otherwise modified without the Administrative Agent's prior written consent;

(u)     any gaming or gambling tax or surcharge assessed or levied by any Governmental Authority against Holdings, the Borrower, any Subsidiary or any Credit Party thereof as of the Effective Date shall increase subsequent to the Effective Date, or any new or additional gaming or gambling tax or surcharge shall be assessed or levied subsequent to the Effective Date;

(v)     other than the issuance of a Gaming License to operate pari-mutuel gaming at Hialeah Park, any Gaming License to operate a pari-mutuel gaming establishment or facility in Miami-Dade County is granted, issued, extended or approved subsequent to the Effective Date;

(w)     Holdings and the Borrower shall fail to possess and maintain computer systems necessary to accumulate wagers, record sales, calculate payoffs and display wagering

data in a secure manner (which systems, as of the Effective Date are supplied by Scientific Games Corp., but may, subsequent thereto, be supplied by other nationally recognized providers of such computer systems), and such failure may be expected to result in a termination, suspension or cancellation of the Borrower's or any of its Affiliates' Gaming Licenses;

(x)    the Management Agreement is terminated and the Borrower fails to enter into a replacement agreement with a replacement manager acceptable to the Administrative Agent in its sole discretion within 30 days after such termination, or amounts payable under the Management Agreement at any time fail to be subordinated to the repayment of the Obligations on terms and conditions acceptable to the Administrative Agent;

(y)    Holdings shall fail to issue on April 26, 2011 the warrants in the form specified in the Holdings Warrant Agreement to the holders in the respective amounts set forth in Schedule 2(b) to the Holdings Warrant Agreement; or

(z)    the Borrower shall fail to issue on April 26, 2011 the warrants in the form specified in the Borrower Warrant Agreement to the holders in the respective amounts set forth in Schedule 2(b) to the Borrower Warrant Agreement;

then, and in every such event (other than an event with respect to Holdings, the Borrower, any Subsidiary, or any other Credit Party described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to Holdings or the Borrower, take either or both of the following actions, at the same or different times:

(i)    terminate the Commitments, and thereupon the Commitments shall terminate immediately, and

(ii)    declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each of Holdings and the Borrower; and in case of any event with respect to Holdings, the Borrower, any Subsidiary or any other Credit Party described in clause (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other Obligations accrued hereunder and under the Loan Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each of Holdings and the Borrower.

Amounts received in respect of the Obligations during the continuance of an Event of Default shall be applied in accordance with the priority of payments set forth in Section 7.4 of the Pledge and Security Agreement.

CH1 5547448v.28

SECTION 7.02.        Right to Complete Construction.  Upon the occurrence and during the continuance of an Event of Event of Default hereunder, the Administrative Agent, on behalf of the Lenders and with the prior consent of the Required Lenders, shall have the right, in person or by agent, in addition to all other rights and remedies available to the Administrative Agent under this Agreement and the other Loan Documents, to the fullest extent permitted by law, to take possession of the Miami Jai-Alai Facility and perform any and all work and labor necessary to complete the Miami Jai-Alai Facility substantially in accordance with the Plans and Specifications (with such modifications as shall be deemed appropriate by the Administrative Agent), and employ watchmen to protect the Miami Jai-Alai Facility from injury, all as described in this Section 7.02.  All reasonable sums so expended by the Administrative Agent shall be deemed to have been paid to the Borrower and constitute Obligations.  Effective upon the occurrence and during the continuance of an Event of Default, each of Holdings and the Borrower hereby constitutes and appoints the Administrative Agent its true and lawful attorney in fact, with full power of substitution, to so complete the Miami Jai-Alai Facility in the name of Holdings or the Borrower.  Each of Holdings and the Borrower hereby empowers said attorney to: (a) use any funds of Holdings or the Borrower, including any funds which may remain undisbursed hereunder for the purpose of so completing the Miami Jai-Alai Facility; (b) make such additions, changes and corrections in the Plans and Specifications as the Administrative Agent deems appropriate; (c) employ such contractors, subcontractors, agents, architects and inspectors as shall be required for said purposes; (d) pay, settle or compromise all existing bills and claims which may be liens against the Miami Jai-Alai Facility, or as may be necessary or desirable for such completion of the Miami Jai-Alai Facility or for clearance of title; (e) execute all applications and certificates in the name of Holdings or the Borrower which may be required by any of the contract documents; (f) prosecute and defend all actions or proceedings in connection with the Miami Jai-Alai Facility or the construction of the Miami Jai-Alai Facility and take such action and require such performance as it deems necessary under any bond or guaranty of completion; and (g) do any and every act which Holdings or the Borrower might do on its own behalf.  It is further understood and agreed that this power of attorney, which shall be deemed to be a power coupled with an interest, cannot be revoked.

SECTION 7.03.        Curing Certain Events of Default.  Upon the occurrence of an Event of Default hereunder, the Administrative Agent, without waiving any right of acceleration or foreclosure under the Loan Documents which Administrative Agent or the Lenders may have by reason of such Event of Default or any other right Administrative Agent or the Lenders may have against Holdings or the Borrower because of said Event of Default, shall, solely with respect to maintaining the value of the Collateral and with the prior consent of the Required Lenders, have the right (but not the obligation) to take such actions and make such payments as shall be necessary to cure such Event of Default, including, without limitation, the making of Loans and protective advances; provided that, for the avoidance of doubt, no such actions, payments, loans or advances shall be made to cure an Event of Default under Sections 6.12 through Section 6.15.  All amounts so expended shall constitute Obligations and shall be payable by the Borrower on demand by Administrative Agent.

ARTICLE VIII

The Administrative Agent

82

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and on behalf of the Holders of Obligations and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, by the Disbursement Agreement and by any other Loan Document, together with such actions and powers as are reasonably incidental thereto, with the Administrative Agent being entitled to make all decisions in its sole discretion unless, by the terms hereof or thereof, such decision requires the approval of all or any of the Lenders, or the Administrative Agent, pursuant to the following, seeks authorization from all or any of the Lenders, as applicable.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein, in the Disbursement Agreement and in the other Loan Documents. Without limiting the generality of the foregoing,

(a)    the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing,

(b)    the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and

(c)    except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Borrower, any Subsidiary or any Credit Party that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it under this Agreement, the Disbursement Agreement or any other Loan Document with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by Holdings or the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into:

(i)    any statement, warranty or representation made in or in connection with this Agreement,

(ii)     the contents of any certificate, report or other document delivered hereunder or in connection herewith,

(iii)     the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein,

(iv)     the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document,

(v)     the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or

(vi)      the perfection or priority of any of the Liens on any of the Collateral.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Holdings or the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, Holdings and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by Holdings or the Borrower to a successor Administrative Agent shall be the same as those payable to its

CH1 5547448v.28

predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

Except with respect to the exercise of setoff rights of any Lender in accordance with Section 9.08, the proceeds of which are applied in accordance with this Agreement, each Lender agrees that it will not take any action, nor institute any actions or proceedings, against Holdings or the Borrower or with respect to any Loan Document, without the prior written consent of the Required Lenders or, as may be provided in this Agreement or the other Loan Documents, with the consent of the Administrative Agent.

The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.  The Administrative Agent shall have the exclusive right on behalf of the Lenders to (i) enforce the payment of the principal of and interest on any Loan after the date such principal or interest has become due and payable pursuant to the terms of this Agreement and (ii) exercise such other rights and remedies granted to the Lenders under the Loan Documents.

In its capacity, the Administrative Agent is a "representative" of the Holders of Obligations within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code.  Each Lender authorizes the Administrative Agent to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents.  Each Lender agrees that no Holder of Obligations (other than the Administrative Agent) shall have the right individually to seek to realize upon the security granted by any Collateral Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent for the benefit of the Holders of Obligations upon the terms of the Collateral Documents.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Obligations, the Administrative Agent is hereby authorized, and hereby granted a power of attorney, to execute and deliver on behalf of the Holders of Obligations any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Administrative Agent on behalf of the Holders of Obligations.  The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than contingent indemnity obligations and Obligations in respect of Swap Agreements) at any

85

time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby; (ii) as permitted by, but only in accordance with, the terms of the applicable Loan Document; or (iii) if approved, authorized or ratified in writing by the Required Lenders, unless such release is required to be approved by all of the Lenders hereunder. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant hereto.  Upon any sale or transfer of assets constituting Collateral which is permitted pursuant to the terms of any Loan Document, or consented to in writing by the Required Lenders or all of the Lenders, as applicable, and upon at least five Business Days' prior written request by the Borrower to the Administrative Agent, the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Holders of Obligations herein or pursuant hereto upon the Collateral that was sold or transferred; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens upon (or obligations of Holdings the Borrower or any Subsidiary in respect of) all interests retained by Holdings, the Borrower or any Subsidiary, including (without limitation) the proceeds of the sale, all of which shall continue to constitute part of the Collateral.

The Lenders authorize the Administrative Agent to enter into and perform under the Disbursement Agreement on behalf of the Lenders, including, without limitation, taking all actions required by or permitted to be taken by the Administrative Agent on behalf of the Lenders thereunder.   Each Lender agrees to be bound by the terms of the Disbursement Agreement.

