ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 9

Agent receives such certificates after giving value and without notice (actual or constructive) on the part of the Administrative Agent or any Lender or any of their respective representatives of an adverse claim, within the meaning of Sections 8-102 and 8-105 of the Massachusetts UCC, the Administrative Agent will acquire such security interest free of adverse claims.

15. The Freedom Pledge Agreement creates, in favor of Administrative Agent, a valid security interest in the Pledged Freedom Stock, assuming that Pledgors have delivered to Administrative Agent the stock certificates representing all of the Pledged Freedom Stock, duly indorsed to the Administrative Agent or in blank, and that such stock certificates have been continuously held by Administrative Agent since such delivery, the possessory security interest granted pursuant to the Freedom Pledge Agreement in favor of Administrative Agent will constitute a perfected security interest in such Pledged Freedom Stock under the Massachusetts UCC, and, assuming the Administrative Agent receives such certificates after giving value and without notice (actual or constructive) on the part of the Administrative Agent or any Lender or any of their respective representatives of an adverse claim, within the meaning of Sections 8-102 and 8-105 of the Massachusetts UCC, the Administrative Agent will acquire such security interest free of adverse claims. Each of the W. Bennett Collett UCC Financing Statement and the W. Bennett Collett, Jr. UCC Financing Statement is in proper form for filing with the Florida Secretary of State under Section 9-502 of the Florida UCC. Upon the filing of the W. Bennett Collett UCC Financing Statement and the W. Bennett Collett, Jr. UCC Financing Statement, such security interests in the Pledged Freedom Stock owned by W. Bennett Collett and W. Bennett Collett, Jr., respectively, will be perfected under 9-501 to the extent a security interest therein can be perfected by the filing of a financing statement under the Florida UCC. The Hurd UCC Financing Statement is in proper form for filing with the New Jersey Secretary of State under Section 9-502 of the Uniform Commercial Code as adopted in the State of New Jersey (the "New Jersey UCC"). Upon the filing of the Hurd UCC Financing Statement, such security interest in the Pledged Freedom Stock owned by Hurd will be perfected under 9-501 to the extent a security interest therein can be perfected by the filing of a financing statement under the New Jersey UCC.

16. The provisions of the Control Agreements are effective to give the Administrative Agent "control" (as defined in Section 9-104 of the Florida UCC, which governs the Control Agreements pursuant to the Control Agreements) over each Account, and no other action need be taken in order to perfect the Administrative Agent's security interest in such Accounts under Section 9-314 of the Florida UCC, which perfected security interest will be prior to any security interest in any such Account as original collateral that is created by the Borrower in favor of any other secured party under the Florida UCC.

17. The offer, issue, sale and delivery of the warrants under the circumstances contemplated by the Warrant Agreements are not required to be registered under the Securities Act of 1933, as amended.

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 10

18. The shares of common stock issuable upon exercise of the warrants have been duly authorized and reserved for issuance upon such exercise by all necessary corporate action on the part of Holdings and the Borrower, and such shares, when issued upon such exercise in accordance with the terms of the Warrant Agreements and the warrants, will be validly issued, fully paid, and non-assessable.

19. Holdings is legally permitted, without a shareholder vote, to (i) grant the Lenders the warrants contemplated in the Warrant Agreements, (ii) enter into the Freedom Note and Freedom Consulting Agreement, and (iii) make the payments contemplated by the Freedom Note and Freedom Consulting Agreement.

20. Certain debt of Freedom Financial Corporation ("FFC") in favor of Isle of Capri Casinos, Inc., a Delaware corporation ("Isle"), evidenced by a Promissory Note (the "FFC/Isle Note" dated July 8, 2002 (the "FFC/Isle Debt"), remains outstanding as of the date of this letter. Based on our review of the FFC/Isle Note, we do not believe that this debt is an obligation of any of the Credit Parties and we believe that this debt is non-recourse as to any assets owned by the Credit Parties. To our knowledge, there are no other documents pertaining to the FFC/Isle Note other than the FFC/Isle Note itself, and Isle has not made any effort to collect amounts due from FFC under the FFC/Isle Note.

