vii.    May, where less than all of a contract may be unenforceable, limit the enforceability of the balance of the contract to circumstances in which the unenforceable portion is not an essential part of the agreed exchange;

viii.    Govern and afford judicial discretion regarding the determination of damages and entitlement to attorneys' fees and other costs;

ix.    May, in the absence of a waiver or consent, discharge a guarantor to the extent that (i) action by a creditor impairs the value of collateral securing guaranteed debt to the detriment of the guarantor, or (ii) guaranteed debt is materially modified;

x.    May permit a party who has materially failed to render or offer performance required by the contract to cure that failure unless (i) permitting a cure would unreasonably hinder the aggrieved party from making substitute arrangements for performance, or (ii) it was important in the circumstances to the aggrieved party that performance occur by the date stated in the contract;

xi.    Limit or affect the enforceability of a waiver of a right of redemption;

xii.    Impose limitations on attorneys' or trustees' fees;

xiii.    Purport to establish evidentiary standards;

xiv.    Provide for payment of penalty interest; and

xv.    Purport to select any State's law (other than Florida law) as the governing law for the Florida Real Estate Documents.

C.    We express no opinion as to the effect of the Lenders' compliance with any state or Federal laws or regulations applicable to the transactions because of the nature of the Lenders' business.

D.    Insofar as the opinions set forth above relate to the enforceability of the Florida Real Estate Documents, they are subject to all applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws affecting the rights of creditors generally, as well as by limitations imposed upon creditors generally by the constitutions of the United States and the State of Florida. The enforceability of the obligations of the Borrowing Entities under the Florida Real Estate Documents, as the case may be, is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). Accordingly, we express no opinion as to the extent to which any provision may be specifically enforced.

E.    The opinions set forth above with respect to the enforceability of the Florida Real Estate Documents are qualified to the extent that certain remedial or waiver provisions of the Florida Real Estate Documents may be unenforceable in whole or in part under applicable law, but such laws do not render the Florida Real Estate Documents invalid as a whole, and there exist in the

Florida Real Estate Documents legally adequate remedies for the realization of the security and principal benefits to be provided by the Florida Real Estate Documents. We express no opinion as to the validity or enforceability of any provision in the Florida Real Estate Documents (1) modifying or waiving any requirement of commercial reasonableness, prior notice or right of redemption arising under the UCC as enacted in the State of Florida; (2) purporting to grant to the Agent or the Lenders any rights, remedies, or powers with respect to the disposition of personal property, with or without notice to the extent that such rights, remedies or powers are not expressly permitted under the UCC; (3) purporting to waive equitable rights or remedies; (4) purporting to waive any rights of the Borrowing Entities under the Florida Real Estate Documents or any consent thereto, or any duty owing to any of them as a matter of law, except to the extent that the Borrowing Entities may so waive or consent as a matter of law; (5) purporting to require payment or reimbursement of fees, costs, expenses or other amounts which are unreasonable in nature or amount; and (6) purporting to grant or limit the right of the Borrowing Entities to alienate or sell the Florida Real Property or personal property.

F.     We express no opinion as to the validity or effect of any provision in the Florida Real Estate Documents providing for the assignment or transfer of any governmental permits, licenses, franchises or similar governmental rights or interests of the Borrower or the Guarantors that require governmental approval in connection with their assignment or transfer.

G.     We express no opinion as to the validity, enforceability or effect of any Transaction Document not governed by the laws of the state of Florida, including but not limited to, the Credit Agreement, Security Agreement, Note or Warrant Agreement (except in Paragraph 15).


Knowledge.

        The qualification "to our knowledge", "of which we have knowledge", "knowledge" or words of similar impact mean that as a result of our representation of the Borrowing Entities in the negotiation, execution and delivery of the Transaction Documents, no lawyers in our firm who have had actual involvement in the preparation of this opinion letter have had conscious awareness of any information contrary to the opinion expressed herein. We have not made any independent verification with respect to such matters. We have not interviewed the officers of the Borrowing Entities with respect to the representations and warranties of the Borrowing Entities contained in the Transaction Documents, and having no actual knowledge or reason to believe that such statements or disclosures are inaccurate, misleading or false, we have assumed the correctness and accuracy of such representations and warranties. We have relied exclusively upon Borrower's good standing certificate and corporate resolutions to opine as to the Borrower's good standing and corporate authority without any independent investigation.

        To the extent our opinion relates to any matters governed by the laws of the United States or any jurisdiction outside of the State of Florida or the Trust we have relied, with your approval, on the opinion of Frost Brown Todd LLC, counsel for the Borrowing Entities, delivered to you on the Closing Date. We believe that we and you are entitled to rely on such opinions.

## USE OF THIS OPINION AND LIMITATIONS

Use.

This opinion is furnished to you and your successors and assigns solely for your and their benefit. This opinion may not be used, quoted from or relied upon by any other person without our prior written consent. Our opinions expressed herein are limited to those matters expressly set forth herein, and no opinion may be implied or inferred beyond the matter expressly stated herein. Further, the opinions expressed herein are provided to you (including your and your counsel) solely in connection with the transactions contemplated by the Transaction Documents to which a Borrowing Entity is a party and, without our prior written consent, may not be relied upon by any other person or entity.

Limitation.

This opinion is rendered as of the date first set forth above, and we do not undertake to advise you or anyone else of any changes in the opinions expressed herein resulting from changes in law, changes in fact, new developments, or any other matters that hereafter might occur, be brought to our attention, or affect any opinion set forth herein.

Very truly yours,

INFANTE ZUMPANO SALAZAR & MILOCH

# Exhibit "A"

FL Financing Statement

INFANTE, ZUMPANO, SALAZAR & MILOCH, LLC.
500 SOUTH DIXIE HIGHWAY, SUITE 302, CORAL GABLES, FLORIDA 33146
T: 305.503.2990  F: 305.774.5908  W: www. InfanteZumpano.com

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

**B. SEND ACKNOWLEDGEMENT TO:**
Name  Steven Shoumer, Esquire

Address  One Logan Square, 3rd Floor

Address  130 N. 18th Street

City/State/Zip  Philadelphia    PA    19103

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1a. ORGANIZATION'S NAME  Florida Gaming Centers, Inc. | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS  3500 NW 37th Avenue | CITY  Miami | STATE  FL | POSTAL CODE  33142 / COUNTRY  USA |
| 1d. TAX ID#  | REQUIRED ADD'L INFO RE: ORGANIZATION  DEBTOR | 1e. TYPE OF ORGANIZATION  Corporation | 1f. JURISDICTION OF ORGANIZATION  Florida | 1g. ORGANIZATIONAL ID#  P96000085895 ☐NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE / COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION  DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#  ☐NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)– INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME  ABC Funding, LLC, as administrative agent for the Lenders, its successors and assigns | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS  222 Berkley Street, 18th Floor | CITY  Boston | STATE  MA | POSTAL CODE  02116 / COUNTRY  USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Debtor grants to Secured Party a security interest in all of Debtor's now owned or hereafter acquired or arising accounts, accounts receivable, machinery, inventory, furniture, fixtures, equipment, general intangibles, chattel paper, contract rights, documents, instruments, deposit accounts, investment property, commercial tort claims, commercial deposit accounts, health-care insurance receivables, and all cash and non-cash proceeds thereof (including, without limitation, insurance proceeds) as more fully described in Exhibit "A" attached hereto and made a part hereof, to the extent that such items of collateral are located on, or are used or usable in connection with the real estate more fully described in Exhibit "B" attached hereto and made a part hereof.

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG. LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

◉ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**  St. Lucie County, FL Fixture Filing  135758-00401

STANDARD FORM - FORM UCC-1 (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE
## FINANCING STATEMENT FORM – ADDENDUM

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME |
|---|
| Florida Gaming Centers, Inc. |

| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

**9. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (10a OR 10b) – Do Not Abbreviate or Combine Names**

| 10a. ORGANIZATION'S NAME |
|---|
| |

| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 10d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 10e. TYPE OF ORGANIZATION | 10f. JURISDICTION OF ORGANIZATION | 10g. ORGANIZATIONAL ID# |
|---|---|---|---|---|
| | | | | NONE |

**11. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY NAME (11a OR 11b)**

| 11a. ORGANIZATION'S NAME |
|---|
| |

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**13.** Description of real estate:

Land and improvements located in the County of St. Lucie, State of Florida as more fully described in Exhibit "B" attached hereto.

**14.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**15.** Additional collateral description:

**16.** Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**17.** Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction – effective 30 years

☐ Filed in connection with a Public-Finance Transaction – effective 30 years

STANDARD FORM - FORM UCC-1 ADDENDUM (REV.12/2001)     Filing Office Copy     Approved by the Secretary of State, State of Florida

**EXHIBIT "A"**
**to UCC-1 Financing Statement**

Debtor:      **Florida Gaming Centers, Inc.**
Secured Party:    **ABC Funding, LLC, as administrative**
                         **agent for the Lenders, its successors and**
                         **assigns**

All of Debtor's now owned or hereafter acquired right, title and interest in and to:

      (a)     The real property located in the County of St. Lucie, State of Florida, as described in ***Exhibit B***, together with all existing and future easements and rights affording access to it (the *"Premises"*); together with

      (b)     All buildings, structures and improvements now located or later to be constructed on the Premises (the *"Improvements"*); together with

      (c)     All existing and future appurtenances, privileges, easements, franchises and tenements of the Premises, including all minerals, oil, gas, other hydrocarbons and associated substances, sulphur, nitrogen, carbon dioxide, helium and other commercially valuable substances which may be in, under or produced from any part of the Premises, all development rights and credits, air rights, water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant) and water stock, and any Premises lying in the streets, roads or avenues, open or proposed, in front of or adjoining the Premises and Improvements; together with

      (d)     All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions (*"leases"*) relating to the use and enjoyment of all or any part of the Premises and Improvements, and any and all guaranties and other agreements relating to or made in connection with any of such leases; together with

      (e)     All real property and improvements on it, and all appurtenances and other property and interests of any kind or character, whether described in *Exhibit B* or not, which may be reasonably necessary or desirable to promote the present and any reasonable future beneficial use and enjoyment of the Premises and Improvements; together with

      (f)     All goods, materials, supplies, chattels, furniture, fixtures, equipment and machinery now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Premises and Improvements, whether stored on the Premises or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment, all of which shall be considered to the fullest extent of the law to be real property for purposes of that certain Mortgage, Absolute Assignment of Rents, Security Agreement and Fixture Filing from Debtor to Secured Party and any manufacturer's warranties with respect thereto; together with

(g)     All building materials, equipment, work in process or other personal property of any kind, whether stored on the Premises or elsewhere, which have been or later will be acquired for the purpose of being delivered to, incorporated into or installed in or about the Premises or Improvements.   The items of property encumbered by subparagraph (f) and by this subparagraph (g) are jointly and severally called the *"Tangible Personalty"*;  together with

(h)     All of Debtor's interest in and to all operating accounts, the Loan funds, whether disbursed or not and any other bank accounts of Debtor; together with

(i)     All rights to the payment of money, accounts, accounts receivable, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including all earnest money sales deposits) or deposited by Debtor with third parties (including all utility deposits), contract rights, development and use rights, governmental permits and licenses, applications, architectural and engineering plans, specifications and drawings, as-built drawings, chattel paper, instruments, documents, notes, drafts and letters of credit (other than letters of credit in favor of Secured Party), which arise from or relate to construction on the Premises or to any business now or later to be conducted on it, or to the Premises and Improvements generally and any builder's or manufacturer's warranties with respect thereto; together with

(j)     All insurance policies pertaining to the Premises and all proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Premises, Improvements or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any damage or injury to the Premises, Improvements or the other property described above or any part of them, or breach of warranty in connection with the construction of any Improvements, including causes of action arising in tort, contract, fraud or concealment of a material fact; together with

(k)     All books and records pertaining to any and all of the property described above, including computer-readable memory and any computer hardware or software necessary to access and process such memory; together with

(l)     All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

All undefined capitalized terms used above shall have the meanings ascribed to such terms in that certain Credit Agreement by and among Debtor, Secured Party, and other parties.

## Exhibit "B"

Officer's Certificate, Unanimous Written Consent of the Board of Directors of Florida
Gaming Centers, Inc. and Trustee Affidavit Supporting
Infante, Zumpano, Hudson & Miloch, LLC
Opinion

# FLORIDA GAMING CENTERS, INC.

## OFFICER'S CERTIFICATE

April 15 2011

The undersigned officer of Florida Gaming Centers, Inc., a Florida corporation (the "Company"), hereby certifies the following matters to Infante, Zumpano, Hudson, & Miloch, LLC ("Counsel"), in order to induce Counsel to provide certain opinions (collectively, the "Opinion"), based, in part, upon the matters set forth in this Officer's Certificate (this "Certificate"). Unless otherwise indicated, capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in that certain Credit Agreement, dated as of even date herewith, made by and among the Company, Florida Gaming Corporation, ABC Funding, LLC, as agent and the Lenders (as defined therein) (the "Credit Agreement").

1. Representations and Warranties True and Correct. The representations and warranties of the Company set forth in the Loan Documents and Collateral Documents and any documents contemplated thereby or referenced therein and any other documents executed or delivered in connection with the Credit Agreement (collectively, the "Related Transaction Documents"), are true, correct and complete as of the date hereof, and do not omit any information necessary to make the statements therein not misleading.

2. Certificate of Incorporation. Attached hereto as *Exhibit A* is a true, correct and complete copy of the certificate of incorporation  in effect on and as of the date hereof (collectively, the "Charter"). No action has been taken or is pending or contemplated for the purpose of restating, amending, altering or modifying the Charter, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

3. Bylaws. Attached hereto as *Exhibit B* is a true, correct and complete copy of the Bylaws of the Company as in effect on and as of the date hereof (the "Bylaws"). No action has been taken or is pending or contemplated for the purpose of restating, amending, altering or modifying the Bylaws, and the same have not been rescinded or revoked and are in full force and effect on the date hereof.

4. Resolutions. Attached hereto as *Exhibit C* is a true, correct and complete copy of the resolutions (the "Resolutions"), duly adopted by the joint unanimous written consent of the board of directors (there being no vacancies thereon) and shareholders of the Company approving the Credit Agreement, the Related Transaction Documents and the transactions contemplated thereby (collectively, the "Transactions"). No action has been taken or is pending or contemplated for the purpose of restating, amending, altering or modifying the Resolutions, the same have not been rescinded or revoked and remain in full force and effect on the date hereof, and constitute the only document or action that may affect the authorization of the Credit Agreement, the Related Transaction Documents and the Transactions.

