**ORDERED in the Southern District of Florida on December 2, 2013.**

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN RE:

FLORIDA GAMING CENTERS, INC., *ET AL.*,[1]

DEBTORS. /

CHAPTER 11
CASE NO. 13-29597-RAM
(JOINTLY ADMINISTERED)

**ORDER AUTHORIZING THE RETENTION OF GUGGENHEIM SECURITIES, LLC AS INVESTMENT BANKER TO THE DEBTORS, *NUNC PRO TUNC* TO NOVEMBER 8, 2013**

This matter came before the Court on the Debtors' Florida Gaming Centers, Inc., Florida Gaming Corporation, Tara Club Estates, Inc., and

---

[1] The debtors in these chapter 11 cases and the last four digits of their federal tax identification number are: Florida Gaming Corporation (0533), Florida Gaming Centers, Inc. (5893), Tara Club Estates, Inc. (9545), and Freedom Holding, Inc. (4929).

Freedom Holding, Inc. (collectively, **"Miami Jai-Alai"**), *Application for Entry of an Order Authorizing Retention and Employment of Guggenheim Securities, LLC as Investment Banker to the Debtors, Nunc Pro Tunc to November 8, 2013* (the "**Application**") (ECF No. 208)[2] filed on November 8, 2013, and upon the Affidavit of Alex Fisch (the "**Fisch Affidavit**") in support, and based on the engagement letter dated as of November 8, 2013 attached to the Application as Exhibit B (as revised and attached hereto as Exhibit A, the "**Engagement Letter**"). The Application requests entry of an order authorizing the employment and retention of Guggenheim, *nunc pro tunc* to the November 8, 2013. On November 19, 2013, the Official Joint Committee of Unsecured Creditors (the "**Committee**") filed a limited objection and reservation of rights (ECF No. 220), which was withdrawn at the Hearing (as defined below) in light of various concessions made by the parties, as set forth in this order and the Engagement Letter.

The Court having reviewed the Application, the Fisch Affidavit, and the Engagement Letter, and having heard the statements of counsel at a hearing on the Application held on November 21, 2013 (the "**Hearing**"); and the Court finding and determining that: (a) it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the reference from the District Court pursuant to 28 U.S.C. § 157; (b) notice of the Application was sufficient under the circumstances; (c) Guggenheim is a "disinterested person" pursuant to Bankruptcy Code Section 101(14); and (d) the legal and factual bases set forth in the Application and the Fisch Affidavit establish just cause for the relief granted herein;

**IT IS ORDERED THAT:**

1. The Application shall be, and is, **GRANTED** as set forth herein.

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Application.

2. Miami Jai-Alai is authorized to retain and employ Guggenheim as investment banker at the expense of the chapter 11 estates, pursuant to Bankruptcy Code Sections 327(a) and 328(a), on the terms set forth in the Engagement Letter, as modified by this Order, *nunc pro tunc* to November 8, 2013.

3. Guggenheim shall be compensated in accordance with Bankruptcy Code Sections 328, 330, and 331, the Bankruptcy Rules, the Local Rules, U.S. Trustee Guidelines, and such procedures as may be fixed by order of this Court. Subject to final approval by this Court, Guggenheim's fees and expenses shall be paid in the amounts, at the times, and in the manner described in the Application and Engagement Letter. Upon the conclusion of its engagement, Guggenheim shall file a final fee application for allowance of its compensation and expenses with respect to its services with this Court pursuant to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the guidelines established by the Office of the United States Trustee for the Southern District of Florida and such other procedures as may be fixed by order of this Court; provided, however, that a limited waiver of the information requirements of the Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases (the "Guidelines") is granted such that Guggenheim's time records for its restructuring professionals may be maintained in one-hour increments, and Guggenheim's restructuring professionals shall not be required to maintain their time records on a "project category" or similar basis. Guggenheim's non-restructuring professionals shall not be required to maintain any time records.

4. Guggenheim's fees shall not be subject to challenge except under the standard of review set forth in Bankruptcy Code Section 328(a), other than with respect to the Office of the United States Trustee, which will be entitled to review the fees sought by Guggenheim under the Application and the Engagement Letter pursuant to the standards of Section 330 of the Bankruptcy Code. Nothing in the Engagement Letter, including Section 8(a) thereof, shall constitute a finding

or other impediment to the United States Trustee's review of any fees sought by Guggenheim under Section 330 of the Bankruptcy Code.

5. Guggenheim shall be reimbursed for its expenses in accordance the Engagement Letter, provided that there is any conflict between expenses sought by Guggenheim under the Engagement Letter and allowable expenses under the Guidelines, the Guidelines shall control. In addition, any expenses sought by Guggenheim shall be subject to review under Bankruptcy Code Section 330, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other applicable orders of this Court.

6. The indemnification provisions set forth in the Engagement Letter are approved, subject to the following modifications:

(a) All requests for payment by Guggenheim or by any party claiming a right to indemnity under the Engagement Letter (hereinafter collectively referred to as an "Indemnified Party") shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Engagement Letter, the Bankruptcy Code, the Bankruptcy Rules, and Local Rules and Orders of this Court;

(b) Notwithstanding the foregoing, and also notwithstanding anything to the contrary in Section 6 of the Engagement Letter in respect to the timing of the payment of any fees, in no event shall an Indemnified Party be indemnified or receive contribution or other payment under the Engagement Letter if the Debtors, their estates, or the Committee assert a claim and the Court determines by final order that such claim arose out of bad-faith, self-dealing, gross negligence, or willful misconduct on the part of that Indemnified Party; and, for the avoidance of any doubt, to the extent of a finding of bad-faith, self-dealing, gross negligence, or willful misconduct, the indemnity provisions of the Engagement Letter shall not be applicable, such that Guggenheim's potential

liability for such acts shall not be limited to the amounts received by Guggenheim for services rendered in these chapter 11 cases; and

(c) In the event an Indemnified Party seeks reimbursement for attorneys' fees from the Debtors pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be subject to the Guidelines and the approval of this Court under the standards of Bankruptcy Code Section 330 without regard to whether such attorney has been retained under Bankruptcy Code Section 327.

7. To the extent there are any conflicts between this Order and the Application, the Engagement Letter, or the Fisch Affidavit, the terms of this Order shall govern.

