1            UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA

2                MIAMI DIVISION

3

4                        CASE NO.  13-29597-RAM

5

6 IN RE:
FLORIDA GAMING CENTERS, INC.,
et al.,

7

      Debtors.

8 _____/

9

10            EXCERPT FROM PROCEEDINGS
             A.M. SESSION

11

12    SALE HEARING TO APPROVE SUCCESSFUL BIDDER (228)
   and MOTION TO PERMIT LATE FILED CURE OBJECTION
      FILED BY CREDITOR ST. LUCIE COUNTY (384)

13

              March 26, 2104

14

15     The above-styled cause came on for hearing

16 before the HONORABLE ROBERT A. MARK, one of the

17 Judges of the United States Bankruptcy Court, in and

18 for the Southern District of Florida, at 51 Southwest

19 1st Street, Miami, Miami-Dade County, Florida on

20 Monday,, March 26, 2014, commencing at or about 10:00

21 a.m., and the following proceedings were had:

22

             Reported by:  Anna M. Meagher

23

24

25

```
 1              APPEARANCES:
 2
                SALAZAR JACKSON, LLP, by
 3                LUIS SALAZAR, ESQUIRE
             on behalf of the Debtors.
 4
 5          GENOVESE JOBLOVE & BATTISTA, by
                PAUL J. BATTISTA, ESQUIRE
 6      on behalf of the Official Joint Committee
                 of Unsecured Creditors.
 7
 8             STEARNS WEAVER MILLER
        WEISSLER ALHADEFF & SITTERSON, P.A., by
 9            DREW M. DILLWORTH, ESQUIRE
              on behalf of ABC Funding.
10
11                DLA PIPER, by
             CRAIG V. RASILE, ESQUIRE
12                    and
        MILBANK TWEED HADLEY & McCLOY, LLP, by
13            THOMAS R. KRELLER, ESQUIRE
             on behalf of Silvermark, LLC.
14
15          GREENBERG TRAURIG, LLP, by
                JOHN R. DODD, ESQUIRE
16                    and
           KLEE TUCHIN BOGDANOFF & STERN, by
17            MARTIN R. BARASH, ESQUIRE
        on behalf of Z Cap Florida Gaming, LLC.
18
19             DUANE MORRIS, LLP, by
             HARVEY W. GURLAND, ESQUIRE
20            on behalf of GLP Capital.
21
              BERGER SINGERMAN, LLP, by
22           CHRISTOPHER JARVINEN, ESQUIRE
          on behalf of David Jonas, Receiver.
23
24                              Continued...
25
```

1                PHILLIPS RICHARD & RIND, P.A., by
              HOLLY E. VAN HORSTEN, ATTORNEY AT LAW
2         on behalf of International UAW, Local 18868
                   and the Players' Association.

3

4               LINDA M.  LEALI, ATTORNEY AT LAW
             On behalf of the City of Fort Pierce,
5                       St. Lucie County,
             and St. Lucie County Tax Collector.

6

7               ILEANA CRUZ, ATTORNEY AT LAW
       On behalf of the Miami-Dade County Tax Collector.

8

9          OFFICE OF THE UNITED STATES TRUSTEE, by
             STEVEN D. SCHNEIDERMAN, TRIAL ATTORNEY

10

11                      VIA TELEPHONE:

12

13              CARLTON FIELDS, P.A., by
             FRANCK D. CHANTAYAN, ESQUIRE
              on behalf of William B. Collett
14             and William B. Collett, Jr.

15

16                      ALSO PRESENT:

17              LUIS CASAS, Law Clerk
             ANIEL LICCIARDI, Debtor COO
             ALEX FISCH, Guggenheim Partners

18

19                   -   -   -   -   -   -

20

21

22

23

24

25

**OUELLETTE & MAULDIN COURT REPORTERS, INC.**
**(305) 358-8875**

```
 1          THE COURT:  Okay.  Let's come in, quietly,
 2   sit down.  Thanks.  It's time for court.
 3          Who is here for the debtor?
 4          MR. BATTISTA:  Judge, I don't think
 5   Mr.  Salazar has made it yet.
 6          MR. DILLWORTH:  The line downstairs is
 7   significant.
 8          THE COURT:  I guess we'll wait.
 9          Does anybody know whether there's -- I didn't
10   have notification of a conference call.  I had two
11   different parties asking to participate by phone, Lee
12   Bogdanoff and Heather Ries.
13          MR. DODD:  Your Honor, as to Mr. Bogdanoff,
14   he won't be appearing by phone.
15          THE COURT:  Okay.
16          MR. DODD:  Thank you.
17          THE COURT:  Well, go ahead, Mr. Dodd, as long
18   as you're up, Mr. Dodd, announce your appearance.
19          MR. DODD:  Good morning, your Honor.  John
20   Dodd of Greenberg Traurig.  We represent Capital
21   Florida Gaming, LLC, and with me in the courtroom is
22   Mr. Martin Barash from the law firm of Klee, Tushin,
23   Bogdanoff & Stern.  He has a pro hac vice motion
24   pending.  I would ask that he be allowed to address
25   the Court at the appropriate time.
```

```
1          THE COURT:  I think that order was signed
2     already.
3          MR. DODD:  Thank you.
4          THE COURT:  We think somebody from the debtor
5     is on their way?
6          MR. BATTISTA:  Judge, Paul Battista for the
7     committee.
8          We were planning to meet at Mr. Dillworth's
9     office to finalize a sale order, and I e-mailed and
10    sent to Mr. Salazar to come directly to court for the
11    hearing, to continue it.  I don't know if -- I assume
12    he received it.  We've not heard from him.  He could
13    be in line downstairs.
14         THE COURT:  Okay.  I know there was a few
15    back-and-forths.  We were initially asked to just
16    start the hearing at 11, but then it was determined
17    that it would be better to start at ten and just
18    adjourn, once we got a status.
19         MR. BATTISTA:  Yes, sir.
20         THE COURT:  Well, I guess we'll -- let's
21    recess for a moment, before I bother getting anybody
22    on the phone, and somebody try to reach --
23         MR. BATTISTA:  We will, Judge, try --
24         THE COURT:  -- somebody or Mr. Honaker.
25         MR. BATTISTA:  Yes, sir.
```

1          (Thereupon, a brief recess was taken.)

