**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN THE DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| **FLORIDA GAMING CENTERS, INC.**, *et al.* | Case No. 13-29597-BKC-RAM |
| Debtors. | |
| _____/ | Jointly Administered |

## DISCLOSURE STATEMENT IN CONNECTION WITH JOINT CHAPTER 11 PLAN OF LIQUIDATION OF FLORIDA GAMING CENTERS, INC. AND FLORIDA GAMING CORPORATION

Dated:  June 6, 2014

SALAZAR JACKSON, LLP
Luis Salazar, Esq.
Linda Worton Jackson, Esq.
Jesse R. Cloyd, Esq.
Two South Biscayne Blvd.
Suite 3760
Miami, FL  33131
Tel:  (305) 374-4848
Fax:  (305) 397-1021

*Attorneys for the Debtors and Debtors-in-Possession*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

    A.    Overview of the Plan ..................................................................... 4

    B.    Voting Instructions ........................................................................5

    C.    Confirmation of the Plan by the Bankruptcy Court ................................7

II.   BACKGROUND OF THE DEBTORS ..............................................................7

    A.    Background ...................................................................................7

    B.    Prepetition Secured Debt ............................................................... 8

    C.    Events Leading to These Bankruptcy Filings ..................................... 9

III.  THE CHAPTER 11 CASES ............................................................................10

    A.    Commencement of These Chapter 11 Cases ....................................10

    B.    Retained Professionals .................................................................10

    C.    First Day Orders ........................................................................ 11

    D.    Adversary Proceeding Against ABC and Settlement ...........................12

    E.    The 363 Asset Sale .....................................................................14

IV.   CHAPTER 11 PLAN ......................................................................................15

    A.    Plan Overview ...........................................................................15

    B.    Unclassified Claims ....................................................................16

    C.    Treatment of Claims and Interests .................................................17

        1.    Class 1 – Centers Claims .....................................................17

        2.    Class 2 – Lenders Holdings Claims .......................................17

        3.    Class 3 – Non-Subordinated Holdings Claims ..........................18

        4.    Class 4 – Subordinated Holdings Claims .................................18

        5.    Class 5 – Centers Equity Interests .........................................19

        6.    Class 6 – Holdings Preferred Equity Interests ..........................19

        4.    Class 7 – Holdings Equity Interests .......................................19

    D.    Post-Confirmation Operations of the Debtors .................................. 20

    E.    The Creditor Trustee ................................................................... 20

        1.    Appointment of a Creditor Trustee ........................................ 20

        2.    Powers and Obligations of the Creditor Trustee ...................... 20

**TABLE OF CONTENTS**

(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | 3. | Engagement of Post Confirmation Professionals and Compensation to Creditor Trustee and Post Confirmation Professionals | 21 |
| | 4. | Bond | 22 |
| | 5. | Resignation, Death or Removal of the Creditor Trustee | 22 |
| F. | | Objections to Claims and Interests | 23 |
| G. | | Distributions Under the Plan | 23 |
| H. | | Conditions to Confirmation | 24 |
| I. | | Conditions to the Effective Date | 24 |
| J. | | Modification of the Plan | 25 |
| K. | | Effect of Confirmation | 25 |
| L. | | Retention of Jurisdiction | 25 |
| M. | | Treatment of Executory Contracts and Unexpired Leases | 27 |
| N. | | Preservation of Rights of Setoffs | 28 |
| O. | | Exculpation and Limitation of Liability | 28 |
| V. | CONFIRMATION OF THE PLAN | | 29 |
| | A. | Confirmation Hearing | 29 |
| | B. | Confirmation Standards | 29 |
| VI. | FUNDING AND FEASIBILITY OF THE PLAN | | 30 |
| | A. | Funding of the Plan | 30 |
| | B. | Feasibility | 30 |
| | C. | Risk Factors Associated with the Plan | 30 |
| VII. | ALTERNATIVES TO THE PLAN | | 30 |
| VIII. | CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | | 31 |
| | A. | In General | 31 |
| | B. | U.S. Federal Income Tax Consequences to the Debtors | 32 |
| | C. | U.S. Federal Income Tax Consequences to Holders of Claims | 34 |
| | 1. | Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss | 34 |
| | 2. | Interest Income with respect to Allowed Claims | 34 |
| | D. | Backup Withholding and Information Reporting | 35 |
| IX. | CONCLUSION | | 35 |

**DISCLOSURE STATEMENT IN CONNECTION WITH JOINT CHAPTER 11 PLAN OF LIQUIDATION OF FLORIDA GAMING, INC. AND FLORIDA GAMING CORPORATION**

## I.   INTRODUCTION

Florida Gaming Centers, Inc. and Florida Gaming Corporation, the debtors and debtors in possession in the above-captioned chapter 11 case (the "Debtors") provide this Disclosure Statement (the "Disclosure Statement") to certain of the Debtors' impaired creditors to permit such creditors to make an informed decision in voting to accept or reject the Joint Chapter 11 Plan of Liquidation of Florida Gaming Centers, Inc. and Florida Gaming Corporation (the "Plan") filed on June 6, 2014 with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") in connection with the above-captioned cases filed pursuant to Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases")  A copy of the Plan is attached to this Disclosure Statement as **Exhibit "A"**.  Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.  Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain Holders of Claims against the Debtors in accordance with the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").  Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the Debtors' creditors and stockholders, to make an informed judgment whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above.  This Disclosure Statement has not yet been approved by the Court, and will be considered for approval at the same hearing to consider confirmation of the Debtors' Plan.

This Disclosure Statement is based on information publicly available in SEC filings and pleadings filed with the Bankruptcy Court, as well as information provided by the Debtors' management and legal analysis by Salazar Jackson, LLP ("Salazar Jackson"), counsel for the Debtors.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRATED PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE**

YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE DEBTORS AND THE OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN. ACCORDINGLY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE. THE PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE DEBTORS' ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE ACCURATE AND THE DEBTORS BELIEVE IN GOOD FAITH THAT THE INFORMATION HEREIN IS ACCURATE, THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS CORRECT. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

A STATEMENT OF THE ASSETS AND LIABILITIES OF THE DEBTORS AS OF THE DATE OF THE COMMENCEMENT OF THEIR CHAPTER 11 CASES IS ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT IN ARTICLE 10 OF THE PLAN AND DESCRIBED HEREIN.  THERE IS NO ASSURANCE THAT THE PLAN WILL

**BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT REQUIRED TO BE SATISFIED WILL BE SATISFIED OR OTHERWISE WAIVED.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR OR INTEREST HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISERS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, OR ANY RELATED MATTERS.**

Pursuant to the Bankruptcy Code, this Disclosure Statement and the Plan were filed on June 6. 2014. The Bankruptcy Court will hold a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan beginning at _____ (prevailing Eastern time) on _____, in the _____ (the "Confirmation Hearing"). At that Confirmation Hearing, the Bankruptcy Court will consider whether the Disclosure Statement should be approved; and whether the Plan satisfies the confirmation requirements of the Bankruptcy Code, and will review a ballot report concerning votes cast for the acceptance or rejection of the Plan.

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

<u>Counsel for the Debtors</u>

SALAZAR JACKSON, LLP
Luis Salazar, Esq.
Two South Biscayne Blvd., Suite 3760
Miami, FL 33131
Tel: (305) 374-4848
Fax: (305) 397-1021
Attn: Luis Salazar, Esq.

A.    <u>Overview of the Plan</u>

**THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.   CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF. THE PLAN IS ATTACHED AS <u>EXHIBIT "A"</u> TO THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. The fundamental purpose of a Chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. With this purpose in mind, businesses sometimes use Chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the aim is reorganization or liquidation, a Chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Plan divides the Claims against the Debtors and Interests in the Debtors into Classes. Certain Claims — in particular, Other Administrative Claims, Statutory Fees, Professional Fee Claims, Priority Tax Claims and Lenders Centers Claims—remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code. The Plan assigns all other Claims and Interests as described below.

<u>Class 1</u> consists of Allowed Centers Claims.

<u>Class 2</u> consists of Allowed Lenders Holdings Claims.

<u>Class 3</u> consists of Allowed Non-Subordinated Holdings Claims.

<u>Class 4</u> consists of Allowed Subordinated Holdings Claims.

<u>Class 5</u> consists of Allowed Centers Equity Interests.

<u>Class 6</u> consists of Allowed Holdings Preferred Equity Interests.

<u>Class 7</u> consists of Allowed Holdings Equity Interests.

The Debtors believe that the Distributions under the Plan will provide Creditors of the Debtors a greater recovery on account of Allowed Claims then would Distributions by a Chapter 7 trustee.  Further, distributions under the Plan to Creditors of the Debtors would be made more quickly than distributions by a Chapter 7 trustee and a Chapter 7 trustee would

4

charge a substantial fee, reducing the amount, if any, available for distribution on account of Allowed Claims.

ACCORDINGLY, THE DEBTORS URGE EACH CREDITOR ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

**B.    Voting Instructions**

**THE DEBTORS STRONGLY RECOMMEND THAT EACH CREDITOR ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

The Bankruptcy Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Holders of classes of claims or equity interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it.

The Holders of Claims in Class 1 are Impaired under the Plan and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit votes of all Claimants in Class 1.

The Holders of Claims in Class 2 are Impaired under the Plan and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit votes of all Claimants in Class 2.

The Holders of Claims in Class 3 are Impaired under the Plan and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit votes of all Claimants in Class 3.

The Holders of Claims in Class 4 are Impaired under the Plan and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit votes of all Claimants in Class 4.

The Holders of Interests in Class 5 are Impaired under the Plan and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit votes of all Holders of Interests in Class 5.

The Holders of Interests in Class 6 are Unimpaired under the Plan and therefore deemed to have accepted the Plan. Holders of Interests in Class 6 are therefore not entitled to vote.

The Holders of Interests in Class 7 are Unimpaired under the Plan and therefore deemed to have accepted the Plan. Holders of Interests in Class 7 are therefore not entitled to vote.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 2, 3, 4 AND 5.  BEFORE**

**VOTING, SUCH HOLDERS SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND THE PLAN DOCUMENTS, IN THEIR ENTIRETY.**

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may not cast Ballots or votes orally or by facsimile.  **In order for your Ballot to be considered by the Bankruptcy Court, it must be actually received by 4 p.m. (prevailing Eastern time) on _____ (the "Voting Deadline").**  If you are a Holder of a Claim or Interest in Classes 1, 2, 3, 4 or 5, and you did not receive a Ballot with this Disclosure Statement, please contact:

SALAZAR JACKSON, LLP
Luis Salazar, Esq.
Two South Biscayne Blvd.
Suite 3760
Miami, FL  33131
Tel:  (305) 374-4848
Fax: (305) 397-1021
Attn:  Luis Salazar, Esq.

Only Holders of Allowed Claims and Interests in Impaired Classes 1, 2, 3, 4 and 5 are entitled to vote on the Plan.  Any Ballot executed by the Holder of an Allowed Claim, but which does not indicate acceptance or rejection of the Plan, will be considered a vote to accept the Plan.  Any Ballot not executed by the Holder of an Allowed Claim will not be counted as a vote to accept or reject the Plan.

**An Impaired class of Claims accepts the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class that actually vote are cast in favor of the Plan.** Whether or not a creditor or Interest holder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the classes of creditors and is confirmed by the Bankruptcy Court. Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan.

If the voting members of an Impaired Class do not vote unanimously for the Plan but, nonetheless, vote for the Plan by at least the requisite two-thirds (2/3) in amount and one-half (1/2) in number of Allowed Claims in that Class actually voted, the Plan, at a minimum, must provide that each Holder of a Claim in such Class will receive property of a value, as of the Effective Date, that is not less than the amount such Class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtors or other parties in interest may dispute Proofs of Claim or Proofs of Interest that have been filed or that the Debtors listed as disputed in the Schedules the Debtors filed with

6

the Bankruptcy Court. Persons whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes.

## C.    Confirmation of the Plan by the Bankruptcy Court

Once it is determined which Impaired Classes have or have not accepted the Plan, the Bankruptcy Court will determine whether the Plan may be confirmed.

The Plan provides for, among other things, the wind-down of the Debtors, the resolution of Claims by the Creditor Trustee, the possible pursuit by the Creditor Trustee of Causes of Action, the distribution of monies by the Creditor Trustee to Holders of Allowed Claims in satisfaction of such Allowed Claims, and the payment of post-confirmation professional fees. Confirmation will make the Plan binding upon the Debtors, their creditors, holders of Claims and Interests, and other parties in interest regardless of whether they have accepted the Plan.

## II.    BACKGROUND OF THE DEBTORS

## A.    Background

Miami Jai Alai is one of Miami's oldest institutions. In fact, the first professional jai alai game was played at Miami Jai Alai in 1926. Over the years, Miami Jai Alai has been an important part of the growing Miami community – hosting jammed-packed Jai-Alai games, concerts by Jimi Hendrix, Miami Vice episodes, Miami Junior Women's Club meetings, and championship boxing matches. In fact, when Anthony Bourdain came to town and wanted to experience something uniquely Miami, he went to watch Miami Jai Alai.

Over the years, as the popularity of Jai Alai itself waned, it became clear that casino gambling was the key to Miami Jai Alai's continued viability. In 2008, when Miami-Dade voters voted to legalize gambling at pari-mutuel sites, Miami Jai Alai began the process of building a Casino that would house the permitted slot machines adjacent to the historic Miami Jai Alai site.

Miami Jai-Alai is operated by Florida Gaming Centers, Inc. ("Centers"), which in turn, is 100% owned by Florida Gaming Corporation ("Holdings") (Centers and "Holdings together, "Florida Gaming"), a corporation organized under the laws of the state of Delaware. Holdings is a public company registered with the United States Securities and Exchange Commission. Miami Jai-Alai's principal business is owning jai-alai frontons – courts where jai-alai is played – with simulcasting operations in Miami and Ft. Pierce, Florida. It is one of the largest, if not the largest jai-alai operator in the world.

Due to a decline in the jai-alai industry and the need to bring in additional cash flow to the Miami Jai-Alai fronton, using loans from the Syndicated Credit Facility, as defined below, Miami Jai Alai opened Casino Miami Jai-Alia in January 2012. The addition includes a 40,000 square

foot state of the art casino with 1035 Class III slot machines, an expanded poker room, electronic blackjack, roulette, dominoes, live shows such as concerts and boxing, a new restaurant and three full-service bars.

Miami Jai Alai continues to operate a fronton in Ft. Pierce, Florida and an inactive jai-alai permit for Tampa, Florida. The Ft. Pierce location provides inter-track wagering on interstate simulcasting of horse racing, dog racing, and jai-alai from various tracks and frontons in the United States and within the state of Florida.

## B.    Prepetition Secured Debt

**The Syndicated Credit Facility**. On April 25, 2011, Centers and Holdings entered into a Credit Agreement (the "Prepetition Credit Agreement" and together with related documents, including the Warrant Agreement, the "Loan Documents") with ABC Funding, LLC, as administrative agent ("ABC") and a syndicate of unaffiliated third party lenders (collectively, the "Prepetition Lenders").

Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders agreed to make revolving loans available to Centers in an amount of up to $87,000,000 (the "Syndicated Credit Facility") to be used by Centers to pay off existing debt of Centers and Holdings, fund the casino project at the Miami Jai-Alai fronton and for working capital. The Syndicated Credit Facility was secured by substantially all of the assets of Centers, Holdings, Tara Club and Freedom (the "Prepetition Liens"), which Prepetition Liens were subsequently subject to certain litigation as part of the Chapter 11 Cases, which is described in more detail below. Holdings, Tara Club and Freedom were guarantors under the Prepetition Credit Agreement.

**The Debtors' Miami-Dade County Debt**. In February 2009, in a settlement agreement related to an eminent domain proceeding, Holdings agreed to acquire a total of 10.982 acres of land from Miami-Dade County (the "County") in two (2) separate phases and to sell the County a temporary construction easement and 0.492 acres of Centers' Miami property. The purchase price for the acquisition of the 10.982 acres from the County is $16,742,145 (the "County Debt").

On April 6, 2009, Holdings acquired approximately 2.283 acres (the "Phase I Property") from the County for $3,348,429, which a portion was financed by the County in the amount of $3,013,586. The financing was evidenced by a promissory note executed and delivered by Holdings to the County in the original principal amount of $3,013,586 (the "Phase I Note"), which was allegedly secured by a first mortgage lien on the Phase I Property.

On June 16, 2011, Holdings acquired the remaining 8.67 acres (the "Phase II Property") from the County for $13,393,716, a portion of which was financed by the County in the amount of $12,054,344. The financing was evidenced by a promissory note executed and delivered to County by Holdings in the original principal amount of $12,054,344 (the "Phase II Note"), which was allegedly secured by a first mortgage lien on the Phase II Property.

8

The parking lot for the Miami jai-alai facility is located on the Phase I Property and the Phase II Property, which is vital to the operations of such facility.

## C.    Events Leading to These Bankruptcy Filings

On September 5, 2012, ABC filed a Complaint in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida seeking to foreclose the Mortgage, styled as *ABC Funding, LLC, et al. v. Florida Gaming Centers, Inc., et al.*, Case No. 12-35064 CA 58.

On that same day, ABC also initiated a foreclosure action against Florida Gaming in the Circuit Court of the 19th Judicial Circuit in and for St. Lucie County, Florida, styled as *ABC Funding, LLC, et al. v. Florida Gaming Centers, Inc., et al.*, Case No. 56-2012-CA-003525 AXXXHC.  The St. Lucie matter was later transferred to and consolidated with the Miami-Dade matter on May 8, 2013 (together, the "ABC Florida Action").

The ABC Florida Action was heavily contested and litigated for over 11 months leading up to the filing of the Chapter 11 Cases, with many complex and unique legal and factual issues addressed along the way.  The ABC Florida Action is being dismissed pursuant to the terms of the Settlement Agreement, and is extensively described in the pleadings filed by the Debtors and ABC in the ABC Adversary (as defined below) and in connection with the Settlement Agreement.

**Appointment of Receiver in the ABC Florida Action**.  On October 18, 2012, ABC Funding filed its *Verified Motion to Appoint Receiver* in the ABC Florida Action, relying in large part upon the obligation in the Loan Documents that a receiver be appointed upon declaration of a default.  On November 2, 2012, Miami Jai Alai consented to an Order (the "Receiver Order") appointing David Jonas as Receiver (the "Receiver"), nunc pro tunc to October 25, 2012, of the real and personal property described in and encumbered by the two mortgages at issue in the ABC Florida Action including, without limitation, all real, personal, tangible, and intangible property, contracts, records, documents (collectively, the "Receivership Property").  Jonas was subsequently retained as Receiver by the Debtors in the Chapter 11 Cases pursuant to order of the Bankruptcy Court.  *See Agreed Order Granting, in Part, the Motion of ABC Funding, LLC for an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code and for an Order Directing that David Jonas Remain as Receiver* [ECF No. 198].

**The Proposed Prepetition Silvermark Sale**.  Shortly after the ABC Florida Action was filed, Florida Gaming negotiated an agreement for the sale of Holdings' stock in Centers to a qualified third party, Silvermark, LLC ("Silvermark"), for $115 million in cash and approximately $15 million in assumed liabilities.  Florida Gaming initiated a proxy process and obtained approval for the transaction from its shareholders in [March] of 2013.

**The Warrant Agreement and Jefferies Valuation**.  In connection with the Prepetition Credit Agreement, Florida Gaming executed a Warrant Agreement providing warrants to the Prepetition Lenders that could, under certain circumstances, be exercised in exchange for common stock in Centers.  Alternatively, under certain other circumstances, including the sale of

Centers, the Warrant Agreement required Florida Gaming to repurchase the warrants from the Prepetition Lenders. If, under such a scenario, the parties could not agree to a valuation for that repurchase price, the Warrant Agreement provided a process for the appointment of an independent investment bank to determine the valuation of the business necessary to compute the warrant repurchase price.

Pursuant to the terms of the Warrant Agreement, the parties selected Jefferies, LLC to serve as the investment bank to provide valuation services and reports as required under the terms of the Warrant Agreement. Jefferies ultimately issued its valuation report (the "Jefferies Valuation") valuing Miami Jai Alai at a range of $170 million to $190 million, for a midpoint valuation of $180 million. Under the terms of the Warrant Agreement, the Jefferies Valuation provided that the repurchase price due the warrant holders was approximately $26,845,000 (as subsequently modified, the "Prepetition Repurchase Price").

**The Payoff and Estoppel Issues**. Silvermark had agreed to close the transaction to purchase the stock in Centers and pay the full amount due and owing to ABC under the Loan Documents, including the Prepetition Repurchase Price under the Warrant Agreement and all professional fees asserted by ABC. On July 9, 2013, ABC provided Florida Gaming with the estoppel letter, stating the unpaid balance due and owing under the Loan Documents was $90,302,907.27. Together with fee amounts asserted by ABC and the over $26 million Prepetition Repurchase Price, Miami Jai-Alai would have been required to pay approximately $120 million to pay-off the Prepetition Lenders in full in connection with the Silvermark sale.

Miami Jai-Alai was unable to close the transaction with Silvermark. Based on the foregoing, Miami Jai-Alai determined in its business judgment that the commencement of these Chapter 11 Cases would be the best avenue to realize and maximize the value of the residual equity in the Debtors for the benefit of their creditors, shareholders and other parties in interest.

## III.    THE CHAPTER 11 CASES

### A.    Commencement of These Chapter 11 Cases

On the Petition Date, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. These Chapter 11 Cases are pending before the Honorable Robert A. Mark, United States Bankruptcy Judge for the Southern District of Florida, located at the United States Bankruptcy Court, 51 S.W. 1st Ave., Room 1406, Miami, FL 33130.

### B.    Retained Professionals

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with these Chapter 11 Cases. Specifically, the Debtors have retained, and the Bankruptcy Court has approved the retention of, the following professionals: (a) Salazar Jackson, LLP. as counsel for the Debtors in these Chapter 11 Cases [ECF No. 159];

(b) Kapila & Company as financial consultants and accountants for the Debtors [ECF No. 125]; (c) Guggenheim Securities, LLC. as investment bankers to the Debtors [ECF No. 231]; (d) Morris Brown, Argiz & Farra, LLC as auditors to the Debtors [ECF No. 376] (collectively the "Debtors' Professionals").

The Bankruptcy Court authorized the Creditors' Committee to retain certain professionals to represent them and assist them in connection with these Chapter 11 Cases. Specifically, the Creditors' Committee has retained, and the Bankruptcy Court has approved retention of, the following professionals: (a) Genovese, Joblove & Battista, P.A. as counsel for the Committee [ECF No. 157] and (b) Development Specialists, Inc. as financial advisors to the Creditors' Committee [ECF No. 196] (collectively the "Creditors' Committee Professionals").

## C.    First Day Orders

On the Petition Date, the Debtors filed a number of motions seeking approval of certain so-called "first day orders." The first day orders facilitated the transition between the Debtors' pre-petition and post-petition business operations by authorizing the Debtors to continue with certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval. The first day orders in these Chapter 11 Cases, the majority of which were entered after a hearing held on August 21, 2013, authorized, among other things, the following:

1.    **Emergency Application for Entry of Interim and Final Orders Authorizing Employment and Retention of Salazar Jackson, LLP as General Counsel for Debtors and Debtors-in-Possession, *Nunc Pro Tunc* to Petition Date [ECF No. 7]**

The Bankruptcy Court entered an order authorizing employment of Salazar Jackson as general counsel for Debtors and Debtors-in-Possession [ECF No. 159].