ARTICLE IX

Miscellaneous

SECTION 9.01.    Notices.    (a)   Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)      if to Holdings or the Borrower, to it at Florida Gaming Corporation, 3500 NW 37th Avenue, Miami, FL 33142, Attention of Dan Licciardi (Facsimile: (305) 634-1712);

(ii)      if to the Administrative Agent, to ABC Funding, LLC, 222 Berkeley Street, 18th floor, Boston, MA 02116, Attention of James Freeland and Adam Britt (Facsimile: (617) 598-4902);  and

86

(iii)    if to any other Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent, Holdings or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02.    <u>Waivers; Amendments</u>.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings or the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders or by Holdings, the Borrower and the Administrative Agent with the consent of the Required Lenders; <u>provided</u> that no such agreement shall:

(i)    increase the Commitment of any Lender without the written consent of such Lender,

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby,

(iii)    postpone the date of any scheduled payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or extend the Maturity Date, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby; provided, however, that with the consent of the Required Lenders, Holdings and the Borrower, the scheduled principal payments for the Term Loans may be amended or modified to increase or decrease the amount payable on any Term Loan Repayment Date, including, without limitation, reallocating amounts from one or more Term Loan Repayment Dates to the Maturity Date (thereby increasing the size of the final principal payment due on the Maturity Date, and decreasing or eliminating the amount payable on any Term Loan Repayment Date),

(iv)    change Section 2.14(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender affected thereby,

(v)    change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender,

(vi)    other than pursuant to a transaction permitted by the terms of this Agreement or any other Loan Document, release all or substantially all of the Collateral or release, limit or condition any Credit Party's guarantee obligations under any Loan Document or terminate or modify the Disbursement Agreement without the written consent of each Lender, or

(vii)    change the priority of payments set forth in Section 7.4 of the Pledge and Security Agreement;

provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, and no such agreement shall amend, modify or otherwise affect the rights or duties of the counterparty under a Swap Agreement (to the extent such Swap Agreement is with a Lender or its Affiliate) without the prior written consent of such counterparty.  Each Lender (and/or each Affiliate of a Lender) that enters into a Swap Agreement with Holdings or the Borrower shall provide the Administrative Agent with notice information for the relevant entity providing such Swap Agreement, including names of personnel, phone numbers, facsimile numbers and e-mail addresses.

SECTION 9.03.        Expenses; Indemnity; Damage Waiver.

(a)    Each of Holdings and the Borrower shall pay:

(i)    all reasonable out-of-pocket expenses incurred by the Administrative Agent and its respective Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and

(ii)    all out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with any Loan Document, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans (which workout and restructuring expenses shall include expenses incurred by the retention and use of financial or similar advisors).

(b)    Each of Holdings and the Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of:

(i)    the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or any other Loan Document of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or by the other Loan Documents,

(ii)    any Loan or the use of the proceeds therefrom,

(iii)    any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Holdings, the Borrower or any Subsidiaries, or any Environmental Liability related in any way to Holdings, the Borrower or any Subsidiaries, or

(iv)    any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

89

(c)     To the extent that Holdings or the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or any Related Party of any of them under paragraph (a) or (b) of this Section or Section 10.15.1 of the Disbursement Agreement, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, Holdings or the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable promptly not later than fifteen days after written demand therefor.

SECTION 9.04.     Successors and Assigns.     (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by Holdings or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)(i)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loans by a Lender to an Affiliate of such Lender or an Approved Fund corresponding with such Lender.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment by a Lender to an Affiliate thereof or Approved Fund corresponding therewith, or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with

CH1 5547448v.28

respect to such assignment is delivered to the Administrative Agent) shall not be less than the lesser of $5,000,000 and the remaining amount of such Lender's Term Loans or Term Loan Commitment, unless the Administrative Agent otherwise consents;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)    each assignee shall be a commercial bank, an insurance company, a finance company, a financial institution, a fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person); provided, that none of Holdings, the Borrower, a Subsidiary thereof or an Affiliate thereof shall constitute a permitted assignee under this Agreement; and

(E)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee (i) designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about Holdings, the Borrower, their subsidiaries, their affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and (ii) shall agree to be bound by Section 9.12 hereof.

For the purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue

91

to be entitled to the benefits of Sections 2.11, 2.12, 2.13 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04(b), 2.14(d) or 9.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)(i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.11, 2.12 and 2.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also

shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.14(c) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.11 or 2.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.13 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.13(e) as though it were a Lender.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05.    Survival.  All covenants, agreements, representations and warranties made by Holdings, the Borrower and the Subsidiaries in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.11, 2.12, 2.13 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective

93

successors and assigns.   Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07.    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of Holdings or the Borrower against any of and all the obligations of Holdings or the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

(b)    Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the United States District Court of the Southern District of New York and state courts located in the Borough of Manhattan in New York City, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against Holdings, the Borrower or its properties in the courts of any jurisdiction.

(c)    Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by

CH1 5547448v.28

law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.     **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.     Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.     Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed:

(a)     to its and its Affiliates' directors, partners, members, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential),

(b)     to the extent requested by any regulatory authority,

(c)     to the extent required by applicable laws or regulations or by any subpoena or similar legal process,

(d)     to any other party to this Agreement,

(e)     in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder,

(f)     subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Holdings or the Borrower and its obligations,

(g)    with the consent of Holdings or the Borrower, or

(h)    to the extent such Information

(i)    becomes publicly available other than as a result of a breach of this Section or

(ii)    becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than Holdings or the Borrower.

For the purposes of this Section, "Information" means all information received from Holdings or the Borrower relating to Holdings, the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings or the Borrower; provided that, in the case of information received from Holdings or the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Notwithstanding anything herein to the contrary and for the avoidance of doubt, each Lender shall be permitted to disclose to its investors, or to any potential investors of such Lender, in the ordinary course of its business information of the type it typically discloses, which may include, among other things, the amount, nature and material terms of the Loan, the material terms of other Loan Documents, interests rates and returns, top-line financial information (revenue, EBITDAM, etc.) and the occurrence and cause of any Default or Event of Default.

Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, AND THEIR RESPECTIVE RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY HOLDINGS, THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER AND THEIR AFFILIATES, THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES) AND ITS SECURITIES, ACCORDINGLY, EACH LENDER REPRESENTS TO HOLDINGS, THE BORROWER, AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT

CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

SECTION 9.13.    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies each of Holdings and the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each of Holdings and the Borrower, which information includes the name and address of Holdings and the Borrower and other information that will allow such Lender to identify Holdings and the Borrower in accordance with the Act.  Such information shall also be made available for the Subsidiaries.

SECTION 9.14.    Subordination of Intercompany Indebtedness.  Each of Holdings and the Borrower agrees that any and all claims of Holdings or the Borrower against any Credit Party with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Obligations, or against any of its property shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Obligations; provided that, and not in contravention of the foregoing, so long as no Event of Default has occurred and is continuing, each of Holdings and the Borrower may make loans to and receive payments in the ordinary course with respect to such Intercompany Indebtedness from each such guarantor, including, the Credit Parties, to the extent permitted by the terms of this Agreement and the other Loan Documents.  Notwithstanding any right of Holdings or the Borrower to ask, demand, sue for, take or receive any payment from any guarantor, including the Credit Parties, all rights, liens and security interests of Holdings or the Borrower, whether now or hereafter arising and howsoever existing, in any assets of any such guarantor shall be and are subordinated to the rights of the Holders of Obligations in those assets.  Neither Holdings nor the Borrower shall have any right to possession of any such asset or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until all of the Obligations (other than contingent indemnity obligations) shall have been fully paid and satisfied (in cash) and all financing arrangements pursuant to any Loan Document among Holdings, the Borrower and the Holders of Obligations (or any affiliate thereof) have been terminated.  If all or any part of the assets of any such guarantor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such guarantor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such guarantor is dissolved or if substantially all of the assets of any such guarantor are sold, then, and in any such event (such events being herein referred to as an "Insolvency Event"), any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any Indebtedness of any guarantor, including the Credit Parties, to Holdings or the Borrower ("Intercompany Indebtedness") shall be paid or delivered directly to the Administrative Agent for application on any of the Obligations, due or to become due, until such Obligations (other than contingent indemnity obligations) shall have first been fully paid and satisfied (in cash).  Should any payment, distribution, security or instrument or proceeds thereof be received by Holdings or the Borrower upon or with respect to the Intercompany Indebtedness after an Insolvency Event prior to the satisfaction of all of the Obligations (other than contingent

indemnity obligations) and the termination of all financing arrangements pursuant to any Loan Document among Holdings, the Borrower and the Holders of Obligations (and their Affiliates), Holdings and the Borrower shall receive and hold the same in trust, as trustee, for the benefit of the Holders of Obligations and shall forthwith deliver the same to the Administrative Agent, for the benefit of the Holders of Obligations, in precisely the form received (except for the endorsement or assignment of Holdings or the Borrower where necessary), for application to any of the Obligations, due or not due, and, until so delivered, the same shall be held in trust by Holdings or the Borrower, as applicable, as the property of the Holder of Obligations.  If Holdings or the Borrower fails to make any such endorsement or assignment to the Administrative Agent, the Administrative Agent or any of its officers or employees are irrevocably authorized to make the same.  Each of Holdings and the Borrower agrees that until the Obligations (other than the contingent indemnity obligations) have been paid in full (in cash) and satisfied and all financing arrangements pursuant to any Loan Document among Holdings, the Borrower and the Holders of Obligations (and their Affiliates) have been terminated, neither Holdings nor the Borrower will assign or transfer to any Person (other than the Administrative Agent) any claim Holdings or the Borrower has or may have against any guarantor, including the Credit Parties.

SECTION 9.15.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate) which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.    Interest Reserve Account.  Amounts on deposit in the Interest Reserve Account shall initially be used only to support and satisfy Obligations corresponding with such Interest Reserve Account.  No amount on deposit in the Interest Reserve Account shall be used to repay Obligations that are not tied to such Interest Reserve Account without the consent of the Lenders until such time as all Obligations that correspond with such account have been paid.  Subsequent to such satisfaction, any amounts remaining on deposit in such an account shall be applied in accordance with Section 7.4 of the Pledge and Security Agreement.