## Qualifications

Our opinions set forth herein are subject to the following qualifications or limitations:

(i) We express no opinion as to the effect of the Administrative Agent's or any Lender's compliance with any state or federal laws or regulations applicable to the transactions because of the nature of its business.

(ii) Insofar as the opinions set forth above relate to the enforceability of the Loan Documents, they are subject to all applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws affecting the rights of creditors generally, as well as by limitations imposed upon creditors generally by the constitutions of the United States and the State of New York. The enforceability of the obligations of the Borrower or the Guarantors under the Loan Documents, as the case may be, is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). Accordingly, we express no opinion as to the extent to which any provision may be specifically enforced.

(iii) The opinions set forth above with respect to the enforceability of the Loan Documents are qualified to the extent that certain remedial or waiver provisions of the Loan Documents may be unenforceable in whole or in part under applicable law, but such laws do not render the Loan Documents invalid as a

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 11

whole, and there exist in the Loan Documents legally adequate remedies for the realization of the security and principal benefits to be provided by the Loan Documents. We express no opinion as to the validity or enforceability of any provision in the Loan Documents (1) modifying or waiving any requirement of commercial reasonableness, prior notice or right of redemption arising under the New York UCC; (2) purporting to grant to the Administrative Agent or the Lenders any rights, remedies, or powers with respect to the disposition of personal property, with or without notice to the extent that such rights, remedies or powers are not expressly permitted under the New York UCC; (3) purporting to waive equitable rights or remedies; (4) purporting to waive any rights of the Borrower or the Guarantors under the Loan Documents or any consent thereto, or any duty owing to any of them as a matter of law, except to the extent that the Borrower or the Guarantors may so waive or consent as a matter of law; (5) purporting to require payment or reimbursement of fees, costs, expenses or other amounts which are unreasonable in nature or amount; and (6) purporting to limit the right of the Borrower or the Guarantors to alienate or sell the Pledged Assets.

(vi) Our opinions as to the standing and valid existence of the Borrower, the Guarantors and Hurd in various jurisdictions are based solely upon certificates of good standing issued by the secretaries of the states of Delaware, Florida, Georgia, District of Columbia, and New Jersey attached to this opinion letter as Schedule III.

(vii) We express no opinion as to the validity or effect of any provision in the Loan Documents providing for the assignment or transfer of any governmental permits, licenses, franchises or similar governmental rights or interests of the Borrower or the Guarantors that require governmental approval in connection with their assignment or transfer.

(viii) In rendering the opinions set forth in paragraphs 13-16 above we have, with your permission, advised you only as to such knowledge as we have obtained from our review of the Uniform Commercial Code in effect in the States of Florida, Delaware, Georgia, and New Jersey and the Commonwealth of Massachusetts, as published in standard compilations.

(ix) We express no opinion as to the priority of the Administrative Agent's or the Lenders' security interest in any of the Pledged Assets, Pledged Freedom Stock or Pledged Holdings Stock.

Our opinions expressed herein are limited to those matters expressly set forth herein, and no opinion may be implied or inferred beyond the matter expressly stated herein. Further, the opinions expressed herein are provided to you (including all of the Lenders' respective successors and assigns) and your counsel solely in connection with the transactions contemplated

ABC Funding, LLC, as Administrative Agent
April 25, 2011
Page 12

by the Loan Documents to which each of the Credit Parties is a party and, without our prior written consent, may not be relied upon by any other person or entity.

This opinion is rendered as of the date first set forth above, and we do not undertake to advise you or anyone else of any changes in the opinions expressed herein resulting from changes in law, changes in fact, new developments, or any other matters that hereafter might occur, be brought to our attention, or affect any opinion set forth herein.