5.      Good Standing.  No event has occurred which has adversely affected the standing of the Company reflected in the certificate of good standing attached hereto as *Exhibit D* since the date of such certificate.

6.      No Dissolution.  The Company has not received any notice from the Secretary of State of the State of Florida or any other governmental authority of a determination that any grounds exist for administratively dissolving the Company, and the Company has not received notice of the commencement of any action to judicially dissolve the Company. None of the shareholders, directors, officers or agents of the Company have taken any action with respect to the dissolution of the Company; the Company has not filed any notice of intent to dissolve with the Secretary of State of the State of Florida; and there are no proceedings pending or contemplated for (i) the merger, consolidation, conversion, dissolution, liquidation or termination of the Company or (ii) the Company's transfer to or domestication in any jurisdiction other than the State of Florida.

7.      Authorization.  The Company has the requisite corporate power and authority to own its properties and assets and to carry on and conduct its business as presently conducted and as currently proposed to be conducted and to execute, deliver, and perform its obligations under the Credit Agreement and the Related Transaction Documents. The person who signed the Credit Agreement and the Related Transaction Documents on behalf of the Company is now duly elected, appointed and qualified to sign on behalf of the Company and the signature of such person appearing on such document is his or her genuine signature.  The Company has given possession of the fully executed Credit Agreement and the Related Transaction Documents to the other parties thereto with the intent to form an immediately binding agreement between the parties thereto.

8.      Required Governmental Approvals. Based on the nature of the business and business activities of the Borrower, no consent, approval, order or authorization of, or registration, declaration or filing by Borrower, with, any governmental or public body or authority or agency is required for the valid execution, delivery and performance of each of the Opinion Documents by the Borrower.

9.      Litigation.  Except as set forth on Exhibit D attached hereto, there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, pending or, to the knowledge of the undersigned, threatened against or affecting the Borrower.

10.     No Shareholders Agreement. The Company does not have and has never had a Shareholders Agreement in effect.

11.     Conflict with Governmental Authorities.  There are no orders, judgments or decrees of any court, administrative agency or other governmental authority applicable to the Company that would prohibit or restrict the execution, delivery and performance by the Company of the Credit Agreement or the Related Transaction Documents or the consummation of the Transactions.

12.   No Defaults.  The Company is not in default with respect to any order, judgment or decree of any court, or in violation of any applicable order, regulation or demand of any administrative agency or other governmental agency or instrumentality.

13.   Accuracy of Statements.  The undersigned is not aware of any facts that could render any of the foregoing statements to be untrue or incomplete in any respect.

14.   No Known Breach.  The Borrower is not aware of (a) except for contracts that are not material, any agreement, document, or instrument to which the Borrower or which any of its assets may be bound, or (b) any license, permit, judgment, decree or order to which the Borrower is subject or to which any of its assets may be bound, which would be violated, conflict with or result in a default under in connection with the execution, delivery and performance of the Related Transaction Documents by the Borrower.

15.   Purpose.  The Borrower has provided this Certificate in order to provide  Counsel with factual information requested by Counsel so that Counsel may issue its Opinion. The Borrower has made inquiries and investigations reasonably calculated to assure that the information provided in this Certificate is accurate and complete, including (1) inquiries of appropriate personnel responsible for legal matters, financial matters and compliance with governmental requirements and (2) identification and review of relevant documents.  The Borrower understands that Counsel will not check, audit, or otherwise attempt to verify the information in this Certificate.  The Borrower intends and agrees that Counsel may rely upon this Certificate and all information provided in this Certificate.  The undersigned is aware that Counsel is relying on this Certificate in rendering the Opinion and that this Certificate may be annexed to the Opinion.

The undersigned certifies that on the date hereof, he is a duly elected, qualified and acting officer of the Company and is authorized on behalf of the Company to execute this Certificate. The undersigned has knowledge of all the facts contained herein and hereby consents to Counsel's issuance of the Opinion.

[Signature on Following Page]

**IN WITNESS WHEREOF**, the undersigned has executed this Officer's Certificate on behalf of the Company as of the date first above written.

W. Ilm. B Garry (name), as ___CEO___ (office)
of Florida Gaming Centers, Inc.

MIA181133526 v4

**Exhibit A**
<u>Certificate of Incorporation</u>

(see attached)

# *State of Florida*
## *Department of State*

I certify from the records of this office that FLORIDA GAMING CENTERS, INC. is a corporation organized under the laws of the State of Florida, filed on October 17, 1996.

The document number of this corporation is P96000085895.

I further certify that said corporation has paid all fees due this office through December 31, 2010, that its most recent annual report was filed on April 23, 2010, and its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Fifteenth day of March, 2011*



## *Secretary of State*

Authentication ID: **200198038972-031511-P96000085895**

To authenticate this certificate,visit the following site, enter this ID, and then follow the instructions displayed.
**https://efile.sunbiz.org/certauthver.html**

**Exhibit B**
<u>Bylaws</u>

(see attached)

AUG-10-2010  14:45                                  8129457717   P.01/14

# BYLAWS

## OF

## FLORIDA GAMING CENTERS, INC.

### 1.    Offices

1.1    **Registered Office.**   The Corporation shall have and maintain in Florida a registered office which shall be the business office of the Corporation's registered agent in Florida.

1.2    **Other Offices.**   The Corporation may have such other offices at such places, both within and without Florida, as the Board of Directors may from time to time designate or as the business of the Corporation may from time to time require.

### 2.  Meetings of Stockholders

2.1    **Meeting Place.**  All meetings of the stockholders shall be held at such place, either within or without Florida, as the Board of Directors may from time to time designate and as stated in the notice of the meeting.

2.2    **Annual Meetings.**  An annual meeting of the stockholders shall be held for the election of directors at such date and time during each fiscal year of the Corporation as the Board of Directors shall designate and as stated in the notice of the annual meeting. In addition to the election of directors, the stockholders shall transact such other business as may properly be brought before the meeting.

EXHIBIT A

1

2.3  Special Meetings.  Unless otherwise prescribed by law, by the Corporation's Articles of Incorporation, or by these Bylaws, special meetings of the stockholders may be called for any purpose or purposes by (a) the Chairman of the Board, if any, or (b) the Chief Executive Officer or the Secretary upon the written request of a majority of the members of the Board of Directors.

2.4  Meeting Notices.  Except as otherwise provided by law, by the Corporation's Articles of Incorporation, or by these Bylaws, written notice of any annual or special meeting of the stockholders shall state the place, date, and time thereof and, in the case of a special meeting, the purpose or purposes for which the meeting is called, and shall be given to each stockholder of record entitled to vote at such meeting not less than ten nor more than sixty days before the meeting.

2.5  Presiding Officers; Order of Business.

(a) The Chief Executive Officer, if any, shall preside at all meetings of the stockholders at which the Chief Executive Officer is present. If the Chief Executive Officer is not present at a meeting of the stockholders, the following officer or person shall preside (in descending order of preference): (1) the Chairman of the Board, if any, (2) the President, (3) a Vice President or director specifically designated by the Board of Directors to preside at the meeting, or (4) a stockholder chosen at the meeting by stockholders present in person or by proxy who own a majority of the shares of capital stock of the Corporation entitled to vote and represented at the meeting.

2

(b) If present at the meeting, the Secretary of the Corporation shall serve as secretary of the meeting. If the Secretary of the Corporation is not present at the meeting, a person designated by the officer or person presiding over the meeting shall serve as secretary of the meeting.

2.6  Quorum; Adjournments.

(a) Except as otherwise provided by law, by the Corporation's Articles of Incorporation, or by these Bylaws, the holders of a majority of the shares of capital stock of the Corporation issued and outstanding and entitled to vote at any given meeting present in person or by proxy shall be necessary to, and shall constitute a quorum for, the transaction of business at all meetings of the stockholders.

(b) If a quorum is not present in person or by proxy at any meeting of stockholders, the stockholders entitled to vote thereat, present in person or by proxy, shall have the power to adjourn the meeting from time to time, without notice of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, until a quorum is present in person or by proxy.

(c) If a meeting is adjourned in accordance with Section 2.6(b) of these Bylaws and a quorum is present in person or by proxy at such adjourned meeting, the stockholders may transact at the adjourned meeting any business which might have been transacted at the original meeting. But if the adjournment is for more than thirty days, or if after the adjournment a new record date is fixed

3

for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

2.7  Voting.

(a) At any meeting of stockholders, every stockholder having the right to vote on a particular subject matter shall be entitled to vote in person or by proxy on that subject matter. Except as otherwise provided by law or by the Corporation's Articles of Incorporation, each stockholder of record shall be entitled to one vote (on each matter submitted to a vote) for each share of capital stock registered in his or her name on the books of the Corporation.

(b) As to the election of directors, the candidate or candidates, up to the number of directors to be elected, receiving the highest number of votes shall be elected.

(c) As to all other matters and except as otherwise provided by law or by the Corporation's Articles of Incorporation, the vote or the holders of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote on that matter, present in person or by proxy, shall decide any question brought before the meeting.

2.8  Action by Consent.  Any action required or permitted to be taken at any meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a written consent in lieu of such meeting, setting forth the action so taken, is signed before or after such action by the holders of issued and

4

AUG-18-2010  14:47                                      8129457717   P.05/14

outstanding shares of the capital stock of the Corporation having
not less than the minimum number of votes that would be necessary
to authorize or take such action at a meeting at which all shares
entitled to vote thereon were present and voted. All written
consents shall be filed with the minutes of the meetings of the
stockholders .

### 3.  Board of Directors.

3.1.  Number of Directors.   Subject to any provision of the
Corporation's Articles of Incorporation governing the number of the
corporation's directors, the exact number of the Corporation's
directors may be fixed, increased, or decreased from time to time
by a resolution adopted by the vote of the directors at the
meeting, or by consent in lieu of a meeting, at which, or by which,
the time and place of the annual meeting of stockholders are
designated.  Directors need not be stockholders or residents of
Florida.

3.2  Term.   Each director shall held office for the term for
which he is elected or until his successor shall have been elected
and qualifies for the office, whichever period is longer.

3.3  Vacancies.   Any vacancy occurring in the Board of
Directors may be filled by the affirmative vote of a majority of
the remaining directors though less than a quorum of the Board of
Directors.  A director elected to fill a vacancy shall serve for
the unexpired term of his or her predecessor in office.

3.4  Chief Executive Officer; Chairman.   The Board of
Directors may from time to time select from among its members a

Chief Executive Officer and a Chairman of the Board who shall serve
during the pleasure of the Board of Directors. The Chief Executive
Officer, if any, shall preside at all meetings of the Board of
Directors. If there is no Chief Executive Officer or if the Chief
Executive Officer is not present at the meeting, the following
shall preside (in descending order of preference): (1) the Chairman
of the Board, if any, (2) the President, or (3) a director selected
by a majority of the directors present at a meeting at which a
quorum is present.

3.5 Meetings. The Board of Directors may hold meetings, both
regular and special, either within or without Florida. Regular
meetings of the Board of Directors may be held without notice at
such time and at such place as the Board shall from time to time
determine.  Special meetings of the Board of Directors may be
called by the Chairman of the Board or by the Chief Executive
Officer on two days' notice to each director, either personally or
by telephone or telegram, or on seven days notice to each director
by mail or overnight courier. The President or the Secretary shall
call a special meeting of the Board of Directors in like manner and
on like notice at the written request of any two directors.

3.6 Quorum and Voting. Except as otherwise provided by law
or by the Corporation's Articles of Incorporation, a majority of
the total number of directors shall constitute a quorum for the
transaction of business, and the vote of a majority of the
directors present at any meeting at which quorum is present shall
be the act of the Board of Directors. If less than a quorum is

6

present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

3.7  Vacancies.  Except as otherwise provided in these Bylaws, vacancies and newly created directorships may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director.  When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective.  Each director so chosen shall hold office until the earliest end of his or her tenure as prescribed by these Bylaws, the Corporation's Articles of Incorporation or otherwise by law.

3.8  Action by Consent.  Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting and without prior notice if a written consent in lieu of such meeting, setting forth the action so taken, is signed either before or after such action by all directors.  All written consents shall be filed with the minutes of the proceedings of the Board of Directors.

3.9  Telephone Meetings.  The Board of Directors may participate in meetings by means of conference telephone or similar communications equipment, whereby all directors participating in

7

the meeting can hear each other at the same time, and participation in any such meeting shall constitute presence in person by such director at such meeting.  A written record shall be made of all actions taken at any meeting conducted by means of a conference telephone or similar communications equipment.

### 4. Committees

4.1  Establishment of Committees.  The Board of Directors may, by resolution duly adopted by a majority of the whole Board, appoint such committee or committees as it shall deem advisable and with such limited authority as the Board of Directors shall from time to time determine.

4.2  Miscellaneous.

(a)  The Board of Directors shall have the power at any time and from time to time to fill vacancies in, to change the membership of, or to discharge any committee.

(b)  Unless prohibited by law, the provisions of section 3.8 ("Action by Consent") and of Section 3.9 ("Telephone Meetings") shall apply to all committees from time to time created by the Board of Directors.

### 5. Officers

5.1  Positions.  The Corporation may have a Chief Executive Officer and a Chairman of the Board, and shall have a President and Chief Operating Officer, one or more Vice Presidents, a Secretary, and a Treasurer, all of whom shall be chosen by the Board of Directors.  The Corporation may also have such assistant officers as the Board of Directors may deem necessary, all of whom shall be

8

elected by the Board of Directors.  Any number of offices may be held by the same person.

5.2  Rights and Duties--General.  The election of any officer of the Corporation shall not of itself create any contract rights for any such officer with respect to that officer's position or employment by the Corporation. All officers of the Corporation shall exercise such powers and perform such duties as the Board of Directors may from time to time direct.

5.3  Term of Office; Removal.  Each officer of the corporation shall hold office at the pleasure of the Board of Directors and any officer may be removed, with or without cause, at any time.  The Board of Directors may fill any vacancy in any office for the unexpired portion of the office term.

5.4  Chief Executive Officer.  The Chief Executive Officer, if any, shall, subject to the direction of the Board of Directors, have general charge and authority over the business of the Corporation and perform such executive, supervisory, and management functions and duties as the Board of Directors may from time to time assign.

5.5  The Chairman of the Board.  The Chairman of the Board, if any, shall, subject to the direction of the Board of Directors, have general charge and authority over the business of the Corporation and perform such executive, supervisory, and management functions and duties as the Board of Directors may from time to time assign.

9

5.6 <u>President</u>.  The President, if any, shall, subject to the direction of the Board of Directors, have general charge and authority over the business of the Corporation and perform such executive, supervisory, and management functions and duties as the Board of Directors may from time to time assign.