8. Miami Jai-Alai and Guggenheim are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9. Guggenheim's fees and other amounts owed under the Engagement Letter shall be entitled to priority as expenses of administration under Sections 503(b)(1)(A), 503(b)(2), and 507(a)(2) of the Bankruptcy Code; provided, however, that the budget issued pursuant to the final cash collateral order shall be modified to permit payment of the Initial Fee and expenses incurred by Guggenheim when and as provided in the Engagement Letter (proved as set forth above that such expenses shall be subject to the Guidelines); provided further that, if and to the extent there are insufficient unencumbered assets to pay the Sale Transaction Fee, any Monthly Fees, and any other amounts owing under the Engagement Letter, then such amounts may be paid from any sale proceeds that are subject to the liens of the Company's lenders, but provided, further that nothing herein shall be deemed a finding by the Court that Guggenheim's fees and other amounts owed under the Engagement Letter shall be first paid from unencumbered assets, and the Committee's rights with respect to the source of funds to satisfy such fees are hereby preserved.

10. Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, and 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11. The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order, and notwithstanding anything to the contrary in the Engagement Letter, this Court shall retain exclusive jurisdiction over all matters relating to the Guggenheim's retention and the Engagement Letter, including, without limitation, any proceedings relating to any claim for indemnity under the Engagement Letter.

# # #

Submitted by:

Luis Salazar, Esq.
**SALAZAR JACKSON, LLP**
One Biscayne Tower, Suite 3760
Two South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 374-4848
Facsimile: (305) 397-1021
Email: salazar@salazarjackson.com

*(Attorney Salazar shall serve a copy of this order upon all interested parties upon receipt and file a certificate of service)*

# EXHIBIT "A"

GUGGENHEIM

GUGGENHEIM SECURITIES, LLC
330 MADISON AVENUE
NEW YORK, NEW YORK 10017
GUGGENHEIMPARTNERS.COM

November 8, 2013

Florida Gaming Corporation
3500 NW 37th Avenue
Miami, Florida 33142

Attention: Mr. W. Bennett Collett, Jr.
President and Chief Executive Officer

Ladies and Gentlemen:

This letter agreement (together with the Annex and the Indemnification Provisions attached hereto, this "Agreement") confirms the agreement between Florida Gaming Corporation (collectively with its debtor subsidiaries and affiliates, the "Company") and Guggenheim Securities, LLC ("Guggenheim Securities") as follows:

1. The Company hereby engages Guggenheim Securities to act, on an exclusive basis, as the Company's investment banker in connection with the sale (the "Sale Process") of substantially all of the assets of Florida Gaming Centers, Inc. ("Centers") pursuant to Section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") to be undertaken in the bankruptcy cases commenced under the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Florida (Miami) (the "Bankruptcy Court") by the Company (as consolidated under case number 13-29597-RAM, the "Bankruptcy Case").

2. Guggenheim Securities hereby accepts the engagement and, in that connection, to the extent requested by the Company and appropriate under the circumstances, agrees to assist the Company with respect to the following:

   (a) *Sale Services.* In connection with the Sale Process and any Sale Transaction (as defined below), Guggenheim Securities will:

      (i) To the extent it deems necessary in connection with the Sale Process, as appropriate and feasible, review and analyze the Company's business, financial condition and prospects;

      (ii) Provide financial advice and assistance to the Company in connection with the Sale Process in accordance with the Sale Procedures (as defined below), identify potential Acquirors (as defined below) with respect to such Sale Process, provide updates and information regarding the Sale Process, solicit such Acquirors and help evaluate any bids received by the Company by such Acquirors and conduct an auction pursuant to the Sale Procedures;

(iii) If Guggenheim Securities and the Company deem it advisable, assist the Company in developing and preparing Offering Materials (as defined in the Annex) to be used in soliciting Acquirors with respect to any Sale Transaction; and

(iv) If requested by the Company, assist the Company and/or participate in negotiations with Acquirors.

(b) *Certain Caveats and Limitations.* In providing its services to the Company pursuant to this Agreement, Guggenheim Securities is not assuming any responsibility for the Company's underlying business and financial decision to pursue, endorse, support or effect (or not pursue, endorse, support or effect) any business or financial strategy or to effect or not to effect any Sale Transaction and/or any other transaction. The Company agrees that Guggenheim Securities will not have any obligation or responsibility to provide, nor will Guggenheim Securities be deemed to have provided, any (i) legal, accounting, audit, tax, actuarial or other specialist advice for or to the Company, (ii) "crisis management" or business consultant services for or to the Company, (iii) professional services related to designing or implementing operational, organizational, administrative, cash management or liquidity improvements related to the Company or (iv) fairness or valuation opinions or any advice or opinions with respect to solvency in connection with any Sale Transaction. The Company confirms that it will rely on its own legal counsel, accountants, tax advisors, actuaries and similar expert advisors for all legal, accounting, audit, tax, actuarial and other similar advice.

(c) *Additional Services.* Finally, Guggenheim Securities agrees to provide such other investment banking services as may be agreed upon by Guggenheim Securities and the Company in writing during the term of this engagement (after consultation with the official committee of unsecured creditors in the Bankruptcy Case (the "Committee") and ABC Funding, LLC ("ABC") and approval by the Bankruptcy Court upon notice and hearing).

3. For purposes herein:

(a) The term "Stalking Horse Bid" means the offer of Silvermark LLC ("Silvermark"), in substantially the form set forth in that certain asset purchase agreement submitted on November 15, 2013 (the "APA") to act as stalking horse bidder to purchase the majority of the assets of Centers (the "Assets") for the approximate gross amount of $115,000,000 plus the assumption of certain debt as set forth in the APA in the approximate amount of $15,000,000, provided the definitive APA and all supporting documentation are executed, and the Debtors have filed a motion in the Bankruptcy Court to approve Silvermark as the stalking horse bidder, all by no later than December 11, 2013; for the avoidance of doubt, if any party other than Silvermark is the stalking horse bidder for the Assets, or if Silvermark is the stalking horse bidder but the APA and all supporting documentation are not executed and filed with the Bankruptcy Court by December 11, 2013, then there is no Stalking Horse Bid for purposes of this Agreement.

(b) The term "Sale Procedures" means the bidding and sale procedures for the sale of the Assets, as established by the Bankruptcy Court in the Bankruptcy Case.