2          THE COURT:  After three days, I think the GSA

3    has finally decided maybe it's worth spending a little

4    bit of money and fixing the air-conditioning, so it

5    should be cooler later.  I took the opportunity during

6    my break to start my e-mail back to them in response

7    to their thanks for our patients.

8          Anyway, Mr. Salazar, is there a conference

9    call number or no, on this?

10          MR. SALAZAR:  Your Honor, first of all, my

11    apologies for being late.

12          The conference call number should be the

13    same.  There may be some people on the line.  I'm not

14    sure who is going to dial in.

15          THE COURT:  And will you go call Heather Ries

16    and tell her that she needs to dial in.

17          Do you have the number?

18          MR. CASAS:  I guess.

19          THE COURT:  Well, no.  Do you have the number

20    for conference call for her to dial in?

21          MR. SALAZAR:  I have it.

22          THE COURT:  It's (218)548-7284-192 -- I

23    better write this down, (218)548-7284.  One-nine-two?

24    One-nine-two, and will she dial just pound?

25          Mr. Salazar?

1          MR. SALAZAR:  Oh, sorry, your Honor, yes.

2          THE COURT:  She dials pound and I dial --

3          MR. SALAZAR:  She dials -- you dial the

4    asterisks and she dials pound.

5          THE COURT:  Which one do I dial first?

6          MR. SALAZAR:  You do asterisks then pound.

7          THE COURT:  Then pound.

8          MR. SALAZAR:  She just does the pound.

9          (Thereupon, the Court contacts a conference

10   call with two callers on the conference.)

11         THE COURT:  This is Judge Mark.  We've got a

12   bit of a late start.  I understand there's two callers

13   on the line, if we can get appearances, please.

14         MR. CHANTAYAN:  Good morning, Judge.  Franck

15   Chantayan on behalf William Collett, Jr. and William

16   B. Collett.

17         THE COURT:  All right.  Is there another

18   party on the line?

19         (No response.)

20         THE COURT:  Okay.  Then we'll get appearances

21   in court, starting on the debtor's side.

22         MR. SALAZAR:  Good morning, your Honor.  Luis

23   Salazar of Salazar Jackson for the debtors.

24         MR. BATTISTA:  Judge, good morning.  Paul

25   Battista of Genovese Joblove & Battista on behalf of

1   the Official Committee of Unsecured Creditors.

2          MR. DILLWORTH:  Good morning, Judge Mark.

3   Drew Dillworth, Stearns Weaver Miller, Miami, Florida,

4   on behalf of ABC Funding.

5          MS. LEALI:  Good morning, your Honor.  Linda

6   Leali on behalf of the City of Fort Pierce, St. Lucie

7   County, and the St. Lucie County tax collector.

8          MS. CRUZ:  Good morning, your Honor.  Ileana

9   Cruz, Miami-Dade County tax collector.

10          MR. JARVINEN:  Good morning, your Honor.

11   Christopher Jarvinen from Berger Singerman, LLP on

12   behalf of Dave Jonas, the state court appointed

13   receiver, and I have with me in the courtroom today,

14   Mr. Jonas.

15          MR. GURLAND:  Good morning, your Honor.

16   Harvey Gurland from Duane Morris on behalf of GLP

17   Capital, the alternate bidder.

18          MR. SCHNEIDERMAN:  Steven Schneiderman for

19   the U.S. trustee.

20          MS. VAN HORSTEN:  Holly Van Horsten from

21   Phillips, Richard & Rind here on behalf of the

22   International UAW, as well as the Local 8868, The

23   Players Association, and I have here with me the

24   president, Jose Oyarbide.

25          THE COURT:  How do you spell the --

1        MS. VAN HORSTEN:  The last name?

2        THE COURT:  Yeah.

3        MS. VAN HORSTEN:  It's O-Y-A-R-B-I-D-E.

4        THE COURT:  B-I-D-E?

5        MS. VAN HORSTEN:  Correct.

6        MR. RASILE:  Good morning, your Honor.  Craig

7   Rasile of DLA Piper on behalf of Silvermark, LLP, and

8   with me in Mr. Tom Kreller from Milbank Tweed.

9        THE COURT:  Okay.  There were a few back-and-

10  forth phone calls from the law offices of local

11  counsel for ABC asking that we delay the start of the

12  hearing, and then it was determined that it would be

13  better to start at ten for notice purposes, and then

14  adjourn.

15       So do you want to just make a brief statement

16  now, and then talk about whether there's anything we

17  can accomplish now or whether you just want to come

18  back later?

19       MR. SALAZAR:  Your Honor, I would be

20  delighted to.  Thank you.

21       Your Honor, as you probably may have already

22  heard, we had a successful auction yesterday.  After

23  some 27 rounds and 80 bids, ABC Funding placed the

24  highest bid at $140 million in the cash component,

25  obviously with a credit bid in their case, and the

1    assumption of the Miami-Dade County debt for a total

2    of $155 million.  GLP, as was noted, put the second

3    highest bid at a hundred-thirty-eight seven-fifty on

4    the cash side, plus the assumption.  They're the

5    alternative bidder.

6              THE COURT:  GLP?

7              MR. SALAZAR:  Yes, it's GLP Capital.  It's a

8    joint bid with GLP Capital and MGA Gaming, as the

9    alternate bidder.

10             THE COURT:  Okay.

11             MR. SALAZAR:  Your Honor, I guess I could

12   say, in general, it was a somewhat long day.  I think

13   it was relatively free from any major issues, and

14   bidding really started in the afternoon.  I think

15   later we'll be able to show with witnesses all the

16   requirements to approve the sale.