2.    **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Other Relief [ECF No. 8]**

The Bankruptcy Court initially entered an interim order [ECF No. 31], amended interim order [ECF No. 34] and subsequently entered a final order [D.E. 201] authorizing the Debtors to continue to utilize their existing cash management systems, to continue to use their existing bank accounts and to be excused from certain investment and deposit guidelines of section 345 of the Bankruptcy Code and guidelines promulgated by the U.S. Trustee.

3. **Debtors' Emergency Motion for an Order (I) Authorizing Debtors to Pay (A) Prepetition Employee Wages and Related Items; (B) Prepetition Employee Business Expenses; (C) Prepetition Contributions to and Benefits Under Employee Benefit Plans; (D) Prepetition Employee Payroll Deductions and Withholdings; and € All Expenses Incident to the Foregoing; and (II) Authorizing and Directing All Financial Institutions to Pay All Related Checks and Electronic Payment Requests [ECF No. 9]**

The Bankruptcy Court entered an order authorizing the Debtors to pay prepetition compensation, prepetition business expenses, deductions, withholding and benefits due and owing as of the Petition Date for the benefit of its employees [ECF No. 37].

4. **Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Perform and Honor Certain Customer Programs in the Ordinary Course of Business and Obligations Under Gaming Acts and Regulations [ECF No. 10]**

The Bankruptcy Court entered an order authorizing Debtors to honor and perform its obligations in regard to its Customer Programs in the ordinary course of business [ECF No. 38].

**D.    Adversary Proceeding Against ABC and Settlement Agreement**

On November 8, 2013, The Debtors instituted an adversary proceeding against each of the Prepetition Lenders and ABC, which was later amended to remove the Prepetition Lenders as named defendants[1] (the "ABC Adversary").  In the ABC Adversary, the Debtors sought subordination and disallowance of portions of the Lender Claims (as defined below) on various grounds.

On December 16, 2013, as part of the scheduling order agreed to by the parties in connection with the ABC Adversary, ABC filed a master proof of claim on behalf of itself and the Prepetition Lenders [Claim No. 20] asserting certain claims under the Loan Documents in an amount of no less than $127,645,985.77 as of the Petition Date (the "Lender Claims").  The Lender Claims included, among other components, (a) amounts on account of the Syndicated Debt Facility and related fees (including the prepayment fee and OID) and interest arising under the Prepetition Credit Agreement in the approximately amount of $94 million (the "Loan Claim"), and (b) amounts related to the repurchase obligations of the Debtors under the Warrant Agreement in the approximate amount of $33.6 million (the "Repurchase Claims").

On December 30, 2013, the Debtors filed *Florida Gaming Centers, Inc. and Florida Gaming Corporation's Motion for: (I) Summary Judgment on Subordination, Prepayment, Penalty Claim, and Original Issue Discount Claim; and (II) Partial Summary Judgment on Choice of Law Regarding*

---

[1]    Pursuant to a Stipulation of Dismissal filed with the Court on December 19, 2013 [Adv. ECF No. 10], the Prepetition Lenders were dismissed from the ABC Adversary.  In connection therewith, the Prepetition Lenders stipulated, among other things, to be bound by any rulings of this Court with respect to the ABC Claim.

*Usury Issues* [ABC Adversary ECF No. 30], which asserted, among other things, that: (i) the portion of the Lender Claims stemming from the repurchase obligations under the Warrant Agreement were subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code, to the level of common stock in both Centers and Holdings; and (ii) the Lender Claims improperly included a prepayment premium and OID and that such portions must be disallowed.  Also on December 30, 2013, ABC filed *Defendant's Motion for Summary Judgment Dismissing Counts I, IV, V, VI and VII of the Adversary Complaint* [ABC Adversary ECF No. 16].  Each party subsequently filed responses and replies to such pleadings.  Also in connection with the ABC Adversary, on January 23, 2014, the Creditors' Committee filed a *Motion to Limit the Credit Bid of ABC Funding, LLC in Connection with Sale of Substantially All of Debtors' Assets* (the "Credit Bid Motion") [ECF No. 280], which the Debtors joined.  Pursuant to the Credit Bid Motion, the Creditors' Committee sought the Bankruptcy Court's determination of the amount of any credit bid amount that could be made by ABC at the Auction.

The Bankruptcy Court conducted a hearing on the ABC Adversary on January 24, 2014 and on February 5, 2014, entered its *Order on Summary Judgment Motions; Preliminary Order on Motion to Limit Credit Bid; Order Abating Procedures Pending Mediation; and Order Setting Further Hearing* (the "Summary Judgment Order") [ECF No. 305 and ABC Adversary ECF No. 35], which held, among other things:

- The Repurchase Claim against Centers in the amount of $33,600,000 was subordinated under section 510(b) to all claims and interests senior to the common stock interests in Centers.
- The Repurchase Claim against Centers was to be converted into an equity interest *pari passu* with the existing common stock of Centers, in an amount to be determined at a later date by the  Bankruptcy Court.
- The Bankruptcy Court reserved ruling on whether the Repurchase Claim against Holdings should be subordinated.
- Disallowing the prepayment premium portion of the Loan Claim in the amount of $1,744,512.23.
- Disallowing the Loan Claim in the amount of $1,740,000 on account of OID that constituted unaccrued interest as of the Petition Date.
- Dismissing the usury count of the ABC Adversary.

In connection with the Summary Judgment Order, on February 5, 2014, the Bankruptcy Court entered an *Order of Referral to Mediation* [Adv. ECF No. 306], which required the Debtors, ABC and the Creditors' Committee to participate in mediation no later than February 24, 2014. Thereafter, on February 19, 2014 and February 20, 2014, the Debtors, ABC and the Creditors' Committee participated in a Court ordered mediation regarding the remaining issues in the ABC Adversary and the credit bid rights of ABC.  Subsequently, on March 19, 2014, the Debtors, the Creditors' Committee and ABC entered into a Settlement Agreement, which is attached to the

Plan as Exhibit A.  The Settlement Agreement resolved the Lender Claims, ABC Adversary and Credit Bid Motion.

E.    **The 363 Asset Sale**

On November 25, 2013, the Debtors filed a motion with the Bankruptcy Court seeking approval of the form of the stalking horse Asset Purchase Agreement between the Debtors and Silvermark (the "Stalking Horse APA"), as well as competitive bidding, sale and auction procedures.  The Stalking Horse APA, which was eventually finalized on December 17, 2013, was for the sale of substantially all of the Debtors' assets (the "363 Sale").  The proposed 363 Sale was to be conducted under the provisions of section 363 of the Bankruptcy Code and was subject to proposed bidding procedures and the receipt of higher and better bids at auction (the "Auction").

On December 30, 2013, the Court entered its *Order (A) Authorizing and Approving Sale Procedures for the Sale of Substantially all the Debtors' Assets; (B) Approving Debtors' Entry into and Form of Asset Purchase Agreement, Including Break-Up Fee; (C) Scheduling an Auction and Final Hearing to Consider Approval of the Sale; (D) Approving Form and Manner of Notice of Sale Procedures, Auction and Sale Hearing; (E) Authorizing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (F) Approving the Compromise and Settlement of Claims between Parties to the November 25, 2012 Stock Purchase Agreement* (the "Sale Procedures Order") [ECF No. 261].  Pursuant to the Sales Procedures Order, a deadline of March 19, 2014 at 5:00 PM (the "Bid Deadline") was set for submitting Qualified Bids (as defined in the Sales Procedures) for the sale of the Debtors' assets.  The Sales Procedures provided that, if a Qualified Bid was received, the Auction would be held on March 25, 2014, but that in the event no Qualified Bids were received by the Bid Deadline, the Auction would be canceled, and the Debtors would seek approval of the Stalking Horse APA.  The Sale Procedures Order scheduled a hearing on March 26, 2014(the "Sale Hearing") at which Debtors would seek approval of the transactions contemplated by the Stalking Horses APA or the successful bidder from the auction.

The Debtors received multiple qualifying bids, and held the Auction on March 25, 2014.  The highest bid at the auction was from Fronton Holdings, LLC, an entity established by ABC to bid on behalf of the Prepetition Lenders, in the amount of $140,000,000 (the "Purchase Price") plus certain assumed liabilities including the County Debt.  The Purchase Price consisted of a credit bid of $99,907,336 on account of the Loan Claim and cash in the amount of $40,092,664.  On March 28, 2014, the Debtors and Fronton Holdings, LLC, entered into the Asset Purchase Agreement (the "Asset Purchase Agreement") memorializing the transaction.

At the Sale Hearing, the Debtors sought approval of the sale of substantially all of the Debtors' assets to Fronton Holdings, LLC.  On April 7, 2014, the Bankruptcy Court entered an *Order Under 11 U.S.C. §§ 105, 363 and Fed. R. Bankr. P.2002, 6004, 6006, 9007, 9019, and 9014 Approving (A) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts to Successful Bidder, and (C) Related Relief* (the

"Sale Order") [ECF No. 420], approving the transaction.  On April 30, 2014 (the "Closing Date"), the Centers, Holdings and Fronton consummated the 363 Sale contemplated by the Asset Purchase Agreement.

On May 1, 2014, Prides Capital Fund I, L.P., a holder of preferred stock in Holdings, filed a motion seeking to vacate the Sale Order and *Order Pursuant to Fed.R.Bankr.P. 9019(A) Approving Settlement and Compromise By and Among the Debtors and Their Respective Estates, William B. Collett, William B. Collett, Jr., ABC Funding, LLC and the Official Joint Committee of Unsecured Creditors [ECF No. 387]* (the "Motion to Vacate") [ECF No. 387], on the basis that it did not receive proper notice.  The Debtors and ABC each filed their respective responses to the motion [ECF Nos. 476 & 477].  On May 13, 2014, the Bankruptcy Court entered its *Order Denying Emergency Motion of Preferred Shareholder, Prides Capital I, L.P., to Vacate Pursuant to Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b): (I) Order Under 11 U.S.C. §§ 105, 363 and Fed. R. Bankr. P.2002, 6004, 6006, 9007, 9019, and 9014 Approving (A) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts to Successful Bidder, and (C) Related Relief* [ECF No. 420] and (II) *Order Pursuant to Fed.R.Bankr.P. 9019(A) Approving Settlement and Compromise By and Among the Debtors and Their Respective Estates, William B. Collett, William B. Collett, Jr., ABC Funding, LLC and the Official Joint Committee of Unsecured Creditors [ECF No. 387]* [ECF No. 490], denying the Motion to Vacate.

## IV.    CHAPTER 11 PLAN

**THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN.  THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT "A".  THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN.  CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN.  SUCH CONSIDERATION IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY.  THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.**

## A.    Plan Overview

The Plan contains four types of unclassified Claims:  Administrative Expense Claims, Statutory Fees, Professional Fee Claims and Priority Tax Claims.  In addition, the Plan classifies Claims and Interests as follows:  Class 1- Centers Claims, Class 2- Lenders Claims, Class 3-Non-Subordinated Holdings Claims, Class 4- Subordinated Holdings Claims, Class 5- Centers Equity Interests, Class 6- Holdings Preferred Equity Interests, and Class 7- Holdings Equity Interests.  Classes 1, 2, 3, 4 and 5 are Impaired.

**B.**    <u>**Unclassified Claims**</u>

The Unclassified Claims consist of Other Administrative Claims, Statutory Fees, Professional Fee Claims and Priority Tax Claims.  These Claims shall be treated as follows:

**Other Administrative Claims**.  Subject to the allowance procedures and deadlines provided in the Plan, each Holder of an Allowed Other Expense Claim shall receive on account of, and in full satisfaction, settlement and release of and in exchange for such Allowed Other Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Other Administrative Claim; *provided, however*, that Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during these Chapter 11 Cases shall be paid in accordance with the terms and conditions of any agreement or course of dealing relating thereto.  Proof of Administrative Expense Claims must be filed on or before the Other Administrative Claims Bar Date.

**Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 shall be paid in full by the  Debtors in Cash.  Following the Effective Date, the Creditor Trustee shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930 for post-confirmation periods based upon disbursements made by the Creditor Trustee until the earlier of the closing of the Chapter 11 Cases of the Debtors by the issuance of a final decree by the Bankruptcy Court or upon the entry of an order by the Bankruptcy Court dismissing or converting the Chapter 11 Cases of the Debtors to another chapter under the Bankruptcy Code.  The fees due and payable to the U.S. Trustee in respect of the Distribution (by the Debtors or the Creditor Trustee) of the Centers Claim Reserve, the Initial Holdings Distribution Amount, the Other Administrative Claim Reserve and the Professional Fee Claim Reserve shall be deemed an Allowed Other Administrative Claim.

**Professional Fee Claims**.  On or prior to the deadline set by the Bankruptcy Court for Professionals to File final fee applications, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date.  Within ten (10) days after entry of an Order with respect to its final fee application, as applicable, either the Debtors or the Creditor Trustee, as applicable, shall pay the Allowed Professional Fee Claims of each Professional.

**Priority Tax Claims**.  Each Holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, payment in full in Cash upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Priority Tax Claim.

In addition, as described in the Plan, the Lenders Centers Claims were satisfied in full pursuant to the terms of the Settlement Agreement and the Sale Order and shall not be classified,

16

nor entitled to vote or receive any Distribution on account of such Lenders Centers Claims pursuant to this Plan.

In accordance with the Bankruptcy Code, the Allowed Administrative Expense Claims, Statutory Fees, Professional Claims, Allowed Priority Tax Claims and Lenders Centers Claims are not classified. Therefore, the claimants holding the aforementioned Claims may not vote on the Plan.

**C.    Treatment of Claims and Interests**

    **1.    Class 1 – Centers Claims**

        (a)    Definition of Class 1 – Centers Claims

The Centers Claims are all Allowed Claims (including Priority Claims and Priority Tax Claims) against Centers excluding however Administrative Claims against Centers and the Lenders Centers Claims; *provided*, *however*, for the avoidance of doubt, that the Centers Claims shall not include the Collett Claims and the Holdings Intercompany Claim (each as defined in the Settlement Agreement), which have been waived pursuant to the terms of the Settlement Agreement..

        (b)    Treatment of Class 1 – Centers Claims

Each Holder of an Allowed Centers Claim shall receive payment in full, in cash, of the allowed amount of its Centers Claim, exclusive of any post-petition interest and/or fees of any kind, upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing each such Centers Claim.

    **2.    Class 2 – Lenders Holdings Claims**

        (a)    Definition of Class 2 – Lenders Holdings Claims

The Lenders Holdings Claims are Allowed Claims of the Lenders against Holdings arising under the Prepetition Credit Agreement and related agreements and allowed pursuant to the Settlement Agreement.

(b)      Treatment of Class 2 – Lenders Holdings Claims

The Holders of Lenders Holdings Claims received a partial Distribution (or were deemed to have received a partial Distribution) in respect of the Lenders Holdings Claims pursuant to the Settlement Agreement and Sale Order and shall receive no further Distribution pursuant to the Plan on account of the Allowed Lenders Holdings Claims other than any distributions provided pursuant to the terms of the Settlement Agreement.

3.      **Class 3 – Non-Subordinated Holdings Claims**

(a)      Definition of Class 3 – Non-Subordinated Holdings Claims

The Non-Subordinated Holdings Claims are all non-subordinated Claims against Holdings, other than the Lenders Holdings Claims and any Administrative Claims against Holdings.

(b)      Treatment of Class 3 – Non-Subordinated Holdings Claims

Each Holder of an Allowed Non-Subordinated Holdings Claim shall receive payment, in Cash, of its Pro Rata share of (a) the Initial Holdings Distribution Amount; (b) (i) the Centers Claim Remainder, if any, and (ii) that portion of the Administrative Claim Remainder, if any, distributable to the Estates of the Debtors pursuant to section 6 of the Settlement Agreement, in each case pursuant to the terms of the Settlement Agreement; and (c) the proceeds of Causes of Action; including in respect of the D&O Claims (net of Post Confirmation Administrative Claims related thereto), and (d) the proceeds (net of Post Confirmation Administrative Claims) from the liquidation of the balance of the Creditor Trust Assets; *provided*, *however*, that for the avoidance of doubt, Holders of Allowed Non-Subordinated Holdings Claims shall not receive payment of any post-petition interest and/or fees of any kind.  The initial Distributions to Holders of Allowed Non-Subordinated Holdings Claims shall be made upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Non-Subordinated Administrative Claim.  Thereafter, Distributions to Holders of Allowed Non-Subordinated Holdings Claims shall be made on such other Distribution Dates as determined by the Creditor Trustee.

4.      **Class 4 – Subordinated Holdings Claims**

(a)      Definition of Class 4 – Subordinated Holdings Claims

Subordinated Holdings Claims are unsecured subordinated Claims against Holdings.

(b)      Treatment of Class 4 – Subordinated Holdings Claims

Each Holder of an Allowed Subordinated Holdings Claim, shall receive payment, in Cash, of its Pro Rata share of the Subordinated Holdings Claim Remainder, if any; *provided*, *however*, that for the avoidance of doubt, Holders of Allowed Subordinated Holdings Claims shall not receive payment of any post-petition interest and/or fees of any kind.

5.      **Class 5 – Centers Equity Interests**

(a)      Definition of Class 5 – Centers Equity Interests

Centers Equity Interests are all equity Interests in Centers, including the Lenders Centers Interests.

(b)      Treatment of Class 5 – Centers Equity Interests

The Holders of Centers Equity Interests shall receive Distributions on account of such Interests pursuant to this Plan from the net proceeds of Causes of Action, if any, after payment in full of all Allowed Claims in Class 1 above, provided however, that the Lenders have agreed, in the Settlement Agreement, to waive any such Distribution on account of such Lenders Centers Interests.

6.      **Class 6 – Holdings Preferred Equity Interests**

(a)      Definition of Class 6 – Holdings Preferred Equity Interests

Holdings Preferred Equity Interests are all preferred equity Interests in Holdings.

(b)      Treatment of Class 6 – Holdings Preferred Equity Interests

Each Holder of an Allowed Holdings Preferred Equity Interest shall receive payment, in Cash, of its Pro Rata share of the Holdings Preferred Equity Interest Remainder, if any.

7.      **Class 7 – Holdings Equity Interests**

(a)      Definition of Class 7 – Holdings Equity Interests

Holdings Equity Interests are all equity Interests in Holdings other than Holdings Preferred Equity Interests.

(b)      Treatment of Class 7 – Holdings Equity Interests

Each Holder of an Allowed Holdings Equity Interest shall receive shall receive payment, in Cash, of its Pro Rata share of the Holdings Equity Interest Remainder, if any.

**D.**     **Post-Confirmation Operations of the Debtors**

On and after the Effective Date, the Creditor Trustee shall be authorized, in his sole and absolute discretion, to take all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or Filing any necessary paperwork or documentation. The Creditor Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries as provided herein. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

**E.**     **The Creditor Trustee**

**1.**     **Appointment of a Creditor Trustee**

The Debtors have selected Soneet R. Kapila to act as Creditor Trustee commencing on the Effective Date.  The Creditor Trustee shall perform the duties reserved for such person in the Plan.  The Creditor Trustee shall be the "representative of the estates" as contemplated by 11 U.S.C. § 1123(b)(3)(B) for all purposes, including to bring or assert Causes of Action, including under the D&O Policies.  The Creditor Trustee will hold and monetize all the Creditor Trust Assets in accordance with the provisions of this Plan.  The Creditor Trust, through the Creditor Trustee, shall succeed to all rights and interests provided to, and assume all obligations of, the Debtors, the Creditors' Committee and the Estates under the Asset Purchase Agreement, the Sale Order, the Settlement Agreement (including without limitation the rights conferred on the Creditors' Committee to enforce the Insider Subordination Agreements for the benefit of Holders of Non-Subordinated Holdings Claims pursuant to paragraph 13 of the Settlement Agreement) and the Settlement Order.

**2.**     **Powers and Obligations of the Creditor Trustee**

As of the Effective Date, the Creditor Trustee shall act in a fiduciary capacity for the Holders of all Allowed Claims thereunder, shall be deemed a representative of the Estates pursuant to 1123 of the Bankruptcy Code, and shall have the power and shall have the power and authority to act in such manner as the Creditor Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Creditor Trustee or provided herein and to conserve and protect the Creditor Trust Assets or to confer on the Creditors the benefits intended to be conferred upon them by the Plan and the Settlement Agreement.  The Creditor Trustee shall have the power and authority without further approval by the Bankruptcy Court to liquidate the Creditor Trust Assets and otherwise take any action as shall be necessary to administer the Chapter 11 Cases of the Debtors and effect the closing of the Debtors' Chapter 11 Cases, and shall have the rights and powers of a trustee under sections 542 through 552 of the Bankruptcy Code and the duties of a trustee under sections 704(1), (2), (4), (5), (7) and (9) of the Bankruptcy Code.  The Creditor Trustee shall administer the Plan, the

Creditor Trust and the Creditor Trust Assets, subject to the foregoing duties and powers, which shall include the following:

(a)     To open and maintain accounts in accordance with section 345 of the Bankruptcy Code;

(b)     To prosecute, compromise or settle Objections and to make or direct that Distributions be made to Holders of Allowed Claims;

(c)     To make decisions regarding the retention or engagement of Professionals and to pay all reasonable fees and expenses incurred after the Effective Date;

(d)     To make or direct Distributions to Holders of Allowed Claims and to otherwise implement and administer the Plan;

(e)     To pursue, litigate or settle all Causes of Action;

(f)     To conduct discovery pursuant to Fed. R. Bankr. P. 2004 or otherwise to investigate any potential Causes of Action;

(g)     To honor or enforce the provisions of the Asset Purchase Agreement, Sale Order, Settlement Agreement and Settlement Order;

(h)     To enforce the rights conferred upon the Creditors' Committee pursuant to Settlement Agreement to enforce the Insider Subordination Agreements for the benefit of Holders of Non-Subordinated Holdings Claims;

(i)     To prepare and file tax returns and collect Income Tax Refunds, including tax returns for the Creditor Trust as grantor trust in accordance with IRC Reg. Sec. 1.671-4(a);

(j)     To file with the Bankruptcy Court the reports and other documents and to pay any and all fees required by the Plan or otherwise required to close these Chapter 11 Cases, including the preparation and filing of a motion for a final decree;

(k)     To set off amounts owed to any Debtor against any and all amounts otherwise due to be distributed to the Holder of an Allowed Claim hereunder; and

(l)     To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan.