SECTION 9.17.    Post Closing Requirements.  Notwithstanding anything to the contrary set forth herein or in any other Loan Document, the following may be completed, delivered or otherwise resolved, by the following dates.  The following may occur subsequent to the Effective Date.  The following shall be completed by the Borrower, at its sole cost and expense.  The Administrative Agent, in its sole discretion, may extend any such completion date for any such item.  Failure to complete, deliver or otherwise resolve any of the following by the

date required therefor (as may be extended, if at all, by the Administrative Agent in its sole discretion) shall result in an Event of Default.  The Administrative Agent shall determine, in its sole discretion, whether the following have been completed, delivered or otherwise resolved by the dates required therefor.  In addition, the Administrative Agent, in its sole discretion, may waive any of the following.

| Action Item | Completion Date therefor |
|---|---|
| Delivery of written acknowledgement by Miami-Dade County (or other applicable Governmental Authority) confirming the Administrative Agent's second mortgage on real property on which Miami-Dade County (or other applicable Governmental Authority) holds a first mortgage | Within sixty (60) days of the Effective Date. |
| The Borrower shall purchase and accept fee simple title to that certain 8.7 acre parcel of real property currently owned by Miami-Dade County and adjacent to the Miami Jai-Alai Facility ("County Property") in accordance with the terms and conditions of that certain Settlement Agreement as to Parcel No. 155 and Parcel No. 155 TCE, dated as of February 3, 2009 by and between Miami-Dade County and Borrower.  Immediately following such transfer of the County Property to Borrower, Borrower shall (i) execute and deliver in favor of Administrative Agent an amendment to the Mortgage encumbering the Miami Jai-Alai Facility spreading the lien of such Mortgage (in form and substance acceptable to Administrative Agent in its sole discretion) to include the County Property (the "Mortgage Spreader"); and (ii) cause the Title Insurer (as defined in Disbursement Agreement) to issue an endorsement (in form and substance acceptable to Administrative Agent in its sole discretion) to the Title Policies insuring the County Property and the first lien position of the Mortgage Spreader. | Within sixty (60) days of the Effective Date. |
| Delivery to the Administrative Agent by Borrower of (i) confirmation of, along with copies of all executed documents in connection with, the Administrative Agent's first lien mortgage on all of that certain real property | Within sixty (60) days of the Effective Date. |

99

| | |
|---|---|
| commonly known as Tara Club Estates located in Loganville, Georgia and owned in fee simple by Tara Club Estates, Inc. (the "Tara Land"), (ii) a title commitment issued by Title Insurer (as defined in Disbursement Agreement) and an ALTA survey acceptable to the Administrative Agent with regards to the Tara Land, (iii) the title policy issued by the Title Insurer in favor of Administrative Agent in form and substance acceptable to Administrative Agent in its sole discretion insuring the first lien position of the Tara Estates Mortgage. | |
| Delivery to the Administrative Agent by Borrower or Holdings of irrevocable account control agreements for any deposit accounts held by any Credit Party or Subsidiary thereof that are not (i) subject to an account control agreement in favor of the Administrative Agent as of the date hereof or (ii) Excluded Assets (such account control agreements, the "Additional Account Control Agreements"). All Additional Account Control Agreements shall be springing blocked account control agreements in form and substance acceptable to the Administrative Agent and shall be accompanied by an acknowledgment by the bank where the applicable deposit account is located of the Lien of the Administrative Agent on such account and of irrevocable instructions to wire all amounts collected therein to an account designated by the Administrative Agent upon the notice of the Administrative Agent.  Concurrently with the delivery of the Additional Account Control Agreements, Borrower or Holdings shall also provide evidence in form and substance satisfactory to the Administrative Agent describing each deposit account not subject to an account control agreement in favor of the Administrative Agent as of the date hereof, such evidence with respect to each deposit account to include, without limitation, the following information: (i) the holder of each deposit account; (ii) the amount of cash on deposit in each deposit account; (iii) the | Within ten (10) days of the Effective Date. |

| corporate purpose to which each deposit account is being used; (iv) the name, location and contact information for the bank where each deposit account is located; and (v) in the event a deposit account is an Excluded Asset, the reason such deposit account should be considered an Excluded Asset. | |
|---|---|

# ARTICLE X

## GAMING

SECTION 10.01.    Restrictions Under Gaming Laws and Liquor Laws. Notwithstanding any other provision of this Agreement or any other Loan Document to the contrary, all rights, remedies and powers provided in this Agreement and the other Loan Documents, including with respect to the Collateral, may be exercised only to the extent, and in the manner, that the exercise thereof does not violate any applicable Gaming Laws and Liquor Laws and only to the extent that all approvals required for the exercise thereof, including prior approvals, are obtained from the requisite Gaming Authorities and Liquor Authorities.  In addition, all provisions of this Agreement and the other Loan Documents, including with respect to the Collateral, are intended to be subject to all applicable mandatory provisions of the Gaming Laws and Liquor Laws and to be limited solely to the extent necessary to not render the provisions of this Agreement and the other Loan Documents invalid or unenforceable, in whole or in part.  The Lenders and the Administrative Agent agree and confirm that they have not taken and do not intend to take any interest in any Excluded Asset owned by Holdings, the Borrower or any Affiliate thereof.

The remainder of this page is intentionally blank.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FLORIDA GAMING CENTERS, INC., as the Borrower

By _____
    Name: William B. Collett Jr
    Title: C.E.O.

FLORIDA GAMING CORPORATION, as Holdings

By _____
    Name: William B. Collett Jr
    Title: CEO.

ABC FUNDING, LLC, individually and as Administrative Agent

By _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FLORIDA GAMING CENTERS, INC., as the Borrower

By _____

   Name:

   Title:

FLORIDA GAMING CORPORATION, as Holdings

By _____

   Name:

   Title:

ABC FUNDING, LLC, individually and as Administrative Agent

By _____

   Name:  Thomas Roberts

   Title:  Managing Director

SUMMIT PARTNERS SUBORDINATED
DEBT FUND IV-A, L.P., as a Lender
By: Summit Partners SD IV, L.P. Its General Partner
   By: Summit Partners SD IV, LLC. Its General Partner

By _____

Name: Thomas Roberts

Title: Member


SUMMIT PARTNERS SUBORDINATED
DEBT FUND IV-B, L.P., as a Lender
By: Summit Partners SD IV, L.P. Its General Partner
   By: Summit Partners SD IV, LLC. Its General Partner

By _____

Name: Thomas Roberts

Title: Member

CANYON VALUE REALIZATION FUND, L.P.,
as a Lender
    By: Canyon Capital Advisors LLC, its
    Investment Advisor

By  _____
Name:
Title:    **Mitchell R. Julis**

       **Authorized Signatory**

FS INVESTMENT CORPORATION, as a Lender

By: GSO / Blackstone Debt Funds
Management LLC as Sub-Advisor

By _____

Name:

Title:    Daniel H. Smith
          Authorized Signatory

## SCHEDULE 1.01

### PERMITTED CORPORATE EXPENSES

| Item | During Construction (2),(3) | Year 1 (Annual) |
|---|---:|---:|
| Consulting Agreement (1) | $0 | $300,000 |
| Auto Expense | 18,933 | 28,400 |
| Salaries | 84,000 | 126,000 |
| Office Expenses | 48,000 | 72,000 |
| Director Fees | 48,000 | 72,000 |
| Travel | 64,000 | 192,000 |
| Public Company costs | 30,000 | 45,000 |
| Professional Fees | 148,333 | 445,000 |
| Insurance | 24,000 | 36,000 |
| Misc. | 54,733 | 22,500 |
| **Total before Interest Exp. & Dividends** | **$520,000** | **$1,338,900** |
| Interest and/or Preferred Dividends | 0 | 498,600 |
| **Total Permitted Corporate Expenses** | **$520,000**  (4) | **$1,837,500** |

(1) Assumes only base line covenants are met, however, if certain financial performance is achieved based on the "No Hialeah" scenario, Consulting Agreement payments are permitted to increase to $450,000.

(2) Applicable for any month ending prior to the end of the first full fiscal quarter to occur after the quarter in which the Opening Date occurs.

(3) Assumes 8 months of construction.

(4) Capped at $65,000 per month during construction.

## SCHEDULE 2.01(a)

## TERM LOAN COMMITMENTS

| LENDER | TERM LOAN COMMITMENT |
|---|---|
| SUMMIT PARTNERS SUBORDINATED DEBT FUND IV-A, L.P. | $30,806,666.65 |
| SUMMIT PARTNERS SUBORDINATED DEBT FUND IV-B, L.P. | $13,193,333.35 |
| CANYON VALUE REALIZATION FUND, L.P. | $20,000,000.00 |
| FS INVESTMENT CORPORATION | $23,000,000.00 |
| **AGGREGATE TERM LOAN COMMITMENT** | $87,000,000.00 |

**SCHEDULE 2.01(b)**

**MAIN CASH ACCOUNT REQUIREMENTS:**

**Permitted Uses of Initial Deposits to Main Cash Account**

|  | Amount |
|---|---|
| **Expected Initial Deposit to Main Cash Account** | **$479,117.39** |
| Permitted Uses of Main Cash Account: | |
| Pre-funding of Projected Operating Losses (1) | 479,117.39 |

(1) Total projected operating losses for construction period equal to $2,061,002. The initial deposit into the Main Cash Account is projected to fund such operating losses for April 2011, May 2011 and a portion of June 2011. Incremental funding of losses for future months during construction to be funded at a later stage in connection with disbursement requests.