The qualification "to our knowledge", "of which we have knowledge", "knowledge" or words of similar impact mean that as a result of our representation of the Credit Parties in the negotiation, execution and delivery of the Loan Documents, no lawyers in our firm who have had actual involvement in the preparation of this opinion letter have had conscious awareness of any information contrary to the opinion expressed herein. We have not made any independent verification with respect to such matters. We have not interviewed the officers or partners, as applicable, of the Credit Parties with respect to the representations and warranties of the Credit Parties contained in the Loan Documents, and having no actual knowledge or reason to believe that such statements or disclosures are inaccurate, misleading or false, we have assumed the correctness and accuracy of such representations and warranties.

To the extent that our opinion relates to any matters governed by the laws of jurisdictions other than New York or the United States, the corporate laws of Delaware, Florida, New Jersey, and Georgia, the Uniform Commercial Codes in effect in Delaware, Florida, New Jersey, Georgia, and Massachusetts, we have relied, with your approval, on the opinion of Infante, Zumpano, Hudson & Miloch, LLC, counsel for the Credit Parties, delivered to you on the Closing Date. We believe that we and you are entitled to rely on such opinions.

Very truly yours,

FROST BROWN TODD LLC

By *(signature)* Bonita K. Black
   Bonita K. Black

400 West Market Street | 32nd Floor | Louisville, Kentucky  40202-3363 | 502.589.5400 | frostbrowntodd.com
Offices in Indiana, Kentucky, Ohio, Tennessee and West Virginia

## Schedule I

## Opinion Certificates

## FLORIDA GAMING CENTERS, INC.
## FLORIDA GAMING CORPORATION
## FREEDOM HOLDING, INC.
## TARA CLUB ESTATES, INC.

### Officer's Certificate Supporting Frost Brown Todd LLC Opinions

The undersigned, on behalf of Florida Gaming Centers, Inc. ("Borrower"), a Florida corporation, Florida Gaming Corporation ("Holdings"), a Delaware corporation, Freedom Holding, Inc. ("Freedom Holding"), a Delaware corporation, and Tara Club Estates, Inc. ("Tara", collectively with Holdings and Freedom Holding, the "Guarantors"), a Georgia corporation, hereby certifies that:

1. Frost Brown Todd LLC ("FBT") has acted as counsel to the Borrower and the Guarantors in connection with the Opinion Documents (as defined below). Section 4.01(c) of the Credit Agreement (the "Loan Agreement"), dated as of April 25, 2011 by and among the Borrower, Holdings, the Lenders party thereto, and ABC Funding, LLC (the "Administrative Agent) requires that, as a condition to closing, that counsel for the Borrower and the Guarantors deliver an opinion letter to the Administrative Agent. The term "FBT Opinion" whenever used in this Certificate means the opinion letter which FBT will actually deliver in response to this condition in the form previously provided to the Administrative Agent. Each term which is defined or given a special meaning in the FBT Opinion has the same meaning whenever it is used in this Certificate. The term "Opinion Documents" (all of which are to be dated as of or on April 25, 2011 unless otherwise noted) whenever it is used in this Certificate means:

   1. an executed Credit Agreement and executed Term Loan Notes made by the Borrower in favor of the Lenders;

   2. an executed Disbursement Agreement by and among the Borrower and the Administrative Agent (the "Disbursement Agreement");

   3. an executed Credit Party Guaranty by and among the Guarantors and the Administrative Agent;

   4. an executed Pledge and Security Agreement (the "Security Agreement") by and among the Borrower, Holdings, Freedom Holding, Tara and the Administrative Agent in favor of the Lenders, encumbering all assets of the Borrower, Holdings, Freedom Holding, and Tara, as more particularly described therein (including, without limitation, the "Collateral" under and defined therein, the "Pledged Assets");

   5. an executed Holdings Pledge Agreement (the "Holdings Pledge Agreement") by and among Freedom Holding and the Administrative Agent

1039504v3

       in favor of the Lenders, encumbering certain capital stock of Holdings, as more particularly described therein (the "Pledged Holdings Stock");