5.7 <u>Chief Operating Officer</u>.  The Chief Operating Officer, if any, shall, subject to the direction of the Board of Directors, have general charge and authority over the business of the Corporation and perform such executive, supervisory, and management functions and duties as the Board of Directors may from time to time assign.

5.8 <u>Vice President(s)</u>.  The Vice President, or if there be more than one Vice President the Vice Presidents in the order of their seniority by designation (or if not designated, in the order of their seniority of election), shall perform the duties of the President in his absence.  The Vice President(s) shall have such other powers and duties as the Board of Directors or the Chief Executive Officer, if any, or the President, if there is no Chief Executive Officer, may assign.

5.9 <u>Secretary</u>.  The Secretary shall:

(a) Issue notices of all meetings for which notice is required to be given;

(b) Keep the minutes of all meetings and have charge of the corporate record books; and

10

(c) Have such other duties and powers as the Board of Directors or the Chief Executive Officer, if any, or the President, if there is no Chief Executive Officer, may assign.

5.10. Treasurer. The Treasurer shall:

(a) Have the custody of all funds and securities of the Corporation;

(b) Keep adequate and correct accounts of the Corporation's affairs and transactions; and

(c) Have such other duties and powers as the Board of Directors or the Chief Executive Officer, if any, or the President, if there is no Chief Executive Officer, may assign.

## 6. Notices

6.1  Written Notice--Form; Delivery. Any written notice required or permitted to be given to any director, officer, stockholder, or committee member shall be either personally delivered or given by first-class mail or overnight courier with postage prepaid, in any case addressed to the recipient at his or her address as it appears in the records of the Corporation. Personally delivered notices shall be deemed given at the time they are delivered at the address of the named recipient as it appears in the records of the Corporation, mailed notices shall be deemed given at the time they are deposited in the United States mail, and notices given by overnight courier shall be deemed given at the time they are delivered to the courier. Notice to a director may also be given by telegram sent to his or her address as it appears

11

on the records of the Corporation and shall be deemed given at the time delivered at such address.

6.2  <u>Waiver; Effect of Attendance</u>.  Whenever any notice is required to be given by law, by the Corporation's Articles of Incorporation, or by these Bylaws, a written waiver thereof, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be the equivalent of the giving of such notice.  Any stockholder who attends a meeting of stockholders in person, or who is represented at such meeting by a proxy, or any director or committee member who attends a meeting of the Board of Directors or of a committee thereof, shall be deemed to have had timely and proper notice of the meeting, unless such stockholder (or his or her proxy), director, or committee member attends for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened.

## 7.  Indemnification

The Corporation shall indemnify each person who may be indemnified (individually an "Indemnitee" and collectively the "Indemnitees") pursuant to the Florida Corporation Law, as amended from time to time (or any successor provision thereto), to the fullest extent permitted by the Florida Corporation Law in each and every situation in which the Corporation may do so under said law, the Corporation hereby obligates itself to so indemnify the Indemnitees, and in each case, if any, in which the Corporation must make certain investigations on a case-by-case basis before

12

indemnification, the Corporation hereby obligates itself to pursue such investigations diligently, it being the specific intention of these Bylaws to obligate the Corporation to indemnify each Indemnitee to the fullest extent permitted by law at any time and from time to time. To the extent not prohibited by any provision of the Florida Corporation Law, as amended from time to time), the Indemnitees shall not be liable to the Corporation except for their own individual willful misconduct or actions taken in bad faith.

### 8. General Provisions

8.1 Registered Stockholders. Except as otherwise provided by law, the Corporation shall be entitled to recognize the exclusive right of a person who is registered on its books as the owner of shares of its capital stock to receive dividends or other distributions (to the extent otherwise distributable or distributed), to vote (in the case of voting stock) as such owner, and to hold liable for calls and assessments a person who is registered on its books as the owner of shares of its capital stock. The Corporation shall not be bound to recognize any other person's equitable or legal claim to, or interest in, such shares. The Corporation (or its transfer agent) shall not be required to send notices or dividends to a name or address other than the name or address of the stockholders appearing on the stock ledger maintained by the Corporation (or by the transfer agent or registrar, if any), unless any such stockholder shall have notified the Corporation (or the transfer agent or registrar, if any), in

13

writing, of another name or address at least ten days before the
mailing of such notice or dividend.

8.2   Dividends.   Subject to the provisions of the
Corporation's Articles of Incorporation and of the Florida
Corporation Law, as amended from time to time, the Board of
Directors may declare dividends upon the capital stock of the
Corporation at any regular or special meeting, and such dividends
may be paid in cash, in property, or in shares of the capital stock
of the Corporation.

8.3   Fiscal Year.   Subject to change at any time at the
direction of the Board of Directors, the fiscal year of the
Corporation shall end on December 31 in each calendar year.

8.4   Amendment of Bylaws.   The Board of Directors shall have
the power to make, alter, and repeal these Bylaws, and to adopt new
bylaws, in all cases by an affirmative vote of a majority of the
whole Board of Directors, provided that notice of the proposal to
make, alter, or repeal these Bylaws, or to adopt new bylaws, is
included in the notice of the meeting of the Board of Directors at
which such action takes place.

**Exhibit C**
Resolutions

(see attached)

*MIA181133526 v4*

## UNANIMOUS WRITTEN CONSENT OF THE
## BOARD OF DIRECTORS OF FLORIDA GAMING CENTERS, INC.

April _15_ , 2011

The undersigned, being all the directors of the Board of Directors (the "**Board**") of Florida Gaming Centers, Inc., a Florida corporation (the "**Company**" or "Borrower") hereby adopt the following resolutions:

**WHEREAS**, the Board has reviewed the terms of the Credit Agreement dated as of _April 15_ , 2011 (the "**Credit Agreement**") and all of the documents by and among the Company, as borrower, Florida Gaming Corporation, a Delaware corporation, the financial institutions from time to time parties thereto (each a "Lender" and collectively, the "Lenders") and ABC Funding, LLC, as Administrative Agent (the "Agent"), setting forth the terms and conditions of certain loans being made by the Lenders to the Borrower, as guaranteed by Holdings, Freedom Holding, Inc., a Delaware corporation ("Holdings"), Tara Club Estates, Inc., a Georgia corporation, and City National Bank of Florida, a national banking corporation, as trustee of Trust Number 5003471 under that certain Land Trust Agreement dated January 3, 1979 (the "Trustee"), and all of the documents and agreements contemplated thereby, including, without limitation, the documents listed in Exhibit "A" attached hereto (hereinafter, collectively with the Credit Agreement, the "Transaction Documents"); and

**WHEREAS**, the Board has determined that it is desirable and in the best interest of the Company for the Company to enter into the Transaction Documents; and

**NOW, THEREFORE, BE IT RESOLVED**, that the Transaction Documents are hereby ratified and approved in all respects and the execution and delivery of such instruments to Lenders, in the name and on behalf of the Company, by any Authorized Representative (as such term is defined below) is hereby ratified and approved; and it is

**RESOLVED, FURTHER,** that each of _William B. Collett_ and _William B. Collett, Jr._ (the "**Authorized Representatives**") are hereby authorized and empowered, for and on behalf of the Company, to negotiate and approve the Transaction Documents and to take all such further action as may, in the judgment of such Authorized Representative, be necessary or desirable to cause such Transaction Documents to be consummated and effective, and it is

**RESOLVED FURTHER**, that each Authorized Representative (in the name and on behalf of the Company) is hereby authorized, directed and empowered, as security for any and all indebtedness, liabilities and obligations of the Company to the Lenders, to grant a security interest in all of the Company's assets and property, including, without limitation, real property and accounts receivable, equipment, fixtures, intellectual property, inventory, and general intangibles (and all accessions, improvements and additions to, substitutions for, and replacements, products, profits and proceeds of any of the foregoing) detailed in the Miami Mortgage and the St. Lucie Mortgage, to the Lenders (in each case, whether now owned or hereafter acquired or arising), and to execute and deliver to the Lenders any and all grants, security interests, pledges, assignments, transfers, financing statements, and any other similar agreement in connection therewith as required pursuant to the Transaction Documents.

**RESOLVED, FURTHER,** that all of the terms, provisions, and conditions included or to be included in the foregoing described documents are hereby ratified and approved in all respects, and each of the Authorized Representatives are hereby authorized and directed to execute and deliver such instruments to Lenders, in the name and on behalf of the Company, with such changes, additions or omissions therefrom as the Authorized Representative executing and delivering the same may in his, her or their absolute discretion approve, such approval to be conclusively evidenced by his, her or their execution and delivery of any such agreement, instrument or document with such changes therein; and it is

**RESOLVED, FURTHER,** that the Authorized Representatives be, and each of them thereby is, authorized and empowered for, in the name of and on behalf of the Company to take such actions, to negotiate, execute and deliver such promissory notes, certificates, agreements, instruments, notices, and documents and to effect any necessary filings under federal or state securities laws and with any and all appropriate regulatory authorities, state, federal and foreign, as may be required or as such Authorized Representative may deem necessary, advisable or proper to carry out the transactions contemplated by, or for the purposes and intents of the foregoing resolutions, all such actions to be performed in such manner, and all such certificates, instruments, notices and documents to be executed and delivered, in such form as the Authorized Representative performing or executing the same shall approve, the performance or execution thereof by such Authorized Representative to be conclusive evidence of the approval thereof by such Authorized Representative; and it is

**RESOLVED FURTHER,** that the authority granted to the Authorized Representatives under the foregoing resolutions shall be deemed to include, in the case of each such resolution, the authority to perform such further acts and deeds as may be necessary or appropriate, in the judgment of such Authorized Representative, to carry out the transactions contemplated hereby, and all acts and deeds previously performed by such Authorized Representative prior to the date of these resolutions that are within the authority conferred hereby, are ratified, confirmed and approved as the authorized acts and deeds of the Company; and it is

**RESOLVED FURTHER,** that the execution by any of the said Authorized Representatives of any document authorized by the foregoing resolutions or any document executed in the accomplishment of any action or actions so authorized, is (or shall become upon delivery) the enforceable and binding act and obligation of the Company, without the necessity of the signature or attestation of any other officer of the Company or the affixing of the corporate seal.

**RESOLVED FURTHER,** that the Authorized Representatives and the Secretary of the Company be and are hereby authorized to execute on behalf of the Company and to affix the corporate seal to any and all documents, instruments or papers required to accomplish the procuring of the Transaction Documents.

**RESOLVED FURTHER,** that the Lenders may rely upon a copy of this Unanimous Written Consent, certified by the Secretary or any of the Authorized Representatives, as evidence of the authority of the Secretary and the Authorized Representatives, and that said certified copy of this Unanimous Written Consent shall be conclusive evidence that his Unanimous Written Consent stands unimpaired and unrevoked.

**[Signatures on following page]**

2

**IN WITNESS WHEREOF**, this Unanimous Written Consent has been adopted by the undersigned Board of the Directors of Florida Gaming Centers, Inc. as of the date first written above.

**BOARD OF DIRECTORS**

Name: William B Collett Jr

Name:

Name:

3

APR-14-2011  16:00                                                    P.05/07

IN WITNESS WHEREOF, this Unanimous Written Consent has been adopted by the undersigned Board of the Directors of Florida Gaming Centers, Inc. as of the date first written above.

BOARD OF DIRECTORS

Name: _____ W. B. Collett

4

**IN WITNESS WHEREOF,** this Unanimous Written Consent has been adopted by the undersigned Board of the Directors of Florida Gaming Centers, Inc. as of the date first written above.

**BOARD OF DIRECTORS**

Name:_____

Name:_____

Name: _____

## Exhibit "A"

1.       Credit Agreement.

2.       Disbursement Agreement.

3.       Pledge and Security Agreement.

4.       Term Loan Notes made by the Borrower in favor of the Lenders.

5.       Mortgage, Absolute Assignment of Rents, Security Agreement, and Fixture Filing by Trust and Borrower in favor of the Agent against real property located in Miami-Dade County, Florida ("Miami Mortgage").

6.       Mortgage, Absolute Assignment of Rents, Security Agreement, and Fixture Filing by Borrower in favor of Agent against real property located in St. Lucie, Florida ("St. Lucie Mortgage").

7.       Collateral Assignment of Beneficial Interest Under Land Trust Agreement, from Borrower to and for the benefit of the Agent.

8.       Assignment of Construction and Development Documents, by and between Borrower and Holdings and the Agent.

9.       Collateral Assignment of Development Agreement, by and between Borrower, d/b/a Miami Jai Alai, Inc. d/b/a W.J.A. Realty, Inc., and the Agent.

10.      Collateral Assignment of Settlement Agreement Documents, by and between Borrower d/b/a Miami Jai Alai, Inc., d/b/a W.J.A. Realty, Inc. and Trust and the Agent.

11.      Environmental Indemnity Agreement, by and between Borrower and Holdings in favor of the Agent relating to real property located in St. Lucie, Florida.

12.      Environmental Indemnity Agreement, by and between Borrower and Trust, in favor of the Agent relating to real property located in Miami-Dade, Florida.

13.      Warrant Agreement among Borrower, Holdings and the Holders named therein and the warrants issued pursuant thereto.

MINUTES OF A SPECIAL MEETING
OF THE
BOARD OF DIRECTORS
OF
FLORIDA GAMING CENTERS, INC.

A special meeting of the Board of Directors of Florida Gaming Centers, Inc., a Florida corporation (the "Corporation"), was held at 1:30 p.m. Eastern Daylight Time on March 25, 2011 in Duluth, Georgia pursuant to proper notice given to each Director. Present in person at the meeting were the following Directors: W. Bennett Collett, W. Bennett Collett, Jr., William C. Haddon and George W. Galloway, M.D.

W. Bennett Collett, Chairman of the Board and Chief Executive Officer of the Corporation served as Chairman of the meeting. W. Bennett Collett, Jr., President and Chief Operating Officer of the Corporation, served as Secretary of the meeting.

The Chairman called the meeting to order and declared that a quorum of Directors was present.

At the invitation of the Board, Matt Sodl, Kevin Scheible and Michael Hilcove of Innovation Capital (the "Innovation Representatives"), the Corporation's financial advisor, participated in the meeting via teleconference. Also at the invitation of the Board, Daniel J. Licciardi, Executive Vice President and General Manager, and R. James Straus of Frost Brown Todd LLC, legal counsel to the Corporation, attended, and participated in, the meeting. Jeff Stodghill of Frost Brown Todd participated in the meeting via teleconference.