(c) The term "Sale Transaction" means and includes any transaction or series of related transactions whereby, directly or indirectly, all or substantially all of the equity securities of the Company or all or a significant amount of the Company's businesses or assets are transferred to, disposed of, or combined with one or more persons, groups of persons, partnerships, corporations or any other entity (including, without limitation, one or more of the Company's creditors acquiring such businesses or assets through a credit bid) (any of the foregoing, including any potential acquiror, each an "Acquiror" and collectively "Acquirors"), including without limitation via (i) a sale, acquisition, purchase or exchange of stock (including shares issuable upon conversion of any securities or debt convertible into stock) or options, (ii) the acquisition of all or any significant portion of the assets, properties or businesses of the Company or any of its subsidiaries by way of a direct or indirect acquisition, purchase, exchange, joint venture, partnership, other business combination or other means, including, without limitation, transactions under Section 363 of the Bankruptcy Code (including, without limitation, one or more of the Company's creditors acquiring such businesses or assets through a credit bid), (iii) a lease or license of assets (with or without a purchase option), (iv) a joint venture or (v) a merger, reverse merger, consolidation, reorganization, scheme of arrangement, tender offer, exchange offer, leveraged buyout, recapitalization or any other such corporate transaction or business combination involving the Company.

4. In consideration of Guggenheim Securities' services pursuant to this Agreement, the Company agrees to pay Guggenheim Securities the cash fees as outlined below:

(a) *Initial Fee.* The Company will pay Guggenheim Securities a non-refundable cash financial advisory fee of $100,000 (the "Initial Fee"), which will be due and paid by the Company within two (2) business days of the entry of an order by the Bankruptcy Court approving the Company's entry into this Agreement and the retention of Guggenheim Securities as the Company's investment banker in the Bankruptcy Case. Regardless of whether any Sale Transaction has taken place or will take place, Guggenheim Securities will earn and be paid the Initial Fee.

(b) *Monthly Fees.* In the event that a Sale Transaction has not been consummated by March 31, 2014 (and thereafter during the term of this Agreement, regardless of whether any Sale Transaction has taken place or will take place), beginning April 1, 2014 and thereafter on the first day of each subsequent month during the term of this Agreement, the Company will pay Guggenheim Securities a non-refundable cash fee of $50,000 per month (each, the "Monthly Fee" and collectively, the "Monthly Fees"). To the extent applicable, the Monthly Fee shall be calculated on a pro rata basis for the month in which the Agreement is terminated.

(c) *Sale Transaction Fee:*

(i) If at any time during the term of this engagement or within the twelve full months following the expiration or termination of this engagement (including the term of this engagement, the "Fee Period") there is a Sale Transaction, then the Company shall pay Guggenheim Securities a Sale Transaction Fee, calculated as follows:

(A) If there is a Stalking Horse Bid, then $650,000, plus 5% of the Aggregate Value Added (as defined below) up to a total Aggregate Sale Consideration (as defined below) of $170,000,000, plus 3% of the Aggregate Value Added once the Aggregate Sale Consideration exceeds $170,000,000.

(B) If there is not a Stalking Horse Bid, then Guggenheim Securities shall promptly reach an agreement with the Company, with the advice of the Committee and the Company's primary secured lenders (and subject to the approval of the Bankruptcy Court), on an appropriate Sale Transaction Fee, taking into account the increased effort and difficulty expected to consummate a Sale Transaction, provided that under no circumstances shall Guggenheim Securities receive a Sale Transaction Fee that is less than $650,000 plus 5% of the Aggregate Sale Consideration in excess of $130,000,000 but less than $170,000,000, plus 3% of the Aggregate Sale Consideration in excess of $170,000,000.

(ii) Any such Sale Transaction Fee will be payable promptly upon the consummation of any Sale Transaction.

(iii) For purposes hereof, the term "Aggregate Sale Consideration" will mean and include (A) the total amount of cash and the fair market value of all securities and/or other property or consideration in any form paid or to be paid, directly or indirectly, by the Acquiror to the Company and/or its contract parties, claim holders, security holders and employees in connection with the Sale Transaction or any transaction related thereto (including, without limitation, the face amount of any indebtedness, securities or other property "credit bid" in any Sale Transaction, but *not* including any breakup fee, expense reimbursement, or other bid protections paid by the Acquiror) and amounts paid by the Acquiror (I) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements of the Company and (II) to holders of any warrants, stock purchase rights, convertible securities or similar rights of the Company and to holders of any options or stock appreciation rights issued by the Company, whether or not vested plus (B) the amount of any liabilities (including the principal amount of any indebtedness for borrowed money and any obligations relating to any capitalized leases) or preferred stock assumed, acquired, redeemed or repaid (directly or indirectly) following the execution of definitive documents with respect to a Sale Transaction or in connection with the Sale Transaction or related transaction or which remains on the Company's financial statements at the time of the Sale Transaction plus (C) only to the extent greater than zero, (I) the value of any current assets not sold to the Acquiror minus (II) the value of any current liabilities not assumed by the Acquiror, each such value as of the closing date of the Sale Transaction and as determined by Guggenheim Securities in good faith plus (D) to the extent in connection with or in contemplation of the Sale Transaction or any related transaction, any (I) amounts paid into escrow, (II) consideration that is contingent upon the occurrence of some future event (*e.g.*, the net present value of any expected future earnout payments, milestone payments or royalties on future sales), (III) the aggregate amount of any dividends or other distributions declared by the Company (other than regularly scheduled dividends) and

(IV) amounts paid by the Company to repurchase any securities of the Company (other than pre-existing, ordinary course repurchase programs). In calculating "Aggregate Sale Consideration," any shares issuable upon exercise of "in-the-money" options, warrants or other "in-the-money" rights of conversion, whether or not vested, will be deemed to be acquired by such Acquiror for the same consideration paid or to be paid with respect to such shares. As used in this Agreement, the terms "payment," "paid" or "payable" will be deemed to include, as applicable, the issuance or delivery of securities or other property other than cash.

Notwithstanding anything to the contrary in the above definition, (Y) under no circumstances will "Aggregate Sale Consideration" include any claims or causes of action which did not arise in the ordinary course of the Company's operations or which are not acquired as part of the Sale Transaction, including those claims asserted by the Company and its bankruptcy estates in the case styled Florida Gaming Centers, Inc. v. ABC Funding, LLC, and any avoidance actions or other like claims which may be asserted by the Company or its estates pursuant to Sections 510, 542, 544, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (Z) to the extent any amounts which qualify as "Aggregate Sale Consideration" are further distributed within the Debtors or to third parties, such amounts shall only count once for purposes of calculating Aggregate Sale Consideration.