17             What we're looking for this morning is

18   perhaps an hour or so to make sure that the final form

19   of contract we'll be handing up contains all the

20   changes discussed and agreed to leading up to the

21   auction and after, and I think that's why we need some

22   additional time.

23             Now, with respect to what we can resolve

24   here, I think we can take care of a few of the

25   objections, and therefore send some people home, if it

```
 1   pleases the Court.
 2           THE COURT:  Let me ask you and then parties
 3   in the courtroom, are there any -- besides the limited
 4   objections of American Gaming regarding assumption and
 5   assignment issues and cure issues and the limited
 6   objection by Miami-Dade, also regarding cure issues
 7   and assignment issues, and then Ms. Leali's objection
 8   as to the cure amount, I think, basically for Fort
 9   Pierce -- but those are the things that are on file.
10   Although, I haven't looked today if anything else --
11           MR. SALAZAR:  I don't believe there's
12   anything else.
13           THE COURT:  So are there any -- oh, okay, so
14   I guess --
15           MR. SALAZAR:  So UAW?
16           MS. VAN HORSTEN:  Yes.
17           MR. SALAZAR:  Yes.  UAW also filed an
18   objection.  I think that's -- I'm not sure, I don't
19   think you mentioned that one, but, yes, that's all
20   there is.
21           THE COURT:  And that relates to.
22           MS. VAN HORSTEN:  It relates to assumption of
23   a CBA, and there's one --
24           THE COURT:  Why don't you come up.
25           MS. VAN HORSTEN:  Certainly.  It was filed by
```

1    counsel for the UAW, who is up in Georgia, and then

2    they retained local counsel to be present here at the

3    hearing, which is myself.  And, in essence, it has to

4    do with full assumption of the CBA, the CBA, which is

5    required to be assumed pursuant to the terms of the

6    CBA in such a sale --

7            THE COURT:  And CBA is?

8            MS. VAN HORSTEN:  I'm sorry, I apologize --

9            THE COURT:  The bargaining agreement?

10            MS. VAN HORSTEN:  -- for the labor

11    vernacular, the collective bargaining agreement for

12    The Players' Association.

13            And initially in Schedule 2, it was listed

14    under revenue sharing agreements, but it contains so

15    much more than revenue sharing with respect to the

16    slots.  It contains the terms and conditions of

17    employment, so we just wanted to insure that it was

18    going to be assumed in its entirety.

19            And also there's one technical issue in terms

20    of a player who is listed in the player contract

21    section, he's actually deceased, and there was a new

22    player who was signed on in lieu of that individual,

23    Jonathan Hernandez, and so his contract isn't

24    specifically listed.  So that's just a very simple

25    modification.

1    And then we just found out that there's a

2 relatively small amount in medical expenses that

3 remains unpaid, that's due under the contract, and

4 just the mere sum of $5,935.

5    THE COURT:  All right.  Well, we'll come back

6 in a moment maybe to the response.  I just wanted --

7 on the universe of objections, then, with the addition

8 of the labor objection, they all relate to assumption,

9 assignment, and cure issues, so are there any

10 objections that have been filed with respect to the

11 sale itself.

12    MR. SALAZAR:  None that I'm aware of, your

13 Honor.

14    THE COURT:  All right.  And are there any

15 parties in court objecting to the sale?  I assume -- I

16 assume you're announcing now, Mr. Salazar, that you

17 will be seeking approval of ABC as the high bidder and

18 GLP Capital as a backup.

19    MR. SALAZAR:  Yes, sir.

20    MR. DILLWORTH:  The actual bidder, your

21 Honor, is Fronton Holdings.

22    MR. SALAZAR:  Yes, thanks.

23    THE COURT:  Okay.  All right.

24    MR. SALAZAR:  Thanks for the reminder.

25    MR. KRELLER:  Your Honor, Thomas Kreller of

1    Milbank Tweed Hadley & McCloy on behalf of Silvermark,

2    LLC.  We don't have an objection to the sale.  I do

3    want to note, your Honor, that we'd be interested in

4    seeing the sale order and the final version of the

5    Asset Purchase Agreement, because there are provisions

6    relative to our breakup fee that I would want to see

7    and make sure they are covered in the way that the

8    bidding procedures require.  That would be the focus

9    of our -- any further statements I would make today.

10            THE COURT:  Okay.  I assume that's fine, but

11   isn't it -- what is the issue besides, you get $4

12   million at closing.

13            MR. KRELLER:  The issue, your Honor, is that

14   the sale procedures -- the bidding procedures provide

15   that if ABC is the winning bidder -- ABC was not

16   required to put up a deposit.  If it were any other

17   bidder there was a deposit posted, and the deposit

18   would be the source of payment of the breakup fee.  In

19   the absence of a deposit, what the bidding procedures

20   provide for ABC is that their Asset Purchase Agreement

21   has to specifically provide that they will fund in

22   cash sufficient to pay the breakup fee.  So I just

23   want to make sure that ultimately the order and Asset

24   Purchase Agreement conform to what is already in the

25   bidding procedures.

1          THE COURT:  Well, the settlement order

2     already provides that.  You just want to make sure the

3     APA is consistent with sale order?

4          MR. KRELLER:  That's correct, your Honor.  I

5     don't think it's controversial.  I think it's just

6     tracking it all the way through.

7          THE COURT:  Okay.  That's fine.

8          MS. LEALI:  Your Honor, I represent the

9     St.  Lucie County tax collector, and they do not

10    object to the sale, and I've been in discussions with

11    the debtor's counsel, but I just would like to confirm

12    that there will be clarification in the actual sale

13    order that the taxes will be paid out of the proceeds,

14    and that -- for 2013, and as well prorated for 2014,

15    and that the lien on the assets will not be released

16    until such time as the taxes are paid.