**3.     Engagement of Creditor Trustee Professionals and Compensation to Creditor Trustee and Creditor Trustee Professionals**

The Creditor Trustee shall be entitled to bill for his services at his usual hourly rate and will be compensated for such services at the Creditor Trustee's standard hourly rate. The Creditor Trustee may engage counsel, a claims administrator and other professionals to represent him in connection with his duties hereunder (the "Creditor Trustee Professionals"); *provided,*

21

*however*, that the Creditor Trustee Professionals shall not be precluded from representing the Creditor Trustee to the extent that certain of their Administrative Expense Claims remain unpaid from the Debtors' Estates. Any fees and expenses of such Creditor Trustee Professionals shall constitute "Post-Confirmation Administrative Expense Claims" and shall be paid from the Creditor Trust Funding, and otherwise from the net proceeds of the Creditor Trust Assets as set forth herein.

The Creditor Trustee and Creditor Trustee Professionals shall be paid 90% of their fees and 100% of their costs on a monthly basis, unless such fees relate to the pursuit of potential recoveries from the Creditor Trust Assets on a contingency fee basis as agreed upon between the Creditor Trustee and the Creditor Trustee Professionals (the "Contingency Fee"), in which case payment of such Contingency Fees (which are Post Confirmation Administrative Expense Claims) shall be paid from any such recoveries within thirty (30) days of receipt of the Creditor Trustee of such recoveries. The Creditor Trustee and Creditor Trustee Professionals shall File fee applications no less frequently than every 120 days seeking approval of fees and expenses to be awarded by the Bankruptcy Court, including approval of the amounts paid on a monthly basis. A Creditor Trustee Professional who fails to File an application seeking approval of compensation and expenses previously paid when such application is due every 120 days shall preclude such Creditor Trustee Professional from being paid monthly as provided herein until an interim fee application has been Filed and heard by the Bankruptcy Court. Upon the filing of each such application, the Creditor Trustee Professionals shall be entitled to request the payment of some or all of any pending holdbacks in fees. The Bankruptcy Court shall retain jurisdiction to allow or disallow all Post-Confirmation Administrative Claims of the Creditor Trustee and the Creditor Trustee Professionals. The invoices for services rendered and out-of-pocket expenses incurred which are to be submitted shall be sufficiently detailed to identify the hours worked, the rates charged and the work performed.

The Creditor Trustee may employ such staff as is reasonably necessary to carry out his/her functions and duties, store the books and records of the Debtors and compensate such staff.

### 4. Bond

The Creditor Trustee, if requested by the U.S. Trustee, shall post a bond in favor of the Debtors in an amount equal to 100% of the book value of the Creditor Trust Assets determined as of 30 days from the Effective Date; *provided, however*, that the book value of the Causes of Action for the purposes of the bond shall be zero. The cost of such bond is payable from the Creditor Trust Assets and shall be deemed an Other Administrative Claim.

### 5. Resignation, Death or Removal of the Creditor Trustee

The Creditor Trustee may resign at any time; *provided, however,* that he shall File a motion with the Bankruptcy Court in connection therewith and request that a successor or replacement be appointed in accordance herewith, which motion shall be on notice to the top twenty (20) unsecured creditors holding Allowed Claims and the Office of the United States

Trustee. The Office of the United States Trustee or any party in interest, by motion Filed with the Bankruptcy Court, or the Bankruptcy Court on its own order to show cause, may seek to remove the Creditor Trustee for cause, including under section 324 of the Bankruptcy Code, for the violation of any material provision of the Plan, or in the event the Creditor Trustee becomes incapable of acting hereunder as a result of physical or mental disability and such physical or mental disability continues for a period in excess of thirty (30) days (except in the case of death, in which instance the procedures for replacement will begin immediately). In the event of a resignation or removal, the Creditor Trustee, unless he is incapable of doing so, shall continue to perform his duties hereunder until such time as a successor is approved by a Final Order of the Bankruptcy Court. In the event the Creditor Trustee resigns or is removed, the successor shall be elected in the manner prescribed by section 1104(b) of the Bankruptcy Code.

**F.      Objections to Claims and Interests**

Subject to applicable law, from and after the Effective Date, the Creditor Trustee shall have the authority to file, settle, compromise, withdraw, arbitrate or litigate to judgment Objections to Claims and Interests pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Plan. Objections to any Claim, other than an Administrative Expense Claim, must be Filed and served on the claimant not later than the later of (i) the date established by order of the Bankruptcy Court for such objections (but not later than the Effective Date), or (ii) thirty (30) days after the date the Claim is Filed (the "Claim Objection Deadline"). The Creditor Trustee shall use reasonable efforts to promptly and diligently pursue resolution of any and all Disputed Claims. The Creditor Trustee shall be substituted for the Debtors or the Creditors' Committee, as the case may be, with respect to any Objections to Claims or Interests brought by such party which remain pending as of the Effective Date.

**G.      Distributions Under the Plan**

In accordance with Section 9.2 of the Plan and unless otherwise expressly provided therein, to the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided under the applicable provisions of the Plan.

Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth in the Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notices of address change filed with the Bankruptcy Court or delivered to the Creditor Trustee after the date on which any related Proof of Claim was Filed; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no Proof of Claim has been Filed and the Creditor Trustee has not received a written notice of a change of address.

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. To the extent that any Allowed Claim

23

entitled to a distribution, under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

No payment of Cash in an amount of less than $10.00 shall be required to be made on account of any Allowed Claim.

Unless otherwise expressly set forth herein with respect to a specific Claim or Class of Claims, for the purpose of the provisions of this Article, the "Face Amount" of a Disputed Claim means the amount set forth on the proof of Claim unless the Disputed Claim has been estimated for distribution purposes or, in the alternative, if no proof of Claim has been timely Filed or deemed Filed, zero.

Checks issued in respect of Distributions under the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, such Unclaimed Property shall be forfeited by such Holder. Pursuant to Local Rule 3011-1(B)(2), Unclaimed Property shall be redistributed to other creditors or administrative claimants.

On the Effective Date, or as soon thereafter as practicable, the Creditor Trustee shall distribute to the Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Professional Claims an amount equal to the Distribution for each respective Class as set forth in the Plan.

In connection with the Plan and the distributions made in accordance therewith, if and to the extent applicable, the Creditor Trustee shall comply with all tax withholding and reporting requirements imposed by any Governmental Unit and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Creditor Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## H.    Conditions to Confirmation

The following are conditions to entry of the Confirmation Order:

(a)    The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors.

## I.    Conditions to the Effective Date

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions are satisfied or, if waivable, waived:

(a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors, ABC and the Creditors' Committee;

(b)    The Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to section 1125 of the Bankruptcy Code;

(c)    All documents, instruments and agreements, in form and substance reasonably satisfactory to the Debtors, provided for under this Plan or necessary to implement this Plan, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

(d)    The Confirmation Order shall have become a Final Order (which requirement can be waived by the Debtors, in consultation with ABC and the Creditors' Committee).

## J.    Modification of the Plan

Subject to the restrictions on Plan modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation.

## K.    Effect of Confirmation

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law, including among other things, jurisdiction over the subject matters set forth in Article 12 of the Plan.

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against or Interest in the Debtors, and its respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

## L.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date and the transfer of the Post Confirmation Debtor Assets to the Creditor Trustee, the Bankruptcy Court shall retain jurisdiction over these Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims;

25

(b)    Hear and determine any and all Causes of Action against any Person and rights of the Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Chapter 5 of the Bankruptcy Code;

(c)    Grant or deny any applications for allowance of compensation for professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(d)    Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in these Chapter 11 Cases on the Effective Date;

(g)    Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code;

(h)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order;

(i)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(j)    Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

(k)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(l)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

26

(m)     Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order;

(n)     Enter any orders in aid of prior orders of the Bankruptcy Court; and

(o)     Enter a final decree closing these Chapter 11 Cases.

## M.     Treatment of Executory Contracts and Unexpired Leases

On the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Entity which (i) have not previously been assumed and assigned to the Purchaser pursuant to the terms of the Sale Order and Asset Purchase Agreement or (ii) are not the subject of pending motions to assume, assume and assign or reject as of the Confirmation Date, will be deemed rejected in accordance with the provisions and requirements of section 365 of the Bankruptcy Code.  The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving such rejections.  The listing of a contract or lease to be rejected pursuant to Section 6.1 of the Plan shall not constitute an admission by the Debtors that such contract or lease is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

To the extent that any and all D&O Policies are considered Executory Contracts, then notwithstanding anything herein to the contrary, such D&O Policies shall be deemed assumed and assigned to the Creditor Trust.  Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to the D&O Policies.  For the avoidance of any doubt, all rights under the D&O Policies shall be preserved and shall vest with the Creditor Trust and shall remain in full force and effect after the Effective Date for the term thereof; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such insurance policies, including the D&O Policies.

Proofs of Claim for alleged damages arising from the rejection pursuant to the Plan, the Confirmation Order or any subsequent Order of the Bankruptcy Court, of any executory contract or any unexpired lease shall be Filed with the Bankruptcy Court and served on counsel for the Debtor or the Creditor Trustee not later than thirty (30) days after the service of the earlier of: (i) notice of entry of the Confirmation Order or (ii) other notice that the executory contract or unexpired lease has been rejected (including service of an Order of the Bankruptcy Court providing for such rejection).  **Any Holder of a Claim arising from the rejection of any executory contract or any unexpired lease that fails to File a Proof of Claim on or before the date specified in this paragraph shall be forever estopped and enjoined from asserting such Claims in any manner against any of the Debtors, their Estates, any other Person or Entity or the Purchaser (or Filing Proofs of Claim with respect thereof) or their Property and the Debtors shall be forever discharged from all indebtedness or liability with respect to such Claims, and, if applicable, such Holders shall not be permitted to vote on the Plan or to**

participate in any distribution in this Chapter 11 Case on account of such Claims or to receive further notices regarding such Claims and shall be bound by the terms of the Plan.

The Bankruptcy Court shall determine any Objections to any Proofs of Claim Filed in accordance with Section 6.3 of the Plan at a hearing to be held at a date to be determined by the Bankruptcy Court. Allowed Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be either Class 1 Centers Claims or Class 3 Non-Subordinated Holdings Claims, as applicable, and treated in accordance therewith.

Notwithstanding anything in Article 6 of the Plan to the contrary, unless assumed by the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement, all employment and/or compensation agreements between the Debtors and any employees of the Debtors shall be deemed rejected in accordance with the provisions and requirements of section 365 of the Bankruptcy Code.

## N.    Preservation of Rights of Setoffs

The Debtors, through the Creditor Trustee, may, but shall not be required to, set off against any Claim, and the payment or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claims; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such Holder.

## O.    Exculpation and Limitation of Liability

Except as otherwise provided in the Plan, the Confirmation Order, the Sale Order, or any other Final Order of this Court, as of the Effective Date, neither the  Debtors, Creditors' Committee, ABC, Fronton, the Lenders, nor any of their respective employees, attorneys, representatives, financial advisors, investment bankers, advisors or agents, in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.   With respect to Professionals, the foregoing provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Chapter 11 Cases.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the

Confirmation Order.  Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision.  All such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder and under the Bankruptcy Code.    Notwithstanding anything herein to the contrary, the exculpation and limitation of liability provided for herein shall not apply to any acts of omissions that occurred prior to the Petition Date.  The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of this section shall not release any of the Causes of Action.

## V.    CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation Hearing for confirmation of the Plan (and for final approval of the Disclosure Statement) for _____ at ___ ___.m. (prevailing Eastern time) before the Honorable Robert A. Mark, Bankruptcy Judge for the Southern District of Florida located at the United States Bankruptcy Court, 51 S. W. 1st Ave, Courtroom 1406, Miami, Florida  33130.

The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.  The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served on or before _____ at ____ ___.m. (prevailing Eastern time) in the manner prescribed in the Notice accompanying this Disclosure Statement.

### B.    Confirmation Standards

For a plan to be confirmed, the Bankruptcy Court requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.  Section 1129 of the Bankruptcy Code also imposes requirements that at least one class of impaired claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interest of creditors, and that a plan be fair and equitable with respect to each class of claims or interests which is impaired under the plan.

The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Bankruptcy Code have been met.   The Debtors believe that the Plan satisfies all of the requirements for confirmation.

## VI.    FUNDING AND FEASIBILITY OF THE PLAN

### A.    Funding of the Plan

All distributions required to be made pursuant to the terms of this Plan, and the costs of administering such distributions incurred by the Creditor Trustee, shall be obtained (a) from Cash on hand in the Estates and/or (b) through recoveries under the Causes of Action; provided, however, ABC and/or Fronton shall fund any shortfall in the Centers Claim Reserve, the Professional Fee Claim Reserve or the Other Administrative Claim Reserve as necessary and as provided for in the Settlement Agreement.

### B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Debtors be able to perform their obligations under the Plan.  For the purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan.  The Debtors believe that they have adequate funding to be able to meet their obligations under the Plan.

### C.    Risk Factors Associated with the Plan

Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.  As discussed below in Article VII, if the Bankruptcy Court does not confirm the Plan, the Debtors could be forced to pursue a different plan with attendant costs to the Estates that could decrease distributions or could be forced to convert to Chapter 7, which could also diminish recoveries.

## VII.    ALTERNATIVES TO THE PLAN

Although this Disclosure Statement is intended to provide information to assist a Claim Holder in determining whether to vote for or against the Plan, a summary of alternatives to confirmation of the Plan may be helpful.

If the Plan is not confirmed with respect to any of the Debtors, the following alternatives are available:   (a) conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; or (b) dismissal of these Chapter 11 Cases leaving creditors and interest holders to pursue available non-bankruptcy remedies.  These alternatives to the Plan are very limited and not likely to benefit creditors.  The most likely result if the Plan was not confirmed is that these Chapter 11 Cases would be converted to cases under Chapter 7 of the Bankruptcy Code.  The Debtors believe that conversion of these Chapter 11 Cases to Chapter 7 cases would result in (i) significant delay in distributions to all creditors who could have received a distribution under the Plan and (ii) diminished or no recoveries for certain creditors and/or Interest Holders.  If these Chapter 11 Cases are dismissed, creditors would be free to pursue nonbankruptcy remedies in their attempts to satisfy claims against the Debtors.  However, in that

30

event, creditors would be faced with the costs and difficulties of attempting, each on its own, to collection claims from non-operating entities.

## VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

### A.    In General

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service.(the "IRS"). There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the beneficial owners of Claims (each a "Holder" and collectively, the "Holders")of Claims or the Debtors.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one

31

taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a. discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**B.**     <u>**U.S. Federal Income Tax Consequences to the Debtors**</u>

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise. to cancellation of debt ("<u>COD</u>") income, which must be included in the debtor's income. However, the Debtors should be able to utilize a special tax provision which excludes from income debts discharged in a Chapter 11 case (the "<u>Bankruptcy Exception</u>").

Under section 108(b) of the IRC and Treasury Regulations that apply to members of a consolidated group, each Debtor that does not recognize COD income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as consolidated net operating losses and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor, attributes that arose in separate return limitation years of such Debtor (if any), and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception. A "look-through rule" applies when asset basis reduction reduces the basis of stock of .another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that a significant portion of NOLs (and alternative minimum tax NOLs) of the Debtors will be eliminated after consummation of the Plan. Because the Debtors are liquidating rather than continuing to operate in reorganized form, and because substantially all of the Debtors' assets were sold to the Purchaser, any remaining NOLs allocable to the Debtors are not expected to have material value.

The liquidation of the Debtors may trigger income or gain recognition by the Debtors. However, the Debtors' existing NOLs and capital losses (prior to being reduced as a result of any attribute reduction) should generally first be available to offset any such income or gain (with any capital losses available to only offset capital gains). Based on the amount of the Debtors' NOLs, the Debtors do not anticipate owing regular U.S. federal income tax with respect to taxable years ending after the Petition Date. If, however, the IRS were to prevail in assessing U.S. federal income tax for any of these years or for tax years ending prior to the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where a NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of. computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). Although it is possible that the Debtors could be liable for the AMT, at this time the Debtors do not expect to incur a material amount of AMT.

### C.    U.S. Federal Income Tax Consequences to Holders of Claims

The U.S. federal income tax consequences of the implementation of the Plan to the Claimants, typical of the holders of Claims and Interests who are entitled to vote to confirm or reject the Plan, will depend on a number of factors, including:  (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes, (ii) the nature and origin of the Claim, (iii) the manner in which the holder acquired the Claim, (iv) the length of time the Claim has been held, (v) whether the Claim was acquired at a discount, (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year, (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim, (viii) the holder's method of tax accounting, (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (x) the timing of any distributions under the Plan.

### 1.    Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss

Claimants will generally not recognize gain, but may recognize loss, with respect to the amount in which the Claimants receive on their Claims (generally, the amount of cash and the fair market value of any other property received in satisfaction of the Debtors' obligations) that either exceeds, on one hand, or is less than, on the other hand, the Claimant's basis in the Claim. Thus, it is possible that certain Claimants may recognize a gain or loss as a result of distributions under the Plan.

In general, gain or loss is recognized by any such Claimant is either capital or ordinary in character.  The character is dependent upon the underlying nature of the Claim and whether such Claim, in the hands of the Claimant, constitutes a capital asset.  To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount.  A holder of a Claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim.  There may also be state, local or foreign tax considerations applicable to particular holders of Claims, none of which are discussed herein.  **Claimants should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.**

### 2.    Interest Income with respect to Allowed Claims

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. The Creditor Trustee intends to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed

34

Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

### D.    Backup Withholding and Information Reporting

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments may be subject to backup withholding.  Under the Tax Code's backup withholding rules, a U.S. Claimant may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Claimant:  (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.   Payments made to Foreign Claimants may also be subject to withholding, which may be reduced under an applicable Treaty.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U. S. federal income tax liability, and a Claimant may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

### IX.    CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtors recommend all Holders of Class 1, 2, 3 and 4 Claims and Class 5 Interests to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be ACTUALLY RECEIVED by the Balloting Agent on or before 4 p.m. (prevailing Eastern time) on _____.

Dated:  June 6, 2014

**SALAZAR JACKSON, LLP**
*Attorneys for Michael Phelan*
Two South Biscayne Blvd., Suite 3760
Miami, Florida 33131
Telephone: (305) 374-4848
Facsimile:  (305) 397-1021
Email:  Salazar@SalazarJackson.com (primary)


By:____/s/  Luis Salazar_____
        Luis Salazar
        Florida Bar No. 147788

# EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| **FLORIDA GAMING CENTERS, INC.**, *et al.* | Case No. 13-29597-BKC-RAM |
| Debtors. | |
| _____/ | Jointly Administered |

### JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
### FLORIDA GAMING CENTERS, INC. AND FLORIDA GAMING CORPORATION

Dated:  June 6, 2014

SALAZAR JACKSON, LLP
Luis Salazar, Esq.
Linda Worton Jackson, Esq.
Jesse R. Cloyd, Esq.
Two South Biscayne Blvd.
Suite 3760
Miami, FL  33131
Tel:  (305) 374-4848
Fax:  (305) 397-1021

*Attorneys for the Debtors and Debtors-in-Possession*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

ARTICLE 1    DEFINITIONS, INTERPRETATION AND RULES OF
CONSTRUCTION ........................................................................................ 2

1.1    Scope of Definitions ........................................................................ 2
1.2    Definitions ....................................................................................... 2
1.3    Rules of Interpretation ...................................................................14
1.4    Computation of Time ......................................................................15

ARTICLE 2    TREATMENT OF OTHER ADMINISTRATIVE CLAIMS,
PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, LENDERS
CENTERS CLAIMS AND STATUTORY FEES .............................................15

2.1    Other Administrative Claims ..........................................................15
2.2    Statutory Fees .................................................................................15
2.3    Professional Fee Claims .................................................................16
2.4    Priority Tax Claims .........................................................................16
2.5    Lenders Centers Claims ..................................................................16

ARTICLE 3    CLASSIFICATION, IMPAIRMENT AND VOTING OF CLASSIFIED
CLAIMS AND INTERESTS.........................................................................16

3.1    General.............................................................................................16
3.2    Classification and Impairment ........................................................16

ARTICLE 4    TREATMENT OF CLAIMS AND INTERESTS..........................................17

4.1    Class 1 (Centers Claims) .................................................................17
4.2    Class 2 (Lenders Holdings Claims) .................................................17

4.3    Class 3 (Non-Subordinated Holdings Claims).................................18
4.4    Class 4 (Subordinated Holdings Claims) .........................................18
4.5    Class 5 (Centers Equity Interests) ...................................................16
4.6    Class 6 (Holdings Preferred Equity Interests) .................................16
4.7    Class 7 (Holdings Equity Interests) .................................................16

ARTICLE 5    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE
PLAN .........................................................................................................18

5.1    Generally..........................................................................................18
5.2    Vesting of Remaining Assets in the Creditor Trust .........................18
5.3    Appointment of a Creditor Trustee ..................................................19
5.4    Preservation of Investigation and Litigation Rights ........................19
5.5    Derivative Litigation Claims ...........................................................19
5.6    Powers and Obligations of the Creditor Trustee ..............................19
5.7    Engagement of Creditor Trustee Professionals and Compensation
to Creditor Trustee and Creditor Trustee Professionals...................21
5.8    Bond ................................................................................................21

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.9 | Privileges | 22 |
| 5.10 | Taxpayer Identification Numbers | 22 |
| 5.11 | Resignation, Death or Removal of the Creditor Trustee | 22 |
| 5.12 | Dissolution of the Creditors' Committee | 22 |
| 5.13 | Dissolution of the Debtor Entities | 22 |
| 5.14 | Cancelation of Securities in Holdings | 23 |
| 5.15 | Closing of the Chapter 11 Cases | 23 |
| 5.16 | Post-Effective Date Settlements | 23 |
| 5.17 | Post-Effective Date Reporting | 23 |

ARTICLE 6  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; BENEFIT PROGRAMS ..... 24

| | | |
|---|---|---|
| 6.1 | Treatment of Executory Contracts and Unexpired Leases | 24 |
| 6.2 | Claims for Rejection Damages | 24 |
| 6.3 | Objections to and Treatment of Rejection Claims | 24 |
| 6.4 | Employment Agreements | 25 |

ARTICLE 7  POSTCONFIRMATION LITIGATION ..... 25

| | | |
|---|---|---|
| 7.1 | Transfer and Enforcement of Causes in Action | 25 |

ARTICLE 8  PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS GOVERNING DISTRIBUTIONS ..... 25

| | | |
|---|---|---|
| 8.1 | Objections to Claims and Interests | 25 |
| 8.2 | Amendments to Claims and Requests for Payment of Administrative Claims; Claims Filed After the Bar Dates | 26 |
| 8.3 | No Payment of Distribution Pending Allowance | 26 |

ARTICLE 9  DISTRIBUTIONS ..... 27

| | | |
|---|---|---|
| 9.1 | Timing of Distributions | 27 |
| 9.2 | No Duplicate Distributions | 28 |
| 9.3 | Delivery of Distributions in General | 28 |
| 9.4 | Cash Payments | 28 |
| 9.5 | Interest on Claims | 28 |
| 9.6 | No De Minimis Distributions | 28 |
| 9.7 | Face Amount | 28 |
| 9.8 | Unclaimed Property | 28 |
| 9.9 | Compliance with Tax Requirements | 29 |

ARTICLE 10  CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN ..... 29

| | | |
|---|---|---|
| 10.1 | Conditions to the Effective Date | 29 |

ARTICLE 11  EFFECT OF CONFIRMATION ..... 29

# TABLE OF CONTENTS

(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
|  | 11.1 | Jurisdiction of Court | 29 |
| ARTICLE 12 | RETENTION OF JURISDICTION | | 30 |
| ARTICLE 13 | ACCEPTANCE OR REJECTION OF THE PLAN | | 31 |
|  | 13.1 | Persons Entitled to Vote | 31 |
|  | 13.2 | Acceptance by Impaired Classes | 31 |
| ARTICLE 14 | EXCULPATION AND RELEASES | | 31 |
|  | 14.1 | Term of Injunctions or Stays | 31 |
|  | 14.2 | Exculpation | 32 |
|  | 14.3 | Injunction | 32 |
| ARTICLE 15 | MISCELLANEOUS PROVISIONS | | 33 |
|  | 15.1 | Modification of the Plan | 33 |
|  | 15.2 | Revocation of the Plan | 33 |
|  | 15.3 | Governing Law | 33 |
|  | 15.4 | No Admissions | 33 |
|  | 15.5 | Severability of Plan Provisions | 33 |
|  | 15.6 | Successors and Assigns | 34 |
|  | 15.7 | Exemption from Certain Transfer Taxes | 34 |
|  | 15.8 | Preservation of Rights of Setoffs | 34 |
|  | 15.9 | Defenses with Respect to Unimpaired Claims | 34 |
|  | 15.10 | No Injunctive Relief | 34 |
|  | 15.11 | Saturday, Sunday or Legal Holiday | 34 |
|  | 15.12 | Entire Agreement | 34 |
|  | 15.13 | Notices | 34 |

# INTRODUCTION

Florida Gaming Centers, Inc. ("**Centers**") and Florida Gaming Corporation ("**Holdings**"), as the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), propose this Joint Chapter 11 Plan of Liquidation of Florida Gaming Centers, Inc. and Florida Gaming Corporation  (including all addenda, exhibits, schedules, and other attachments hereto, as any of the same may be amended from time to time, all of which are incorporated herein by reference,  the "**Plan**") pursuant to the provisions of Chapter 11 of the Bankruptcy Code (as defined herein).