**SCHEDULE 3.01**

**SUBSIDIARIES**

| Credit Party | Owners | Subsidiaries | Jurisdiction of Incorporation or Organization | Class of Stock | Authorized Shares | Issued and Outstanding Shares | Unissued and Unreserved Shares |
|---|---|---|---|---|---|---|---|
| Freedom Holding, Inc. | W. Bennett Collett, W. Bennett Collett, Jr. and Hurd Family Partnership, L.P. | Florida Gaming Corporation | Delaware | Common | 1,000 | 954.30 | 45.7 |
| Florida Gaming Corporation | Freedom Holding, Inc. | Florida Gaming Centers, Inc. and Tara Club Estates, Inc. | Delaware | Common | 7,500,000 | 3,888,959 | 1,870,624 |
| | | | | Class B Convertible Preferred Stock | 50 | 45 | 5 |
| | | | | Class A Convertible Preferred Stock | 1,200,000 | 27,756 | 1,172,244 |
| | | | | Class AA Convertible Preferred Stock | 5,000 | 5,000 | 0 |
| | | | | Class F Convertible Preferred Stock | 2,500 | 2,000 | 500 |
| Florida Gaming Centers, Inc. | Florida Gaming Corporation | | Florida | Common | 2,000 | 1,000 | 1,000 |
| Tara Club Estates, Inc. | Florida Gaming Corporation | | Georgia | Common | 10,000,000 | 2,084,000 | 7,916,000 |

LOULibrary 1040148v2

## SCHEDULE 3.05

## OWNED AND LEASED PROPERTIES

## Owned Property

| Owner | Folio # | Street Address | Other |
|-------|---------|----------------|-------|
| City National Bank of Florida | 01-3129-015-0010 | 3500 NW 37th Ave., Miami, FL 33142 | Fronton Heights Addn PB 90-20, City of Miami |
| Florida Gaming Centers, Inc. | 01-3129-015-0020 | 3500 NW 37th Ave., Miami, FL 33142 | Fronton Heights Addn PB 90-20, Dade County |
| Florida Gaming Centers, Inc. and City National Bank of Florida | 30-3128-014-1910 | 3695 NW 35th St., Miami, FL 33142 | Melrose Hgts 5th Sec. PB 17-22, Lots 24-29 BLK 71 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | 30-3128-014-1970 | 3695 NW 35th St., Miami, FL 33142 | Melrose Hgts 5th Sec. PB 17-22, Lot 30, BLK 71 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | 30-3128-014-1980 | 3695 NW 35th St., Miami, FL 33142 | Melrose Hgts, 5th Sec. PB 17-22, Lot 31, BLK 71 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | 30-3128-014-1990 | 3695 NW 35th St., Miami, FL 33142 | Melrose Hgts 5th Sec. PB 17-22, Lot 32, BLK 71 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | 30-3128-014-2000 | 3601 NW 35th St., Miami, FL 33142 | Melrose Hgts 5th Sec. PB 17-22, Lots 33-36, BLK 71 |
| Florida Gaming Centers, Inc. | 2313-233-0001-000/0 | 1750 S. Kings Hwy., Ft. Pierce, FL 34945 | |
| Florida Gaming Corporation | 2313-233-0002-000/7 | 1776 Kings Hwy., Ft. Pierce, FL 34945 | |
| Florida Gaming Corporation | 2313-233-0003-000/4 | 1790 Kings Hwy, Ft. Pierce, FL 34945 | |
| Florida Gaming Centers, Inc. | 2313-322-0012-000/3 | 0 Kings Hwy, Ft. Pierce, FL 34945 | |
| Florida Gaming Corporation | 2313-323-0000-000/9 | 0 Kings Hwy, Ft. Pierce, FL 34945 | |
| Florida Gaming Centers, Inc. | | Lots V/#25B, 26, 27, 28, 29, 30 at Tara Club Estates | |

LOULibrary 1040148v2

| | | | |
|---|---|---|---|
| Freedom Financial Corporation | | Building and Lot, SR 64, Milltown, IN | |
| Freedom Financial Corporation | | 4019 Marquette Dr., Floyds Knobs, IN 47119 | |

## Leased Property

| Lessee | Street Address | Other |
|---|---|---|
| Florida Gaming Corporation | 2669 Charlestown Road, Ste. D, New Albany, IN 27150 | |

LOULibrary 1040148v2

**SCHEDULE 3.06**

**DISCLOSED MATTERS**

1       West Flagler Associates et. al. v. Florida Gaming Centers, Inc., Miami-Dade County Circuit Court, Action No. 2009-91853-CA-01.

2.      Isle of Capri Casinos v. Florida Gaming Corporation et. al., Palm Beach County Circuit Court, Action No. 50-2010CA004440xxxx MB.

3.      Isle of Capri Casinos v. Florida Gaming Corporation et. al., St. Luci County Circuit Court, Action No. 56-2010CA001462.

4.      Pending Fort Pierce Jai Alia employee Molz-Lara discrimination charge.

5.      CCLN, LLC v. Florida Gaming Corporation, Miami-Dade County Circuit Court, Action No. 2011-4658-CA-01.

6.      Patricia D. Malcom, Walton County Tax Commissioner v. Tara Club Estates, Inc., Walton County Superior Court, Action No. 190017, judgment in the amount of $486.52.

7.      Perez v. Florida Gaming Centers, Inc., et. al, Miami-Dade County Circuit Court, Action No. 2010-61585-CA-01.

8.      Dames v. Florida Gaming Centers, Inc., Miami-Dade County Circuit Court, Action No. 2011-5272-CA-01.

**SCHEDULE 3.07**

**COMPLIANCE WITH LAWS AND AGREEMENTS; NO BURDENSOME RESTRICTIONS**

NONE

LOULibrary 1040148v2

# SCHEDULE 3.17

# INSURANCE

General Liability (contractors)

- Commercial General Liability coverage including Products/Completed Operations Liability with limits not less than $1,000,000 Per Occurrence for bodily injury and property damage liability and a $2,000,000 Annual Aggregate. Products/Completed Operations Liability must have a minimum aggregate of $2,000,000. A per-project aggregate or separate project-specific policy is required.
    - If contractor's GL policy has deductible; recommend that max deductible permitted is $15,000.
    - Contractors Insurance must be primary and non-contributory with any and all other insurance maintained by or otherwise afforded to ABC Funding, LLC.
    - Contractor shall maintain GL coverage for itself and all additional insureds for the duration of the project and must maintain Completed Operations coverage for itself and each additional insured for at least 3 years after project completion.

- Automobile Liability coverage with limits not less than $1,000,000 of Combined Single Limit for bodily injury and property damage liability and $1,000,000 for Uninsured Motorist Liability limit and Underinsured Motorist Liability limit.

- Excess or Umbrella Liability coverage with limits not less than $25,000,000 per Occurrence/Aggregate. A higher limit may be required at the discretion of ABC Funding, LLC.

- Workers Compensation coverage must be carried, including Employers Liability coverage, at not less than $500,000 per Accident, $500,000 per Disease and $500,000 per Policy Limit.

- Professional Liability insurance may be required by ABC Funding, LLC with limits not less than:
    - $2,000,000 per claim/aggregate for Architects and Engineers.
    - $1,000,000 per claim/aggregate for General Contractors.

- General Contractors, or Sub-Contractors working with lower tier Sub-Contractors, are responsible to enforce the above insurance requirements and said General Contractor, or higher tiered Contractor shall be named as "Additional Insured" on all of the above coverages with the only exception being Employers Liability and Professional Liability.

| Insurance to be Purchased during Construction | |
|---|---|
| Coverage | Minimum Amount Required |
| Travelers Primary Flood | $500,000 |
| Existing Miami Building (w. Full Wind/Flood) | 25,000,000 |
| Builder's Risk* | 27,150,000 |

*Including $10.0 million in soft costs for interest on term loan.

LOULibrary 1040148v2

**SCHEDULE 4.01(n)**

**INDEBTEDNESS TO BE REPAID ON THE EFFECTIVE DATE**

| Debt Instrument | Issuance Date | Maturity Date | Initial Principal | Interest Rate | Proj. Balance (4/25/11) |
|---|---|---|---|---|---|
| Rittvo Unsecured Note | 11/14/10 | 12/31/11 | $25,000.00 | 3.00% | $25,000.00 |
| Rittvo Unsecured Note - Accrued Interest | | | | | 332.76 |
| Scheible Unsecured Note | 11/14/10 | 12/31/11 | 25,000.00 | 3.00% | 25,000.00 |
| Scheible Unsecured Note - Accrued Interest | | | | | 332.76 |
| Sodl Unsecured Note | 11/14/10 | 12/31/11 | 25,000.00 | 3.00% | 25,000.00 |
| Sodl Unsecured Note - Accrued Interest | | | | | 332.76 |
| **Total** | | | | | **$75,998.28** |

Note: Assumes debt is repaid out of the intial funding, currently projected to be 4/25/11.

LOULibrary 1040148v2

## SCHEDULE 4.01(x)

## MODIFIED INDEBTEDNESS

| Debt Instrument | Issuance Date | Original Mat. Date | Extended Mat. Date | Initial Principal | Interest Rate | Balance (12/31/10) | Proj. Balance (4/25/11) |
|---|---|---|---|---|---|---|---|
| Freedom Financial (1) | 4/25/11 | 10/25/16 | 10/15/16 | $1,905,000.00 | 6.00% | N/A | $1,905,000.00 |
| Freedom Financial - Accrued Interest | | | | | | N/A | 0.00 |
| Freedom Holding Note* | 9/1/09 | 9/1/10 | 10/15/16 | 1,322,873.73 | 10.00% | 1,322,573.73 | 1,322,573.73 |
| Freedom Holding Note - Accrued Interest* | | | | | | 286,612.81 | 328,282.94 |
| Florida Lemark Note* | 12/9/10 | 1/31/11 | 10/15/16 | 446,000.00 | 13.00% | 446,000.00 | 446,000.00 |
| Flroida Lemark Note - Accrued Interest* | | | | | | 3,209.75 | 21,477.42 |
| Neiman Note* | 12/3/10 | 1/1/12 | 10/15/16 | 125,000.00 | 15.00% | 125,000.00 | 125,000.00 |
| Neiman Note - Accrued Interest* | | | | | | 705.65 | 3,700.44 |
| Stuckert / Howell | | 12/31/09 | 10/15/16 | | 24.00% | 1,000,000.00 | 1,000,000.00 |
| Stuckert / Howell - Accrued Interest | | | | | | 254,643.84 | 330,260.28 |
| **Total** | | | | | | **$3,438,745.78** | **$5,482,294.81** |

Note: Balances at 4/25/11 represent amounts to be modified at the projected closing date.

* Indicates note that is currently held at Florida Gaming Centers, but must be moved to Florida Gaming Corp., subordinated and extended 6 months after the Maturity Date.