6.   an executed Freedom Pledge Agreement (the "Freedom Pledge Agreement") by and among the W. Bennett Collett, W. Bennett Collett, Jr. and Hurd Family Partnership, L.P. (collectively, the "Pledgors") and the Administrative Agent in favor of the Lenders, encumbering certain capital stock of Freedom Holding, as more particularly described therein (the "Pledged Freedom Stock");

7.   an Uniform Commercial Code Financing Statement naming the Borrower as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "Borrower UCC Financing Statement");

8.   an Uniform Commercial Code Financing Statement naming Holdings as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Delaware (the "Holdings UCC Financing Statement");

9.   an Uniform Commercial Code Financing Statement naming Freedom Holding as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Delaware (the "Freedom Holding UCC Financing Statement");

10.   an Uniform Commercial Code Financing Statement naming Tara as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Georgia (the "Tara UCC Financing Statement", collectively with Borrower UCC Financing Statement, Holdings UCC Financing Statement and Freedom Holding UCC Financing Statement, the "Borrower and Guarantors UCC Financing Statements");

11.   an Uniform Commercial Code Financing Statement naming W. Bennett Collett as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "W. Bennett Collett UCC Financing Statement");

12.   an Uniform Commercial Code Financing Statement naming W. Bennett Collett, Jr. as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of Florida (the "W. Bennett Collett, Jr. UCC Financing Statement");

13.   an Uniform Commercial Code Financing Statement naming Hurd Family Partnership, L.P. ("Hurd") as "Debtor" and the Administrative Agent as "Secured Party" for filing with the Secretary of State of New Jersey (the

"Hurd UCC Financing Statement", collectively with the W. Bennett Collett UCC Financing Statement and the W. Bennett Collett, Jr. UCC Financing Statement, the "Pledgors UCC Financing Statements");

14. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Interest Reserve Account of the Borrower (the "Interest Reserve Account Control Agreement");

15. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Construction Funds Account of the Borrower (the "Construction Funds Account Control Agreement");

16. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Contingency Reserve Account of the Borrower (the "Contingency Reserve Account Control Agreement");

17. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Slot License Account of the Borrower (the "Slot License Account Control Agreement");

18. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Holdback Account of the Borrower (the "Holdback Account Control Agreement");

19. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Completion Reserve Account of the Borrower (the "Completion Reserve Account Control Agreement");

20. an executed Deposit Account Control Agreement by the Borrower in favor of the Administrative Agent, encumbering the Main Cash Account of the Borrower (the "Main Cash Account Control Agreement", collectively with the Interest Reserve Account Control Agreement, the Construction Funds Account Control Agreement, the Contingency Reserve Account Control Agreement, the Slot License Account Control Agreement, the Holdback Account Control Agreement and the Completion Reserve Account Control Agreement, the "Control Agreements") (the Interest Reserve Account, Construction Funds Account, Contingency Reserve Account, Slot License Account, Holdback Account, Completion Reserve Account and the Main Cash Account shall collectively be referred to herein as the "Accounts");

21. an executed Transaction Fee Letter (the "Transaction Fee Letter") by and among the Borrower, Holdings and the Administrative Agent;

1039504v3

22. an executed Agent Fee Letter (the "Agent Fee Letter") by and among the Borrower, Holdings and the Administrative Agent;

23. an executed Warrant Agreement (the "Holdings Warrant Agreement") by and among Holdings and the Administrative Agent;

24. an executed Warrant Agreement (the "Borrower Warrant Agreement", collectively with Holdings Warrant Agreement, the "Warrant Agreements") by and among the Borrower and the Administrative Agent;

25. an executed Registration Rights Agreement (the "Registration Rights Agreement") by and among Holdings and the Administrative Agent;

26. an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Borrower and the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Miami, Florida, as more particularly described therein;

27. an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Miami, Florida, as more particularly described therein;

28. an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from the Borrower and the Florida Trust in favor of the Administrative Agent, encumbering certain real property in Ft. Pierce, Florida, as more particularly described therein;