Mr. Collett, with the assistance of Mr. Straus and the Innovation Representatives, led a discussion of the Corporation's current financial situation and its urgent need for a significant capital infusion. Previous financing and investment proposals that ultimately were not consummated were discussed. The Innovation Representatives discussed in detail a proposal from ABC Funding, LLC, a wholly-owned affiliate of Summit Partners Credit Advisors, L.P., to provide approximately $86.0 million in financing to the Corporation and its parent Florida Gaming Corporation to enable the Corporation and its parent to fund construction of a build-out of the Miami Jai Alai facility to facilitate slot machine gaming, refinance existing debt, and pay fees and expenses incurred in furtherance of the foregoing. With the assistance of the Innovation Representatives, Mr. Straus and Mr. Stodghill, the Directors discussed the Summary of Proposed Terms and Conditions related to the ABC Funding financing. The Innovation Representatives left the meeting and the Directors, with the assistance of Mr. Straus and Mr. Stodghill, reviewed drafts of the principal documents to be entered into by the Corporation and its affiliates and discussed legal issues pertaining to the ABC Funding proposal.

After the discussion, the Directors adopted the following resolutions:

WHEREAS, the Directors have determined that it is in the best interests of the Corporation and its shareholder to cause the Corporation to seek financing to (i) fund construction and improvement costs associated with the build-out of the Miami Jai-Alai facility

Exercise Percentage multiplied by the net value of the Corporation as determined under the Credit Agreement;

FURTHER RESOLVED, that the Articles of Incorporation of the Corporation be amended so that, as amended, Article III thereof reads in its entirety as follows:

"The number of shares of stock that this corporation is authorized to have outstanding at any one time is 2,000 shares of stock at no par value."

FURTHER RESOLVED, that effective simultaneously with the execution and delivery of the Credit Facility Documents by the Corporation, the Corporation accepts the resignation of W. Bennett Collett as the Chief Executive Officer of the Corporation, which resignation shall not affect Mr. Collett's status as a member and the Chairman of the Corporation's Board of Directors;

FURTHER RESOLVED, that effective simultaneously with the resignation of W. Bennett Collett, the Board elects W. Bennett Collett, Jr. as the President and Chief Executive Officer of the Corporation and Daniel J. Licciardi as the Vice President and Chief Operating Officer of the Corporation and authorizes the Company to enter into employment agreements with Mr. Collett, Jr. and Mr. Licciardi providing for an annual salary of $300,000 to Mr. Collett, Jr. and $225,000 to Mr. Licciardi and containing such other terms and conditions set forth in the forms of employment agreements reviewed by the Board; and

FURTHER RESOLVED, that each of W. Bennett Collett and W. Bennett Collett, Jr., acting alone, is authorized and directed, for and on behalf of the Corporation, to execute and deliver each of the Credit Facility Documents and all such other documents, instruments and agreements that are contemplated therein or necessary or appropriate to effect the intent thereof, each in such specific form as Mr. Collett or Mr. Collett, Jr. shall approve, and to take all such other actions as are necessary or appropriate to cause the Corporation to obtain the Credit Facility and to initiate and complete the Project.

**Exhibit D**
Certificate of Good Standing

(see attached)

*MIA181133526 v4*

# *State of Florida*
## *Department of State*

I certify from the records of this office that FLORIDA GAMING CENTERS, INC. is a corporation organized under the laws of the State of Florida, filed on October 17, 1996.

The document number of this corporation is P96000085895.

I further certify that said corporation has paid all fees due this office through December 31, 2011, that its most recent annual report was filed on April 8, 2011, and its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Fifteenth day of April, 2011*

## *Secretary of State*



Authentication ID: **200202014042-041511-P96000085895**

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.
**https://efile.sunbiz.org/certauthver.html**

<u>**TRUSTEE'S AFFIDAVIT**</u>

BEFORE ME, this date personally appeared <u>DOUGLAS J. HELSPER</u>, who, being duly sworn, deposes and says:

1.    <u>The Affiant</u>. Your Affiant is the First and Trust Officer Vice President of City National Bank of Florida, Successor by Merger to City National Bank of Miami, as Trustee ("Trustee") under the provisions of a certain Trust Agreement dated the 3d day of January, 1979, and known as Trust number 5003471 ("Trust") and makes this Affidavit upon his personal knowledge.

2.    <u>The Trust</u>. The Trust is in full force and effect and there have been no amendments or modifications to the Trust from the date of execution to the present.

3.    <u>Counsel's Reliance</u>. The undersigned Trustee, hereby certifies the following matters to Infante Zumpano, LLC ("<u>Counsel</u>"), in order to induce Counsel to provide certain opinions (collectively, the "<u>Opinion</u>"), based, in part, upon the matters set forth in this Trustee's Affidavit (this "<u>Affidavit</u>"). Unless otherwise indicated, capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in that certain Credit Agreement, dated as of even date herewith, made by and among Florida Gaming Centers, Inc. (the "Company"), Florida Gaming Corporation, ABC Funding, LLC, as agent and the Lenders (as defined therein) (the "<u>Credit Agreement</u>").

4.    <u>Representations and Warranties</u>. The representations and warranties of the Company set forth in the Loan Documents and Collateral Documents and any documents contemplated thereby or referenced therein and any other documents executed or delivered in connection with the Credit Agreement (collectively, the "<u>Related Transaction Documents</u>"), are true, correct and complete as of the date hereof, and do not omit any information necessary to make the statements therein not misleading.

5.    <u>Mortgages.</u> The Trust is in fact the instrument referred to in those certain Mortgages (the "Mortgages") in favor of Lenders dated April ___, 2011, with respect to the real property located in Miami-Dade County, Florida and described in Exhibits "A" and "B" attached hereto (together, the "Property").

6.    <u>Authority to Execute</u>. The Trustee is authorized to execute and deliver all documents necessary to mortgage the Property to Lenders, and their successors and assigns, and to execute and deliver a Guaranty secured by said Mortgages in the original principal amount of Eighty-Seven Million and no/100ths Dollars ($87,000,000.00), the Credit Agreement, and any other Related Transaction Documents to which it is a party.

7.    <u>Power to Mortgage Property</u>. No contrary powers or restrictions appear in the Trust which relate to the Trustee's powers to mortgage the Property and execute all Related Transaction Documents and the Trust expressly provides for the Trustee to have the power to

mortgage the Property with the Beneficiary's consent, which the Trustee has obtained, and to execute all of the Related Transaction Documents.

8.    <u>Duties and Responsibilities Under Trust</u>. No joinder or consent of any beneficiary or third party, other than the Company is required for the Trustee to execute its powers as described herein. The Trustee has accepted its duties and responsibilities under the Trust.

9.    <u>Intent to Bind</u>. The Trustee has given possession of the fully executed Credit Agreement and the Related Transaction Documents to the other parties thereto with the intent to form an immediately binding agreement between the parties thereto.

10.    <u>Required Governmental Approvals</u>. Based on the nature of the Trust, no consent, approval, order or authorization of, or registration, declaration or filing by the Trustee, with, any governmental or public body or authority or agency is required for the valid execution, delivery and performance of each of the Related Transaction Documents by the Trustee.

11.    <u>Litigation</u>. Except as set forth on Exhibit C attached hereto, there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, pending or, to the knowledge of the undersigned, threatened against or affecting the Trust.

12.    <u>Conflict with Governmental Authorities</u>. There are no orders, judgments or decrees of any court, administrative agency or other governmental authority applicable to the Trust that would prohibit or restrict the execution, delivery and performance by the Trust of the Credit Agreement, Mortgages or the Related Transaction Documents or the consummation of the Transactions.

13.    <u>No Defaults</u>. The Trust is not in default with respect to any order, judgment or decree of any court, or in violation of any applicable order, regulation or demand of any administrative agency or other governmental agency or instrumentality.

14.    <u>Trust Agreement</u>. Attached hereto as <u>Exhibit D</u> is a complete copy of the agreement creating the Trust and all documents related thereto.

15.    <u>Oath</u>. Affiant is familiar with the nature of an oath; and with the penalties as provided by the laws of the State of Florida for falsely swearing to statements made in an instrument of this nature.

16.    <u>Accuracy of Statements</u>. The undersigned is not aware of any facts that could render any of the foregoing statements to be untrue or incomplete in any respect.

17.    <u>Purpose</u>. The Trustee has provided this Affidavit in order to provide Counsel with factual information requested by Counsel so that Counsel may issue its Opinion. The Trustee has made inquiries and investigations reasonably calculated to assure that the information provided in this Affidavit is accurate and complete, including (1) inquiries of

2

appropriate personnel responsible for legal matters, financial matters and compliance with governmental requirements and (2) identification and review of relevant documents. The Trustee understands that Counsel will not check, audit, or otherwise attempt to verify the information in this Affidavit. The Trustee intends and agrees that Counsel may rely upon this Certificate and all information provided in this Affidavit. The Affiant is aware that Counsel is relying on this Affidavit in rendering the Opinion and that this Affidavit may be annexed to the Opinion.

The Affiant certifies that on the date hereof, he is the Trustee, and is authorized on behalf of the Trust to execute this Affidavit. The undersigned has knowledge of all the facts contained herein and hereby consents to Counsel's issuance of the Opinion.

Further Affiant Sayeth Naught.

CITY NATIONAL BANK OF FLORIDA, AS TRUSTEE
UNDER LAND TRUST NO. 2400-3471-00,

_____
DOUGLAS J. HELSPER
1st Vice President and Trust Officer

_____
Print

CITY NATIONAL BANK OF FLORIDA EXECUTES THIS INSTRUMENT SOLELY AS TRUSTEE UNDER LAND TRUST NO. *2400-3471* AND NOT PERSONALLY AND NOT INDIVIDUALLY AND NO PERSONAL JUDGEMENT OR DECREE SHALL EVER BE SOUGHT OR OBTAINED AGAINST THE SAID BANK BY REASON OF THIS INSTRUMENT.

**STATE OF FLORIDA**           )
                              )
**COUNTY OF MIAMI-DADE**       )

The foregoing instrument was sworn to, subscribed and acknowledged before me this ___13___ day of April, 2011, by DOUGLAS J. HELSPER (*) who ☒ is personally known to me OR ☐ has produced _____ as identification and he/she ☐ did take an oath ☐ did not take an oath.

(*)as 1st Vice President and Trust Officer of CITY NATIONAL BANK OF FLORIDA, AS TRUSTEE UNDER LAND TRUST NO. 2400-3471-00.

**NOTARY SEAL**

_____
Notary Public

MAYRA A. ESPINOLA
Notary Public - State of Florida
My Comm. Expires Oct 28, 2013
Commission # DD 903796
Bonded Through National Notary Assn.

_____
Print

My Commission Expires:_____

3

**Exhibit A**
**Legal Description for Parcel One**

PARCEL 1

LOTS 24-36, INCLUSIVE, IN BLOCK 71 OF MELROSE HEIGHTS 5TH SECTION, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 17, PAGE 22, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA; AND THE NORTH HALF OF THE RIGHT-OF-WAY OF NW 35 STREET CLOSED BY RESOLUTION R-1317-77

**Exhibit B**
**Legal Description for Parcel Two**

PARCEL 2
TRACT A, OF FRONTON HEIGHTS ADDITION, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN
PLAT BOOK 90, AT PAGE 20, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

LESS PARCEL NO. 155 (FEE SIMPLE), TAKEN BY MIAMI-DADE COUNTY BY VIRTUE OF THAT CERTAIN
STIPULATED ORDER OF TAKING AND FINAL JUDGMENT RECORDED MARCH 19, 2009, IN OFFICIAL
RECORDS BOOK 26794, PAGE 1330, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

A PORTION OF TRACT "A" OF FRONTON HEIGHTS ADDITION ACCORDING TO THE PLAT THEREOF
RECORDED IN PLAT BOOK 90 AT PAGE 20 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY
FLORIDA, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHWEST CORNER OF THE NW 1/4 OF SECTION 28, TOWNSHIP 53 SOUTH,
RANGE 41 EAST, THENCE RUN S 87° 58' 59" W FOR 343.10 FEET TO A POINT OF INTERSECTION WITH
NON-TANGENT CIRCULAR CURVE IN THE METRO-RAIL BASELINE HAVING A RADIUS OF 1355 FEET, THE
CENTER POINT OF WHICH LIES ON A BEARING OF S 57°39'44" E FROM SAID POINT OF
INTERSECTION; THENCE RUN SOUTHWESTERLY 47.88 FEET ALONG THE ARC OF SAID CURVE, WHICH
IS CONCAVE SOUTHEASTERLY, THROUGH A CENTRAL ANGLE OF 2°01'29" FEET TO A POINT ON THE
NORTH LINE OF SAID TRACT "A" AND THE POINT OF BEGINNING; THENCE S 87°58'59" W ALONG SAID
NORTH LINE OF TRACT "A", FOR 14.76 FEET TO A POINT OF INTERSECTION WITH A NON-TANGENT
CIRCULAR CURVE HAVING A RADIUS OF 1367.50 FEET, THE CENTER POINT OF WHICH LIES ON A
BEARING OF S 60°01'04" E FROM THE POINT OF INTERSECTION LAST MENTIONED; THENCE RUN
SOUTHWESTERLY TO SOUTHERLY FOR 430.40 FEET ALONG THE ARC OF SAID CURVE, WHICH IS
CONCAVE SOUTHEASTERLY, THROUGH A CENTRAL ANGLE OF 18°01'59" TO A POINT OF COMPOUND
CURVATURE (PCC) WITH A CIRCULAR CURVE HAVING A RADIUS OF 1537.11 FEET; THENCE
SOUTHERLY FOR 63.94 FEET ALONG THE ARC OF SAID CURVE, WHICH IS CONCAVE EASTERLY,
THROUGH A CENTRAL ANGLE OF 2°23'00" TO THE SOUTHWESTERLY LINE OF SAID TRACT "A";
THENCE S 31°54'05" E, ALONG SAID SOUTHWESTERLY LINE OF TRACT "A", FOR 50.99 FEET TO THE
POINT OF CURVATURE OF A NON-TANGENT CURVE IN SAID SOUTHWESTERLY LINE OF TRACT "A",
HAVING A RADIUS OF 2829.93 FEET, THE CENTER POINT OF WHICH LIES ON A BEARING OF N
33°32'07" E FROM SAID POINT OF CURVATURE; THENCE SOUTHEASTERLY FOR 8.39 FEET, ALONG THE
ARC OF SAID CURVE, WHICH IS CONCAVE NORTHEASTERLY, IN THE SOUTHWESTERLY LINE OF TRACT
"A", THROUGH A CENTRAL ANGLE OF 0°10'12" TO A POINT OF INTERSECTION WITH A NON-TANGENT
CIRCULAR CURVE HAVING A RADIUS OF 3198.83 FEET, THE CENTER POINT OF WHICH LIES ON A
BEARING S81°26'44"E FROM THE POINT OF INTERSECTION LAST MENTIONED; THENCE NORTHERLY
FOR 28.54 FEET ALONG THE ARC OF SAID CURVE, WHICH IS CONCAVE EASTERLY, THROUGH A
CENTRAL ANGLE OF 0°30'40" TO A POINT OF COMPOUND CURVATURE (PCC) WITH A CIRCULAR CURVE
HAVING A RADIUS OF 1496.11 FEET; THENCE NORTHERLY ALONG THE ARC OF SAID CURVE, WHICH IS
CONCAVE EASTERLY, FOR 75.29 FEET, THROUGH A CENTRAL ANGLE OF 2°53'00" TO A POINT OF
COMPOUND CURVATURE (PCC) WITH A CIRCULAR CURVE, HAVING A RADIUS OF 1326.50 FEET;
THENCE NORTHEASTERLY FOR 443.27 FEET ALONG THE ARC OF SAID CURVE, WHICH IS CONCAVE

SOUTHEASTERLY, THROUGH A CENTRAL ANGLE OF 19°08'47" TO THE NORTH LINE OF SAID TRACT
"A"; THENCE S 87°58'59" W ALONG SAID NORTH LINE OF TRACT "A" FOR 33.88 FEET TO THE POINT
OF BEGINNING.