(iv) For purposes hereof, the term "Aggregate Value Added" will mean and include the amount by which the Aggregate Sale Consideration of any Sale Transaction other than the Stalking Horse Bid exceeds the Aggregate Sale Consideration of the Stalking Horse Bid. By way of example, if there is a Stalking Horse Bid featuring a gross amount of Aggregate Sale Consideration of $115,000,000 in cash and $15,000,000 in assumed debt, but the final gross amount of Aggregate Sale Consideration in the Sale Transaction is $120,000,000 in cash and $20,000,000 in assumed debt, and the party submitting a Stalking Horse Bid receives $X of this amount as a breakup fee, expense reimbursement, or other form of bid protections, then, regardless of the identity of the Acquiror or whether the increased amount are due to an auction of other means of increasing the values set forth in the Stalking Horse Bid, the Aggregate Value Added in this example is $10,000,000 less $X.

5. In addition to any fees payable by the Company to Guggenheim Securities hereunder, the Company will, whether or not any Sale Transaction contemplated by this Agreement will be proposed or consummated, reimburse Guggenheim Securities on a monthly basis for its reasonable travel and all other reasonable out-of-pocket expenses incurred in connection with or arising out of this Agreement, including Guggenheim Securities' entering into this Agreement, Guggenheim Securities' activities under or contemplated by this Agreement or Guggenheim Securities' enforcing its rights hereunder, including all reasonable fees, disbursements and other charges of any legal counsel retained by Guggenheim Securities (without the requirement that the retention of such legal counsel be approved by the Bankruptcy Court). Guggenheim Securities bills its clients for its reasonable out-of-pocket expenses including, but not limited to, (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Guggenheim Securities may receive from,

or fixed fee arrangements made with, travel agents, airlines or other vendors on a periodic basis and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Guggenheim Securities, which amount shall not exceed $2,000 monthly. The Company will also reimburse Guggenheim Securities, at such times as Guggenheim Securities will request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by, this Agreement. Such reimbursements will be made promptly upon submission by Guggenheim Securities of customary statements for such expenses, provided that such payments shall be on an interim basis, subject to final approval by the Bankruptcy Court.

6. The Company's obligation to pay any fee, expense or indemnity set forth herein will be absolute and unconditional and will not be subject to any reduction by way of setoff, recoupment or counterclaim, except for any claims that may arise from Guggenheim's willful misconduct or gross negligence.

7. The Company acknowledges and agrees that (i) Guggenheim Securities' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required during the term of Guggenheim Securities' engagement hereunder, were important factors in determining the nature and amount of the various fees set forth herein and (ii) the ultimate benefit of Guggenheim Securities' services hereunder cannot be measured merely by reference to the number of hours to be expended by Guggenheim Securities' professionals in the performance of such services. The Company also acknowledges and agrees that (i) the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial professional commitment of time and effort will be required of Guggenheim Securities and its professionals in connection with this complex engagement, (ii) such commitment may foreclose other business opportunities for Guggenheim Securities and (iii) the actual time and commitment required of Guggenheim Securities and its professionals to perform its services hereunder may vary substantially from week to week or month to month, thereby creating potential "peak load" issues for Guggenheim Securities. Given the numerous and complex issues that may arise in engagements of this nature, the aforementioned issues with Guggenheim Securities' commitment to the variable level of time and effort necessary to address all such complex issues as they arise, the expertise and capabilities of Guggenheim Securities that will be required for this engagement and the market prices for professionals of Guggenheim Securities' stature and reputation for engagements of this nature, each of the Company and Guggenheim Securities agrees that the fee and expense arrangements hereunder are just and reasonable under all applicable legal standards and provide the requisite certainty to the Company.

8. The Company and Guggenheim Securities agree to the following provisions with respect to the Bankruptcy Case:

   (a) The Company will apply promptly to the Bankruptcy Court for the approval, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, of this Agreement (including, without

limitation, the compensation, expense and indemnification provisions hereof) and Guggenheim Securities' retention by the Company under the terms of this Agreement pursuant to, and subject to the standards of review set forth in, Section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in Section 330 of the Bankruptcy Code or any other standard of review), *nunc pro tunc* to the date first written above (or, if later, the date the Bankruptcy Case is commenced) and will use its best efforts to obtain an interim and final order of the Bankruptcy Court for authorization thereof. The Company will supply Guggenheim Securities and its legal counsel with a draft of such application and the proposed orders authorizing Guggenheim Securities' retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order (as the case may be) to enable Guggenheim Securities and its legal counsel to review and comment thereon. The retention application and the proposed interim and final orders authorizing Guggenheim Securities' retention must be acceptable to Guggenheim Securities in its sole discretion. In agreeing to seek Guggenheim Securities' retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that (i) it believes that Guggenheim Securities' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities will inure to the benefit of the Company, (ii) the value to the Company of Guggenheim Securities' services derives in substantial part from that experience and expertise and (iii) accordingly, the structure and amount of the fees set forth in Section 4 herein are reasonable, regardless of the number of hours expended by Guggenheim Securities' professionals in the performance of the services to be provided hereunder.

(b) Guggenheim Securities hereby notifies the Company that it does not keep time records as part of its normal business practice for engagements of this nature. Each of the Company and Guggenheim Securities acknowledges and agrees that Guggenheim Securities will have no obligation to keep any such time records and will have no obligation to provide services under this Agreement if it will be required to alter its normal time-keeping practices. If Guggenheim Securities is requested or required to alter is normal time-keeping practices, then Guggenheim Securities may terminate this Agreement, and the Company will be obligated to reimburse Guggenheim Securities for all fees, compensation and expenses incurred prior to the date of termination.

(c) Guggenheim Securities will have no obligation to provide services under this Agreement or any other agreement unless Guggenheim Securities' retention under this Agreement or such other agreement is approved by a final order of the Bankruptcy Court acceptable to Guggenheim Securities, which final order must also approve the Indemnification Provisions attached hereto and will not be subject to appeal, rehearing, reconsideration or petition for *certiorari* under Section 328(a) of the Bankruptcy Code (the "Retention Order"), within 60 days of the date first written above. If such Retention Order is not obtained within such 60-day period, or such order is later reversed, vacated, stayed or set aside for any reason, then Guggenheim Securities may terminate this Agreement, and the Company will be obligated to reimburse Guggenheim Securities for all fees and expenses incurred prior to the date of termination but Guggenheim Securities shall not be eligible to receive any Sale Transaction Fee as contemplated in Section 4 herein. Following entry of the

interim order authorizing the retention of Guggenheim Securities, the Company will pay to Guggenheim Securities as promptly as possible, the Initial Fee as approved by the Bankruptcy Court and, on an interim basis subject to final approval by the Bankruptcy Court, all expenses incurred by Guggenheim Securities in accordance with Section 5 of this Agreement.