17         MR. SALAZAR:  It's a tangible property tax.

18         THE COURT:  The tax collector wants a partial

19    payment for 2014?  I thought you didn't --

20         MS. LEALI:  Well, it's typical --

21         THE COURT:  -- usually get partial --

22         MS. LEALI:  -- when there is a closing on a

23    sale that the taxes are prorated at that point for

24    2014.

25         THE COURT:  All right.  In any event, going

1    back to the big issue, though, if there's any

2    objection that anybody wants to preview now to

3    approval of ABC as the -- or what is it called?

4              MR. DILLWORTH:  Fronton Holdings.

5              THE COURT:  -- Fronton Holdings as the

6    bidder.

7              MR. BARASH:  Good morning, your Honor.

8    Martin Barash, Klee Tushin Bogdanoff & Stern.  We

9    represent Z Cap Florida Gaming, LLC.  We were a bidder

10   in the auction yesterday.  We do not rise to object,

11   but simply to confirm that we were neither the winning

12   bidder nor alternate bidder, and seek confirmation

13   that in accordance with the procedures that the Court

14   approved that within five business days of today's

15   hearing, we'll receive a refund of our good faith

16   deposit, which was very close to $6 million.

17             THE COURT:  Okay.  That provision, I assume,

18   will be part of the sale order you're drafting which

19   will specify return of deposit, or that's something

20   you're going to do?

21             MR. SALAZAR:  Something we're going to do,

22   it's in the prior -- I believe it's in the prior -- in

23   the sales procedure.  I don't think we need to

24   reaffirm it in the order.  I would like to, in fact,

25   agree with counsel and thank them for their

1   participation, that they are not the winner or the

2   alternate.

3           THE COURT:  Okay.  Well, if we're on the

4   subject of deposits then, how many other deposits are

5   you holding that you'll be returning?

6           MR. SALAZAR:  We will be returning the

7   deposit of Silvermark, and I believe the only other

8   deposit we are holding is that of the alternate bidder

9   which we will be holding until their obligation to

10  remain alternate bidder expires.

11          THE COURT:  Okay.  So you're confirming

12  whether or not it's -- it probably doesn't need to be

13  in the sale order, that within five days you will be

14  returning Silvermark's deposit and Z Capital's

15  deposit.

16          MR. SALAZAR:  Yes.

17          THE COURT:  Z Capital?  Yeah.

18          MR. BARASH:  Thank you, your Honor, and

19  thanks to counsel for his acknowledgement and his many

20  curtesies.

21          THE COURT:  All right.  So did you want to

22  try to deal with the 365 issues now, before we --

23          MR. SALAZAR:  I think we can, your Honor --

24          THE COURT:  -- adjourn?

25          MR. SALAZAR:  -- at least a few of them.

1        With respect to The Players' Union, we thank

2   them for appearing.  We want to make clear that the

3   CBA is being assumed in full by the buyer, that we

4   will make the correction to the player who is

5   deceased.  We'll replace him with an active player.

6   That contract will be assumed, and then, finally, to

7   the extent there's any outstanding amounts on medical,

8   I'll confirm that with Mr. Licciardi, but that will

9   covered as part of the cure amount.

10        THE COURT:  Mr. Chantayan, I don't know if

11   it's the phone connection, but, you know, if you're

12   either breathing heavily or rustling papers maybe put

13   your phone on mute.

14        MR. CHANTAYAN:  Yes, Judge.

15        THE COURT:  Thanks.

16        MR. SALAZAR:  But so I think with that, that

17   eliminates the Players Union.

18        THE COURT:  So are there separate player

19   contracts also that are going to be assumed and

20   assigned?

21        MR. SALAZAR:  Yes, sir.

22        THE COURT:  And is there -- it's Ms. Van -- I

23   can't read my own writing.

24        MS. VAN HORSTEN:  Ms. Van Horsten.

25        THE COURT:  Van?

1          MS. VAN HORSTEN:  Ms. Van Horsten.

2          THE COURT:  Horsten, okay, sorry.

3          MS. VAN HORSTEN:  And with that announced

4    onto the record, I think that's what, in essence,

5    we're looking for, but at the same time, we want to

6    make sure and can see the -- if there are any

7    modifications to the APA as it was written with

8    respect to Silvermark, we would like to review that

9    and make sure that, in fact, it does include what we

10   were looking for.

11         MR. SALAZAR:  We're glad to share it, your

12   Honor.  There won't be any modifications as to that,

13   as to their players contract or that included in

14   assumed contract section.

15         THE COURT:  Is it contemplated, Mr. Salazar,

16   just take me back, it's been a while since I looked at

17   all the details of the sale procedures, that the order

18   that you're seeking today will approve assumption,

19   assignment, and liquidate all the cure payments, or

20   will some cure payments maybe remain up in the air?

21         MR. SALAZAR:  May I consult with counsel for

22   a moment.

23         (Inaudible discussion off the record.)

24         MR. SALAZAR:  Sorry, your Honor, it's --

25   today is the day to approve, resolve, those assumed

1   contracts where there has been no objection and the

2   cure amount has not been objected to, that is 99% of

3   the contracts.  The few objections that you identified

4   are the ones that will be resolved ongoing.  I think

5   we can resolve them, in fact, here today as well.

6           THE COURT:  Okay.  But there may be an order

7   approving the assumption, but not liquidating the cure

8   amount if there's some dispute?

9           MR. SALAZAR:  That may be possible, but I

10  think as a practical matter there is no -- there are

11  no disputes.

12          THE COURT:  But the way it was set up in

13  terms of notice and objection, if any party to an

14  executory contract was objecting to the assumption

15  itself, was that to be determined today, other than

16  perhaps Dade County?

17          MR. SALAZAR:  Today, correct, your Honor.  So

18  we -- later, again, I will specify the notice we

19  provided and the evidence of that, and -- but three of

20  the objections you mentioned, I believe, relate to

21  cure amounts specifically.

22          THE COURT:  So there's no additional period

23  of time for executory parties to object to the

24  particular buyer that's going to be their new contract

25  party.  That's going to be resolved today.