The Debtors urge all Holders of Claims against and Interests in the Debtors to read the Plan and the Disclosure Statement (as defined herein) in their entirety. To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials other than the Disclosure Statement and any schedules and exhibits attached thereto or referenced therein, or otherwise enclosed with the Disclosure Statement served by the  Debtors on interested parties, have been authorized by the  Debtors or the Bankruptcy Court (as defined herein) for use in soliciting acceptances of the Plan.   Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Federal Bankruptcy Rule 3019, the Debtors expressly reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation (after consultation with the Creditors' Committee and ABC (each as defined below)).

IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DEBTORS RECOMMEND THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTORS' BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE TRANSACTIONS TO WHICH THE DEBTORS WERE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY, INCLUDING PROFESSIONALS ENGAGED BY THE DEBTORS OR THE CREDITORS' COMMITTEE.

# ARTICLE 1

## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1** **Scope of Definitions.** For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 1 of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively. Whenever the context requires, capitalized terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**1.2** **Definitions.** In addition to such other terms as are defined in other Sections of the Plan, the following terms (which appear in the Plan as capitalized terms) used herein shall have the respective defined below.

**1.2.1 ABC** means ABC Funding, LLC, in its capacity as administrative agent under the Prepetition Credit Agreement.

**1.2.2 Administrative Claim** means any right to payment for any cost or expense of administration of these Chapter 11 Cases asserted or arising under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including, any (i) actual and necessary cost or expense of preserving the Debtors' Estates or operating the Debtors' business arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default on an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business arising on or after the Petition Date, (iv) Professional Fee Claims, (v) Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(2)(A) of the Bankruptcy Code, and (vi) fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

**1.2.3 Administrative Claim Remainders** means the Professional Fee Claim Remainder and the Other Administrative Claim Remainder.

**1.2.4 Administrative Claims Bar Date** means June 23, 2014, which is the date set by the Bankruptcy Court as the last day for filing all requests for payment of Administrative Claims.

**1.2.5 Affiliate** shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

**1.2.6 Allowed Claim or Allowed Interest** means a Claim against or Interest in a Debtor or any portion thereof (a) that has been allowed by a Final Order, or (b) as to which (i) no Proof of Claim or Proof of Interest has been filed with the Bankruptcy Court and (ii) the

-2-

liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed on or before the last date set by the Bankruptcy Court to file such objections, or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

   **1.2.7 Asset Purchase Agreement** means the Asset Purchase Agreement by and between Fronton Holdings, LLC or its assignee(s) and Florida Gaming Centers, Inc. and Florida Gaming Corporation, dated as of March 28, 2014.

   **1.2.8 Assets** means any and all property of the Estates as defined under and included in Section 541(a) of the Bankruptcy Code, including without limitation, all legal or equitable prepetition and postpetition interests of the Debtors in any and all real or personal property of any nature, including any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, tax refunds, cash, deposit accounts, reserves, deposits, equity interests, contractual rights, intellectual property rights, claims, causes of actions, assumed executory contracts and unexpired leases, other general intangibles, and the proceeds, products, offspring, rents or profits thereof.

   **1.2.9 Bankruptcy Code** means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in these Chapter 11 Cases.

   **1.2.10 Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Florida (Miami Division) having jurisdiction over these Chapter 11 Cases and, to the extent of any withdrawal of the reference under section 157 of title 28 of the United States Code, the United States District Court for the Southern District of Florida.

   **1.2.11 Bankruptcy Rules** means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (b) the Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (c) the Local Rules of the United States Bankruptcy Court for the Southern District of Florida and the guidelines and requirements of the Office of the United States Trustee, and (d) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to these Chapter 11 Cases or proceedings herein, as the case may be.

   **1.2.12 Bar Date** means January 2, 2014 which was established by the Bankruptcy Court as the deadline for filing and serving all Proofs of Claim (other than with respect to Governmental Unit Claims) against [and Proofs of Interest in] the Debtors in these Chapter 11 Cases.

**1.2.13 Bar Date for Governmental Unit Claims** means February 18, 2014, which was established by the Bankruptcy Court as the deadline for Governmental Units to file and serve all Proofs of Claim against the Debtors in these Chapter 11 Cases, including, without limitation, Claims for Taxes.

**1.2.14    Business Day** means any day other than a Saturday, Sunday or a Legal Holiday (as such term is defined in Federal Bankruptcy Rule 9006(a)).

**1.2.15    Cash** means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

**1.2.16 Causes of Action** means any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, any of the Debtors, whether arising before or after the Petition Date, including, without limitation, those which are: (i) property of the Estates under and pursuant to Section 541 of the Bankruptcy Code; (ii) for subrogation, contribution, set off and recoupment; (iii) for turnover; (iv) for avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under Section 506(c) of the Bankruptcy Code; (vii) for subordination under Section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) for professional malpractice against professionals employed by the Debtors; (xi) under and pursuant to any policies of insurance maintained by the Debtors; (xii) direct or derivative claims or causes of action of any type or kind, including the Derivative Litigation Claims and the Silverberg Derivative Litigation, as defined herein; (xiii) against any and all current and/or former officers and directors of the Debtors, and any of their affiliates, insiders, successors, and subsequent transferees, for, among other things, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, misrepresentation, corporate waste, deepening insolvency or breach of contract, regardless of whether or not such Causes of Action are specifically enumerated herein, in the Disclosure Statement, or elsewhere, (xiv) under and pursuant to any policies for insurance (including for bad faith) maintained by the Debtors, including, without limitation, any liability insurance policy and/or D&O Policies; (xv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xvi) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xvii) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; (xviii) or may be available to the Debtors against any third party(ies) under any legal or equitable theory, whether or not specifically identified or described herein or in the Disclosure Statement and (xix) to the extent not otherwise set forth above, as described in the Disclosure Statement; *provided, however,* for the avoidance of doubt, that no claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights

to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, any of the Debtors that were discharged, released, assigned, transferred or otherwise no longer held by the Debtors or the Debtors' Estates pursuant to the terms of the Settlement Agreement, Settlement Order, Asset Purchase Agreement and Sale Order are, shall be or shall be deemed to be Causes of Action.

      **1.2.17 Centers Claims** means all Allowed Claims (including Priority Claims and Priority Tax Claims) against Centers excluding however Administrative Claims against Centers, Claims assumed by Fronton under the Asset Purchase Agreement and the Lenders Centers Claims; *provided, however*, for the avoidance of doubt, that the Centers Claims shall not include the Collett Claims and the Holdings Intercompany Claim (each as defined in the Settlement Agreement), which have been waived pursuant to the terms of the Settlement Agreement.

      **1.2.18 Centers Claim Remainder** means any amounts left in the Centers Claim Reserve after satisfaction of all Centers Claims pursuant to the terms of this Plan and the Settlement Agreement.

      **1.2.19 Centers Claim Reserve** means a cash reserve established in connection with the Settlement Agreement and Sale and funded in the amount of $3,500,000; *provided however*, for the avoidance of doubt and notwithstanding the Centers Claim Reserve, all Centers Claims will be paid in full in accordance with the terms of the Settlement Agreement and this Plan.

      **1.2.20  Centers Equity Interests** means all equity Interests in Centers, including the Lenders Centers Interests.

      **1.2.21 Chapter 11 Cases** means collectively, the chapter 11 cases captioned *In re Florida Gaming Centers, Inc., et al.,* Case No. 13-29597-BKC-RAM, pending before the Bankruptcy Court.

      **1.2.22  Claim** means a right of a Creditor against the Debtors, or any one of them, whether or not asserted or allowed, of the type described in section 101(5) of the Bankruptcy Code, as construed by section 102(2) of the Bankruptcy Code.

      **1.2.23  Class** means one or more Claims or Interests as classified in a particular class under the Plan pursuant to sections 1122 and 1123 of the Bankruptcy Code.

      **1.2.24  Collateral** means any property or interest in property of the Estate of any Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance or is otherwise invalid under the Bankruptcy Code or applicable state law.

      **1.2.25  Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket pursuant to Bankruptcy Rule 5003(a).

**1.2.26 Confirmation Hearing** means the duly noticed hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1128, including any continuances thereof.

**1.2.27 Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

**1.2.28 Creditor** means any Person or Entity who holds a Claim against any of the Debtors.

**1.2.29 Creditor Trust** means the grantor trust to be created on the Effective Date pursuant to this Plan under the control of the Creditor Trustee and into which the Creditor Trust Assets will vest.

**1.2.30 Creditor Trust Agreement** means that certain grantor trust agreement to be executed and delivered by and between the Debtors and the Creditor Trustee on the Effective Date, the form of which trust agreement will be filed with the Bankruptcy Court on or before the Effective Date.

**1.2.31 Creditor Trustee** means Soneet R. Kapila.

**1.2.32 Creditor Trust Assets** means all Assets of the Estates existing and remaining as of the Effective Date (including without limitation, the Causes of Action, the D&O Policies, the D&O Claims, the Income Tax Refund, and the Cash (including the Centers Claims Reserve, the Initial Holdings Distribution Amount, the Other Administrative Claim Reserve and the Professional Fee Claim Reserve)), which Assets shall be transferred to and vest in the Creditor Trust pursuant to the terms of this Plan as of the Effective Date.

**1.2.33 Creditor Trust Funding** means an amount equal to $75,000 that will be transferred from the Professional Fee Claim Reserve to the Creditor Trust on the Effective Date.

**1.2.34 Creditors' Committee** means the Official Joint Committee of Unsecured Creditors appointed in the Chapter 11 Cases of Centers and Holdings.  As of the date hereof, the Committee consists of the following members:    Florida Lemark Corporation; SHFL Entertainment (as acquired by Bally Technologies, Inc. post-petition); Tampa Bay Downs, Inc.; S. Oden Howell, Jr.; and Miami Gaming Ventures.

**1.2.35 D&O Claims** means any and all Causes of Action against any and all current and/or former officers and directors of the Debtors, and any of their affiliates, insiders, successors, and subsequent transferees, for, among other things, breach of fiduciary duty, aiding and abetting breach of fiduciary duty negligence, misrepresentation, or breach of contract.

**1.2.36 D&O Policies** means any and all insurance policies of any or all of the Debtors providing coverage for claims against directors, officers, executives, or employees, including but not limited to that certain Executive and Organization Liability Insurance Policy,

-6-

dated March 5, 2012, provided by National Union Fire Insurance Company of Pittsburgh, Pa. and/or its affiliates, Policy No. 01-608-45-71, as well as any and all amendments, endorsements, renewals, extensions, binders, or similar documents relating thereto, including but not limited to that certain Extension Binder of Insurance dated March 5, 2014, with an extended policy period through and including March 5, 2015, along with any and all other policies of insurance, including but not limited to that certain Employment Edge Employment Practices Liability Insurance Policy, dated March 5, 2013, provided by Illinois National Insurance Company and/or its affiliates, Policy No. 01-818-59-13 (Replacement of Policy No. 01-614-15-54), as well as any and all amendments, endorsements, renewals, extensions, binders, or similar documents relating thereto.

**1.2.37 D&O Recovery** means any cash proceeds of any D&O Claims and/or D&O Policies.

**1.2.38 Debtor(s)** means, individually, Centers and Holdings,  and collectively all of them, including in their capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**1.2.39 Disallowed** means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in a Debtor which (i) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court, (ii) has been withdrawn by agreement of the  Debtors and the Holder thereof, in whole or in part, (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a Proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim or Proof of Interest, or (vi) is deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such Proof of Claim or Proof of Interest was not timely or properly Filed.  In each case a Disallowed Claim or Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

**1.2.40 Disallowed Claim** means a Claim, or any portion thereof, that is Disallowed.

**1.2.41 Disallowed Interest** means an Interest, or any portion thereof, that is Disallowed.

**1.2.42 Disclosure Statement** means that certain *Disclosure Statement in Connection with Joint Chapter 11 Plan of Liquidation of Florida Gaming Centers, Inc. and Florida Gaming Corporation*, including the schedules and exhibits attached thereto, as amended, modified or supplemented from time to time, that is prepared and will be distributed (upon approval of the

Bankruptcy Court) in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

       **1.2.43  Disputed** means with respect to a Claim or Interest, any Claim or Interest that has not been Allowed by a Final Order as to which (a) a Proof of Claim or Proof of Interest has been Filed with the Bankruptcy Court, or is deemed Filed under applicable law or order of the Bankruptcy Court, and (b) an Objection to such Claim or Interest has been or may be timely Filed or deemed Filed under applicable law by the Debtors or any other party in interest and any such Objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order.  For purposes of the Plan, a Claim or Interest that has not been Allowed by a Final Order shall be considered a Disputed Claim or Disputed Interest, whether or not an Objection has been or may be timely Filed, to the extent (A) the amount of the Claim or Interest specified in the Proof of Claim or Proof of Interest exceeds the amount of any corresponding Claim or Interest in the Schedules, (B) the classification of the Claim or Interest specified in the Proof of claim or Interest differs from the classification of any corresponding Claim or Interest listed in the Schedules, (C) any corresponding Claim or Interest has been listed in the Schedules as zero or as Disputed, contingent or unliquidated, (D) no corresponding Claim or Interest has been listed in the Schedules or (E) such Claim or Interest is reflected as zero or as unliquidated or contingent in the Proof of Claim or Proof of Interest Filed in respect thereof.

       **1.2.44  Disputed Claim** means a Claim, or any portion thereof, that is Disputed.

       **1.2.45  Disputed Interest** means an Interest, or any portion thereof, that is Disputed.

       **1.2.46  Distribution** means each distribution of Cash to Holders of Allowed Claims or Allowed Interests pursuant to and under the terms of this Plan by the Creditor Trustee on each Distribution Date.

       **1.2.47  Distribution Date** means the dates on which a Holder of an Allowed Claim or Holder of an Allowed Interest shall receive a Distribution of Cash under the terms of the Plan, which dates shall be (a) the Effective Date, and (b) such other dates designated in the Confirmation Order or as determined by the Creditor Trustee.

       **1.2.48  Effective Date** means the later of (i) the fifteenth (15th) day following the Confirmation Date and (ii) the date upon which all of the conditions precedent to the Effective Date as set forth in Article 10 are satisfied or waived in accordance therewith.

       **1.2.49  Entity** means an entity as defined in section 101(15) of the Bankruptcy Code.

       **1.2.50  Estate** means, with regard to each Debtor, the estate that was created by the commencement by such Debtor of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges and Causes of Action of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or

extensions of time that such Debtor or such estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of these Chapter 11 Cases, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise. "Estates" has a correlative meaning.

 **1.2.51 File or Filed** means file or filed with the Bankruptcy Court in these Chapter 11 Cases.

 **1.2.52 Final Decree** means the final decree entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

 **1.2.53 Final Order** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

 **1.2.54 Fronton** means Fronton Holdings, LLC, the purchaser under the Asset Purchase Agreement.

 **1.2.55 Holder** means the holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

 **1.2.56 Holdings Equity Interest Remainder** means any amounts remaining for payment to the Holders of Holdings Equity Interests after payment in full of the Holdings Preferred Equity Interests pursuant to the terms of the Settlement Agreement and this Plan.

 **1.2.57 Holdings Equity Interests** means all equity Interests in Holdings other than Holdings Preferred Equity Interests.

 **1.2.58 Holdings Preferred Equity Interest Remainder** means any amounts remaining for payment to the Holders of Preferred Equity Interests after payment in full of the Subordinated Holdings Claims pursuant to the terms of the Settlement Agreement and this Plan.

 **1.2.59 Holdings Preferred Equity Interests** means all preferred equity Interests in Holdings.

**1.2.60 Initial Holdings Distribution Amount** means cash in the amount of $2,403,202.

**1.2.61 Impaired** shall have the meaning ascribed to it in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

**1.2.62 Income Tax Refunds** means all refunds of tax that may be paid to any of the Debtors, their subsidiaries, and consolidated, combined or unitary tax group, whether Federal, state or local, including, without limitation, as a result of a carryback (including a carryback pursuant to an election under Tax Code Section 172(b)(1)(H)) by the Debtors and/or their subsidiaries of net operating losses and alternative minimum tax net operating losses.

**1.2.63 Interests** means any and all equity interests, ownership interests or shares in any of the Debtors and issued by any of the Debtors prior to the Petition Date (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in any of the Debtors, partnership interests in any of the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of any of the Debtors or obligating any of the Debtors to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security.

**1.2.64 IRC** means the Internal Revenue Code of 1986, as amended from time to time.

**1.2.65 Lenders** means the lenders from time to time to the Prepetition Credit Agreement, and their successors and assigns.

**1.2.66 Lenders Centers Claims** means Allowed Claims of the Lenders against Centers arising under the Prepetition Credit Agreement and allowed pursuant to the Settlement Agreement.

**1.2.67 Lenders Centers Interests** means Allowed Interests of the Lenders in Centers arising under the Prepetition Credit Agreement and related agreements and allowed pursuant to the Settlement Agreement.

**1.2.68 Lenders Holdings Claims** means Allowed Claims of the Lenders against Holdings arising under the Prepetition Credit Agreement and related agreements and allowed pursuant to the Settlement Agreement.

**1.2.69 Lien** means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

**1.2.70  Local Rules** means the Local Rules of the United States Bankruptcy Court for the Southern District of Florida and the guidelines and requirements of the Office of the United States Trustee for the Southern District of Florida.

**1.2.71  Non-Subordinated Holdings Claims** means all non-subordinated Claims against Holdings, other than the Lender Holdings Claims and any Administrative Claims against Holdings.

**1.2.72  Objection** means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to Disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) or Interest other than a Claim or an Interest that is Allowed.

**1.2.73  Other Administrative Claims** means Administrative Claims against either of Centers or Holdings other than a Professional Fee Claim; *provided*, *however*, that any Other Administrative Claim of any one Debtor against either Centers or Holdings have been released pursuant to the terms of the Settlement Agreement; *provided*, *further*, that the Estates will continue to satisfy their obligations in the ordinary course of business arising from and after the Effective Date.

**1.2.74  Other Administrative Claim Remainder** means any amounts left in the Other Administrative Claim Reserve after satisfaction of all Allowed Other Administrative Claims.

**1.2.75  Other Administrative Claim Reserve** means a cash reserve in the amount of $250,000 established pursuant to the terms of the Settlement Agreement for the payment of Allowed Other Administrative Claims; *provided, however,* for the avoidance of doubt and notwithstanding the Other Administrative Claim Reserve, all Allowed Other Administrative Claims will be paid in full and satisfied pursuant to the terms of the Settlement Agreement and this Plan.

**1.2.76  Person** means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization, or a governmental unit as defined in section 101(41) of the Bankruptcy Code.

**1.2.77  Petition Date** means August 19, 2013.

**1.2.78  Plan** means this Joint Chapter 11 Plan of Liquidation of Florida Gaming Centers, Inc. and Florida Gaming Corporation, and all exhibits annexed hereto or referenced herein, as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

**1.2.79  Post-Confirmation Administrative Claim** means a Claim for services rendered or expenses incurred after the Effective Date in connection with these Chapter 11 Cases by the Creditor Trustee and/or the Professionals employed by the Creditor Trustee.

**1.2.80 Prepetition Credit Agreement** means that certain credit agreement by and among ABC, as administrative agent, Centers, as Borrower, Holdings, and the lenders from time to time thereunder, dated as of April 25, 2011.

**1.2.81 Priority Claim** means a Claim to the extent that it is of a kind described in, and entitled to priority under, sections 507(a)(2),(a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

**1.2.82 Priority Tax Claim** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.2.83 Professional** means a Person (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331 and 363 (solely in the case of ordinary course professionals) of the Bankruptcy Code, (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, and (c) employed by the Creditor Trustee from and after the Effective Date.

**1.2.84 Professional Fee Claim** means a Claim of a Professional retained in these Chapter 11 Cases by the Debtors or the Creditors' Committee pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code or otherwise, for compensation or reimbursement of actual and necessary costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date; *provided*, for the avoidance of doubt, that fees and expenses incurred by the Creditor Trustee and the Professionals employed by the Creditor Trustee shall be Post Confirmation Administrative Claims.

**1.2.85 Professional Fee Claim Remainder** means any amounts left in the Professional Fee Claim Reserve after satisfaction of all Professional Fee Claims.

**1.2.86 Professional Fee Claim Reserve** means a reserve in the amount of $1,810,000 established for the payment of Professional Fee Claims pursuant to the Post-Closing Fee Budget (as defined in the Settlement Agreement); *provided however*, for the avoidance of doubt and notwithstanding the Professional Fee Claim reserve, all Allowed Professional Fee Claims will be paid in full pursuant to the terms of the Settlement Agreement and this Plan.

**1.2.87 Proof of Claim** means any proof of Claim Filed with the Bankruptcy Court with respect to any of the Debtors pursuant to Bankruptcy Rules 3001 or 3002.

**1.2.88 Proof of Interest** means any proof of Interest Filed with the Bankruptcy Court with respect to any of the Debtors pursuant to Bankruptcy Rule 3002.

**1.2.89 Pro Rata** means the proportion by amount that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion by amount that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such

-12-

Allowed Claim under the Plan; *provided, however,* that in no event shall the amount of consideration distributed on account of an Allowed Claim exceed 100% of the amount of the Allowed Claim.