(1) Terms in accordance with Promissory Note dated 4/25/11; until execution of Promissory Note, amounts booked as accounts receivable.

LOULibrary 1040148v2

## SCHEDULE 5.01(a)

## ACCEPTABLE ACCOUNTANTS

1. Ernst & Young LLP
2. Deloitte & Touche LLP
3. PricewaterhouseCoopers LLP
4. KPMG LLP
5. McGladrey & Pullen, LLP
6. BDO Seidman, LLP

## SCHEDULE 5.05

**Insurance to be Purchased during Construction**

| Coverage | Minimum Amount Required |
|---|---|
| Travelers Primary Flood | $500,000 |
| Existing Miami Building (w. Full Wind/Flood) | 25,000,000 |
| Builder's Risk* | 27,150,000 |

*Including $10.0 million in soft costs for interest on term loan.

**Insurance to be Purchased on or Prior to Opening Date**

| Coverage | Minimum Amount Required |
|---|---|
| Slot Machines | $20,000,000 |
| Umbrella (must overlay liquor liability) | 50,000,000 |
| General Liability | Varied |
|     General Aggregate | 3,000,000 |
|     Liquor Liability | 1,000,000 |
|     Products/Completed Operations | 3,000,000 |
|     Personal & Advertising Injury | 1,000,000 |
|     Each Occurrence | 1,000,000 |
|     Employee Benefits Liability | 1,000,000 |
| General Liability - Valet Parking | Varied |
|     General Aggregate | 2,000,000 |
|     Products/Completed Operations | 2,000,000 |
|     Personal & Advertising Injury | 1,000,000 |
|     Each Occurrence | 1,000,000 |
|     Garage Dealers | 5,000,000 |
| 401K Bond | 120,000 |
| Boiler & Machinery | 25,000,000 |
| Workers Compensation - Indiana | 500,000 |
| Workers Compensation - Florida | 500,000 |
| Directors & Officers / EPLI | 5,000,000 |
| Crime | 500,000 |
|     Employee Dishonesty | 500,000 |
|     Forgery/Alteration | 500,000 |
|     Theft Disappearance and Destruction – In | 500,000 |
|     Theft Disappearance and Destruction – Out | 500,000 |
|     Computer Fraud | 500,000 |
| Pari-Mutuel Bonds - Ft. Pierce | 100,000 |
| Pari-Mutuel Bonds - Miami | 100,000 |
| Pari-Mutuel Bonds - Summer | 50,000 |
| Slot Machine Bond | 100,000 |

LOULibrary 1040148v2

## SCHEDULE 5.08(a)

## SOURCES AND USES

**Sources & Uses**
*($ in Thousands)*

| Sources | | Uses | |
|---|---|---|---|
| Senior Credit Facility | $85,260 | Hard Construction Costs (excl. Develop. Costs) | $16,073 |
| Contractor Note | 554 | Construction Contingency | 1,607 |
| Free Cash Flow from Operations | 1,000 | Architecture, Engineering & Contractor Fees | 1,643 |
| Accounts Payable to Legal Counsel | 95 | Permit Fees | 300 |
| | | Gaming FF&E | 14,450 |
| | | Count Room Equipment / Floor Kiosks | 375 |
| | | Gaming Related Systems | 4,600 |
| | | Other Systems | 195 |
| | | Casino Signage | 330 |
| | | Owner Supplied Furniture (bars, restaurant, etc.) | 25 |
| | | Funding of Year 1 Licensing Fees | 2,750 |
| | | Performance Bond Premium for Payment of Gaming Taxes (2) | 162 |
| | | County Property Downpayment | 1,339 |
| | | Street Remediation | 1,000 |
| | | GMP Performance Bond Premium | 180 |
| | | Insurance Expense | 943 |
| | | Construction Consultant - Merritt & Harris | 65 |
| | | Owner's Rep | 100 |
| | | Pre-Opening Expenses | 1,337 |
| | | Operating Cash & Working Capital | 2,577 |
| | | Subtotal of Project Budget excl. Financing Costs | $50,051 |
| | | | |
| | | Repayment of Bridge Loan and Accrued Interest | $1,026 |
| | | Repayment of Isle Note (plus accrued interest, fees & payables) | 4,525 |
| | | Repayment of Hamilton State Note | 46 |
| | | Repayment of Humane Society Note | 210 |
| | | 1st Mortgage Payment | 1,060 |
| | | Repayment of Other ST Debt | 128 |
| | | Reserve for Repayment of PAC Contribution Note | 3,550 |
| | | Funding of Est. Losses during Construction | 2,061 |
| | | Funding of Aging Payables | 843 |
| | | Property Taxes | 1,020 |
| | | Subtotal of Additional Funding Needs | $14,470 |
| | | | |
| | | Pre-Funded Interest Reserve (3) | $13,740 |
| | | Completion Guarantee | 3,000 |
| | | Estimated Transaction Fees & Expenses | 5,648 |
| | | Subtotal of Financing Costs | $22,388 |
| | | | |
| **Subtotal of Sources before County Financing** | **$86,909** | **Subtotal of Uses before Balance of County Property** | **$86,909** |
| | | | |
| Miami-Dade County Loan (1) | $12,054 | Balance of County Property Acquisition | $12,054 |
| | | | |
| **Total Sources** | **$98,963** | **Total Uses** | **$98,963** |

(1) Dade County Loan is secured only by purchased real estate and will not have a lien on any other asset of the Borrower or its Affiliates.
(2) Represents premium to post the required $2.0mm performance bond for the guarantee of slot tax payments to the State.
(3) Assumed to cover interest on the Senior Credit Facility for the 8-month construction schedule, plus 4 months post-opening reserve.

LOULibrary 1040148v2

# SOURCES AND USES (cont'd)

| Proceeds from Senior Credit Facility | | |
|---|---|---|
| **Loan Amount net of OID** | | **$85,260,000.00** |
| Less: 2.0% Construction Monitoring Fee to Admin Agent | | (1,740,000.00) |
| Less: Servicing Fee to Admin Agent | | (12,500.00) |
| Less: Admin Agent Expenses | | (35,000.00) |
| Less: Sidley Austin LLP Legal Expenses | | (475,000.00) |
| Less: Blank Rome LLP Legal Expenses | | (100,000.00) |
| Less: Rutledge Ecenia, Purnell & Hoffman, P.A. Legal Expenses | | (51,942.59) |
| Less: Ernst & Young Audit Fee | | (29,700.00) |
| Less: Merritt & Harris Construction Consultant Fee | | (19,816.15) |
| Less: Admin Agent Insurance Consultant Fee | | (3,500.00) |
| **Net Funding Amount** | | **$82,792,541.26** |
| | | |
| *Initial Funding* | | |
| GMP Performance Bond Premium | $180,000.00 | |
| First American - Title Insurance & Mortgage Tax | 569,309.75 | |
| Repayment of Short-term Debt | 75,998.28 | |
| Fort Pierce Zoning Letter | 117,665.66 | |
| Hurd Family Partnership, L.P. | 122,218.67 | |
| Development Fees to MCM | 25,000.00 | |
| **Main Cash Account (1)** | **479,117.39** | |
| **Total Initial Funding (to Borrower & Direct Payments Made)** | | **$1,569,309.75** |
| **Interest Reserve Account** | | **13,740,000.00** |
| **Contingency Reserve Account** | | **1,607,303.40** |
| **Completion Reserve Account** | | **3,000,000.00** |
| **Slot License Account** | | |
| Licensing Payment | $2,500,000.00 | |
| Regulatory Fee for Problem Gambling | 250,000.00 | |
| $2.0 million Performance Bond Premium | 162,080.00 | |
| Inter-Track Wagering Payables | 101,371.69 | |
| **Total Slot License Account** | | **$3,013,451.69** |
| **Holdback Account (for Slot License Date Payments) (2)** | | **15,529,957.15** |
| **Construction Funds Account** | | **44,332,519.27** |
| **Total Funding Uses** | | **$82,792,541.26** |

(1) Total projected operating losses for construction period equal to $2,061,002.  The initial deposit into the Main Cash Account is
   projected to fund such operating losses for April 2011, May 2011 and a portion of June 2011.  Incremental funding of losses for future
   months during construction to be funded at a later stage in connection with disbursement requests.

(2) Includes reserve for PAC Contribution Note.

LOULibrary 1040148v2

**SCHEDULE 5.08(b)**

**INDEBTEDNESS TO BE REPAID UPON RECEIPT OF SLOT LICENSES**

| Debt Instrument | Issuance Date | Maturity Date | Initial Principal | Interest Rate | Proj. Balance (5/4/11) |
|---|---|---|---|---|---|
| AGS Bridge Loan | 1/21/11 | 3/31/11 | $1,000,000.00 | 8.00% | $1,000,000.00 |
| AGS Bridge Loan - Accrued Interest | | | | | 26,088.34 |
| Hamilton State Note | 12/28/06 | 11/17/09 | 51,317.52 | 8.75% | 36,690.60 |
| Hamilton State Note - Accrued Interest (1) | | | | | 9,718.23 |
| Humane Society | 2/22/09 | 2/1/11 | 200,000.00 | 18.00% | 200,000.00 |
| Humane Society - Accrued Interest (1) | | | | | 9,964.18 |
| Isle of Capri | 12/31/08 | 12/31/09 | 3,000,000.00 | 18.00% | 3,000,000.00 |
| Isle of Capri - Accrued Interest (2) | | | | | 1,050,205.41 |
| Nurmi Mortgage Note | 12/11/09 | 12/11/11 | 500,000.00 | 13.00% | 985,000.00 |
| Nurmi Mortgage Note - Accrued Interest (3) | | | | | 75,461.65 |
| Phoenix Unsecured Note | 12/17/10 | 12/31/11 | 50,000.00 | 10.00% | 50,000.00 |
| Phoenix Unsecured Note - Accrued Interest | | | | | 1,904.16 |
| **Total** | | | | | **$6,445,032.57** |

(1) Includes legal fees of lender due to default.