29. an executed Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from Holdings in favor of the Administrative Agent, encumbering certain real property in Ft. Pierce, Florida, as more particularly described therein;

30. an executed Environmental Indemnity Agreement from the Borrower and the Florida Trust in favor of the Administrative Agent covering certain real property in Miami, Florida, as more particularly described therein;

31. an executed Environmental Indemnity Agreement from the Borrower and Holdings in favor of the Administrative Agent covering certain real property in Ft. Pierce, Florida, as more particularly described therein;

32. an executed Assignment of Construction and Development Documents by and between the Borrower and the Administrative Agent;

33. an executed Collateral Assignment of Development Agreement by and between the Borrower and the Administrative Agent;

34. an executed Collateral Assignment of Beneficial Interests Under Land Trust Agreement from the Borrower in favor of the Administrative Agent;

35. an executed Collateral Assignment of Settlement Agreement Documents by and between the Borrower and the Trust in favor of the Administrative Agent; and

36. the other documents and instruments referenced in the Credit Agreement as Loan Documents.

Unless otherwise indicated, capitalized terms used herein but not otherwise defined herein or in the FBT Opinion have the respective meanings set forth in the Credit Agreement.

2. <u>Purpose</u>. The Borrowers and the Guarantors have provided this Certificate in order to provide FBT with factual information requested by FBT so that FBT may issue the FBT Opinion. The Borrower and the Guarantors have made inquiries and investigations reasonably calculated to assure that the information provided in this Certificate is accurate and complete, including (1) inquiries of appropriate personnel responsible for legal matters, financial matters and compliance with governmental requirements and (2) identification and review of relevant documents. The Borrower and the Guarantors understand that FBT will not check, audit, or otherwise attempt to verify the information in this Certificate. The Borrower and the Guarantors intend and agree that FBT may rely upon this Certificate and all information provided in this Certificate.

3. <u>Execution and Delivery of Opinion Documents</u>. Each of the Opinion Documents has been executed by each of the Borrower and the Guarantors, as applicable, through an officer authorized by resolution of the Board of Directors of each of the Borrower and the Guarantors, as applicable, and delivered to the Administrative Agent.

4. <u>No Known Breach</u>. The Borrower and the Guarantors are not aware of (a) except for contracts that are not material, any agreement, document, or instrument to which either the Borrower or the Guarantors or which any of their assets may be bound, or (b) any license, permit, judgment, decree or order to which the Borrower or Guarantors is subject or to which any of their assets may be bound which would be violated, conflict with or result in a default under in connection with the execution, delivery and performance of the Opinion Documents by the Borrower or the Guarantors.

5. <u>Required Governmental Approvals</u>. Based on the nature of the business and business activities of the Borrower and the Guarantors, no consent, approval, order or authorization of, or registration, declaration or filing by Borrower or the Guarantors, with, any governmental or public body or authority or agency is required for the valid execution,

5

delivery and performance of each of the Opinion Documents by the Borrower and the Guarantors.

6.   Litigation. Except as set forth on Schedule III to the FBT Opinion, there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, pending or, to the knowledge of the undersigned, threatened against or affecting the Borrower or the Guarantors.

7.   Board of Directors Resolutions. Attached hereto as Annex A are true, correct and complete copies of the resolutions duly adopted by quorum of the board of directors or by unanimous written consent of each of the Borrower and the Guarantors approving and authorizing the execution, delivery and performance of the Opinion Documents and the transactions contemplated by each, which approvals have not been rescinded or modified in any manner and are in full force and effect as of the date of this Certificate.

[SIGNATURES ON FOLLOWING PAGE]

This Certificate is executed as of April 15, 2011, but actually executed on the date set forth below.