**Exhibit C**
**Litigation Report**

ISLE OF CAPRI CASINO'S, INC. vs. FLORIDA GAMING CORPORATION and FLORIDA
GAMING CENTERS, INC.,
Case Number:  50 2010 CA 004440 XXXX MB

ISLE OF CAPRI CASINO'S INC. vs. FLORIDA GAMING CORPORATION, FLORIDA
GAMING CENTERS, INC.
Case Number: 562010 CA 001462 HC

CITY OF FORT PIERCE VS FLORIDA GAMING CENTERS (BC)
Case Number: 562011CA000784AXXXHC

SCRIPPS TREASUER COAST VS FL GAMING CENTERS
Case Number: 562011CC000254AXXXSC

**Exhibit D**
**Trust Agreement**

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE TRUST
AGREEMENT, AS AMENDED, FOR LAND TRUST NO. 2400-3471 (A/K/A #5003471).

CITY NATIONAL BANK OF FLORIDA

By: _Douglas J. Welsper_
    Douglas J. Welsper, Trust Officer
    AND First Vice President

CITY NATIONAL BANK OF FLORIDA EXECUTES THIS
INSTRUMENT SOLELY AS TRUSTEE UNDER LAND TRUST
NO. 2400-3471 AND NOT PERSONALLY AND NO
PERSONAL LIABILITY SHALL OR SHALL EVER BE
ENFORCEABLE OR OBTAINED AGAINST THE SAID
BANK BY REASON OF THIS INSTRUMENT.

LAND TRUST

AGREEMENT


Between


Miami Jai-Alai, Inc.

and

City National Bank
of Miami
Miami, Florida


Trust Department
City National Bank of Miami
25 West Flagler Street
Miami, Florida 33130

## LAND TRUST AGREEMENT

THIS TRUST AGREEMENT, dated this ....3rd.......................... day of ...January........................, 19....7.2., and known as Trust Number ....5003471.............., is to certify that CITY NATIONAL BANK of MIAMI, Miami, Florida, a national banking association organized under the statutes of the United States, and duly authorized to accept and execute trusts within the State of Florida, not individually but as Trustee hereunder, is about to take title of the following described real estate in ................................Dade............................County, Florida, to-wit:

Said real estate is further described in Schedule A attached hereto and incorporated herein by reference.

and that when it has taken title thereto, or to any other real estate deeded to it as Trustee hereunder, it will hold the same for the uses and purposes and upon the trusts hereinafter set forth.

IT IS UNDERSTOOD AND AGREED between the parties hereto, and by any person or persons who may become entitled to any interest under this Trust, as follows:

1. That, subject to the power of direction hereinafter provided for, the Trustee hereunder shall have and is hereby granted full power and authority to improve, manage and protect said premises or any part thereof, to contract to sell, to grant options to purchase, to sell on any terms, to take back, foreclose and release mortgages, to convey either with or without consideration, to donate, dedicate, mortgage, pledge or otherwise encumber said property, or any part thereof, from time to time to lease said property, or any part thereof, in possession or reversion, by leases to commence in praesenti or in futuro, and upon any terms and for any period or periods of time, not exceeding in the case of any single demise the term of 99 years, and to renew or extend leases upon any terms and for any period or periods of time and to amend, change or modify leases and the terms and provisions thereof at any time or times hereafter; to contract to make leases and to grant options to lease and options to renew leases and options to purchase the whole or any part of the reversion and to contract respecting the manner of fixing the amount of present and future rentals; to exchange said property or any part thereof, for other real or personal property, to grant easements or charges of any kind; to release, convey or assign any right, title or interest in or to said premises or any part thereof; and to deal with said property and every part thereof in all other ways and for such other considerations as it would be lawful for any person owning the same to deal with the same, whether similar to or different from the ways above specified; at any time or times hereafter.

#1

2. That, the following named persons (or their successors in interest as hereinafter provided for) shall be the beneficiaries of this Trust and be entitled to the earnings, avails and proceeds of said real estate according to the respective interests set forth opposite their respective names, to-wit:

Miami Jai-Alai, Inc., a Florida corporation with its principal place of business in Miami, Florida.

3. That, pursuant to the powers and rights hereinafter set forth and granted to it, said Trustee shall and will hold, convey, lease, mortgage or otherwise deal with the title to said real estate only when authorized to do so on the written direction of the following person or persons, to-wit:

or, in the alternative, on the written collective direction of the person or persons then constituting the beneficiaries hereunder, provided, however, that the Trustee shall not be required to enter into any personal obligation or liability in dealing with said real estate nor to make itself personally liable for any damages, costs, expenses, fines or penalties, nor to deal with the said title so long as any money is due to it hereunder. Otherwise, the Trustee shall not be required to inquire into the propriety of any such written direction.

4. That, the interest of any such beneficiary or beneficiaries hereunder (or their successors in interest, as hereinafter provided for) shall consist solely of a power of direction to deal with the title to said real estate and to manage and control said real estate as hereinabove provided, and the right to receive the proceeds from rentals, sales, mortgages or other disposition of said real estate, and that such right in the avails of said real estate shall be deemed to be personal property and may be assigned and transferred as such. Subject to the provisions hereof, a beneficial interest may be subdivided by assignment so as to vest in an assignee or assignees an undivided interest in the whole of a previously existing beneficial interest. Upon receipt of an original or a duplicate assignment as aforesaid, the Trustee shall immediately endorse its acceptance on a copy thereof and deliver said copy to said assignee, as and for his or her certificate of beneficial interest hereunder.

The death of any beneficiary hereunder shall not terminate this Trust nor in any manner affect the powers of the Trustee hereunder and in event of the death of any such beneficiary during the existence of this trust, his or her right and interest hereunder shall, except as herein otherwise specifically provided, pass as personal property to his or her executor or administrator, and not as real estate to his or her heirs at law. It is further understood and agreed that no beneficiary now has nor at any time shall have any right, title or interest in or to any portion of said real estate as such, either legal or equitable, but only an interest in the earnings, avails and proceeds as aforesaid.

~~5. That, no assignment of an interest other than by operation of law shall be binding on the Trustee until the original~~ or duplicate original of said assignment is lodged with the Trustee and its acceptance indicated thereon. Any person having a power of direction who is not a beneficiary hereunder shall not have the right to assign such power without the written collective consent of all beneficiaries hereunder. No person or beneficiary hereunder shall have the right to contract for or bind the ~~Trustee personally.~~ See Paragraph 5 which follows Paragraph 15 of this instrument.

6. That, the beneficiary or beneficiaries hereunder shall in his, her or their own right have the full management of said real estate and control of the selling, renting and handling thereof, and any beneficiary, or his or her agent, shall handle the rents thereof and the proceeds of any sales of said property and the Trustee shall not be required to do anything in the management or control of said real estate or in respect to the payment of taxes or assessments or in respect to insurance, litigation or otherwise, except on written direction as hereinabove provided and after payment to it of all monies necessary to carry out said instructions.

7. That, in case the Trustee shall make any advances of money on account of this Trust or shall be made a party to any litigation on account of holding title to said real estate or in connection with this trust, or in case the Trustee shall be compelled to pay any sum of money on account of this trust, whether on account of breach of contract, injury to person or property, fines or penalties under any law or otherwise, the beneficiaries hereunder do hereby jointly and severally agree that they will on demand pay to the Trustee, with interest thereon at the rate of 6% per annum, all such disbursements or advances or payments made by the Trustee, together with its expenses, including reasonable attorney's fees, and that the Trustee shall not be called upon to convey or otherwise deal with said property at any time held hereunder until all of said disbursements, payments, advances and expenses made or incurred by the Trustee shall have been fully paid, together with interest thereon as aforesaid. However, nothing herein contained shall be construed as requiring the Trustee to advance or pay out any money on account of this trust or to prosecute or defend any legal proceeding involving this trust or any property or interest thereunder unless it shall be furnished with funds sufficient therefor or be satisfactorily indemnified in respect thereto.

8. That, nothing herein contained shall be construed as imposing any obligation on the Trustee to file any income, profit or other tax reports or schedules, it being expressly understood that the beneficiaries hereunder from time to time will individually make all such reports and pay any and all taxes growing out of their interest under this Trust Agreement.

9. That, any contracts, obligations or indebtedness incurred or entered into by the Trustee in connection with said real estate may be entered into by it in the name of the then beneficiaries hereunder, as their attorney-in-fact, hereby irrevocably appointed for such purpose, or, at the election of the Trustee, in its own name, as Trustee of an express trust, and the Trustee shall have no obligation whatsoever with respect to any such contract, obligation or indebtedness except only so far as the trust property and funds in the actual possession of the Trustee shall be applicable to the payment and discharge thereof.

10. That, no party dealing with said Trustee or any successor Trustee in relation to said real estate or to whom said real estate or any part thereof shall be conveyed, contracted to be sold, leased or mortgaged by said Trustee, shall be obliged to see to the application of any purchase money, rent or money borrowed or advanced on said real estate, or be obliged to see that the terms of this Trust have been complied with, or be obliged to inquire into the authority, necessity or expediency of any act of said Trustee or be obliged or privileged to inquire into any of the terms of this Trust Agreement; and every deed, trust deed, mortgage, lease or other instrument executed by said Trustee in relation to said real estate shall be conclusive evidence in favor of every person relying upon or claiming under any such conveyance, lease, mortgage or other instrument, (a) that at the time of the delivery thereof, the trust created by this Trust Agreement was in full force and effect; (b) that such conveyance or other instrument was executed in accordance with the trusts, conditions and limitations contained in this Trust Agreement and all amendments hereof, if any, and binding upon all beneficiaries under this Trust Agreement; (c) that said Trustee was duly authorized and empowered to execute and deliver every such deed, trust deed, lease, mortgage or other instrument; and (d) if a conveyance has been made to a successor or successors in trust, that such successor or successors in trust have been properly appointed and are fully vested with all the title, estate, rights, powers, authorities, duties and obligations of its, his or their predecessor in trust.

11. This Trust Agreement shall not be placed on record in the county in which the real estate is situated or elsewhere, but if for any reason same is so recorded, such recording shall not be considered as notice of the rights of any person hereunder derogatory to the title or powers of said Trustee.

12. The Trustee may at any time resign by sending a notice of its intention so to do by registered mail to each of the then beneficiaries hereunder at his or her address last known to the Trustee. Such resignation shall become effective ten days after the mailing of such notices by the Trustee. In the event of such resignation, a successor or successors may be appointed by the person or persons then entitled hereunder to direct to Trustee in the disposition of the trust property, and the Trustee shall thereupon convey the trust property to such successor or successors in trust. In the event that no successor in trust is named as above provided within ten days after the mailing of such notices by the Trustee, then the Trustee may convey the trust property to the beneficiaries in accordance with their respective interests hereunder, or the Trustee may, at its option, file a bill for appropriate relief in any court of competent jurisdiction. The Trustee, notwithstanding such resignation, shall continue to have a first lien on the trust property for its costs, expenses and attorney's fees and for its reasonable compensation.

13. Every successor Trustee or trustees appointed hereunder shall become fully vested with all the estate, properties, rights, powers, trusts, duties and obligations of its, his or their predecessor.

14. That, in event any property shall be remaining in this trust twenty (20) years from this date, it shall be the duty of said Trustee to sell and dispose of the same at public sale, to be held by it as expeditiously as possible and on reasonable advertisement and on reasonable notice to the then beneficiaries hereunder, and after deducting its reasonable fees and expenses, shall divide the proceeds among said beneficiaries as their respective interests may then appear.

15.   Said Trustee shall receive for its services in accepting this trust and in taking title hereunder the sum of $1,500; also the sum of $750 per year for holding title after the 3rd day of January, 1979; so long as any property remains in this trust; also its regular schedule of fees for making deeds, mortgages, leases and/or other instruments as may from time to time be required hereunder, and it shall receive reasonable compensation for any special services which may be rendered by it hereunder, or for taking and holding any other property which may hereafter be deeded to it hereunder, which fees, charges or other compensation, the beneficiaries hereunder jointly and severally agree to pay, and it is hereby understood and agreed that all such fees and compensations shall constitute a first lien on the real estate and property held hereunder.

5.   That, no assignment of an interest other than by operation of law shall be binding on the Trustee until the original or duplicate original of said assignment is lodged with the Trustee and its acceptance indicated thereon.   Such assignment shall, however, be binding as between the assignor and assignee upon delivery to the assignee of the instrument of assignment. A certificate by the Trustee identifying the holders of beneficial interests as appearing from its records shall be conclusive evidence in favor of every person relying thereon.   No person or beneficiary hereunder shall have the right to contract for or bind the Trustee personally. *see 2nd amendment dated 07-31-85 gac*

16.   The Trustee shall enforce for the benefit of those holding beneficial interests from time to time, including holders of beneficial interests as collateral, all title insurance policies, commitments and the like, now existing or issued in the future and covering the real estate described in Schedule A and/or such additional real estate as may later be conveyed to the Trustee as it is Trustee hereunder.

IN TESTIMONY WHEREOF, said CITY NATIONAL BANK of MIAMI, Miami, Florida, has caused these presents to be signed by its Trust Officer, attested by its _____, and has caused its corporate seal to be hereto affixed as and for the act and deed of the Bank, the day and year first above written.

CITY NATIONAL BANK of MIAMI,
Miami, Florida

By _____
(Trust Officer)   SENIOR VICE PRESIDENT & TRUST OFFICER

ATTEST: _____
SR. VICE PRESIDENT & TRUST OFFICER

And on said day the said beneficiary has signed this Declaration of Trust and Trust Agreement in order to signify its assent to the terms hereof.