(d) The Company agrees that Guggenheim Securities' fees as set forth herein, payments made pursuant to the expense reimbursement provisions of this Agreement and the Indemnification Provisions attached hereto will be entitled to priority as expenses of administration under Sections 503(b)(1)(A), 503(b)(2) and 507(a)(2) of the Bankruptcy Code. The Company will use its best efforts to ensure that the final cash collateral order and related budget entered in the Bankruptcy Case is amended to (i) permit the use of cash collateral and financing proceeds for the full and prompt payment of all of Guggenheim Securities' fees and expenses contemplated hereby (including, without limitation, all fees contingent upon the occurrence of a Sale Transaction), (ii) entitle Guggenheim Securities to the benefits of any "carve-outs" for professional fees and expenses (which carve-outs will be adequate to enable the Company to pay promptly Guggenheim Securities the fees and expense reimbursements contemplated hereby taking into account the Company's obligations to other professionals entitled to the benefit of the carve-outs) and (iii) contain an agreement by the Company's lenders (or parties whose cash collateral may be used) that Guggenheim Securities' fees and expenses will be paid at the times and from the sources specified herein. The Company also agrees to assist Guggenheim Securities in preparing, filing and serving all required monthly fee and expense statements, interim fee applications and a final fee application. The Company agrees to support Guggenheim Securities' fee and expense applications during any Bankruptcy Court hearing regarding such applications, so long as the fees and expenses sought by Guggenheim Securities therein are consistent with this Agreement.

(e) Reserved.

(f) The terms of this Section 8 are solely for the benefit of Guggenheim Securities and may be waived, in whole or in part, only by Guggenheim Securities in its sole discretion.

9. The Company and Guggenheim Securities agree to the following termination and tail provisions:

(a) Guggenheim Securities' engagement pursuant to this Agreement will extend until the earliest of the (i) conversion of the Bankruptcy Case to Chapter 7 of the Bankruptcy Code, (ii) appointment of a Chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Cases, (iii) dismissal of the Bankruptcy Cases and (iv) consummation of a Sale Transaction; *provided, however,* that this Agreement may be (i) terminated earlier, with or without cause, either by the Company (with the prior written consent of the Committee and ABC or upon an order of the Bankruptcy Court after proper notice and a hearing if there is a dispute among such parties) or by Guggenheim Securities upon 10 business days' prior written notice thereof to the other party, (ii) terminated earlier as provided elsewhere herein or (iii) extended as may be agreed in writing by the Company (with the prior written

consent of the Committee and ABC) and Guggenheim Securities.

(b) Notwithstanding the foregoing, in the event of any expiration or termination of Guggenheim Securities' engagement pursuant to this Agreement, Guggenheim Securities will continue to be entitled to payment by the Company (or its bankruptcy estates) of (i) any unpaid fees pursuant to Section 4 of this Agreement and (ii) any unreimbursed expenses pursuant to Section 5 of this Agreement that were incurred by Guggenheim Securities as a result of services rendered prior to the date of such expiration or termination, all of which amounts will become immediately payable by the Company (or its bankruptcy estates) in full, *provided*, *however*, that if the Agreement is terminated by either party or pursuant to its terms prior to April 1, 2014, the Company shall not owe or be required to pay the Monthly Fees described in Section 4 herein. Furthermore, Sections 5 through 14 inclusive (and Section 4 for purposes of calculation any Sale Transaction Fee, if any is due after Termination in accordance with the terms of this Agreement), and the Annex and the Indemnification Provisions attached hereto, will survive any expiration or termination of Guggenheim Securities' engagement hereunder

(c) If, at any time prior to the expiration of the Fee Period (i) any Sale Transaction is consummated or (ii) (A) an agreement in principle, definitive agreement or Plan to effect a Sale Transaction is entered into and (II) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period) any such Sale Transaction is consummated, then Guggenheim Securities will receive the appropriate fee specified in Section 4 above immediately upon the closing of such Transaction.

10. The Company agrees to indemnify Guggenheim Securities and certain related persons in accordance with the Indemnification Provisions attached hereto. The Company acknowledges and agrees that the Annex and the Indemnification Provisions are integral parts of this Agreement, and the provisions thereof are incorporated by reference herein in their entirety. Such Annex and Indemnification Provisions will survive any termination or completion of Guggenheim Securities' engagement hereunder.

11. THE COMPANY ACKNOWLEDGES AND AGREES THAT (I) GUGGENHEIM SECURITIES WILL ACT SOLELY AS THE COMPANY'S INVESTMENT BANKER IN CONNECTION WITH THE SALE PROCESS AND (II) THIS AGREEMENT DOES NOT ENSURE OR GUARANTEE THE SUCCESSFUL COMPLETION OF ANY SALE TRANSACTION.

12. EACH OF GUGGENHEIM SECURITIES AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY LAW, ON BEHALF OF ITS RESPECTIVE EQUITY HOLDERS AND CREDITORS) HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED UPON, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND THE POTENTIAL SALE TRANSACTIONS CONTEMPLATED HEREBY.

13. This Agreement will be deemed to be made in the State of New York. This Agreement and all controversies arising hereunder or directly or indirectly relating hereto will be governed by, and

construed and enforced in accordance with, the laws of the State of New York without giving effect to such state's rules concerning conflicts of laws that might provide for any other choice of law. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein will remain in full force and effect and will in no way be affected, impaired or invalidated. Both parties agree to the exclusive jurisdiction of the Bankruptcy Court to govern all aspects of this Agreement, including without limitation, any claims that are related to the Agreement.

14. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which will be an original instrument and all of which taken together will constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by e-mail or facsimile transmission will constitute valid and sufficient delivery thereof.

* * *

We are delighted to accept this engagement and look forward to working with you on this important assignment. Please confirm that the foregoing is in accordance with your understanding by signing in the space provided below and returning to us a duplicate of this Agreement, which will thereupon constitute a binding agreement between Guggenheim Securities and the Company.

Very truly yours,

GUGGENHEIM SECURITIES, LLC

By: ______________________

James D. Decker
Senior Managing Director

ACCEPTED AND AGREED TO:

FLORIDA GAMING CORPORATION

By: ______________________

Mr. W. Bennett Collett, Jr.
President and Chief Executive Officer

# ANNEX

## Additional Provisions

Capitalized terms used herein without definition will have the meanings ascribed thereto in the letter agreement dated as of November 8, 2013 (as amended from time to time, the "Agreement") between Florida Gaming Corporation (collectively with its subsidiaries and affiliates and as further defined in the Agreement, the "Company") and Guggenheim Securities, LLC ("Guggenheim Securities").