1          MR. SALAZAR:  That is correct, your Honor.

2          THE COURT:  All right.  So Ms. Van Horsten,

3   you raise some issues that I think are going to be

4   dealt with.  But is it fair to say, then, that the

5   union and the players don't object to the assumption

6   and -- to the assignment of their contracts and the

7   assignment of the CBA to Fronton Holdings, the buyer.

8          MS. VAN HORSTEN:  No objection to that, and

9   we think that's what it contracts -- the collective

10  bargaining agreement calls for and that it's proper.

11         THE COURT:  Okay.  Good.

12         MS. VAN HORSTEN:  We just want to make sure

13  that that's accomplished.

14         THE COURT:  All right.  Sounds like that's

15  taken care of then, subject to the words --

16         MS. VAN HORSTEN:  -- review of -- I mean, our

17  objection remains subject to the contents of the Asset

18  Purchase Agreement.

19         THE COURT:  Right.  At least there's an

20  announced agreement subject to seeing the document.

21         All right.  What about the others?  Did you

22  want to comment on the county?

23         MR. SALAZAR:  I would like to -- um, as a

24  matter of fact, yes.  With respect to St. Lucie

25  County, they filed a motion to allow a late filed

1  claim, and we plead guilty.  We, in fact, failed to

2  notice them properly of this sale, so we are not

3  objecting to that relief.  We would support them in

4  obtaining that relief.  We still have to confirm the

5  amount due, and Mr. Licciardi is confirming that

6  number, so I believe the resolution of the St. Lucie

7  County objection is to allow the claim, number one.

8  And number two, by the next hearing -- a little later

9  today, we should have the number settled as well.

10          THE COURT:  And so the debtor will actually

11  pay the first nearly three months of 2014?  I thought

12  normally in real estate deals, there's just a credit

13  to the buyer, and then the buyer pays the taxes when

14  they are due.  That's not how it works?

15          MR. SALAZAR:  Your Honor, I have to

16  apologize, I'm not -- I don't recall the mechanics of

17  that section, but --

18          MR. BATTISTA:  Judge, I think that's how it

19  works.  There is a proration section under the APA to

20  do things just like that, so when the bill comes out,

21  presumably, from St. Lucie County for the 2014 taxes,

22  then the buyer's obligation is to pay the entire month

23  -- the entire year, excuse me.

24          THE COURT:  Yeah, that's my understanding.

25  It's usually prorated in the contracts, but not

1  prorated as far as partial payment.

2       MS. LEALI:  And, your Honor, that very well

3  is the case generally speaking, but the way that the

4  contract reads is that actually the liability is

5  separated amongst the parties based on the date of

6  sale.

7       I have spoken with debtor's counsel regarding

8  the issue, not Mr. Salazar, but his colleague, and

9  they have not disputed the interpretation.  If that is

10  indeed the case and the seller is going -- excuse me,

11  the purchaser is going to take on the full liability

12  for 2014, then I don't think the taxing authority has

13  an issue, but I actually think that's not the case,

14  under the terms of the agreement, your Honor.

15       THE COURT:  All right.  That needs to be

16  clarified one way or the other.

17       MR. DILLWORTH:  My assumption is that this

18  will be the typical deal, that we'll get a closing

19  proration and the purchaser will be obligated for the

20  full amount due in 2014 when it's due, starting in

21  November, and we will clarify that with Ms. Leali.

22       THE COURT:  All right.  But suffice it to say

23  it will be -- one way or the other, either there will

24  be a partial payment if the buyer is not obligated for

25  the full year, or a closing credit and the buyer will

1   be obligated for the full year, which I think is

2   probably the normal way to go.

3          MR. DILLWORTH:  Absolutely, Judge.

4          THE COURT:  All right.  And the two others

5   that I'm aware of, AGS Partners and Dade County.

6          MR. SALAZAR:  So, your Honor, with my

7   apologies, you know, I divided the universe with my

8   partner, Ms. Jackson, as on the transactional side.

9   So all our transactional attorneys are actually

10  working on that, so a little bit of ignorance on my

11  part on the mechanics.

12         However, AGS, I understand that has been

13  resolved.  They agree to the cure amount.  They have

14  requested their lease of slot machine equipment --

15  they have requested the UCC they have on file with

16  respect to their equipment, that that security

17  interest continue through, along with the assumption.

18         Yesterday evening counsel for Fronton

19  Holdings sent proposed language in the order, which

20  counsel for AGS have already accepted, so I understand

21  that the addition of that language and our

22  confirmation that the number is correct, that resolves

23  AGS's objection.

24         THE COURT:  Okay.

25         MR. SALAZAR:  And then with respect to the

1    county, counsel for the county is here.  In the

2    lead-up to the auction, we confirmed the cure amounts

3    and the payoff amounts and the per diem on each of the

4    payoff amounts, so I believe that the buyer is going

5    to be assuming -- curing and assuming, and I think

6    with confirmation of the numbers, that should resolve

7    the county's issues, subject to the county -- to the

8    buyer going through the county's consent process to

9    get approval to be a counter-party to the agreements.

10            THE COURT:  And what does that take?  Does

11    that have to go to the commission?

12            MS. CRUZ:  In this case, it has to go to the

13    mayor's office to obtain consent.  The process could

14    be lengthy.  We worked on it with the stalking horse

15    for several weeks and finally obtained the consent.

16    So now with a completely foreign person to, at least,

17    my office, I can't tell you standing here that consent

18    is going to be granted or it's not going to be

19    granted, so whatever order your Honor, you know, puts

20    in place today, granting assumption and assignment, it

21    has to be contingent upon whether the mayor's office

22    is going to grant consent.

23            THE COURT:  And that's to all the agreements,

24    the slot machine agreement, the settlement agreement,

25    and the agreement regarding parking lots.

1        MS. CRUZ:  Right.  The settlement agreement

2   is the agreement regarding the parking lots, so it's

3   really just two agreements.  It's the settlement

4   agreement and the slot machine agreement.