**1.2.90  Rejection Claim** means a Claim for damages resulting from the rejection of an executory contract by the Debtors pursuant to **Section 6.2** of the Plan.

**1.2.91  Sale** means the sale of substantially all of the Assets of Centers and Holdings to Fronton pursuant to, as defined in and in accordance with the terms of the Asset Purchase Agreement, as approved by the Bankruptcy Court in the Sale Order.

**1.2.92  Sale Order** means the *Order Under 11 U.S.C. §§ 105, 363 and Fed. R. Bankr. P. 2002, 6004, 6006, 9007, 9019, and 9014 Approving (A) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts to Successful Bidder; and (C) Related Relief*, entered by the Bankruptcy Court on April 7, 2014, approving the Sale.

**1.2.93  Scheduled** means as set forth on the Schedules.

**1.2.94  Schedules** means the Schedules of Assets and Liabilities Filed by the Debtors in accordance with Bankruptcy Code section 521 and Federal Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Federal Bankruptcy Rule 1009.

**1.2.95  Settlement Agreement** means that certain settlement agreement entered into as of March 19, 2014 by and among (a) Centers, Holdings, Tara Club and Freedom, on behalf of themselves and their respective chapter 11 bankruptcy estates; (b) the Creditors' Committee; (c) ABC; and (d) William B. Collett and William B. Collett, Jr., approved by the Bankruptcy Court pursuant to the Settlement Order, which Settlement Agreement is incorporated herein by reference and attached as **Exhibit A** hereto.

**1.2.96  Settlement Order** means the *Order Pursuant to Fed. R. Bankr. P. Approving Settlement and Compromise By and Among the Debtors and Their Respective Estates, William B. Collett, William B. Collett, Jr., ABC Funding, LLC, and the Official Joint Committee of Unsecured Creditors,* entered by the Bankruptcy Court on March 20, 2014, approving the Settlement Agreement.

**1.2.97  Subordinated Holdings Claims** means unsecured subordinated Claims against Holdings.

**1.2.98  Subordinated Holdings Claim Remainder** means any amounts remaining for payment to the Holders of Subordinated Holdings Claims after payment in full of the Non-Subordinated Holdings Claims pursuant to the terms of the Settlement Agreement and this Plan.

**1.2.99  Taxes** means all income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, excise, sales, use, employment, withholding,

property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign governmental authority on or from any of the Debtors.

**1.2.100  U. S. Trustee** means the Office of the United States Trustee.

**1.2.101  Unimpaired** means any Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.3**    **Rules of Interpretation.**

**1.3.1** In the event of an inconsistency, (a) the provisions of the Plan shall control over the contents of the Disclosure Statement, and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

A.    For the purposes of the Plan:

(1)  any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; provided, however, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document expressly provides otherwise;

(2)  any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or Plan schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(3)  unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Plan Schedules" are references to Sections, Articles, Exhibits and Plan Schedules of or to the Plan;

(4)  unless otherwise specified, the words "herein," "hereof," "hereto," "thereunder" and others of similar import, refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(5)  captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part of or to affect interpretations of the Plan; and

(6)  the word "including" means "including without limitation."

B.    Whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date or as soon as reasonably practicable thereafter.

-14-

C.    All exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

D.    Subject to the provisions of any contract, certificate, bylaws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

E.    This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, ABC, the Creditors' Committee, and certain other creditors and constituencies. Each of the foregoing was represented by counsel who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "*contra proferentum*" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, any of the exhibits to the Plan, or any contract, instrument, release, indenture, or other agreement or document generated in connection herewith.

**1.4    Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Federal Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2

## TREATMENT OF OTHER ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, LENDERS CENTERS CLAIMS AND STATUTORY FEES

**2.1    Other Administrative Claims.**  Each Holder of an Allowed Other Administrative Claim shall receive on account of, and in full satisfaction, settlement and release of and in exchange for such Allowed Other Administrative Claim, Cash equal to the unpaid portion of such Allowed Other Administrative Claim, upon the earlier to occur of (i) ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Other Administrative Claim; *provided*, *however*, that Other Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto. Other Administrative Claims must be filed on or before the Administrative Claims Bar Date.

**2.2    Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 shall be paid in full by the  Debtors in Cash.  Following the Effective Date, the Creditor Trustee shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930 for post-confirmation periods based upon disbursements made by the Creditor Trustee until the earlier of the closing of the Chapter 11 Cases of the

Debtors by the issuance of a final decree by the Bankruptcy Court or upon the entry of an order by the Bankruptcy Court dismissing or converting the Chapter 11 Cases of the Debtors to another chapter under the Bankruptcy Code.  The fees due and payable to the U.S. Trustee in respect of the Distribution (by the Debtors or the Creditor Trustee) of the Centers Claim Reserve, the Initial Holdings Distribution Amount, the Other Administrative Claim Reserve and the Professional Fee Claim Reserve shall be deemed an Allowed Other Administrative Claim.

**2.3    Professional Fee Claims.**  On or prior to the deadline set by the Bankruptcy Court for Professionals to File final fee applications, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date.  Within ten (10) days after entry of an Order with respect to its final fee application, as applicable, either the Debtors or the Creditor Trustee, as applicable, shall pay the Allowed Professional Fee Claims of each Professional.

**2.4    Priority Tax Claims.**  Each Holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, payment in full in Cash upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Priority Tax Claim.

**2.5    Lenders Centers Claims.**  The Lenders Centers Claims were satisfied in full pursuant to the terms of the Settlement Agreement and the Sale Order and shall not be classified, nor entitled to vote or receive any Distribution on account of such Lenders Centers Claims pursuant to this Plan.

## ARTICLE 3

## CLASSIFICATION, IMPAIRMENT AND VOTING OF CLASSIFIED CLAIMS AND INTERESTS

**3.1    General.**  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims against and Interests in Centers and Holdings. A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class. A Claim or Interest is also placed in a particular Class for purposes of receiving a distribution under the Plan, but only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released, or otherwise settled prior to the Effective Date.  Except as otherwise expressly set forth in this Plan, a Claim or Interest which is not an Allowed Claim or Allowed Interest shall not receive any payments, rights or distributions under this Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims of the kinds specified in section 507(a)(2) and Priority Tax Claims of the kinds specified in section 507(a)(8) of the Bankruptcy Code have not been classified and are treated as set forth in Article 2 above.

**3.2    Classification and Impairment.**  The Plan includes a separate plan of liquidation for each of the Debtors.  The Plan does not seek to effect a substantive consolidation or other

combination of the separate Estates of each Debtor but instead provides that creditors of each Debtor will be permitted to assert their Claims only against the Debtor(s) against which they hold Allowed Claims. The following summary is for the convenience of all interested parties and is superseded for all purposes by the classification, description and treatment of Claims and Interests in **Article 4** of the Plan.

        **3.2.1** **Class 1:  Centers Claims**. Class 1 consists of Allowed Centers Claims. Class 1 is Impaired and entitled to vote on the Plan.

        **3.2.2** **Class 2:  Lenders Holdings Claims.** Class 2 consists of Allowed Lenders Holdings Claims.  Class 2 is Impaired and entitled to vote on the Plan.

        **3.2.3** **Class 3: Non-Subordinated Holdings Claims.** Class 3 consists of Allowed Non-Subordinated Holdings Claims.  Class 3 is Impaired and entitled to vote on the Plan.

        **3.2.4** **Class 4: Subordinated Holdings Claims**.  Class 4 consists of Allowed Subordinated Holdings Claims.  Class 4 is Impaired and entitled to vote on the Plan.

        **3.2.5** **Class 5: Centers Equity Interests.** Class 5 consists of Allowed Centers Equity Interests.  Class 5 is Impaired and entitled to vote on the Plan.

        **3.2.6** **Class 6: Holdings Preferred Equity Interests.** Class 6 consists of Allowed Holdings Preferred Equity Interests.  Class 6 is Unimpaired and the Holders therein are presumed to have voted to accept the Plan; *provided*, *however*, that in the event Class 6 is found to be Impaired, it will be deemed to reject the Plan and will not be entitled to vote on the Plan.

        **3.2.7** **Class 7: Holdings Equity Interests.** Class 7 consists of Allowed Holdings Equity Interests.  Class 7 is Unimpaired and the Holders therein are presumed to have voted to accept the Plan; *provided*, *however*, that in the event Class 7 is found to be Impaired, it will be deemed to reject the Plan and will not be entitled to vote on the Plan.

## ARTICLE 4

## TREATMENT OF CLAIMS AND INTERESTS

    **4.1**    **Class 1 (Centers Claims).**  Each Holder of an Allowed Centers Claim shall receive payment in full, in Cash, of the allowed amount of its Centers Claim, exclusive of any post-petition interest and/or fees of any kind, upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing each such Centers Claim.

    **4.2**    **Class 2 (Lenders Holdings Claims).**  The Holders of Lenders Holdings Claims received a partial Distribution (or were deemed to have received a partial Distribution) in respect of the Lenders Holdings Claims pursuant to the Settlement Agreement and Sale Order, and shall receive no further Distribution pursuant to the Plan on account of the Allowed Lenders Holdings Claims other than any distributions provided pursuant to the terms of the Settlement Agreement.

**4.3    Class 3 (Non-Subordinated Holdings Claims).**  Each Holder of an Allowed Non-Subordinated Holdings Claim shall receive payment, in Cash, of its Pro Rata share of (a) the Initial Holdings Distribution Amount; (b) (i) the Centers Claim Remainder, if any, and (ii) that portion of the Administrative Claim Remainder, if any, distributable to the Estates of the Debtors pursuant to section 6 of the Settlement Agreement, in each case pursuant to the terms of the Settlement Agreement;  (c) the proceeds of Causes of Action, including in respect of the D&O Claims (net of Post Confirmation Administrative Claims related thereto), and (d) the proceeds (net of Post Confirmation Administrative Claims) from the liquidation of the balance of the Creditor Trust Assets; *provided*, *however*, that for the avoidance of doubt, Holders of Allowed Non-Subordinated Holdings Claims shall not receive payment of any post-petition interest and/or fees of any kind.  The initial Distributions to Holders of Allowed Non-Subordinated Holdings Claims shall be made upon the earlier to occur of (i) within ten (10) Business Days after the Effective Date, or (ii) ten (10) Business Days after the entry of a Final Order allowing such Non-Subordinated Holdings Claim.  Thereafter, Distributions to Holders of Allowed Non-Subordinated Holdings Claims shall be made on such other Distribution Dates as determined by the Creditor Trustee.

**4.4    Class 4 (Subordinated Holdings Claims).**  Each Holder of an Allowed Subordinated Holdings Claim shall receive payment, in Cash, of its Pro Rata share of the Subordinated Holdings Claim Remainder, if any; *provided*, *however*, that for the avoidance of doubt, Holders of Allowed Subordinated Holdings Claims shall not receive payment of any post-petition interest and/or fees of any kind.

**4.5    Class 5 (Centers Equity Interests)**.  The Holders of Centers Equity Interests shall receive Distributions on account of such Interests pursuant to this Plan from the net proceeds of Causes of Action, if any, after payment in full of all Allowed Claims in Class 1 above, *provided, however*, that the Lenders have agreed, in the Settlement Agreement, to waive any such Distribution on account of such Lenders Centers Interests.

**4.6    Class 6 (Holdings Preferred Equity Interests).**  Each Holder of an Allowed Holdings Preferred Equity Interest shall receive payment, in Cash, of its Pro Rata share of the Holdings Preferred Equity Interest Remainder, if any.

**4.7    Class 7 (Holdings Equity Interests).**  Each Holder of an Allowed Holdings Equity Interest shall receive shall receive payment, in Cash, of its Pro Rata share of the Holdings Equity Interest Remainder, if any.

## ARTICLE 5

## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

**5.1    Generally**.  This Plan is a liquidating plan.  The Creditor Trustee shall make Distributions in accordance with the provisions of this Plan and the Confirmation Order.

**5.2    Vesting of Remaining Assets in the Creditor Trust**.  On the Effective Date, except as otherwise expressly provided in the Plan, all Assets of the Estates in existence as of the

Effective Date (including specifically all Causes of Action, the D&O Policies and any claims arising thereunder) shall be transferred to and vest in the Creditor Trust, free and clear of all Liens, encumbrances, or interests of any kind.

**5.3     Appointment of a Creditor Trustee**.  On or prior to the Effective Date, the Debtors shall appoint a Creditor Trustee.  The Creditor Trustee shall perform those duties reserved for such person in the Plan.  The Creditor Trustee shall be the "representative of the estates" as contemplated by 11 U.S.C. § 1123(b)(3)(B) for all purposes, including to bring or assert Causes of Action, including under the D&O Policies.  The Creditor Trustee will hold and monetize all the Creditor Trust Assets in accordance with the provisions of this Plan.  The Creditor Trust, through the Creditor Trustee, shall succeed to all rights and interests provided to, and assume all obligations of, the Debtors, the Creditors Committee and the Estates under the Asset Purchase Agreement, the Sale Order, the Settlement Agreement (including without limitation the rights conferred on the Committee to enforce the Insider Subordination Agreements for the benefit of Holders of Non-Subordinated Holdings Claims pursuant to paragraph 13 of the Settlement Agreement) and the Settlement Order.

**5.4     Preservation of Investigation and Litigation Rights**.  The Creditor Trustee, on behalf of the Creditor Trust, shall retain all rights of, and on behalf of, the Debtors and the Creditor Trust to investigate, conduct discovery on, pursuant to Fed. R. Bankr. P. 2004 or otherwise, and to commence and pursue any and all Causes of Action, regardless of whether or not such Causes of Action are specifically enumerated herein, in the Disclosure Statement, or elsewhere, and all such rights shall not be deemed modified, waived, released in any manner, nor shall confirmation of the Plan or the Confirmation Order act as *res judicata* or limit the Creditor Trustee's rights to investigate, conduct discovery on pursuant to Fed. R. Bankr. P. 2004 or otherwise, and to commence and pursue any and all Causes of Action to the extent the Creditor Trustee deems appropriate.

**5.5     Derivative Litigation Claims.**  Causes of Action that are derivative of or from the Debtors (the "**Derivative Litigation Claims**") are property of the Estate under section 541 of the Bankruptcy Code.  On and after the Effective Date, all such Derivative Litigation Claims, including the litigation pending in the United States District Court for the Southern District of Florida captioned *Herbert Silverberg, individually and derivatively on behalf of Florida Gaming Corporation v. Bennett Collett, et. al.*, Case No. 14-CV-21615 (the "**Silverberg Derivative Litigation**"), regardless of whether pending on the Petition Date, will be retained by, vest in, and/or become property of the Creditor Trust and shall be administered by the Creditor Trustee.  All named plaintiffs in the actions pending on the Effective Date relating to any Derivative Litigation Claims, including the Silverberg Derivative Litigation, and their respective servants, agents, attorneys, and representatives shall, on and after the Effective Date, be permanently enjoined, stayed, and restrained from pursuing or prosecuting any Derivative Litigation Claim, including the Silverberg Derivative Litigation, and the Creditor Trustee shall be, without need of further order, substituted as plaintiff upon his request.

**5.6**    <u>**Powers and Obligations of the Creditor Trustee**</u>.  As of the Effective Date, the Creditor Trustee shall act in a fiduciary capacity for the Holders of all Allowed Claims hereunder, shall be deemed a representative of the Estates pursuant to section 1123 of the Bankruptcy Code, and shall have the power and authority to act in such manner as the Creditor Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Creditor Trustee or provided herein and to conserve and protect the Creditor Trust Assets or to confer on the Creditors the benefits intended to be conferred upon them by this Plan and the Settlement Agreement.  The Creditor Trustee shall have the power and authority without further approval by the Bankruptcy Court to liquidate the Creditor Trust Assets and otherwise take any action as shall be necessary to administer the Chapter 11 Cases of the Debtors and effect the closing of the Debtors' Chapter 11 Cases, and shall have the rights and powers of a trustee under sections 542 through 552 of the Bankruptcy Code and the duties of a trustee under sections 704(1), (2), (4), (5), (7) and (9) of the Bankruptcy Code.  The Creditor Trustee shall administer the Plan, the Creditor Trust and the Creditor Trust Assets, subject to the foregoing duties and powers, which shall include the following:

(a)    To open and maintain accounts in accordance with section 345 of the Bankruptcy Code;

(b)    To prosecute, compromise or settle Objections and to make or direct that Distributions be made to Holders of Allowed Claims and Allowed Interests;

(c)    To make decisions regarding the retention or engagement of Professionals and to pay all reasonable fees and expenses incurred after the Effective Date;

(d)    To make or direct Distributions to Holders of Allowed Claims and Allowed Interests and to otherwise implement and administer the Plan;

(e)    To pursue, litigate or settle all Causes of Action;

(f)    To conduct discovery pursuant to Fed. R. Bankr. P. 2004 or otherwise to investigate any potential Causes of Action;

(g)    To honor or enforce the provisions of the Asset Purchase Agreement, Sale Order, Settlement Agreement and Settlement Order;

(h)    To enforce the rights conferred upon the Creditors' Committee pursuant to Settlement Agreement to enforce the Insider Subordination Agreements for the benefit of Holders of Non-Subordinated Holdings Claims;

(i)    To prepare and file tax returns and collect Income Tax Refunds, including tax returns for the Creditor Trust as a grantor trust in accordance with IRC Reg. Sec. 1.671-4(a);

(j)    To File with the Bankruptcy Court the reports and other documents and to pay any and all fees required by the Plan or otherwise required to close the Chapter 11 Cases, including the preparation and filing of a motion for a final decree;

(k)    To set off amounts owed to any  Debtor against any and all amounts otherwise due to be distributed to the Holder of an Allowed Claim hereunder; and

(l)    To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan.

**5.7    Engagement of Creditor Trustee Professionals and Compensation to Creditor Trustee and Creditor Trustee Professionals.**  The Creditor Trustee shall be entitled to bill for his services and shall be compensated for such services at the Creditor Trustee's standard hourly rate.  The Creditor Trustee may engage counsel and other professionals to represent him in connection with his duties hereunder (the "**Creditor Trustee Professionals**"); *provided, however*, that Creditor Trustee Professionals shall not be precluded from representing the Creditor Trustee to the extent that certain of their Administrative Expense Claims remain unpaid from the  Debtors' Estates.  Any fees and expenses of such Creditor Trustee Professionals shall constitute "**Post-Confirmation Administrative Expense Claims**" and shall be paid from the Creditor Trust Funding, and otherwise from the net proceeds of the Creditor Trust Assets as set forth herein.

The Creditor Trustee and the Creditor Trustee Professionals shall be paid 90% of their fees and 100% of their costs on a monthly basis, unless such fees relate to the pursuit of potential recoveries from the Creditor Trust Assets on a contingency fee basis as agreed upon between the Creditor Trustee and the Creditor Trustee Professional (the "Contingency Fees"), in which case payment of such Contingency Fees (which are Post Confirmation Administrative Expense Claims) shall be paid from any such recoveries within thirty (30) days of receipt by the Creditor Trustee of such recoveries.  The Creditor Trustee and the Creditor Trustee Professionals shall File fee applications no less frequently than every 120 days seeking approval of fees and expenses to be awarded by the Bankruptcy Court, including approval of the amounts paid on a monthly basis.  A Creditor Trustee Professional who fails to File an application seeking approval of compensation and expenses previously paid when such application is due every 120 days shall preclude such Creditor Trustee Professional from being paid monthly as provided herein until an interim fee application has been Filed and heard by the Bankruptcy Court.  Upon the filing of each such application, the Creditor Trustee Professionals shall be entitled to request the payment of some or all of any pending holdbacks in fees.  The Bankruptcy Court shall retain jurisdiction to allow or disallow all Post-Confirmation Administrative Claims of the Creditor Trustee and the Creditor Trustee Professionals.  The invoices for services rendered and out-of-pocket expenses incurred which are to be submitted shall be sufficiently detailed to identify the hours worked, the rates charged and the work performed.

The Creditor Trustee may employ such staff as is reasonably necessary to carry out his/her functions and duties, store the books and records of the Debtors and compensate such staff.

**5.8    Bond**.  The Creditor Trustee, if requested by the U.S. Trustee, shall post a bond in favor of the Debtors in an amount equal to 100% of the book value of the Creditor Trust Assets determined as of 30 days from the Effective Date; *provided, however*, that the book value of the

Causes of Action for purposes of the bond shall be zero.  The cost of such bond is payable from the Creditor Trust Assets and shall be deemed an Other Administrative Claim.

5.9    **Privileges**.  All of the Debtors' privileges, including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections (the "Privileges") shall be transferred, assigned and delivered to the Creditor Trust, without waiver, limitation or release, and shall vest with the Creditor Trust.  The Creditor Trustee shall hold and be the beneficiary of all Privileges and entitled to assert all Privileges.

5.10    **Taxpayer Identification Numbers.**  The Creditor Trustee may require any Creditor with an Allowed Claim or Holder of an Allowed Interest entitled to a Distribution under the Plan to furnish its, his or her employer or taxpayer identification number (the "TIN") assigned by the Internal Revenue Service.  Any Distribution under the Plan may be conditioned on the receipt of such TIN.  If any such Holder of an Allowed Claim or an Allowed Interest entitled to a Distribution hereunder fails to provide a requested TIN within forty-five (45) days after the request thereof, then such failure shall be deemed to be a waiver of such Holder's interest in any future Distributions, including the right to receive any future Distributions.

5.11    **Resignation, Death or Removal of the Creditor Trustee**.  The Creditor Trustee may resign at any time; *provided, however*, that he shall File a motion with the Bankruptcy Court in connection therewith and request that a successor or replacement be appointed in accordance herewith, which motion shall be on notice to the top twenty (20) unsecured creditors holding Allowed Claims and the U.S. Trustee.  The U.S. Trustee or any party in interest, by motion Filed with the Bankruptcy Court, or the Bankruptcy Court on its own order to show cause, may seek to remove the Creditor Trustee for cause, including under section 324 of the Bankruptcy Code, for the violation of any material provision of the Plan, or in the event the Creditor Trustee becomes incapable of acting hereunder as a result of physical or mental disability and such physical or mental disability continues for a period in excess of thirty (30) days (except in the case of death, in which instance the procedures for replacement will begin immediately).  In the event of a resignation or removal, the  Creditor Trustee, unless he is incapable of doing so, shall continue to perform his duties hereunder until such a time as a successor is approved by a Final Order of the Bankruptcy Court.  In the event the Creditor Trustee resigns or is removed, the successor shall be elected in the manner prescribed by section 1104(b) of the Bankruptcy Code.

5.12    **Dissolution of the Creditors' Committee**.  On the first (1st) Business Day following the Effective Date, and provided that the Creditor Trust has become effective pursuant to the Plan, the Creditors' Committee shall be dissolved and the Creditors' Committee, its members, and Professionals retained by the Creditors' Committee in accordance with section 1103 of the Bankruptcy Code will be released and discharged from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Cases.