(2) Balance represents only accrued interest portion, excludes accounts payable of $474,661.38 (of which $354,743.23 is related to simulcast fees and $119,918.15 is related to collection fees & expenses per payoff schedule provided by Isle of Capri Casinos, Inc. on 3/28/11).

(3) Represents estimated accrued interest since last payment on 10/10/10 through projected receipt of slot licenses of 5/4/11.

## SCHEDULE 6.01

## EXISTING INDEBTEDNESS

| Debt Instrument | Issuance Date | Maturity Date | Initial Principal | Interest Rate | Balance (12/31/10) | Proj. Balance (3/31/11) | Proj. Balance (4/25/11) | Proj. Balance (5/4/11) |
|---|---|---|---|---|---|---|---|---|
| Freedom Financial (1) | 4/25/11 | 10/25/16 | $1,905,000.00 | 6.00% | N/A | N/A | $1,905,000.00 | $1,905,000.00 |
| Freedom Financial - Accrued Interest | | | | | N/A | N/A | 0.00 | 2,818.36 |
| Freedom Holding Note* | 9/1/09 | 9/1/10 | 1,322,873.73 | 10.00% | 1,322,573.73 | 1,322,573.73 | 1,322,573.73 | 1,322,573.73 |
| Freedom Holding Note - Accrued Interest* | | | | | 286,612.81 | 319,224.22 | 328,282.94 | 331,544.08 |
| Florida Lemark Note* | | 1/31/11 | 446,000.00 | 13.00% | 446,000.00 | 446,000.00 | 446,000.00 | 446,000.00 |
| Flroida Lemark Note - Accrued Interest* | | | | | 3,209.75 | 17,506.19 | 21,477.42 | 22,907.07 |
| Miami Dade County | 4/1/09 | 4/1/24 | 3,013,586.00 | 7.25% | 2,827,477.18 | 2,796,414.41 | 2,786,447.72 | 2,783,116.66 |
| Miami Dade County - Accrued Interest | | | | | 34,193.29 | 32,834.67 | 32,834.67 | 32,834.67 |
| Neiman Note* | 12/3/10 | 1/1/12 | 125,000.00 | 15.00% | 125,000.00 | 125,000.00 | 125,000.00 | 125,000.00 |
| Neiman Note - Accrued Interest* | | | | | 705.65 | 3,049.40 | 3,700.44 | 3,931.45 |
| Stuckert / Howell | | 12/31/09 | | 24.00% | 1,000,000.00 | 1,000,000.00 | 1,000,000.00 | 1,000,000.00 |
| Stuckert / Howell - Accrued Interest | | | | | 254,643.84 | 313,821.92 | 330,260.28 | 336,178.09 |
| AGS Bridge Loan | 1/21/11 | 3/31/11 | 1,000,000.00 | 8.00% | 0.00 | 1,000,000.00 | 1,000,000.00 | 1,000,000.00 |
| AGS Bridge Loan - Accrued Interest | | | | | 0.00 | 15,123.29 | 24,115.72 | 26,088.34 |
| Hamilton State Note | 12/28/06 | 11/17/09 | 51,317.52 | 8.75% | 36,690.60 | 36,690.60 | 36,690.60 | 36,690.60 |
| Hamilton State Note - Accrued Interest (2) | | | | | 4,924.02 | 9,414.95 | 9,637.95 | 9,718.23 |
| Humane Society | 2/22/09 | 2/1/11 | 200,000.00 | 18.00% | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 |
| Humane Society - Accrued Interest (2) | | | | | 2,333.34 | 8,595.00 | 9,601.75 | 9,964.18 |
| Isle of Capri | 12/31/08 | 12/31/09 | 3,000,000.00 | 18.00% | 3,000,000.00 | 3,000,000.00 | 3,000,000.00 | 3,000,000.00 |
| Isle of Capri - Accrued Interest (3) | | | | | 885,986.24 | 999,904.11 | 1,036,890.36 | 1,050,205.41 |
| Nurmi Mortgage Note | 12/11/09 | 12/11/11 | 500,000.00 | 13.00% | 985,000.00 | 985,000.00 | 985,000.00 | 985,000.00 |
| Nurmi Mortgage Note - Accrued Interest (4) | | | | | 29,837.48 | 62,990.00 | 72,304.27 | 75,461.65 |
| Phoenix Unsecured Note | 12/17/10 | 12/31/11 | 50,000.00 | 10.00% | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| Phoenix Unsecured Note - Accrued Interest | | | | | 205.48 | 1,438.36 | 1,780.86 | 1,904.16 |
| Rittvo Unsecured Note | 11/14/10 | 12/31/11 | 25,000.00 | 3.00% | 25,000.00 | 25,000.00 | 25,000.00 | 0.00 |
| Rittvo Unsecured Note - Accrued Interest | | | | | 96.58 | 281.51 | 332.76 | 0.00 |
| Scheible Unsecured Note | 11/14/10 | 12/31/11 | 25,000.00 | 3.00% | 25,000.00 | 25,000.00 | 25,000.00 | 0.00 |
| Scheible Unsecured Note - Accrued Interest | | | | | 96.58 | 281.51 | 332.76 | 0.00 |
| Sodl Unsecured Note | 11/14/10 | 12/31/11 | 25,000.00 | 3.00% | 25,000.00 | 25,000.00 | 25,000.00 | 0.00 |
| Sodl Unsecured Note - Accrued Interest | | | | | 96.58 | 281.51 | 332.76 | 0.00 |
| **Total** | | | | | **$11,570,683.13** | **$12,821,425.37** | **$14,803,596.99** | **$14,756,936.68** |

* Indicates note that is currently held at Florida Gaming Centers, but must be moved to Florida Gaming Corp., subordinated and extended 6 months after the Maturity Date.

(1) Terms in accordance with Promissory Note dated 4/25/11; until execution of Promissory Note, amounts booked as accounts receivable.

(2) Includes legal fees of lender due to default.

(3) Balance represents only accrued interest portion, excludes accounts payable of $474,661.38 (of which $354,743.23 is related to simulcast fees and $119,918.15 is related to collection fees & expenses per payoff schedule provided by Isle of Capri Casinos, Inc. on 3/28/11.

(4) Represents estimated accrued interest since last payment on 10/10/10 through projected receipt of slot licenses of 5/4/11.

LOULibrary 1040148v2

## SCHEDULE 6.02

## EXISTING LIENS

### Notes Payable

| Lienholder | Recording Information | Amount |
|---|---|---|
| Isle of Capri Casinos, Inc. | | $4,050,205.41 |
| H2C | | $347,975.77 |
| Nurmi Properties, LLC | | $1,060,461.65 |
| Hamilton State Bank | | $46,408.83 |

### Delinquent Property Taxes

| | | |
|---|---|---|
| Miami, FL [1] | 2008 | $211,619.29 |
| | 2009 | $184,181.47 |
| | 2010 | $174,543.51 |
| Ft. Pierce, FL [2] | 2008 | $185,029.70 |
| | 2009 | $129,562.66 |
| | 2010 | $135,518.22 |

[1] Balances represent amounts as of 4/13/11 per Miami-Dade County.
[2] Balances represent amounts due if received by 4/29/11 per St. Lucie Tax Collector.

### UCC Financing Statements

| Debtor | Secured Party | Recording Information |
|---|---|---|
| Florida Gaming Centers, Inc. | Isle of Capri Casinos, Inc. | No. 20080978627 |
| Florida Gaming Centers, Inc. | Isle of Capri Casinos, Inc. | No. 20080978628x |
| Florida Gaming Centers, Inc. and City National Bank of Florida as Trustee | Nurmi Properties, LLC and Robinette Investments, LLC | No. 201001778047 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | AGS Capital, LLC | No. 201103963722 |
| Florida Gaming Centers, Inc. and City National Bank of Florida | AGS Capital, LLC | Book 27567, Page 1039 (Fixture Filing) |

### County Tax Liens

| Debtor | Secured Party | Recording Information |
|---|---|---|
| Tara Club Estates, Inc. | Walton County Superior Court | Judgment No. 190017, in the amount of $486.52 |

LOULibrary 1040148v2

## SCHEDULE 6.08

## EXISTING RESTRICTIONS

Miami Jai-Alai Facility:  Those certain restrictions regarding the sale of alcohol set forth in Restrictive Covenant Running with the Land dated October 17, 1977 by Miami Jai-Alai Fronton Inc. and recorded in Miami-Dade County in Book 9900, Page 1251.