**FLORIDA GAMING CENTERS, INC.**

By _____
W. Bennett Collett, Jr., President and Chief Executive Officer

Date: _____

**FLORIDA GAMING CORPORATION**

By _____
W. Bennett Collett, Jr., President and Chief Executive Officer

Date: _____

**FREEDOM HOLDING, INC.**

By _____
W. Bennett Collett, Jr., President and Chief Executive Officer

Date: _____

**TARA CLUB ESTATES, INC.**

By _____
W. Bennett Collett, Jr., President and Chief Executive Officer

Date: _____

7

1039504v2

## Annex A

Board Resolutions of the Borrower and the Guarantors

1039504v2

MINUTES OF A SPECIAL MEETING
OF THE
BOARD OF DIRECTORS
OF
FLORIDA GAMING CENTERS, INC.

A special meeting of the Board of Directors of Florida Gaming Centers, Inc., a Florida corporation (the "Corporation"), was held at 1:30 p.m. Eastern Daylight Time on March 25, 2011 in Duluth, Georgia pursuant to proper notice given to each Director. Present in person at the meeting were the following Directors: W. Bennett Collett, W. Bennett Collett, Jr., William C. Haddon and George W. Galloway, M.D.

W. Bennett Collett, Chairman of the Board and Chief Executive Officer of the Corporation served as Chairman of the meeting. W. Bennett Collett, Jr., President and Chief Operating Officer of the Corporation, served as Secretary of the meeting.

The Chairman called the meeting to order and declared that a quorum of Directors was present.

At the invitation of the Board, Matt Sodl, Kevin Scheible and Michael Hilcove of Innovation Capital (the "Innovation Representatives"), the Corporation's financial advisor, participated in the meeting via teleconference. Also at the invitation of the Board, Daniel J. Licciardi, Executive Vice President and General Manager, and R. James Straus of Frost Brown Todd LLC, legal counsel to the Corporation, attended, and participated in, the meeting. Jeff Stodghill of Frost Brown Todd participated in the meeting via teleconference.

Mr. Collett, with the assistance of Mr. Straus and the Innovation Representatives, led a discussion of the Corporation's current financial situation and its urgent need for a significant capital infusion. Previous financing and investment proposals that ultimately were not consummated were discussed. The Innovation Representatives discussed in detail a proposal from ABC Funding, LLC, a wholly-owned affiliate of Summit Partners Credit Advisors, L.P., to provide approximately $86.0 million in financing to the Corporation and its parent Florida Gaming Corporation to enable the Corporation and its parent to fund construction of a build-out of the Miami Jai Alai facility to facilitate slot machine gaming, refinance existing debt, and pay fees and expenses incurred in furtherance of the foregoing. With the assistance of the Innovation Representatives, Mr. Straus and Mr. Stodghill, the Directors discussed the Summary of Proposed Terms and Conditions related to the ABC Funding financing. The Innovation Representatives left the meeting and the Directors, with the assistance of Mr. Straus and Mr. Stodghill, reviewed drafts of the principal documents to be entered into by the Corporation and its affiliates and discussed legal issues pertaining to the ABC Funding proposal.

After the discussion, the Directors adopted the following resolutions:

WHEREAS, the Directors have determined that it is in the best interests of the Corporation and its shareholder to cause the Corporation to seek financing to (i) fund construction and improvement costs associated with the build-out of the Miami Jai-Alai facility

(the "Facility") owned and operated by the Corporation to, among other things, permit the operation by the Corporation of a slot machine gambling business, (ii) refinance existing debt of the Corporation and its parent Florida Gaming Corporation ("FGC"), (iii) provide working capital to the Corporation and FGC, and (iv) pay fees and expenses incurred in accordance with the foregoing (collectively, the "Project");

WHEREAS, the Corporation's investment banker Innovation Capital, LLC has secured a proposal from ABC Funding, LLC, a wholly-owned affiliate of Summit Partners Credit Advisors, L.P. ("ABC Funding"), to provide or arrange a Senior Secured Credit Facility in the amount of approximately $86,000,000 (the "Credit Facility") in general accordance with the terms and provisions outlined in the Summary of Proposed Terms and Conditions dated February 24, 2011(the "Proposal"), which has been provided to and reviewed by the Board; and

WHEREAS, the Board has determined that it is in the best interests of the Corporation and its shareholder for the Corporation to obtain the Credit Facility in accordance with the Proposal to complete the Project.