MIAMI JAI-ALAI, INC.

By _____
President

Beneficiaries Tax Identification or
Social Security Number must be
provided.

AMENDMENT TO LAND TRUST AGREEMENT
Between
MIAMI JAI-ALAI, INC.
and
CITY NATIONAL BANK OF MIAMI
dated January 3, 1979
and known as Trust Number 5003471

This Amendment executed as of this 31st day of July 1985, by and between WJA Realty Limited Partnership (the "Company"), a Massachussetts limited partnership, as assignee of Miami Jai-Alai, Inc., a Florida corporation, and City National Bank of Miami (the "Trustee"), a national banking association

WITNESSETH:

WHEREAS the Company is the holder and owner of a 100% beneficial interest under the above-described Trust Agreement; and

WHEREAS the Company and the Trustee wish to amend and restate in its entirety paragraph 5 of said Trust Agreement.

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and Trustee agree as follows:

1.  The foregoing recitals are true and correct.

2.  Paragraph 5 of said Trust Agreement is hereby amended and restated to read in its entirety as follows:

"5.  That, no assignment of an interest other than by operation of law shall be binding on the Trustee until the original or duplicate original of said assignment or a copy of said assignment certified by the assignor to be true and correct is lodged with the Trustee and its acceptance indicated thereon.  Such assignment shall, however, be binding as between the assignor and assignee upon delivery to the assignee of the instrument of assignment.  A certificate by the Trustee identifying the holders of beneficial interests as appearing from its records shall be conclusive evidence in favor of every person relying thereon.  No person or beneficiary hereunder shall have the right to contract for or bind the Trustee personally."

IN TESTIMONY WHEREOF, said CITY NATIONAL BANK OF MIAMI, Miami, Florida, has caused these presents to be signed by Trust Officer, attested by its _____, and has caused its corporate seal to be hereto affixed as and for the act and deed of the Bank, the day and year first above written.

CITY NATIONAL BANK OF MIAMI, Miami, Florida

_____
(Trust Officer) SENIOR VICE PRESIDENT & TRUST OFFICER

ATTEST: _____

And on said day the said beneficiary has signed this Amendment to Land Trust Agreement in order to signify its assent to the terms thereof.

WJA REALTY LIMITED PARTNERSHIP

By_____
        (President)

- 2 -

SCHEDULE A

Attached to Land Trust Agreement
dated January 3, 1979 and Known as Trust Number 5003471

The following described lands located in Dade County, Florida:

Lot 6-B and the West 15 Feet of Lot 7-B, FINKEL'S INDUSTRIAL
SUBDIVISION, SECTION ONE, according to the Plat thereof,
recorded in Plat Book 79, Page 22, of the Public Records of
Dade County, Florida.

AND

Tract "A" FRONTON HEIGHTS ADDITION, according to the Plat thereof,
recorded in Plat Book 90, Page 20, of the Public Records of Dade
County, Florida.

AND

Lots 27, 28, 33 and 34, Block 61,
Lots 1 through 6, inclusive, 8, and 10 through 15, inclusive,
Lots 16 through 20, inclusive; and 23, Block 62;
Lots 3 through 6, inclusive, and 13 through 21, inclusive, Block 63;
Lots 1 through 19, inclusive, and 21 through 26, inclusive, Block 69;
Lots 1 through 18, inclusive, and 23 through 26, inclusive, Block 70;
Lots 1 through 6, inclusive, 11 through 22, inclusive, 24 through 36,
inclusive, Block 71 of MELROSE HEIGHTS 5TH SECTION, recorded in Plat
Book 17, Page 22, of the Public Records of Dade County, Florida.

LESS

The West 5 feet of Lot 22, Block 71, of MELROSE HEIGHTS 5TH SECTION,
according to the Plat thereof, recorded in Plat Book 17, Page 22, of
the Public Records of Dade County, Florida.

EXHIBIT B-3

FORM OF OPINION OF GUNSTER, YOAKLEY & STEWART, L.P., HOLDINGS' AND
BORROWER'S GAMING COUNSEL

Attached.



Writer's E-Mail Address: JLockwood@gunster.com

April 12, 2011

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

ABC Funding, LLC
Attention: Adam Britt
222 Berkeley Street, 18th Floor
Boston, MA 02166

Re:    Addendum to Florida Gaming Centers, Inc., Opinion Letter

Dear Mr. Britt:

We have acted as counsel to Florida Gaming Centers, Inc., a Florida corporation ("Florida Gaming"), solely with respect to certain regulatory matters involving Florida Gaming's application for a slot machine gaming license at Miami Jai Alai, and no other locations.   We have not represented Florida Gaming or any affiliated individual in any other matters including, without limitation, in connection with any financing or re-financing associated with Florida Gaming or any of its assets.  This addendum to the opinion letter provided to you on March 30, 2011, is furnished to you at the request, and with the consent of, Florida Gaming.

This opinion letter is limited to the matters expressly stated herein in reliance of facts and documents currently presented and no opinions are to be inferred or may be implied beyond the opinions expressly so stated.  We are members of the bar of the State of Florida only and do not express any opinion concerning any law other than the law of the State of Florida and the federal laws of the United States.  As counsel for Florida Gaming, we have represented Florida Gaming for the purposes of Florida Gaming's application for a slot machine gaming license at Miami Jai Alai and are not otherwise familiar with Florida Gaming's business or its day-to-day operations.

In connection with issuing this addendum, we have reviewed a copy provided by the Division of Pari-Mutuel Wagering (the "Division") of the Permitholder Application for Annual Slot Machine License and related materials filed by Florida Gaming pursuant to Chapter 551, Florida Statutes, with the Division, and all related documents including all individual license applications filed by Florida Gaming in connection with such slot machine license application, and all deficiency letters issued by the Division in relation to such applications (collectively, the "Application").  The Application is attached hereto as **Exhibit A**.

April 12, 2011
Page 2

We have also spoken to the following governmental and Florida Gaming personnel:

1.    Jamie Pouncey, Licensing Administrator, Division of Pari-Mutuel Wagering.

2.    Daniel J. Licciardi, Vice President and General Manager, Florida Gaming (collectively, the "Personnel").

We have assumed, with your permission and without independent investigation or inquiry, the genuineness of all signatures, the completeness of the Application provided to us by the Division, the authenticity and correctness of the Application submitted to us (whether copy or original), and the correctness of all of the representations made to us by the Personnel.

In rendering this addendum to the opinion previously furnished, we have also assumed, with your permission and without independent investigation or inquiry, the following:

(i)    Florida Gaming is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, with full power, authority and legal right (including, without limitation, all necessary permits, non-gaming approvals and licenses, including, without limitation, occupational licenses, certificates of occupancy, etc.), to own and operate its property and carry on its business; and

(ii)    No violations exist under the Licenses and no event or circumstance has occurred that, with the giving of notice or passage of time, or both, would constitute a violation under the Licenses and all fees due and owing in connection with issuance of the Licenses have been timely paid.

Based solely upon our review of the Application and our conversations with the Personnel, to the best of our actual knowledge, it is our opinion that the Application filed by Florida Gaming is entitled to favorable action by the Division resulting in the issuance of an annual slot machine license at Miami Jai-Alai pursuant to Chapter 551, Florida Statutes, subject to the satisfactory resolution of the items identified in the deficiency letter issued by the Division on April 8, 2011.

We express no opinion as to the transferability of any or all of the Licenses under any circumstances.

This opinion is solely (a) based upon existing facts and laws as of the date hereof and is not intended to be a guaranty of what determination will be made in each or any specific instance in which a court ruling is sought relative to the documents or matters referred to herein and we have no obligation to advise you with respect to matters hereafter occurring, and (b) for your benefit and may not be relied on by any other person without our prior written consent.

Gunster, Yoakley & Stewart, P.A.
ATTORNEYS AT LAW
TAL 2310.2

April 12, 2011
Page 3

Sincerely,

Gunster, Yoakley & Stewart, P.A.

By: _____

John M. Lockwood
For the Firm

Initials:

Gunster, Yoakley & Stewart, P.A.
ATTORNEYS AT LAW
TAL 2310.2

LE

**DBPR PMW-3400 – Permitholder Application for Annual Slot Machine License**



STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
DIVISION OF PARI-MUTUEL WAGERING
1940 North Monroe Street
Tallahassee, Florida 32399-1037
www.MyFlorida.com/dbpr

*RECEIVED*
*2013 JAN 13 AM 10: 31*
*PARI-MUTUEL DIVISION OF WAGERING*

| INSTRUCTIONS |
|---|
| This form is to be submitted in conjunction with Form DBPR PMW-3460 Authorization for Release of Information, and Form DBPR PMW-3190 Officers and Directors. |

| ORGANIZATION INFORMATION |
|---|
| Federal Employer ID Number: |
| Permitholder's Legal Name:  Florida Gaming Centers, Inc. |
| Doing Business As (D/B/A) Name:  Miami Jai-Alai |

| MAILING ADDRESS | | |
|---|---|---|
| Street Address or P.O. Box: 3500 NW 37th Avenue | | |
| City: Miami | State: Fl | Zip Code: 33142 |
| County: MiamiDade | Country: USA | |

| CONTACT INFORMATION | |
|---|---|
| Contact Name: Daniel J Licciardi | Title: Vice President & General Manager |
| Primary Phone Number: 305 633-6400 | Primary E-Mail Address: cetaceandl@aol.com |

| PHYSICAL ADDRESS | | |
|---|---|---|
| Street Address: 3500 NW 37th Avenue | | |
| City: Miami | State: FL | Zip Code (+4 optional) 33142 |
| County: MiamiDade | | |

| ADDITIONAL CONTACT INFORMATION | |
|---|---|
| Alternate Phone Number 305 332-8153 | Fax Number 305 634-1712 |
| Alternate E-Mail Address danlicciardi@aol.com | |



**EXHIBIT**
**A**

## SLOT MACHINE AREA INFORMATION

Short Description of Physical Location of Slot Machine Area(s):
Approximately 30,000 square feet of gaming floor on the west and north side of the Miami Jai-Alai building

What is the number of slot machines you intend to operate during the license period?
Approximately 1,000

Name and license number of Slot Machine Operations Manager or Slot Machine Management Company:
Miami Casino Management, LLC.        8851667

Name and address of the Custodian of Records:
Daniel J. Licciardi, 3500 NW 37th Avenue, Miami, Fl., 33142

List the dates and hours of slot machine operations:
Beginning approximately August 15, 2011, operating daily 10 AM through 4 AM

**Additional requirements:**
1) Submission of a list of all ownership interests of five percent or greater. If a corporation, the name of the state in which incorporated and the names and addresses of the officers, directors, and shareholders holding five percent or more equity or, if a business entity other than a corporation, the names and addresses of the principles, partners, shareholders or any other person holding five percent or more equity as described in Rule 61D-14.002(b)(c)(d) and (e), Florida Administrative Code (F.A.C.), on Form DBPR PMW-3190, Officers and Directors.
2) Submission of a complete set of fingerprints and a completed DBPR PMW-3460 Authorization for Release of Information Form for each individual listed in the application as an owner, partner, officer, or director of the applicant.
3) Submission of a DBPR PMW-3460, Authorization for Release of Information, for the slot machine applicant as required by Rule 61D-14.002, F.A.C.
4) Submission of a copy of the applicant's security plan, slot machine area floor plan, location of security cameras, and listing of all security equipment.
5) Submission of a copy of the binding written agreements between the facility and respective associations as required by Section 551.104(10), Florida Statutes.
6) Disclosure of each of the applicant's ownership interest in any other pari-mutuel permit in Florida.
7) Evidence of a current surety bond in the amount of $2,000,000, payable to the Governor of the State of Florida, as specified in s. 551.103(1)(f), Florida Statutes.
8) Payment of the non-refundable $3,000,000 application fee for a Slot Machine License as required by Section 551.106(1), Florida Statutes. Payment must be submitted via electronic funds transfer.
9) Payment of the non-refundable $250,000 regulatory fee for the Compulsive or Addictive Gambling Prevention Program as required by Section 551.118, Florida Statutes, made payable to the Division.
10) Submission of the slot machine applicant's employee training plan for the Compulsive or Addictive Gambling Prevention Program.
11) Submission of a list of slot machine business occupational licensees (i.e. vendors, manufacturers, distributors, service companies, etc.) with whom you intend to do business.
12) A copy of the facility's written policy for creating opportunities to purchase from minority vendors in Florida, creating employment opportunities for minority residents in Florida, opportunities for construction services provided by minority contractors, and ensuring opportunities for employment are offered on an equal, nondiscriminatory basis.
13) Disclosure of any administrative, civil or criminal proceedings, and/or any judgments initiated by any governmental agency or any other state or federal agency that would affect the license status of the applicant or any affiliate of the applicant pursuant to Sections 550.054 and 550.1815, Florida Statutes.
14) Disclosure of the applicant's internal control procedures required by Rule 61D-14.058, F.A.C.

## ATTEST STATEMENT

I hereby certify that all information contained herein is true and correct and that I understand any misstatement or omission in this application may result in denial or revocation of my pari-mutuel license. I agree to abide by and obey all rules and regulations of the Division of Pari-Mutuel Wagering and the laws of the State of Florida.

Signature of Applicant or Applicant's Representative _____

Date _1/11/2011_____

DBPR PMW-3460 – Authorization for Release of Information



RECEIVED
2013 JAN 13 AM 10: 32
PARI-MUTUEL WAGERING DIVISION OF

**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**
**DIVISION OF PARI-MUTUEL WAGERING**
www.MyFlorida.com/dbpr

| PERSONAL INFORMATION |
|---|

Social Security Number/Federal Employer ID Number:

| IF INDIVIDUAL APPLICANT, PLEASE COMPLETE THE FOLLOWING SECTION |
|---|

| Last Name: | First: | Middle: | Title: | Suffix: |
|---|---|---|---|---|

Birth Date: (MM/DD/YYYY)

Name of Employer:

| IF BUSINESS APPLICANT, PLEASE COMPLETE THE FOLLOWING SECTION |
|---|

| Representative's Name: Last: | First: | Middle: | Title: | Suffix: |
|---|---|---|---|---|
| Licciardi | Daniel | Joseph | Mr. | |

Business Entity Name:
Florida Gaming Centers, Inc. D.B.A. Miami Jai-Alai

Official Capacity:
Vice President and General Manager

| ALL APPLICANTS PLEASE READ AND SIGN BELOW |
|---|

I, _____Daniel J. Licciardi_____, do hereby instruct all law enforcement of criminal justice agencies to
       (name of applicant/representative)

release all requested information to the bearer of this release form, who is an authorized representative of the State of Florida, Department of Business and Professional Regulation or the Florida Department of Law Enforcement.