A. During the period of Guggenheim Securities' engagement hereunder, the Company will furnish or arrange to have furnished to Guggenheim Securities all industry, business, financial, legal, regulatory, tax, accounting, actuarial and other information concerning the Company (including, without limitation, its assets, businesses, operations, financial condition and prospects) and any potential Sale Transaction (including the Stalking Horse Bid), and, to the extent within the Company's control, any Acquiror that Guggenheim Securities reasonably deems appropriate for purposes of this engagement (collectively, the "Information") and will provide Guggenheim Securities with access to the Company's and, to the extent within the Company's control, any such Acquiror's officers, directors, employees, affiliates, appraisers, independent accountants, legal counsel and other agents, consultants and advisors (collectively with respect to any such party, "Representatives"). In addition, the Company agrees promptly to advise Guggenheim Securities of any material event or change in the business, affairs and/or condition (financial or otherwise) of the Company and, to the extent within the Company's knowledge, any Acquiror that occurs during the term of this Agreement.

The Company represents and warrants that all Information (i) made available by the Company or its Representatives to Guggenheim Securities or any Acquiror, (ii) contained in any offering or sales memorandum, offering circular or similar disclosure document for any Sale Transaction and/or posted on any online data-room in connection with the Sale Process (as amended and supplemented from time to time, any "Offering Materials"), (iii) contained in any filing by the Company with (a) the Bankruptcy Court (including, without limitation, any Plan) or (b) any governmental or regulatory agency or commission or any rating agency (each of the foregoing, an "Agency") with respect to any Sale Transaction in all such cases will, at all times during the period of the engagement of Guggenheim Securities hereunder, be true, complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which such statements are made, not misleading. The Company further represents and warrants that any projections or other information provided by the Company or its Representatives to Guggenheim Securities, any Acquiror, the Bankruptcy Court and/or any Agency, or contained in any Offering Materials, will have been prepared in good faith and will be based upon assumptions which, in light of the circumstances under which they are made, are reasonable.

B. The Company acknowledges, agrees and confirms that the Company will be solely responsible for the contents of any Offering Materials and that, in providing its services pursuant to this Agreement, Guggenheim Securities (i) is and will be entitled to rely upon and assume the accuracy, completeness and reasonableness of all Information furnished by or discussed with the Company, any Acquiror and their respective Representatives, or available from public

sources, data suppliers and other parties; (ii) does not and will not assume responsibility, obligation or liability (whether direct or indirect, in contract or tort or otherwise) for the accuracy, completeness, reasonableness or achievability of any such Information; (iii) will have no responsibility or obligation to independently verify such Information or to conduct any independent evaluation or appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of the Company, any Acquiror or any other party; (iv) will assume that all financial projections, synergy estimates, other estimates and other forward-looking information (all of the foregoing, "Forward-Looking Information") that may be furnished by or discussed with the Company or any Acquiror and their respective Representatives will have been reasonably prepared and reflect the best then-currently available estimates and judgments of the Company's and/or such Acquiror's senior management (as the case may be) as to the expected future performance of the relevant company or entity and the realization of any such synergies; (v) will express no view, opinion, representation, guaranty or warranty (in each case, express or implied) regarding the reasonableness or achievability of such Forward-Looking Information; and (vi) will have no responsibility or obligation to evaluate the solvency of the Company, any Acquiror or any other party under any US federal or state laws relating to bankruptcy, insolvency or similar matters. Guggenheim Securities' role in connection with any due diligence investigation will be limited solely to performing such review as it will deem necessary to support its own financial advice and analyses and will not be on behalf of the Company or any other party.

C. The Company hereby authorizes Guggenheim Securities to use and distribute the Offering Materials and other Information and documents provided by the Company pursuant to this Agreement to solicit Sale Transaction Counterparties in connection with the Sale Process in accordance with the Sale Procedures entered by the Bankruptcy Court. The Company further authorizes the negotiation by Guggenheim Securities of confidentiality agreements (in a form approved by the Company and in each case subject to final approval by the Company's counsel) on the Company's behalf with Acquirors in connection with the Sale Process.

The Company understands and acknowledges that in connection with this Agreement and any Sale Transaction, Guggenheim Securities will communicate electronically, by e-mail and other such media, with the Company, Acquirors, their respective Representatives and/or other participants in any such Sale Transaction and that Information belonging to the Company may be stored electronically on Guggenheim Securities' information systems. The Company further understands and acknowledges that (i) any such electronic communication could be intercepted, corrupted, lost, destroyed, infected by virus or otherwise be adversely affected or unsafe to use, (ii) the security or integrity of any such electronic communications cannot be guaranteed by Guggenheim Securities and (iii) Guggenheim Securities will not be liable for any damages resulting from unauthorized access, misuse or alteration of such Information by persons not acting on its behalf, provided that Guggenheim Securities exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's Information that it exercises with regard to its most sensitive proprietary information.

In the event that, during the period of the engagement of Guggenheim Securities hereunder, the Company and/or any of its Representatives is/are contacted by or on behalf of any party concerning the possibility of a Sale Transaction, the Company will promptly so inform Guggenheim Securities so that it can evaluate such party and its interest and assist the Company in any subsequent discussions. The Company also will disclose any discussions, negotiations or

inquiries with respect to the Company and/or any Sale Transaction that have occurred during the one year period prior to the date of this Agreement. In addition, the Company also will promptly inform Guggenheim Securities in the event that the Company retains any legal counsel, consultant or other advisor or Representative in connection with any Sale Transaction. The Company will keep confidential and will not disclose or distribute to any person (other than its Representatives) the Offering Materials or any other materials related to any Sale Transaction, or otherwise advertise to or solicit Acquirors with respect to any Sale Transaction without Guggenheim Securities' prior consent.