5        MR. SALAZAR:  May I be heard, your Honor?

6        THE COURT:  Yeah.

7        MR. SALAZAR:  Your Honor, we're optimistic,

8   perhaps I'd say confident, that the buyer will be

9   approved.  Part of -- I think part of the decision

10  making process is that they actually obtain a state

11  license and transfer the permit, so these are things I

12  think we will accomplish.  That said, we'd be happy to

13  include some contingent language like counsel

14  suggests, but we want to reserve the right also to say

15  that we can -- we can, via the Bankruptcy Code, compel

16  that assumption if we had to.

17       MS. CRUZ:  This is news to me.

18       MR. SALAZAR:  I said that last time.

19       THE COURT:  Okay.  But the closing will be

20  contingent upon either -- will be contingent upon

21  county consent or an order compelling, if you think

22  you're entitled to one, compelling the assignment?

23       MR. SALAZAR:  Yes, sir, and in a larger

24  sense, the closing is contingent upon county approval

25  and licensing approval.

1        THE COURT:  And you think the timing of those

2   will work, that we're not delayed just by the county,

3   hopefully?

4        MR. SALAZAR:  In our prior discussions with

5   the county and county counsel, we understood it was a

6   four to five-week process, so I think we're right on

7   the edge of that timetable, and hopefully that's the

8   process -- will, in fact, be the timing and it'll work

9   out.

10       THE COURT:  So we'll probably get into this

11  more later, but you think four or five weeks is what

12  you're looking at in terms of closing based on the

13  gaming license approvals?

14       MR. SALAZAR:  Our outside deadline pursuant

15  to the bid is April 30th, so that is the deadline

16  we're looking to close, and the backup bidder will

17  have up 'til May 31st should the winning bidder not be

18  able to close or some other arrangements aren't

19  entered into.  So, yes, that is our expectation in

20  terms of timing.

21       THE COURT:  Okay.  All right.  Well, I won't

22  ask what if's.  I will share your optimism.

23       MS. CRUZ:  Well, your Honor, if I may, if

24  there is a prospect of an order compelling the county

25  to consent, if that is a prospect, then I'd like to

Page 28

1   just insure that I'd be on notice of hearing to the

2   county.

3          THE COURT:  Yeah.  I mean, they'll have to

4   file a motion, and you have a right to object.

5          MR. SALAZAR:  Yes.

6          THE COURT:  But hopefully we don't get to

7   that.

8          All right.  But the cure -- the number issues

9   are resolved, so it's just a consent issue for the

10  county.

11         MS. CRUZ:  Correct, right.  The buyer has

12  agreed -- well, the stalking horse buyer.  The debtor

13  has agreed that in order to assume and assign the

14  promissory notes and mortgages, they have to cure the

15  delinquencies that are currently outstanding on those

16  notes, and -- which today amount to about 1.16

17  million, in order to assume the rest of the debt,

18  which would amount to about 14 million.

19         THE COURT:  All right.  So it sounds like

20  we're pretty much there on the objections that were

21  filed.

22         MR. SALAZAR:  I think so.

23         THE COURT:  Other than on the county consent

24  issue.

25         Anything else you want to do, try to deal

1  with now, or if not, anything you want to preview as

2  far as how you see the remainder of the hearing going

3  once we resume?

4       MR. SALAZAR:  Yes.  I want to first take a

5  moment, in case they don't return, I want to thank

6  Silvermark, Mr. Kreller and Mr. Rasile for their

7  sticking through the process.  I know at times it was

8  contentious and difficult.  But I think they played an

9  important role.  We thank them for participating and

10  look forward to returning their deposit promptly and

11  paying the breakup fee promptly as well.

12       Your Honor, this afternoon what I expect is a

13  fairly short presentation on our part.  I'll present

14  one of the officer of the company on best interest and

15  the decision, business judgment decision, to accept

16  the bids.  Mr. Fisch from Guggenheim, who assisted us,

17  the investment banker, will be testifying as to the

18  process.  I will proffer both of those.  I don't think

19  anything will be controversial.  And perhaps there may

20  be some additional evidence presented by the buyer.  I

21  think I see him kind of rising, but I think it should

22  be all pretty brief.

23       (Inaudible discussion off the record.)

24       MR. SALAZAR:  Oh, yes.  Thank you.

25       One other thing I would like to deal with,

1   unrelated to the sale, your Honor, if you'll permit

2   me.

3            THE COURT:  Okay.  Well, if you -- whatever

4   order, if you want to continue it, what do you expect

5   this afternoon, or --

6            MR. SALAZAR:  That is all with respect to

7   this afternoon.

8            THE COURT:  Okay.  All right.

9            MR. SALAZAR:  Okay.  Sorry.

10           Your Honor, our cash collateral expires on

11   March 31st.  We had contemplated filing, perhaps, a

12   motion to just extend that 30 days, but in discussion

13   with counsel, the committee, the lender, debtor are

14   all in agreement on the form of an order, which will

15   simply extend the existing cash collateral 30 days.

16   Frankly, under the budget that has been pretty much

17   circulated and in circulation for some time, the

18   debtor has been consistently preparing, kind of

19   rolling 13-week cash flows, so we don't think there

20   will much debate even on the budget issue.

21           So with your permission, your Honor, what we

22   would like to suggest and if it pleases the Court is

23   to upload that short agreed order, extending cash

24   collateral for 30 days, and perhaps if someone has an

25   objection, they can lodge it afterwards, but therefore

1  avoid the necessity of having to file a motion and

2  have hearings, et cetera.

3          THE COURT:  Okay.  So I will treat this as an

4  ore tenus motion to extend use of cash collateral.