5.13    **Dissolution of the Debtor Entities**.  On and after the Effective Date, the Creditor Trustee shall be authorized, in his sole and absolute discretion, to take all actions reasonably necessary to dissolve the  Debtors and their subsidiaries under applicable laws,

including the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or Filing any necessary paperwork or documentation. The Creditor Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries as provided herein. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

      **5.14**   **Cancellation of Securities in Holdings**.  Except as otherwise provided in the Plan, and in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards and commitments shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released.  The holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.  Notwithstanding anything herein to the contrary, (i) this Section 5.14 shall not apply to the Interests owned by Holdings in Centers, and (ii) such Interests shall not be cancelled hereunder.

      **5.15**   **Closing of the Chapter 11 Cases**.  Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Cases, when all Assets have been liquidated and converted into Cash (other than those Assets abandoned by the Creditor Trustee), and such Cash has been distributed in accordance with this Plan, the Creditor Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

      **5.16**   **Post-Effective Date Settlements**.  Except as otherwise set forth in this Plan or the Confirmation Order, on and after the Effective Date, the Creditor Trustee shall obtain approval of the Bankruptcy Court to settle Objections and/or Causes of Action, if any.

      **5.17**   **Post-Effective Date Reporting**.  As promptly as practicable after the making of any distributions that are required under this Plan to be made on the Effective Date or as soon as practicable thereafter in recognition of the applicable claims reconciliation process, but in any event no later than ten (10) Business Days after the making of such distributions, the Creditor Trustee shall File with the Bankruptcy Court and serve on the U.S. Trustee a report setting forth the amounts and timing of all such distributions and the recipients thereof.  Thereafter, the Creditor Trustee shall File with the Bankruptcy Court and serve on the U.S. Trustee quarterly reports summarizing the disbursements of the Debtors for the immediately preceding three-month period.  Quarterly reports shall be provided no later than the twentieth (20th) day of each January, April, July and October until all Distributions under this Plan have been made.

## ARTICLE 6

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; BENEFIT PROGRAMS

**6.1    Treatment of Executory Contracts and Unexpired Leases**.  On the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Entity which (i) have not previously been assumed and assigned to Fronton pursuant to the terms of the Sale Order and Asset Purchase Agreement or (ii) are not the subject of pending motions to assume, assume and assign or reject as of the Confirmation Date, will be deemed rejected in accordance with the provisions and requirements of section 365 of the Bankruptcy Code.  The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving such rejections.  The inclusion of a contract or lease to be rejected pursuant to this **Section 6.1** shall not constitute an admission by the Debtors that such contract or lease is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

To the extent that any and all D&O Policies are considered Executory Contracts, then notwithstanding anything herein to the contrary, such D&O Policies shall be deemed assumed and assigned to the Creditor Trust.  Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to the D&O Policies.  For the avoidance of any doubt, all rights under the D&O Policies shall be preserved and shall vest with the Creditor Trust and shall remain in full force and effect after the Effective Date for the term thereof; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such insurance policies, including the D&O Policies.

**6.2    Claims for Rejection Damages**.  Proofs of Claim for alleged damages arising from the rejection pursuant to the Plan, the Confirmation Order or any subsequent Order of the Bankruptcy Court, of any executory contract or any unexpired lease shall be Filed with the Bankruptcy Court and served on counsel for the Debtor not later than thirty (30) days after the service of the earlier of: (i) notice of entry of the Confirmation Order or (ii) other notice that the executory contract or unexpired lease has been rejected (including service of an Order of the Bankruptcy Court providing for such rejection).  **Any Holder of a Claim arising from the rejection of any executory contract or any unexpired lease that fails to File a Proof of Claim on or before the date specified in this paragraph shall be forever barred, estopped and enjoined from asserting such Claims in any manner against the Debtors (or Filing Proofs of Claim with respect thereof) or their Property and the Debtors shall be forever discharged from all indebtedness or liability with respect to such Claims, and, if applicable, such Holders shall not be permitted to vote on the Plan or to participate in any distribution in these Chapter 11 Cases on account of such Claims or to receive further notices regarding such Claims and shall be bound by the terms of the Plan.**

**6.3    Objections to and Treatment of Rejection Claims**.  The Bankruptcy Court shall determine any Objections to any Proofs of Claim Filed in accordance with **Section 6.3** hereof at a

hearing to be held at a date to be determined by the Bankruptcy Court. Allowed Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be either Class 1 Centers Claims or Class 3 Non-Subordinated Holdings Claims, as applicable, and treated in accordance therewith.

**6.4**    **Employment Agreements**.    Notwithstanding anything in this **Article 6** to the contrary, unless assumed by the Purchaser pursuant to the  Asset Purchase Agreement, all employment and/or compensation agreements between the  Debtors and any employees of the Debtors shall be deemed rejected in accordance with the provisions and requirements of section 365 of the Bankruptcy Code.

**ARTICLE 7**

**POSTCONFIRMATION LITIGATION**

**7.1**    **Transfer and Enforcement of Causes in Action**.    Pursuant to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in this Plan or the Confirmation Order, the Creditor Trustee will have the exclusive right to investigate, pursue, enforce, litigate and settle any and all Causes of Action against any Person or Entity and rights of the Debtors that arose before or after the Petition Date, including but not limited to the rights and powers of a trustee and debtor-in-possession, against any Person or Entity whatsoever, including but not limited to all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to Chapter 5 of the Bankruptcy Code, and in the sole and absolute discretion of the Creditor Trustee to prosecute such Causes of Action in any and all jurisdictions as permitted by law.

**ARTICLE 8**

**PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS
GOVERNING DISTRIBUTIONS**

**8.1**    **Objections to Claims and Interests**.    Subject to applicable law, from and after the Effective Date, the Creditor Trustee shall have the authority to file, settle, compromise, withdraw, arbitrate or litigate to judgment Objections to Claims and Interests pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Objections to any Claim other than an Administrative Claim must be Filed and served on the claimant no later than the later of (i) the date established by order of the Bankruptcy Court for such objections, or (ii) thirty (30) days after the date the Claim is Filed (the "**Claim Objection Deadline**"). The Creditor Trustee shall use reasonable efforts to promptly and diligently pursue resolution of any and all Disputed Claims. The Creditor Trustee shall be substituted for the Debtors or the Creditors' Committee, as the case may be, with respect to any Objections to Claims or Interests brought by such party which remain pending as of the Effective Date.

**8.2**    **Amendments to Claims and Requests for Payment of Administrative Expense Claims; Claims Filed After the Bar Dates**.  Unless otherwise provided in a Final Order of the Bankruptcy Court:

(a)    after the Bar Date or the Bar Date for Governmental Unit Claims, a Claim on account of which a Proof of Claim is not timely Filed in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or an Order of the Bankruptcy Court, may not be Filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim solely to decrease, but not to increase, the face amount or priority;

(b)    except as otherwise provided herein, after the Administrative Expense Claims Bar Date, a Claim on account of which a request for payment of Administrative Expense Claims is not timely Filed may not be Filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim solely to decrease, but not to increase, the face amount or priority; and

(c)    Except as otherwise provided in the Plan, any new or amended Claim Filed after the Bar Date, Bar Date for Governmental Units or the Administrative Claims Bar Date (as applicable) shall be deemed Disallowed in full and expunged without any action by the Creditor Trustee, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the Filing.  The Holder of a Claim which is Disallowed pursuant to this **Section 8.2** shall not receive any distribution on account of such Claim.  The Creditor Trustee shall File with the Bankruptcy Court and serve on the Holder of any Claim whose Claim is deemed Disallowed pursuant to this **Section 8.2**, but whose Proof of Claim or request for payment of an Administrative Expense Claim is subsequently deemed timely Filed or Allowed notwithstanding this **Section 8.2** by a Final Order of the Bankruptcy Court, any Objection to such Claim or request for estimation thereof within thirty (30) days (or such later date as the Bankruptcy Court shall approve) after any such order becomes a Final Order.

**8.3**    **No Payment of Distribution Pending Allowance.**  All references to Claims or Interests and amounts of Claims and Interests refer to the amount of the Claim or Interest Allowed by operation of law, Final Order of the Bankruptcy Court or the Plan.  Accordingly, notwithstanding any other provision in the Plan, no payment or Distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, on or as soon as practicable after the Claim Objection Deadline, as applicable, the Creditor Trustee shall make distributions to Holders of Disputed Claims to the extent, and only to the extent, the portion of such Claim is not subject to a pending Objection.

# ARTICLE 9

# DISTRIBUTIONS

**9.1** <u>Timing of Distributions.</u>  The distribution of Property will be made to Holders of Allowed Claims and Allowed Interests in accordance with this **Article 9** of the Plan.  If a Claim is not an Allowed Claim or an Interest is not an Allowed Interest as of the applicable Distribution Date, distributions will be made only if and when the Claim or Interest is allowed and, with respect to the cure of defaults for assumed executory contracts and unexpired leases, pursuant to **Article 6** of the Plan. The Creditor Trustee shall make distributions as follows:

**9.1.1 <u>Distributions to Holders of Allowed Other Administrative Claims.</u>** Distributions to Holders of Allowed Other Administrative Claims will be made on the  Effective Date or ten (10) Business Days after the entry of a Final Order allowing such Other Administrative Claim.

**9.1.2 <u>Distributions to Holders of Allowed Professional Fee Claims.</u>** Distributions to Holders of Allowed Professional Fee Claims will be made within ten (10) days after entry of an order of the Bankruptcy Court with respect to such Holder's final fee application.

**9.1.3 <u>Distributions to Holders of Allowed Priority Tax Claims</u>.**  Distributions to Holders of Allowed Priority Tax Claims will be made on the Effective Date or as soon thereafter as is practicable.

**9.1.4 <u>Distributions to Holders of Allowed Centers Claims</u>.**  Distributions to Holders of Allowed Centers Claims will be made in full within ten (10) Business Days after the Effective Date, or within five (5) Business Days after the date upon which such Centers Claims becomes an Allowed Centers Claim if such Centers Claim is not allowed as of the Effective Date.

**9.1.5 <u>Distributions to Holders of Lenders Holdings Claims, If Any</u>.** Distributions to Holders of Lenders Holdings Claims shall be made pursuant to the terms of the Settlement Agreement and this Plan at such time as the Creditor Trustee determines that such amounts are required to be paid pursuant to the terms of the Settlement Agreement.

**9.1.6 <u>Distributions to Holders of Allowed Non-Subordinated Holdings Claims.</u>**  An Initial Distribution to Holders of Allowed Non-Subordinated Holdings Claims that are allowed as of the Effective Date will be made in the maximum amount possible within ten (10) Business Days after the Effective Date or five (5) Business Days after the entry of a Final Order allowing such Non-Subordinated Holdings Claim.   Subsequent Distributions to Holders of Allowed Non-Subordinated Holdings Claims shall be made pursuant to the terms of this Plan at such time as the Creditor Trustee determines that an applicable remainder exists to fund such Distributions.

**9.1.7 <u>Distributions to Holders of Allowed Subordinated Holdings Claims, Allowed Holdings Preferred Equity Interests and Holdings Equity Interests, If Any</u>.**

Distributions to Holders of Allowed Subordinated Holdings Claims, Holdings Preferred Equity Interests and Holdings Equity Interests shall be made pursuant to the terms of this Plan at such time as the Creditor Trustee determines that an applicable remainder exists to fund such Distributions.

**9.2   No Duplicate Distributions**.  Unless otherwise expressly provided herein, to the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

**9.3   Delivery of Distributions in General**.  Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth in the proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notices of address change Filed with the Bankruptcy Court or delivered to the Creditor Trustee after the date on which any related proof of Claim was Filed; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no proof of Claim has been Filed and the Creditor Trustee has not received a written notice of a change of address.

**9.4   Cash Payments**.  Except as otherwise provided in the Confirmation Order, any Cash payment to be made pursuant to the Plan shall be made by check drawn on a U.S. bank or by wire transfer from a U.S. bank, at the option of the Creditor Trustee.

**9.5   Interest on Claims**.  Except as required by applicable bankruptcy law (or as otherwise provided pursuant to the Settlement Order), postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. To the extent that any Allowed Claim entitled to a distribution, under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

**9.6   No De Minimis Distributions**.  No payment of Cash in an amount of less than $10.00 shall be required to be made on account of any Allowed Claim.

**9.7   Face Amount**.  Unless otherwise expressly set forth herein with respect to a specific Claim or Class of Claims, for the purpose of the provisions of this Article, the "Face Amount" of a Disputed Claim means the amount set forth on the Proof of Claim corresponding to such Claim unless the Disputed Claim has been estimated for distribution purposes or, in the alternative, if no Proof of Claim has been timely Filed or deemed Filed, zero.

**9.8   Unclaimed Property**.  Checks issued in respect of Distributions under the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance.  If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted

-28-

to be delivered) in accordance with the Plan to the Holder entitled thereto, such unclaimed property shall be forfeited by such Holder.  Pursuant to Local Rule 3011-1(B)(2), unclaimed property shall be redistributed to the Holders of Allowed Claims in accordance herewith.  `

    **9.9**    **Compliance with Tax Requirements**.  In connection with the Plan and the distributions made in accordance therewith, to the extent applicable, the Creditor Trustee shall comply with all tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Creditor Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## ARTICLE 10

## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

    **10.1**    **Conditions to the Effective Date**.  The Plan shall not become effective and the Effective Date shall not occur unless and until:

    **10.1.1** The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the  Debtors, ABC and the Creditors' Committee;

    **10.1.2** The Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to section 1125 of the Bankruptcy Code;

    **10.1.3** All documents, instruments and agreements, in form and substance, provided for under this Plan or necessary to implement this Plan, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

    **10.1.4** The Confirmation Order shall have become a Final Order (which requirement can be waived by the Debtors, in consultation with ABC and the Creditors' Committee).

## ARTICLE 11

## EFFECT OF CONFIRMATION

    **11.1**    **Binding Effect**.    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against or Interest in the Debtors and its respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted the Plan.

## ARTICLE 12

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date and the transfer of the Assets to the Creditor Trustee, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of all Claims;

(b)     Hear and determine any and all Causes of Action against any Person and rights of the Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Chapter 5 of the Bankruptcy Code;

(c)     Grant or deny any applications for allowance of compensation for professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(d)     Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(g)     Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code;

(h)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order;

-30-

(i)        Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(j)        Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

(k)        Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(l)        Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)        Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order or any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(n)        Enter any orders in aid of prior orders of the Bankruptcy Court; and

(o)        Enter a final decree closing the Chapter 11 Cases.

## ARTICLE 13

## ACCEPTANCE OR REJECTION OF THE PLAN

**13.1    Persons Entitled to Vote**.  Classes 6 and 7 are Unimpaired and are therefore deemed to have accepted the Plan and are not entitled to vote.  Classes 1, 2, 3, 4 and 5 are Impaired. Votes from Holders of Claims in Classes 1, 2, 3, 4 and 5 will be solicited.

**13.2    Acceptance by Impaired Classes**.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

## ARTICLE 14

## EXCULPATION AND INJUNCTION

**14.1    Term of Injunctions or Stays**.  Unless otherwise provided in the Plan, all injunctions or stays in the Chapter 11 Cases pursuant Bankruptcy Code §§ 105 or 362, or

otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Cases.

**14.2** <u>**Exculpation.**</u>  **Neither the Debtors, Creditors' Committee, ABC, Fronton, the Lenders, nor any of their respective employees, attorneys, representatives, financial advisors, investment bankers, advisors or agents, in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan,** provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.  With respect to Professionals, the foregoing provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Chapter 11 Cases.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the Confirmation Order.  Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision.  All such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder and under the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the exculpation and limitation of liability provided for herein shall not apply to any acts of omissions that occurred prior to the Petition Date.  The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of this Article 14 shall not release any of the Causes of Action.

**14.3** <u>**Injunction.**</u>  **On and after the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons that have held, currently hold or may hold a Claim, Equity Interest, or other debt or liability that is addressed in the Plan, are permanently enjoined from taking any of the following actions on account of any such Claims, Equity Interests, or other debts or liabilities, other than actions brought to enforce any rights or obligations under the Plan: (i) commencing or continuing in any manner any action or other proceedings against the Debtors, the Creditor Trust or their respective assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the  Debtors, the Creditor Trust or their respective assets; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Creditors Trust or their respective assets; (iv) asserting a setoff of any kind against any debt, liability or obligation due to the Debtors, the Creditor Trust or their respective assets;**

**and (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

## ARTICLE 15

## MISCELLANEOUS PROVISIONS

**15.1    Modification of the Plan**.  Subject to the restrictions on Plan modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation.

**15.2    Revocation of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date after consultation with the Creditors' Committee and ABC. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (b) constitute an admission of any fact or legal conclusion by the Debtors or any other Entity; (c) prejudice in any manner the rights of the Debtors in any further proceedings involving the Debtors, or (d) affect the rights of the Debtors, the Creditors' Committee or ABC under the Settlement Agreement, the Settlement Order, the Asset Purchase Agreement and the Sale Order.

**15.3    Governing Law.**  Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

**15.4    No Admissions.**  If Confirmation or the Effective Date does not occur, nothing contained in the Plan or Disclosure Statement shall be deemed as an admission by the Debtors with respect to any matter set forth herein or therein including, without limitation, liability on any Claim or the propriety of any Claims classification.

**15.5    Severability of Plan Provisions.**  If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and

provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

      **15.6**    **Successors and Assigns**. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

      **15.7**    **Exemption from Certain Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax, use tax, sales tax or similar tax. Any sale of any Asset occurring after or upon the Effective Date shall be deemed to be in furtherance of this Plan.

      **15.8**    **Preservation of Rights of Setoffs**. The Debtors, through the Creditor Trustee, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claims; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such Holder,

      **15.9**    **Defenses with Respect to Unimpaired Claims**. Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

      **15.10**    **No Injunctive Relief**. Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief.

      **15.11**    **Saturday, Sunday or Legal Holiday**. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

      **15.12**    **Entire Agreement.** This Plan and the Settlement Agreement sets forth the entire agreement and undertaking relating to the subject matter hereof and supersedes all prior discussions and documents. The Debtors' Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein, *provided, however*, that nothing herein shall abrogate or derogate any right of any party in interest in these Chapter 11 Cases provided for in any order of the Bankruptcy Court entered in connection with these Chapter 11 Cases.

      **15.13**    **Notices**. Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

<u>Counsel for the Debtors</u>

SALAZAR JACKSON, LLP
Two South Biscayne Blvd.
Suite 3760
Miami, FL  33131
Tel:  (305) 374-4848
Fax:  (305) 397-1021
Attn:  Luis Salazar, Esq.

<u>Counsel for the Creditors' Committee</u>

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. Second Street, 44th Floor
Miami, FL  33131
Tel:  (305) 349-2300
Fax:  (305) 349-2310
Attn:  Paul J. Battista, Esq. and Glenn D. Moses, Esq.

Dated:  June 6, 2014

**SALAZAR JACKSON, LLP**
*Attorneys for Michael Phelan*
Two South Biscayne Blvd., Suite 3760
Miami, Florida 33131
Telephone: (305) 374-4848
Facsimile:  (305) 397-1021
Email:  Salazar@SalazarJackson.com (primary)

By:    /s/  Luis Salazar
Luis Salazar
Florida Bar No. 147788

# EXHIBIT "A"

Execution Copy

# SETTLEMENT AGREEMENT

This settlement agreement (this "Settlement Agreement") is entered into as of March 19, 2014 by and among: (a) Centers, Holdings, Tara Club and Freedom Holding, on behalf of themselves and their respective chapter 11 bankruptcy estates (the "Estates"); (b) the Committee; (c) ABC Funding, LLC ("ABC"), in its capacity as agent under the Credit Agreement; and (d) William B. Collett and William B. Collett, Jr. (together, the "Colletts"). The Debtors (on behalf of themselves and their Estates), the Committee, ABC and the Colletts are sometimes referred to individually as a "Party" hereto and, together, the "Parties" hereto.

# RECITALS

WHEREAS, Florida Gaming Centers, Inc. ("Centers"), Florida Gaming Corporation ("Holdings"), Freedom Holding, Inc. ("Freedom Holding") and Tara Club Estates, Inc. ("Tara Club") are debtors and debtors in possession (the "Debtors") in the Bankruptcy Cases;

WHEREAS, Centers owns and operates a casino and jai alai fronton in Miami, Florida and a jai alai fronton and card room in Ft. Pierce, Florida (the "Business Operations");

WHEREAS, prior to the Petition Date, ABC and the Lenders provided certain loans and other financial accommodations to Centers (collectively, the "Loan") pursuant to the Credit Agreement, secured by first priority liens on and security interests in substantially all of the Debtors' assets;

WHEREAS, on August 9, 2012, ABC, on behalf of the Lenders, sent notice of default and acceleration to the Debtors pursuant to the terms of the Loan Documents, accelerating the Loan thereunder;

WHEREAS, on July 25, 2013 ABC, on behalf of the holders of warrants under the Warrant Agreement, accepted Centers' repurchase offer for the warrants pursuant to the terms of the Warrant Agreement (the "Repurchase Obligation") in the amount of $26,845,000;

WHEREAS, on August 14, 2013, Hialeah Casino opened, which ABC asserts triggered an increase in the "Base Percentage" of the warrants under the Warrant Agreement, which increased the Repurchase Obligation from $26,845,000 to $33,600,000;

WHEREAS, on August 19, 2013 (the "Petition Date"), the Debtors initiated their Bankruptcy Cases in the Bankruptcy Court;

WHEREAS, the Committee was appointed in the Bankruptcy Cases on September 9, 2013 to jointly represent the interests of the general, unsecured, nonpriority creditors of Centers and Holdings;

WHEREAS, Centers and Holdings have decided to sell substantially all of their assets, including the Business Operations and personal property located at the Business Operations, and related assets (collectively, the "Assets") pursuant to section 363 of the Bankruptcy Code (the "363 Sale");

**Execution Copy**

WHEREAS, prior to the Bankruptcy Cases, Centers and Holdings entered into a Stock Purchase Agreement dated November 25, 2012 (the "SPA") with Silvermark, and Silvermark has not provided a release to the Colletts in their individual capacities in respect of the guarantees they provided in connection with the SPA;

WHEREAS, on December 31, 2013, the Colletts each filed proofs of claim in the Bankruptcy Cases of Centers (Claim Nos. 34 and 35) and Holdings (Claim Nos. 7 and 8) in the amount of $50 million and asserted rights of subrogation and/or indemnification against Centers and Holdings for any claims that may be asserted against the Colletts by Silvermark with respect to the SPA transaction (the "Collett Claims");

WHEREAS, Centers and Willliam B. Collett, Jr. are parties to an Employment Agreement dated as of April 25, 2011 (the "Collett Employment Agreement");

WHEREAS, Centers and Daniel Licciardi are parties to an Employment Agreement dated as of April 25, 2011 (the "Licciardi Employment Agreement");

WHEREAS, pursuant to paragraph 16 of the Final Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Utilize Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Other Relief (the "Final Cash Collateral Order") [Docket No. 201], dated October 28, 2013, any challenge to any claim against ABC had to commence by December 15, 2013 and any challenges not raised by that date were deemed "forever waived, released and barred . . . .";

WHEREAS, the Final Cash Collateral Order further provided that if the Debtors failed to challenge the Lenders' claims by November 8, 2013, the Committee would "automatically" be "granted standing and authority" to challenge the Lenders' claims;