# SCHEDULE 6.15

## PRE-OPENING EXPENSES

| Pre-opening Expenses | Staff | Base | Pre-Closing | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-opening Staffing | | | | | | | | | | | | |
| Operations Manager | 1 | $225,000 | | | | | | | | | | |
| Slot Manager | 1 | $100,000 | | | | | $4,166 | $8,333 | $8,333 | $8,333 | $8,333 | $37,498 |
| Finance Director | 1 | $150,000 | | | | | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 62,500 |
| Marketing Director | 1 | $100,000 | | | | | | | | | | |
| Database Manager | 1 | $80,000 | | | | | | | | | | |
| Talent Manager | 1 | $125,000 | | | | | | | 10,415 | 10,415 | 10,415 | 31,245 |
| IT Director | 1 | $150,000 | | | | | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 62,500 |
| Security Director | 1 | $100,000 | | | | | | | | 8,333 | 8,333 | 16,666 |
| Surveillance Director | 1 | $125,000 | | | | | | | 10,415 | 10,415 | 10,415 | 41,660 |
| | | | | | | | | | | | | |
| Staff A - Salaried | 18 | $35,000 | | | | | | | | | 48,462 | 48,462 |
| Staff B - Hourly | 225 | $15,600 | | | | | | | | | 135,000 | 135,000 |
| **Subtotal Pre-opening Wages** | | | $0 | $0 | $0 | $0 | $29,166 | $43,748 | $54,163 | $62,496 | $245,958 | $435,531 |
| | | | | | | | | | | | | |
| Fringe Benefits | | | | | | | 7,292 | 10,937 | 13,541 | 15,624 | 61,490 | 108,883 |
| **Total Pre-opening Wages** | | | $0 | $0 | $0 | $0 | $36,458 | $54,685 | $67,704 | $78,120 | $307,448 | $544,414 |
| | | | | | | | | | | | | |
| Drug Screening/Compliance | | | | | | 3,000 | | 2,000 | 12,500 | 7,500 | | 25,000 |
| **Total Pre-opening Staffing** | | | $0 | $0 | $0 | $3,000 | $36,458 | $56,685 | $80,204 | $85,620 | $307,448 | $569,414 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Pre-opening Staff Activities | Staff | $/Unit | | | | | | | | | | |
| | | | | | | | | | | | | |
| Meals, manuals, t-shirts etc. | 150 | $243 | | | | | | | | | 36,450 | 36,450 |
| Uniforms | 150 | $225 | | | | | | | | | 33,750 | 33,750 |
| | | | | | | | | | | | | |
| Development Fees | | | | 75,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | | 225,000 |
| Related Expenses | | | 20,000 | 9,041 | 10,959 | 10,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 112,500 |
| **Total Pre-opening Staff Activities** | | | $20,000 | $84,041 | $35,959 | $35,000 | $37,500 | $37,500 | $37,500 | $37,500 | $82,700 | $407,700 |
| | | | | | | | | | | | | |
| Supplies - Gaming (In Marketing Budget) | | | | | | | | | | | | |
| New Chip Series | | | | | | | | | | | | |
| Players Club Cards | | | | | | | | | | | | |
| Paper (Boca, etc) | | | | | | | | | | | | |
| **Total Pre-opening Gaming Supplies** | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Forms | | | | | | | | | | 27,500 | 27,500 | 55,000 |
| Supplies - Facility | | | | | | | | | | 12,500 | 12,500 | 25,000 |
| Inventory - F&B | | | | | | | | | | | 50,000 | 50,000 |
| Pre-Opening Marketing | | | | | | 25,000 | 75,000 | 75,000 | 50,000 | 15,000 | 10,000 | 250,000 |
| | | | | | | | | | | | | |
| **Total Pre-opening Expenses** | | | $20,000 | $84,041 | $35,959 | $63,000 | $148,958 | $169,185 | $167,704 | $178,120 | $490,148 | $1,357,114 |

Note: Estimated Working Capital / Minimum Bankroll of $2,500,000 to be replaced with operating cash, and not included in pre-opening expense estimates

LOULibrary 1040148v2

EXHIBIT A

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "<u>Standard Terms and Conditions</u>") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | _____ |
| 2. | Assignee: | _____ |
| | | [and is an Affiliate/Approved Fund of [*identify Lender*] [1]] |
| 3. | Borrower: | Florida Gaming Centers, Inc. |
| 4. | Administrative Agent: | ABC Funding, LLC, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit Agreement dated as of April 25, 2011 by and |

_____

[1] Select as applicable.

*EXHIBIT A*
1

among Florida Gaming Centers, Inc., Florida Gaming
Corporation, the Lenders parties thereto from time to time,
and ABC Funding, LLC, as Administrative Agent

6.       Assigned Interest:

| Aggregate Amount of Term Loan Commitment/Loans for all Lenders | Amount of Term Loan Commitment/Loans Assigned | Percentage Assigned of Term Loan Commitment/Loans |
|---|---|---|
| $ | $ | % |
| $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE
AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF
TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:  _____
        Name:
        Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By:  _____
        Name:
        Title:

CONSENTED TO AND ACCEPTED:

ABC FUNDING, LLC,
as Administrative Agent


By: _____
      Name:
      Title:

## ANNEX 1

### STANDARD TERMS AND CONDITIONS FOR
### ASSIGNMENT AND ASSUMPTION

1. <u>Representations and Warranties</u>.

1.1 <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender (including without limitation, that it is a commercial bank, an insurance company, a finance company, a financial institution, or a fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person)), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest,

fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3. <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

EXHIBIT B-1

FORM OF OPINION OF FROST BROWN TODD LLC, HOLDINGS' AND BORROWER'S
EXTERNAL COUNSEL

Attached.



**Bonita K. Black**
Member
502.568.0216 (t)
502.581.1087 (f)
bblack@fbtlaw.com

April 25, 2011

ABC Funding, LLC, as Administrative Agent
and the below-defined Lenders

> Re:    Credit Agreement dated as of April 25, 2011 (the "Credit Agreement") by and
> among Florida Gaming Centers, Inc., a Florida corporation, as borrower (the
> "Borrower"), Florida Gaming Corporation, a Delaware corporation ("Holdings"),
> the financial institutions from time to time parties thereto (each a "Lender" and
> collectively, the "Lenders") and ABC Funding, LLC, as Administrative Agent
> (the "Administrative Agent"), setting forth the terms and conditions of certain
> loans being made by the Lenders to the Borrower, as guaranteed by Holdings,
> Freedom Holding, Inc., a Delaware corporation ("Freedom Holding"), Tara Club
> Estates, Inc., a Georgia corporation ("Tara") and City National Bank of Florida, a
> national banking corporation, as trustee ("Trustee") of Trust Number 5003471
> under that certain Land Trust Agreement dated January 3, 1979 ("Florida Trust",
> collectively with Holdings, Freedom Holding and Tara, the "Guarantors")

Ladies and Gentlemen:

We have acted as legal counsel to (i) the Borrower, (ii) the Guarantors, and (iii) W.
Bennett Collett, W. Bennett Collett, Jr. and Hurd Family Partnership, L.P. (collectively, the
"Pledgors", collectively with the Borrower and the Guarantors, the "Credit Parties") in
connection with term loans to the Borrower in the original aggregate principal amount of Eighty
Seven Million Dollars ($87,000,000.00) established by each of the Lenders in favor of the
Borrower pursuant to and upon the terms and conditions set forth in the Credit Agreement. This
opinion has been delivered to the Lender pursuant to Section 4.01(c) of the Credit Agreement.
Capitalized terms used herein, unless otherwise expressly defined herein, shall have the
meanings given them in the Credit Agreement.

In connection with such representation, we have examined and are familiar with the
following documents and instruments, each dated as of the date of this letter unless otherwise
noted below:

> 1.    an executed Credit Agreement and executed Term Loan Notes made by the
> Borrower in favor of the Lenders;

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 2

2.    an executed Disbursement Agreement by and among the Borrower and the Administrative Agent (the "Disbursement Agreement");

3.    an executed Credit Party Guaranty by and among the Guarantors and the Administrative Agent;

4.    an executed Pledge and Security Agreement (the "Security Agreement") by and among the Borrower, Holdings, Freedom Holding, Tara and the Administrative Agent in favor of the Lenders, encumbering all assets of the Borrower, Holdings, Freedom Holding, and Tara, as more particularly described therein (including, without limitation, the "Collateral" under and defined therein, the "Pledged Assets");

5.    an executed Holdings Pledge Agreement (the "Holdings Pledge Agreement") by and among Freedom Holding and the Administrative Agent in favor of the Lenders, encumbering certain capital stock of Holdings, as more particularly described therein (the "Pledged Holdings Stock");

6.    an executed Freedom Pledge Agreement (the "Freedom Pledge Agreement") by and among the Pledgors and the Administrative Agent in favor of the Lenders, encumbering certain capital stock of Freedom Holding, as more particularly described therein (the "Pledged Freedom Stock");

7.    an Uniform Commercial Code Financing Statement naming the Borrower as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "Borrower UCC Financing Statement");

8.    an Uniform Commercial Code Financing Statement naming Holdings as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Delaware (the "Holdings UCC Financing Statement");

9.    an Uniform Commercial Code Financing Statement naming Freedom Holding as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Delaware (the "Freedom Holding UCC Financing Statement");

10.   an Uniform Commercial Code Financing Statement naming Tara as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Georgia (the "Tara UCC Financing Statement", collectively with Borrower UCC Financing Statement, Holdings UCC Financing Statement and Freedom Holding UCC Financing Statement, the "Borrower and Guarantors UCC Financing Statements");

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 3

11.    an Uniform Commercial Code Financing Statement naming W. Bennett Collett as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "W. Bennett Collett UCC Financing Statement");

12.    an Uniform Commercial Code Financing Statement naming W. Bennett Collett, Jr. as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "W. Bennett Collett, Jr. UCC Financing Statement");

13.    an Uniform Commercial Code Financing Statement naming Hurd Family Partnership, L.P. ("Hurd") as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of New Jersey (the "Hurd UCC Financing Statement", collectively with the W. Bennett Collett UCC Financing Statement and the W. Bennett Collett, Jr. UCC Financing Statement, the "Pledgors UCC Financing Statements");

14.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Interest Reserve Account of the Borrower (the "Interest Reserve Account Control Agreement");

15.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Construction Funds Account of the Borrower (the "Construction Funds Account Control Agreement");

16.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Contingency Reserve Account of the Borrower (the "Contingency Reserve Account Control Agreement");

17.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Slot License Account of the Borrower (the "Slot License Account Control Agreement");

18.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Holdback Account of the Borrower (the "Holdback Account Control Agreement");

19.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Completion Reserve Account of the Borrower (the "Completion Reserve Account Control Agreement");

20.    an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Main Cash Account of the Borrower (the

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 4

"Main Cash Account Control Agreement", collectively with the Interest Reserve Account Control Agreement, the Construction Funds Account Control Agreement, the Contingency Reserve Account Control Agreement, the Slot License Account Control Agreement, the Holdback Account Control Agreement and the Completion Reserve Account Control Agreement, the "Control Agreements") (the Interest Reserve Account, Construction Funds Account, Contingency Reserve Account, Slot License Account, Holdback Account, Completion Reserve Account and the Main Cash Account shall collectively be referred to herein as the "Accounts");

21.   an executed Transaction Fee Letter (the "Transaction Fee Letter") by and among the Borrower, Holdings and the Administrative Agent;