NOW, THEREFORE, IT IS:

RESOLVED, that the Corporation is authorized and directed to obtain the Credit Facility in general accordance with the Proposal and to initiate and complete the Project;

FURTHER RESOLVED, that in furtherance of the foregoing and as contemplated in the Proposal, the Corporation is authorized and directed to enter into (i) a Credit Agreement among the Corporation, the Lenders Parties (as defined therein), ABC Funding, and FGC, (ii) a Disbursement Agreement between the Corporation and ABC Funding, (iii) a Management Agreement between the Corporation and Miami Casino Management, LLC, (iv) a Construction Contract between the Corporation and Florida Lemark Corp., and (v) all other documents and instruments contemplated by the Credit Agreement and the Proposal or otherwise necessary to enable the Corporation to obtain the Credit Facility (collectively, the "Credit Facility Documents") in substantially the same form and substance as reviewed by the Directors;

FURTHER RESOLVED, that as required by the Proposal and the Credit Agreement, the Corporation is authorized and directed to enter into a Warrant Agreement with the Lenders Party pursuant to which on the date thereof the Corporation will issue warrants to the Lenders Party pursuant to which the Lenders Party may acquire up to 32.5% (the "Exercise Percentage") of the Corporation's common stock (which percentage may increase up to a maximum of 42.5% in the event Hialeah Park offers slot machine gambling while the Credit Facility is outstanding) and requiring the Corporation to repurchase the Warrants, upon the earlier to occur of (x) the repayment of the Credit Facility and (y) the date upon which the equity or substantially all of the assets of the Corporation or FGC are sold, transferred or assigned (provided, however, if the Credit Facility is repaid within five years of the Project's opening date, other than in connection with a transaction described in clause (y), the Lenders Party shall have the right to decline the Warrant payment in their sole discretion, in which case, the Lenders Party shall have the opportunity to accept a Warrant payment on each yearly anniversary of the date upon which the Credit Facility was repaid until five years after the Project's opening date), at a price equal to the

Exercise Percentage multiplied by the net value of the Corporation as determined under the Credit Agreement;

FURTHER RESOLVED, that the Articles of Incorporation of the Corporation be amended so that, as amended, Article III thereof reads in its entirety as follows:

"The number of shares of stock that this corporation is authorized to have outstanding at any one time is 2,000 shares of stock at no par value."

FURTHER RESOLVED, that effective simultaneously with the execution and delivery of the Credit Facility Documents by the Corporation, the Corporation accepts the resignation of W. Bennett Collett as the Chief Executive Officer of the Corporation, which resignation shall not affect Mr. Collett's status as a member and the Chairman of the Corporation's Board of Directors;

FURTHER RESOLVED, that effective simultaneously with the resignation of W. Bennett Collett, the Board elects W. Bennett Collett, Jr. as the President and Chief Executive Officer of the Corporation and Daniel J. Licciardi as the Vice President and Chief Operating Officer of the Corporation and authorizes the Company to enter into employment agreements with Mr. Collett, Jr. and Mr. Licciardi providing for an annual salary of $300,000 to Mr. Collett, Jr. and $225,000 to Mr. Licciardi and containing such other terms and conditions set forth in the forms of employment agreements reviewed by the Board; and

FURTHER RESOLVED, that each of W. Bennett Collett and W. Bennett Collett, Jr., acting alone, is authorized and directed, for and on behalf of the Corporation, to execute and deliver each of the Credit Facility Documents and all such other documents, instruments and agreements that are contemplated therein or necessary or appropriate to effect the intent thereof, each in such specific form as Mr. Collett or Mr. Collett, Jr. shall approve, and to take all such other actions as are necessary or appropriate to cause the Corporation to obtain the Credit Facility and to initiate and complete the Project.