I, _____Daniel J. Licciardi_____, do hereby instruct all law enforcement, gaming commissions, tribal
       (name of applicant/representative)

gaming regulatory agencies and/or commissions, state agencies and/or commissions responsible for gaming regulation or criminal justice agencies to release all requested information to the bearer of this release form, who is an authorized representative of the State of Florida, Department of Business and Professional Regulation or the Florida Department of Law Enforcement.

I further authorize any financial or public institution to release any and all information requested by the bearer of this release form with respect to myself or my business. Additionally, I do release such individuals or entities from any and all liability due to the release of information requested. Further, I understand that under Florida Statute, any information released that is not specifically exempted shall become part of the public record, releasable upon request to the public pursuant to Chapter 119, Florida Statutes.

Under the Federal Privacy Act, disclosure of Social Security numbers is voluntary unless specifically required by Federal Statute. In this instance, disclosure of Social Security numbers is mandatory pursuant to Title 42, United States Code, Sections 653, 654; and Sections 409.2577, 409.2598, and 559.79, Florida Statutes. Social Security numbers are used to allow efficient screening of applicants and licensees by a Title IV-D child support agency to assure compliance with child support obligations. Social Security numbers must also be recorded on all occupational license applications and are used for licensee identification purposes pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Welfare Reform Act), 104 Pub.L. 193, Sec. 317.

_____
(if individual applicant – legal name and any nickname or alias in parentheses)

Applicant/Representative Signature: _____Daniel J. Licciardi_____   Date: ___1/11/2011___



DBPR PMW-3190 – Officers and Directors



**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**
**DIVISION OF PARI-MUTUEL WAGERING**
www.MyFlorida.com/dbpr



Please provide information on the partners, managers, officers, or directors for your business entity below.

| ORGANIZATION NAME | |
|---|---|
| Name of Organization | Florida Gaming Centers, Inc. |
| D/B/A or Trade Name | Miami Jai-Alai |

**LIMITED LIABILITY CORPORATION QUESTIONS**

If your corporation is a limited liability corporation (LLC), is the corporation member managed or manager managed?  You can check your Articles of Incorporation for this information.
Member Managed ❑    Manager Managed ❑

Please list below all Officers, Directors, Managers, and/or Shareholders with 10% or more interest in the business:



| MANAGEMENT INFORMATION | | | | |
|---|---|---|---|---|
| Last Name<br>Collett | First<br>William | Middle<br>Bennett | Title<br>Mr. | Suffix |
| Office Held<br>C.E.O. | Percentage of Ownership | | Active ☒<br>Non-Active ❑ | |
| RESIDENCE ADDRESS | | | | |
| Street Address or P.O. Box<br>2669 Charlestown Road | | | | |
| City<br>New Albany | | State<br>Indiana | Zip Code (+4 optional)<br>47150 | |
| County (if Florida address) | | Country<br>USA | | |



| MANAGEMENT INFORMATION | | | | |
|---|---|---|---|---|
| Last Name<br>Collett | First<br>William | Middle<br>Bennett | Title<br>Mr. | Suffix<br>Jr. |
| Office Held<br>C.O.O. & President | Percentage of Ownership | | Active ☒<br>Non-Active ❑ | |
| RESIDENCE ADDRESS | | | | |
| Street Address or P.O. Box<br>5548 SW Coral Tree Lane | | | | |
| City<br>Palm City | | State<br>FL | Zip Code (+4 optional)<br>34990 | |
| County (if Florida address)<br>Martin | | Country<br>USA | | |

## MANAGEMENT INFORMATION

| Last Name | First | Middle | Title | Suffix |
|---|---|---|---|---|
| Licciardi | Daniel | Joseph | Mr. | |

| Office Held | Percentage of Ownership | Active | ☒ |
|---|---|---|---|
| Vice President & Gen. Manager | | Non-Active | ☐ |

### RESIDENCE ADDRESS

Street Address or P.O. Box
8912 SW 150th North Court Circle

| City Miami | | State Fl | Zip Code (+4 optional) 33196 |
|---|---|---|---|
| County (if Florida address) MiamiDade | Country USA | | |

---

## MANAGEMENT INFORMATION

| Last Name | First | Middle | Title | Suffix |
|---|---|---|---|---|
| | | | | |

| Office Held | Percentage of Ownership | Active | ☐ |
|---|---|---|---|
| | | Non-Active | ☐ |

### RESIDENCE ADDRESS

Street Address or P.O. Box

| City | | State | Zip Code (+4 optional) |
|---|---|---|---|
| County (if Florida address) | Country | | |

---

## MANAGEMENT INFORMATION

| Last Name | First | Middle | Title | Suffix |
|---|---|---|---|---|
| | | | | |

| Office Held | Percentage of Ownership | Active | ☐ |
|---|---|---|---|
| | | Non-Active | ☐ |

### RESIDENCE ADDRESS

Street Address or P.O. Box

| City | | State | Zip Code (+4 optional) |
|---|---|---|---|
| County (if Florida address) | Country | | |

---

## MANAGEMENT INFORMATION

| Last Name | First | Middle | Title | Suffix |
|---|---|---|---|---|
| | | | | |

| Office Held | Percentage of Ownership | Active | ☐ |
|---|---|---|---|
| | | Non-Active | ☐ |

### RESIDENCE ADDRESS

Street Address or P.O. Box

| City | | State | Zip Code (+4 optional) |
|---|---|---|---|
| County (if Florida address) | Country | | |

Attach additional sheets as necessary

Schedule A

Florida Gaming Centers, Inc. Is a subsidiary of 100% owned by Florida Gaming Corporation.

Florida Gaming Corporation is a public company with approximately 7000-8000 Shareholders. Florida Gaming Corporation is listed on the NASDAQ Small Cap market under the symbol "FGMG". The total number of shares outstanding are 3,171,050 and to our knowledge these are the only shareholders with over 5% ownership.

Freedom Holding, Inc.
# of shares 866,157 or            34.1%
2669 Charlestown Rd., Suite D
New Albany, IN 47150

Roland and Dorothy Howell
# of shares 282,500 or            8%
Miami, Florida 33132

The remaining shares are spread over the aforementioned shareholder base. A list of shareholders can be provided through the transfer agent, however this would show shares held in brokerages.

*Ho*    MJA

| | |
|---|---|
| AGS, LLC | 8281949 |
| Aristocrat Technologies, Inc | 7830421 |
| Aruze Gaming America, Inc. | 8587586 |
| Atlantic City Coin & Slot Service Company Inc. | 1510155 |
| Bally Gaming Inc | 7805891 |
| IGT | 7800936 |
| Integrated Systems Design, Inc. | 8526519 |
| Konami Gaming, Inc. | 7883140 |
| NRT Technology Corp. | 7860084 |
| Universal Gaming Resources LLC | 8776984 |
| Western Money Systems | 7852302 |
| WMS Gaming, Inc | 7810518 |

| | |
|---|---|
| Gaming Labortories International, LLC | 8237912 |

| | |
|---|---|
| Cummins-Allison Corporation | 7934408 |
| Global Casino Supply Inc. | 7961307 |
| R.A. Giovanetti & Assoc. Consulting Engineers | 7957549 |
| Shuffle Master, Inc. | 1516141 |
| Teleview Racing Patrol, Inc. | 96578 |

| | |
|---|---|
| Central Credit, LLC | 7897323 |
| Certegy Check Services, Inc | 7989887 |
| Global Gaming Resource, Inc | 8504715 |
| JCM American Corporation | 7977121 |
| NCR Corporation | 8175133 |
| Secure-Tek Systems Corporations | 7902166 |
| V.S.R. Lock, Inc. | 1499535 |

| License | Name | Expiration |
|---|---|---|
| 8281949 | AGS, LLC | 6/30/2011 |
| 7830421 | Aristocrat Technologies, Inc | 6/30/2012 |
| 8587586 | Aruze Gaming America, Inc. | 6/30/2012 |
| 1510155 | Atlantic City Coin & Slot Service Company Inc. | 6/30/2012 |
| 7805891 | Bally Gaming Inc | 6/30/2012 |
| 7800936 | IGT | 6/30/2012 |
| 8526519 | Integrated Systems Design, Inc. | 6/30/2012 |
| 7883140 | Konami Gaming, Inc. | 6/30/2012 |
| 7860084 | NRT Technology Corp. | 6/30/2012 |
| 8776984 | Universal Gaming Resources LLC | 6/30/2011 |
| 7852302 | Western Money Systems | 6/30/2012 |
| 7810518 | WMS Gaming, Inc | 6/30/2012 |
| 8237912 | Gaming Labortories International, LLC | 6/30/2011 |
| 7934408 | Cummins-Allison Corporation | 6/30/2013 |
| 7961307 | Global Casino Supply Inc. | 6/30/2012 |
| 7957549 | R.A. Giovanetti & Assoc. Consulting Engineers | 6/30/2012 |
| 1516141 | Shuffle Master, Inc. | 6/30/2011 |
| 96578 | Teleview Racing Patrol, Inc. | 6/30/2012 |
| 7897323 | Central Credit, LLC | 6/30/2012 |
| 7989887 | Certegy Check Services, Inc | 6/30/2012 |
| 8504715 | Global Gaming Resource, Inc | 6/30/2012 |
| 7977121 | JCM American Corporation | 6/30/2012 |
| 8175133 | NCR Corporation | 6/30/2013 |
| 7902166 | Secure-Tek Systems Corporations | 6/30/2011 |
| 1499535 | V.S.R. Lock, Inc. | 6/30/2012 |

13.  MJA

THERE ARE NO KNOWN ADMINISTRATIVE, CIVIL OR CRIMINAL PROCEEDING, AND OR ANY JUDGEMENTS INITIATED BY ANY GOVERNMENT AGENCY OR ANY OTHER STATE OR FEDERAL AGENCY THAT WOULD AFFECT THE LICENSE STATUS OF THE APPLICANT OR ANY AFFILIATE OF THE APPLICANT PURSUANT TO SECTION 550.054 AND 550.1815, FLORIDA STATUES.

11.

The training program is from the Florida Council on Compulsive Gambling, Inc. and is the Online Gaming Industry Training Program.

Florida Council on Compulsive Gambling │ Help With Problem Gambling

Page 1 of 1

 Florida Council on Compulsive Gambling, Inc.

About FCCGWho We ServeFCCG 24-Hour HelplineAbout Compulsive GamblingResourcesTraining and DevelopmentFCCG 24-Hour Helpline-Chat

 **24-HOUR** HELPLINE

 **WHAT IS** COMPULSIVE GAMBLING?

 **NEWS** AND EVENTS

 **ARE YOU** AT RISK?

## Whether you're seeking information or help for a gambling problem, you've come to the right place.

The Florida Council on Compulsive Gambling is a
not-for-profit 501(c)(3) organization that provides
information, resource referrals, and support services for problem gamblers, their families, employers and others. We also offer prevention and education programs, as well as professional training for mental health, addiction and medical practitioners, gambling operators, governments, businesses, academia, law enforcement authorities, faith based organizations, and others.

**Call our 24-hour confidential and multilingual HelpLine at 888-ADMIT-IT.**

 SORRY, LIVE CHAT IS UNAVAILABLE



Copyright © 2008 • Florida Council on Compulsive Gambling, Inc. •

Gaming Industry | Florida Council on Compulsive Gambling

 Florida Council on Compulsive Gambling, Inc.

About FCCGWho We ServeFCCG 24-Hour HelplineAbout Compulsive GamblingResourcesTraining and DevelopmentFCCG 24-Hour Helpline-Chat

## Training and Development



Gaming Industry

*The FCCG's industry program furnishes training to employees regarding problem gambling impacts, their appropriate role in the program, and how to address different situations.*

**Click below to listen to our Podcast regarding the Self Exclusion Process.**



Over the years, the FCCG has consistently made active efforts to work with gambling operators within the State of Florida for purposes of providing increased awareness about problem gambling and outlining the importance of implementing responsible gaming programs. In an effort to address this ongoing need, the FCCG hosted "*Meeting of the Minds*" forums to convene members of pari-mutuel and floating casino facilities and has held similar discussions with members of the casino industry in Florida. Industry members and the Council discussed issues and approaches relative to problem and compulsive gambling among patrons. As a result of these dialogues, the FCCG implemented its *Responsible Gaming and Player Protection Program* (RGPPP). The Agency's RGPPP walks gambling operators through the implementation of a facility wide problem gambling awareness and intervention program and provides all necessary collateral materials, including a Facility Manual, Train-the-Trainer Guide, Participant and Patron Materials. The Program highlights information about problem gambling, furnishes warning signs, and characteristics commonly associated with the disorder, empowers gaming operators to know how to handle different situations, and educates patrons how to access help through the FCCG's 24-hour HelpLine number.

In addition to the initial start up training offered to all employees of new facilities and the annual physical update training provided to each facility, the FCCG has developed an online training module which licensees can utilize for new hire trainings. This training is available through request by clicking the following link: **Request for Online Gaming Industry Training**.

RESPONSIBLE GAMING PROGRAM

The purpose of the Florida Council on Compulsive Gambling's *Responsible Gaming and Player Protection Program* (RGPPP) is for gaming operators to acknowledge the importance of problem and compulsive gambling impacts, how they can play a role in educating employees, assisting persons in need, and providing mutual benefits to the organization, employee base, clientele, and community at large.

The FCCG also recognizes the importance for government operated gambling programs to implement in-house and point of sale training and education protocols to increase awareness among employees, licensees, and customers about problem gambling issues and support services for the constituency it serves. The FCCG's RGPPP furnishes employees with professional training opportunities to ensure an understanding of problem gambling issues and impacts, their appropriate role in the program, knowledge about the referral protocol, and how and what to do in the event they encounter various related

situations. The FCCG further conducts problem gambling awareness training to Florida Lottery employees and to gaming equipment manufacturers.

Finally, the Agency produces a newsletter geared specifically toward members of the gaming industry. *Gaming FOCUS* provides important informaton about problem and compulsive gambling and furnishes insight about responsible gaming programs and protocols.

Request for Online Gaming Industry Training

 Florida Council on Compulsive Gambling, Inc.

About FCCGWho We ServeFCCG 24-Hour HelplineAbout Compulsive GamblingResourcesTraining and DevelopmentFCCG 24-Hour Helpline-Chat

## Gaming Industry

Request for Online Gaming Industry Training

*FCCG has developed an online training module "Improving the Odds", which licensees can utilize for new hire trainings.*

Please provide your contact information below to register for this online training.