D. All advice (written or oral) provided by Guggenheim Securities in connection with Guggenheim Securities' engagement (i) is intended solely for the benefit and use of the Company's Board of Directors (solely in its capacity as such) and senior management and (ii) is not intended for the benefit and use by, and with respect to any Sale Transaction will not constitute any recommendation to, the Company's controlling stockholders or other stockholders, creditors or any other constituency. The Company agrees that, notwithstanding any expiration or termination of Guggenheim Securities' engagement, no such advice will be used or relied upon for any other purpose or by any other person or entity, be disclosed publicly or made available to third parties or be reproduced, disseminated, quoted from or referred to at any time, in any manner or for any purpose, nor will any public references to Guggenheim Securities be made by the Company, in each case without Guggenheim Securities' prior written consent; provided, however, that this provision shall not apply to disclosure required to be made in any filings with the Securities and Exchange Commission by the Company's parent, Florida Gaming Corporation, although the Company and Florida Gaming shall use commercially reasonable efforts to provide advance written notice of the substance of any such disclosure to Guggenheim Securities, and an opportunity for Guggenheim Securities to comment on any public references to Guggenheim Securities in the same.

E. The Company hereby acknowledges that Guggenheim Securities and its affiliates engage in a wide range of financial services activities for their own accounts and the accounts of customers, including asset and investment management, investment banking, corporate finance, mergers and acquisitions, restructuring, merchant banking, fixed income and equity sales, trading and research, derivatives, foreign exchange and futures. In the ordinary course of these activities, Guggenheim Securities or its affiliates may (i) provide such financial services to the Company and/or any Interested Party (as defined below), for which services Guggenheim Securities or certain of its affiliates has received, and may receive, compensation and (ii) directly or indirectly, hold long or short positions, trade and otherwise conduct such activities in or with respect to certain debt or equity securities, bank debt and derivative products of or relating to the Company and/or any Interested Party. In particular, certain asset management affiliates of Guggenheim Securities and accounts managed by such affiliates may arrange or participate in financing for or by any Acquiror or the Company in connection with any Sale Transaction. Furthermore, Guggenheim Securities' affiliates, directors, officers and employees may have investments in the Company and/or any Interested Party.

For purposes hereof, the term "Interested Party" includes, without limitation, the Company's stockholders and creditors, any Acquiror, other participants in any Sale Transaction or any of the foregoing parties' respective affiliates, subsidiaries, investment funds and portfolio companies.

At any given time, Guggenheim Securities and/or its affiliates may be engaged by one or more entities that may be competitors with, or otherwise adverse to, the Company in connection with matters unrelated to any Sale Transaction. As a result, it is possible that Guggenheim Securities and/or its affiliates may from time to time be involved in one or more capacities that, directly or indirectly, may be or may be perceived as being adverse to the Company's interests in the context of a potential Sale Transaction or otherwise. Moreover, Guggenheim Securities and/or its affiliates may, in the course of other client relationships, have or in the future acquire or come into possession of information material to the Company's interests in the context of a potential or actual Sale Transaction or otherwise which, by virtue of such other client relationships, Guggenheim Securities and/or its affiliates is/are not or will not be at liberty to disclose to the Company.

Consistent with applicable legal and regulatory guidelines, Guggenheim Securities has adopted certain policies and procedures to establish and maintain the independence of its research departments and personnel. As a result, Guggenheim Securities' research analysts may hold views, make statements or investment recommendations and/or publish research reports with respect to the Company, any Interested Party and/or any Sale Transaction that differ from the views of Guggenheim Securities' investment banking personnel.

Nothing in the foregoing section shall relieve Guggenheim Securities of its obligation of disclosure and disinterestedness pursuant to Bankruptcy Code Section 363.

F. Guggenheim Securities may, at its option and expense, include the Company's name and logo and a description of Guggenheim Securities' role in connection with any Sale Transaction in such websites, newspapers, periodicals, annual reports and other public marketing materials as it may choose. If requested by Guggenheim Securities, the Company agrees to use its commercially reasonable efforts to include a mutually acceptable reference to Guggenheim Securities and its role as the Company's financial advisor and investment banker in any press release or other public announcement which may be issued in connection with the matters described in this Agreement.

G. To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing such business. Accordingly, the Company will provide Guggenheim Securities upon request with certain identifying information or documents sufficient to verify the Company's identity, including a government-issued identification number (*e.g.*, a US taxpayer identification number) and certain other information or documents necessary to verify the Company's identity (*e.g.*, a certificate of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

H. The Company represents to the best of its knowledge that none of (i) the Company, (ii) any person controlling or controlled by the Company, (iii) any person having a beneficial ownership interest in the Company and (iv) any person for whom the Company acts as an agent or nominee is (x) a country, territory, individual or entity named on the US Treasury Department's Office of Foreign Assets Control ("OFAC") list, (y) a person or entity prohibited under the programs administered by OFAC ("OFAC Programs") or according to other US government regulatory or enforcement agencies or (z) a country, territory, individual or entity named on

another international sanctions list. The Company further represents that, to the best of its knowledge, none of the proceeds of any Sale Transaction will be derived from or used for any purpose prohibited under the OFAC Programs or other international sanctions programs.

I. Notwithstanding any agreement or representation, written or oral, by either the Company or Guggenheim Securities in connection with any Sale Transaction, the Company and its Representatives will have no obligation to Guggenheim Securities to maintain the confidentiality of the tax treatment and tax structure of any Sale Transaction or any materials of any kind (including opinions or other analyses) that are provided to the Company relating to such tax treatment and tax structure. As required by US Treasury Regulations, Guggenheim Securities hereby informs the Company that (i) any discussion of federal tax issues contained or referred to in any materials prepared by Guggenheim Securities in connection with its engagement hereunder is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code and (ii) such discussion is written to support the promotion or marketing of the matters addressed therein. Guggenheim Securities does not provide legal, tax, accounting or actuarial advice. The Company will consult its own legal, tax, accounting and/or actuarial advisors in connection with any Sale Transaction.

J. The Company hereby acknowledges and agrees that Guggenheim Securities will act under this Agreement as an independent contractor with obligations solely to the Company and is not being retained hereunder to advise the Company as to the underlying business and/or financial decision to consummate any Sale Transaction. Nothing in this Agreement or the nature of Guggenheim Securities' services will be deemed to create a fiduciary or agency relationship between Guggenheim Securities and the Company or its stockholders, creditors, employees or any other party in connection with any Sale Transaction or otherwise. The Company acknowledges that Guggenheim Securities is not the agent of and is not authorized to bind the Company with respect to any action or decision. Other than as set forth in the Indemnification Provisions attached hereto or with respect to the Covered Persons (as defined and discussed below), nothing in this Agreement is intended to confer upon any other person (including stockholders, creditors or employees of the Company) any rights or remedies hereunder or related hereto. The Company agrees that Guggenheim Securities and its affiliates, each of its and their controlling persons (within the meaning of the US federal securities laws), members, stockholders, directors, officers, managers, employees, consultants, legal counsel and agents and each of its and their respective heirs, successors and assigns (all of the foregoing, "Covered Persons") will not have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) in contract, tort or otherwise to the Company or to any person claiming through the Company or in the Company's right in connection with the engagement of Guggenheim Securities pursuant to this Agreement, the matters contemplated hereby or any Sale Transaction or conduct in connection therewith, except where such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of such Covered Person. The Company further agrees that Guggenheim Securities will have no responsibility for any act or omission by any of the Company's other Representatives.