5          Mr. Jarvinen?

6          MR. JARVINEN:  Yes.  Christopher Jarvinen

7  from Berger Singerman on behalf of Dave Jonas.  I've

8  been in communication with the debtor's counsel, the

9  secured lender, and the committee.  As a part of the

10 cash collateral order, just for clarity purposes, it

11 will indicate that Mr. Jonas will remain as the

12 receiver through the end of the cash collateral

13 period.  The parties have informally agreed that the

14 understanding is that Mr. Jonas will remain until the

15 closing on the sale, but at least this order will

16 state that he'll be in place through April 30th.

17         MR. SALAZAR:  Your Honor, absolutely, yes.

18         THE COURT:  All right.  Any other comments on

19 cash collateral?

20         (No response.)

21         THE COURT:  All right.  Then that motion will

22 be granted.

23         MR. SALAZAR:  Thank you, your Honor.

24 Appreciate it.

25         THE COURT:  Upload the order.

1          All right.  Timing, the lawyers' estimate of

2     11, we were thinking 2:30, but we can be a little

3     flexible.  We don't have any other matters set.  I

4     just don't want to create a lot of wasted time, but

5     not everybody that may want to come back is going to

6     go to your office, so we probably do need to have a

7     start time.  And perhaps if we push that back, you

8     could get e-mails from anybody that's not going to be

9     in the inner circle if we're going to delay the start.

10          MR. SALAZAR:  Your Honor --

11          THE COURT:  What were you thinking?

12          MR. SALAZAR:  I was thinking 11, so I think

13     that your -- but I think you're a hundred percent

14     right, my estimates have never been correct.

15          However, there are some other logistical

16     issues, and I apologize as I stepped away while you

17     were speaking, because Mr. Fisch has a three o'clock

18     flight, which I think he would like to make, and, your

19     Honor, if it's acceptable to you, perhaps I could

20     proffer his testimony now, so he would not have to

21     return.  Mr. Licciardi is local.  He can come back.

22     He's scheduled to come back later, and I think that

23     would clear the path to a 2:30 hearing, like you're

24     suggesting.

25          THE COURT:  Or it can be 1:30.  You know, I

1   don't want to have all the lawyers' clocks running

2   just to sit around to wait for the hearing to start if

3   you think it's going to be earlier.  But also there's

4   a couple parties that wanted to see the APA, and it'd

5   be nice if they saw it before they walked back into

6   court.

7           MR. SALAZAR:  May I suggest one o'clock, your

8   Honor.  I think that should do it.  I think that

9   accommodates other counsel that have some conflict as

10  well, so pushing it too far back is going to make it

11  difficult for other reasons.

12          THE COURT:  Okay.  So one o'clock, and if you

13  can provide copies of the APA or those pertinent

14  portions of it to the parties that want to see it.

15          MR. SALAZAR:  Sure.

16          THE COURT:  Mr. Kreller and Ms. Van Horsten,

17  I think were among the two that requested that.

18          Okay.  Let's proffer Mr. Fisch's testimony

19  and see if anybody wants to cross-examine.

20          MR. SALAZAR:  Thank you, your Honor.  And if

21  I may, I prepared this proffer, but I haven't had a

22  chance to actually discuss it with the winning bidder,

23  so there may be -- someone may whisper in my ear if

24  they want some slight additional information, but I

25  think this covers it, but, your Honor --

1          THE COURT:  As long as you discussed

2    Mr. Fisch's proffer with Mr. Fisch.

3          (Laughter.)

4          MR. SALAZAR:  Yes.  Yes, exactly.  I think he

5    agrees to this proffer.  I should probably have

6    started with that.

7          Your Honor, I would proffer the testimony of

8    Alex Fisch of Guggenheim Partners.  Your Honor, Mr.

9    Fisch previously testified here as to his experience,

10   but if called to testify, he would testify truthfully

11   of his own personal knowledge that he has been in the

12   investment banking and sale of distressed asset

13   business for over 20 years, during which time he has

14   handled at least that many, if not more, 363

15   distressed asset sales.

16         He would testify that in connection with the

17   Florida Gaming process, he contacted -- or Guggenheim

18   contacted over 95 financial and strategic investors;

19   that of those 95, 35 signed non-disclosure agreements

20   and obtained confidential information memoranda,

21   describing the business and the opportunity.  Fifteen

22   of those 35 actually undertook some form of due

23   diligence, even beyond the CIM and access to the data

24   room, they were either via phone calls or in-person

25   meetings.

1          That ultimately led to four qualified bidders

2     and four qualified bids, the bid of Silvermark, which

3     the Court is aware, the bid by Fronton Holdings, the

4     ABC entity, and the bid of GLP Capital/MGA Gaming, and

5     also the Z Capital.  GLP Capital/MGA Gaming is a joint

6     bid that is -- the entities are affiliates of Penn

7     Gaming and Mohican Gaming, two well-known casino and

8     gaming companies.  Z Capital, he would testify, is a

9     well-known private equity firm.

10          Your Honor, he would further testify the

11     debtors ran a very robust and fair process and a

12     robust and fair auction as well; that the auction was

13     conducted fairly and consistent with his experience in

14     his numerous other distressed sales over the last 20

15     years.  He would testify that it's his belief and

16     opinion that the purchase price is fair for the assets

17     and the market circumstances.

18          And if you'd give me a moment, your Honor, to

19     just confirm if there's anything else that counsel

20     would like me to proffer.

21          (Inaudible discussion off the record.)