WHEREAS, on November 8, 2013, Centers and Holdings filed their (A) Complaint Against ABC Funding, LLC, as Administrative Agent and the Warrant Holders; and (B) Objections to Claim (the "Complaint") [Adv. Docket No. 1] under adversary docket number 13-01816 (RAM) (the "Adversary Proceeding") asserting, among other things, seven Counts setting forth several grounds for subordination and/or disallowance in whole or in part the Lender Claims:  (a) Count I, objecting to the reasonableness of the professional fees and expenses component of the Loan Claim, (b) Count II, objecting to the allowance of the "Pre-Payment Premium" component of the Loan Claim, (c) Count III, objecting to the allowance of the "OID" component of the Loan Claim, (d) Count IV, to subordinate the Centers Repurchase Claim under section 510(b) of the Bankruptcy Code, (e) Count V, to subordinate the Guaranty Repurchase Claim under section 510(b) of the Bankruptcy Code, (f) Count VI, to subordinate the Lender Claims under section 510(c) of the Bankruptcy Code, and (g) Count VII, alleging that the Lender Claims violated Florida usury law;

WHEREAS, on December 16, 2013, ABC, on behalf of the Lenders, filed master proofs of claim against each Debtor asserting secured claims against each Debtor for (a) Loan amounts owed under the Loan Documents in the amount of $94,045,985.77, plus post-petition interest, fees and expenses (the "Loan Claim"), and (b) the Repurchase Claims in the amount of

2

$33,600,000, plus post-petition interest, fees and expenses (together with the Loan Claim, the "Lender Claims");

WHEREAS, on December 19, 2013, the Debtors amended their Complaint by stipulation with ABC and the Lenders to remove the Lenders as named defendants in the Complaint, leaving ABC as the sole remaining defendant thereunder, but otherwise asserting the same Counts I-VII as in the Complaint, with the Lenders agreeing to be bound by any determinations or rulings of the Bankruptcy Court in the Adversary Proceeding in connection with such stipulation (the "Amended Complaint") [Adv. Docket No. 8];

WHEREAS, the Debtors and ABC agreed, pursuant to a stipulated scheduling order entered on December 19, 2013, to a briefing schedule in respect of the Adversary Proceeding, which was later supplemented by the Court's order dated January 8, 2014 setting briefing deadlines and a hearing date;

WHEREAS, on December 20, 2013, ABC filed its Answer and Affirmative Defenses to Plaintiffs/Counter-Defendants Florida Gaming Centers, Inc. and Florida Gaming Corporation's Amended Complaint and Counterclaim (the "ABC Answer") [Adv. Docket No. 11] responding to Counts I-VII asserted in the Amended Complaint and asserting counterclaims alleging fraudulent and improper conduct with respect to representations and omissions of the Debtors based on the Loan Documents (the "Counterclaims");

WHEREAS, on December 30, 2013, (a) the Debtors filed their Motion for: (I) Summary Judgment on Subordination, Prepayment Penalty Claim, and Original Issue Discount Claim; and (II) Partial Summary Judgment on Choice of Law Regarding Usury Issues (the "Debtors' Motion") [Adv. Docket No. 17], seeking summary judgment on Counts I, II, III, IV, V and VII of the Amended Complaint, and (b) ABC filed its Motion for Summary Judgment Dismissing Counts I, IV, V, VI and VII of the Amended Complaint (the "ABC Motion") [Adv. Docket No. 16] seeking summary judgment on Counts I, IV, V, VI and VII of the Amended Complaint;

WHEREAS, on January 13, 2014, (a) the Debtors filed their Response to Defendant's Motion for Summary Judgment Dismissing Counts I, IV, V, VI, and VII of the Adversary Complaint (the "Debtors' Response") [Adv. Docket No. 22], and (b) ABC filed its Response to the Plaintiffs' Motion for Summary Judgment on Subordination, Prepayment Penalty Claim, and Original Issue Discount Claim; and Partial Summary Judgment on Choice of Law Regarding Usury Issues (the "ABC Response") [Adv. Docket No. 21];

WHEREAS, on January 21, 2014, (a) the Debtors filed their Reply to Defendant's Response to Motion for Summary Judgment [Adv. Docket No. 25] (the "Debtors' Reply", together with the Amended Complaint, Debtors' Motion and Debtors' Response, the "Debtors' Pleadings"), and (b) ABC filed its Reply in Further Support of Its Motion for Summary Judgment Dismissing Counts I, IV, V, VI and VII of the Adversary Complaint [Adv. Docket No. 26] (the "ABC Reply", together with the ABC Answer, ABC Motion and ABC Response, the "ABC Pleadings" and collectively with the Debtors' Pleadings, the "Adversary Pleadings");

WHEREAS, on January 23, 2014, the Committee filed its Motion to Limit the Credit Bid of ABC Funding, LLC in Connection with the Sale of Substantially All of the Debtors' Assets

(the "Credit Bid Motion") [Docket No. 280], which the Debtors joined in their Joinder in Motion by the Official Committee of Unsecured Creditors to Limit the Credit Bid of ABC Funding, LLC in Connection with the Sale of Substantially All of the Debtors' Assets [Docket No. 286], seeking to limit and/or estimate the amount that ABC would be allowed to credit bid in connection with the 363 Sale;

WHEREAS, on January 24, 2014, the Bankruptcy Court held a hearing on the Adversary Pleadings in the Adversary Proceeding;

WHEREAS, on February 3, 2014, ABC filed its Response to the Motion by the Official Joint Committee of Unsecured Creditors to Limit the Credit Bid of ABC Funding, LLC in Connection with the Sale of Substantially All of the Debtor's Assets [Docket No. 302];

WHEREAS, on February 5, 2014, the Bankruptcy Court gave its oral ruling on the Adversary Pleadings and the Credit Bid Motion, and issued its Order on Summary Judgment Motions, Preliminary Order on Motion to Limit Credit Bid; Order Abating Proceeding Pending Mediation; and Order Setting Further Hearing (the "Summary Judgment Order") [Docket No. 305], and Order of Referral to Mediation (the "Mediation Order") [Docket No. 306];

WHEREAS, the Bankruptcy Court, in its Summary Judgment Order, among other things (1) granted (a) the Debtors' Motion as to Count II, disallowing the "Prepayment Premium" as defined in the Credit Agreement, (b) the Debtors' Motion as to Count III, disallowing that portion of original issue discount ("OID") that was unaccrued as of the Petition Date, (c) the Debtors' Motion as to Count IV, subordinating the Centers Repurchase Claim under section 510(b) of the Bankruptcy Code and finding that such claim will be converted into an equity interest *pari passu* with the existing common stock of Centers, and (d) the ABC Motion as to Count VII, dismissing the usury arguments in Count VII; (2) denied (a) the ABC Motion as to Count I, finding that genuine issues of material fact remaining regarding (i) the dollar amount of OID to be allowed as part of the Loan Claim and (ii) the amount of costs, charges and reasonable professional fees to be allowed as part of the Loan Claim, and (b) the ABC Motion as to Count VI, finding that the Debtors stated a claim for equitable subordination under section 510(c) of the Bankruptcy Code in the Amended Complaint and summary judgment on such claim was not appropriate at that time; and (3) reserved its ruling on Count V of the Amended Complaint regarding subordination of the Guaranty Repurchase Claim under section 510(b) of the Bankruptcy Code;

WHEREAS, on February 19-20, 2014, the Debtors, ABC and the Committee participated in a Bankruptcy Court ordered mediation regarding the remaining issues in the Adversary Proceeding and the credit bid rights of ABC pursuant to the terms of the Mediation Order;

WHEREAS, the Parties have determined to enter into this Settlement Agreement in order to avoid the uncertainties and further expense of litigation involving the remaining issues in the Adversary Proceeding, 363 Sale proceeds allocation issues, credit bidding issues, claims allowance issues related to the Adversary Proceeding and 363 Sale, and any and all other claims or causes of action that the Parties have or may have against each other relating to the Loan Documents, the Lender Claims, the Counterclaims, the Business Operations, the 363 Sale or the Bankruptcy Cases, on the terms set forth below; and

WHEREAS, the Parties each have consulted with their respective counsel in connection with the matters subject hereto;

WHEREAS, the Debtors filed their Notice of Filing Settlement Agreement on March 17, 2014 [Docket No. 373]; and

WHEREAS, Tara Club owns the Tara Property subject to the first mortgage lien of ABC under the Credit Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      **Recitals Incorporated.**   The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full, and made a part of, this Settlement Agreement.

2.      **Definitions.**   Capitalized terms not otherwise defined in the Preamble and Recitals above shall have the following definitions:

a.   "ABC Released Parties" means ABC, the Lenders (including holders of warrants under the Warrant Agreement) and their respective affiliates, and each of their respective employees, officers, directors, agents, professionals, attorneys, accountants, investment bankers, other legal representatives, bankruptcy and restructuring advisors and financial advisors, affiliates, predecessors, successors and assigns; provided, however, for the avoidance of doubt, that none of the Debtors or the Estates shall be deemed an affiliate of ABC or the Lenders by virtue of the Summary Judgment Order or otherwise; provided further, however, ABC Released Parties shall not include Innovation Partners, its affiliates, employees, or agents.

b.   "ABC Releasors" means ABC, the Lenders (including holders of warrants under the Warrant Agreement), and each of their officers, directors, agents, professionals, employees, attorneys, other legal representatives, affiliates, predecessors, successors and assigns; provided, however, for the avoidance of doubt, that none of the Debtors or the Estates shall be deemed an affiliate of ABC or the Lenders by virtue of the Summary Judgment Order or otherwise.

c.   "Administrative Claims" means, collectively, the Professional Fee Claims and the Other Administrative Claims.

d.   "Administrative Claim Remainders" means the Professional Fee Claim Remainder and the Other Administrative Claim Remainder.

e.   "Administrative Claim Reserves" means the Professional Fee Claim Reserve and the Other Administrative Claim Reserve.

f.   "Auction" means the auction of the Assets to be conducted by the Debtors in connection with the 363 Sale.

g. "Bankruptcy Cases" means, collectively, the chapter 11 cases captioned *In re Florida Gaming Centers, Inc., et al.*, case number 13-29597 (RAM) pending before the Bankruptcy Court.

h. "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida, Miami Division.

i. "Bankruptcy Code" means title 11 of the United States Code.

j. "Bar Order" means an order of the Bankruptcy Court barring Silvermark from commencing or proceeding with any litigation against the Colletts with respect to, or in connection with the SPA transaction.

k. "Bidding Procedures" means the procedures governing the 363 Sale and Auction approved by order of the Bankruptcy Court dated December 30, 2013 [Docket No. 261].

l. "Centers Claims" means all allowed claims against Centers other than Administrative Claims against Centers, the Lender Claims against Centers; for the avoidance of doubt, the Centers Claims shall not include the Collett Claims and the Holdings Intercompany Claim, which shall be waived pursuant to the terms of this Agreement.

m. "Centers Claim Remainder" means any amounts left in the Centers Claim Reserve after satisfaction of all Centers Claims.

n. "Centers Claim Reserve" means a cash reserve to be established and funded from the Sale Proceeds for the payment of Centers Claims in the amount of $3,500,000; provided, for the avoidance of doubt, all Centers Claims will be paid in full and satisfied pursuant to the terms of this Settlement Agreement and/or the Plan irrespective of the amount reserved in the Centers Claim Reserve.

o. "Centers Repurchase Claim" means the secured claim against Centers for the Repurchase Obligation pursuant to the terms of the Loan Documents.

p. "Closing" means the closing and consummation of the 363 Sale.

q. "Committee" means the official joint committee of unsecured creditors appointed in the Centers and Holdings bankruptcy cases.

r. "Credit Agreement" means that certain credit agreement, dated April 25, 2011, by and among ABC, as administrative agent, Centers, as Borrower, Holdings as Holdings, and the lenders from time to time thereunder as it may have been amended, restated, supplemented and/or modified from time to time pursuant to the terms thereof.

s. "D&O Litigation" means any claims or causes of action of the Estates against the current and former directors and officers of the Debtors.

t.  "<u>Default Rate</u>" means the default interest rate of 18.5% as provided in the Credit Agreement.

u.  "<u>Effective Date</u>" means the first business day upon which all conditions to the effectiveness of this Settlement Agreement as set forth in <u>Section 14</u> below are satisfied.

v.  "<u>Estate Cash</u>" means any cash retained by Centers or Holdings after the Closing of the 363 Sale, which, for the avoidance of doubt, shall not include any Sale Proceeds to be received by the Estates pursuant to <u>Section 5</u> of this Settlement Agreement.

w.  "<u>Estate Released Parties</u>" means the Committee and its respective members, solely in their capacity as Committee members; the Committee's attorneys, accountants, bankruptcy and restructuring advisors and financial advisors; the Debtors and the Estates; and the Debtors' current and former officers, directors, attorneys, accountants, bankruptcy and restructuring advisors and financial advisors.

x.  "<u>Estate Releasors</u>" means the Debtors, the Debtors' respective Estates, the Committee, and each of their officers, directors, agents, professionals, employees, attorneys, other legal representatives, affiliates, predecessors, successors and assigns.

y.  "<u>Guaranty Repurchase Claim</u>" means the claim against Holdings for Holdings' guarantee of the Repurchase Obligation pursuant to the terms of the Warrant Agreement.

z.  "<u>Guggenheim</u>" means Guggenheim Securities, LLC, the Debtors' investment banker in the Bankruptcy Cases.

aa. "<u>Guggenheim Engagement Letter</u>" means the letter dated November 8, 2013, providing for employment of Guggenheim as the Debtors' investment banker in the Bankruptcy Cases.

bb. "<u>Guggenheim Fee</u>" means the sale transaction fee of at least $650,000 to be paid to Guggenheim upon completion of the 363 Sale pursuant to the terms of the Guggenheim Engagement Letter.

cc. "<u>Holdings Equity Interests</u>" means all equity interests in Holdings.

dd. "<u>Holdings Intercompany Claim</u>" means the alleged intercompany claim of Holdings scheduled against Centers in the amount of $5,021,284.

ee. "<u>Initial Holdings Distribution Amount</u>" means a cash reserve in the amount of $1,500,000 to be established and funded from the Sale Proceeds to be distributed to the Estates for the payment of Non-Subordinated Holdings Claims pursuant to the Payment Waterfall.

ff.  "Initial Repurchase Claim Distribution Amount" means $10,000,000 (or the remainder of the Sale Proceeds if less than $10,000,000 remains after payment of the Initial Holdings Distribution Amount pursuant to the terms of the Payment Waterfall) to be distributed to ABC for the partial payment of the Repurchase Claims pursuant to the Payment Waterfall.

gg.  "Insider Subordination Agreements" means the subordination agreements by and among certain insider creditors of the Debtors, Centers and/or Holdings, and ABC, dated April 25, 2011, listed in Exhibit A-3 hereto.

hh.  "Lenders" means the lenders from time to time under the Credit Agreement and the holders of warrants under the Warrant Agreement.

ii.  "Loan Documents" means the Credit Agreement and all related documents, including, without limitation, the Warrant Agreement.

jj.  "Modification Agreements" means the modification agreements by and among certain creditors of the Debtors, Centers and Holdings, dated April 25, 2011, listed in Exhibit A-2 hereto.

kk.  "Non-Insider Subordination Agreements" means the subordination agreements by and among certain creditors of the Debtors, Centers, Holdings, and ABC, dated April 25, 2011, listed in Exhibit A-1 hereto.

ll.  "Non-Subordinated Holdings Claims" means all allowed, non-subordinated claims against Holdings other than Administrative Claims against Holdings and the Lender Claims against Holdings.

mm.  "Other Administrative Claims" means a claim against either of Centers or Holdings for: (i) any cost or expense of administration of the Bankruptcy Cases asserted or arising under sections 503 or 507(a)(2) of the Bankruptcy Code including, but not limited to, (A) any actual and necessary post-Petition Date cost or expense of preserving the Debtors' respective estates or operating the businesses of the Debtors, and (B) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses; and (ii) any fees or charges assessed against the Debtors' respective estates under section 1930 of title 28 of the United States Code; provided, however, that any Other Administrative Claim of any one Debtor against Centers or Holdings are being released pursuant to Section 13 of this Settlement Agreement, provided, further, that the Estates will continue to satisfy their obligations in the ordinary course of business from and after the Effective Date.

nn.  "Other Administrative Claim Remainder" means any amounts left in the Other Administrative Claim Reserve after satisfaction of all Other Administrative Claims.

oo. "Other Administrative Claim Reserve" means a cash reserve to be established and funded from the Sale Proceeds for the payment of Other Administrative Fee Claims in the amount of $250,000; provided, for the avoidance of doubt, all Other Administrative Claims will be paid in full and satisfied pursuant to the terms of this Settlement Agreement irrespective of the amount reserved in the Other Administrative Claims Reserve.

pp. "Payment Waterfall" means the order of priority and allocation amounts for the distribution of Sale Proceeds provided for in Section 5 hereof.

qq. "Plan" means the plan of liquidation to be prepared in accordance with the terms of this Settlement Agreement, which Plan shall be in form and substance reasonably acceptable to the Debtors, ABC and the Committee.

rr. "Post-Closing Fee Budget" means the budget containing a good faith estimate of all fees and expenses of professionals retained by the Committee and the Debtors for the period beginning on the Closing through the closing of the Bankruptcy Cases, which budget shall be agreed upon by the Debtors, ABC and the Committee prior to the Closing.

ss. "Professional Fee Claims" means a claim against either of Centers or Holdings for: (i) any cost or expense of administration of the Bankruptcy Cases asserted or arising under sections 503 or 507(a)(2) of the Bankruptcy Code for compensation or reimbursement of expenses of the Debtors' and Committee's professionals to the extent allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code.

tt. "Professional Fee Claim Remainder" means any amounts left in the Professional Fee Claim Reserve after satisfaction of all Professional Fee Claims.

uu. "Professional Fee Claim Reserve" means a reserve to be established for the payment of Professional Fee Claims pursuant to the Post-Closing Fee Budget in an amount to be agreed upon by the Debtors, ABC and the Committee prior to the Closing, provided, for the avoidance of doubt, all Professional Fee Claims will be paid in full and satisfied pursuant to the Post-Closing Fee Budget and the terms of this Settlement Agreement.

vv. "Property Tax Amount" means any unpaid personal property taxes owed by the Debtors at Closing with respect to the Business Operations.

ww. "Releasors" means the ABC Releasors and the Estate Releasors.

xx. "Repurchase Claims" means the Centers Repurchase Claim and the Guaranty Repurchase Claim.

yy. "Sale Proceeds" means the cash proceeds of the 363 Sale; provided, however, that if ABC is the successful bidder for the Assets, it will not have to provide or

distribute any Sale Proceeds that it would otherwise receive pursuant to <u>Section 5</u> hereof (subject to the terms of <u>Sections 7 and 10(c)</u> hereof).

zz. "<u>Settlement Motion</u>" means the Committee's motion (A)(I) to intervene in the Adversary Proceeding, (II) for standing and authority to settle the Estates' claims against ABC, and (III ) to approve the Settlement with ABC; and (B) to shorten the notice period for the approval of the Settlement, including the Debtors' joinder in such motion in respect of that portion of the Settlement Motion seeking to approve the terms of this Settlement Agreement.

aaa. "<u>Settlement Order</u>" means the order of the Bankruptcy Court approving this Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

bbb. "<u>Silvermark</u>" means Silvermark LLC, the stalking horse bidder for the Assets in the 363 Sale.

ccc. "<u>Silvermark Break-Up Fee</u>" means the bid protections in the amount of $4,000,000 to be paid to Silvermark under certain circumstances if Silvermark is not the successful bidder for the Assets in the 363 Sale.

ddd. "<u>Subordinated Holdings Claims</u>" means all allowed subordinated or allowed insider claims against Holdings.

eee. "<u>Tara Property</u>" shall mean those certain six (6) parcels of real property located in Loganville, Georgia owned by Tara Club and listed in the bankruptcy schedules of Tara Club, which properties have the following street addresses: 143 Tara Boulevard, 137 Tara Boulevard, 139 Tara Boulevard, 141 Tara Boulevard, 145 Tara Boulevard and 147 Tara Boulevard.

fff. "<u>Warrant Agreement</u>" means that certain warrant agreement, dated April 25, 2011, by and among Centers, Holdings as Guarantor, ABC as agent, and the holders of the warrants thereunder.

3. **Allowance of the Lender Claims.**  The Lender Claims shall be allowed for purposes of distribution pursuant to <u>Section 5</u> of this Settlement Agreement in the following amounts:

a. <u>Loan Claim</u>:  The Loan Claim shall be allowed in the amount set forth in <u>Exhibit A-4</u> hereto[1]; provided, <u>however</u>, that such amount shall be adjusted as of the date of the Closing to account for any additional fees (subject to the cap described in <u>Exhibit A-4</u>), expenses and/or interest at the Default Rate that accrue under the Loan Documents between the Effective Date and the date of the Closing, subject to a credit for any additional adequate protection payments made.

---

[1] Exhibit A-4 shows a decrease of the Loan Claim by $1.5 million, resulting from movement of $1.5 million of professional fees from the Loan Claim to the Repurchase Claim.

**Execution Copy**

    b.  <u>Repurchase Claims</u>:  The Repurchase Claims shall be allowed in the fixed amount of $37,000,000, calculated as set forth in <u>Exhibit A-5</u>, with no further accrual of post-petition interest thereon.[2]

In consideration of the foregoing and the receipt by the Lenders of the distributions of the Sale Proceeds on account of the Lender Claims pursuant to the terms of <u>Section 5</u> of this Agreement, the Lenders shall waive any right to receive a distribution from the Estates in respect of their deficiency claim against the Estates for any portion of the Lender Claims that are not satisfied hereunder.

    4.  **Distribution of Estate Cash**.   Any Estate Cash (which excludes the Sale Proceeds) shall be retained by the Estates for (a) <u>First</u>, the payment of Administrative Claims, (b) <u>Second</u>, the payment of Centers Claims, (c) <u>Third</u>, the payment of Non-Subordinated Holdings Claims, (d) <u>Fourth</u>, the payment of Subordinated Holdings Claims, and (e) <u>Fifth</u>, distribution to Holdings Equity Interests.