22.   an executed Agent Fee Letter (the "Agent Fee Letter") by and among the Borrower, Holdings and the Administrative Agent;

23.   an executed Warrant Agreement (the "Holdings Warrant Agreement") by and among Holdings and the Administrative Agent;

24.   an executed Warrant Agreement (the "Borrower Warrant Agreement", collectively with Holdings Warrant Agreement, the "Warrant Agreements") by and among the Borrower and the Administrative Agent;

25.   an executed Registration Rights Agreement (the "Registration Rights Agreement") by and among Holdings and the Administrative Agent;

26.   an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Borrower and the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Miami, Florida, as more particularly described therein;

27.   an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Miami, Florida, as more particularly described therein;

28.   an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Borrower and the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Ft. Pierce, Florida, as more particularly described therein;

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 5

29.   an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from Holdings in favor of the Administrative Agent, encumbering certain real property in Ft. Pierce, Florida, as more particularly described therein;

30.   an executed Environmental Indemnity Agreement from the Borrower and the Florida Trust in favor of the Administrative Agent covering certain real property in Miami, Florida, as more particularly described therein;

31.   an executed Environmental Indemnity Agreement from the Borrower and Holdings in favor of the Administrative Agent covering certain real property in Ft. Pierce, Florida, as more particularly described therein;

32.   an executed Assignment of Construction and Development Documents by and between the Borrower and the Administrative Agent;

33.   an executed Collateral Assignment of Development Agreement by and between the Borrower and the Administrative Agent;

34.   an executed Collateral Assignment of Beneficial Interests Under Land Trust Agreement from the Borrower in favor of the Administrative Agent;

35.   an executed Collateral Assignment of Settlement Agreement Documents by and between the Borrower and the Trust in favor of the Administrative Agent; and

36.   the other documents and instruments referenced in the Credit Agreement as Loan Documents.

(collectively, items 1-36 above are referred to herein as the "Loan Documents").

We have also examined and relied on such public records as we have deemed necessary or appropriate in rendering this opinion, and we assumed such public records have been properly indexed and were complete and accurate at the time of our examination thereof, and upon the originals or copies, certified or otherwise and identified to our satisfaction, of such other documents, certificates and instruments as in our judgment are necessary or appropriate to enable us to render the opinions expressed below, including, without limitation, the formation documents of the Borrower, the Guarantors, and Hurd, the Land Trust Agreement dated January 3, 1979 (the "Trust Agreement"), and the Certificates attached hereto on <u>Schedule I</u> incorporated herein by reference.

## Assumptions

For purposes of the opinions we express herein, we have assumed the genuineness and authenticity of all documents submitted to us as originals and the conformity with the original

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 6

documents of documents submitted to us as copies; that all signatures of parties, other than those of the Credit Parties and their respective authorized officers, to the Loan Documents to which each of the Credit Parties are a party are genuine, and that the documents have been signed by each party thereto other than the Credit Parties, with the intention to be presently binding upon the respective parties. In addition, as to matters of fact only, we have, when relevant facts were not independently established by us, relied to the extent we deemed such reliance proper upon certificates of public officers and certificates and other written statements of officers or partners of the Credit Parties.

Opinions

Based upon the foregoing and subject to the qualifications stated herein, we are of the opinion that, as of the date hereof:

1.      The Borrower has been duly organized and is validly existing and in good standing under the laws of the State of Florida. The Borrower has requisite corporate power and authority to own and encumber its properties and assets and to conduct its business.

2.      Holdings has been duly organized and is validly existing and in good standing under the laws of the State of Delaware. Holdings has requisite corporate power and authority to own and encumber its properties and assets and to conduct its business.

3.      Freedom Holding has been duly organized and is validly existing and in good standing under the laws of the State of Delaware. Freedom Holding has requisite corporate power and authority to own and encumber its properties and assets and to conduct its business.

4.      Tara has been duly organized and is validly existing and in good standing under the laws of the State of Georgia. Tara has requisite corporate power and authority to own and encumber its properties and assets and to conduct its business.

5.      Florida Trust is a trust duly organized and is validly existing and in good standing under the laws of the State of Florida. Trustee has requisite trust power and authority under the Trust Agreement to encumber the Florida Trust's properties and assets and to conduct the business of the Florida Trust. Borrower is the one hundred percent (100%) beneficial owner of the Florida Trust.

6.      Hurd is a limited partnership duly organized and is validly existing and in good standing under the laws of the State of New Jersey. Hurd has requisite power and authority to own and encumber its properties and assets and to conduct its business.

7.      Each of the Borrower, the Guarantors and Hurd has requisite corporate power and authority to execute, deliver and perform its obligations under each of the Loan Documents to which it is a party. Such execution, delivery and performance:

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 7

        (a)    have been duly authorized by all necessary and proper corporate, partnership, or trust action of each of the Borrower, the Guarantors and Hurd;

        (b)    do not violate any provision of the certificate of incorporation, bylaws, partnership agreement, or the Trust Agreement, as applicable, of the Borrower, the Guarantors or Hurd, or require any approval of the Borrower's, Hurd's or the Guarantors' shareholders, limited partners, or beneficial owners, as applicable;

        (c)    will not violate any laws of the State of New York (including, without limitation, any usury laws) or any applicable law of the United States of America (including, without limitation, Regulations T, U or X) applicable to the Borrower, the Guarantor and Hurd; and

        (d)    will not violate, or require the termination of, or require the approval or consent of any Person under, the terms of any indenture, mortgage, deed of trust, loan agreement, lease agreement or any other material agreement known to us to which the Borrower, the Guarantors, or Hurd is a party or by which the Borrower, the Guarantors or Hurd or any of its properties may be bound ("Material Agreements"), and will not result in or require the creation or imposition of any lien upon or security interest in any property of the Borrower or the Guarantors pursuant to any Material Agreement (other than the liens and security interests created pursuant to the Loan Documents).

        8.    Except as listed on Schedule II attached hereto and incorporated herein by reference, to our knowledge, there is no action, suit, proceeding or arbitration pending or overtly threatened in writing before any court or any governmental or regulatory authority, against each of the Borrower, the Guarantors and Hurd, which purports to affect the validity or enforceability of the Loan Documents, seeks to enjoin the consummation of the transactions contemplated thereby, or would, if adversely determined, result in a material adverse effect.

        9.    Each of the Loan Documents has been duly authorized, executed and delivered by the Borrower and the Guarantors, as applicable. Each of the Loan Documents constitutes the valid and binding obligation of each of the Borrower and the Guarantors, as applicable, enforceable against each of the Borrower and the Guarantors, as applicable, in accordance with its terms.

        10.    The Freedom Pledge Agreement has been duly authorized, executed and delivered by the Pledgors and such Freedom Pledge Agreement constitutes the valid and binding obligation of each Pledgor, enforceable in accordance with its terms.

        11.    Each of the Borrower, the Guarantors and Hurd is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or, to our knowledge, controlled by such a company.

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 8

12.    Other than approvals, licenses, permits and other authorizations required by any Gaming Authority, no consent approval or authorization of, or registration, filing or declaration with, any federal or New York state governmental authority or other regulatory agency is required under New York or federal law for the valid execution or delivery by the Credit Parties of the Loan Documents or the performance by the Credit Parties of their obligations thereunder, except any such consent, approval, authorization, registration, filing or declaration which has been obtained or made and remains in effect.

13.    The Security Agreement creates, in favor of the Administrative Agent, a valid security interest in all of the Pledged Assets to the extent a security interest may be created therein under Article 9 of the Uniform Commercial Code adopted in the State of New York (the "New York UCC"). The Borrower UCC Financing Statement is in proper form for filing with the Florida Secured Transaction Registry under Section 9-502 of the Uniform Commercial Code adopted in the State of Florida (the "Florida UCC"). Upon the filing of the Borrower UCC Financing Statement in the Florida Secured Transaction Registry, such security interest in the Pledged Assets owned by the Borrower will be perfected under 9-501 of the Florida UCC to the extent a security interest therein can be perfected by the filing of a financing statement under the Florida UCC. Each of the Holdings UCC Financing Statement and the Freedom Holding UCC Financing Statement is in proper form for filing with the Delaware Secretary of State under Section 9-502 of the Uniform Commercial Code adopted in the State of Delaware (the "Delaware UCC"). Upon the filing of the Holdings UCC Financing Statement and the Freedom Holding UCC Financing Statement, such security interests in the Pledged Assets owned by Holdings and Freedom Holding, respectively, will be perfected under Section 9-501 of the Delaware UCC to the extent a security interest therein can be perfected by the filing of a financing statement under the Delaware UCC. The Tara UCC Financing Statement is in proper form for filing with the Georgia Secretary of State under Section 11-9-502 of the Uniform Commercial Code adopted in the State of Georgia (the "Georgia UCC"). Upon the filing of the Tara UCC Financing Statement, such security interest in the Pledge Assets owned by Tara will be perfected under 11-9-501 to the extent a security interest therein can be perfected by the filing of a financing statement under the Georgia UCC.

14.    The Holdings Pledge Agreement creates, in favor of Administrative Agent, a valid security interest in the Pledged Holdings Stock subject to the occurrence of the following events: (i) the termination and release of the security interest in the Pledged Holdings Stock granted by Freedom Holding in favor of The Farmers Bank, and (ii) the delivery by Freedom Holding to the Administrative Agent the stock certificates representing all of the Pledged Holdings Stock, duly indorsed to the Administrative Agent or in blank, and, after such delivery of the Pledged Holdings Stock, such stock certificates are continuously held by Administrative Agent since such delivery, the possessory security interest granted pursuant to the Holdings Pledge Agreement in favor of Administrative Agent will constitute a perfected security interest in such Pledged Holdings Stock under the Uniform Commercial Code of the Commonwealth of Massachusetts (the "Massachusetts UCC") where the certificates shall be held by the Administrative Agent. Only if the foregoing events occur and assuming the Administrative