### Contact Information Form

| | |
|---|---|
| Full Name | : |
| Gaming Facility | : |
| Position or Title | : |
| Name of RGPPP Manager | : |
| Street Address | : |
| City, State & Zip | : |

Request for Online Gaming Industry Training

Email Address :

Phone Number : Ext:

Fax Number :

Course Found By :

Comments :

Submit    Reset

# MIAMI JAI-ALAI CASINO

## Minority Hiring Practices

### &

### Minority Recruitment

RECEIVED

2011 JAN 13  AM 10: 34

DIVISION OF
PARI-MUTUEL WAGERING

Florida Gaming Centers, Inc., owner of the Miami Jai Alai Casino, together with its management company, Miami Gaming Management, LLC are pledged to abide by existing minority hiring practices established at both the State and the federal level.

Miami Jai Alai Casino shall provide equal employment opportunities to all persons regardless of their race, color, creed, religion, national origin, sex, sexual orientation, age, ancestry, marital status, citizenship status provided the individual is authorized to work in the United States, being a victim of domestic or sexual violence, disabilities if otherwise able to perform the essential functions of the job with reasonable accommodation, and other legally protected categories.

No employee or applicant will be discriminated or retaliated against because he or she initiated a complaint, was a witness, supplied information, or otherwise participated in an investigation or proceeding involving an alleged violation of this policy or State or federal laws, rules or regulations provided the employee or applicant did not make a knowingly false accusation or provide knowingly false information.

Administrative Implementation

Management shall appoint a Nondiscrimination Coordinator for personnel who shall be responsible for coordinating the employment nondiscrimination efforts. The Nondiscrimination Coordinator may be the HR Director, Casino Manager or General Manager.

# MIAMI JAI-ALAI CASINO

Affirmative Action/Minority Recruitment and Hiring

Miami Jai Alai Casino is desirous of employing and maintaining a culturally and socially diverse staff.  To that end, it is a goal of the owners and management and operators to:

1. Recruit minority applicants in all employment positions.
2. Attempt to provide equal employment opportunities to all minority job applicants; and
3. Hire those minority applicants who, in the judgment of management, are those most qualified for the positions for which they have applied.

All Casino Management is directed to implement this policy in the methods it deems appropriate, subject to further guidance by the State of Florida's Regulatory bodies.

Miami Gaming Management, LLC is partially minority owned and is intimately familiar with obligation, as well as the necessity, of hiring and training members of the widely diverse South Florida minority community.



# Southern Florida Minority Supplier Development Council

THIS CERTIFIES THAT

## Florida Lemark Corporation

Has met the requirements for certification as a bona fide Minority Business Enterprise as defined by the National Minority Supplier Development Council, Inc.® (NMSDC®) and as adopted by the Southern Florida Minority Supplier Development Council

**NAICS Code(s): 236220 ; 238390 ; 238110 ; 238120 ; 238320

**Description of their product/services as defined by the North American Industry Classification System (NAICS)

FL001728

Certificate Number



Beatrice Louissaint, President, SF|MSDC

06/01/2010

Issued Date

06/01/2011

Expiration Date

By using your assigned (through NMSDC only) password, NMSDC Corporate Members may view the original certificate by logging in at http://www.nmsdc.org.

An affiliate of the National Minority Supplier Development Council, Inc.® (NMSDC®)



**MIAMI-DADE COUNTY**

**Procurement Management**
111 NW 1st Street • Suite 1300
Miami, Florida 33128-1974
T 305-375-5289 F 305-375-4407  305-372-6128

miamidade.gov

Carlos Alvarez, Mayor

CERT. NO: 13356
APPROVAL DATE(s): 07/31/2010 - CSBE Level 1
EXPIRATION DATE: 07/31/2011

August 20, 2010

Mr. Marcos Rodriguez
M.A.R. CONTRACTING, INC.
2040 NW 94 Ave
Miami, FL 33172-0000

Dear Mr. Rodriguez:

The Department of Procurement Management (DPM) has completed the review of your application and attachments submitted for certification. Your firm is officially certified as a Community Small Business Enterprise (CSBE) in the categories listed below.

This certification is valid for twelve (12) months, which will expire on July 31, 2011. This certification affords your company the opportunity to benefit from participation in county contracts with small business measures. Please note the trade categories listed below. These are the only sheltered market areas that your company is eligible to bid or participate in under your current certification.

Due to a backlog, your renewal application was reviewed and/or approved after the expiration date of your certification. Considering the fact that your application was received prior to the expiration date, your recertification approval date will correspond with your previous expiration date.

If any changes occur within your company during the certification period (such as ownership, address, telephone number, trade category, licensing, technical certification, bonding capacity, or if the business ceases to exist) you are required to notify this department within 30 days in writing. It is of critical importance that current information regarding your company be kept current. All inquiries or changes related to this certification should be directed to Jacob Mizrahy at jmizrah@miamidade.gov in the DPM Vendor Services Section. An application for re-certification must be submitted and forwarded to this office four (4) weeks prior to the referenced expiration date. Should your firm fail to re-certify, or lose its certification for any reason, the ability to work on contracts with measures will be affected. Thank you for doing business with Miami-Dade County.

Sincerely,

Miriam Singer, CPPO
Director
singer@miamidade.gov

CATEGORIES: (Your firm may bid or participate on contracts only under these categories)
NEW SINGLE-FAMILY HOUSING CONSTRUCTION (EXCEPT OPERATIVE BUILDERS) (CSBE)
NEW MULTIFAMILY HOUSING CONSTRUCTION (EXCEPT OPERATIVE BUILDERS) (CSBE)
NEW HOUSING OPERATIVE BUILDERS (CSBE)
RESIDENTIAL REMODELERS (CSBE)
INDUSTRIAL BUILDING CONSTRUCTION (CSBE)
COMMERCIAL AND INSTITUTIONAL BUILDING CONSTRUCTION (CSBE)
WATER AND SEWER LINE AND RELATED STRUCTURES CONSTRUCTION (CSBE)
POURED CONCRETE FOUNDATION AND STRUCTURE CONTRACTORS (CSBE)
STRUCTURAL STEEL AND PRECAST CONCRETE CONTRACTORS (CSBE)
OTHER FOUNDATION, STRUCTURE, AND BUILDING EXTERIOR CONTRACTORS (CSBE)



State of Florida

*Minority, Women &*
*Service-Disabled Veteran*

Business Certification

Florida Lemark Corporation

Is certified under the provisions of
287 and 295.187, Florida Statutes for a period from:

August 27, 2009     to     August 27, 2011

*Torey Alston, Executive Director*

*Florida Department of Management Services*
*Office of Supplier Diversity*

Office of Supplier Diversity ○ 4050 Esplanade Way, Suite 380 ○ Tallahassee, FL 32399-0950 ○ 850.487.0915 ○ www.osd.dms.state.fl.us

## COMPULSIVE GAMING TRAINING AND PRACTICES

Florida Gaming, Inc., owner of the Miami Jai Alai Casino, and it management company, Miami Gaming Management, LLC are both well aware of the problems dealing with compulsive gaming and are committed to training all employees to recognize this issue.  In addition the companies pledge to enforce self-exclusion policies when operations commence.

The Florida Council on Compulsive Gambling, Inc. has consistently made active efforts to work with gambling operators within the State of Florida for purposes of providing increased awareness about problem gambling and outlining the importance of implementing responsible gaming programs.  Florida Gaming, Inc. and Miami Gaming Management, LLC recognize the effectiveness of these programs, and, as such, have registered with the Council as an active partner to educate both employees and patrons in the dangers of compulsive gaming.  The Council will provide training to all casino employees to enhance their ability to recognize signs of problem gamblers and make them aware of available programs to help customers in need.

In addition appropriate signage will be affixed at critical points throughout the casino warning patrons of the need for awareness of this problem and providing pertinent information about the council, including 24 hour assistance or counseling.

Prior to commencement of operations all employees will be briefed on a "self-exclusion" program, which will offer the customer the opportunity to bar himself or herself from the casino on either a temporary or permanent basis.  This "self-exclusion" program will be monitored by security personnel and others stationed throughout the casino.

DIVISION OF PARI-MUTUEL WAGERING    2011 JAN 13  AM 10:33    RECEIVED OFFICE

## Pouncey, Jamie

| | |
|---|---|
| **From:** | Trabue, Carolynn |
| **Sent:** | Tuesday, February 01, 2011 11:02 AM |
| **To:** | Pouncey, Jamie |
| **Cc:** | Champion, Milton |
| **Subject:** | Miami Jai Alai-IC Review |
| **Attachments:** | MJA Tally IC Memo.doc; image001.png |

Jamie,

Please see the attached memo regarding Internal Control deficiencies for Miami Jai Alai. Please let me know if you have any questions.

Respectfully,



**Carolynn Trabue, Chief of Slot Operations**
Division of Pari-Mutuel Wagering, Office of Slot Operations
1400 W. Commercial Blvd., Suite 165, Ft. Lauderdale, FL 33309
954.202.3900 ext 135 Office ~ 954.495.3001 Cell ~ 954.202.3370 Fax

The information contained in this transmission is intended solely for the use of the person(s) named herein. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.

The State of Florida has a very broad public records law pursuant to Chapter 119, Florida Statutes. Most written communications to and from state officials regarding state business are public records, available to the public and media upon request. Therefore, your e-mail communications may be subject to public disclosure. LARGER VIEW



Florida Department of
Business ∧
Professional
Regulation

Division of Pari-Mutuel Wagering
Office of Slot Operations
1400 West Commercial Boulevard, Suite 165
Ft. Lauderdale, Florida 33309
Phone: 954.202.3900 • Fax: 954.202.3370

**Charlie Liem,** Secretary

**Rick Scott,** Governor

# M E M O R A N D U M

TO:        **Jamie Pouncey, Licensing Administrator**

FROM:    **Carolynn Trabue, Chief of Slot Operations**

SUBJECT: **Miami Jai Alai Internal Controls Review**

DATE:      **January 31, 2011**

Jamie,

Listed below are the deficiencies found upon reviewing Miami Jai Alai's Internal Control submission:

- 61D-14.058(4):      Missing the signed statement by the CEO and slot machine officers

- 61D-14.065(1)(a):  Missing a workflow diagram indicating all equipment used in the counting process

- 61D-14.065(1)(b):  Missing a description of all computer equipment used in the counting and recording process including other systems that communicate with the computer equipment

- 61d-14.050(2)(a):  Missing the location of each slot machine with corresponding location number on the floor plan

- 61D-14.050(2)(b):  Missing the location of security cameras and any other surveillance equipment on the floor plan

- 61D-14.050(2)(e):  Missing the location of the surveillance system monitoring room on the floor plan

- 61D-14.051(2):      Missing a diagram that shows all the areas to be monitored and the placement of surveillance equipment in relation to the activities being observed

- 61D-14.051(2):      Missing a description of the procedures used in the operation of the surveillance system

- 61D-14.051(4)(b):  The minimum number of security employees staffed by shift *(IC's list 2 entrances staffed by 2 security officers, floor plan indicates 4-5 public entrances)*

- 61D-14.051(6):      Missing procedures for clearing the slot gaming area prior to closing

- 61D-14.053(4):     Establishes a key log system *(IC's do not list the requirement for the key log to include slot employee Occupational License number)*

- 61D-14.054(1):     Includes continuous monitoring with an on-site CCTV surveillance system at the facility *(IC's do not indicate the CCTV system will be maintained on-site)*

- 61D-14.054(2)(a):  Records to a quality of 4 CIF and is capable of observing/recording at no less than 30 frames per second *(IC's do not list the 4 CIF requirement)*

- 61D-14.054(2)(e):  Missing statement that recording systems are locked to disable erase/reformat functions

- 61D-14.054(2)(h):  Missing the ability to provide images with a video verification encryption code

- 61D-14.054(3):     Missing requirement for access to the surveillance system, system plan, and any related information to be limited by an alpha and numeric password protection of at least 6 characters

- 61D-14.054(18):    Missing the requirement for the surveillance monitoring room to be continuously monitored and recorded

- 61D-14.055(1):     Missing the requirement for digital recordings to be retained for at least 30 days for areas referenced in 61D-14.054(2)(b) or 7 days for areas referenced in 61D-14.054(2)(c)

- 61D-14.055(2):     Missing the requirement for recordings of illegal or suspected illegal activity or jackpot payment is saved and stored separately and securely, and labeled with date, time and identity of the surveillance personnel

- 61D-14.055(3):     Missing the requirement for maintaining video recordings of illegal activity be retained until written permission from the division is received

Please let me know if you have any questions.

Carolynn

Florida Department of
**Business**
**Professional**
Regulation

Division of Pari-Mutuel Wagering
Office of Operations
1940 North Monroe Street
Tallahassee, Florida 32399-1037
Phone: 850.488.3211 • Fax: 850.410.5350

Charlie Liem, Secretary

Rick Scott, Governor

February 9, 2011

Mr. Daniel J. Licciardi, Vice President
Florida Gaming Centers, Inc.
3500 Northwest 37th Avenue
Miami, Florida 33142

Dear Mr. Licciardi:

The Slot Machine License Application and Internal Controls submitted for Florida Gaming Centers, Inc., have been received. The items listed below have not been submitted or require correction before processing of your application can be completed:

❖ Payment of the non-refundable $2,500,000 application fee for a Slot Machine License and $250,000 regulatory fee for the Compulsive or Addictive Gambling Prevention Program, made payable to the division, submitted via EFT;

❖ Evidence of a current surety bond in the amount of $2,000,000, payable to the Governor of the State of Florida, as specified in s. 551.103(1)(f), Florida Statutes, and;

❖ Each Officer/Director/Shareholder must hold a current slot occupational license. A deficiency letter was mailed to each under separate cover.

Additionally, the following are missing or require correction in the written description of your Internal Control Procedures:

❖ 61D-14.058(4)-The signed statement by the CEO and slot machine officers;

❖ 61D-14.065(1)(a)-A workflow diagram indicating all equipment used in the counting process;

❖ 61D-14.065(1)(b)-A description of all computer equipment used in the counting and recording process including other systems that communicate with the computer equipment;

❖ 61d-14.050(2)(a)-The location of each slot machine with corresponding location number on the floor plan;

❖ 61D-14.050(2)(b)-The location of security cameras and any other surveillance equipment on the floor plan;

❖ 61D-14.050(2)(e)-The location of the surveillance system monitoring room on the floor plan;

❖ 61D-14.051(2)-A diagram that shows all the areas to be monitored and the placement of surveillance equipment in relation to the activities being observed;

❖ 61D-14.051(2)-A description of the procedures used in the operation of the surveillance system;

❖ 61D-14.051(4)(b)-The minimum number of security employees staffed by shift *(Internal Controls list two entrances staffed by two security officers; floor plan indicates four-five public entrances)*;

❖ 61D-14.051(6)-Procedures for clearing the slot gaming area prior to closing;