K. Subject to the approval of the Bankruptcy Court, the Company has all requisite power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement

has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms. This Agreement has been reviewed by the signatories hereto and their legal counsel. There will be no construction of any provision against Guggenheim Securities because this Agreement was drafted by Guggenheim Securities, and the parties waive any statute or rule of law to that effect.

L. This Agreement (including this Annex and the Indemnification Provisions attached thereto) embodies the entire agreement and understanding of the Company and Guggenheim Securities with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof. The provisions of this Agreement may not be waived, modified, amended or supplemented except in writing executed by the Company and Guggenheim Securities. This Agreement will inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

## INDEMNIFICATION PROVISIONS

Capitalized terms used herein without definition will have the meanings ascribed thereto in the letter agreement dated as of November 6, 2013 (as amended from time to time, the "Agreement") between Florida Gaming Corporation (collectively with its subsidiaries and affiliates, the "Company") and Guggenheim Securities, LLC. As used in these Indemnification Provisions, the term "Guggenheim Securities" will be deemed to refer to and include each of Guggenheim Securities, LLC and its affiliates, each of its and their controlling persons (within the meaning of the US federal securities laws), members, stockholders, directors, officers, managers, employees, consultants, legal counsel and agents and each of its and their respective heirs, successors and assigns.

The Company hereby agrees to (a) indemnify and hold harmless Guggenheim Securities, to the fullest extent permitted by law, from and against any and all losses, claims, damages, obligations, penalties, judgments, awards and other liabilities as and when incurred by Guggenheim Securities (collectively, "Liabilities") and (b) fully reimburse Guggenheim Securities for any and all fees, costs, expenses and disbursements (in all such cases, whether legal or otherwise) as and when incurred by Guggenheim Securities (collectively, "Expenses"), including those of investigating, preparing for (including, without limitation, preparing, reviewing or furnishing documents), participating in, defending against or giving testimony with respect to any private, regulatory, self-regulatory or governmental requests, inquiries, investigations, actions, claims, interrogatories, subpoenas, suits, litigation, proceedings or injunctions, whether or not in connection with any threatened or actual litigation, arbitration or other dispute resolution process and whether or not Guggenheim Securities is a direct party thereto (collectively, "Actions"), in the case of each of the foregoing clauses (a) and (b) whether directly or indirectly caused by, relating to, based upon, arising out of or in connection with any of the following: (w) any advice or services requested of, or rendered or to be rendered by, Guggenheim Securities pursuant to the Agreement, (x) any actions or inactions by Guggenheim Securities with respect to the Agreement, (y) any Sale Transaction in connection with or related to the Agreement or (z) the determination and enforcement by Guggenheim Securities of its rights pursuant to the Agreement (including, without limitation, these Indemnification Provisions); *provided, however*, such indemnification agreement will not apply to any portion of any such Liability or Expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of Guggenheim Securities.

If any Action is commenced as to which Guggenheim Securities proposes to demand indemnification hereunder, it will notify the Company with reasonable promptness; *provided, however*, that any failure by Guggenheim Securities to notify the Company will not relieve the Company from its obligations hereunder. Guggenheim Securities will have the right to retain legal counsel of its own choice to represent it, and the Company will pay the Expenses of such legal counsel; and such legal counsel will, to the extent it believes consistent with its professional responsibilities, cooperate with the Company and any legal counsel designated by the Company. The Company will be liable for any settlement of any claim against Guggenheim Securities made with the Company's written consent, which consent will not be unreasonably withheld. The Company will not, without the prior written consent of Guggenheim Securities, (a) settle or compromise any claim, (b) permit a default or (c) consent to any settlement or other such agreement or the entry of any judgment, in all of the foregoing cases in connection with or related to any Action with respect to which indemnification or contribution may be sought hereunder (whether or not Guggenheim Securities is an actual or

potential party to such Action) or as to which any allegation of wrongful acts or omissions by Guggenheim Securities is not denied.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these Indemnification Provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification is unavailable, in whole or in part, for any reason, even though the express provisions hereof provide for indemnification in such case, then the Company, on the one hand, and Guggenheim Securities, on the other hand, will contribute to the Liabilities and Expenses to which the indemnified persons may be subject (a) in accordance with the relative benefits received (or anticipated to be received) by the Company, on the one hand, and Guggenheim Securities, on the other hand, in connection with Guggenheim Securities' engagement pursuant to the Agreement or (b) if the allocation provided by clause (a) immediately above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a), but also the relative fault of the Company, on the one hand, and Guggenheim Securities, on the other hand, in connection with the statements, acts or omissions which resulted in such Liabilities and Expenses. The Company agrees for purposes of this paragraph that the relative benefits to the Company and Guggenheim Securities of any contemplated Sale Transaction (whether or not consummated) will be deemed to be in the same proportion as the total value paid, received or issued or contemplated to be paid, received or issued to or by the Company and its stockholders, claim holders or contract parties in connection with such Sale Transaction bears to the fees paid or payable to Guggenheim Securities pursuant to the Agreement. Notwithstanding the foregoing, Guggenheim Securities will not be obligated to contribute any amount pursuant to this paragraph that exceeds the amount of fees previously received by Guggenheim Securities pursuant to the Agreement. Each of the Company and Guggenheim Securities hereby agrees that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method which does not take into account the considerations referred to in this paragraph.

The Company's indemnification, contribution, reimbursement and other obligations pursuant to these Indemnification Provisions will be in addition to any liability that the Company may otherwise have, at common law or otherwise, to Guggenheim Securities and will be binding on the Company's successors and assigns. These Indemnification Provisions will (a) apply to Guggenheim Securities' engagement pursuant to the Agreement, any activities or actions of Guggenheim Securities relating to such engagement occurring prior to the date of such Agreement and any subsequent modification of or amendment to such Agreement and (b) remain in full force and effect following the termination or expiration of Guggenheim Securities' engagement pursuant to the Agreement.