22          MR. SALAZAR:  My apologies, your Honor.

23          Mr. Fisch would also testify that Fronton

24     Holdings submitted a timely qualified bid and that

25     there were no facts that would suggest that their

Page 36

```
 1   bid -- or the submission of the bid deviated from the
 2   sales procedures in any way.
 3           With that, your Honor, I would proffer the
 4   testimony of Mr. Fisch.
 5           THE COURT:  Thank you.
 6           Would anybody like to cross-examine?
 7           (No response.)
 8           THE COURT:  Okay.  I have a couple of
 9   questions.  If we could just have him stand up and be
10   sworn in.
11           MR. SALAZAR:  Yes.
12           THE COURT:  You can just do it right at the
13   podium.
14           (Thereupon, ALEX FISCH was duly sworn to tell
15   the truth by the court reporter.)
16           THE COURT:  Okay.  Just state your name,
17   again, for the record.
18           THE WITNESS:  Alex Fisch, Guggenheim.
19           THE COURT:  I really just have one question.
20   It's more of a summary question based on the proffer,
21   and that is, given the timeframes that were agreed to
22   by the debtor and the major parties in interest, do
23   you believe the sale that's resulted is -- that the
24   sale process has resulted in the highest reasonable --
25   I don't know how to phrase it.
```

1         Why don't you, instead of answering a leading

2    question, why don't you tell me your conclusion about

3    the sale process and the result.

4         THE WITNESS:  With respect to timing, your

5    Honor, the process was approximately about a

6    four-month process from back in December to today.

7    And, you know, I think we were able to contact a very

8    broad swath of potential parties, solicited

9    significant interest, and did have a robust auction.

10   So I think the valuation where we ended up yesterday,

11   basically the company's performance is certainly in

12   the range of fair multiples, and it was above -- well

13   above the stalking horse valuation.

14        So, you know, I think while not all parties

15   received consideration, equity in this case, but you

16   know, I think we received full value yesterday, with

17   good recoveries.

18        THE COURT:  So full value for the assets in

19   light of the timing and procedures that were agreed?

20        THE WITNESS:  And the performance of the

21   business, yes, sir.

22        THE COURT:  All right.  Any follow-up anybody

23   wants to ask?

24        MR. SALAZAR:  I do not.

25        THE COURT:  All right.  I appreciate your

1   efforts, and certainly would find Mr. Fisch to be an

2   expert in the field and thank this firm for their

3   participation and contribution.

4           MR. SALAZAR:  Your Honor, I'd echo that.

5   They were terrific to work with and extremely

6   dedicated and a pleasure.  So thank you.

7           THE COURT:  All right.  So when we come back

8   this afternoon, I want to get through whatever

9   proffers and findings and any objections there may be

10  and get to the approval of the sale, hopefully, unless

11  there's some compelling objection, and then we can

12  talk about the status.

13          So just to preview, though, I'm going to be

14  interested in just understanding from the waterfall

15  agreed to in the settlement, essentially how the

16  numbers are going to play out, what the -- if you have

17  an estimate for the administrative reserve and what

18  Guggenheim's fees are going to be, and -- I just had a

19  question.  Maybe you can answer it now.

20          There was a reference in the settlement to

21  estate cash, which is something separate from sale

22  proceeds.  At closing will there be -- will the debtor

23  retain cash as part of this sale?

24          MR. SALAZAR:  So subject to Mr. Battista

25  correcting me, but my understanding is there's the

1   cage cash and there's -- whether there will be cash

2   left is a function of the cage cash, which we

3   discussed early in the case, the payables that are

4   assumed, but, yes, we do expect that there is some

5   amount of cash that will left as part of the recovery

6   for the estate and part of that waterfall.  Right?

7           MR. BATTISTA:  (Nods his head.)

8           THE COURT:  Okay.  But -- and, of course,

9   that cash could go toward administrative expenses.

10          But are you going to set aside a reserve at

11   closing that's going to be to cover the full amount of

12   administrative expenses, independent of what other

13   sources of cash there may be?

14          MR. SALAZAR:  That's my understanding, yes.

15   We're establishing a reserve, period, and then that

16   may be part of the funding for the reserve, but it's

17   designed to pay off all the claims.

18          THE COURT:  Okay.  So other than just getting

19   a sense of some of those numbers and how far down we

20   get in the waterfall, then -- as I recall it's 30 days

21   to file a plan after closing?

22          MR. SALAZAR:  Yes, sir.

23          THE COURT:  And then you can speak a little

24   bit about what's going to be left to do after closing

25   and what you see as far as a plan and other assets.

Page 40

1   But we'll defer that until we get through the heart of

2   the hearing.

3          MR. SALAZAR:  I appreciate the heads-up, your

4   Honor.  We'll be prepared for that.

5          THE COURT:  All right.  So anybody have any

6   questions or comments before we recess until one

7   o'clock?

8          (No response.)

9          THE COURT:  All right.  Mr. Chantayan, you're

10  on the line.

11         Is there anybody else on the call?  If not,

12  Mr. Chantayan, if we can just call you directly.

13         Anybody else on the --

14         MR. CHANTAYAN:  That's fine, Judge.

15         THE COURT:  All right.  What's your number?

16  And we'll just call you directly.

17         MR. CHANTAYAN:  (561)402 --

18         THE COURT:  Yes.

19         MR. CHANTAYAN:  -- 7064.

20         THE COURT:  Okay.  So as long as somebody

21  reminds me, when we start at one, we'll call you

22  directly, and we won't use the conference line.

23         Thank you.

24         MR. CHANTAYAN:  That's fine.  Thank you,

25  Judge.

Page 41

1          THE COURT:  All right.  Bye.

2          Thanks.

3          MR. SALAZAR:  Thank you, your Honor.

4          MR. BATTISTA:  Thank you.

5          (Whereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

CERTIFICATE

STATE OF  FLORIDA:
COUNTY OF MIAMI-DADE:

         I, Anna M. Meagher, Shorthand Reporter and
Notary Public for the State of Florida at Large, do
hereby certify that the foregoing proceedings were
taken before me, in the cause, at the time and place,
and in the presence of the Court and counsel as stated
in the caption hereto on Page 1 hereof; that the
foregoing computer-assisted transcription, consisting
of pages numbered 1 through 42, inclusive, is a true
and accurate record of my Stenographic notes taken at
said proceedings.

         I further certify that I am not of counsel, I
am not related to nor employed by any attorney in this
case.

         Dated this 18th day of April 2014.


                              _____

My Commission Expires:  Anna M. Meagher, Notary Public
January 8, 2017         State of Florida at Large
Commission #EE852439