    5.  **Allocation of the Sale Proceeds.**  Upon the Closing and after accounting for the distribution of the Estate Cash pursuant to <u>Section 4</u> above, the Sale Proceeds shall be distributed to the Estates or ABC in the following order of priority and amounts until the exhaustion of such Sale Proceeds (to the extent such amounts were not otherwise funded with Estate Cash):

    a.  <u>First</u>, the full amount of the Loan Claim shall be distributed to ABC;

    b.  <u>Second</u>, the Estates shall be funded with Sale Proceeds sufficient to satisfy:

        i.  the Administrative Claim Reserves;

        ii.  the Property Tax Amount, if any;

        iii.  the Guggenheim Fee; and

        iv.  the Silvermark Break-Up Fee, if any.

    c.  <u>Third</u>, the Estates shall be funded with the Centers Claim Reserve;

    d.  <u>Fourth</u>, the Estates shall be funded with the Initial Holdings Distribution Amount;

    e.  <u>Fifth</u>, ABC shall be funded with the Initial Repurchase Claim Distribution Amount (unless there are insufficient funds to satisfy such amount, in which case ABC shall be funded with all remaining Sale Proceeds);

    f.  <u>Sixth</u>, the next $10,000,000 in Sale Proceeds (or the entirety of remaining Sale Proceeds if less than $10,000,000 remains after the distribution described in (e) above) shall be distributed as follows:

---

[2] This amount reflects a waiver of half of the post-petition interest accrued on the Repurchase Claims through March 31 and no further accrual of interest going forward.  It also reflects movement of $1.5 million of professional fees from the Loan Claim to the Repurchase Claim.

    i. 95.00% of each dollar shall be distributed to ABC for payment of the Repurchase Claims; and

    ii. 5.00% of each dollar shall be distributed to the Estates for payment of Non-Subordinated Holdings Claims.

g. <u>Seventh</u>, until funds sufficient to pay an additional portion of the Repurchase Claims in the amount of $15,325,000 (such that the total amount paid on the Repurchase Claims is $34,825,000), any Sale Proceeds remaining after the distributions described above in (f) shall be distributed as follows:

    i. 92.50% of each dollar of shall be distributed to ABC for payment of the Repurchase Claims; and

    ii. 7.50% of each dollar shall be distributed to the Estates for payment of Non-Subordinated Holdings Claims.

h. <u>Eighth</u>, until funds sufficient to pay an additional portion of the Repurchase Claims in the amount of $2,175,000 (such that the Repurchase Claims are paid in full in the total amount of $37,000,000), any Sale Proceeds remaining after the distributions described above in (g) shall be distributed as follows:

    i. 50.00% of each dollar of shall be distributed to ABC for payment of the Repurchase Claims until such Repurchase Claims are paid in full (i.e., an additional $2,175,000); and

    ii. 50.00% of each dollar shall be distributed to the Estates for payment of the remaining Holdings stakeholders in the following order of priority:

        1. *First*, to pay any remaining Non-Subordinated Holdings Claims in full;

        2. *Second*, to pay Subordinated Holdings Claims in full; and

        3. *Third*, for distribution to Holdings Equity Interests.

i. <u>Ninth</u>, any Sale Proceeds remaining after distribution of amounts to ABC sufficient to pay the Repurchase Claims in full pursuant to (h) above shall be distributed to the Estates for payment of the remaining Holdings stakeholders in the following order of priority:

    i. *First*, to pay any remaining Non-Subordinated Holdings Claims in full;

    ii. *Second*, to pay Subordinated Holdings Claims in full; and

    iii. *Third*, for distribution to Holdings Equity Interests.

6. **Application of Administrative Claim Remainders and Centers Claim Remainder.**

    a. <u>Professional Fee Claim Remainder</u>: To the extent that there is a Professional Fee Claim Remainder and/or Other Administrative Claim Remainder, 100% of such amount(s) shall be distributed to the Estates and/or ABC pursuant to the Payment Waterfall.

    b. <u>Centers Claim Remainder</u>: To the extent that there is a Centers Claim Remainder, 100% of such Centers Claim Remainder will be retained by the Estates for (A) <u>First</u>, the payment of Non-Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, (B) <u>Second</u>, the payment of Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, and (C) <u>Third</u>, distribution to Holdings Equity Interests.

7. **Payment of Administrative Claims and Centers Claims.** To the extent the Centers Claims are allowed in an aggregate amount that is greater than the Centers Claims Reserve, or the Administrative Claims are allowed in an aggregate amount that is greater than the Administrative Claim Reserves, and Sale Proceeds and/or Estate Cash are not otherwise available or sufficient for the satisfaction of such amounts, if any, pursuant to the terms of this Settlement Agreement, ABC agrees to pay such amounts (solely from amounts distributed pursuant to <u>Sections 5(e)</u>, <u>(f)</u>, <u>(g)</u> or (h) above on account of the Repurchase Claims), and shall provide for the satisfaction of any such amounts in a manner reasonably satisfactory to the Debtors, ABC, and the Committee, which manner shall be agreed upon prior to the Closing. Centers and Holdings agree that Holdings shall waive any right to receive a distribution on or in respect of the Holdings Intercompany Claim.

8. **Allowance of Claims and Support of Bar Order.** Provided that Mr. Collett or Mr. Licciardi are not employed by the successful buyer following the 363 Sale, whether through the assumption and/or assignment of the Collett Employment Agreement or the Licciardi Agreement or otherwise, and the Collett Employment Agreement and/or the Licciardi Employment Agreement are otherwise rejected by Centers pursuant to section 365 of the Bankruptcy Code, then the claims by Mr. William B. Collett, Jr. and Mr. Daniel Licciardi against Centers for six months of severance pay shall be deemed allowed in the amount of $165,375.00 and $124,031.25, respectively. The Colletts shall waive their respective Collett Claims against Centers and Holdings relating to their claims for subrogation and/or indemnification on the Effective Date. The Committee and ABC shall support any effort by the Colletts to obtain entry of a Bar Order by the Bankruptcy Court barring Silvermark from commencing or proceeding with any litigation against the Colletts, in their individual capacity, with respect to or in connection with the SPA transaction.

9. **Plan.** The Debtors shall draft the initial draft of the Plan and provide such draft to ABC and the Committee for comment within 15 days of Closing, and file a Plan no later than 30 days after the Closing; <u>provided</u>, <u>however</u>, that if the Debtors fail or refuse to do so, then the Committee shall seek authority from the Bankruptcy Court to prepare and file such Plan; <u>provided further</u> that any such Plan must be consistent with the provisions of this Settlement

Agreement; provided further, however, that the effectiveness of this Settlement Agreement is not conditioned upon any such Plan being confirmed by the Bankruptcy Court or becoming effective in the Bankruptcy Cases.

10.     **363 Sale and Credit Bidding.**

   a.   ABC shall be entitled to submit a credit bid under the terms of the Bidding Procedures at the Auction pursuant to section 363(k) of the Bankruptcy Code in the amount of the Loan Claim, and the Debtors and the Committee shall not object to any such credit bid on any grounds, including the grounds set forth in section 363(k) of the Bankruptcy Code.

   b.   There shall be no deduction in the value of any bid by ABC at the Auction based on the terms of this Settlement Agreement, including, without limitation, the allocation and manner of distribution of Sale Proceeds described in the Payment Waterfall.  The Debtors and the Committee agree that bids from other bidders at the Auction shall not circumvent the allowance or payment provisions set forth in this Settlement Agreement.

   c.   If ABC is determined to have submitted the highest and best bid pursuant to the Bidding Procedures at the Auction and an order is entered approving ABC as the purchaser of the Assets, on the Closing ABC shall not be required to fund any cash amounts that it would otherwise receive pursuant to the Payment Waterfall provided above in Section 5, but would be required to fund all amounts to be paid to all creditors and parties in interest pursuant to the terms of the Payment Waterfall herein (in the same amounts as such creditors and parties in interest would be paid from sale proceeds if a third-party had purchased the assets at the identical purchase price, including amounts payable under Section 7 hereof).

11.     **D&O Litigation Proceeds.**  Any proceeds (net of professional fees and expenses) obtained by the Committee through D&O Litigation, including, without limitation, any proceeds related to insurance policies held by the Debtors, will be retained by the Estates for (a) First, the payment of Non-Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, (b) Second, the payment of Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, and (c) Third, distribution to Holdings Equity Interests.  For avoidance of doubt, ABC agrees to waive any right to receive a distribution of any portion of the proceeds from the D&O Litigation in respect of any of the Lender Claims.

12.     **Lender Claims Against Freedom Holding and Tara Club.**  Upon the liquidation or sale of any assets of the bankruptcy estates of Freedom Holdings or Tara Club (excluding the Tara Property in the event Tara Club is required to transfer the Tara Property pursuant to this Section 12), or the receipt of any distributions by ABC from the estates of Freedom Holding or Tara Club (excluding the proceeds from the Tara Property in the event Tara Club is required to transfer the Tara Property pursuant to this Section 12) in respect of the Lender Claims against Freedom Holding or Tara Club, ABC agrees to cause any and all such proceeds and/or distributions to be distributed to the Estates to be used as follows:  (A) First, the

payment of Non-Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, (B) <u>Second</u>, the payment of Subordinated Holdings Claims, to the extent such claims are not paid in full pursuant to the Payment Waterfall, and (C) <u>Third</u>, distribution to Holdings Equity Interests.  In the event either (a) the Colletts provide written notice to the Committee and the Debtors that they are not seeking the Bar Order, or (b) the Bankruptcy Court denies the request by the Colletts for the Bar Order in a final and non-appealable order, then within thirty (30) days thereafter, Tara Club agrees to sell and transfer the Tara Property for no additional consideration to the Colletts or their designee free and clear of any and all liens, claims or encumbrances of ABC.  In the event the Bankruptcy Court grants the request of the Colletts for the Bar Order in a final and non-appealable order, then Tara Club shall not be obligated to sell or transfer the Tara Property to the Colletts and shall retain the Tara Property for liquidation and distribution pursuant to this Section 12.

13. **Waivers or Assignment of, or Amendment to, Certain Subordination Agreements.**

a. Except as otherwise provided herein, ABC shall waive its rights under the Non-Insider Subordination Agreements listed on <u>Exhibit A-1</u> hereto; <u>provided, however</u>, that each such waiver shall be contingent, and only effective upon, each such party's release of any and all actions, causes of action, suits, claims or demands whatsoever, of any kind or nature, whether known or unknown, disputed or undisputed, contingent, inchoate, or matured (including, without limitation, any ability to amend any related proof of claim) (i) against ABC and/or the Lenders,(ii) in respect of Centers Claims, regarding the amount, priority or structural seniority of such party's claims, and (iii) in respect of Non-Subordinated Holdings Claims, regarding the priority or structural seniority of such party's claims; <u>provided further</u>, that the Modification Agreements listed on <u>Exhibit A-2</u> hereto are not being waived and shall remain in full force and effect (and the Non-Insider Subordination Agreements shall remain in effect solely to the extent necessary to provide for the enforcement of such Modification Agreements);

b. ABC agrees to and shall (i) delegate, authorize and permit the Committee to enforce its rights under the Insider Subordination Agreements in its favor listed on <u>Exhibit A-3</u> hereto for the benefit of the holders of the Non-Subordinated Holdings Claims and (ii) if necessary, take such further action or execute and deliver such further documents to facilitate and effectuate the enforcement of such agreements and/or any similar provisions in the Loan Documents, subject to any amendments thereto as may be agreed upon by ABC and the Committee, so as to insure that the holders of the Non-Subordinated Holdings Claims receive the benefits of such agreements.

14. **Releases.**

a. <u>ABC Released Parties</u>:  Subject to and conditioned upon the occurrence of the Effective Date, each of the Estate Releasors and the Colletts shall, and shall be conclusively deemed to have, unconditionally, absolutely, and irrevocably

released, discharged and forever waived any and all actions, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate, or matured, in law or in equity, arising in connection with or relating to the Loan Documents, any act or omission relating to any transaction in connection with the Loan Documents, the Bankruptcy Cases, the Adversary Proceeding, the 363 Sale, and this Settlement Agreement, which each of the Estate Releasors or the Colletts have or ever had against the ABC Released Parties on or at any time prior to the Effective Date, including without limitation claims asserted in the Amended Complaint and any claims, surcharges or causes of action under chapter 5 of the Bankruptcy Code; provided, however, that nothing contained in this Section 14 shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement.

b. <u>Estate Released Parties</u>:  Subject to and conditioned upon the occurrence of the Effective Date and the occurrence of the Closing, each of the ABC Releasors shall, and shall be conclusively deemed to have, unconditionally, absolutely, and irrevocably released, discharged and forever waived any and all actions, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate, or matured, in law or in equity, arising in connection with or relating to the Loan Documents, the Bankruptcy Cases, the Adversary Proceeding, the 363 Sale, and this Settlement Agreement, which each of the ABC Releasors have or ever had against the Estate Released Parties or the Colletts on or at any time prior to the Effective Date, including without limitation the Loan Claims, the Repurchase Claims and the Counterclaims; provided, however, that nothing contained in this Section 14 shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement.

15. **Conditions to Effectiveness.**  The effectiveness of all terms and conditions of this Settlement Agreement is subject to the occurrence of the following conditions precedent:

a. This Settlement Agreement shall have been fully executed and delivered by all of the Parties; and

b. The Bankruptcy Court shall have entered the Settlement Order approving this Settlement Agreement prior to the bidding deadline set forth in the Bidding Procedures.

16. **Jurisdiction and Governing Law.**  The Parties agree that the Bankruptcy Court shall retain jurisdiction to the fullest extent possible over the interpretation and enforcement of this Settlement Agreement, and over any dispute between them in any way related to this Settlement Agreement.  The Parties further agree that this Settlement Agreement shall be

construed and governed by the laws of the State of New York, irrespective of its choice of law rules.

17.    **Entire Agreement.**  This Settlement Agreement constitutes the entire agreement of the Parties as to the subject matter hereof and is the final and complete expression of their intent, and supersedes and renders moot any previous term sheets regarding the terms of this Settlement Agreement.  The undersigned acknowledge that there are no communications or understandings, oral or written, contrary, different, or which in any way restrict this Settlement Agreement.  The undersigned further acknowledge that all prior agreements, communications, and understandings within the scope of the subject matter of this Settlement Agreement are, upon execution of this Settlement Agreement, superseded, null and void.  This Settlement Agreement can only be changed, modified or discharged if consented to in writing executed by the Parties hereto and, if applicable, approved by order of the Bankruptcy Court.

18.    **Counterparts.**  This Settlement Agreement may be executed in one or more counterparts, via facsimile or electronic means; each counterpart to be considered an original portion of this Settlement Agreement.

19.    **Advice of Counsel.**  The Parties acknowledge that the matters being settled hereby have been subject to contention and the opportunity for discovery, and that each Party has had the opportunity to make an investigation of the facts pertaining to this Settlement Agreement and all matters pertaining thereto, as it deems necessary.  The Parties further acknowledge: (a) each Party is represented by experienced counsel; (b) each Party has read this Settlement Agreement and understands its contents; and (c) each Party is entering into this Settlement Agreement voluntarily and without duress, and with a full understanding of its terms.  The Parties agree that no Party shall later seek to overturn or invalidate any aspect of this Settlement Agreement on grounds of unconscionability, oppression or any similar reason.

20.    **No Admissions, Representations or Warranties.**  Nothing contained in this Settlement Agreement shall be deemed to be an admission, by either Party, of any fact, matter, claim or defense previously in dispute.  Each Party is aware that it may hereafter discover claims or facts in addition to or different from those it now knows or believes to be true.  Nevertheless, it is the intention of the Parties to fully, finally, and forever settle and release any and all controversies among themselves, and all claims relative thereto, that do now exist or heretofore have existed between them.  In furtherance of such intention, the releases given herein shall be and remain in effect as full and complete releases of all such matters, notwithstanding the discovery or existence of any additional or different claims or facts relative thereto.

21.    **Covenant of Further Assurances.**  The Parties covenant and agree that, from and after the execution and delivery of this Settlement Agreement, they shall, execute, deliver and file any and all documents and instruments as are reasonably necessary or requested by the other Party to obtain approval of or implement the terms of this Settlement Agreement, and shall not take any action to directly or indirectly oppose the approval of the Settlement Agreement.

**Execution Copy**

22.    **Authority**.

a.    Subject to and conditioned on the Bankruptcy Court's entry of the Settlement Order, the Committee has the authority to execute and deliver this Settlement Agreement on its behalf and the Debtors have the authority to execute and deliver the Settlement Agreement on their behalf, and to perform fully their respective obligations hereunder and to consummate the transactions contemplated hereby. The Debtors, the Committee and the Colletts have duly executed and delivered this Settlement Agreement.  Subject to and conditioned on the Bankruptcy Court's entry of the Settlement Order, this Settlement Agreement is a legal, valid and binding obligation of each of the Debtors, the Estates and the Colletts, enforceable against such Debtors, the Estates and the Colletts in accordance with its terms.

b.    ABC has the corporate power and authority to execute and deliver this Settlement Agreement on behalf of itself and on behalf of the Lenders, to perform fully its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery of this Settlement Agreement by ABC, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action of ABC.  ABC has duly executed and delivered this Settlement Agreement.  This Settlement Agreement shall constitute a legal, valid and binding obligation of ABC and the Lenders, enforceable against them in accordance with its terms, upon full execution hereof.

23.    **Notices**.    Any and all notices required or permitted under this Settlement Agreement and any and all correspondence shall be in writing and shall be personally delivered or mailed by registered or certified mail, return receipt requested, or by overnight delivery to the Parties at the addresses designated with their respective signatures below, unless and until a different address has been designated by written notice to the other Parties.

**[Signature pages follow.]**

 

**IN WITNESS WHEREOF**, the Parties hereto, each by persons duly authorized, have caused the Settlement Agreement to be executed as of the day and year first written above.

**FLORIDA GAMING CENTERS, INC.**

By: _____

Its: _____
<u>CEO</u>

Notice address:

3500 NW 37th Ave
Miami, FL 33142
_____

Attn: William B Collett, Jr
Email: wbcjr55@gmail.com

**TARA CLUB ESTATES, INC.**

By: _____

Its: _____
<u>CEO</u>

Notice address:

2649 Charlestown Rd
New Albany, IN 47150
_____

Attn: William B Collett Jr
Email: wbcjr55@gmail.com

**FLORIDA GAMING CORPORATION**

By: _____

Its: _____
<u>CEO</u>

Notice address:

3500 NW 37th Ave
Miami, FL 33142
_____

Attn: William B Collett Jr
Email: wbcjr55@gmail.com

**FREEDOM HOLDING, INC.**

By: _____

Its: _____
President

Notice address:

2649 Charlestown Rd
New Albany, IN 4760
_____

Attn: William B Collett Jr
Email: wbcjr55@gmail.com

*Company Signature Page to Settlement Agreement*

**Execution Copy**

**THE COMMITTEE, ON ITS OWN
BEHALF**

By: _____
Its: ___Chairperson_____

Notice address:

_____
_____
_____
_____

Attn:
Email:

*Committee Signature Page to Settlement Agreement*

**Execution Copy**

**ABC FUNDING, LLC**

By:  Summit Partners Credit Advisors, L.P.
Its:  Manager

By:  Summit Master Company, LLC
Its:  General Partner

By:  _____

Name:  Tom Roberts

Title:  Member

Notice address:

222 Berkeley Street
17th Floor
Boston, MA 02116
Attn:  James Freeland
Email:  JFreeland@summitpartners.com

*ABC Signature Page to Settlement Agreement*

Execution Copy

**IN WITNESS WHEREOF**, the Parties hereto, each by persons duly authorized, have caused the Settlement Agreement to be executed as of the day and year first written above.

**WILLIAM B. COLLETT**

Notice address:

2669 Charlestown
New Albany, IN 47150

W. B. Collett
Attn:
Email:

**WILLIAM B. COLLETT, JR.**

Notice address:

6034 Springcrest Dr
Georgetown IN 47122

Attn: William B. Collett Jr
Email: wbcjr56@gmail.com

*Colletts Signature Page to Settlement Agreement*

<u>Exhibit A-1</u>

Non-Insider Subordination Agreements

1. Subordination Agreement dated as of April 25, 2011 between Florida Gaming Centers, Inc., Florida Gaming Corporation, Florida Lemark Corp. and Construct Design, Inc., and ABC Funding, LLC.

2. Management Fee Subordination Agreement dated as of April 25, 2011 between Florida Gaming Centers, Inc., Florida Gaming Corporation, Miami Casino Management, LLC, and ABC Funding, LLC.

3. Collateral Subordination Agreement dated as of April 25, 2011 between Florida Gaming Centers, Inc., Florida Gaming Corporation, City National Bank of Florida, AGS Capital, LLC, and ABC Funding, LLC.

4. Subordination Agreement dated as of April 25, 2011 between Florida Gaming Centers, Inc., Florida Gaming Corporation, Andrea S. Neiman, and ABC Funding, LLC.

5. Subordination Agreement dated as of April 25, 2011 between Florida Gaming Corporation, Florida Gaming Centers, Inc., Solomon O. Howell and James W. Stuckert, and ABC Funding, LLC.

3

<u>Exhibit A-2</u>

Non-Waived Modification Agreements

1. Modification Agreement dated as of April 25, 2011 between Solomon O. Howell and James W. Stuckert, Florida Gaming Corporation, and Florida Gaming Centers, Inc.

2. Modification, Assignment and Assumption Agreement dated as of April 25, 2011 by and among Andrea S. Neiman, Florida Gaming Centers, Inc., and Florida Gaming Corporation.

3. Modification, Assignment and Assumption Agreement dated as of April 25, 2011 by and among Freedom Holding, Inc., Florida Gaming Centers, Inc., and Florida Gaming Corporation.

4. Modification, Assignment and Assumption Agreement dated as of April 25, 2011 by and among Florida Lemark Corp., Construct Design, Inc., Florida Gaming Centers, Inc., and Florida Gaming Corporation.

ACTIVE 200551041v.1

<u>Exhibit A-3</u>

Insider Subordination Agreements

1.  Subordination Agreement dated as of April 25, 2011 between Florida Gaming Centers, Inc., Florida Gaming Corporation, Freedom Holding, Inc., and ABC Funding, LLC.

2.  Freedom Consulting Subordination Agreement dated as of April 25, 2011 between Florida Gaming Corporation, Florida Gaming Centers, Inc., Freedom Financial Corporation, and ABC Funding, LLC.

3.  Subordination Agreement dated as of April 25, 2011 between Florida Gaming Corporation, Florida Gaming Centers, Inc, Freedom Financial Corporation, and ABC Funding, LLC.

5

<u>Exhibit A-4</u>

Allowed Loan Claim Amount

The Loan Claim is subject to adjustment for, among other things, additional fees, expenses, and/or interest at the Default Rate that accrue on the Loan Claim between the Effective Date and the date of the Closing; provided, however, that post-petition professional fees accruing after the sale hearing through Closing shall be capped at an amount equal to $300,000, provided that Closing occurs on or before May 11, 2014.

Total Allowed Loan Claim: approximately $99,907,336.

Allowed Loan Claim Components:

$85,485,611 = Petition Date principal amount owed under the Credit Agreement <u>excluding</u> OID and Prepayment Premium.
$806,667 = OID accrued as of the Petition Date.
$1,325,807 = unpaid interest as of the Petition Date.
$2,750,055 = unpaid fees and expenses as of the Petition Date.
$10,877,406 = post-petition interest through the end of March, 2014.
$3,364,639 = post-petition professional fees through the end of March, 2014 (partially estimated based on blended monthly totals through January, 2014; will be updated to reflect actual fees for February through sale hearing).

Credit of $4,702,849.51 for adequate protection payments through end of March (partially estimated).

6

<u>Exhibit A-5</u>

Allowed Repurchase Claim Amount

The Repurchase Claim is allowed at the fixed amount of $37,000,000. No further interest will accrue on the Repurchase Claim.

$33,600,000 = amount owed as of the Petition Date.
$1,900,000 = half of post-petition interest accrued through March 31, 2014.
$1,500,000 = component of professional fees through Closing allocated to the Repurchase Claims.

7